Sophia M. Rios (SBN 305801)
BERGER MONTAGUE PC
401 B Street, Suite 2000
San Diego, CA 92101
Tel: (619) 489-0300
Email: srios@bm.net

[additional counsel listed on signature page]

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUSTIN DICKER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TUSIMPLE HOLDINGS, INC.; CHENG LU; PATRICK DILLON; XIAODI HOU; MO CHEN; JAMES MULLEN; MORGAN STANLEY & CO. LLC; CITIGROUP GLOBAL MARKETS INC.; J.P. MORGAN SECURITIES LLC; BOFA SECURITIES, INC.; CREDIT SUISSE SECURITIES (USA) LLC; COWEN AND COMPANY, LLC; NOMURA SECURITIES INTERNATIONAL, INC.; RBC CAPITAL MARKETS, LLC; NEEDHAM & COMPANY, LLC; OPPENHEIMER & CO. INC.; PIPER SANDLER & CO.; ROBERT W. BAIRD & CO. INCORPORATED; and VALUABLE CAPTIAL LIMITED,<br><br>Defendants. | Case No. **'22CV1300 LL    MSB**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Austin Dicker ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding TuSimple Holdings, Inc. ("TuSimple" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons who: (a) purchased or otherwise acquired TuSimple common stock pursuant and/or traceable to the Registration Statement and Prospectus (collectively, the "Registration Statement") issued in connection with TuSimple's April 15, 2021 initial public offering ("IPO") (the "IPO Class"); and/or (b) that purchased or otherwise acquired TuSimple securities between April 15, 2021 and August 1, 2022, both dates inclusive (the "Class Period") (the "10b-5 Class") (collectively, the "Classes"). Plaintiff brings strict liability, non-fraud claims under the Securities Act of 1933 (the "Securities Act") against all Defendants and fraud-based claims under the Securities Exchange Act of 1934 (the "Exchange Act") against TuSimple and certain senior executives, as detailed herein.

2.     TuSimple, headquartered in San Diego, develops autonomous technology specifically designed for semi-trucks in the United States and internationally. It is developing a line of purpose-built Level 4 ("L4") autonomous

semi-trucks for the North American market. The Company operates its Autonomous Freight Network ("AFN") L4 autonomous semi-trucks equipped with its autonomous driving technology. According to TuSimple, AFN is an ecosystem that consists of L4 autonomous semi-trucks, high-definition digital mapped routes, terminals, and TuSimple Connect, a cloud-based autonomous operations oversight system. Founded in 2015, the Company conducted its initial public offering in April 2021, and its securities trade on the Nasdaq Stock Market under the symbol "TSP."

3.    On April 15, 2021, TuSimple effected its IPO, selling 33.8 million class A common shares at $40.00 per share, generating $1.031 billion in gross proceeds. The Registration Statement contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein regarding TuSimple's business, operations, and prospects.

4.    On August 1, 2022, the *Wall Street Journal* published an article titled "Self-Driving Truck Accident Draws Attention to Safety at TuSimple," which brought to light a number of previously undisclosed concerns that undermined Defendants' representations and omissions concerning the Company's safety. The article referenced an April 6, 2022, accident involving a truck fitted with TuSimple's autonomous driving technology. Among many other things, the article reported that:

> [t]he accident, which regulators disclosed to the public in June after TuSimple filed a report on the incident, underscores concerns that the autonomous-trucking company is ***risking safety*** on public roads ***in a rush to deliver driverless trucks*** to market, ***according to independent analysts and more than a dozen of the company's former employees***.[1]

5.    On this news, TuSimple's shares fell $0.97 per share, or nearly 10%, from a closing price of $9.96 per share on July 29, 2022, to a closing price of $8.99 per share on August 1, 2022.

---

[1] Unless otherwise indicated, all emphasis herein is added and does not appear in the original text.

CLASS ACTION COMPLAINT

6. Throughout the Class Period, including in connection with the IPO effected by means of the Registration Statement, Defendants made materially false or misleading statements and/or failed to disclose, *inter alia*, that: (i) TuSimple's commitment to safety was significantly overstated and Defendants concealed fundamental problems with the Company's technology; (ii) TuSimple was rushing the testing of its autonomous driving technology in order to deliver driverless trucks to the market ahead of its more safety-conscious competitors; (iii) there was a corporate culture within TuSimple that suppressed or ignored safety concerns in favor of unrealistically ambitious testing and delivery schedules; (iv) the aforementioned conduct made accidents involving the Company's autonomous driving technology more likely; (v) the aforementioned conduct invited enhanced regulatory scrutiny and investigatory action toward the Company; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

7. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

8. As of the date of the filing of this Complaint, TuSimple shares traded as low as $7.05 per share, representing a decline of over 82% from the $40 IPO offering price.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11. Venue is proper in this Judicial District pursuant to Section 28 U.S.C.

§ 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v(a)), and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). TuSimple maintains its corporate headquarters in this Judicial District.

12.   In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

13.   Plaintiff, as set forth in the attached Certification, purchased or otherwise acquired TuSimple securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.   Defendant TuSimple is a Delaware corporation with principal executive offices located at 9191 Towne Centre Drive, Suite 600, San Diego, California 92122. The Company's common stock trades in an efficient market on the NASDAQ under the trading symbol "TSP."

15.   Defendant Cheng Lu ("Defendant Lu") was the Company's President and Chief Executive Officer ("CEO") during the Class Period until his resignation on March 3, 2022. Defendant Lu signed TuSimple's Forms 10-K and 10-Q filed with the SEC during the Class Period.

16.   Defendant Patrick Dillon ("Defendant Dillon") was at all relevant times the Company's Chief Financial Officer ("CFO") throughout the Class Period until his resignation on July 7, 2022. Defendant Dillon signed TuSimple's Forms 10-K and 10-Q filed with the SEC during the Class Period.

17.   Defendant Xiaodi Hou ("Defendant Hou") was TuSimple's co-founder. He served as Chief Technology Officer during the Class Period until March 3, 2022, at which point he was appointed to serve as President, CEO, and Chairperson of the Board. Defendant Hou signed TuSimple's Forms 10-Q during the Class Period.

18.     Defendant Mo Chen ("Defendant Chen") was TuSimple's co-founder, Executive Chairman, and director.  Prior to the Class Period, Defendant Chen served as CEO from 2015 to September 2020.

19.     Defendant James Mullen ("Defendant Mullen") was TuSimple's Chief Administrative and Legal Officer.

20.     Defendants Lu, Dillon, Hou, Chen, and Mullen are referred to herein collectively as the "Individual Defendants."

21.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the Company's IPO.

22.     Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter for the Company's IPO.

23.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the Company's IPO.

24.     Defendant BofA Securities, Inc. ("BofA") served as an underwriter for the Company's IPO.

25.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as an underwriter for the Company's IPO.

26.     Defendant Cowen and Company, LLC ("Cowen") served as an underwriter for the Company's IPO.

27.     Defendant Nomura Securities International, Inc. ("Nomura") served as an underwriter for the Company's IPO.

28.     Defendant RBC Capital Markets, LLC ("RBC") served as an underwriter for the Company's IPO.

29.     Defendant Needham & Company, LLC ("Needham") served as an underwriter for the Company's IPO.

30.     Defendant Oppenheimer & Co., Inc. ("Oppenheimer") served as an underwriter for the Company's IPO.

31.     Defendant Piper Sandler & Co. ("Piper Sandler") served as an underwriter for the Company's IPO.

32.     Defendant Robert W. Baird & Co. Incorporated ("Baird") served as an underwriter for the Company's IPO.

33.     Defendant Valuable Capital Limited ("Valuable Capital") served as an underwriter for the Company's IPO.

34.     Defendants listed in paragraphs 21 – 33 are referred to herein as the "Underwriter Defendants."

35.     The Individual Defendants possessed the power and authority to control the contents of TuSimple's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of TuSimple's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with TuSimple, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

36.     The Underwriter Defendants are liable for the materially false and misleading statements in the Registration Statement. In connection with the IPO, the Underwriter Defendants drafted and disseminated the Registration Statement and were paid significant fees and discounts in connection therewith. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

37.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

        a.     The Underwriter Defendants are investment banking houses that

specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the IPO and received millions of dollars in fees (collectively) for their service.

b.     The Underwriter Defendants also demanded and obtained an agreement from TuSimple and the Individual Defendants that TuSimple would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

c.     Representatives of the Underwriter Defendants also assisted TuSimple and the Individual Defendants in planning the IPO and were required to conduct an adequate and reasonable due diligence investigation into the business and operations of TuSimple. The due diligence investigation was required of the Underwriter Defendants in order to participate in the IPO. During the course of their purported due diligence, the Underwriter Defendants had continual access to internal, confidential, then current corporate information concerning TuSimple's most up-to-date operational and financial results and prospects, including the representations in the Registration Statement.

d.     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with TuSimple's lawyers, management and top executives and engaged in drafting sessions ahead of the IPO. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which TuSimple's share would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about TuSimple would be made in the Registration Statement; and (v) what responses would be made to the SEC, in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and TuSimple's management and

top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, TuSimple's existing problems and the misrepresentations and nondisclosures in the Registration Statement alleged herein.

e.    Finally, the Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of the TuSimple's registered and sold to Plaintiff and the other members of the IPO Class.

## SUBSTANTIVE ALLEGATIONS
### Background

38.    TuSimple, a Delaware corporation with principal executive offices in San Diego, California, describes itself as "a self-driving technology company with the mission to improve the safety and efficiency of the trucking industry." The Company, founded in 2015, is principally engaged in the operation and development of autonomous trucks and an autonomous freight network ("AFN"). According to the Company, it has "developed industry-leading autonomous technology specifically designed for semi-trucks." This technology has purportedly enabled the Company to build the world's first AFN in partnership with world-class shippers, carriers, railroads, freight brokers, fleet asset owners, and truck hardware partners.

39.    With respect to its AFN, the Company represents that:

> We currently operate on our [AFN] Level 4 ("L4") autonomous semi-trucks equipped with our autonomous driving technology. We also partner with OEMs, such as Navistar and Traton, that are seeking to manufacture purpose-built L4 autonomous semi-trucks capable of incorporating our autonomous driving technology, and may in the future partner with other OEMs. In addition to OEMs, we depend on other third parties, such as ZF, Knorr-Bremse, and Nvidia, to produce components for our L4 autonomous semi-trucks.

40.    On December 23, 2020, TuSimple submitted to the SEC a draft Registration Statement on Form S-1 relating to a proposed IPO of its common shares.

41.     After receiving correspondence from the SEC, on February 16, 2021, TuSimple filed a revised draft Registration Statement on Form DRS/A with the SEC, following by another revision on March 8, 2021.

42.     On March 23, 2021, the Company filed the operative Registration Statement on Form S-1.

43.     On April 7, 2021, the Company filed an Amendment No. 1 to the Registration Statement.

44.     On April 14, 2021, the Registration Statement was declared effective.

45.     On April 16, 2021, the Company filed with the SEC its Prospectus on Form 424B4 with the SEC, which incorporated and formed part of the Registration Statement. Pursuant to the Registration Statement, Defendants offered and sold 33,783,783 Class A common shares at $40 per share, raising total proceeds of approximately $1.031 billion.

46.     TuSimple's common stock started trading on the NASDAQ under the symbol "TSP."

47.     The Registration Statement for TuSimple's IPO was negligently prepared and, as a result, contained materially false and misleading statements of fact and failed to disclose material facts required to be disclosed under the rules and regulations applicable to its preparation.

**Materially False and Misleading Statements Issued During the Class Period**

48.     The Class Period begins on April 15, 2021, the date of TuSimple's IPO. In the IPO, the Company sold 33.8 million class A common shares pursuant to the Registration Statement at $40.00 per share, generating gross proceeds of $1.031 billion.

49.     In the offering documents issued in connection with the IPO, Defendants made a number of representations regarding the performance and safety of TuSimple's self-driving technology, all of which were designed to encourage investment in the Company by raising expectations about the Company's prospects.

For instance, in the overview of the Company set forth in the Prospectus, Defendants touted TuSimple's purportedly "industry-leading" L4 autonomous technology, which has resulted in more than 5,700 orders:

> We are an autonomous technology company that is revolutionizing the estimated $4 trillion global truck freight market. We have developed *industry-leading autonomous technology* specifically designed for semi-trucks, which has enabled us to build the world's first Autonomous FreightNetwork ("AFN") in partnership with world-class shippers, carriers, railroads, freight brokers, fleet asset owners, and truck hardware partners. We believe that our technology and our AFN will make long haul trucking significantly *safer as well as more reliable*, efficient and environmentally friendly, creating significant benefits for all who rely on the freight ecosystem to deliver essential goods.

> Since our founding in 2015, we have developed a fully integrated software and hardware solution enabling what we believe is the world's most advanced Level 4 ("L4") driver-out autonomous semi-truck technology. Hallmarks of our proprietary semi-truck specific technology include our 1,000 meter perception range, 35 second planning horizon, high definition ("HD") maps with accuracy within five centimeters, and an integrated L4 autonomous semi-truck design comprising of a fully redundant sensor suite and components. Long-range perception, advanced planning and decision-making, and highly accurate mapping are critical capabilities for the autonomous operation of semi-trucks, which are heavy, articulated vehicles that need to be able to operate at highway speeds. *We believe that we are the first and only company to demonstrate these capabilities and achieve L4 autonomous semi-trucks driving on both highways and surface streets as well as the first company to autonomously haul apaid freight load. We further believe that our technological differentiation and unique go-to-market strategy is a key driver of the over 5,700 reservations which we received as of March 23, 2021 in four months of availability* for our purpose-built L4 autonomous semi-trucks.

50.   Along the same lines, Defendants represented in the Prospectus that:

> We believe that our Autonomous Freight Network will address the trucking industry's most pressing challenges and *will revolutionize the way freight moves*. Our AFN is designed to provide a comprehensive, turnkey, autonomous freight solution that supplies users with access to purpose-built L4 autonomous semi-trucks operating on HD digital mapped routes connecting a nationwide network of terminals.

51.    In the Prospectus, Defendants also touted its technology as a transformative of the trucking industry in particular, stating:

> We are developing a Level 4 autonomous technology solution specifically designed for the unique demands of semi-trucks. L4 autonomy is characterized by the ability of the vehicle to perform all driving functions under a given set of pre-specified conditions. ***We believe that our L4 autonomous capabilities are well suited for "middle mile" truck freight—in which fixed, predictable, and primarily highway routes make up the majority of total miles driven on a shipping route—and focusing on this opportunity will optimize our path to commercialization.*** Autonomous trucking also presents unique challenges, primarily due to the size of long haul semi-trucks and the speed at which these semi-trucks typically operate. We believe that being the first company to focus exclusively on semi-truck autonomy positions us to lead the development of the solutions to these challenges and capitalize on the autonomous truck freight opportunity. Our leading autonomous technology enables semi-trucks to drive day or night on both the highway and surface streets and in other poor weather conditions. Semi-trucks with our leading autonomous technology can travel at speeds of up to 75 miles per hour.

52.    Similarly, Defendants characterized their network of partners as "world class" and "de-risk" the commercialization of its autonomous freight network and result in "rapid adoption":

> We have created a ***world class*** ecosystem of partners consisting of shippers, carriers, railroads, freight brokers, fleet asset owners, OEMs, Tier 1 components suppliers, and third party service providers that we believe will ***de-risk commercialization of the AFN, enable rapid adoption of our autonomous freight solution***, and allow us to build an attractive, network based business model.

53.    Importantly, Defendants touted the safety of its purportedly "world class" sensor system that will provide its semi-trucks with a one-thousand-meter "perception range." According to the Prospectus:

> Our proprietary sensor system is critical to our L4 autonomous semi-trucks' perception range and accuracy. ***We designed a proprietary camera module coupled with our proprietary software that enables the semi-truck's 1,000 meter perception range, even in low light conditions.*** This range across lighting environments is designed to provide our semi-trucks with ***sufficient***

***reaction time to safely operate at highway speeds, ultimately allowing for a planning horizon up to 35 seconds***. Our camera-centric system is powered by both primary and backup cameras, ***providing a fully redundant camera system for increased safety***. Augmenting the camera perception is an array of LiDAR, radar systems, GPS, and ultrasonic sensors. Our combined use of cameras and sensors provides our semi-trucks with superior perception range, while also being highly accurate in different road scenarios. With the exception of our specially designed long range high definition camera, we have sourced the balance of our sensor suite from existing third party products in order to reduce the cost of the overall system.

54.     Defendants also touted TuSimple's mapping technology and monitoring system as crucial to safety:

Our in-house mapping technology can quickly map new routes and provide users with more location options for shipping on our AFN. Our proprietary mapping technology and process is accurate to within five centimeters. ***Precise localization accuracy is crucial to safely operate semi-trucks autonomously given the 8.5 foot average tractor width, particularly when travelling on local streets which average just 10 feet wide***. We are able to map new routes at a rate of over 250 miles per week which translates into our ability to map atypical "middle mile" route for a user in approximately four weeks on average. This nimble, flexible approach allows us to quickly meet our users' evolving freight demands while efficiently expanding our network.

***

Our seamless user experience is enhanced by our proprietary TuSimple connect system. This ***cloud-based autonomous operations oversight system is designed to ensure safe operations, reliability, and efficient capacity for our users***. The system directly connects to our users' Transportation Management Systems, integrating TuSimple Connect into their supply chain and creating a close user relationship. Our users can book and track their freight seamlessly with real-time two way communication that allows our AFN to dynamically match freight supply with demand.

55.     Defendants also emphasized to investors its "leader" status in the autonomous trucking industry, stating for instance:

***We have accomplished many first of their kind milestones*** for an L4 autonomous semi-truck technology company. ***We believe that we are further***

***in the development of our autonomous technology and closest to commercialization than any L4 autonomous semi-truck technology company***.

• First to announce partnerships with OEMs via our Navistar and TRATON partnerships

• First to announce an investment from a major carrier when UPS invested in our company in 2019

• First to establish a near highway terminal for autonomous commercial freight operations

• First and only to demonstrate L4 autonomous semi-truck driving on both surface streets and highways

• First L4 autonomous semi-truck to haul a paid freight load

56.     Defendants further emphasized for investors that its technology and business model had been validated by the partnerships into which TuSimple had entered, which rendered the Company superior to its competitors. In particular, the Prospectus stated that:

> Our partnerships with, and in some cases investments from, sophisticated companies from the freight and technology industries, such as NVIDIA, UPS, Navistar, TRATON, U.S. Xpress, Werner, Schneider, and CN, ***validate the strength of our technology and our business model***. We believe that we have ***the most significant and most numerous points of external validation of our technology and approach among autonomous trucking technology companies***.

57.     On May 10, 2021, TuSimple filed with the SEC a Form 8-K which attached a "Q1 2021 Letter to Shareholders," also dated May 10, 2021, in which Defendants shared with investors the Company's financial results for the first quarter 2021, ended March 31, 2021 ("Q1 2021"). In the Q1 2021 Letter to Shareholders, Defendants touted the development and progress of its technology, stating:

> We continued to gain momentum throughout Q1, refining our proprietary artificial intelligence technology and designing our purpose-built L4, Class 8 truck with Navistar. Alongside these technology developments, we led the

industry in building autonomous vehicle ecosystem partnerships and expanded our Autonomous Freight Network (AFN), never losing sight of our mission to enable reliable, low-cost freight capacity as a service *while setting a new standard for safety* and fuel efficiency.

\*\*\*

Our proprietary AI-based technology continues to set the industry standard and positions us as the leader in autonomous trucking.

58.    In addition, the Q1 2021 Letter to Shareholders outlined a four-phase development plan for TuSimple's "autonomous semi-truck technology" intended to "remove the requirement for driver supervision." According to Defendants, the goal of the "Driver-Out" pilot program "is to publicly demonstrate the safety, maturity, and functionality of our virtual driving system, including commercial operation at night, on our AFN." Defendants described the four phases of the Driver-Out program as follows:

We have divided the development of our Driver-Out pilot program into 4 phases. Phase 1 was focused on designing the autonomous system architecture and Phase 2 focused on developing our first prototype. We are currently in Phase 3, targeted at bringing up our testing fleet with Phase 4 as final validation, which we aim to complete in Q4.

59.    The Q1 2021 Letter to Shareholders included a number of additional representations regarding the state of the Company's technology, including, without limitation:

**Our Perception System's Capabilities**

One of the most important features in TuSimple's technology stack is the long range perception system. Our L4 truck can perceive and understand road situations for up to 1,000 meters forward and 300 meters in all directions providing up to a 35 second planning horizon. At 75 mph, a fully loaded semi-truck has ~2x the kinetic energy versus 55 mph. To travel at top highway speeds, a long planning horizon is necessary for safe L4 operation.

\*\*\*

CLASS ACTION COMPLAINT

We have designed a state-of-the-art system for image-based perception. Our camera-centric architecture combines multiple sensors (cameras, LiDARs and radars) with TuSimple Computer Vision technology, processing 600 trillion operations per second…. Our Computer Vision technology has broken 10 world records, ranking first at KITTI, Cityscapes, and on Waymo's 2020 Open Dataset for 2D perception.

\*\*\*

### Seeing is Not Enough: Proprietary AI Interpretation

Our perception system provides rich context information about road conditions and behavior of other road users, which is essential for safety. Our L4 truck is not only aware of other vehicles but also their distance, speed, and vehicle type. Furthermore, it attempts to predict their intentions and future maneuvers. The system also performs extensive scenario classification to understand the entire context of the road.

\*\*\*

### End Result: Unmatched Capabilities for TuSimple

Our 1,000 meter perception has enabled us to be the only AV trucking company to demonstrate autonomous operations on both surface streets and highways up to 75 mph, positioning us as the industry leader.

60.   On May 11, 2021, TuSimple filed on Form 10-Q its quarterly report for Q1 2021 ("Q1 2021 10-Q"). In the Q1 2021 10-Q, Defendants made a number of representations regarding safety, including:

> ***Since the market for autonomous solutions is relatively new and disruptive, if our L4 autonomous driving technology fails to gain acceptance from users and other stakeholders in the freight transportation industry, our business, prospects, operating results, and financial condition could be materially harmed.***
>
> Demand for autonomous driving technology depends to a large extent on general, economic, political, and social conditions in a given market. The market opportunities we are pursuing are at an early stage of development, and it is difficult to predict user demand or adoption rates for our solutions,

15

including the AFN, or the future growth of the markets in which we operate. Despite the fact that the automotive industry has engaged in considerable effort to research and test L2 and L3 autonomous cars, our technology targeting L4 autonomous semi-trucks requires significant investment and may never be commercially successful on a large scale, or at all.

Further, even if we succeed in operating at commercial scale, because of the disruptive nature of our business to the freight transportation industry, key industry participants may not accept our AFN, may develop competing services or may otherwise seek to subvert our efforts. For example, autonomous semi-trucks might displace individual semi-truck drivers and small fleet owners. Labor unions may also raise concerns about autonomous semi-trucks displacing drivers or otherwise negatively affecting employment opportunities for their members, as has been the case in other industries that have been subject to automation. This has in the past resulted, and could in the future result, in negative publicity, lobbying efforts to U.S. local, state, and federal, lawmaking authorities, or equivalent authorities in the foreign jurisdictions in which we seek to do business, to implement legislation or regulations that make it more difficult to operate our business or boycotts of us or our users. Any such occurrences could materially harm our future business.

Additionally, regulatory, safety, and reliability issues, or the perception thereof, many of which are outside of our control, could also cause the public or our potential partners and users to lose confidence in autonomous solutions in general. The safety of such technology depends in part on user interaction and users, as well as other drivers, pedestrians, other obstacles on the roadways or other unforeseen events. For example, there have been several crashes involving automobiles of other manufacturers resulting in death or personal injury where autopilot features are engaged. Even though these incidents were unrelated to our AFN and our technology, such cases resulted in significant negative publicity and, in the future, could result in suspension or prohibition of self-driving vehicles. If safety and reliability issues for autonomous driving technology cannot be addressed properly, our business, prospects, operating results, and financial condition could be materially harmed.

***Our autonomous driving technology and related hardware and software could have undetected defects, errors or bugs in hardware or software which could create safety issues, reduce market adoption, damage our reputation with current or prospective users or expose us to product liability and other claims that could materially and adversely affect our business.***

CLASS ACTION COMPLAINT

Our autonomous driving technology is highly technical and very complex, and has in the past and may in the future experience defects, errors or bugs at various stages of development. We may be unable to timely correct problems to our partners' and users' satisfaction. Additionally, there may be undetected errors or defects especially as we introduce new systems or as new versions are released. These risks are particularly prevalent in the highly competitive freight transport market, as any such errors or defects could delay or prevent the adoption of autonomous driving technology in trucks. Errors or defects in our products may only be discovered after they have been tested, commercialized, and deployed. If that is the case, we may incur significant additional development costs and product recall, repair or replacement costs, or more importantly, liability for personal injury or property damage caused by such errors or defects, as these problems would also likely result in claims against us. Our reputation or brand may be damaged as a result of these problems and users may be reluctant to use our services, which could adversely affect our ability to retain existing users and attract new users, and could materially and adversely affect our financial results.

In addition, we could face material legal claims for breach of contract, product liability, tort or breach of warranty as a result of these problems. Any such lawsuit may cause irreparable damage to our brand and reputation. In addition, defending a lawsuit, regardless of its merit, could be costly and may divert management's attention and adversely affect the market's perception of us and our services. In addition, our business liability insurance coverage could prove inadequate with respect to a claim and future coverage may be unavailable on acceptable terms or at all. These product-related issues could result in claims against us and our business could be materially and adversely affected.

***The operation of our L4 autonomous semi-trucks is different from non-autonomous semi-trucks and may be unfamiliar to our users and other road users.***

We have specifically engineered our L4 autonomous semi-trucks with our technology to provide a superior ability to sense, predict, and react to real-world driving situations. Our proprietary artificial intelligence ("AI") and machine vision capabilities are specifically engineered to meet the demands of commercial trucks. In certain instances, these protections may cause the vehicle to behave in ways that are unfamiliar to drivers of non-autonomous driving trucks. For example, our L4 autonomous semi-trucks adhere strictly to safety rules, including stopping for three seconds at a stop sign. These safety

rules may not be strictly adhered to by human drivers, and thus may be unfamiliar or come as a surprise to other drivers on the road.

Furthermore, there can be no assurance that our users will be able to properly adapt to the different operation processes for our L4 autonomous semi-trucks. For example, they may not be able to adapt their business processes to address activities such as the dispatching of trucks, pre-trip inspections, remote monitoring, and rescuing of trucks. Any accidents resulting from such failure to operate our L4 autonomous semi-trucks properly could harm our brand and reputation, result in adverse publicity, and product liability claims, and have a material adverse effect on our business, prospects, financial condition, and operating results.

61.   In the Q1 2021 10-Q, Defendants further warned of the impact of performance failures and product recalls that could materially and adversely impact the Company's business:

> ***If our L4 autonomous semi-trucks fail to perform as expected, our ability to develop our AFN and market, sell or lease our purpose-built L4 autonomous semi-trucks could be harmed. Future product recalls involving our purpose-built L4 autonomous semi-trucks or hardware deployed on our L4 autonomous semi-trucks could materially and adversely affect our business, prospects, operating results, and financial condition.***

> Our L4 autonomous semi-trucks and, once production begins, our purpose-built L4 autonomous semi-trucks may contain defects in design and manufacture that may cause them not to perform as expected or may require repair. For example, our L4 autonomous semi-trucks currently use, and our purpose-built L4 autonomous semi-trucks are expected to use, a substantial amount of software to operate which will require modification and updates over the life of the vehicle. Software products are inherently complex and often contain defects and errors when first introduced. There can be no assurance that we will be able to detect and fix any defects in the semi-trucks' hardware or software prior to commencing user sales or during the life of the trucks. Our purpose-built L4 autonomous semi-trucks may not perform consistent with users' expectations or consistent with other trucks that may become available. Any product defects or any other failure of our purpose-built L4 autonomous semi-trucks to perform as expected could harm our reputation, ability to develop our AFN and result in adverse publicity, lost revenue, delivery delays, product recalls, product liability claims, and significant warranty and other

expenses, and could have a material adverse impact on our business, financial condition, operating results, and prospects.

Once production begins, we may experience recalls involving our purpose-built L4 autonomous semi-trucks, which could adversely affect our brand in our target markets and could adversely affect our business, prospects, and results of operations. Any product recall in the future may result in adverse publicity, damage our brand, and materially adversely affect our business, prospects, operating results, and financial condition. In the future, we may voluntarily or involuntarily, initiate a recall if any of our purpose-built L4 autonomous semi-truck components (including LiDAR sensors, cameras, and other components) prove to be defective or noncompliant with applicable motor vehicle safety standards. Such recalls typically involve significant expense and diversion of management attention and other resources, which could adversely affect our brand image, as well as our business, prospects, financial condition, and results of operations.

62.   The Q1 2021 10-Q further included representations regarding the Company's exposure resulting from harm or injury caused by its technology, including the following:

***We may be subject to product liability or warranty claims that could result in significant direct or indirect costs, including reputational harm, increased insurance premiums or the need to self-insure, which could adversely affect our business and operating results.***

Our technology is used for autonomous driving, which presents the risk of significant injury, including fatalities. We may be subject to claims if one of our or a user's semi-truck is involved in an accident and persons are injured or purport to be injured or if property is damaged. Any insurance that we carry may not be sufficient or it may not apply to all situations. The risk of serious injury, death, and substantial damage to property is much higher with a substantially heavier fast-moving autonomous semi-truck, as compared to a collision with a slower moving autonomous passenger car in an urban environment. In accidents involving semi-trucks, most of the resulting fatalities are victims outside of the semi-truck. If we experience such an event or multiple events, our insurance premiums could increase significantly or insurance may not be available to us at all. Further, if insurance is not available on commercially reasonable terms, or at all, we might need to self-insure. In addition, lawmakers or governmental agencies could pass laws or

adopt regulations that limit the use of autonomous trucking technology or increase liability associated with its use. Any of these events could adversely affect our brand, relationships with users, operating results, or financial condition.

63.   Also in the Q1 2021 10-Q, with respect to risks related to the regulatory environment in which TuSimple operates, Defendants represented that:

***Our business may be adversely affected by changes in automotive safety regulations or concerns that drive further regulation of the automobile safety market.***

Government vehicle safety regulations have a substantial impact on our business, prospects, and our future plans. Government safety regulations are subject to change based on a number of factors that are not within our control, including new scientific or technological data, adverse publicity regarding industry recalls and safety risks associated with autonomous driving technology, accidents involving autonomous vehicles, domestic and foreign political developments or considerations, and litigation relating to autonomous vehicles. Changes in government regulations, especially in autonomous driving and the freight industry could adversely affect our business. If government priorities shift and we are unable to adapt to changing regulations, our business may be materially and adversely affected.

The costs of complying with safety regulations could increase as regulators impose more stringent compliance and reporting requirements in response to product recalls and safety issues in the automotive industry. As the semi-trucks that carry our systems go into production, we would be subject to existing stringent requirements under the National Traffic and Motor Vehicle Safety Act of 1966 (the "Vehicle Safety Act"), including a duty to report, subject to strict timing requirements, safety defects. The Vehicle Safety Act imposes potentially significant civil penalties for violations including the failure to comply with such reporting actions. We are also subject to the existing U.S. Transportation Recall Enhancement, Accountability and Documentation Act (the "TREAD Act"), which requires motor vehicle equipment manufacturers, such as us, to comply with "Early Warning" requirements by reporting certain information to the National Highway Traffic Safety Administration (the "NHTSA") such as information related to defects or reports of injury. The TREAD Act imposes criminal liability for violating such requirements if a defect subsequently causes death or bodily injury. In addition, the National Traffic and Motor Vehicle Safety Act authorizes NHTSA to require a

manufacturer to recall and repair vehicles that contain safety defects or fail to comply with U.S. federal motor vehicle safety standards. Sales into foreign countries may be subject to similar regulations. If we cannot rapidly address any safety concerns or defects with our products, our business, results of operations, and financial condition will be adversely affected.

The U.S. Department of Transportation issued regulations in 2016 that require manufacturers of certain autonomous vehicles to provide documentation covering specific topics to regulators, such as how automated systems detect objects on the road, how information is displayed to drivers, what cybersecurity measures are in place and the methods used to test the design and validation of autonomous driving systems. If the obligations associated with complying with safety regulations increase it may require increased resources, divert management's attention, and adversely affect our business.

***We are subject to substantial regulations, including regulations governing autonomous vehicles, and unfavorable changes to, or failure by us to comply with, these regulations could substantially harm our business and operating results.***

Our L4 autonomous semi-trucks are subject to substantial regulation under international, federal, state, and local laws. Regulations designed to govern autonomous vehicle operation, testing and/or manufacture are still developing and may change significantly. These regulations could include requirements that significantly delay or narrowly limit the commercialization of autonomous vehicles, limit the number of autonomous vehicles that we can manufacture or use on our platform, impose restrictions on the number of vehicles in operation and the locations where they may be operated or impose significant liabilities on manufacturers or operators of autonomous vehicles or developers of autonomous vehicle technology. If regulations of this nature are implemented, we may not be able to commercialize our autonomous vehicle technology in the manner we expect, or at all. In addition, the costs of complying with such regulations could be prohibitive and prevent us from operating our business in the manner we intend.

Further, we are subject to international, federal, state, and local laws and regulations, governing pollution, protection of the environment, and occupational health, and safety, including those related to the use, generation, storage, management, discharge, transportation, disposal, and release of, and human exposure to, hazardous and toxic materials. Such laws and regulations have tended to become more stringent over time.

CLASS ACTION COMPLAINT

Fines, penalties, costs or liabilities associated with such existing or new regulations or laws, including as a result of our failure to comply, could be substantial and in certain cases joint and several, and could adversely impact our business, prospects, financial condition, and operating results.

64.     In connection with the Q1 2021 10-Q, Defendants Lu and Dillon each executed a certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), and certified that:

1.     I have reviewed this Quarterly Report on Form 10-Q of TuSimple Holdings Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

65.    Also pursuant to Section 906 of the Sarbanes-Oxley Act, Defendants Lu and Dillon certified that the Q1 2021 10-Q "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company."

66.    On August 6, 2021, TuSimple filed with the SEC its quarterly report on Form 10-Q for the second quarter 2021, ended June 30, 2021 ("Q2 2021 10-Q"). The Q2 2021 10-Q included the same or substantially similar representations regarding safety, the risks and exposure to the Company of performance failures, and the risks regarding the Company's regulatory environment as Defendants made in the Q1 2021 10-Q as alleged in paragraphs 60 – 63, *supra*.

67.     Moreover, in the Q2 2021 10-Q, Defendants Lu and Dillon executed certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act, as set forth in paragraphs 64 – 65, *supra*.

68.     On November 4, 2021, TuSimple filed with the SEC its quarterly report on Form 10-Q for the third quarter 2021, ended September 30, 2021 ("Q3 2021 10-Q").  The Q3 2021 10-Q included the same or substantially similar representations regarding safety, the risks and exposure to the Company of performance failures, and the risks regarding the Company's regulatory environment as Defendants made in the Q1 2021 10-Q as alleged in paragraphs 60 – 63, *supra*.

69.     Moreover, in the Q3 2021 10-Q, Defendants Lu and Dillon executed certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act as set forth in paragraphs 64 – 65, *supra*.

70.     On February 24, 2022, TuSimple filed with the SEC its annual report on Form 10-K for the fourth quarter and full year 2021, ended December 31, 2021 ("2021 10-K").   The 2021 10-K included the same or substantially similar representations regarding safety, the risks to the Company of performance failures, and the risks regarding the Company's regulatory environment as Defendants made in the Q1 2021 10-Q as alleged in paragraphs 60 – 63, *supra*.

71.     Moreover, in the 2021 10-K, Defendants Lu and Dillon executed certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act as set forth in paragraphs 64 – 65, *supra*.

72.     On March 3, 2022, on Form 8-K filed with the SEC, the Company announced that Defendant Lu was resigning as President, CEO, and as a member of TuSimple's Board of Directors, effective immediately. Also resigning was Executive Chairman of the Board Mo Chen.  According to the 8-K, the Board had appointed Defendant Hou, TuSimple's co-founder and then-Chief Technology Officer to serve as President, CEO, and Chairperson of the Board.

73.    On May 4, 2022, TuSimple filed with the SEC its quarterly report on Form 10-Q for the first quarter 2022, ended March 31, 2022 ("Q1 2022 10-Q").  The Q1 2022 10-Q included the same or substantially similar representations regarding safety, the risks and exposure to the Company of performance failures, and the risks regarding the Company's regulatory environment as Defendants made in the Q1 2021 10-Q as alleged in paragraphs 60 – 63, *supra*.

74.    Moreover, in the Q1 2022 10-Q, Defendants Hou and Dillon executed certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act as set forth in paragraphs 64 – 65, *supra*.

75.    The statements referenced in paragraphs 49 – 74, *supra*, were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, these statements misrepresented and/or failed to disclose that: (i) TuSimple's commitment to safety was significantly overstated and Defendants concealed fundamental problems with the Company's technology; (ii) TuSimple was rushing the testing of its autonomous driving technology in order to deliver driverless trucks to the market ahead of its more safety-conscious competitors; (iii) there was a corporate culture within TuSimple that suppressed or ignored safety concerns in favor of unrealistically ambitious testing and delivery schedules; (iv) the aforementioned conduct made accidents involving the Company's autonomous driving technology more likely; (v) the aforementioned conduct invited enhanced regulatory scrutiny and investigatory action toward the Company; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

## **The Truth Emerges**

76.    On August 1, 2022, the *Wall Street Journal* published an article titled "Self-Driving Truck Accident Draws Attention to Safety at TuSimple." The article, which shed light on an accident involving a truck fitted with TuSimple's autonomous

driving technology, gave investors cause to question Defendants' representations regarding the Company's approach to safety in the development and launch of its technology. The article also reported that federal regulators were investigating the Company. In pertinent part, the article stated that:

> On April 6, an autonomously driven truck fitted with technology by TuSimple Holdings Inc. suddenly veered left, cut across the I-10 highway in Tucson, Ariz., and slammed into a concrete barricade.
>
> The accident, which regulators disclosed to the public in June after TuSimple filed a report on the incident, *underscores concerns that the autonomous-trucking company is risking safety on public roads in a rush to deliver driverless trucks to market, according to independent analysts and more than a dozen of the company's former employees*.
>
> ***
>
> The Federal Motor Carrier Safety Administration, an agency within the Transportation Department regulating trucks and buses, has launched what it described in a May 26 letter to the company as a "*safety compliance investigation" into TuSimple*. The letter referenced the accident.
>
> The April incident involved a rig with a TuSimple driver and engineer aboard, and the company has repeatedly blamed the accident on human error. But details in the June regulatory disclosure, along with internal company documents, show what autonomous-driving-system specialists say are *fundamental problems with the company's technology*.
>
> ***
>
> But researchers at Carnegie Mellon University said it was the autonomous-driving system that turned the wheel and that *blaming the entire accident on human error is misleading*. Common safeguards would have prevented the crash had they been in place, said the researchers, who have spent decades studying autonomous-driving systems.
>
> For example, a safety driver—a person who sits in the truck to backstop the artificial
>
> intelligence—should never be able to engage a self-driving system that isn't properly functioning, they said. The truck also shouldn't respond to commands that are even a couple hundredths of a second old, they said. And

26

the system should never permit an autonomously-driven truck to turn so sharply while traveling at 65 miles an hour.

"***This information shows that the testing they are doing on public roads is highly unsafe***," said Phil Koopman, an associate professor at Carnegie Mellon who has contributed to international safety standards for autonomous vehicles, referring to the company's disclosures.

TuSimple said that after the accident, it modified its autonomous-driving system so that a human can't engage it unless the computer system is fully functional. A former TuSimple engineer said the move was ***long overdue***.

*** 

The National Highway Traffic Safety Administration is joining the DOT agency investigation into TuSimple.

***

So far, TuSimple's rivals, including Aurora Innovation Inc. and Embark Technology Inc., have refrained from testing unmanned trucks on public highways because the technology hasn't developed enough to satisfy their own safety standards, according to public statements by the companies and investor filings.

Don Burnette, chief executive of autonomous-trucking startup Kodiak Robotics Inc., said his firm is leaving safety drivers in the cab until he can confirm that his trucks operate more safely than an attentive human driver.

TuSimple's April accident involved a truck with an engineer and safety driver. But TuSimple is also testing trucks without drivers on public roads and announced in December 2021 that it had completed one such trip of 80 miles in Arizona. ***That distance far exceeds those of the handful of other companies that have attempted driverless runs***, and TuSimple said it has since logged hundreds of miles more without any human in the cab.

TuSimple's founder, Xiaodi Hou, a graduate of the California Institute of Technology who holds a Ph.D. in computation and neural systems, said the December event showed the company had cleared the final technological hurdle ahead of commercializing autonomous trucks. "We have actually no unconquered technical challenges on the table," Mr. Hou said in a March interview on CNBC.

CLASS ACTION COMPLAINT

TuSimple had set a goal of 500 practice runs before launching "Ghost Rider," the internal name for the December driverless run, according to people familiar with the matter. ***But it had conducted less than half of those when it launched the fully automated drive, which it did without informing its security teams. They learned of the event only after it occurred, one of the people said***. A TuSimple spokesman said the company proceeded with the driverless test "after addressing any and all legitimate concerns."

***TuSimple's accident follows years of management rebuffing what some former employees say were significant safety and security complaints. In late 2021, a group of employees raised some of these issues with the legal department, according to people familiar with the matter***. A presentation included the company's alleged ***failure to check software regularly for vulnerabilities and use of unencrypted communications to manage trucks***, which could provide an opening for hackers to intercept data going between engineers and the vehicles' systems, the people said.

***Safety drivers, meanwhile, have flagged concerns about failures in a mechanism that didn't always enable them to shut off the self-driving system*** by turning the steering wheel, a standard safety feature, other people familiar with the matter said. ***Company management dismissed the safety drivers' concerns***, the people said.

\*\*\*

TuSimple was the first autonomous-trucking startup to tap the public markets, listing shares on the Nasdaq Composite Index in April 2021 with a valuation of $8.5 billion. Other rivals soon followed suit. Some analysts worry that pressures to deliver results to investors, expecting near-term returns, might come at the expense of public safety. "***The industry is enormously incentivized to go as fast as they can***," said Mr. Koopman.

\*\*\*

Meanwhile, dozens of employees in key roles have departed and Mr. Hou has moved to consolidate control over the company he started, according to former employees. The moves reflect his efforts to avoid executives pushing back on his rush to get products to market, these people say. On March 3, the company announced the departure of its chief executive and said Mr. Hou would take on that role.

Mr. Hou, the company's largest stakeholder, also became chairman of the board. On June 21, TuSimple announced the departure of Chief Financial

CLASS ACTION COMPLAINT

Officer Patrick Dillon, who held that position for about a year and a half. No successor has been announced.

*** 

***People familiar with the matter say those who raised safety concerns were ignored, or even fired in some instances, which the company spokesman denied. John Lindland, once the company's top safety official, said in a lawsuit filed in federal court in California in March 2021 that he was wrongfully fired after he refused to sign off on safety standards that he said the company had yet to meet.***

"Essentially, Mr. Hou would come up with an idea, instruct his teams to execute the idea, and then would test the idea on public roads, bypassing all safety standards and regulations," Mr. Lindland said in a filing in the case, which is pending.

77.   In fact, in his wrongful termination complaint,[2] John Lindland ("Lindland"), the former TuSimple safety engineer quoted in the *Wall Street Journal* article, alleges highly troubling conduct on the part of the Company and Defendant Hou that calls into question TuSimple's Class Period representations regarding safety. For instance, during his year-and-a-half tenure at TuSimple that spanned from August 2018 through March 2020, Lindland was given the impression that management considered Functional Safety "a waste of [Defendant Hou's team's] time," and yet management "*falsely* advertis[ed] to their customers how Function Safety is _concern number one_ at TuSimple." (Emphasis in original.)   Lindland's complaint details numerous incidents underscoring that "Lindland was wrongfully terminated under the excuse that he was 'disruptive' and 'did not do his job,' while the real reason for his termination was the fact that he would not falsify information with respect to safety…."[3]

---

[2] *Lindland v. TuSimple, Inc.*, Case No. 3:21-cv-00417-RBM-MDD (S.D. Cal.) at ECF No. 1.

[3] As of the filing of this Complaint, the parties in the Lindland wrongful termination suit are briefing summary judgment.  *Lindland*, ECF Nos. 56, 57

CLASS ACTION COMPLAINT

78.     On this news, shares of TuSimple plummeted 9.8%, falling $0.97 per share, from a closing price of $9.96 per share on July 29, 2022 to a closing price of $8.99 per share on August 1, 2022.

79.     As of the date of the filing of this Complaint, TuSimple shares traded as low as $7.05 per share, representing a decline of over 82% from the $40 IPO offering price.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

80.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons and entities other than Defendants who: (a) purchased or otherwise acquired TuSimple common stock pursuant and/or traceable to the Registration Statement and Prospectus issued in connection with TuSimple's April 15, 2021 IPO, defined previously as the "IPO Class"; and/or (b) that purchased or otherwise acquired TuSimple securities during the Class Period – namely, between April 15, 2021 and August 1, 2022, both dates inclusive, defined previously as the "10b-5 Class"; and were damaged thereby (the "Classes"). Excluded from the Classes are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

81.     The members of the Classes are so numerous that joinder of all members is impracticable. Throughout the Class Period, TuSimple securities were actively traded on the NASDAQ. While the exact number of Classes members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Classes. Record owners and other members of the Classes may be identified from records maintained by TuSimple or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

CLASS ACTION COMPLAINT

82.     Plaintiff's claims are typical of the claims of the members of the Classes as all members of the Classes are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

83.     Plaintiff will fairly and adequately protect the interests of the members of the Classes and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Classes.

84.     Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes. Among the questions of law and fact common to the Classes are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period, misrepresented material facts about the business, operations and management of TuSimple;

- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of TuSimple securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Classes have sustained damages and, if so, what is the proper measure of damages.

85.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

86.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- TuSimple securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Classes purchased, acquired and/or sold TuSimple securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

87.     Based upon the foregoing, Plaintiff and the members of the Classes are entitled to a presumption of reliance upon the integrity of the market.

88.     Alternatively, Plaintiff and the members of the Classes are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **ADDITIONAL SCIENTER ALLEGATIONS**

89.     As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or

documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

90.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding TuSimple, their control over, receipt, and/or modification of TuSimple's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning TuSimple, participated in the fraudulent scheme alleged herein.

## **INAPPLICABILITY OF STATUTORY SAFE HARBOR**

91.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

92.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward- looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of TuSimple who knew that the statement was false when made.

**LOSS CAUSATION**

93.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Classes.

94.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market.  This artificially inflated the prices of TuSimple's common stock and operated as a fraud or deceit on the Classes.   When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of TuSimple's stock fell precipitously, as the prior artificial inflation came out of the price.

## COUNT I

### (Violations of § 11 of the Securities Act
### Against All Defendants)

95.     Plaintiff repeats and realleges each and every allegation contained above. Additionally, for purposes of this Cause of Action, Plaintiff expressly excludes and disclaims any allegation construed as alleging fraud or intentional or reckless misconduct, as this Cause of Action is based solely on claims of strict liability and/or negligence under the Securities Act.

96.     This Cause of Action is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the IPO Class, against all Defendants.

97.     The Registration Statement was false and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

98.     TuSimple is the registrant for the IPO. As issuer of the shares, TuSimple is strictly liable to Plaintiff and the IPO Class for the misstatements and omissions.

99.     Defendants were responsible for the contents and dissemination of the Registration Statement. Each of the Securities Act Individual Defendants signed the Registration Statement, was a director of TuSimple at the time of filing, and/or was named in the Registration Statement, with their consent, as about to become a director.

100.    The Underwriter Defendants were responsible for the contents and dissemination of the Registration Statement.

101.    None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omission of any material facts and were not misleading.

102.    By reason of the conduct herein alleged, each Defendant violated and/or controlled a person who violated § 11 of the Securities Act.

103.    Plaintiff acquired his shares pursuant and/or traceable to the Registration Statement for the IPO.

104.    Plaintiff and the IPO Class have sustained damages. The value of TuSimple shares has declined substantially subsequent to and due to Defendants' violations.

105.    At the time of their purchases or acquisitions of TuSimple shares, Plaintiff and other members of the IPO Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

106.    Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that this action was commenced. Less than three years has elapsed between the time that the securities upon which this cause of action is brought were offered to the public and the time this action was commenced.

107.   By reason of their conduct alleged herein, Defendants violated § 11 of the Securities Act.

## COUNT II

### (Violations of § 15 of the Securities Act
### Against the Securities Act Individual Defendants and TuSimple)

108.   Plaintiff repeats and realleges each and every allegation contained above. Additionally, for purposes of this Cause of Action, Plaintiff expressly excludes and disclaims any allegation construed as alleging fraud or intentional or reckless misconduct, as this Cause of Action is based solely on claims of strict liability and/or negligence under the Securities Act.

109.   This Cause of Action is brought pursuant to § 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the IPO Class, against the Individual Defendants and TuSimple.

110.   The Individual Defendants and TuSimple were control persons of TuSimple by virtue of their positions as directors and/or senior officers, which allowed each of the Individual Defendants to exercise control over TuSimple, its operations, and the Registration Statement.

111.   TuSimple and the Individual Defendants controlled TuSimple and all of its employees.

112.   Each of the Defendants named herein was a culpable participant in the violations of § 11 of the Securities Act alleged in the Cause of Action above, based on their having signed or authorized the signing of the Registration Statement, having been named with their consent in the Registration Statement, and/or having otherwise participated in the process that allowed the IPO to be completed.

# COUNT III

## (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against TuSimple and the Individual Defendants)

113.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

114.   This Count is asserted against TuSimple and the Individual Defendants on behalf of the 10b-5 Class, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

115.   During the Class Period, TuSimple and the Individual Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the 10b-5 Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other 10b-5 Class members, as alleged herein; (ii) artificially inflate and maintain the market price of TuSimple securities; and (iii) cause Plaintiff and other members of the 10b-5 Class to purchase or otherwise acquire TuSimple securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, TuSimple and the Individual Defendants, and each of them, took the actions set forth herein.

116.   Pursuant to the above plan, scheme, conspiracy, and course of conduct, TuSimple and the Individual Defendants each participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market

for TuSimple securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about TuSimple's finances and business prospects.

117.   By virtue of their positions at TuSimple, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the 10b-5 Class, or, in the alternative, these Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to TuSimple and the Individual Defendants. Said acts and omissions of these Defendants were committed willfully or with reckless disregard for the truth. In addition, TuSimple and the Individual Defendants each knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

118.   Information showing that TuSimple and the Individual Defendants acted knowingly or with reckless disregard for the truth is peculiarly within these Defendants' knowledge and control. As the senior managers and/or directors of TuSimple, the Individual Defendants had knowledge of the details of TuSimple's internal affairs. TuSimple and the Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of TuSimple. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to TuSimple's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of TuSimple's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning TuSimple's business and

financial condition which were concealed by Defendants, Plaintiff and the other members of the 10b-5 Class purchased or otherwise acquired Company securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by TuSimple and the Individual Defendants, and were damaged thereby.

119.   During the Class Period, TuSimple securities were traded on an active and efficient market. Plaintiff and the other members of the 10b-5 Class, relying on the materially false and misleading statements described herein, which TuSimple and the Individual Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of TuSimple securities at prices artificially inflated by TuSimple and the Individual Defendants' wrongful conduct. Had Plaintiff and the other members of the 10b-5 Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the 10b-5 Class, the true value of TuSimple securities was substantially lower than the prices paid by Plaintiff and the other members of the 10b-5 Class. The market price of TuSimple securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and 10b-5 Class members.

120.   By reason of the conduct alleged herein, TuSimple and the Individual Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

121.   As a direct and proximate result of TuSimple and the Individual Defendants' wrongful conduct, Plaintiff and the other members of the 10b-5 Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT IV

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

122.   Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

123.   This Count is asserted against TuSimple and the Individual Defendants on behalf of the 10b-5 Class, and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

124.   During the Class Period, the Individual Defendants participated in the operation and management of TuSimple, and conducted and participated, directly and indirectly, in the conduct of TuSimple's business affairs. Because of their senior positions, they knew the adverse non-public information about TuSimple's misstatement of income and expenses and false financial statements.

125.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to TuSimple's financial condition and results of operations, and to correct promptly any public statements issued by TuSimple which had become materially false or misleading.

126.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which TuSimple disseminated in the marketplace during the Class Period concerning TuSimple's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause TuSimple to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of TuSimple within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of TuSimple securities.

127.   Each of the Individual Defendants, therefore, acted as a controlling person of TuSimple. By reason of their senior management positions and/or being directors of TuSimple, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, TuSimple to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of TuSimple and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

128.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by TuSimple.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative of both Classes;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: August 31, 2022                Respectfully submitted,

                                      /s/ Sophia M. Rios
                                      Sophia M. Rios (Bar No. 305801)
                                      BERGER MONTAGUE PC
                                      401 B Street, Suite 2000
                                      San Diego, CA 92101
                                      Tel: (619) 489-0300
                                      Email: srios@bm.net

                                      Sherrie R. Savett*
                                      Michael Dell'Angelo*
                                      Barbara Podell*
                                      Andrew Abramowitz*
                                      BERGER MONTAGUE PC
                                      1818 Market Street, Suite 3600
                                      Philadelphia, PA 19103
                                      Tel: (215) 875-3000
                                      Email: ssavett@bm.net
                                             mdellangelo@bm.net
                                             bpodell@bm.net
                                             aabramowitz@bm.net

                                      *pro hac vice to be requested

                                      Brian Schall
                                      SCHALL LAW FIRM
                                      2049 Century Park East, Suite 2460
                                      Los Angeles, CA 90067
                                      Tel: (310) 301-3335

                                      Attorneys for Plaintiff

CLASS ACTION COMPLAINT