1
ROBBINS GELLER RUDMAN
  & DOWD LLP
2
DARREN J. ROBBINS (168593)
LUCAS F. OLTS (234843)
3
HEATHER G. GEIGER (322937)
STEPHEN JOHNSON (347822)
4
655 West Broadway, Suite 1900
San Diego, CA  92101
5
Telephone:  619/231-1058
619/231-7423 (fax)
6
darrenr@rgrdlaw.com
lolts@rgrdlaw.com
7
hgeiger@rgrdlaw.com
sjohnson@rgrdlaw.com

KAHN SWICK & FOTI, LLP
RAMZI ABADOU (222567)
580 California Street, Suite 1200
San Francisco, CA  94104
Telephone:  415/459-6900
504/455-1498 (fax)
ramzi.abadou@ksfcounsel.com

8

9
[Additional counsel appear on signature page.]

10
UNITED STATES DISTRICT COURT

11
SOUTHERN DISTRICT OF CALIFORNIA

12
AUSTIN DICKER, INDIANA PUBLIC )
RETIREMENT SYSTEM, ROBERT )
13
MILLER, MICHELLE POIRIER, )
Individually and on Behalf of All Others )
14
Similarly Situated, )
                                  Plaintiffs, )
15
      vs. )
16
TUSIMPLE HOLDINGS, INC., )
GUOWEI "CHARLES" CHAO, )
17
XIAODI HOU, MO CHEN, BONNIE )
YI ZHANG, CHENG LU, PATRICK )
18
DILLON, BRAD BUSS, KAREN C. )
FRANCIS, MORGAN STANLEY & )
19
CO. LLC, CITIGROUP GLOBAL )
MARKETS, INC., J.P. MORGAN )
20
SECURITIES LLC, BOFA )
SECURITIES, INC., COWEN AND )
21
COMPANY, LLC, CREDIT SUISSE )
SECURITIES (USA) LLC, NOMURA )
22
SECURITIES INTERNATIONAL, )
INC., RBC CAPITAL MARKETS, )
23
LLC, NEEDHAM & COMPANY, LLC, )
OPPENHEIMER & CO., INC., PIPER )
24
SANDLER & CO., ROBERT W. )
BAIRD & CO. INCORPORATED, and )
25
VALUABLE CAPITAL LIMITED, )
26
                                  Defendants. )
                                                )
27

28

Case No. 3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-00282-
BEN-MSB)

<u>CLASS ACTION</u>

CONSOLIDATED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

4887-3830-0802.v2

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION................................................................ 1

II.   SUMMARY OF THE ACTION ........................................................ 2

    A.    Introduction ..................................................................... 2

    B.    Defendants' Materially False and Misleading Statements and Omissions About Its Related Party Transactions ................... 3

    C.    Defendants' Materially Misleading Statements and Omissions About TuSimple's Safety Record and Capabilities ........................... 9

III.  JURISDICTION AND VENUE ...................................................... 12

IV.  PARTIES ........................................................................................ 13

    A.    Plaintiffs ........................................................................ 13

    B.    Corporate Defendant ..................................................... 14

    C.    Defendants Named Under the Exchange Act ................... 14

    D.    Defendants Named Under the Securities Act ................... 20

V.   DEFENDANTS' VIOLATIONS OF THE FEDERAL SECURITIES LAWS ............................................................................................. 22

    A.    Relevant Company Background ...................................... 22

    B.    Relevant National Security Background........................... 24

    C.    TuSimple's NSA with CFIUS ........................................ 26

    D.    Hou and Chen Violate the NSA ..................................... 29

    E.    TuSimple's Undisclosed Safety Failures and Prospects.................... 33

    F.    Relevant Post-Class Period Developments........................... 40

    G.    Defendants' Materially False and Misleading Class Period Related Party Statements and Omissions Concerning Hydron ........... 43

        1.    April 16, 2021 Registration Statement ................... 44

        2.    May 11, 2021 Quarterly Report on Form 10-Q...................... 45

        3.    August 5, 2021 2Q 2021 Release on Form 8-K and Earnings Call ................................................... 47

        4.    August 6, 2021 Quarterly Report on Form 10-Q .................... 48

- i -

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-
cv-00282-BEN-MSB)

**Page**

5.   November 4, 2021 Quarterly Report on Form 10-Q ............... 49

6.   February 24, 2022 Annual Report on Form 10-K ................... 50

7.   April 28, 2022 – Form 8-K ............................................... 51

8.   April 29, 2022 Schedule 14A Definitive Proxy Statement ...... 52

9.   May 3 and 4, 2022 1Q 2022 Earnings Call and Quarterly
     Report on Form 10-Q ...................................................... 54

10.  August 8, 2022 Quarterly Report on Form 10-Q ................... 56

11.  SOX Certifications ......................................................... 57

H.   Defendants' Materially False and Misleading Statements and
     Omissions Concerning Safety ............................................ 59

1.   May 10, 2021 Release on Form 8-K and 1Q 2021
     Earnings Call ................................................................ 59

2.   August 5, 2021 2Q 2021 Earnings Call ............................... 60

3.   November 3, 2021 Release on Form 8-K and Letter to
     Shareholders ................................................................. 61

4.   February 9, 2022 – Form 8-K and 4Q 2021 Earnings Call ...... 62

5.   TuSimple's March 10, 2022 Blog Post ................................ 63

6.   March 30, 2022 Hou Interview with *CNBC* ......................... 64

I.   Defendants' Materially False and Misleading Statements and
     Omissions Concerning Safety Subsequent to the April Crash ......... 66

1.   April 28, 2022 Release on Form 8-K ................................... 66

2.   May 3-4, 2022 1Q 2022 Earnings Call and Form 8-K
     Letter to Shareholders ..................................................... 67

3.   May 11, 2022 Investor Day Presentation .............................. 71

4.   July 26, 2022 Blog Post Misleadingly Blames "Human
     Error" for the April Crash ............................................... 72

VI.  ADDITIONAL SCIENTER ALLEGATIONS .............................. 74

1.   Chen Founded and Controlled Hydron and Chao Was a
     "Critical Backer" of Hydron ............................................. 74

2.   TuSimple Entered into the NSA with the U.S.
     Government ................................................................... 75

4887-3830-0802.v2

**Page**

3. TuSimple's Corporate Culture Suppressed Safety Concerns ................................................................... 77

4. Defendants' Failure to Utilize Common Safeguards Demonstrates Scienter ............................................ 79

5. Post-Class Period Events and Admissions Support Scienter ..................................................................... 79

6. The Resignations and Terminations of TuSimple's Officers, Directors, and Independent Auditor Demonstrate Scienter.................................................. 82

7. Chao's and Lu's Insider Stock Sales Support a Motive to Commit Fraud............................................ 83

8. The Alleged Misrepresentations and Omissions Concerned TuSimple's Core Operations.................... 85

VII. LOSS CAUSATION ......................................................... 86

VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE ........................... 97

IX. INAPPLICABILITY OF SAFE HARBOR ................................................. 98

X. CLASS ACTION ALLEGATIONS ................................................. 98

XI. CLAIMS FOR RELIEF ................................................. 101

COUNT I ................................................. 101

COUNT II................................................. 108

COUNT III................................................. 110

COUNT IV................................................. 112

COUNT V................................................. 115

COUNT VI................................................. 116

COUNT VII................................................. 119

XII. PRAYER FOR RELIEF ................................................. 120

XIII. JURY DEMAND ................................................. 121

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-
cv-00282-BEN-MSB)

4887-3830-0802.v2

| Defendant: | Primary Liability: |
|---|---|
| TuSimple Holdings, Inc. | Securities Act and Exchange Act for Safety, Related Party Misrepresentations and Scheme |
| Guowei "Charles" Chao | Securities Act and Exchange Act for Safety, Related Party Misrepresentations and Scheme |
| Xiaodi Hou | Securities Act and Exchange Act for Safety, Related Party Misrepresentations and Scheme |
| Mo Chen | Securities Act and Exchange Act for Safety, Related Party Misrepresentations and Scheme |
| Bonnie Yi Zhang | Securities Act and Exchange Act for Safety, Related Party Misrepresentations and Scheme |
| Cheng Lu | Securities Act and Exchange Act for Safety, Related Party Misrepresentations and Scheme |
| Patrick Dillon | Securities Act and Exchange Act for Safety Misrepresentations |
| Brad Buss | Securities Act and Exchange Act for Safety Misrepresentations |
| Karen C. Francis | Securities Act |
| Morgan Stanley & Co. LLC | Securities Act |
| Citigroup Global Markets, Inc. | Securities Act |
| J.P. Morgan Securities LLC | Securities Act |
| BofA Securities, Inc. | Securities Act |
| Cowen and Company, LLC | Securities Act |
| Credit Suisse Securities (USA) LLC | Securities Act |
| Nomura Securities International, Inc. | Securities Act |
| RBC Capital Markets, LLC | Securities Act |
| Needham & Company, LLC | Securities Act |
| Oppenheimer & Co., Inc. | Securities Act |
| Piper Sandler & Co. | Securities Act |
| Robert W. Baird & Co. | Securities Act |
| Valuable Capital Limited | Securities Act |

- iv -

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-00282-BEN-MSB)

## TABLE OF ACRONYMS

| Acronym | Meaning |
| --- | --- |
| AFN | Autonomous Freight Network |
| AI | Artificial Intelligence |
| AV | Autonomous Vehicle |
| CCP | Chinese Communist Party |
| CFIUS | Committee on Foreign Investment in the United States |
| CTO | Chief Technologies Officer |
| FMCSA | Federal Motor Carrier Safety Administration |
| HD | High Definition |
| IP | Intellectual Property |
| IPO | Initial Public Offering |
| L4 | Level 4 |
| NHTSA | National Highway Traffic Safety Administration |
| NSA | National Security Agreement |
| SEC | Securities and Exchange Commission |
| SOX | Sarbanes-Oxley Act of 2002 |

4887-3830-0802.v2

Plaintiffs Indiana Public Retirement System, Robert Miller, and Michelle Poirier (collectively, "Plaintiffs") allege the following based upon personal knowledge with respect to themselves and, with respect to all other matters, the investigation of Counsel. Counsel's investigation included a review and analysis of, *inter alia*: (i) regulatory filings by TuSimple Holdings, Inc. ("TuSimple" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, media statements, and marketing presentations issued and disseminated by defendants; (iii) defendants' statements to analysts and the Company's investors during earnings conference calls, conferences, and television interviews; (iv) analyst and industry reports concerning TuSimple; and (v) other industry-specific information related to TuSimple. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a class action alleging violations of the federal securities laws on behalf of all persons and entities who purchased and/or otherwise acquired TuSimple securities between April 15, 2021 and October 31, 2022, inclusive (the "Class Period") and were damaged by the conduct asserted herein (the "Class").

2. Plaintiffs assert claims pursuant to §§10(b), 20A, and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder against TuSimple and certain of its current and former officers and directors as defined in ¶¶50-60, *infra*.

3. Plaintiffs' Exchange Act claims arise out of a scheme and fraudulent course of conduct pursuant to which defendants: (i) concealed the Company's related-party transactions with a Chinese semi-trucking rival controlled by TuSimple senior insiders Xiaodi Hou, Mo Chen, and Guowei "Charles" Chao; (ii) materially overstated TuSimple's safety profile while simultaneously concealing its safety record; and (iii)

- 1 -

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-00282-BEN-MSB)

concealed from investors that certain "Risk Factors" listed in the Company's Class Period SEC filings had already materialized.

4.   Separately, Plaintiffs assert strict liability claims under §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act").  Plaintiffs' Securities Act claims are brought on behalf of all persons who purchased TuSimple securities pursuant or traceable to the April 7, 2021 Form S-1/A Registration Statement and April 16, 2021 Form 424B4 Prospectus (together, the "Registration Statement"). Plaintiffs' Securities Act claims are brought against TuSimple, certain of its current and former officers and directors (as defined in ¶¶68-69, *infra*), and the underwriters of the Company's April 15, 2021 initial public offering ("IPO").  *See* ¶¶70-82, *infra*.

5.   Plaintiffs' Securities Act claims arise out of material omissions from the Registration Statement, concerning: (i) the Company's related party transactions with a Chinese semi-trucking rival controlled by Hou, Chen, and Chao; (ii) the Company's safety prospects and record; and (iii) the fact that certain "Risk Factors" listed in the Registration Statement had already materialized prior to the IPO.

## II.   SUMMARY OF THE ACTION

### A.   Introduction

6.   TuSimple is an artificial intelligence ("AI") software company that claims to develop autonomous technology designed for semi-trucks.  It purports to develop a line of purpose-built Level 4 ("L4") autonomous semi-trucks.  The Company operates its Autonomous Freight Network ("AFN") L4 autonomous semi-trucks equipped with its autonomous driving technology.  According to TuSimple, AFN is an ecosystem that consists of L4 autonomous semi-trucks, high-definition digital mapped routes, terminals, and TuSimple Connect, a cloud-based autonomous operations oversight system.

7.   TuSimple was founded in September 2015 by Chen and Hou.  The Company is incorporated in Delaware and has offices in Beijing and San Diego.

4887-3830-0802.v2

TuSimple went public in April 2021 after raising funds prior thereto from private equity investors primarily in China. TuSimple and the other defendants raised more than $1 billion from investors in the IPO via the sale of 27,027,027 securities of Class A common stock at $40 per share. At the time of the IPO, the Company was valued at $8.5 billion. Due to the misconduct alleged herein, the trading price of TuSimple common stock has fallen 98% and currently trades at approximately $1.50 per share. Shares of the Company's securities trade on the Nasdaq Stock Market ("NASDAQ") under the trading symbol "TSP."

8.     The Registration Statement and TuSimple's other Class Period statements were materially false and/or misleading in that they omitted and/or misrepresented material facts concerning TuSimple's: (i) now-admitted failure to disclose related party transactions; and (ii) purported safety record. Both categories of false and/or misleading statements concerned development of TuSimple's technology for the benefit of a Chinese company called Hydron, Inc. (f/k/a Turing Auto, Inc.) (together, "Hydron"), a Chinese tech startup and self-driving semi-truck rival founded by Chen, which was incorporated in Delaware on March 29, 2021 – *just two weeks before the IPO*.

**B.     Defendants' Materially False and Misleading Statements and Omissions About Its Related Party Transactions**

9.     In 2020, NASDAQ unveiled new restrictions on initial public offerings to make it more difficult for Chinese companies to debut on its stock exchange. According to a *Reuters* report dated May 18, 2020 titled "Nasdaq to Tighten Listing Rules, Restricting Chinese IPOs," "the move is being driven largely by concerns about some of the Chinese IPO hopefuls' lack of accounting transparency and close ties to powerful [Chinese State] insiders." At the time, SEC Chair Gary Gensler ordered

4887-3830-0802.v2

1    SEC staff to "engage in targeted additional reviews of filings for companies with

2    significant China-based operations."[1]

3        10.    On July 30, 2021, *Reuters* reported that the SEC would no longer "allow

4    Chinese companies to raise money in the United States unless they fully explain their

5    legal structures and disclose ***the risk of Beijing interfering in their businesses***."

6        11.    Also prior to the Class Period, the Committee on Foreign Investment in

7    the United States ("CFIUS") initiated an investigation focused on TuSimple's

8    connections to a Chinese company called Sun Dream, Inc. ("Sun Dream"), which is a

9    subsidiary of Sina Corporation ("Sina") – a large Chinese conglomerate with close ties

10   to the Chinese Communist Party ("CCP").  At the commencement of the Class Period,

11   Sina owned a 12% stake in TuSimple.  Both Sun Dream and Sina are controlled by

12   Chao, who also backed Chen's Hydron startup and held a significant financial interest

13   in TuSimple.

14       12.    As a result of the CFIUS' investigation, on February 18, 2022, the

15   Company entered into a National Security Agreement ("NSA") with CFIUS, which

16   TuSimple disclosed in an SEC Form 8-K filed that same day.  Under the terms of the

17   NSA, TuSimple was required to: (i) appoint a "security officer"; (ii) have a "security

18   director" on its Board; (iii) maintain a "Government Security Committee" chaired by

19   the security director; and (iv) submit periodic reports to CFIUS.  To comply with the

20   NSA, TuSimple placed Reed Werner on its Board to serve as its security director,

21   Chair of the Government Security Committee, and a member of the Audit Committee.

22   Before joining TuSimple, Mr. Werner worked in various positions with the

23   Departments of Defense and State, and the National Security Council.

24       13.    Pursuant to the NSA, CFIUS also required: (i) TuSimple to isolate its

25   intellectual property to prevent it from being shared with and/or divested to a Chinese

26

27   [1]   For quoted materials, all emphasis has been added and internal citations omitted
     unless otherwise indicated.

28

- 4 -

4887-3830-0802.v2

subsidiary of TuSimple; and (ii) Chao to relinquish the two Board seats controlled by Sun Dream, which had been previously held by Chao and Zhang.

14.    As alleged herein, in a scheme designed to avoid SEC scrutiny, Hou and Chen incorporated TuSimple in the United States (rather than China) to avoid enhanced NASDAQ and SEC oversight of the Company's operations.  Further, unbeknownst to investors, a month before the IPO in March 2021, Chen, with Hou's knowledge, launched Hydron as a rival autonomous trucking company to TuSimple. While the Company disclosed other related party transactions in the Registration Statement and in the Company's Class Period Quarterly Reports on Form 10-Q and Annual Report on Form 10-K, it failed to disclose its transactions with Hydron as a related party as required by SEC Item 404(a) of Regulation S-K ("Regulation S-K").

15.    Throughout the Class Period, Hou, Chen, Chao, and Zhang misled investors by concealing that: (i) TuSimple was engaged in undisclosed related party transactions with Hydron; (ii) TuSimple shared confidential information and/or proprietary technology with Hydron without Board approval or informing TuSimple shareholders; (iii) TuSimple failed to disclose the Board's internal investigation, which commenced in July 2022, into the Company's ties to Hydron; and (iv) the aforementioned conduct enhanced the likelihood of regulatory scrutiny and investigatory action against the Company.

16.    Defendants' related party omissions violated not only U.S. federal securities laws as alleged herein but also, according to public sources, various U.S. national security laws.  Indeed, in connection with the allegations described herein, the Treasury Department has publicly stated that the United States is "committed to taking all necessary actions within its authority to safeguard U.S. national security."[2]

---

[2]   Kate O'Keeffe and Aruna Viswanatha, *Leaders of Self-Driving Truck Company Face Espionage Concerns Over China Ties: National-security review sparked concerns over TuSimple's alleged tech transfer to China*, Wall St. J. (Feb. 1, 2023).

17.    Then, on October 30, 2022, the *Wall Street Journal* published an investigative report titled "TuSimple Probed by FBI, SEC Over Its Ties to a Chinese Startup," revealing that various federal government agencies were investigating "whether [TuSimple] improperly financed and transferred technology to a Chinese startup." The *Wall Street Journal* also revealed that, in particular, the Federal Bureau of Investigation ("FBI"), the SEC, and CFIUS were examining whether Company executives, including Hou, improperly shared TuSimple's technology and intellectual property with Hydron. The federal probes, which remain ongoing, are investigating whether: (i) Hou's potential violation of the federal securities laws for failing to properly disclose TuSimple's relationship with Hydron; (ii) TuSimple's intellectual property was improperly transferred to Hydron; and (iii) TuSimple "improperly financed" Hydron. The SEC is reportedly focused on whether TuSimple shareholders were defrauded by Hou and Chen by their transfer of TuSimple's sensitive technology to Hydron.

18.    On October 31, 2022, the Company ***admitted*** in its Form 8-K filing with the SEC that defendants had improperly shared sensitive information with Hydron, stating:

> As of the time of this filing, the Company believes that, based on information obtained in connection with an ongoing investigation by the Company's Audit Committee, during 2021 Company employees spent paid hours working on matters for Hydron Inc. (f/k/a Turing Auto), a company which the Company believes has significant operations in China, and that such paid hours had an estimated value of less than $300,000. Mr. Mo Chen, one of our co-founders and former Executive Chairman, is a founder, director and chief executive officer of Hydron, and he has an equity interest in the Company of greater than 10%. ***This related party transaction was not presented to, or approved by, the Audit Committee as required by the Company's Code of Conduct***.

> Based on the Audit Committee's investigation, which remains ongoing, the Company also believes that during 2022, in connection with the Company's evaluation of Hydron as a potential OEM partner, ***the Company shared confidential information with Hydron and its partners, which was not brought to the attention of the Audit Committee and Government Security Committee, and before entering into relevant non-disclosure and other cooperation agreements***.

4887-3830-0802.v2

19.     The same release announced that, as a result, TuSimple's Board had terminated Hou "as the Chief Executive Officer, President and Chief Technology Officer of the Company and removed Dr. Hou from his position as Chairman of the Board, in each case, effective as of October 30, 2022." The *San Diego Union-Tribune* confirmed that TuSimple had "fired" "Hou after an internal probe found that [the] [C]ompany shared confidential information with a Chinese startup **without proper disclosures**."[3]

20.     On this news, TuSimple's share price fell 45.6% in a single day.

21.     During a November 1, 2022 conference call with investors about these stunning developments, TuSimple Director Brad Buss explained that the "decision to terminate the CEO . . . was made in connection with an ongoing internal investigation launched by the Audit Committee in July."  Moreover, the Company revealed that TuSimple's Audit Committee had "lost trust and confidence in [Hou]'s judgment, decision making and ability to lead as the company's CEO."

22.     On November 7, 2022, the Company issued a release confirming that Hou was terminated because:

> [T]he directors had lost trust and confidence in Dr. Hou's ability to lead a public company, including due to concerns about his **lack of candor** and transparency with the Board. The decision to terminate Dr. Hou was made in connection with an ongoing investigation that was initiated by the Board's Audit Committee.

23.     Following the Audit Committee's determination that TuSimple had misled shareholders about the Company's undisclosed related-party transactions, Chen and Hou schemed to leverage their super-majority voting power to unravel the actions the Board undertook specifically to protect the Company's shareholders.

24.     On November 10, 2022, less than two weeks after the Audit Committee terminated Hou, Hou and Chen used their corporate control over the Company's

---

[3]   Despite the adverse actions taken by the Board against Hou, he remained on the Board.

4887-3830-0802.v2

shares to assert their control over TuSimple by ***removing the entire Audit Committee*** and others at TuSimple who were investigating Hou's related party scheme with Hydron. That same day, Hou exercised his power as the sole remaining director to appoint Chen and Lu to the Board.

25. Notably, one of the directors Hou and Chen fired was Mr. Werner, whom TuSimple had previously agreed to place on its Board pursuant to the NSA to serve as the Board's security director, Chair of the Government Security Committee, and a member of the Audit Committee. Accordingly, as a result of Hou's, Lu's, and Chen's actions, TuSimple violated the NSA, which they knew required that the Company maintain a Government Security Committee and that the Security Director be a member of that committee.

26. In response to this misconduct, the Company's independent auditor (KPMG LLP), which had served as TuSimple's auditor since 2018, immediately resigned. According to the Company, KPMG's resignation was the "result of recent events that culminated in the dismissal of [TuSimple's] previous Board of Directors, including its Audit Committee." Before resigning, KPMG was investigating Chen on behalf of the Company's Audit Committee.

27. On February 1, 2023, the *Wall Street Journal* reported that "[t]he Justice Department has been urged by representatives of a U.S. national-security panel to consider ***economic espionage*** charges against leaders of TuSimple Holdings Inc." The following month, in March 2023, Hou suddenly resigned from the Company's Board after having ***again*** been accused by the Audit Committee of pilfering the Company's intellectual property (this time for attempting to induce current TuSimple employees to join his latest venture). According to an article by *TechCrunch* on March 13, 2023:

> Sources familiar with the matter told *TechCrunch* a 'whistleblower' informed upper management about Hou's solicitations of employees over the past few months to join a company he was starting. Hou had allegedly been pressuring certain employees to stop

4887-3830-0802.v2

working so hard, either because they would soon join his new venture or because he wanted to see the autonomous trucking company fail without him, the sources say.

TuSimple began an internal investigation, during which it confirmed at least two employees – top talent in 'high tech' teams – had been approached by Hou, *but the co-founder resigned from the board before TuSimple could conclude the investigation*.

28.     One of the primary financial beneficiaries of this misconduct was Chao, who sold over 6.75 million shares of TuSimple stock in connection with the IPO for proceeds of over *$270 million*.  Chao, a Chinese national with close ties to the CCP, currently serves as the Chairman of the Board of the Directors and as Chief Executive Officer ("CEO") of Sina.

29.     On September 7, 2023, the Company filed with the SEC its Annual Report on Form 10-K which admitted that: (i) "[t]he Company is cooperating with an inquiry by CFIUS concerning its compliance with the National Security Agreement ("NSA") entered into with the U.S. government as it relates to information shared by TuSimple U.S. with TuSimple's China-based businesses ("TuSimple China"), Hydron, and Hydron's partners"; and (ii) "the Company and certain current and former directors and officers *received subpoenas from the SEC requesting the production of Company documents*."[4]

**C.     Defendants' Materially Misleading Statements and Omissions About TuSimple's Safety Record and Capabilities**

30.     As the above-referenced developments unfolded during the Class Period, defendants also simultaneously misrepresented the performance and safety of TuSimple's autonomous vehicle ("AV") technology.  While defendants' statements were designed to encourage investment in the Company by raising expectations about TuSimple's prospects, in reality, Hou, Chen, Chao, Zhang, and Lu were scheming to

---

[4]   TuSimple China, Hydron, and Hydron's partners are defined as the "Hydron Entities."

4887-3830-0802.v2

refine its AV technology on U.S. roads, thereby risking the safety of U.S. motorists, only to then transfer that improved technology to Hydron.

31.    On April 6, 2022, an autonomous semi-trailer truck operated by TuSimple was traveling on Interstate 10 in Tucson, Arizona.  When its autopilot was engaged, the 80,000 pound semi-truck suddenly lurched left, slammed into a concrete divider, and nearly caused a catastrophic collision with a pickup truck which was passing it on the left (the "April Crash").  The previous month, on March 30, 2022, Hou (then the Company's CEO, Chairman of the Board, and Chief Technology Officer ("CTO")) publicly misrepresented during a live *CNBC* interview that "***we have no unconquered technological challenges on the table***."

32.    News of the April Crash began to be publicly revealed when an internal TuSimple whistleblower provided a video of the April Crash with "Mutha Trucker," a content provider which publishes material to "[h]elp[] truck drivers build financial freedom with trucking and daily trucking news information."  Mutha Trucker posted the video to YouTube on July 25, 2022.[5]

33.    In response to Mutha Trucker's video release, the Company falsely stated that the April Crash was due to "human error."  That statement was false because common safeguards would have prevented the autonomous driving system from executing the outdated command and would have prevented the crash.  An AV technology expert interviewed by Counsel confirmed that a properly operating AV system should not respond to commands that are even a couple hundredths of a second old, and sharp turns at 65 mph should never have been allowed by the AI system.

34.    Then, between the April Crash and its full public disclosure by the *Wall Street Journal* on August 1, 2022, the Company: (i) issued a release on Form 8-K on April 28, 2022; (ii) conducted an earnings call on May 3, 2022; (iii) filed a Form 8-K with an accompanying "Letter to Shareholders" and a Quarterly Report on Form 10-Q

---

[5]  https://www.youtube.com/watch?v=ymD8_DGwP50.

on May 3 and 4, 2022 (respectively); and (iv) made an "Investor Day" presentation on May 11, 2022, all of which touted the Company's purported safety record *without disclosing the April Crash*.  Defendants concealed that material fact to avoid drawing additional unwanted federal regulatory scrutiny of the Company; some of them were particularly motivated to do so, given the Company's still-undisclosed relationship with Hydron.

35.    The *Wall Street Journal*'s August 1, 2022, article titled "Self-Driving Truck Accident Draws Attention to Safety at TuSimple," brought to light a number of previously undisclosed concerns that undermined defendants' representations and omissions concerning the Company's safety.  The article detailed the April Crash, reporting that:

> [T]he incident, underscores concerns that the autonomous-trucking company is risking safety on public roads in a rush to deliver driverless trucks to market, according to independent analysts and more than a dozen of the company's former employees.

36.    The *Wall Street Journal* further relayed that "'[t]his information shows that the testing they are doing on public roads is highly unsafe,' said Phil Koopman, an associate professor at Carnegie Mellon who has contributed to international safety standards for autonomous vehicles, referring to the company's disclosures."[6]  In addition to describing TuSimple employees' deep frustration with the Company's safety protocols and controls, the article added that "dozens of employees in key roles have departed and Mr. Hou has moved to consolidate control over the company he started, according to former employees.  The moves reflect his efforts to avoid executives pushing back on his rush to get products to market, these people say."

37.    On this news, TuSimple's shares fell by 9.7%, to a closing price of $8.99 per share on August 1, 2022.

---

[6]  As part of its investigation, Counsel interviewed Professor Koopman on August 18, 2023, who confirmed his statements to the *Wall Street Journal*.

4887-3830-0802.v2

38.     As alleged herein, TuSimple employees who raised safety concerns were ignored, or even fired in some instances – including John Lindland, the previous Functional Safety Engineering Lead at the Company who had been personally hired by Hou.   Throughout the Class Period, therefore, TuSimple misrepresented its commitment to safety as defendants concealed fundamental problems with the Company's technology.   Defendants suppressed safety concerns as the Company recklessly tested its autonomous driving technology in order to deliver it to the market (and Hydron) ahead of its more safety-conscious competitors.   The aforementioned conduct invited enhanced regulatory scrutiny and investigatory action toward the Company.

39.     Plaintiffs and other Class members have suffered significant damages as a result of the precipitous decline in the market value of the Company's securities. Indeed, as of the date of the filing of this Complaint, TuSimple securities have traded as low as $0.75 per share, representing *a decline of over 98%* from the Company's artificially inflated $40 per share IPO offering price.

## III.   JURISDICTION AND VENUE

40.     The claims asserted herein arise under and pursuant to §§11, 12, and 15 of the Securities Act (15 U.S.C. §§77k, 77l, and 77o), §§10(b), 20A, and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t-l, and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

41.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the Securities Act (15 U.S.C. §77v), and §27 of the Exchange Act (15 U.S.C. §78aa).

42.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), §22 of the Securities Act (15 U.S.C. §77v(a)), and §27 of the Exchange Act (15 U.S.C. §78aa(c)).   At all relevant times, TuSimple maintained its corporate headquarters in this District.

4887-3830-0802.v2

43.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.   PARTIES

### A.   Plaintiffs

44.     Lead Plaintiff Indiana Public Retirement System ("INPRS") purchased and/or otherwise acquired shares of TuSimple common stock during the Class Period, including shares traceable to the Company's Registration Statement.  INPRS oversees approximately $42 billion in assets (at fiscal year-end 2022) for the benefit of its 517,000 members representing approximately 1,300 employers, including public universities, school corporations, municipalities, and state agencies and is among the largest 100 pension funds in the United States.

45.     Named Plaintiff Robert Miller ("Miller") purchased and/or otherwise acquired shares of TuSimple common stock during the Class Period, including shares traceable to the Registration Statement.

46.     Named Plaintiff Michelle Poirier ("Poirier") purchased and/or otherwise acquired shares of TuSimple common stock during the Class Period, including shares traceable to the Registration Statement.

47.     Together, INPRS, Miller and Poirier are referred to herein as "Plaintiffs."

48.     As demonstrated by Plaintiffs' Certifications, as incorporated by reference herein, Plaintiffs purchased or otherwise acquired shares of TuSimple common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein. *See Woldanski v. TuSimple Holdings, Inc. et al.*, No. 1:22-CV-09625, ECF 34-2 (S.D.N.Y.); *see also* Exs. A-B.

4887-3830-0802.v2

### B.     Corporate Defendant

49.     TuSimple is a Delaware corporation with principal executive offices located at 9191 Towne Centre Drive, Suite 150, San Diego, California 92122.  The Company's securities trade in an efficient market on the NASDAQ under the trading symbol "TSP."

### C.     Defendants Named Under the Exchange Act

50.     Guowei "Charles" Chao ("Chao") served at all relevant times as TuSimple's Board Chair from April 22, 2019 until his forced resignation in June 2022.  Chao served as the Chair of the Nominating and Corporate Governance Committee.   At all relevant times, Chao had simultaneously invested in both TuSimple and Hydron.   During the Class Period, Chao signed TuSimple's: (i) Registration Statement on Form S-1, filed on March 23, 2021; (ii) Amendment No. 1 to the Registration Statement on Form S-1/A, filed on April 7, 2021 (via power of attorney granted to Lu); and (iii) Annual Report on Form 10-K, filed on February 24, 2022.

51.     Chao also serves in leadership positions for several companies other than TuSimple.  For example, Chao currently serves as the Chairman of the Board of the Directors and as CEO of Sina.  In his time at Sina, Chao served as President from 2005 to 2013, Chief Financial Officer ("CFO") from 2001 to 2006, Co-Chief Operating Officer from 2004 to 2005, Executive Vice President from 2002 to 2003, and Vice President of Finance from 1999 to 2001.  Prior to joining Sina Corporation, Mr. Chao served as an audit manager at PricewaterhouseCoopers, LLP, an accounting firm.  Chao is also currently the chairman of the board of Sina's subsidiary, Weibo Corporation ("Weibo"), a leading social media company in China; a director of NetDragon Websoft Holdings Limited, a Chinese company providing technology for online gaming; and a director of Leju Holdings Ltd., an online-to-offline real estate services provider in China.

4887-3830-0802.v2

52.     Pursuant to the NSA, Chao was forced to not stand for re-election to the Board when his term expired in June 2022.

53.     Xiaodi Hou ("Hou") was at all relevant times TuSimple's co-founder. He also served as TuSimple's Chief Technology Officer ("CTO") during the Class Period until March 3, 2022, when he was appointed to serve as TuSimple's President, CEO, and Chairperson of the Board.  In addition to speaking during earnings calls, presentations, and media appearances during the Class Period, Hou signed TuSimple's: (i) Registration Statement on Form S-1, filed on March 23, 2021; (ii) Amendment No. 1 to the Registration Statement on Form S-1/A, filed on April 7, 2021 (via power of attorney granted to Lu); (iii) Annual Report on Form 10-K, filed on February 24, 2022; (iv) "Letter to Shareholders," attached as an Exhibit to a current report on Form 8-K, filed on May 3, 2022; (v) quarterly report on Form 10-Q, filed on May 4, 2022, and the SOX Certifications attached thereto; and (vi) quarterly report on Form 10-Q, filed on August 8, 2022, and the Sarbanes-Oxley Act of 2002 ("SOX") Certifications attached thereto.

54.     Hou was terminated by the Audit Committee and removed from his position as Chairman of the Board on October 31, 2022.  Hou subsequently resigned from the Company's Board of Directors on March 9, 2023 while the Audit Committee was conducting an internal investigation into claims that he was poaching TuSimple employees for work in a new business venture.

55.     Mo Chen ("Chen") was at all relevant times TuSimple's co-founder, Executive Chairman, and director.  Prior to the Class Period, Chen served as the Company's CEO from 2015 to September 2020.  He is currently TuSimple's Executive Chairman of the Board.  In addition to speaking during earnings calls, presentations, and media appearances during the Class Period, Chen signed the Company's: (i) Registration Statement on Form S-1, filed on March 23, 2021; (ii) Amendment No. 1 to the Registration Statement on Form S-1/A, filed on April 7,

2021 (via power of attorney granted to Lu); and (iii) Annual Report on Form 10-K, filed on February 24, 2022.

56.     Bonnie Yi Zhang ("Zhang") was a member of TuSimple's Board of Directors from September 30, 2020 until she was forced (pursuant to the NSA) not to stand for reelection at the end of her term in June 2022.  During the Class Period, Zhang signed TuSimple's: (i) Registration Statement on Form S-1, filed on March 23, 2021; (ii) Amendment No. 1 to the Registration Statement on Form S-1/A, filed on April 7, 2021 (via power of attorney granted to Lu); and (iii) Annual Report on Form 10-K, filed on February 24, 2022.  Zhang currently serves as a member of the Board of Directors and as CFO of Sina.  Prior to joining Sina, Zhang served as CFO of Weibo, a subsidiary of Sina, from 2014 to 2015.  Before working at Weibo, Zhang was the CFO of AdChina Ltd., a company operating an integrated internet advertising platform in China, from 2011 to 2014.  From 2007 to 2011, Zhang was an audit partner of Deloitte Touche Tohmatsu based in Shanghai, with a focus on serving Chinese companies listed in the United States and Chinese companies making initial public offerings in the United States.

57.     From 2005 to 2007, Zhang served as a senior manager in the National Office SEC Services group of Deloitte & Touche, LLP.  While with that group, Zhang was primarily responsible for pre-issuance reviews of securities offering documents and periodic reports to be filed with the SEC and was primarily focused on foreign private issuers.  Pursuant to the NSA, Zhang was forced to not stand for re-election to the Board when her term expired in June 2022.

58.     Cheng Lu ("Lu") was at all relevant times the Company's President and CEO during the Class Period until his resignation on March 3, 2022.  He subsequently returned to the position of CEO in November 2022 and is currently the Company's President and CEO. In addition to speaking during earnings calls, presentations, and media appearances during the Class Period, Lu also signed TuSimple's:

(i) Registration Statement on Form S-1, filed on March 23, 2021; (ii) Amendment No. 1 to the Registration Statement on Form S-1/A, filed on April 7, 2021 (in addition to signing as power of attorney on behalf of Chen, Hou, Buss, Chao, Francis, and Zhang); (iii) "Letter to Shareholders," attached as an Exhibit to a current report on Form 8-K, filed on May 10, 2021; (iv) quarterly report on Form 10-Q, filed on May 11, 2021, and the SOX Certifications attached thereto; (v) quarterly report on Form 10-Q, filed on August 6, 2021, and the SOX Certifications attached thereto; (vi) "Letter to Shareholders," attached as an Exhibit to a current report on Form 8-K, filed on November 3, 2021; (vii) quarterly report on Form 10-Q, filed on November 4, 2021, and the SOX Certifications attached thereto; (viii) "Letter to Shareholders," attached as an Exhibit to a current report on Form 8-K, filed on February 9, 2022; and (ix) Annual Report on Form 10-K filed on February 24, 2022, and the SOX Certifications attached thereto.

59. Patrick Dillon ("Dillon") was at all relevant times the Company's CFO throughout the Class Period until his resignation on July 7, 2022. In addition to speaking during earnings calls, presentations, and media appearances during the Class Period, Dillon also signed TuSimple's: (i) Registration Statement on Form S-1, filed on March 23, 2021; (ii) Amendment No. 1 to the Registration Statement on Form S-1/A, filed on April 7, 2021; (iii) current report on Form 8-K, filed on May 10, 2021, and the "Letter to Shareholders" attached as an Exhibit thereto; (iv) quarterly report on Form 10-Q, filed on May 11, 2021, and the SOX Certifications attached thereto; (v) current report on Form 8-K, filed on August 5, 2021; (vi) quarterly report on Form 10-Q, filed on August 6, 2021, and the SOX Certifications attached thereto; (vii) current report on Form 8-K, filed on November 3, 2021, and the "Letter to Shareholders" attached as an Exhibit thereto; (viii) quarterly report on Form 10-Q, filed on November 4, 2021, and the SOX Certifications attached thereto; (ix) current report on Form 8-K, filed on February 9, 2022, and the "Letter to Shareholders"

attached as an Exhibit thereto; (x) Annual Report on Form 10-K, filed on February 24, 2022 (via power of attorney granted to Lu), and the SOX certifications attached thereto (signed personally); (xi) current report on Form 8-K, filed on April 28, 2022; (xii) current report on Form 8-K, filed on May 3, 2022, and the "Letter to Shareholders" attached as an Exhibit thereto; and (xiii) quarterly report on Form 10-Q, filed on May 4, 2022, and the SOX Certifications attached thereto.

60.     Brad Buss ("Buss") served as a member of the Company's Board of Directors from January 2021 until he was ousted by Chen and Hou shortly after the Class Period ended on November 10, 2022.  During his tenure on the Board, Buss served as Chair of the Audit Committee and was a member of the Nominating and Corporate Governance Committee.  Shortly before his ouster, the Company had announced on October 31, 2022 that Buss would serve as the Chairman of the Board – a position which he held for less than two weeks.  Also, during the Class Period, Buss signed TuSimple's: (i) Registration Statement on Form S-1, filed on March 23, 2021; (ii) Amendment No. 1 to the Registration Statement on form S-1/A, filed on April 7, 2021 (via a power of attorney granted to Lu); and (iii) Annual Report on Form 10-K, filed on February 24, 2022.

61.     Dillon and Buss are not named under the Exchange Act for the Related Party misrepresentations.

62.     Given their positions within the Company, defendants each had access to the adverse undisclosed information about TuSimple's business, operations, and practices through access to, *inter alia*: internal corporate documents, conversations and contact with other corporate officers and employees, attendance at meetings, reports, and other information provided to them.

63.     By virtue of their high-level positions, defendants were each directly involved in TuSimple's day-to-day operations and were each privy to confidential information concerning the Company, its business, operations, and practices,

including the misstatements alleged herein.  Their positions of control and authority as officers or directors enabled defendants to control the contents of the Company's SEC filings, press releases, presentations to securities analysts, and other public statements made to TuSimple shareholders during the Class Period.  Accordingly, each of the defendants named in ¶¶50-60 bears responsibility for the accuracy of the public reports and press releases detailed herein, and they are therefore liable for the material misrepresentations and omissions contained therein.

64.    During the Class Period, defendants substantially participated in the creation of and had exclusive authority and control over the content of TuSimple's materially false and misleading statements and omissions, and how they were communicated to investors.  Defendants also acted in furtherance of a fraudulent scheme and wrongful course of business.

65.    Defendants were prohibited under the Exchange Act from: (i) employing any device, scheme, or artifice to defraud; (ii) knowingly or with deliberate recklessness making any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaging in any act, practice, or course of business which operates or would operate as a fraud upon any person.  Their conduct, as alleged herein, violated the federal securities laws and SEC regulations promulgated thereunder in connection with the purchase or sale of TuSimple's securities.

66.    Each of the defendants named under the Exchange Act is liable as a participant in a fraudulent scheme and wrongful course of business, whose primary purpose and effect was to operate as a fraud and deceit on purchasers of TuSimple securities by, among other things, disseminating materially false and misleading statements and/or concealing material adverse facts about TuSimple's operations. Defendants' scheme deceived the investing public regarding TuSimple's operations

4887-3830-0802.v2

and the intrinsic value of TuSimple's securities, and damaged Plaintiffs and other Class members as a result of their purchases of TuSimple securities at artificially inflated prices.

67.     The Company's releases and SEC filings were group-published documents, representing the collective actions of the Company management. Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein under the Exchange Act and were aware, or recklessly disregarded, with respect to the statements at issue herein, that false and misleading statements were being issued regarding the Company.  Defendants also approved or ratified these statements in violation of the Exchange Act.

### D.     Defendants Named Under the Securities Act

68.     In addition to Chao, Hou, Chen, Zhang, Lu, Dillon, and Buss, the following additional defendants are named under the Securities Act.

69.     Karen C. Francis ("Francis") served as a member of the Company's Board of Directors from February 2021 until she was ousted by Chen and Hou shortly after the Class Period ended on November 10, 2022.  During the Class Period, Francis was a member of the Audit Committee and the Compensation Committee.  Also, during the Class Period, Francis signed TuSimple's: (i) Registration Statement on Form S-1, filed on March 23, 2021; (ii) Amendment No. 1 to the Registration Statement on form S-1/A, filed on April 7, 2021, (via a power of attorney granted to Lu); and (iii) Annual Report on Form 10-K, filed on February 24, 2022.

70.     Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the Company's IPO and acted as a lead book-running manager for the proposed offering.  Morgan Stanley is headquartered at 1585 Broadway, New York, NY, 10010.

4887-3830-0802.v2

71.     Citigroup Global Markets, Inc. ("Citigroup") served as an underwriter for the Company's IPO and acted as a lead book-running manager for the proposed offering.  Citigroup is headquartered at 388 Greenwich Street, New York, NY, 10013.

72.     J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the Company's IPO and acted as a lead book-running manager for the proposed offering.  J.P. Morgan is headquartered at 383 Madison Avenue, New York, NY, 10179.

73.     BofA Securities, Inc. ("BofA") served as an underwriter for the Company's IPO and acted as a book-running manager for the offering.  BofA is headquartered at One Bryant Park, New York, NY, 10036.

74.     Cowen and Company, LLC ("Cowen") served as an underwriter for the Company's IPO and acted as a book-running manager for the offering.  Cowen is headquartered at 599 Lexington Avenue, 20th Floor, New York, NY, 10022.

75.     Credit Suisse Securities (USA) LLC ("Credit Suisse") served as an underwriter for the Company's IPO and acted as a book-running manager for the offering.  Credit Suisse is headquartered at 11 Madison Avenue, New York, NY, 10010.

76.     Nomura Securities International, Inc. ("Nomura") served as an underwriter for the Company's IPO and acted as a book-running manager for the offering.  Nomura is headquartered at Worldwide Plaza, 309 West 49th Street, New York, NY, 10019.

77.     RBC Capital Markets, LLC ("RBC") served as an underwriter for the Company's IPO and acted as a book-running manager for the offering.  RBC is headquartered at 3 World Financial Center, 200 Vesey Street, New York, NY, 10281.

78.     Needham & Company, LLC ("Needham") served as an underwriter for the Company's IPO and acted as a co-manager for the offering.  Needham is headquartered at 250 Park Avenue, 10th Floor, New York, NY, 10177.

4887-3830-0802.v2

79.     Oppenheimer & Co., Inc. ("Oppenheimer") served as an underwriter for the Company's IPO and acted as a co-manager for the offering.  Oppenheimer is headquartered at 85 Broad Street, 22nd Floor, New York, NY 10004.

80.     Piper Sandler & Co. ("Piper Sandler") served as an underwriter for the Company's IPO and acted as a co-manager for the offering.  Piper Sandler is headquartered at 800 Nicollet Mall, Minneapolis, MN 55402.

81.     Robert W. Baird & Co. Incorporated ("Baird") served as an underwriter for the Company's IPO and acted as a co-manager for the offering.  Baird is headquartered at 777 East Wisconsin Avenue, Milwaukee, WI, 53202.

82.     Valuable Capital Limited ("Valuable Capital") served as an underwriter for the Company's IPO and acted as a co-manager for the offering.  Valuable Capital is headquartered at China Merchants Tower, Shun Tak Centre, 168-200 Connaught Road Central, Hong Kong.

83.     Defendants listed in ¶¶70-82 *supra*, are referred to herein as the "Underwriter Defendants."

84.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement.

85.     The defendants named under the Securities Act solicited the purchase of the securities issued pursuant to the Registration Statement, planned and participated in the preparation of the statements contained in the Registration Statement, and promoted the IPO to investors.

## V.     DEFENDANTS' VIOLATIONS OF THE FEDERAL SECURITIES LAWS

### A.     Relevant Company Background

86.     TuSimple focuses on developing technology to enable self-driving long-haul freight trucks on public roads.  TuSimple was founded by Chen and Hou in September 2015.  At all relevant times, TuSimple was controlled by Hou and Chen, who together held approximately 59% of the Company's voting power.  At its

founding, the Company was headquartered in San Diego, California, with employees also located in Arizona and in Beijing, China.

87.     TuSimple develops hardware and software designed to allow the fully autonomous operation of semi-trucks without the assistance, intervention, or even presence of a human driver.  This is referred to as a "Level 4" or "L4" autonomy. TuSimple operates in a highly competitive field, with multiple startups, established technology companies, and vehicle manufacturers vying for technological gains and market share.

88.     The Company also claims to "be the first company to autonomously operate semi-trucks without a driver or human operator on open public roads" and to "autonomously haul a paid freight load."  The ability to operate without a human driver gave TuSimple a substantial edge over its competitors, who were operating semi-trucks that still required a human safety driver to take control when needed.

89.     Prior to the IPO, the Company disclosed a federal probe into TuSimple and its connection to Chinese entities by CFIUS, an interagency national security panel that is mandated, among other things, to determine whether investments or transactions involving U.S. businesses create national security risks, including transactions that result in control of an American entity by a foreign person.  On March 8, 2021, TuSimple disclosed that CFIUS was investigating a 2017 related-party transaction orchestrated by Chen and Hou, in which TuSimple's predecessor entity – TuSimple (Cayman) Limited – acquired the U.S. business of TuSimple, LLC.

90.     The Company has repeatedly emphasized that the intellectual property and other assets enabling its technology are extremely valuable and vital to the Company.  For instance, the Company's Registration Statement and Class Period quarterly reports on Forms 10-Q represented that:

> Our intellectual property is an essential asset of our business. Failure to adequately protect our intellectual property rights could result in our competitors offering similar products, potentially resulting in the loss of our competitive advantage, and a decrease in our revenue which

would adversely affect our business prospects, financial condition, and operating results.  Our success depends, at least in part, on our ability to protect our core technology and intellectual property.  We rely on a combination of intellectual property rights, such as patents, trademarks, copyrights, and trade secrets (including know-how), in addition to employee and third-party nondisclosure agreements, intellectual property licenses, and other contractual rights, to establish, maintain, protect, and enforce our rights in our technology, proprietary information, and processes.

91.     The Company also repeatedly assured investors that "***we will endeavor to try to protect our technologies, products, and services with intellectual property rights***."  These statements, repeated throughout the Class Period as alleged in Section V.G., *infra*, were materially misleading when made.  Indeed, while assuring investors that the Company's intellectual property was critical and that they would endeavor to protect it, defendants simultaneously failed to disclose that they were sharing that information with Hydron.[7]

## B.     Relevant National Security Background

92.     Both the United States and China have identified the use of AI for autonomous vehicles as critical for military and economic competitiveness.  During an interview for a *Reuters* news report dated July 27, 2021, SEC Commissioner Allison Lee commented that "Chinese companies listed on U.S. stock exchanges must disclose [to investors] the ***risks of the Chinese government interfering in their businesses*** as part of their regular reporting obligations."  In September 2022, President Biden issued an Executive Order aimed at improving the scrutiny of foreign investment in U.S. companies building critical technology.  The executive order specified that the technology for hydrogen powered vehicles, like those Hydron seeks to develop, is key to United States national security.  According to a *Carnegie Endowment Report* dated April 25, 2022, China has been "pressuring foreign

---

[7]   Chen issued a release revealing that he "launched" Hydron on June 10, 2022.  While this may have been the first time he publicly disclosed Hydron, Chen founded Hydron under the name Turing Auto, Inc. on March 29, 2021.  Nevertheless, merely five days after Chen's disclosure of Hydron, the Company's then CFO (Dillon) suddenly and unexpectedly resigned on June 15, 2022.

companies into sharing trade secrets and intellectual property with Chinese corporate partners [which] has [a] disproportionate impact on U.S. companies built around specific technology rights, know-how, and data."

93. United States companies with AV interests have repeatedly been the victim of trade secret and other intellectual property theft by Chinese insiders, like Chen, Hou, Chao, and Zhang, who then transfer such assets to Chinese companies, like Sun Dream and Hydron.

94. Relatedly, in 2018, the Trump Administration accused China of being the most significant perpetrator of economic espionage in the world.

95. On December 11, 2018, the *Washington Post* reported on "mounting intelligence showing a sustained Chinese hacking effort devoted to acquiring sophisticated American technologies of all stripes" adding that the "Trump administration wants to dismantle China's state-led economic model, fearing its heavily subsidized economic giants – armed with stolen or coerced American technology – give Chinese companies an unfair advantage in global markets." These concerns remain relevant today.

96. According to an August 16, 2023 *Reuters* report titled "U.S. SEC Says Will Continue to Carefully Review China IPO prospectuses," "U.S. Senator Marco Rubio, a senior member of the Senate Committee on Foreign Relations, urged SEC chair Gary Gensler to 'take action to protect American retirees and investors from these deceptive Chinese firms.'"

97. In recent years, the U.S. government has tightened its controls on the illicit transfer of technology and other assets to foreign persons and nations. The National Defense Authorization Act for Fiscal Year 2019 enacted the Foreign Investment Risk and Review Modernization Act, which aims to prevent foreign persons and entities from acquiring critical U.S. technologies through foreign investment. Congress also passed the Export Controls Act in 2019, which closes

loopholes in export controls by restricting the transfer of emerging and foundational technologies to foreign persons.

98.     More recently, the Biden Administration issued Executive Orders on September 22, 2022 and August 11, 2023 addressing, *inter alia*, "evolving national security risks by the Committee on Foreign Investment in the United States [CFIUS]." As is relevant here, President Biden's Executive Order 14083, signed September 15, 2022, specifically highlighted "technologies that are fundamental to national security, including . . . artificial intelligence [and] advanced clean energy (such as battery storage and hydrogen)." The securities fraud scheme alleged herein was designed to, and did, plunder such technologies from TuSimple and defraud U.S. investors.

99.     Currently, the FBI, Treasury Department, and SEC are investigating whether TuSimple improperly financed and transferred its technology to Hydron. These government investigations are scrutinizing TuSimple's failure to make appropriate related party transactions disclosures in its securities filings and whether Hou and others at TuSimple willingly gave technology to Hydron, a Chinese competitor, in violation of, *inter alia*, the federal securities laws.

### C.     TuSimple's NSA with CFIUS

100.     CFIUS is an interagency committee, led by the Department of the Treasury, that is authorized to review certain transactions involving foreign investment in the United States and certain real estate transactions by foreign persons, to determine the effect of such transactions on the national security of the United States. Its mission statement includes reviewing transactions that result in control of a U.S. business, like TuSimple, by foreign adversaries.

101.     Prior to the Class Period, CFIUS initiated an investigation focused on TuSimple's connections to Sun Dream, which is a subsidiary of Sina. Both Sun Dream and Sina are controlled by Chao, who also backed Chen's Hydron startup. Sun

4887-3830-0802.v2

Dream holds 20% of TuSimple's total equity.  The Company's Registration Statement stated that:

> On March 1, 2021, the CFIUS Staff Chairperson, acting at the direction of the Committee, requested that we file a written notice regarding the 2017 purchase of shares of our Series B redeemable convertible preferred stock by Sun Dream Inc. ("Investor"), an affiliate of Sina Corporation (the "Investment").

102.   In March 2021, Chen, then a director and Executive Chairman of the Company, launched Hydron as a rival autonomous trucking company to TuSimple.  Hydron focuses on developing long-haul freight trucks using hydrogen power and, like TuSimple, autonomous driving technology.  TuSimple has since admitted in an SEC filing that Hydron "has significant operations in China."  Hou, who was a director, CTO, and later CEO of the Company, aided Chen and Hydron by expropriating TuSimple's intellectual property – including "technical data, blueprints and schematics that would enable Hydron to replicate TuSimple's technology" – and transferring it to Hydron.  Hydron benefitted from these illicit transfers because it was able to make use of valuable intellectual property and technological advancements that it did not itself develop.

103.   Accordingly, prior to the Class Period, defendants knew that the United States was concerned that the Company's close ties to Sina (and Chao and Zhang) posed a national security risk.  On February 18, 2022, the Company entered into the NSA with CFIUS and other federal entities as a result of the investigation, which it disclosed in a release on Form 8-K on February 22, 2022.[8]  That Form 8-K stated in pertinent part that:

> Charles Chao and Bonnie Yi Zhang have each agreed not to stand for reelection to the board of directors of TuSimple Holdings Inc. (the "Company") when their current terms expire at the next annual meeting of stockholders of the Company.

*     *     *

---

[8]   The Form 8-K was signed by James Mullen, the Company's then Chief Administrative & Legal Officer.

- 27 -

On February 18, 2022, the Committee on Foreign Investment in the United States ("CFIUS") concluded its previously disclosed review of the 2017 acquisition of the U.S. business of TuSimple LLC by TuSimple (Cayman) Limited (now known as TuSimple Holdings Inc.) and determined that there are no unresolved national security concerns.

*      *      *

As part of the resolution, on February 18, 2022, the Company entered into a National Security Agreement ("NSA") with the U.S. government under which it has agreed to limit access to certain data and adopt a technology control plan, appoint a security officer and a security director, establish a government security committee of the board of directors of the Company to be chaired by the security director, and periodically meet with and report to certain CFIUS monitoring agencies. In addition, current directors of the Company representing Sun Dream Inc, one of our stockholders, have agreed that they will not stand for re-election to the board of directors of the Company upon expiration of their current terms, and Sun Dream Inc has agreed that it will not nominate replacement candidates or increase its current shareholdings in the Company.

104.   The NSA required TuSimple to appoint a "security officer" and to have a "security director" on its Board.  It is also required to maintain a "Government Security Committee," chaired by the security director, and to submit reports to CFIUS monitoring agencies.  In addition, CFIUS forced TuSimple to isolate its data and technology to prevent these assets from being shared with a Chinese subsidiary of TuSimple.

105.   As part of the NSA, TuSimple agreed to place Reed Werner on its Board to serve as the Board's security director, Chair of the Government Security Committee, and member of the Audit Committee.  Before joining TuSimple, Mr. Werner worked at several government agencies, including the Department of Defense, the Department of State, and the National Security Council.

106.   The NSA also required Chao to relinquish the two Board seats controlled by Sun Dream, which had been held by Chao and Zhang.  After Chao and Zhang were removed from TuSimple's Board, Hou (then the Company's CTO) was elevated to CEO and Chairman of the Board, replacing Lu as CEO and Chen as Chairman.  Until his removal, Lu had been the CEO since September 2020, having joined the Company

4887-3830-0802.v2

as CFO in January 2019. TuSimple announced these changes to the market in a current report on Form 8-K, which it filed with the SEC on March 3, 2022.

107. This suspicious elevation of Hou, who had no experience being a CEO or Board Chairman, stunned investors and caused the Company's stock price to decline more than 21% on March 3, 2022, with trading prices falling $3.72 per share to close at $13.25 per share, on heavy volume of 6.5 million shares. TuSimple's stock price continued to decline by an additional 13.2% on March 4, 2022.

108. As set forth below, TuSimple thereafter brazenly violated the NSA as Chen and Hou used their corporate control over TuSimple to oust the entire Audit Committee.

**D.   Hou and Chen Violate the NSA**

109. Hou, who was a director, CTO, and later CEO of TuSimple, schemed with Chen and Chao to expropriate TuSimple's intellectual property which, according to the Company's SEC filings, included "technical data, blueprints and schematics that would enable Hydron to replicate TuSimple's technology" and transfer it to Hydron. Hydron benefitted from these illicit transfers because it was able to make use of valuable intellectual property and technological advancements that it did not itself develop.

110. As a result of the improper asset transfers to Hydron, TuSimple's intellectual property was provided to a rival startup with significant operations in China and indirect ties to the CCP. These asset transfers have subjected TuSimple to multiple federal investigations by the FBI, the SEC, and CFIUS.

111. According to the *Wall Street Journal*, Chao was a "critical backer" of TuSimple and Hydron as well as a "confidant and adviser" to both Chen and Hou. Chao was a TuSimple director until he was required by the NSA to forfeit his seat following the Company's 2022 annual meeting in June 2022. Chao controls 5.6% of the Company's voting power, according to TuSimple's 2022 Proxy Statement.

4887-3830-0802.v2

112.    Following extensive public reporting about various federal criminal investigations into the relationship between TuSimple and Hydron, on October 31, 2022, TuSimple announced in a release on Form 8-K that:

> [T]he Board of Directors of the Company has terminated Dr. Xiaodi Hou, the Chief Executive Officer, President and Chief Technology Officer of the Company, and removed Dr. Hou from his position as Chairman of the Board and as a member of the Government Security Committee, effective as of October 30, 2022.

113.    Hou, however, remained on the Board as a director, and Hou and Chen leveraged their combined majority voting power to oust the remaining directors and take complete control of the Board.  A week after Hou's termination as CEO, he transferred his voting rights to Chen, thus creating a controlled company exemption under applicable NASDAQ rules, which exempted TuSimple from any requirement to have a majority of independent directors.  With sole voting control, Chen then acted by written consent to remove the entire Board except Hou.

114.    Chen then departed as the sole remaining director.  Hou immediately filled the vacant directorships, appointing Chen and Lu as directors, thus creating a non-independent Board.  Chen was then appointed as Executive Chairman, and Lu was appointed CEO.  After Hou was ousted, the Board appointed Ersin Yumer as interim CEO and Buss as Chairman.  The Company also announced on October 31, 2022, that an internal investigation revealed that TuSimple employees spent time – while being paid by TuSimple – working for Hydron in 2021, long before Chen resigned from the Board.

115.    That material fact was not presented to or approved by the Board or the Audit Committee, despite the Audit Committee being tasked with "review[ing] and oversee[ing] all transactions between the Company and a related person" and "review[ing] actual and potential conflicts of interest, including potential taking of 'corporate opportunities' by insiders, Board members, and corporate officers."  The

4887-3830-0802.v2

Board also determined that in 2022, TuSimple had improperly provided confidential information to Hydron.

116.   In a release on Form 8-K that was filed with the SEC on October 31, 2022, the Company specifically admitted that:

> As of the time of this filing, the Company believes that, based on information obtained in connection with an ongoing investigation by the Company's Audit Committee, during 2021 ***Company employees spent paid hours working on matters for Hydron Inc*** (f/k/a Turing Auto), a company which the Company believes has significant operations in China, and that such paid hours had an estimated value of less than $300,000. Mr. Mo Chen, one of our co-founders and former Executive Chairman, is a founder, director and chief executive officer of Hydron, ***and he has an equity interest in the Company of greater than 10%. This related party transaction was not presented to, or approved by, the Audit Committee as required by the Company's Code of Conduct***.

> Based on the Audit Committee's investigation, which remains ongoing, the Company also believes that during 2022, in connection with the Company's evaluation of Hydron as a potential OEM partner, the Company shared confidential information with Hydron and its partners, which was not brought to the attention of the Audit Committee and Government Security Committee, and before entering into relevant non-disclosure and other cooperation agreements.

117.   Item 404(a) of Regulation S-K requires disclosure of the following information: (i) the name of the related person and the basis for that person being a related person; (ii) the related person's interest in the transaction and that person's relationship to, or in, any party with an interest in the transaction; (iii) the approximate dollar value of the transaction; (iv) the dollar value of the related person's interest (computed without regard to profit or loss); and (v) any other information that is material to investors in light of the circumstances regarding the transaction or the related person in the context of the transaction.

118.   The determination of materiality involves consideration of the significance of the information to investors in light of all the circumstances, which includes, among other things: (i) the relationship of the related persons to the transaction; (ii) the relationship between the related persons; (iii) the importance of the interest to the related persons; and (iv) the amount involved in the transaction.

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-00282-BEN-MSB)

4887-3830-0802.v2

119. A "transaction" includes any financial transaction, arrangement, or relationship or series of transactions, arrangements, or relationships. A "related person" is any person who was, at any time during the disclosure period, a director or executive officer, any nominee for director for whom information required by Item 404(a) is being disclosed in a proxy involving any significant shareholder. A significant shareholder, as here, is any person who is known to the registrant to be the beneficial owner of more than 5% of any class of the registrant's voting securities. Together, Hou, Chen, and Chao controlled 68.3% of the total voting power under TuSimple's Class A and Class B share voting structure.

120. On November 10, 2022, the Company announced via a release on Form 8-K that Hou and Chen ousted the Company's entire Board. Specifically, the Form 8-K signed by Eric Tapia, the Interim CFO, stated that:

> On November 10, 2022, the Company received a written consent in which stockholders White Marble LLC, White Marble International Limited, Gray Jade Holding Limited, THC International Limited and Brown Jade Holding Limited, which together are the record holders of a majority of the voting power of the outstanding shares of capital stock of the Company, consented to **the removal of Brad Buss, Karen C. Francis, Michelle Sterling and Reed Werner from the Company's board of directors**. At such time, Dr. Xiaodi Hou became the sole remaining member of the Company's board of directors ("Sole Director").

> On November 10, 2022, the Sole Director appointed Mo Chen and Cheng Lu to the Company's board of directors.

> On November 10, 2022, the board of directors (i) removed Ersin Yumer as interim Chief Executive Officer and President of the Company, (ii) appointed Cheng Lu as Chief Executive Officer of the Company, and (iii) appointed Mo Chen, as Executive Chairman of the Company's board of directors, each effective immediately.

> ***All committee posts on the board of directors were vacated upon the removal of the previous directors***. No new committee assignments have been made, including for the Government Security Committee. The Company intends to make committee assignments and to be in compliance with all regulatory and Nasdaq requirements as soon as possible.

121. The actions Hou and Chen took against the Board squarely violated the February 18, 2022 NSA, which was intended to prevent the transfer of assets to China,

- 32 -

4887-3830-0802.v2

1    including through an undisclosed related party such as Hydron.  Their actions also

2    caused the Company's auditors at KPMG to immediately resign on November 10,

3    2022.  The *Wall Street Journal* subsequently reported that members of CFIUS have

4    recommended that the Department of Justice consider bringing criminal espionage

5    charges against Chen and Hou.

6         122.   Integral to defendants' scheme was the secret transfer of the Company's

7    valuable intellectual property by Hou, Chen, Zhang, Lu, and Chao to Hydron, which

8    occurred without Board approval and in violation of the NSA between the Company

9    and the U.S. federal government designed to prevent TuSimple from transferring its

10   technology to China.  When the Board learned of the transfer, and subsequently

11   announced that the Company's outside auditor was investigating it and removed Hou

12   as CEO (but not from the Board), Hou and Chen furthered their scheme by ousting all

13   of the other directors from the Board to restore their power over the Company's

14   operations.

15        **E.    TuSimple's Undisclosed Safety Failures and Prospects**

16        123.   Prior to and during the Class Period, recognizing the importance that

17   investors and the general public placed on safety – or the appearance of safety –

18   concerning driverless vehicles, TuSimple regularly touted its safety profile claiming

19   safety was a priority for the Company.

20        124.   For example, in March 2021 in the lead-up to the IPO, TuSimple posted

21   on its public-access website a document titled "2021 Safety Report."  The 2021 Safety

22   Report described how TuSimple was purportedly developing "the world's safest

23   autonomous truck":

24              We're building fault-tolerance and fail-operational capability into
25         our autonomous system by using proven practices and frameworks
           developed for automotive, aerospace, and military applications to
           improve the reliability and safety of our autonomous system.  To reduce
26         the likelihood of system failure, we design for reliability, self
           diagnostics, self-correction, and redundancy where necessary.  We
27         perform extensive testing to evaluate the reliability of every component
           of the system and implement 3-tier redundancy whenever possible.  We
28

4887-3830-0802.v2

also perform fault analysis to develop a fault mitigation plan that covers the risks identified in our HARA. All safety mechanisms, faults, and fault tolerances are validated as is required to meet our functional safety goals.

125. The 2021 Safety Report not only maintained that TuSimple's autonomous trucks were safe, but that the trucks were being developed "in accordance with exceedingly high safety standards":

> In addition to cutting-edge technology and advanced algorithms, it is important that autonomous systems are designed, manufactured, and used in accordance with exceedingly high safety standards. That is why we are building International Organization for Standardization (ISO) 26262 into every aspect of our system, hardware, software, purchasing, and production processes and are designing to meet the stringent ISO/PAS 21448 SOTIF (safety of the intended function).

> *       *       *

> We adhere to internationally recognized standards including relevant standards, recommended practices and guidance from the DOT, aerospace, and military to inform the design, sourcing, verification, and validation of every element of the autonomous system. Following the process outlined in ISO 26262 (Functional Safety – Road Vehicles), we begin by engaging in a requirements analysis to clearly develop the Item Definition.

> *       *       *

> To safely react to situations that limit the autonomous system's capabilities or changes in roadway, weather, or other conditions outside the system's operational design domain, the system must be able to detect the critical event or change in conditions and to perform a fallback, or minimal risk condition (MRC), maneuver in response. Our system constantly monitors the health of every safety-critical component and validates all data and timestamps through checks and redundancies to detect scenarios in which an MRC maneuver is required.

> *       *       *

> With fail-operational functionality, our system can determine whether to continue to operate under more restricted operational parameters or if it must stop operating immediately.

> *       *       *

> To limit public exposure to unnecessary risk, we use computer simulation testing before moving to test track/proving ground testing, then finally move to road-level testing with Safety Operators after the system has passed the previous two phases of testing. . . . Only after the system has successfully passed the unit, simulation, and closed-road track tests is it allowed to operate on public roads.

4887-3830-0802.v2

126.    Despite presenting a public image which promoted safety in its operations, TuSimple was in actuality cutting corners in a rush to complete its autonomous driving test appropriately codenamed "Ghost Rider."   For example, despite TuSimple's assurances otherwise, John Lindland, a former Functional Safety Engineering Lead at the Company, has alleged that he repeatedly warned management that the Company was not complying with ISO 26262.

127.    Defendants emphasized the safety of its purportedly "world-class" sensor system that will provide its semi-trucks with a one-thousand-meter "perception range."   According to the Prospectus, for instance:

> We designed a proprietary camera module coupled with our proprietary software that enables the semi-truck's 1,000 meter perception range, even in low light conditions.  This range across lighting environments is designed to provide our semi-trucks with sufficient reaction time to safely operate at highway speeds, ultimately allowing for a planning horizon up to 35 seconds.  Our camera-centric system is powered by both primary and backup cameras, providing a fully redundant camera system **for increased safety**.

128.    The Prospectus also added that the Company's "cloud-based autonomous operations oversight system is **designed to ensure safe operations**, reliability, and efficient capacity for our users."

129.    In fact, Mr. Lindland's wrongful termination complaint confirms that the Company's and Hou's conduct contradicted TuSimple's Class Period representations regarding safety.  For instance, during his year-and-a-half tenure at TuSimple that spanned from August 2018 through March 2020, Mr. Lindland was given the impression that management considered "**Functional Safety . . . a waste of [Hou's team's] time**," and yet management "**falsely** advertis[ed] to their customers how Function Safety is **concern number one** at TuSimple." (emphasis in original).  Mr. Lindland details numerous incidents underscoring how he "was wrongfully terminated under the excuse that he was 'disruptive' and 'did not do his job,' while the real reason for his termination was the fact that he would not falsify information with

- 35 -

4887-3830-0802.v2

respect to safety." Mr. Lindland also alleges that the Company retaliated against him for refusing to sign off on unmet safety standards.

130. Notably, Mr. Lindland was hired by Hou, had numerous personal interactions with him and worked in Hou's functional safety department. Mr. Lindland stated that he "was hired in order to control the safety aspect of TuSimple's vehicles, which could weigh as much as 80,000 pounds and would be moving across America's roads autonomously." Mr. Lindland claims that he did not want to place Americans at risk, nor risk civil and criminal liability for adults and children who might be killed or injured or "rendered quadriplegic, paraplegic, or suffered brain or other injuries," which is why he would not falsify information with respect to safety as human lives were at stake. Mr. Lindland stated that "[TuSimple] was not as concerned about the safety of their vehicles as [he was]." In addition, according to Mr. Lindland, "[o]ne of Hou's favorite phrases was 'we are going to do Functional Safety the TuSimple way,' meaning ignoring the legal requirements of ISO 26262 and IATF 16949."

131. According to Mr. Lindland's opposition to TuSimple's motion for summary judgment: "Despite [Mr. Lindland's] efforts to perform the duties of his job, [Mr. Lindland] was prevented from doing so by . . . Mr. Hou" and "[o]n several occasions, Mr. Hou instructed [Mr. Lindland] to cease working on functional safety analyses, which made it impossible for [Mr. Lindland] to perform his job. On one occasion, Mr. Hou instructed [Mr. Lindland] to stop working on functional safety."

132. Moreover, as was later reported by *The Wall Street Journal* on August 1, 2022, the Company completed less than half of its targeted 500 test runs before launching its AVs on public roads.

133. On April 6, 2022, while operating near Tucson, Arizona, one of TuSimple's AVs was driving along Interstate 10, with two safety drivers in the cabin. Immediately after the autonomous driving system was engaged, the vehicle abruptly

1    lurched towards the left and smashed into a concrete barrier.  The April Crash was

2    captured on video.

3         134.   On May 10, 2022, TuSimple "met with NHTSA staff on May 10th

4    [2022] to discuss [the April Crash]," and during that meeting, "NHTSA indicated that

5    it would request additional information about that incident."[9]  TuSimple concealed the

6    existence of this meeting until July 26, 2022.

7         135.   On May 26, 2022, the Federal Motor Carrier Safety Administration

8    ("FMCSA") sent a letter to TuSimple ("FMCSA Letter"), which stated, in pertinent

9    part:

10        The purpose of this letter is to officially notify you that FMCSA
     will investigate your operations to determine the level of safety within
11   your transportation operation.   We will start this safety compliance
     investigation in person at your place of business at the following location
12   and date/time:

13                           *     *     *

14        Please note that because your operations are of a special nature
     involving trucks equipped with Automated Driving Systems (ADS), and
15   because the National Highway Traffic Safety Administration (NHTSA)
     has special expertise related to ADS technology as well as authority over
16   safety of motor vehicles and motor vehicle equipment, NHTSA staff will
     be joining FM CSA in this investigation.  Further, we are aware that
17   TuSimple met with NHTSA staff on May 10th to discuss one specific
     crash incident (the April 6th incident as described in TuSimple's
18   Standing General Order (SGO) data submission), and that NHTSA
     indicated that it would request additional information about that incident.
19   This letter serves to inform you that while FMCSA is using its motor
     carrier oversight authority to initiate this investigation, in the interest of
20   efficiency and to avoid duplicative efforts, NHTSA and FMCSA are
     working together to better understand two samples safety operations and
21   equipment.   As such, information requested by FMCSA within this
     investigation will be shared with NHTSA, and requests of information
22   by NHTSA in connection with the April 6th incident are made part of
     information requests in connection with this FMCSA-led investigation.
23

24        136.   It was not until July 25, 2022, however, that the video of the April Crash

25   was publicly leaked on a YouTube channel titled "Mutha Trucker – Official Trucking

26   Channel" ("Mutha Trucker").  Mutha Trucker uploaded footage of the April Crash in

27   ───────────────
     [9]    The quoted materials are sourced from a letter prepared by the FMCSA to
     TuSimple, dated May 26, 2022.

28
                                   - 37 -          3:22-cv-01300-BEN-MSB
                                            (Consolidated with No. 3:23-
                                                cv-00282-BEN-MSB)

a video titled "Alleged Whistle Blower Shares Raw Video of Self Driving Semi Truck Crashing into Median 🎯."

137.   The video also included the text of the FMCSA Letter.  Both items were purportedly shared by an anonymous Company insider, who had written to "Mutha Trucker":[10]

> *I'm sending this anonymously due to my position at TuSimple*.
>
> The attached video and letter from the FMCSA will speak for themselves.
>
> *Testing on public roads must stop*.
>
> The video shows the driver reaching over to engage the autonomous system.  When he does, the truck immediately makes a left turn.
>
> Hope you post this on YouTube!

138.   On August 1, 2022, the *Wall Street Journal* published an exclusive investigative report titled "Self-Driving Truck Accident Draws Attention to Safety at TuSimple," which highlighted the April Crash, and stated that the Company blaming "human error" for the crash was misleading because common safeguards – which were not in place – should have prevented the April Crash from occurring. Specifically, the article stated in pertinent part:

> On April 6, an autonomously driven truck fitted with technology by TuSimple Holdings Inc. suddenly veered left, cut across the I-10 highway in Tucson, Ariz., and slammed into a concrete barricade.
>
> The accident, which regulators disclosed to the public in June after TuSimple filed a report on the incident, underscores concerns that the autonomous-trucking company is risking safety on public roads in a rush to deliver driverless trucks to market, according to independent analysts and more than a dozen of the company's former employees.  A TuSimple spokesman said safety is a top priority for the company and that nobody was injured in the accident.
>
> *        *        *
>
> The Federal Motor Carrier Safety Administration, an agency within the Transportation Department regulating trucks and buses, has launched what it described in a May 26 letter to the company as a 'safety

---

[10]   *See* YouTube.com, https://youtu.be/ymD8_DGwP50?si=cCcIS1aUUm3dRMr3.

4887-3830-0802.v2

compliance investigation' into TuSimple.  The letter referenced the accident.

The April incident involved a rig with a TuSimple driver and engineer aboard, and the company has repeatedly blamed the accident on human error.  But details in the June regulatory disclosure, along with internal company documents, show what autonomous-driving-system specialists say are fundamental problems with the company's technology.

An internal TuSimple report on the mishap, viewed by *The Wall Street Journal*, said the semi-tractor truck abruptly veered left because a person in the cab hadn't properly rebooted the autonomous driving system before engaging it, causing it to execute an outdated command. The left-turn command was 2 1/2 minutes old-an eternity in autonomous driving-and should have been erased from the system but wasn't, the internal account said.

But researchers at Carnegie Mellon University said it was the autonomous-driving system that turned the wheel and that blaming the entire accident on human error is misleading.  Common safeguards would have prevented the crash had they been in place, said the researchers, who have spent decades studying autonomous-driving systems.

For example, a safety driver-a person who sits in the truck to backstop the artificial intelligence-should never be able to engage a self-driving system that isn't properly functioning, they said.  The truck also shouldn't respond to commands that are even a couple hundredths of a second old, they said.  And the system should never permit an autonomously-driven truck to turn so sharply while traveling at 65 miles an hour.

"This information shows that the testing they are doing on public roads is highly unsafe," said Phil Koopman, an associate professor at Carnegie Mellon who has contributed to international safety standards for autonomous vehicles, referring to the company's disclosures.

TuSimple said that after the accident, it modified its autonomous-driving system so that a human can't engage it unless the computer system is fully functional.  A former TuSimple engineer said the move was long overdue.

139.   On this news, the trading price of TuSimple's shares fell from $9.96 per share to close at $8.99 per share on August 1, 2022, representing a decline of 9.7% in a single day.  By comparison, the S&P 500 Index declined in value by only 0.2% on the same date.

- 39 -

4887-3830-0802.v2

### F.      Relevant Post-Class Period Developments

140.    On November 15, 2022, the Company revealed that it would not be able to timely file its third quarter Report on Form 10-Q.  The Company also acknowledged that NASDAQ informed the Company that it risks delisting from the exchange because of its failure to timely comply with filing requirements.

141.    The Company had until January 16, 2023, to regain compliance.  If the Company failed to meet that deadline, NASDAQ could grant an extension until May 15, 2023, for the Company to regain compliance.  The Company did not meet either deadline, resulting in the Notice of Delisting (detailed below).

142.    On November 21, 2022, TuSimple disclosed the abrupt resignation of KPMG as the Company's auditor.  Despite serving as TuSimple's accountant since 2018, KPMG resigned as the "result of recent events that culminated in the dismissal of [TuSimple's] previous Board of Directors, including its Audit Committee."  TuSimple's CFO admitted in March 2023 that, as the Company searched for a new auditor, KPMG "just didn't want to get associated with TuSimple because **we were deemed high risk**."

143.    On December 6, 2022, after the market closed, TuSimple announced the termination of its partnership with Navistar to develop self-driving trucks.  BofA Securities reported that the "relationship was ended by Navistar primarily due to governance concerns as TuSimple transitioned across 3 different CEOs (Dr. Hou, Dr. Yumer, and now Mr. Lu) over the span of 3 weeks, and then firing its board of directors."  TuSimple's shares dropped from a close of $2.26 per share on December 5, 2022 to a close of $1.83 per share on December 6, 2022, on high trading volume.

144.    On December 20, 2022, after the market closed, news leaked that TuSimple was going to lay off a significant number of its workforce.  The following day, on December 21, 2022, the Company announced "a broad restructuring plan," and confirmed that it was laying off TuSimple's global workforce by 25%.

4887-3830-0802.v2

1    TuSimple's shares dropped from a close of $1.51 per share on December 20, 2022 to a

2    close of $1.42 per share on December 21, 2022, on high trading volume.

3         145.    On February 1, 2023, the *Wall Street Journal* reported that "[t]he Justice

4    Department has been urged by representatives of a U.S. national-security panel to

5    consider economic-espionage charges against leaders of TuSimple Holdings Inc."  On

6    March 3, 2023, TuSimple received a Notice of Delisting from NASDAQ based on its

7    failure to timely file with the SEC its 2023 Form 10-K.

8         146.    On March 13, 2023, the Company announced that Hou had resigned from

9    the Board on March 9, 2023 amidst an internal investigation into claims that Hou was

10   seeking to get employees of TuSimple to resign from the Company and join a new

11   venture that he was planning.

12        147.    On March 13, 2023, *TechCrunch* published a report elucidating the

13   details surrounding Hou's resignation, reporting that "a 'whistleblower' informed

14   upper management" that Hou had been trying to poach "top talent in 'high tech'

15   teams" over the past few months.  Specifically, he was "pressuring certain employees

16   to stop working so hard, either because they would soon join his new venture or

17   because he wanted to see the autonomous trucking company fail without him."

18   According to *TechCrunch*, the Company's internal investigation confirmed that Hou

19   had approached at least two employees.

20        148.    On May 5, 2023, NASDAQ informed TuSimple that – absent an appeal

21   from the Company to NASDAQ's Hearings Panel – TuSimple's securities would stop

22   trading on the exchange at the close of business on May 15, 2023, pursuant to the

23   Notice of Delisting issued on March 3, 2023.  On May 10, 2023, the Company

24   appointed UHY LLP as its new auditor. On May 11, 2023, the Company announced it

25   would appeal NASDAQ's decision.

26        149.    TuSimple also announced in May 2023 major reductions in its U.S. job

27   force, which eliminated positions for 30% of its U.S. employees in Tucson.

28

4887-3830-0802.v2

1    Previously, in December 2022, TuSimple had laid off 25% of its workers (primarily

2    workers in the United States), including in San Diego and Tucson.  In June 2023, the

3    Company announced that it is currently "evaluating strategic alternatives for its U.S.

4    business."

5         150.   Among these alternatives, TuSimple has proposed a sale of its U.S.

6    business, ceasing its operations in the United States and moving them to Asia.  On

7    June 30, 2023, industry magazine *Trucking Topics* confirmed in a report titled

8    "TuSimple Eyes US Exit, Hires Bankers: Self-Driving Truck Tech Company to Focus

9    on Asia-Pacific Operations" that TuSimple "is exploring strategic alternatives for its

10   U.S. operations, including a sale, which would see the self-driving truck technology

11   provider focus on Asia-Pacific activities instead, the company said."

12        151.   On August 18, 2023, the Company disclosed in a release on Form 8-K

13   that:

14        [o]n August 17, 2023, TuSimple Holdings Inc. (the "Company")
          received a notice (the "Notice") from The Nasdaq Stock Market LLC
15        ("Nasdaq") indicating that, as a result of the Company not having timely
          filed its Quarterly Report on Form 10-Q for the period ended June 30,
16        2023 (the "Form 10-Q"), the Company is not in compliance with Nasdaq
          Listing Rule 5250(c)(1) (the "Listing Rule").
17
          152.   On September 7, 2023, the Company announced in their delayed 2022
18
19   10-K that "the Company and certain current and former directors and officers received

20   subpoenas from the SEC requesting the production of Company documents" in

21   response to the investigation "into the related party transaction with Hydron."

22        153.   Additionally, the Company announced that:

23        The Company is cooperating with an inquiry by CFIUS
          concerning its compliance with the National Security Agreement
24        ("NSA") entered into with the U.S. government as it relates to
          information shared by TuSimple U.S. with TuSimple's China-based
25        businesses ("TuSimple China"), Hydron, and Hydron's partners.

26

27

28

4887-3830-0802.v2

### G.   Defendants' Materially False and Misleading Class Period Related Party Statements and Omissions Concerning Hydron

154.   Throughout the Class Period, defendants either knowingly or recklessly published statements concerning TuSimple's efforts to safeguard its intellectual property and the risks that the Company might face if it failed to effectively protect its intellectual property from being exploited or shared with others.

155.   Chen, one of TuSimple's co-founders and former Executive Chairman, was also a founder, director, and CEO of Hydron, and at all pertinent times maintained an ownership interest in that company greater than 10%.  Chen, with Hou's knowledge, launched Hydron as a rival autonomous trucking company to TuSimple one month prior to TuSimple's IPO, but failed to disclose this related party transaction in the Registration Statement, in any of the Company's Class Period Form 10-Qs or Form 10-Ks, or in any of the Company's other public disclosures as set forth in more detail below.

156.   The related party transactions and sharing of confidential and/or proprietary information with the Hydron Entities were never presented to or approved by the Audit Committee as required by the Company's Code of Conduct, or accounted for under accounting standard ASC 850, which requires disclosures of the: (i) nature of the relationships; (ii) descriptions of the transactions; and (iii) the dollar amounts of the transactions.   *See generally* ASC 850-10-50-1.   Moreover, Item 404(a) of Regulation S-K requires issuers to disclose any transaction(s) exceeding $120,000 in which the registrant was or is to be a participant and in which any related person had or will have a direct or indirect material interest.  *See generally* 17 C.F.R. §229.404.

157.   Accordingly, at all relevant times, defendants' SEC filings as set forth below were materially false and misleading when made.

4887-3830-0802.v2

## 1.      April 16, 2021 Registration Statement

158.   On March 23, 2021, the Company filed a Registration Statement on Form S-1 with the SEC, which Chen, Hou, Lu, Dillon, Chao, Zheng, Buss, and Francis signed.  On April 7, 2021, the Company filed Amendment No. 1 to the Registration Statement.  The Registration Statement was declared effective on April 14, 2021.

159.   On April 16, 2021, the Company filed its Prospectus on Form 424B4 with the SEC, which incorporated and formed part of the Registration Statement. Pursuant to the Registration Statement, TuSimple offered and sold 27,027,027 Class A securities at $40 per share, raising total net proceeds of $1 billion.

160.   The Registration Statement represented, in pertinent part, the following regarding the importance of protecting TuSimple's intellectual property:

> Our business may be adversely affected *if we are unable to adequately establish, maintain, protect, and enforce our intellectual property and proprietary rights or prevent third parties from making unauthorized use of our technology and other intellectual property rights*.
>
> *Our intellectual property is an essential asset of our business. Failure to adequately protect our intellectual property rights could result in our competitors offering similar products, potentially resulting in the loss of our competitive advantage, and a decrease in our revenue which would adversely affect our business prospects, financial condition, and operating results.  Our success depends, at least in part, on our ability to protect our core technology and intellectual property.*  We rely on a combination of intellectual property rights, such as patents, trademarks, copyrights, and trade secrets (including know-how), in addition to employee and third-party nondisclosure agreements, intellectual property licenses, and other contractual rights, to establish, maintain, protect, and enforce our rights in our technology, proprietary information, and processes.

161.   The Registration Statement emphasized defendants' knowledge of the need to protect TuSimple's proprietary information by stating, *inter alia*, that: "We rely on proprietary information (such as trade secrets, know-how, and confidential information) to protect intellectual property that may not be patentable, or that we believe is best protected by means that do not require public disclosure."  It also represented that:

4887-3830-0802.v2

*If any of our trade secrets were to be lawfully obtained or independently developed by a competitor or other third party, we would have no right to prevent them from using that trade secret to compete with us.  If any of our trade secrets were to be disclosed (whether lawfully or otherwise) to or independently developed by a competitor or other third party, it could have a material adverse effect on our business, operating results, and financial condition*.

162.   The Registration Statement added that "[a]ny restrictions implemented by CFIUS, or the threat of any such action, may adversely impact the market for our Class A common stock."  Accordingly, prior to the Class Period, defendants knew that the United States was concerned that the Company's close ties to Sina (and Chao) posed a risk to national security, and that actions by CFIUS could negatively impact the Company's stock price.  However, the Registration Statement omitted any disclosure of Chao's ties to the Chinese government and the risk that such ties could invite enhanced governmental scrutiny of the Company's operations.

163.   The statements made by TuSimple, Chao, Hou, Chen, Zhang, and Lu in ¶¶160-162, *supra*, were materially false and misleading when made, and were made either knowingly or with reckless disregard for the truth.  As later admitted by the Company in its Form 8-K filed with the SEC on October 31, 2022, the true facts were that: (i) TuSimple was contemporaneously engaging in undisclosed related party transactions with Hydron (the company founded by Chen and backed by Chao), in violation of, *inter alia*, SEC Regulation S-K; (ii) defendants shared confidential information and/or proprietary technology with Hydron without Board approval or informing TuSimple shareholders in contravention of federal law and the NSA; (iii) Chao, a major investor in TuSimple and Hydron, had close ties to a foreign adversary; and (iv) the aforementioned conduct enhanced the likelihood of TuSimple being subjected to regulatory scrutiny and/or investigatory action.

### 2.   May 11, 2021 Quarterly Report on Form 10-Q

164.   On May 11, 2021, TuSimple filed with the SEC its quarterly report for the period ending March 31, 2021 on Form 10-Q signed by Lu and Dillon ("1Q21

10-Q"). In a section titled "Related Party Transactions" the Company represented that, "[a]t December 31, 2020, the Company had short-term, unsecured, interest free loans outstanding of approximately $0.6 million due to its executive chairman and one of its directors. During the three months ended March 31, 2021, the Company paid off these loans in their entirety."

165. The 1Q21 10-Q reiterated the importance of protecting TuSimple's intellectual property, stating: (i) the Company's "business may be adversely affected *if we are unable to adequately establish, maintain, protect, and enforce our intellectual property and proprietary rights or prevent third parties from making unauthorized use of our technology and other intellectual property*"; (ii) "[w]e rely on proprietary information (such as trade secrets, know-how, and confidential information) to protect intellectual property that may not be patentable, or that we believe is best protected by means that do not require public disclosure; and (iii) "*[i]f any of our trade secrets were to be disclosed (whether lawfully or otherwise) to or independently developed by a competitor or other third party, it could have a material adverse effect on our business, operating results, and financial condition*."

166. The 1Q21 10-Q also falsely represented that the Company's directors had not shared confidential information, and omitted the fact that such information had been provided to Hydron in violation of Company policy and bylaws:

> Each director shall maintain the confidentiality of, *and shall not share with any third party person or entity* (including third parties that originally sponsored, nominated or designated such director (the "*Sponsoring Party*")), *any non-public information learned in their capacities as directors*, including communications among Board members in their capacities as directors. The Board may adopt a board confidentiality policy further implementing and interpreting this bylaw (a "*Board Confidentiality Policy*"). *All directors are required to comply with this bylaw and any such Board Confidentiality Policy unless such director or the Sponsoring Party for such director has entered into a specific written agreement with the Corporation, in either case as approved by the Board, providing otherwise with respect to such confidential information*.

4887-3830-0802.v2

167.   The statements made by TuSimple and Lu in ¶¶164-166, *supra*, were materially false and misleading when made, and were made either knowingly or with reckless disregard for the truth.  As later admitted by the Company in its Form 8-K filed with the SEC on October 31, 2022, the true facts were that: (i) TuSimple was contemporaneously engaging in undisclosed related party transactions with Hydron (the company founded by Chen and backed by Chao), in violation of, *inter alia*, SEC Regulation S-K; (ii) defendants shared confidential information and/or proprietary technology with Hydron without Board approval or informing TuSimple shareholders in contravention of federal law and the NSA; (iii) Chao, a major investor in TuSimple and Hydron, had close ties to a foreign adversary; and (iv) the aforementioned conduct enhanced the likelihood of TuSimple being subjected to regulatory scrutiny and/or investigatory action."

### 3.   August 5, 2021 2Q 2021 Release on Form 8-K and Earnings Call

168.   On August 5, 2021, TuSimple filed with the SEC a Form 8-K which attached a "Q2 2021 Letter to Shareholders," and was signed by Lu and Dillon.  The letter represented that during the previous quarter the Company continued to "***make important technical innovations around less detectable technologies which we protect via trade secret***."

169.   The statement made by TuSimple and Lu in ¶168, *supra*, was materially false and misleading when made, and was made either knowingly or with reckless disregard for the truth.  As later admitted by the Company in its Form 8-K filed with the SEC on October 31, 2022, the true facts were that: (i) TuSimple was contemporaneously engaging in undisclosed related party transactions with Hydron (the company founded by Chen and backed by Chao), in violation of, *inter alia*, SEC Regulation S-K; (ii) defendants shared confidential information and/or proprietary technology with Hydron without Board approval or informing TuSimple shareholders in contravention of federal law and the NSA; (iii) Chao, a major investor in TuSimple

- 47 -

and Hydron, had close ties to a foreign adversary; and (iv) the aforementioned conduct enhanced the likelihood of TuSimple being subjected to regulatory scrutiny and/or investigatory action.

### 4. August 6, 2021 Quarterly Report on Form 10-Q

170. On August 6, 2021, TuSimple filed its quarterly report for the period ending June 30, 2021 with the SEC on Form 10-Q signed by Lu and Dillon ("2Q21 10-Q"). In a section titled "Related Party Transactions" the Company represented that:

> At December 31, 2020, the Company had short-term, unsecured, interest free loans outstanding of approximately $0.6 million due to its executive chairman and approximately $3.7 million due to Jinzhuo Hengbang Technology (Beijing) Co., Ltd. ("Jinzhuo Hengbang"), an affiliated company of Sina Corporation, the ultimate parent company of one of the Company's investors. Additionally, the Company paid a guarantee deposit of $3.7 million to Sina Corporation in connection with the loans borrowed by the Company from Jinzhuo Hengbang, which was outstanding at December 31, 2020. During the six months ended June 30, 2021, the Company paid off these loans in their entirety, and received a refund of the guarantee deposit paid to Sina Corporation.

171. The 2Q21 10-Q reiterated the importance of protecting TuSimple's intellectual property, stating that: (i) the Company's "business may be adversely affected *if we are unable to adequately establish, maintain, protect, and enforce our intellectual property and proprietary rights or prevent third parties from making unauthorized use of our technology and other intellectual property*"; (ii) "[w]e rely on proprietary information (such as trade secrets, know-how, and confidential information) to protect intellectual property that may not be patentable, or that we believe is best protected by means that do not require public disclosure; and (iii) "*[i]f any of our trade secrets were to be disclosed (whether lawfully or otherwise) to or independently developed by a competitor or other third party, it could have a material adverse effect on our business, operating results, and financial condition*."

172. The statements made by TuSimple and Lu in ¶¶170-171, *supra*, were materially false and misleading when made, and were made either knowingly or with

- 48 -

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-00282-BEN-MSB)

reckless disregard for the truth.  As later admitted by the Company in its Form 8-K filed with the SEC on October 31, 2022, the true facts were that: (i) TuSimple was contemporaneously engaging in undisclosed related party transactions with Hydron (the company founded by Chen and backed by Chao), in violation of, *inter alia*, SEC Regulation S-K; (ii) defendants shared confidential information and/or proprietary technology with Hydron without Board approval or informing TuSimple shareholders in contravention of federal law and the NSA; (iii) Chao, a major investor in TuSimple and Hydron, had close ties to a foreign adversary; and (iv) the aforementioned conduct enhanced the likelihood of TuSimple being subjected to regulatory scrutiny and/or investigatory action.

### 5.   November 4, 2021 Quarterly Report on Form 10-Q

173.   On November 4, 2021, TuSimple filed its quarterly report for the period ending September 30, 2021 with the SEC on Form 10-Q signed by Lu and Dillon ("3Q21 10-Q").   In a section titled "Related Party Transactions" the Company represented that:

> At December 31, 2020, the Company had short-term, unsecured, interest free loans outstanding of approximately $0.6 million due to its executive chairman and approximately $3.7 million due to Jinzhuo Hengbang Technology (Beijing) Co., Ltd. ("Jinzhuo Hengbang"), an affiliated company of Sina Corporation, the ultimate parent company of one of the Company's investors.   Additionally, the Company paid a guarantee deposit of $3.7 million to Sina Corporation in connection with the loans borrowed by the Company from Jinzhuo Hengbang, which was outstanding at December 31, 2020.   During the six months ended June 30, 2021, the Company paid off these loans in their entirety, and received a refund of the guarantee deposit paid to Sina Corporation.

174.   The 3Q21 10-Q reiterated the importance of protecting TuSimple's intellectual property, stating that: (i) the Company's "business may be adversely affected *if we are unable to adequately establish, maintain, protect, and enforce our intellectual property and proprietary rights or prevent third parties from making unauthorized use of our technology and other intellectual property*"; (ii) "[w]e rely on proprietary information (such as trade secrets, know-how, and confidential

4887-3830-0802.v2

information) to protect intellectual property that may not be patentable, or that we believe is best protected by means that do not require public disclosure; and (iii) "*[i]f any of our trade secrets were to be disclosed (whether lawfully or otherwise) to or independently developed by a competitor or other third party, it could have a material adverse effect on our business, operating results, and financial condition*."

175.   The statements made by TuSimple and Lu in ¶¶173-174, *supra*, were materially false and misleading when made, and were made either knowingly or with reckless disregard for the truth.  As later admitted by the Company in its Form 8-K filed with the SEC on October 31, 2022, the true facts were that: (i) TuSimple was contemporaneously engaging in undisclosed related party transactions with Hydron (the company founded by Chen and backed by Chao), in violation of, *inter alia*, SEC Regulation S-K; (ii) defendants shared confidential information and/or proprietary technology with Hydron without Board approval or informing TuSimple shareholders in contravention of federal law and the NSA; (iii) Chao, a major investor in TuSimple and Hydron, had close ties to a foreign adversary; and (iv) the aforementioned conduct enhanced the likelihood of TuSimple being subjected to regulatory scrutiny and/or investigatory action.

## 6.   February 24, 2022 Annual Report on Form 10-K

176.   TuSimple filed its 2021 Annual Report with the SEC on Form 10-K on February 24, 2022 ("2021 10-K"), which repeated the Company's February 22, 2022 Form 8-K's disclosures concerning the CFIUS investigation and the NSA, detailed in ¶¶103-104.  The 2021 10-K was, as pertinent here, signed by Lu, Chen, Hou, Chao, and Zhang.

177.   The 2021 10-K reiterated the importance of protecting TuSimple's intellectual property, stating that: (i) the Company's "business may be adversely affected *if we are unable to adequately establish, maintain, protect, and enforce our intellectual property and proprietary rights or prevent third parties from making*

4887-3830-0802.v2

*unauthorized use of our technology and other intellectual property*"; (ii) "[w]e rely on proprietary information (such as trade secrets, know-how, and confidential information) to protect intellectual property that may not be patentable, or that we believe is best protected by means that do not require public disclosure; and (iii) "*[i]f any of our trade secrets were to be disclosed (whether lawfully or otherwise) to or independently developed by a competitor or other third party, it could have a material adverse effect on our business, operating results, and financial condition*."

178. The statements made by TuSimple, Lu, Chen, Hou, Chao, and Zhang in ¶177, *supra*, were materially false and misleading when made, and were made either knowingly or with reckless disregard for the truth. As later admitted by the Company in its Form 8-K filed with the SEC on October 31, 2022, the true facts were that: (i) TuSimple was contemporaneously engaging in undisclosed related party transactions with Hydron (the company founded by Chen and backed by Chao), in violation of, *inter alia*, SEC Regulation S-K; (ii) defendants shared confidential information and/or proprietary technology with Hydron without Board approval or informing TuSimple shareholders in contravention of federal law and the NSA; (iii) Chao, a major investor in TuSimple and Hydron, had close ties to a foreign adversary; and (iv) the aforementioned conduct enhanced the likelihood of TuSimple being subjected to regulatory scrutiny and/or investigatory action.

### 7.     April 28, 2022 – Form 8-K

179. On April 28, 2022, Dillon signed a Form 8-K filed with the SEC, which announced that Chen, who unbeknownst to investors, owned a substantial interest in Hydron, had:

> decided not to stand for re-election as a director at the Company's next annual meeting of stockholders. The decision is not a result of any disagreement with the Company on any matter relating to the Company's operations, policies or practices. The Company thanks him for his years of service to the Company.

4887-3830-0802.v2

180.   The statements in ¶179, *supra*, by TuSimple were materially false and misleading when made, and were made either knowingly or with reckless disregard for the truth.  As later admitted by the Company in its Form 8-K filed with the SEC on October 31, 2022, the true facts were that: (i) TuSimple was contemporaneously engaging in undisclosed related party transactions with Hydron (the company founded by Chen and backed by Chao), in violation of, *inter alia*, SEC Regulation S-K; (ii) defendants shared confidential information and/or proprietary technology with Hydron without Board approval or informing TuSimple shareholders in contravention of federal law and the NSA; (ii) Chao, a major investor in TuSimple and Hydron, had close ties to a foreign adversary; and (iii) the aforementioned conduct enhanced the likelihood of TuSimple being subjected to regulatory scrutiny and/or investigatory action.

### 8.     April 29, 2022 Schedule 14A Definitive Proxy Statement

181.   On April 29, 2022, TuSimple filed its Definitive Proxy Statement on Schedule 14A with the SEC.  The Definitive Proxy Statement was signed by Hou. The Definitive Proxy Statement included a section titled "Certain Relationships and Related Party Transactions" which stated:

***Policies and Procedures for Related Party Transactions***

We have adopted a written related party transaction policy.  ***The policy provides that our executive officers, directors, holders of more than 5% of any class of our voting securities and any member of the immediate family of and any entity affiliated with any of the foregoing persons, will not be permitted to enter into a related-party transaction with us without the prior consent of our audit committee, or other independent members of our board of directors in the event it is inappropriate for our audit committee to review such transaction due to a conflict of interest***.  Any request for us to enter into a transaction with an executive officer, director, principal stockholder, or any of their immediate family members or affiliates, in which the amount involved exceeds $120,000, ***must first be presented to our audit committee for review, consideration and approval***.  In approving or rejecting the proposed transactions, our audit committee will take into account all of the relevant facts and circumstances available.

4887-3830-0802.v2

Although we did not have a written policy for the review and approval of transactions with related persons before our initial public offering in April 2021, our board of directors historically ***reviewed and approved any transaction where a director or officer had a financial interest***. Prior to approving such a transaction, the material facts as to a director's or officer's relationship or interest in the agreement or transaction were disclosed to our board of directors. Our board of directors took this information into account when evaluating the transaction and in determining whether such transaction was fair to us and in the best interest of all our stockholders.

### Certain Related Party Transactions

In addition to the compensation arrangements with directors and named executive officers described elsewhere in this proxy statement, the following is a description of each transaction since January 1, 2021 and each currently proposed transaction in which:

- we have been or are to be a participant;

- the amount involved exceeded or exceeds $120,000; and

- any of our directors, executive officers or holders of more than 5% of our share capital, or any immediate family member of, or person sharing the household with, any of these individuals, had or will have a direct or indirect material interest.

182. While devoid of any reference to TuSimple's related party transactions with Hydron, the Definitive Proxy Statement detailed certain related party transactions under the headings: (i) "Sale of Series E Redeemable Convertible Preferred Stock"; (ii) "Amended and Restated Stockholders' Agreement"; (iii) "Indemnification Agreements"; (iv) "Concurrent Private Placement"; (v) "Other Transactions"; and (vi) "Joint Development Agreement."

183. Further, despite the Definitive Proxy Statement's assurances that, "before our initial public offering in April 2021, our board of directors historically reviewed and approved ***any transaction where a director or officer had a financial interest***," the Company has since admitted that TuSimple's related party transactions with Hydron had not been presented to the Audit Committee, the Board of Directors, and had not been approved.

4887-3830-0802.v2

184.   The statements made by TuSimple and Hou in ¶¶181-183, *supra*, were materially false and misleading when made, and were made either knowingly or with reckless disregard for the truth.  As later admitted by the Company in its Form 8-K filed with the SEC on October 31, 2022, the true facts were that: (i)TuSimple was contemporaneously engaging in undisclosed related party transactions with Hydron (the company founded by Chen and backed by Chao), in violation of, *inter alia*, SEC Regulation S-K; (ii) defendants shared confidential information and/or proprietary technology with Hydron without Board approval or informing TuSimple shareholders in contravention of federal law and the NSA; (iii) Chao, a major investor in TuSimple and Hydron, had close ties to a foreign adversary; and (iv) the aforementioned conduct enhanced the likelihood of TuSimple being subjected to regulatory scrutiny and/or investigatory action.

### 9.   May 3 and 4, 2022 1Q 2022 Earnings Call and Quarterly Report on Form 10-Q

185.   During the Company's May 3, 2022 earnings call with investors, Hou discussed Chen's departure from the Board of Directors, stating:

> We also announced that my Co-Founder, Mo Chen, will not be standing for reelection.  ***Mo and I have a long-standing and deep partnership that has helped build this entire company***.  Mo has always focused on doing what will be best for TuSimple.  As we have talked about previously, we are targeting more independent directors and a more U.S.-centric Board.  We are focused on enhancing governance, and our home market in the U.S. is expected to be the first to commercialize.

> So this is a natural and strategic evolution of our Board composition.  Mo is fully aligned with this strategy, and he made the decision not to seek reelection to support the company.  We thank Mo for the many contributions he has made as a Board member, helping to guide the company from its infancy to what it is today.  ***Mo will continue to be a significant shareholder of the company and will continue to give us his full support while his director term finishes in June***.

186.   Despite expressly referencing Chen and his departure from the Company, Hou omitted any reference whatsoever to Hydron and Chen's substantial investment in that competing company.

187.   On May 4, 2022, the Company filed its quarterly report for the period ending March 31, 2022 with the SEC on Form 10-Q ("1Q22 10-Q"), signed by Hou and Dillon.   The 1Q22 10-Q reiterated the importance of protecting TuSimple's intellectual property, stating that: (i) the Company's "business may be adversely affected *if we are unable to adequately establish, maintain, protect, and enforce our intellectual property and proprietary rights or prevent third parties from making unauthorized use of our technology and other intellectual property*"; (ii) "[w]e rely on proprietary information (such as trade secrets, know-how, and confidential information) to protect intellectual property that may not be patentable, or that we believe is best protected by means that do not require public disclosure; and (iii) "*[i]f any of our trade secrets were to be disclosed (whether lawfully or otherwise) to or independently developed by a competitor or other third party, it could have a material adverse effect on our business, operating results, and financial condition*."

188.   The statements made by TuSimple and Hou in ¶¶185-187, *supra*, were materially false and misleading when made, and were made either knowingly or with reckless disregard for the truth.   As later admitted by the Company in its Form 8-K filed with the SEC on October 31, 2022, the true facts were that: (i) TuSimple was contemporaneously engaging in undisclosed related party transactions with Hydron (the company founded by Chen and backed by Chao), in violation of, *inter alia*, SEC Regulation S-K; (ii) defendants shared confidential information and/or proprietary technology with Hydron without Board approval or informing TuSimple shareholders in contravention of federal law and the NSA; (iii) Chao, a major investor in TuSimple and Hydron, had close ties to a foreign adversary; and (iv) the aforementioned conduct enhanced the likelihood of TuSimple being subjected to regulatory scrutiny and/or investigatory action.

4887-3830-0802.v2

### 10.    August 8, 2022 Quarterly Report on Form 10-Q

189.   On August 8, 2022, the Company published its Form 10-Q for the second quarter of 2022 ("2Q22 10-Q"), which was signed by Hou.  The 2Q22 10-Q reiterated the importance of protecting TuSimple's intellectual property, stating that: (i) the Company's "business may be adversely affected *if we are unable to adequately establish, maintain, protect, and enforce our intellectual property and proprietary rights or prevent third parties from making unauthorized use of our technology and other intellectual property*"; (ii) "[w]e rely on proprietary information (such as trade secrets, know-how, and confidential information) to protect intellectual property that may not be patentable, or that we believe is best protected by means that do not require public disclosure; and (iii) "*[i]f any of our trade secrets were to be disclosed (whether lawfully or otherwise) to or independently developed by a competitor or other third party, it could have a material adverse effect on our business, operating results, and financial condition*."

190.   The statements made by TuSimple and Hou in ¶189, *supra*, were materially false and misleading when made, and were made either knowingly or with reckless disregard for the truth.  As later admitted by the Company in its Form 8-K filed with the SEC on October 31, 2022, the true facts were that: (i) TuSimple was contemporaneously engaging in undisclosed related party transactions with Hydron (the company founded by Chen and backed by Chao), in violation of, *inter alia*, SEC Regulation S-K; (ii) defendants shared confidential information and/or proprietary technology with Hydron without Board approval or informing TuSimple shareholders in contravention of federal law and the NSA; (iii) Chao, a major investor in TuSimple and Hydron, had close ties to a foreign adversary; and (iv) the aforementioned conduct enhanced the likelihood of TuSimple being subjected to regulatory scrutiny and/or investigatory action.

4887-3830-0802.v2

## 11.    SOX Certifications

191.    Lu signed SOX Certifications for TuSimple's 1Q21 10-Q; 2Q21 10-Q; and 3Q21 10-Q representing, in relevant part, that:

1.    I have reviewed this Quarterly Report on Form 10-Q of TuSimple Holdings Inc.;

2.    Based on my knowledge, this report *does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)    *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities*, particularly during the period in which this report is being prepared;

(b)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    *The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions)*:

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's

4887-3830-0802.v2

ability to record, process, summarize and report financial information; and

(b)   *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting*.

192.   Lu additionally signed SOX Certifications for TuSimple's 1Q21 10-Q; 2Q21 10-Q; and 3Q21 10-Q attesting, in pertinent part, that "to the best of my knowledge and pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002," that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company."

193.   Lu signed substantively identical SOX Certifications for TuSimple's 2021 Form 10-K certifying to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

194.   Hou signed substantively identical SOX Certifications for TuSimple's 1Q22 10-Q and 2Q22 10-Q certifying to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

195.   The statements made by TuSimple, Lu, and Hou in ¶¶191-194, *supra*, were materially false and misleading when made, and were made either knowingly or with reckless disregard for the truth.  As later admitted by the Company in its Form 8-K filed with the SEC on October 31, 2022, the true facts were that: (i) TuSimple was contemporaneously engaging in undisclosed related party transactions with Hydron (the company founded by Chen and backed by Chao), in violation of, *inter alia*, SEC Regulation S-K; (ii) defendants shared confidential information and/or proprietary technology with Hydron without Board approval or informing TuSimple shareholders in contravention of federal law and the NSA; (iii) Chao, a major investor in TuSimple and Hydron, had close ties to a foreign adversary; and (iv) the aforementioned conduct

4887-3830-0802.v2

enhanced the likelihood of TuSimple being subjected to regulatory scrutiny and/or investigatory action.

**H.    Defendants' Materially False and Misleading Statements and Omissions Concerning Safety**

**1.    May 10, 2021 Release on Form 8-K and 1Q 2021 Earnings Call**

196.    On May 10, 2021, TuSimple filed with the SEC a release on Form 8-K which attached a "Q1 2021 Letter to Shareholders," also dated May 10, 2021, that was signed by Lu and Dillon.  The letter touted the development and progress of its technology, stating that during the most recent quarter "we have achieved towards our driver-out milestones include: ***Removed single point of failure*** and, for some critical components, we have double and triple redundancy."

197.    On May 10, 2021, TuSimple also convened an earnings call to announce and discuss the Company's first quarter 2021 financial results.  During the call, Lu maintained that TuSimple's "mission is to make trucking safer, more efficient and at lower cost."  In describing the Company's "Driver-Out" program to investors, Lu represented that the Company's "Driver-Out pilot program will publicly demonstrate the safety, maturity and functionality of our autonomous driving system."

198.    In response to a question from Ravi Shanker of Morgan Stanley on the Driver-Out program, Lu further represented that:

> So this is not – so for instance, this is not a – ***we're going to ensure safety above all else***.  And when you think about where we are, we're in Phase 3 of a 4-phase approach.  We are bringing up our autonomous trucks, 10 of them, for – purpose-built for our project, which is fully redundant.  We are doing more feature developments.  We feel pretty good about that.  We're doing extensive testing as it is today.  The next phase is this will undergo a much more intensive end-to-end functional safety process.
>
> And then there's final validation, which is putting the vehicles through a series of test scenarios and then having to hit a very high threshold of safety.

199.    The statements made by TuSimple, Lu, and Dillon in ¶¶196-198, *supra*, were materially false and misleading when made, and were made either knowingly or

with reckless disregard for the truth, because defendants: (i) concealed fundamental problems with the Company's AV technology and its safety profile was significantly overstated; (ii) rushed the testing of the Company's AV technology to deliver driverless trucks to market ahead of its more safety conscious competitors; (iii) actively suppressed safety concerns that were raised internally in favor of reckless testing and delivery schedules; and (iv) recklessly ignored that TuSimple's fleet lacked significant elementary safeguards as: (a) a safety driver (a person who sits in the truck to backstop the artificial intelligence) should have never been able to engage a purported self-driving system that was not properly functioning; (b) an AV semi-truck should not be able respond to commands that are even a couple hundredths of a second old; and (c) an adequate self-driving system would preclude an AV semi-truck weighing 80,000 pounds from turning sharply when traveling at 65 miles per hour.

### 2.   August 5, 2021 2Q 2021 Earnings Call

200.   On August 5, 2021, TuSimple held an earnings call to announce and discuss its second quarter 2021 financial results.   During the call, Lu touted TuSimple's safety record stating:

> ***Safety comes before all else at TuSimple***.   And this is particularly important for the Driver-Out pilot program. The safety case verification process is multifaceted to mitigate the risk inherent in the system.   And this includes significant work in systems engineering, social safety reviews as well as internal audits of our process.   ***It includes proper testing, verification and validation of various software and hardware modules***.  Given the complexity of an autonomous driving system and this mission, we have to clearly understand what systems are on the truck, that the truck performs the way it's intended to perform at all times and that our operational plan is designed to execute the pilot program safely.
>
> In addition, it includes ***validation that our risk management system will identify any issues and signs of degradation from both software and hardware and ensure that the system reacts appropriately, including pulling over or stopping lanes safely, what we call enter into a Minimal Risk Condition, or MRC***.
>
> And lastly, of course, the safety case includes the final on-road validation of the pilot with safety drivers on board.  As you can see, we have a holistic safety case verification process to ensure that we have correctly identified and mitigated risk.  Furthermore, this process is

critical in advancing our autonomous driving truck production programs and us being first to market.

201.   The statements made by TuSimple and Lu in ¶200, *supra*, were materially false and misleading when made, and were made either knowingly or with reckless disregard for the truth, because defendants: (i) concealed fundamental problems with the Company's AV technology and its safety profile was significantly overstated; (ii) rushed the testing of the Company's AV technology to deliver driverless trucks to market ahead of its more safety conscious competitors; (iii) actively suppressed safety concerns that were raised internally in favor of reckless testing and delivery schedules; and (iv) recklessly ignored that TuSimple's fleet lacked significant elementary safeguards as: (a) a safety driver (a person who sits in the truck to backstop the artificial intelligence) should have never been able to engage a purported self-driving system that was not properly functioning; (b) an AV semi-truck should not be able respond to commands that are even a couple hundredths of a second old; and (c) an adequate self-driving system would preclude an AV semi-truck weighing 80,000 pounds from turning sharply when traveling at 65 miles per hour.

### 3.   November 3, 2021 Release on Form 8-K and Letter to Shareholders

202.   On November 3, 2021 the Company filed a Form 8-K with the SEC, signed by Dillon.  Attached to the Form 8-K was a "Letter to Shareholders" which was signed by Lu and Dillon stating in relevant part that:

> The Driver-Out pilot is a major demonstration of our technology as well as our commitment to safety.  At TuSimple, *safety is our primary focus* and we have implemented *safety best practices and processes across the entire organization.  Safety is embedded as the first element in our hiring and training on a day-to-day basis.  Employees are encouraged to actively identify and address safety concerns, including via a confidential safety hotline*.

203.   The statements made by TuSimple, Lu, and Dillon in ¶202, *supra*, were materially false and misleading when made, and were made either knowingly or with reckless disregard for the truth, because defendants: (i) concealed fundamental

4887-3830-0802.v2

problems with the Company's AV technology and its safety profile was significantly overstated; (ii) rushed the testing of the Company's AV technology to deliver driverless trucks to market ahead of its more safety conscious competitors; (iii) actively suppressed safety concerns that were raised internally in favor of reckless testing and delivery schedules; and (iv) recklessly ignored that TuSimple's fleet lacked significant elementary safeguards as: (a) a safety driver (a person who sits in the truck to backstop the artificial intelligence) should have never been able to engage a purported self-driving system that was not properly functioning; (b) an AV semi-truck should not be able respond to commands that are even a couple hundredths of a second old; and (c) an adequate self-driving system would preclude an AV semi-truck weighing 80,000 pounds from turning sharply when traveling at 65 miles per hour.

### 4. February 9, 2022 – Form 8-K and 4Q 2021 Earnings Call

204. On February 9, 2022 the Company filed a Form 8-K with the SEC, signed by Dillon. Attached to the Form 8-K was a "Letter to Shareholders" which was signed by Lu and Dillon. The letter stated in relevant part that:

> *We also validated our Minimum Risk Condition (MRC) capabilities so that if the semi-truck encountered a system degradation or other safety issue, it could safely stop the run*[.] . . . In 2021, we engineered redundancy, reliability, and consistency to operate safely without any driver onboard on a commercial freight route, with our system now responsible for edge case mitigation. *Now that we have proven our Driver Out capabilities, our focus fully shifts to commercialization*.

205. Later that day, Lu and Dillon also participated in the Company's 2021 4Q earnings call with investors. There, Lu stated without equivocation: "Driver Out proves *we are feature complete*, which means our autonomous driving system has all the capabilities required for true Driver Out operations along commercial routes, and that is able to safely mitigate or contain all the edge cases during operations."

206. Lu then repeated that TuSimple's autonomous trucks were "feature complete" approximately four times in response to analyst questions. For example, when asked by a J.P. Morgan analyst whether there was "anything left technically that

4887-3830-0802.v2

you feel like needs to be handled and figured out and tested before you were able to really scale?" Lu answered, in relevant part:

> So when we say scaling, and going back to your question about what is left to develop technically, to be able to demonstrate Driver Out operations repeatedly, ***we do believe that we are feature complete***. And what we define future [*sic*] complete is it means that we have all the capabilities of operating a vehicle from terminal to terminal on a commercial route.
>
> *       *       *
>
> ***So really, today, we are feature complete***. We're also able to mitigate. I think what gives comfort is being able to mitigate or contain all the edge cases that you can counter [*sic*] on a route. So from that standpoint, that is already a significant technology development.

207.   The statements made by TuSimple, Lu, and Dillon in ¶¶204-206, *supra*, were materially false and misleading when made, and were made either knowingly or with reckless disregard for the truth, because defendants: (i) concealed fundamental problems with the Company's AV technology and its safety profile was significantly overstated; (ii) rushed the testing of the Company's AV technology to deliver driverless trucks to market ahead of its more safety conscious competitors; (iii) actively suppressed safety concerns that were raised internally in favor of reckless testing and delivery schedules; and (iv) recklessly ignored that TuSimple's fleet lacked significant elementary safeguards as: (a) a safety driver (a person who sits in the truck to backstop the artificial intelligence) should have never been able to engage a purported self-driving system that was not properly functioning; (b) an AV semi-truck should not be able respond to commands that are even a couple hundredths of a second old; and (c) an adequate self-driving system would preclude an AV semi-truck weighing 80,000 pounds from turning sharply when traveling at 65 miles per hour.

### 5.   TuSimple's March 10, 2022 Blog Post

208.   On March 10, 2022, the Company represented that: "***We consider the current version of our autonomous driving system to be 'feature complete' which means the system has the capabilities needed for true Driver Out operations along a***

1   *commercial route, and it is able to safely mitigate the required edge cases during*

2   *operations*."

3   209.   Analysts relayed TuSimple's claims to have "feature complete"

4   autonomous driving technology.   In a March 18, 2022, report, for instance, J.P.

5   Morgan repeated TuSimple's assurances, stating:

> TuSimple emphasized that ***they are now feature complete*** in the Sun
> Belt region – ***meaning that the features of the area and redundancies
> of the truck have been realized with fail safe operations in place***.
> TuSimple trucks can also run evasive maneuvers in response to erratic
> driver behavior or other dynamic conditions.   Driver-out was a big step
> but Hou expects the technology will continue to adapt with updates from
> further tests.   The goal is to be able to handle all situations safely and
> economically, even if they cannot specifically forecast every potential
> edge case and 'unknown unknowns' but can still apply generic solutions.

11   210.   The statements in ¶¶208-209, *supra*, by TuSimple were materially false

12   and misleading when made, and were made either knowingly or with reckless

13   disregard for the truth, because defendants: (i) concealed fundamental problems with

14   the Company's AV technology and its safety profile was significantly overstated; (ii)

15   rushed the testing of the Company's AV technology to deliver driverless trucks to

16   market ahead of its more safety conscious competitors; (iii) actively suppressed safety

17   concerns that were raised internally in favor of reckless testing and delivery schedules;

18   and (iv) recklessly ignored that TuSimple's fleet lacked significant elementary

19   safeguards as: (a) a safety driver (a person who sits in the truck to backstop the

20   artificial intelligence) should have never been able to engage a purported self-driving

21   system that was not properly functioning; (b) an AV semi-truck should not be able

22   respond to commands that are even a couple hundredths of a second old; and (c) an

23   adequate self-driving system would preclude an AV semi-truck weighing 80,000

24   pounds from turning sharply when traveling at 65 miles per hour.

25   ### 6.   March 30, 2022 Hou Interview with *CNBC*

26   211.   On March 30, 2022, Hou was interviewed by Frank Holland on *CNBC's*

27   "Power Lunch" series.   There, Hou attempted to reassure investors that the

28

4887-3830-0802.v2

Company's operations were sound following his unexpected and sudden elevation to CEO by touting the Company's technological progress in its Driver-Out program, and claiming that the TuSimple had "no unconquered technological challenges" remaining:

> [Holland:] So, Dr Hou – you took the reins of the company; both the CEO spot and the chair of the board on March 3rd. Now you said it was part of a planned succession plan, but it definitely caught the market by surprise. The stock dipped after that announcement. Why, all of a sudden, did you decide to go from Chief Technology Officer – of course you were co-founder – to CEO and chair of this company? What did you think that you needed to bring to the table?

> [Hou:] Oh, it's very simple – just all about speed of commercialization, because after our Driver Out endeavor, you might have heard of that, **we have actually have no unconquered technical challenges on the table** but the rest of the work is all about commercialization.

212. The statements made by TuSimple and Hou in ¶211, *supra*, were materially false and misleading when made, and were made either knowingly or with reckless disregard for the truth, because defendants: (i) concealed fundamental problems with the Company's AV technology and its safety profile was significantly overstated; (ii) rushed the testing of the Company's AV technology to deliver driverless trucks to market ahead of its more safety conscious competitors; (iii) actively suppressed safety concerns that were raised internally in favor of reckless testing and delivery schedules; and (iv) recklessly ignored that TuSimple's fleet lacked significant elementary safeguards as: (a) a safety driver (a person who sits in the truck to backstop the artificial intelligence) should have never been able to engage a purported self-driving system that was not properly functioning; (b) an AV semi-truck should not be able respond to commands that are even a couple hundredths of a second old; and (c) an adequate self-driving system would preclude an AV semi-truck weighing 80,000 pounds from turning sharply when traveling at 65 miles per hour.

4887-3830-0802.v2

**I.   Defendants' Materially False and Misleading Statements and Omissions Concerning Safety Subsequent to the April Crash**

213.   As alleged in ¶¶31 and 133, *supra*, the April Crash occurred on April 6, 2022, during which a TuSimple AV responded to an outdated command and swerved left, narrowly missing a white pickup truck before colliding with an interstate barrier. Consequently, TuSimple grounded its entire fleet to investigate the cause.  Following the April Crash, defendants continued to make materially false statements and misleading omissions.

**1.   April 28, 2022 Release on Form 8-K**

214.   On April 28, 2022, TuSimple announced changes to its Board by filing a Form 8-K signed by Dillon.  However, defendants made no mention of the April Crash involving one of its autonomous trucks, nor that the Company had (as it would later admit in a blog post made on July 26, 2022) "immediately grounded" its entire fleet pending an investigation of the April Crash.

215.   The statements made by TuSimple and Dillon in ¶214, *supra*, were materially false and misleading when made, and were made either knowingly or with reckless disregard for the truth, because defendants: (i) concealed fundamental problems with the Company's AV technology and its safety profile was significantly overstated; (ii) rushed the testing of the Company's AV technology to deliver driverless trucks to market ahead of its more safety conscious competitors; (iii) actively suppressed safety concerns that were raised internally in favor of reckless testing and delivery schedules; (iv) knew that the April Crash had already occurred; (v) "immediately grounded" TuSimple's entire fleet following the April Crash pending an investigation; and (vi) recklessly ignored that TuSimple's fleet lacked significant elementary safeguards as: (a) a safety driver (a person who sits in the truck to backstop the artificial intelligence) should have never been able to engage a purported self-driving system that was not properly functioning; (b) an AV semi-truck

4887-3830-0802.v2

should not be able respond to commands that are even a couple hundredths of a second old; and (c) an adequate self-driving system would preclude an AV semi-truck weighing 80,000 pounds from turning sharply when traveling at 65 miles per hour.

### 2. May 3-4, 2022 1Q 2022 Earnings Call and Form 8-K Letter to Shareholders

216.   On May 3, 2022, Hou touted during the Company's 1Q 2022 earnings call with investors that "[w]hile there is much more work to be done, ***our autonomous driving system is now feature complete***, and I'm excited to be leading TuSimple towards commercialization."  In doing so, however, Hou failed to disclose the April Crash or that the Company had (as it would later admit in a blog post made on July 26, 2022) "immediately grounded" its entire fleet pending an investigation of the April Crash.

217.   Also on May 3, 2022, TuSimple filed a Form 8-K with the SEC. Attached to that Form 8-K was the Company's 1Q 2022 "Letter to Shareholders," also dated May 3, 2022.  The Form 8-K was signed by Dillon, and the accompanying "Letter to Shareholders" was signed by Hou and Dillon.  As they did during the May 3, 2022 earnings call, Hou and Dillon both continued to tout the Company's technological advancements, while omitting any discussion of the April Crash.  The letter stated in pertinent part:

TuSimple Drives Toward L4 Commercialization

Dear Shareholders,

During Q1, we made strong progress on our technology development including a continuation of our Driver Out operations.  When we launched our first fully autonomous semi-truck run on open public roads in December of 2021, we knew it was just the beginning.

*     *     *

In Q1, we continued to conduct Driver Out operations including systematically refining features that are planned to make our operations more efficient and scalable.  ***For example, we refined our Minimal Risk condition (MRC) capabilities, including our Autonomous Driving System's ability to pull the vehicle over to the side of the road in certain scenarios such as a partial system degradation***.

4887-3830-0802.v2

To test this MRC capability, we first ran trials in simulations and our entire validation suite on closed tracks.  Finally, we started Driver Out test runs in which we deliberately triggered an MRC command while the vehicle was in operation on an open public roadway on Interstate 70 in Tucson, AZ.  Our semi-truck identified a safe place to pull over alongside the highway, lowered its vehicle speed in lane and then pulled itself to the side of the roadway.  This maneuver can be particularly difficult given that a highway shoulder is generally an uneven mix of pavement and gravel, and various non-standard objects that can make parts of the shoulder unsafe Validating our MRC capabilities is an important step to ultimately removing the chase van from our Driver Out operations.

218.    Analysts responded positively to Hou's assertion that the ADS was "feature complete."  On May 4, 2022 analysts with Morgan Stanley, for instance, published a report relaying that:

Mgmt. announced that they were "Feature Complete."  This is a significant milestone that involves the truck handling all the conceived "what if" scenarios and involved deliberate failure triggering the ability to pull over on the side of the road autonomously.

219.    RBC Capital Markets' also complimented the Company's technological progress, writing that same day that "[a] more visible accomplishment was test of an MRC [minimal risk condition] where a driver out vehicle successfully pulled over to the side of the road."

220.    On May 4, 2022, the Company published its Form 10-Q for the first quarter of 2022 ("1Q22 10-Q"), which was signed by Hou and Dillon.

221.    The 1Q22 10-Q included risk factors addressing the impact of crashes on the public's tendency to accept or reject AVs, writing:

***Since the market for autonomous solutions is relatively new and disruptive, if our L4 autonomous driving technology fails to gain acceptance from users and other stakeholders in the freight transportation industry, our business, prospects, operating results, and financial condition could be materially harmed***.

Demand for autonomous driving technology depends to a large extent on general, economic, political, and social conditions in a given market.  The market opportunities we are pursuing are at an early stage of development, and it is difficult to predict user demand or adoption rates for our solutions, including the AFN, or the future growth of the markets in which we operate.  Despite the fact that the automotive industry has engaged in considerable effort to research and test L2 and L3 autonomous cars, our technology targeting L4 autonomous semi-

4887-3830-0802.v2

trucks requires significant investment and may never be commercially successful on a large scale, or at all.

Further, even if we succeed in operating at commercial scale, because of the disruptive nature of our business to the freight transportation industry, key industry participants may not accept our AFN, may develop competing services or may otherwise seek to subvert our efforts. For example, autonomous semi-trucks might displace individual semi-truck drivers and small fleet owners. Labor unions may also raise concerns about autonomous semi-trucks displacing drivers or otherwise negatively affecting employment opportunities for their members, as has been the case in other industries that have been subject to automation. This has in the past resulted, and could in the future result, in negative publicity, lobbying efforts to U.S. local, state, and federal lawmaking authorities, or equivalent authorities in the foreign jurisdictions in which we seek to do business, to implement legislation or regulations that make it more difficult to operate our business or boycotts of us or our users. Any such occurrences could materially harm our future business.

Additionally, regulatory, safety, and reliability issues, or the perception thereof, many of which are outside of our control, could also cause the public or our potential partners and users to lose confidence in autonomous solutions in general. The safety of such technology depends in part on user interaction and users, as well as other drivers, pedestrians, other obstacles on the roadways or other unforeseen events. For example, there have been several crashes involving automobiles of other manufacturers resulting in death or personal injury where autopilot features are engaged. Even though these incidents were unrelated to our AFN and our technology, such cases resulted in significant negative publicity and, in the future, could result in suspension or prohibition of self-driving vehicles. If safety and reliability issues for autonomous driving technology cannot be addressed properly, our business, prospects, operating results, and financial condition could be materially harmed.

222.   Similarly, the 1Q22 10-Q stated:

***We may be subject to product liability or warranty claims that could result in significant direct or indirect costs, including reputational harm, increased insurance premiums, or the need to self insure, which could adversely affect our business and operating results***.

Our technology is used for autonomous driving, which presents the risk of significant injury, including fatalities. Product liability claims, even those without merit or those that do not involve our semi-trucks, could harm our business, prospects, financial condition and operating results. The automobile industry in particular experiences significant product liability claims, and we face inherent risk of exposure to claims in the event our semi-trucks do not perform or are claimed to not have performed as expected. ***To the extent our semi-trucks continue to be tested or otherwise operated on open roads, we expect in the future that our semi-trucks will be involved in crashes*** resulting in death or personal injury.

4887-3830-0802.v2

223.   The 1Q22 10-Q addressed "defects, errors, or bugs" in the Company's hardware or software, stating in pertinent part:

***Our autonomous driving technology and related hardware and software could have undetected defects, errors or bugs in hardware or software which could create safety issues, reduce market adoption, damage our reputation with current or prospective users or expose us to product liability and other claims that could materially and adversely affect our business*.**

Our autonomous driving technology is highly technical and very complex, and has in the past and may in the future experience defects, errors or bugs at various stages of development.  We may be unable to timely correct problems to our partners' and users' satisfaction.  Additionally, there may be undetected errors or defects especially as we introduce new systems or as new versions are released.  These risks are particularly prevalent in the highly competitive freight transport market, as any such errors or defects could delay or prevent the adoption of autonomous driving technology in trucks.  Errors or defects in our products may only be discovered after they have been tested, commercialized, and deployed.  If that is the case, we may incur significant additional development costs and product recall, repair or replacement costs, or more importantly, liability for personal injury or property damage caused by such errors or defects, as these problems would also likely result in claims against us.  Our reputation or brand may be damaged as a result of these problems and users may be reluctant to use our services, which could adversely affect our ability to retain existing users and attract new users, and could materially and adversely affect our financial results.

224.   The 1Q22 10-Q further noted:

***If our software contains serious errors or defects, we may lose revenue and market acceptance and may incur costs to defend or settle claims with our licensees, franchisees or other parties*.**

Software inevitably contains errors, defects, security vulnerabilities or software bugs, some of which are difficult to detect and correct, particularly when first introduced or when new versions or enhancements are released.  Despite internal testing, our software may contain serious errors or defects, security vulnerabilities or software bugs that we may be unable to successfully detect or correct in a timely manner or at all, which could result in security incidents, data breaches, vehicle safety issues, product liability claims, lost revenue, significant expenditures of capital, a delay or loss in market acceptance, and damage to our reputation and brand, any of which could adversely affect our business, results of operations, and financial condition.

225.   The statements made by TuSimple, Hou, and Dillon in ¶¶216-219 and 221-224, *supra*, were materially false and misleading when made, and were made either knowingly or with reckless disregard for the truth, because defendants: (i)

concealed fundamental problems with the Company's AV technology and its safety profile was significantly overstated; (ii) rushed the testing of the Company's AV technology to deliver driverless trucks to market ahead of its more safety conscious competitors; (iii) actively suppressed safety concerns that were raised internally in favor of reckless testing and delivery schedules; (iv) knew that the April Crash had already occurred; (v) "immediately grounded" TuSimple's entire fleet following the April Crash pending an investigation; and (vi) recklessly ignored that TuSimple's fleet lacked significant elementary safeguards as: (a) a safety driver (a person who sits in the truck to backstop the artificial intelligence) should have never been able to engage a purported self-driving system that was not properly functioning; (b) an AV semi-truck should not be able respond to commands that are even a couple hundredths of a second old; and (c) an adequate self-driving system would preclude an AV semi-truck weighing 80,000 pounds from turning sharply when traveling at 65 miles per hour.

### 3.     May 11, 2022 Investor Day Presentation

226.   On May 10, 2022, NHTSA agents met with TuSimple employees to address the April Crash.  However, despite the April Crash, the grounding of TuSimple's entire fleet, and the May 10, 2022 meeting between TuSimple and the NHTSA, Hou continued to make materially false and misleading statements during the Company's May 11, 2022 Investor Day Presentation, stating that:

> There are a number of industry challenges within the truck freight market that enables accelerated adoption of our solution.  The first is safety.  Over the last decade, there has been, on average, over 5,000 fatalities involving large truck crashes annually.  According to NHTSA, 94% of all accidents involving trucks are due to human error, including distracted drivers, impaired drivers, fatigued drivers or even noncompliant drivers.  ***Our solution eliminates the human error area elements involving all of those causes of crashes***.

227.   The statements made by TuSimple and Hou in ¶226, *supra*, were materially false and misleading when made, and were made either knowingly or with reckless disregard for the truth, because defendants: (i) concealed fundamental problems with the Company's AV technology and its safety profile was significantly

- 71 -

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-
cv-00282-BEN-MSB)

overstated; (ii) rushed the testing of the Company's AV technology to deliver driverless trucks to market ahead of its more safety conscious competitors; (iii) actively suppressed safety concerns that were raised internally in favor of reckless testing and delivery schedules; (iv) knew that the April Crash had already occurred; (v) "immediately grounded" TuSimple's entire fleet following the April Crash pending an investigation; and (vi) recklessly ignored that TuSimple's fleet lacked significant elementary safeguards as: (a) a safety driver (a person who sits in the truck to backstop the artificial intelligence) should have never been able to engage a purported self-driving system that was not properly functioning; (b) an AV semi-truck should not be able respond to commands that are even a couple hundredths of a second old; and (c) an adequate self-driving system would preclude an AV semi-truck weighing 80,000 pounds from turning sharply when traveling at 65 miles per hour. Additionally, Hou failed to disclose TuSimple's May 10, 2022 meeting with the NHTSA.

### 4. July 26, 2022 Blog Post Misleadingly Blames "Human Error" for the April Crash

228. In an apparent response to Mutha Trucker's publication of the April Crash video (*see* ¶¶136-137, *supra*), on July 26, 2022, TuSimple published a statement titled "Prioritizing Safety." Tellingly, the statement was made on the Company's internet blog, rather than being published via press release or in an SEC filing, in a calculated effort to downplay the significance of the April Crash.

229. On the blog, the Company mischaracterized the April Crash as "human error," and further touted the superiority of TuSimple's autonomous technology to a human driver, stating:

> Over the past several days, we've received questions regarding a vehicle incident and we wanted to provide more information to help everyone understand what occurred and how we have resolved the situation.

> On April 6, 2022, a ***human error*** occurred when two operators in a TuSimple vehicle incorrectly reengaged the autonomous driving mode

*without completing all of the steps necessary to safely reengage, resulting in the truck scraping a median.* Fortunately, no one was injured, there was no property damage, and the only visible sign of the incident was a minor scrape on the truck.

In the US, the National Highway Transportation Safety Administration (NHTSAI reports over 500,000 crashes involving large trucks each year. In comparison, in seven years and 7.2 million miles of autonomous vehicle testing, this is the first on the road incident for which we've been responsible. While our safety record is many times better than traditional manually-driven trucks, we take our responsibility to find and resolve all safety issues very seriously.

That's why, in response to this situation on April 6th, we immediately grounded our entire autonomous fleet and launched an independent review to determine the cause of the incident. *With learnings from this review in hand, we upgraded all of our systems with new automated system checks to prevent this kind of human error from ever happening again and we reported the incident to NHTSA and the Arizona Department of Transportation.* This, along with all incidents involving companies building autonomous driving systems can be found on NHTSA's website where information about the April 6th incident has been publicly available for more than a month.

230.   The statements made by TuSimple in ¶¶228-229, *supra*, were materially false and misleading when made, and were made either knowingly or with reckless disregard for the truth, because defendants: (i) concealed fundamental problems with the Company's AV technology and its safety profile was significantly overstated; (ii) rushed the testing of the Company's AV technology to deliver driverless trucks to market ahead of its more safety conscious competitors; (iii) actively suppressed safety concerns that were raised internally in favor of reckless testing and delivery schedules; (iv) knew that the April Crash had already occurred; (v) "immediately grounded" TuSimple's entire fleet following the April Crash pending an investigation; and (vi) recklessly ignored that TuSimple's fleet lacked significant elementary safeguards as: (a) a safety driver (a person who sits in the truck to backstop the artificial intelligence) should have never been able to engage a purported self-driving system that was not properly functioning; (b) an AV semi-truck should not be able respond to commands that are even a couple hundredths of a second old; and (c) an adequate self-driving system would preclude an AV semi-truck weighing 80,000 pounds from turning

4887-3830-0802.v2

sharply when traveling at 65 miles per hour.  Additionally, Hou failed to disclose TuSimple's May 10, 2022 meeting with the NHTSA.  Additionally, as the Company later admitted, the April Crash was not solely attributable to "human error" and the Company failed to disclose the May 26, 2022 FMCSA Letter that officially informed TuSimple that the FMCSA was opening an investigation into the April Crash.

231.  On August 1, 2023, the *Wall Street Journal* published its exposé on TuSimple's deficient safety practices, and contested the Company's public assertions that the April Crash was due to human error, the trading price of TuSimple shares fell from the preceding day's closing price of $9.96 per share to $8.99 per share, representing a drop of 9.7%.  In fact, it was later admitted by the Company during the November 1, 2022 earnings call, that "it's not only a human error, but there is also software and system-related failures that happened at the same time.  So we have provided an update to the software to prevent these failure[s] as well as the future human errors."

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

232.  As set forth herein, the defendants named under the Exchange Act received information reflecting the true facts regarding TuSimple via their positions with the Company which made them privy to confidential information concerning TuSimple's business and operations.   Defendants' knowledge and/or reckless disregard for the truth is further supported by the following allegations.

### 1.    Chen Founded and Controlled Hydron and Chao Was a "Critical Backer" of Hydron

233.  Chen, who co-founded TuSimple, also founded Hydron prior to the start of the Class Period, on March 29, 2021.  According to the October 30, 2022 *Wall Street Journal* article, Hydron allegedly "plan[ned] to build hydrogen-powered trucks in North America modeled on a design by a subsidiary of a Chinese state-controlled auto manufacturer."  Hydron was backed by Chinese investors and its operations are mostly in China.  Chen has served as Hydron's CEO since its inception.

4887-3830-0802.v2

234.   According to the same *Wall Street Journal* report and a November 1, 2022 *Wall Street Journal* podcast, Chao was a "critical backer" of TuSimple and Hydron as well as a "confidant and adviser" to both Chen and Hou.  Hou also admitted during the Company's May 3, 2022 earnings call with investors that he and Chen "*have a long-standing and deep partnership that has helped build this entire company*," further confirming that Hou knew of Chen's and Chao's involvement with Hydron and the ties to China.

### 2.   TuSimple Entered into the NSA with the U.S. Government

235.   As alleged in Section V.C., on February 18, 2022, CFIUS concluded its review of the 2017 acquisition of TuSimple's U.S. business.  As part of the resolution, the Company entered into a NSA with the U.S. government under which the Company agreed to limit access to certain data and adopt a technology control plan, appoint a security officer and a security director, establish a government security committee of the Board to be chaired by the security director, and periodically meet with and report to certain CFIUS monitoring agencies.  The purpose of the NSA was "to assure that U.S.-created intellectual property was not shared with its China operations."

236.   On February 22, 2022, *Freight Waves* published an article titled "US Takes Limited Oversight of TuSimple as Foreign Investment Probe Ends."  There, journalist Alan Adler documented that TuSimple would periodically meet with certain government agencies, and further documented Lu's understanding of the NSA's significance:[11]

> TuSimple also entered into a National Security Agreement with the U.S. government under which it agreed to limit access to certain data and adopt a technology control plan, appoint a security officer and a security director, and establish a board-level government security committee to be chaired by the security director.

---

[11]   Alan Adler, *US Takes Limited Oversight of TuSimple as Foreign Investment Probe Ends*, FreightWaves.com (Feb. 22, 2022), https://www.freightwaves.com/news/us-takes-limited-oversight-of-tusimple-as-foreign-investment-probe-ends.

- 75 -                        3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-
cv-00282-BEN-MSB)

TuSimple will periodically meet with and report to certain CFIUS monitoring agencies.

"Once you go through this process, there's usually some sort of monitoring or additional compliance," Lu said.

Protecting U.S.-developed technology from China was a key issue.

"Around the world [countries] want to keep those core technologies within the country," Lu said, "This is no different than semiconductors or other artificial intelligence applications."

237. This additional level of required oversight within the Company demonstrates that Lu, Chao, Chen, Hou, and Zhang were on notice of increased scrutiny, and that TuSimple was improperly sharing its technology with Hydron.

238. In addition, Chao, a major investor in TuSimple and Hydron, has close ties to the CCP, including that: (i) Chao is reportedly a close friend of former Sina CEO Mao Daolin, the son-in-law of former Chinese President Hu Jintao; (ii) Chao, in turn, has been CEO of Sina since 2006, its Chairman of the Board since 2012, and the Chairman of the Board of the Twitter-like micro-blogging platform Sina Weibo since it was founded in 2009; (iii) Sina is Weibo's parent company and was a public company until 2021 when New Wave – a company also controlled by Chao – purchased all outstanding Sina shares; (iv) Weibo conducts business in China primarily through its Beijing Weimeng Technology Co., Ltd. subsidiary ("Weimeng"), and as over 77% of Weibo's users are Chinese, Weimeng is an essential part of Weibo; (v) the CCP controls multiple Chinese technology companies through WangTouTongDa (Beijing) Technology Co. Ltd. ("WangTouTongDa"), a subsidiary of the state-owned China Internet Investment Fund ("CIIF"); (vi) through CIIF, the CCP acquires management stakes, known as "golden shares," in key Chinese companies, which are typically equal to a 1% ownership interest and give the CCP board representation and veto rights over business decisions; (vii) WangTouTongDa holds a 1% golden share in Weimeng, and as Weimeng comprises the vast majority of Weibo's business, the CCP can control Weibo through

WangTouTongDa; and (viii) Weibo acknowledges that the CCP owns this stake in WangTouTongDa. The CCP has further power over Weibo, and therefore Chao, through other investments including, *inter alia*, a golden share of 1% in the Alibaba Group, a major Chinese tech company, which in turn, owns 6% of Weibo and is one of its largest investors.

### 3. TuSimple's Corporate Culture Suppressed Safety Concerns

239. The corporate culture within TuSimple suppressed or ignored safety concerns in favor of an unrealistically ambitious testing and delivery schedule. TuSimple was rushing the testing of its autonomous driving technology in order to deliver driverless trucks to the market ahead of its more safety-conscious competitors. This made accidents involving the Company's autonomous driving technology more likely.

240. For example, TuSimple's "Driver-Out" or "Ghost Rider" pilot program, which was detailed in the 1Q 2021 Letter to Shareholders on May 10, 2021, outlined four phases to get TuSimple's trucks on the road without diver supervision. According to the letter, "Phase 1 was focused on designing the autonomous system architecture and Phase 2 focused on developing [the Company's] first prototype." Phase 1 began in 1Q 2020 and Phase 2 was completed sometime before the May 10, 2021 letter. In the letter, the Company announced that it was in Phase 3, which involved testing of the Company's prototype. The Company aimed to complete Phase 4, which was final validation, by the end of 4Q 2021. This meant that the Company aimed to complete two of the four phases in under seven months, and the entire project – from designing the autonomous system to final validation – would only take two years.

241. TuSimple had set a goal of 500 practice runs prior to completing the initial "Ghost Rider" driverless run in December 2021. But according to the *Wall Street Journal*, TuSimple "had conducted less than half of those [practice runs] when

4887-3830-0802.v2

it launched the fully automated drive, which it did without informing its security teams." The April Crash "follows years of management rebuffing what some former employees say were significant safety and security complaints." In late 2021, a group of employees raised significant safety and security complaints to TuSimple's legal department, including the "failure to check software regularly for vulnerabilities and use of unencrypted communications to manage trucks." "Safety drivers, meanwhile, have flagged concerns about failures in a mechanism that didn't always enable them to shut off the self-driving system by turning the steering wheel." These concerns were dismissed by "Company management." In short, defendants were "enormously incentivized to go as fast as they can."

242.   The culture of dismissing safety concerns in favor of speed and profits was perpetuated by Hou, who regularly terminated or ignored individuals in order to avoid "executives pushing back on his rush to get products to market." According to Mr. Lindland, a former Functional Safety Engineering Lead, management considered Functional Safety "a waste of [Hou's team's] time," and Hou would regularly state that the Company is "going to do Functional Safety the TuSimple way," which meant "ignoring the legal requirements of ISO 26262 [an internationally-recognized standard related to the functional safety of electrical and/or electronic systems in motor vehicles] and IATF 16949 [an automotive quality management system]." Mr. Lindland stated that "Hou was only concerned with obtaining quick funding and money, regardless of the safety and functionality of the products." In no uncertain terms, Mr. Lindland's wrongful termination complaint contends that "the model had safety issues, Hou was aware of that, but had wanted to deceive the investors. [Hou's] only impediment was Lindland and the fact that he is a well-respected expert in the realm of safety and sought to adhere to the safety of humans."

4887-3830-0802.v2

### 4. Defendants' Failure to Utilize Common Safeguards Demonstrates Scienter

243. According to the *Wall Street Journal's* August 1, 2022 article about TuSimple, "[c]ommon safeguards would have prevented the [April] crash had they been in place." This includes safeguards such as "a safety driver . . . should never be able to engage a self-driving system that isn't properly functioning. . . . The truck also shouldn't respond to commands that are even a couple hundredths of a second old. . . . And the system should never permit an autonomously-driven truck to turn so sharply while traveling 65 miles an hour." TuSimple later modified its autonomous-driving system "so that a human can't engage it unless the computer system is fully functional," a change that a former TuSimple engineer described as "long overdue."

244. Additionally, the Company failed to "check software regularly for vulnerabilities and use[d] . . . unencrypted communications to manage trucks." Company management also dismissed safety driver concerns that there were "failures in a mechanism that didn't always enable them to shut off the self-driving system by turning the steering wheel," which is a standard safety feature.

245. Hou was at the center of the failure to follow safety standards and regulations. According to Mr. Lindland, "Hou would come up with an idea, instruct his team to execute the idea, and then would test the idea on public roads, bypassing all safety standards and regulations."

### 5. Post-Class Period Events and Admissions Support Scienter

246. Contrary to the Company's July 26, 2022 blog post that attributed the April Crash to "human error," the Company admitted during the November 1, 2022 earnings call that the April Crash was "***not only a human error***, but there is also software and system-related failures that happened at the same time. So, we have provided an update to the software to prevent these failure[s] as well as the future human errors."

247.   On November 7, 2022, the Company announced in a Form 8-K that the SEC had initiated an investigation into TuSimple and the Company had received an initial request for information from the SEC.  TuSimple also announced that it was responding to requests from CFIUS related to the Form 8-K announcing Hou's termination.  It was also revealed that the Board had "lost trust and confidence in Hou's ability to lead a public company, including due to concerns about his lack of candor and transparency with the Board.  The decision to terminate Dr. Hou was made in connection with an ongoing investigation that was initiated by the Board's Audit Committee."

248.   By November 10, 2022, Hou and Chen leveraged their combined majority voting power to oust the remaining TuSimple directors and take complete control of the Board.  A week after Hou's termination as CEO, he transferred his voting rights to Chen, thus creating a controlled company exemption under applicable NASDAQ rules, which exempted TuSimple from any requirement to have a majority of independent directors.  With sole voting control, Chen then acted by written consent to remove the entire Board except Hou.

249.   Hou immediately filled the vacant directorships, appointing Chen and Lu as directors, thus creating a non-independent Board.  Chen was then appointed as Executive Chairman, and Lu was appointed CEO.  After Hou was ousted, the Board appointed Ersin Yumer as interim CEO and Buss as Chairman.

250.   On November 21, 2022, TuSimple disclosed the abrupt resignation of KPMG as the Company's auditor.  Despite serving as TuSimple's accountant since 2018, KPMG resigned as the "result of recent events that culminated in the dismissal of [TuSimple's] previous Board of Directors, including its Audit Committee."  TuSimple's CFO admitted in March 2023 that, as the Company searched for a new auditor, KPMG "just didn't want to get associated with TuSimple because *we were deemed high risk*."

4887-3830-0802.v2

251.   On February 1, 2023, the *Wall Street Journal* published another article titled "Leaders of Self-Driving-Truck Company Face Espionage Concerns Over China Ties."  The article revealed that at the end of 2022, representatives from CFIUS urged the DOJ to consider economic-espionage charges against the leaders of TuSimple. The article also revealed that the Board's investigation into the transfer of information to Hydron "included technical data, blueprints and schematics that would enable Hydron to replicate TuSimple's technology as well as specific information about TuSimple personnel who would be valuable to Hydron" and the "TuSimple employees who also worked for Hydron included top staff in marketing, product development, business development and government relations."

252.   On March 13, 2023, the Company announced in a Form 8-K that Hou had resigned from the Board on March 9, 2023 during an internal investigation into claims that Hou was seeking to get employees of TuSimple to work on a new venture that he was planning.  After market close on March 13, 2023, a *TechCrunch* article, titled "TuSimple co-founder resigns, accused of poaching staff for new venture," revealed further details on Hou's attempt to poach "top talent in 'high tech' teams" in the prior months.

253.   On June 28, 2023, the Company announced in a Form 8-K that it was looking to sell its U.S. business and that it would focus operations in the Asia-Pacific region and other global markets if the sale was successful.

254.   On September 7, 2023, the Company announced in a Form 10-K that "the Company and certain current and former directors and officers received subpoenas from the SEC requesting the production of Company documents" in response to the investigation "into the related party transaction with Hydron."  Additionally, the Company announced that "[t]he Company is cooperating with an inquiry by CFIUS concerning its compliance with the National Security Agreement ("NSA") entered into with the U.S. government as it relates to information shared by TuSimple U.S.

with TuSimple's China-based businesses ("TuSimple China"), Hydron, and Hydron's partners."

### 6. The Resignations and Terminations of TuSimple's Officers, Directors, and Independent Auditor Demonstrate Scienter

255.   Just over a week after TuSimple announced the resolution of the CFIUS investigation that resulted in the Company entering into the NSA with the U.S. government, TuSimple announced on March 3, 2022, that Hou would replace Lu as President and CEO as well as Chen as Chairman of the Board, effective that day.  As discussed in ¶¶275-277, *infra*, the sudden departure of Lu as President and CEO and Chen as Chairman of the Board stunned the market.

256.   After the April Crash and the subsequent investigations by the FMCSA and the NHTSA, additional executives began resigning from the Company.  Further, on June 10, 2022, Chen publicly disclosed his "launch" of Hydron for the first time. Just five days later, on June 15, 2022, Dillon unexpectedly resigned from his role as TuSimple's CFO, effective July 7, 2022.  No successor had been announced as of August 1, 2022.

257.   In July 2022, the Audit Committee of TuSimple's Board commenced an investigation into TuSimple's still undisclosed connection with Hydron.  That investigation remained ongoing as of October 31, 2022.  By August 1, 2022, the April Crash was fully disclosed by the *Wall Street Journal*'s exposé.

258.   Less than a month later, and while the Audit Committee's investigation remained ongoing, on August 31, 2022, James Mullen resigned from his position as Chief Legal and Administrative officer effective September 30, 2022.

259.   On October 31, 2022, TuSimple announced in a Form 8-K that as a result of the Audit Committee's internal investigation that was commenced in July 2022 and remained ongoing, the Board had terminated Hou from his position "as the Chief Executive Officer, President and Chief Technology Officer of the Company and

1  removed Dr. Hou from his position as Chairman of the Board, in each case, effective

2  as of October 30, 2022." According to the Board, Hou's firing was "necessary."

3      260.    KPMG, which had served as TuSimple's auditor since 2018, thereafter

4  immediately resigned on November 21, 2022. According to the Company, KPMG's

5  resignation was the "result of recent events that culminated in the dismissal of

6  [TuSimple's] previous Board of Directors, including its Audit Committee." Before

7  resigning, KPMG was investigating Chen on behalf of the Company's Audit

8  Committee.

9      261.    Additionally, dozens of other employees in key roles have departed the

10  Company. According to the *Wall Street Journal*, "those who raised safety concerns

11  were ignored, or even fired in some instances." For example, Mr. Lindland, a former

12  Functional Safety Engineering Lead, claimed in a lawsuit against the Company that he

13  was wrongfully fired after he refused to sign off on safety standards that the Company

14  had yet to meet.

15              **7.    Chao's and Lu's Insider Stock Sales Support a
                        Motive to Commit Fraud**
16

17      262.    Chao sold TuSimple's stock in connection with TuSimple's IPO, selling

18  6,756,756 shares for an astounding ***$270,270,240*** in proceeds. Chao executed those

19  sales despite having full knowledge of his undisclosed involvement with both

20  TuSimple and Hydron. Moreover, as soon as Hydron launched in March 2021, which

21  Chao was a "critical backer" of, Hydron was recruiting TuSimple employees,

22  including some in senior positions, to work for Hydron while simultaneously working

23  for TuSimple. Investors were completely unaware of this fact until over a year later

24  when it was disclosed by the *Wall Street Journal* on October 30, 2022 and the

25  Company on October 31, 2022.

26      263.    Lu also sold TuSimple's stock in 2021 while he was TuSimple's

27  President and CEO. Lu's first sales occurred in September 2021, at the tail end of the

28  45-day CFIUS investigation into TuSimple's 2017 purchase of its U.S. business. At

4887-3830-0802.v2

the time of Lu's sales on September 3, 7-10, and 14, 2021, the Company was "cooperat[ing] fully with CFIUS" in connection with the investigation. The CFIUS investigation ultimately resulted in the Company entering into the NSA agreement with the U.S. government.

264. The "Driver-Out" or "Ghost Rider" pilot program was also occurring throughout 2021. TuSimple had set a goal of 500 practice runs prior to completing the initial "Ghost Rider" driverless run in December 2021. But according to the *Wall Street Journal*, TuSimple "had conducted less than half of those [practice runs] when it launched the fully automated drive, which it did without informing its security teams."

265. In late 2021, a group of employees raised significant safety and security complaints, including the "failure to check software regularly for vulnerabilities and use of unencrypted communications to manage trucks," to TuSimple's legal department. "Safety drivers, meanwhile, [had] flagged concerns about failures in a mechanism that didn't always enable them to shut off the self-driving system by turning the steering wheel." These concerns were dismissed by "Company management." These facts were not disclosed to investors until the *Wall Street Journal* published its exposé on August 1, 2022.

266. Further, throughout 2021, TuSimple employees, including some in senior positions, spent paid hours working on matters for Hydron. This was not disclosed to investors until October 30, 2022, when the *Wall Street Journal* and then the Company ultimately revealed these facts.

267. In spite of these undisclosed facts, Lu continued to execute trades in the fall and winter of 2021, including on October 1, 2021 and December 16, 17, 20, and 21, 2021. In total, Lu sold 330,422 shares for ***$13,203,096*** in proceeds from September through December 2021.

## 8.   The Alleged Misrepresentations and Omissions Concerned TuSimple's Core Operations

268.   The alleged misrepresentations and omissions at issue concern the core of the Company's business: the security of their intellectual property and the safety of their trucks.

269.   TuSimple recognized in the Registration Statement that TuSimple's "business may be adversely affected if [it is] unable to adequately establish, maintain, protect, and enforce [its] intellectual property and property rights or prevent third parties from making unauthorized use of [its] technology and other intellectual property rights." Indeed, defendants described TuSimple's intellectual property as "an essential asset of [their] business."

270.   The Company's April 16, 2021 Prospectus further stated that it was its "technological differentiation" that was a "key driver" of the Company's sales to date. As stated by the Company's Registration Statement, a

> [f]ailure to adequately protect [their] intellectual property rights could result in [their] competitors offering similar products, potentially resulting in the loss of [their] competitive advantage, and a decrease in [their] revenue which would adversely affect our business prospects, financial condition, and operating results.

271.   Defendants confirmed that the security of TuSimple's intellectual property was at the core of TuSimple's business in the Company's 2021 10-K, stating:

> Our ability to be at the forefront of innovation in the autonomous trucking and freight transport market largely depends on our ability to obtain, *maintain, and protect our intellectual property and other proprietary rights relating to our key technology, and our ability to successfully enforce these rights against third parties*.

272.   Thus, TuSimple's core operations centered on its technology, and protecting the security of such technology remained paramount for the Company.

273.   Defendants also regularly highlighted safety as central to the viability of the Company. TuSimple's self-described mission includes "improv[ing] the safety and efficiency of the trucking industry" and defendants represented at the August 5, 2021 earnings call that "[s]afety comes before all else at TuSimple." The Company's

4887-3830-0802.v2

SEC filings, including the 1Q21 10-Q, confirm that should the Company's trucks "fail to perform as expected." TuSimple's ability to develop the market and sell or lease the Company's trucks could be harmed and ultimately that would "materially and adversely affect [TuSimple's] business, prospects, operating results, and financial condition." In short, the viability of the Company depended on TuSimple's ability to market and sell its one and only product (its trucks) which was entirely dependent on the trucks operating safely.

## VII.   LOSS CAUSATION

274.   The defendants named under the Exchange Act, as alleged herein, directly and proximately caused Plaintiffs' and Class members' economic loss. The market for TuSimple's securities was open, well-developed and efficient at all relevant times. Throughout the Class Period, TuSimple's securities traded at artificially inflated prices as a direct result of defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiffs and other members of the Class purchased or otherwise acquired TuSimple's securities relying upon the integrity of the market price for TuSimple's securities and market information relating to TuSimple, and have been damaged thereby. When the relevant truth began to emerge, the price of TuSimple's securities declined immediately as the artificial inflation was removed from the market price of the stock, causing substantial damage to Plaintiffs and the Class.

275.   On March 3, 2022, prior to the market opening, TuSimple announced that Hou would replace Lu as President and CEO and Chen as Chairman of the Board, effective that day. Although TuSimple claimed that Lu and Chen's departures were a "planned executive succession as the Company moves to its next phase," the market was stunned by this announcement.

4887-3830-0802.v2

276.   For example, a March 3, 2022 *Reuters* article, titled "Self-driving truck company TuSimple replaces CEO, shares plummet 20%," reported that this news "took Wall Street by surprise and caused its shares to plummet more than 20%." BofA Securities similarly reported on March 3, 2022 that "Founder and CTO Xiaodi Hou cleans house" in a "[s]urprising move."  RBC Capital Markets' March 3, 2022 report titled "TSP – Announces CEO transition" also acknowledged that "we believe the market will view the announcement negatively."  The following day, on March 4, 2022, Credit Suisse issued a report stating that "the market clearly did not receive the news well (with the stock down sharply on the day)."  J.P. Morgan also reported in a March 4, 2022 report that the "timing of the release and that it was effective immediately was a surprise and TSP sold off sharply during a tough day for pre-revenue companies."

277.   As a direct result of the March 3, 2022 disclosures, TuSimple shares dropped from a close of $16.97 per share on March 2, 2022 to $13.25 per share by the end of day on March 3, 2022, on unusually high trading volume.  The stock continued to decline on March 4, 2022, to close at $11.49 per share, again on high trading volume.  The declines resulted in a market capitalization loss of over $940 million.

278.   As reflected in the chart below, while the price of TuSimple stock fell by 21.9% on March 3, 2022, the NASDAQ Composite Total Return Index declined by only 1.6% and the S&P 500 Information Technology Index declined by only 1.2%. TuSimple's stock would continue to decline an additional 13.3% on March 4, 2022, as compared to the NASDAQ Composite Total Return Index's decline of 1.7% and S&P 500 Information Technology Index's decline of 1.8%:

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-
cv-00282-BEN-MSB)

4887-3830-0802.v2



279.   The new, Company-specific, material information released on March 3, 2022 was directly related to the false and/or misleading statements previously made by the defendants named under the Exchange Act.  However, TuSimple's stock price remained inflated as defendants continued to conceal the full impact of their fraudulent misconduct from investors.

280.   On August 1, 2022, the *Wall Street Journal* published an article, titled "Self-Driving Truck Accident Draws Attention to Safety at TuSimple," and brought to light a number of previously undisclosed concerns that undermined defendants' representations and omissions concerning the safety of the Company's vehicles.  The article, which relied on independent analysts, interviews with the TuSimple's former employees, and internal Company documents, disputed TuSimple's position that "human error" was to blame for the April Crash by pointing out that the lack of common safeguards should have prevented the April Crash from occurring.

281.   For example, the article reported that the "safety driver – a person who sits in the truck to backstop the artificial intelligence – should never be able to engage a self-driving system that isn't properly functioning, they said.   The truck also

4887-3830-0802.v2

shouldn't respond to commands that are even a couple hundredths of a second old, they said.  And the system should never permit an autonomously-driven truck to turn so sharply while traveling at 65 miles an hour."  Additionally, the article revealed that the April Crash "follows years of management rebuffing what some former employees say were significant safety and security complaints," including "the [C]ompany's alleged failure to check software regularly for vulnerabilities and use of unencrypted communications to manage trucks, which could provide an opening for hackers to intercept data going between engineers and the vehicles' systems."

282.  The market reacted negatively to these new Company-specific disclosures.  A BofA Securities' August 3, 2022 report, titled "Moves to slow cash burn on long road to commercialization/2023 driver-out target," reported, for instance, that "[s]afety was in focus following Monday's WSJ article which detailed an April 6 incident when a test driver working to re-enter autonomous mode, swerved and scraped a barricade (causing no injuries but minor damage).  This led the stock to fall 10% (vs -0.3% S&P)."

283.  As a direct result of these disclosures, TuSimple shares declined from a close of $9.96 per share on July 29, 2022 to a close of $8.99 per share on August 1, 2022 on unusually high trading volume, resulting in a market capitalization loss of approximately $213 million.

284.  As reflected in the chart below, while the price of TuSimple stock fell by 9.7% on August 1, 2022, the NASDAQ Composite Total Return Index and the S&P 500 Information Technology Index declined by only 0.2%:

- 89 -

4887-3830-0802.v2



285.  The new, Company-specific, material information released on August 1, 2022 was directly related to the false and/or misleading statements previously made by defendants.   However, TuSimple's stock price remained inflated because defendants continued to conceal the full impact of their misconduct from investors.

286.  On October 30, 2022, the *Wall Street Journal* published an investigative report titled "TuSimple Probed by FBI, SEC Over Its Ties to a Chinese Startup," revealing that TuSimple was being investigated "into whether it improperly financed and transferred technology to a Chinese startup."  The *Wall Street Journal* revealed that the FBI, the SEC, and CFIUS were investigating whether Company executives, including Hou, improperly shared TuSimple's technology and intellectual property with Hydron.

287.  In a release filed with the SEC on Form 8-K dated October 31, 2022, the Company admitted that TuSimple "employees spent paid hours working on matters for Hydron Inc. (f/k/a Turing Auto)" and that Chen "has an equity interest in the Company of greater than 10%.  This related party transaction was not presented to, or

4887-3830-0802.v2

approved by, the Audit Committee as required by the Company's Code of Conduct." The Form 8-K also revealed that TuSimple "shared confidential information with Hydron and its partners, which was not brought to the attention of the Audit Committee and Government Security Committee, and before entering into relevant non-disclosure and other cooperation agreements."

288.   The same release also announced that TuSimple's Board had terminated Hou "as the Chief Executive Officer, President and Chief Technology Officer of the Company and removed Dr. Hou from his position as Chairman of the Board, in each case, effective as of October 30, 2022." The *San Diego Union-Tribune* confirmed that TuSimple had "fired" Hou after an "internal probe found that [the] Company shared confidential information with a Chinese startup *without proper disclosures*."

289.   As a direct result of these disclosures, TuSimple's shares plummeted by more than 40% from a close of $6.31 per share on October 28, 2022 to a close of $3.43 per share on October 31, 2022, resulting in a market capitalization loss of over $638 million.  TuSimple shares traded on unusually high volume of over 27 million shares traded on October 31, 2022.

290.   The reaction from analysts was swift and negative:

(a)   BofA Securities issued an October 31, 2022 report, titled "Lower to Underperform: Fires founder/CEO for cause; PO to $5.50," and attributed the "surprising shift in the boardroom" as part of the reason for the downgrade.

(b)   Piper Sandler issued an October 31, 2022 report, titled "Downgrading to Neutral Following Sudden Termination of TSP's CEO," and noted that: "We are downgrading shares of TSP to Neutral, following today's sudden announcement that Xiaodi Hou, co-founder and CEO of TuSimple, has been removed by the Board of Directors.  The stock is lower by over 40% in response to the news. This is the latest in a string of management departures."

4887-3830-0802.v2

(c)     RBC Capital Markets issued an October 31, 2022 report, titled "Not so simple; Downgrading to Underperform," and explained that an "[i]nternal investigation led to replacement of CEO and yet more uncertainty around the company.  We are downgrading the stock to Underperform seeing an even further road back to credibility and no immediate catalyst for investors to get involved.  Our new PT is $4."  RBC Capital Markets further explained that "[c]redibility can be hard to re-build.  Investors would need to overcome issues including, the removal of CEO owing to sharing of confidential information, the departure of the prior CEO and CFO as well as key employees such as their prior general counsel and Chief Product Officer.  An accident involving one of their autonomous trucks earlier this year cast a shadow on their technology."

(d)     Truist Securities issued an October 31, 2022 report, titled "Solid 3Q Overshadowed by Massive Sell-Off, Seeking Detailed Mgmt Plan in Upcoming Call," and noted that "[f]ollowing a significant sell-off today in TSP shares (closing down 46% vs. S&P down 0.75%) from the announced termination of the company's CEO (see link) amidst internal/regulatory investigations. . . ."  The report further stated that "TSP's announcement this morning & the subsequent 46% drop in shares certainly in our opinion creates a credibility challenge the company will need to work to remedy.  In the near-term, significant internal controls will need to be established & any potential regulatory issues will need to be addressed."

(e)     Truist Securities issued an additional report on October 31, 2022, titled "CEO Terminated Amidst Investigation; Shares Face Pressure Ahead of Earnings Report," and stated that "[i]n our view, today's announcement represents another hit to the company's credibility following prior challenges with regulatory investigations, management turnover, etc."

(f)     The following day, on November 1, 2022 Truist Securities issued another report, titled "Letting the Dust Settle & Evaluating the Go-Forward; Reiterate

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-
cv-00282-BEN-MSB)

4887-3830-0802.v2

1    Buy & Reduce PT to $8 from $12," and admitted that "the CEO shakeup,

2    investigation & resultant impact to shares (note) came as a surprise to our bullish

3    outlook." The report further stated that "[a]s mentioned in our prior notes, TSP shares

4    saw a significant (~45%) sell-off yesterday following both a WSJ article over the

5    weekend (Link) citing federal agency investigations of TSP's connections to a

6    Chinese startup, and an announcement from the company yesterday morning of the

7    termination of CEO/CTO Xiaodi Hou following an internal audit related to the same

8    startup."

9                    (g)    J.P. Morgan's November 1, 2022 report, titled "Perception is Still

10   Reality; Downgrade to Underweight," stated that "[w]e are downgrading TSP to

11   Underweight and withdrawing our price target after the Board of Directors terminated

12   the company's CEO and Co-Founder following an internal investigation that is still

13   ongoing." The report noted that "[w]e recognize that downgrading after a significant

14   stock price drop is backward looking, but we don't expect to hear anything that

15   reduces the additional risk during the 3Q22 earnings call. Moreover, this disclosure

16   adds to our concern regarding the effectiveness of controls within the company. Last

17   quarter, TuSimple's safety reputation took a hit after an improperly designed safety

18   system control did not stop a safety driver from engaging the autonomous driving

19   system (ADS) when it was unsafe to do so. As such, we believe the company has a

20   long road ahead to restore confidence in the safety culture as well as its broader

21   framework for controlling and identifying financial and operational risks."

22                   (h)    As reflected in the chart below, while the price of TuSimple fell by

23   45.6% on October 31, 2022, the NASDAQ Composite Total Return Index declined by

24   only 1% and the S&P 500 Information Technology Index declined by 1.3%:

25

26

27

28

4887-3830-0802.v2



291.   The new, Company-specific, material information released on that day was directly related to the false and/or misleading statements previously made by defendants.  However, TuSimple's stock price remained inflated because defendants continued to conceal the full impact of their misconduct from investors.

292.   On December 5, 2022, after the market closed, TuSimple announced the termination of its partnership with Navistar to develop self-driving trucks.  BofA Securities' December 6, 2022 report titled "Commercial plan at risk as Navistar ends relationship, more may cancel; PO to $1.00" reported that the "relationship was ended by Navistar primarily due to governance concerns as TuSimple transitioned across 3 different CEOs (Dr. Hou, Dr. Yumer, and now Mr. Lu) over the span of 3 weeks, and then firing its board of directors."  The report further noted that "we view this as a major negative event for the company."

293.   As a direct result of this disclosure, TuSimple's shares dropped from a close of $2.26 per share on December 5, 2022 to a close of $1.83 per share on December 6, 2022, on high trading volume.

4887-3830-0802.v2

294.   As reflected in the chart below, while the price of TuSimple fell by 19%, the NASDAQ Composite Total Return Index declined by only 2% and the S&P 500 Information Technology Index declined by 2.1%:



295.   The new, Company-specific, material information released on that day was directly related to the false and/or misleading statements previously made by defendants.  However, TuSimple's stock price remained inflated because defendants continued to conceal the full impact of their misconduct from investors.

296.   On December 20, 2022, after the market closed, news leaked that TuSimple was going to lay off a significant number of its workforce.  The following day, on December 21, 2022, the Company announced "a broad restructuring plan," and confirmed that it was laying off TuSimple's global workforce by 25%.  The new Company-specific material information released on that day was directly related to the false and/or misleading statements previously made by defendants.

4887-3830-0802.v2

297. On December 20, 2022, TuSimple shares dropped from a close of $1.51 per share on December 20, 2022 to a close of $1.42 per share on December 21, 2022, on high trading volume.

298. As reflected in the chart below, while the price of TuSimple fell by 5.9%, the NASDAQ Composite Total Return Index increased by 1.5% and the S&P 500 Information Technology Index increased by 1.7%.



299. The economic loss suffered by Plaintiffs and other members of the Class was a direct result of defendants' wrongful conduct, which inflated the prices of TuSimple securities and resulted in the subsequent declines in value when defendants' misconduct, including their prior false and misleading statements and omissions, was revealed. The declines in the price of TuSimple securities pled herein were a direct result of the nature, extent and impact of defendants' misconduct, including their prior false and misleading statements and omissions being revealed to investors and the market. The timing and magnitude of the price declines of TuSimple securities negate any inference that the losses suffered by Plaintiffs and other Class members were

4887-3830-0802.v2

1   caused by changed market conditions, macroeconomic or industry factors, or

2   Company-specific factors unrelated to defendants' wrongful conduct.

3   **VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE**

4         300.   At all relevant times, the market for TuSimple's securities was an

5   efficient market for the following reasons, among others:

6               (a)   TuSimple securities met the requirements for listing and were

7   listed and actively traded on the NASDAQ, a highly efficient and automated market;

8               (b)   As a regulated issuer, TuSimple filed periodic reports with the

9   SEC and the NASDAQ;

10              (c)   TuSimple regularly communicated with public investors via

11  established   market   communication   mechanisms,   including   through   regular

12  disseminations of press releases on the national circuits of major newswire services

13  and through other wide-ranging public disclosures, such as communications with the

14  financial press and other similar reporting services; and

15              (d)   TuSimple was followed by numerous securities analysts employed

16  by major brokerage firms who wrote reports that were distributed to the sales force

17  and certain customers of their respective brokerage firms.  Each of these reports was

18  publicly available and entered the public marketplace.

19        301.   As a result of the foregoing, the market for TuSimple's securities

20  promptly digested current information regarding TuSimple from all publicly available

21  sources and reflected such information in the prices of the securities.  Under these

22  circumstances, all purchasers of TuSimple's securities during the Class Period

23  suffered similar injury through their purchase of TuSimple's securities at artificially

24  inflated prices.  The *Basic* presumption of reliance applies.

25        302.   Plaintiffs and the putative Class are also entitled to the *Affiliated Ute*

26  presumption of reliance due to defendants' failure to disclose the related party

27  scheme, which was information Plaintiffs would have wanted to know and which

28

- 97 -                3:22-cv-01300-BEN-MSB
                      (Consolidated with No. 3:23-
                      cv-00282-BEN-MSB)

4887-3830-0802.v2

1   would have caused investors to have avoided purchasing TuSimple securities at the

2   prices they traded at during the Class Period.

3   **IX.    INAPPLICABILITY OF SAFE HARBOR**

4       303.   The federal statutory safe harbor provided for forward-looking statements

5   under certain circumstances does not apply to any of the allegedly false statements

6   pleaded in this Complaint.  The statements alleged to be false and misleading herein

7   all relate to then-existing facts and conditions.  In addition, to the extent certain of the

8   statements alleged to be false may be characterized as forward looking, they were not

9   identified as "forward-looking statements" when made, and there were no meaningful

10  cautionary statements identifying important factors that could cause actual results to

11  differ materially from those in the purportedly forward-looking statements.

12      304.   In the alternative, to the extent that the statutory safe harbor is determined

13  to apply to any forward-looking statements pleaded herein, defendants are liable for

14  those false forward-looking statements because at the time each of those forward-

15  looking statements was made, the speaker had actual knowledge that the forward-

16  looking statement was materially false or misleading, and/or the forward-looking

17  statement was authorized or approved by an executive officer of TuSimple who knew

18  that the statement was false when made.

19  **X.    CLASS ACTION ALLEGATIONS**

20      305.   Plaintiffs bring this action as a class action pursuant to Federal Rule of

21  Civil Procedure 23(a) and (b)(3) on behalf of all persons and entities who: purchased

22  or otherwise acquired TuSimple securities during the Class Period, including those

23  who purchased and/or otherwise acquired TuSimple securities pursuant and/or

24  traceable to the Registration Statement, and were damaged thereby.  Excluded from

25  the Class are defendants, the officers and directors of the Company, at all relevant

26  times, members of their immediate families and their legal representatives, heirs,

27

28

4887-3830-0802.v2

1   successors, or assigns, and any entity in which defendants have or had a controlling

2   interest.

3       306.   The members of the Class are so numerous that joinder of all members is

4   impracticable.   Throughout the Class Period, shares of TuSimple securities were

5   actively traded on the NASDAQ.   While the exact number of Class members is

6   unknown to Plaintiffs at this time and can be ascertained only through appropriate

7   discovery, Plaintiffs believe that there are hundreds or thousands of members in the

8   proposed Class.  Record owners and other members of the Class may be identified

9   from records maintained by TuSimple or its transfer agent and may be notified of the

10  pendency of this action by mail, using the form of notice similar to that customarily

11  used in securities class actions.

12      307.   Plaintiffs' claims are typical of the claims of the members of the Class as

13  all members of the Class are similarly affected by defendants' wrongful conduct in

14  violation of federal law that is complained of herein.

15      308.   Plaintiffs will fairly and adequately protect the interests of the members

16  of the Class and have retained counsel competent and experienced in class and

17  securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with

18  those of the Class.

19      309.   Common questions of law and fact exist as to all members of the Class

20  and predominate over any questions solely affecting individual members of the Class.

21  Among the questions of law and fact common to the Class are:

22          (a)    whether the federal securities laws were violated by defendants'

23  acts as alleged herein;

24          (b)    whether statements made by defendants to the investing public

25  during the Class Period, misrepresented material facts about the business, operations

26  and management of TuSimple;

27

28

- 99 -            3:22-cv-01300-BEN-MSB
                  (Consolidated with No. 3:23-
                  cv-00282-BEN-MSB)

(c)      whether certain of defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(d)      whether the prices of TuSimple securities during the Class Period were artificially inflated because of defendants' conduct complained of herein; and

(e)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

310.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

311.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)      defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)      the omissions and misrepresentations were material;

(c)      TuSimple securities are traded in an efficient market;

(d)      the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)      the Company traded on the NASDAQ and was covered by multiple analysts;

(f)      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(g)      Plaintiffs and members of the Class purchased, acquired and/or sold TuSimple securities between the time defendants failed to disclose or

4887-3830-0802.v2

1  misrepresented material facts and the time the true facts were disclosed, without

2  knowledge of the omitted or misrepresented facts.

3      312.   Based upon the foregoing, Plaintiffs and the members of the Class are

4  entitled to a presumption of reliance upon the integrity of the market.

5      313.   Alternatively, Plaintiffs and the members of the Class are entitled to the

6  presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of*

7  *the State of Utah v. United States*, 406 U.S. 128 (1972), as defendants omitted

8  material information in their Class Period statements in violation of a duty to disclose

9  such information, as detailed above.

10  **XI.    CLAIMS FOR RELIEF**

11  **COUNT I**

12  **Violations of §11 of the Securities Act Against TuSimple, Chao,
Hou, Chen, Zhang, Lu, Dillon, Buss,**

13  **Francis, and the Underwriter Defendants)**

14      314.   Plaintiffs repeat and reallege the allegations contained in ¶¶1, 4-8, 40-47,

15  49-51, 53, 55, 56, 58-60, 68-85, 158-163, 305-308, 309(a),(e) and 310 as if fully set

16  forth herein.

17      315.   This claim is brought on behalf of the Class pursuant to §11 of the

18  Securities Act, 15 U.S.C. §77k, against TuSimple, Chao, Hou, Chen, Zhang, Lu,

19  Dillon, Buss, Francis, and the Underwriter Defendants.

20      316.   Plaintiffs acquired shares traceable to the Registration Statement.

21      317.   The Registration Statement contained untrue statements of material fact,

22  omitted to state facts necessary to make the statements made therein not misleading

23  and omitted to state material facts required to be stated therein.

24      318.   TuSimple is the registrant for the IPO.  As issuer of the shares, TuSimple

25  is strictly liable to Plaintiffs and members of the Class who purchased shares traceable

26  to the Registration Statement for the misstatements and omissions therein.

27

28

4887-3830-0802.v2

319.   Chao, Hou, Chen, Zhang, Lu, Dillon, Buss, and Francis each signed the Registration Statement and was a director of TuSimple at the time of filing and/or was named in the Registration Statement, with their consent, as about to become a director and was responsible for the contents of the Registration Statement.

320.   The Underwriter Defendants are investment banking houses that specialize in underwriting public offerings of securities.  The Underwriter Defendants collectively received more than $50 million in fees for serving as the underwriters of the IPO.

321.   The Underwriter Defendants demanded and obtained an unlawful agreement from Chao, Hou, Chen, Zhang, Lu, Dillon, Buss, and Francis that TuSimple would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

322.   Representatives of the Underwriter Defendants worked together with Chao, Hou, Chen, Zhang, Lu, Dillon, Buss, and Francis in planning the IPO and were required to conduct an adequate and reasonable due diligence investigation into the business and operations of TuSimple in order to participate in the IPO.  During the course of their purported due diligence, the Underwriter Defendants had continual access to internal, confidential, then current corporate information concerning TuSimple's most up-to-date operational and financial results and prospects, including the representations in the Registration Statement.

323.   In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants conferred with TuSimple's lawyers, management and directors and engaged in drafting sessions ahead of the IPO.  During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which TuSimple's shares would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about TuSimple would be made in the

4887-3830-0802.v2

Registration Statement; and (v) what responses would be made to the SEC, in connection with its review of the Registration Statement.  As a result of the contacts and communications between and among the Underwriter Defendants' representatives and TuSimple's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, TuSimple's existing problems and the untrue statements of material fact and omissions in the Registration Statement alleged herein.

324.    Finally, the Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of shares of TuSimple securities registered and sold to Plaintiffs and the other members of the Class.

325.    None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omission of any material facts and were not misleading.

326.    The Registration Statement, as amended, was declared effective on April 14, 2021.  On April 16, 2021, the Company filed its Prospectus on Form 424B4 with the SEC, which incorporated and formed part of the Registration Statement.  Pursuant to the Registration Statement, defendants offered and sold 27,027,027 Class A securities at $40 per share, raising total net proceeds of $1 billion.

327.    The "Underwriting Agreement" TuSimple filed with the SEC in connection with the Form S-1/A also confirmed that the Registration Statement "complied when so filed in all material respects with the Securities Act" and that the Registration Statement and the Prospectus "will not . . . contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading."

4887-3830-0802.v2

**Untrue Statements and Omissions in the Registration Statement Regarding Related Parties and TuSimple's Intellectual Property**

328.   The Registration Statement omitted TuSimple's related party transactions with the Hydron Entities as well as the fact that the "Risk Factors" listed in the Registration Statement had already materialized before the IPO.

329.   The Registration Statement also purported to warn about the risks associated with securing its intellectual property and proprietary information, stating:

> Risks Related to Our Intellectual Property, Information Technology, and Data Privacy
>
> Our business may be adversely affected if we are unable to adequately establish, maintain, protect, and enforce our intellectual property and proprietary rights or prevent third parties from making unauthorized use of our technology and other intellectual property rights.
>
> Our intellectual property is an essential asset of our business. Failure to adequately protect our intellectual property rights could result in our competitors offering similar products, potentially resulting in the loss of our competitive advantage, and a decrease in our revenue which would adversely affect our business prospects, financial condition, and operating results. Our success depends, at least in part, on our ability to protect our core technology and intellectual property. We rely on a combination of intellectual property rights, such as patents, trademarks, copyrights, and trade secrets (including know-how), in addition to employee and third-party nondisclosure agreements, intellectual property licenses, and other contractual rights, to establish, maintain, protect, and enforce our rights in our technology, proprietary information, and processes.
>
> \*        \*        \*
>
> Further, the standards applied by the USPTO and foreign patent offices in granting patents are not always applied uniformly or predictably. For example, there is no uniform worldwide policy regarding patentable subject matter or the scope of claims allowable for business methods. As such, we do not know the degree of future protection that we will have on our technologies, products, and services. While we will endeavor to try to protect our technologies, products, and services with intellectual property rights such as patents, as appropriate, the process of obtaining patents is time-consuming, expensive, and sometimes unpredictable.
>
> \*        \*        \*
>
> In addition to patented technology, we rely on our unpatented proprietary technology, trade secrets, processes, and know-how.

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-00282-BEN-MSB)

4887-3830-0802.v2

We rely on proprietary information (such as trade secrets, know-how, and confidential information) to protect intellectual property that may not be patentable, or that we believe is best protected by means that do not require public disclosure. We generally seek to protect this proprietary information by entering into confidentiality agreements, or consulting, services, or employment agreements that contain non-disclosure and non-use provisions with our employees, consultants, contractors, scientific advisors, and third parties. However, we cannot guarantee that we have entered into such agreements with each party that has or may have had access to our trade secrets or proprietary information and, even if entered into, these agreements may be breached or may otherwise fail to prevent disclosure, third-party infringement or misappropriation of our proprietary information, may be limited as to their term and may not provide an adequate remedy in the event of unauthorized disclosure or use of proprietary information. We have limited control over the protection of trade secrets used by our third-party manufacturers and suppliers and could lose future trade secret protection if any unauthorized disclosure of such information occurs. In addition, our proprietary information may otherwise become known or be independently developed by our competitors or other third parties. To the extent that our employees, consultants, contractors, and other third parties use intellectual property owned by others in their work for us, disputes may arise as to the rights in related or resulting know-how and inventions. Costly and time-consuming litigation could be necessary to enforce and determine the scope of our proprietary rights, and failure to obtain or maintain protection for our proprietary information could adversely affect our competitive business position. Furthermore, laws regarding trade secret rights in certain markets where we operate may afford little or no protection to our trade secrets. If any of our trade secrets were to be lawfully obtained or independently developed by a competitor or other third party, we would have no right to prevent them from using that trade secret to compete with us. If any of our trade secrets were to be disclosed (whether lawfully or otherwise) to or independently developed by a competitor or other third party, it could have a material adverse effect on our business, operating results, and financial condition.

We also rely on physical and electronic security measures to protect our proprietary information, but we cannot guarantee that these security measures provide adequate protection for such proprietary information or will never be breached. There is a risk that third parties may obtain unauthorized access to and improperly utilize or disclose our proprietary information, which would harm our competitive advantages. We may not be able to detect or prevent the unauthorized access to or use of our information by third parties, and we may not be able to take appropriate and timely steps to mitigate the damages (or the damages may not be capable of being mitigated or remedied).

330. The Registration Statement omitted Hydron or Chao's significant ties to the Chinese government while purporting to disclose all related party transactions.

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-00282-BEN-MSB)

4887-3830-0802.v2

331.   The Registration Statement also represented that TuSimple intended to implement a policy to restrict executives from entering into related party transactions without prior approval:

> We intend to adopt a written related party transaction policy to be effective upon the completion of this offering. ***The policy will provide that our executive officers, directors, holders of more than 5% of any class of our voting securities and any member of the immediate family of and any entity affiliated with any of the foregoing persons, will not be permitted to enter into a related-party transaction with us without the prior consent of our audit committee***, or other independent members of our board of directors in the event it is inappropriate for our audit committee to review such transaction due to a conflict of interest.  Any request for us to enter into a transaction with an executive officer, director, principal stockholder, or any of their immediate family members or affiliates, in which the amount involved exceeds $120,000, must first be presented to our audit committee for review, consideration and approval.  In approving or rejecting the proposed transactions, our audit committee will take into account all of the relevant facts and circumstances available.
>
> ***All of the transactions described in this section were entered into prior to the adoption of this policy***.  Although we have not had a written policy for the review and approval of transactions with related persons, our board of directors has historically reviewed and approved any transaction where a director or officer had a financial interest, including the transactions described above.  Prior to approving such a transaction, the material facts as to a director's or officer's relationship or interest in the agreement or transaction were disclosed to our board of directors.  Our board of directors took this information into account when evaluating the transaction and in determining whether such transaction was fair to us and in the best interest of all our stockholders.

332.   The statements in ¶¶328-331, *supra*, were untrue statements of material fact and/or omitted material facts necessary to make the statements made therein not misleading as: (i) TuSimple was contemporaneously engaging in undisclosed related party transactions with Hydron (the company founded by Chen and backed by Chao), in violation of SEC Regulation S-K; (ii) defendants shared confidential information and/or proprietary technology with Hydron without Board approval or informing TuSimple shareholders in contravention of federal law and the NSA; (iii) Chao, a major investor in TuSimple and Hydron, had close ties to a foreign adversary; (iv) TuSimple failed to adequately warn investors that the "Risk Factors" listed above had already materialized well before the time of the IPO; and (v) the aforementioned

4887-3830-0802.v2

conduct enhanced the likelihood of TuSimple being subjected to regulatory scrutiny and/or investigatory action thereby creating an undisclosed risk factor.

**Untrue Statements and Omissions in the Registration Statement Regarding Safety**

333.   The Registration Statement purported to describe the safety of the Company's vehicles stating that:

> Our AFN leverages our proprietary L4 autonomous semi-trucks, HD digital route mapping capabilities, and TuSimple Connect cloud-based autonomous operations oversight system to provide substantial benefits to the key truck freight industry stakeholders. The "plug and play" nature of our solution will allow any truck freight market participant to access and benefit from our autonomous freight capacity. Shippers, carriers, and railroads gain access to reliable and safe freight capacity at a substantially lower annual total cost of ownership when direct labor is removed from the per mile cost structure. Removing the driver from long haul operations allows shippers, carriers, and railroads to reallocate scarce driver resources to customer facing first and last mile routes. Freight brokers benefit from the reliability of autonomy, which allows them to more efficiently match demand with the lowest cost long haul freight capacity. We believe that the wide ranging benefits of our solution to industry participants will accelerate the adoption of our network.

334.   The Registration Statement highlighted the Company's AFN as "the infrastructure to enable safe and efficient autonomous freight capacity as a service."

335.   The Registration Statement also represented that TuSimple's trucks were "powered by our on-board autonomous driving software, our TuSimple Connect cloud-based autonomous operations oversight system, autonomous HD route mapping support, and emergency roadside assistance to provide safe and seamless end-to-end autonomous freight capacity as a service."

336.   The statements in ¶¶333-335 were made in and/or incorporated by reference into the Registration Statement, were untrue statements of material fact and/or omitted material facts necessary to make the statements made therein not false and misleading as they failed to disclose that defendants: (i) concealed fundamental problems with the Company's AV technology and its safety profile was significantly overstated; (ii) rushed the testing of the Company's AV technology to deliver

driverless trucks to market ahead of its more safety conscious competitors; (iii) actively suppressed safety concerns that were raised internally in favor of reckless testing and delivery schedules; and (iv) recklessly ignored that TuSimple's fleet lacked significant elementary safeguards as: (a) a safety driver (a person who sits in the truck to backstop the artificial intelligence) should have never been able to engage a purported self-driving system that was not properly functioning; (b) an AV semi-truck should not be able respond to commands that are even a couple hundredths of a second old; and (c) an adequate self-driving system would preclude an AV semi-truck weighing 80,000 pounds from turning sharply when traveling at 65 miles per hour.

337. Plaintiffs and the Class sustained damages due to Chao, Hou, Chen, Zhang, Lu, Dillon, Buss, Francis and the Underwriter Defendants' violations.

338. At the time of their purchases or acquisitions of TuSimple shares, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

339. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that this action was commenced. Less than three years have elapsed between the time that the securities upon which this cause of action is brought were offered to the public and the time this action was commenced.

340. By reason of their conduct alleged herein, TuSimple, Chen, Hou, Lu, Dillon, Chao, Zhang, Buss, Francis, and the Underwriter Defendants violated §11 of the Securities Act.

**COUNT II**

**(Violations of §12 of the Securities Act
Against TuSimple, Chao, Hou, Chen, Zhang, Lu,
Dillon, Buss, Francis, and the Underwriter Defendants)**

4887-3830-0802.v2

341.   Plaintiffs repeat and reallege the allegations contained in ¶¶314-340 as if fully set forth herein.

342.   By means of the defective Registration Statement (which incorporated the Prospectus), defendants TuSimple, Chao, Hou, Chen, Zhang, Lu, Dillon, Buss, Francis, and the Underwriter Defendants promoted, solicited, offered for sale, and sold TuSimple common stock to Plaintiffs and other members of the Class.

343.   Poirier and members of the class purchased shares of TuSimple common stock pursuant to the Prospectus.

344.   The Prospectus, which formed part of the Registration Statement, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

345.   TuSimple, Chao, Hou, Chen, Zhang, Lu, Dillon, Buss, Francis, and the Underwriter Defendants owed Plaintiffs and the other members of the Class who purchased the Company's securities sold pursuant to the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained therein to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

346.   In the exercise of reasonable care, TuSimple, Chen, Hou, Lu, Dillon, Chao, Zhang, Buss, Francis, and the Underwriter Defendants should have known of the misstatements and omissions contained in the Registration Statement as set forth above.

347.   Plaintiffs did not know, nor in the exercise of reasonable diligence could Plaintiffs have known, of the untruths and omissions contained in the Registration Statement at the time Plaintiffs acquired TuSimple's common stock.

4887-3830-0802.v2

348.  TuSimple, Chen, Hou, Lu, Dillon, Chao, Zhang, Buss, Francis, and the Underwriter Defendants participated in the offers for sale and sale of TuSimple stock for financial gain by means of the Registration Statement.

349.  By reason of the conduct alleged herein, the defendants named herein violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2).  As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased TuSimple securities pursuant to the Registration Statement sustained substantial damages in connection with those purchases.  Accordingly, Plaintiffs and the other members of the Class who hold TuSimple securities sold pursuant to the Registration Statement have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to defendants TuSimple, Chen, Hou, Lu, Dillon, Chao, Zhang, Buss, Francis, and the Underwriter Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

350.  This claim is timely brought within one year after discovery of the untrue statements and/or omissions in the IPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO.

**COUNT III**

**(Violations of §15 of the Securities Act
Against Chao, Hou, Chen, Zhang,
Lu, Dillon, Buss, and Francis)**

351.  Plaintiffs repeat and reallege the allegations contained in ¶¶314-350 as if fully set forth herein.

352.  This claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against Chao, Hou, Chen, Zhang, Lu, Dillon, Buss, and Francis.

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-
cv-00282-BEN-MSB)

4887-3830-0802.v2

353.   Chao, Hou, Chen, Zhang, Lu, Dillon, Buss, and Francis each held executive and/or director positions and/or were beneficial owners of TuSimple.

354.   Chao served at all relevant times as TuSimple's Board Chair from April 22, 2019 until he was forced (pursuant to the NSA) not to stand for reelection at the end of his term in June 2022.   Chao served as the Chair of the Nominating and Corporate Governance Committee.

355.   Hou was at all relevant times TuSimple's co-founder.  Hou also served as TuSimple's CTO during the Class Period until March 3, 2022, when he was appointed to serve as TuSimple's President, CEO, and Chairperson of the Board.  Hou served in these positions until he was terminated by the Audit Committee and removed from his position as Chairman of the Board on October 31, 2022. Hou remained a member of TuSimple's Board until his resignation on March 9, 2023.

356.   Chen was at all relevant times TuSimple's co-founder, Executive Chairman, and director.

357.   Zhang was a member of TuSimple's Board of Directors from September 30, 2020 until she was forced (pursuant to the NSA) not to stand for reelection at the end of her term in June 2022.

358.   Lu was at all relevant times the Company's President and CEO during the Class Period until his resignation on March 3, 2022.  He subsequently returned to the position of CEO in November 2022 and is currently the Company's President and CEO.

359.   Dillon was at all relevant times the Company's CFO throughout the Class Period until his resignation on July 7, 2022.  Dillon spoke on every earnings call and at every conference the Company held and/or attended with investors during the Class Period until his resignation.

360.   Buss served as a member of the Company's Board of Directors from January 2021 until he was ousted by Chen and Hou shortly after the Class Period

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-
cv-00282-BEN-MSB)

4887-3830-0802.v2

ended on November 10, 2022.  During his tenure on the Board, Buss served as Chair of the Audit Committee and, other than Chao, was the only other member of the Nominating and Corporate Governance Committee.  On April 23, 2022, Buss was appointed to serve as the Company's Lead Independent Director "to facilitate communication between management, the independent directors and the chairman of our board, as well as to participate in setting agendas for meetings and presiding at executive sessions of the board of directors."  Shortly before his ouster, the Company had announced on October 31, 2022 that Buss would serve as the Chairman of the Board – a position which he held for less than two weeks.

361.   Francis served as a member of the Company's Board of Directors from February 2021 until she was ousted by Chen and Hou shortly after the Class Period ended on November 10, 2022.  During the Class Period, Francis was a member of the Audit Committee and the Compensation Committee.

362.   Additionally, together, Hou, Chen, and Chao controlled 68.3% of the total voting power under TuSimple's Class A and Class B share voting structure.

363.   Hou and Chen demonstrated their control on November 10, 2022 by *removing the entire Audit Committee* and others at TuSimple who were investigating Hou's related party scheme with Hydron.  That same day, Hou exercised his power as the sole remaining director to appoint Chen and Lu to the Board.

364.   Defendants named in this Count were control persons of TuSimple by virtue of their positions as directors and/or senior officers, which allowed them to exercise control over TuSimple, its operations, and the Registration Statement.

## COUNT IV

### (Violations of §10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against TuSimple, Chao, Hou, Chen, Zhang, Lu, Dillon, and Buss)

365.   Plaintiffs repeat and reallege the allegations contained in ¶¶1-313 as if fully set forth herein.

4887-3830-0802.v2

366.   This Count is asserted against TuSimple, Chao, Hou, Chen, Zhang, Lu, Dillon, and Buss on behalf of the Class, and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.  Dillon and Buss are named herein solely as defendants in connection with their statements regarding TuSimple's safety record and prospects.

367.   During the Class Period, defendants knowingly or recklessly engaged in a course of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase and sale of securities.

368.   Defendants' false and misleading statements and omissions were intended to, and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (2) artificially inflate and maintain the market price of TuSimple securities; and (3) cause Plaintiffs and other members of the Class to purchase or otherwise acquire TuSimple securities and options at artificially inflated prices.

369.   Each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for TuSimple securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about TuSimple's operations and business prospects.

370.   By virtue of their positions at TuSimple, defendants had actual knowledge of the false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class,

1  or, in the alternative, defendants acted with reckless disregard for the truth in that they

2  failed or refused to ascertain and disclose such facts as would reveal the false and

3  misleading nature of the statements made, although such facts were readily available

4  to defendants.

5      371.  Defendants are liable both directly and indirectly for the wrongs

6  complained of herein.  Because of their positions of control and authority, defendants

7  were able to and did, directly or indirectly, control the content of TuSimple's conduct

8  and operations.  As officers and/or directors of a publicly held company, defendants

9  had a duty to disseminate timely, accurate, and truthful information with respect to

10  TuSimple's businesses, operations, future financial condition, and future prospects.

11  As a result of the dissemination of the aforementioned false and misleading reports,

12  releases and public statements, the market price of TuSimple's securities was

13  artificially inflated throughout the Class Period.

14      372.  In ignorance of the adverse facts concerning TuSimple's business

15  operations, which were concealed by defendants, Plaintiffs and the other members of

16  the Class purchased or otherwise acquired TuSimple securities at artificially inflated

17  prices and relied upon the price of the securities, the integrity of the market for the

18  securities and/or upon statements disseminated by defendants and were damaged

19  thereby.

20      373.  During the Class Period, shares of TuSimple securities were traded on an

21  active and efficient market.  Plaintiffs and the other members of the Class, relying on

22  the materially false and misleading statements described herein, which TuSimple and

23  defendants made, issued or caused to be disseminated, or relying upon the integrity of

24  the market, purchased or otherwise acquired TuSimple securities at prices artificially

25  inflated by defendants' wrongful conduct.  Had Plaintiffs and the other members of

26  the Class known the truth, they would not have purchased or otherwise acquired said

27  securities, or would not have purchased or otherwise acquired them at the inflated

28

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-
cv-00282-BEN-MSB)

4887-3830-0802.v2

1   prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs

2   and the Class, the true value of TuSimple securities was substantially lower than the

3   prices paid by Plaintiffs and the other members of the Class.  The market price of

4   TuSimple securities declined sharply upon public disclosure of the facts alleged herein

5   to the injury of Plaintiffs and Class members.

6       374.  By reason of the conduct alleged herein, defendants knowingly or

7   recklessly, directly or indirectly, have violated the Exchange Act and Rule 10b-5

8   promulgated thereunder.

9       375.  As a direct and proximate result of defendants' wrongful conduct,

10  Plaintiffs and the other members of the Class suffered damages in connection with

11  their respective Class Period purchases of the Company's securities upon the

12  disclosure that the Company had been disseminating false and misleading statements

13  to the investing public.

14                        **COUNT V**

15      **(For Violations of §10(b) of the Exchange Act and**
        **Rule 10b-5(a) & (c) Against TuSimple, Chao, Hou,**
16                  **Chen, Zhang, and Lu)**

17      376.  Plaintiffs repeat and reallege the allegations contained in ¶¶1-313 and

18  365-375 as if fully set forth herein.

19      377.  During the Class Period, defendants TuSimple, Chao, Hou, Chen, Zhang,

20  and Lu violated the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder.

21  As alleged herein, defendants' scheme and wrongful course of business was designed

22  to and did: (i) enable TuSimple to complete the IPO and thereby allow Chao to pocket

23  more than $270 million; (ii) conceal the clandestine transfer of TuSimple's proprietary

24  technology via related-party transactions with a Chinese semi-trucking rival controlled

25  by Hou, Chen, and Chao; and (iii) materially overstate TuSimple's safety profile while

26  simultaneously concealing its safety record.  As part of this scheme, defendants

27  refined TuSimple's AV technology on U.S. roads – at this risk of U.S. motorists – in

28

4887-3830-0802.v2

order to then secretly transfer that improved technology to Hydron, unbeknownst to investors.

378.   Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in the scheme and wrongful course of business complained of herein.

379.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for TuSimple's securities. Plaintiffs and the Class would not have purchased TuSimple's securities at the prices they paid, or at all, had they been aware that the market prices for TuSimple's securities had been artificially inflated by defendants' scheme and wrongful course of business.

## COUNT VI

**(Violations of §20(a) of the Exchange Act**
**Against Chao, Hou, Chen, Zhang, Lu, Dillon, and Buss)**

380.   Plaintiffs repeat and reallege the allegations contained in ¶¶1-313 and 365-379 as if fully set forth herein.

381.   This Count is asserted against Chao, Hou, Chen, Zhang, Lu, Dillon, and Buss on behalf of the Class and is based upon §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

382.   Chao, Hou, Chen, Zhang, Lu, Dillon, and Buss each held executive and/or director positions and/or were beneficial owners of TuSimple.

383.   Chao served at all relevant times as TuSimple's Board Chair from April 22, 2019 until he was forced (pursuant to the NSA) not to stand for reelection at the end of his term in June 2022.   Chao served as the Chair of the Nominating and Corporate Governance Committee.

384.   Hou was at all relevant times TuSimple's co-founder.  Hou also served as TuSimple's CTO during the Class Period until March 3, 2022, when he was appointed to serve as TuSimple's President, CEO, and Chairperson of the Board.  Hou served in

4887-3830-0802.v2

these positions until he was terminated by the Audit Committee and removed from his position as Chairman of the Board on October 31, 2022. Hou remained a member of TuSimple's Board until his resignation on March 9, 2023.

385.   Chen was at all relevant times TuSimple's co-founder, Executive Chairman, and director. Chen is currently TuSimple's Executive Chairman of the Board.

386.   Zhang was a member of TuSimple's Board of Directors from September 30, 2020 until she was forced (pursuant to the NSA) not to stand for reelection at the end of her term in June 2022.

387.   Lu was at all relevant times the Company's President and CEO during the Class Period until his resignation on March 3, 2022.  He subsequently returned to the position of CEO in November 2022 and is currently the Company's President and CEO.

388.   Dillon was at all relevant times the Company's CFO throughout the Class Period until his resignation on July 7, 2022.  Dillon spoke on every earnings call and at every conference the Company held and/or attended with investors during the Class Period until his resignation.

389.   Buss served as a member of the Company's Board of Directors from January 2021 until he was ousted by Chen and Hou shortly after the Class Period ended on November 10, 2022.  During his tenure on the Board, Buss served as Chair of the Audit Committee and, other than Chao, was the only other member of the Nominating and Corporate Governance Committee.  On April 23, 2022, Buss was appointed to serve as the Company's Lead Independent Director "to facilitate communication between management, the independent directors and the chairman of our board, as well as to participate in setting agendas for meetings and presiding at executive sessions of the board of directors."

390.   Additionally, together, Hou, Chen, and Chao controlled 68.3% of the total voting power under TuSimple's Class A and Class B share voting structure.

391.   Hou and Chen demonstrated their corporate control on November 10, 2022 by ***removing the entire Audit Committee*** and others at TuSimple who were investigating Hou's related party scheme with Hydron. That same day, Hou exercised his power as the sole remaining director to appoint Chen and Lu to the Board.

392.   Defendants named in this Count directly and indirectly participated in the operation and management of TuSimple, and its business affairs. Because of their senior positions, they knew the adverse non-public information about TuSimple's business practices.

393.   As officers and/or directors of a publicly owned company, the defendants had a duty to disseminate accurate and truthful information with respect to TuSimple, and to correct promptly any public statements issued by TuSimple which had become materially false or misleading.

394.   Because of their positions of control and authority as directors and/or senior officers, defendants were able to, and did, control the contents of the various reports, press releases and public filings which TuSimple disseminated in the marketplace during the Class Period concerning TuSimple's results of operations. Throughout the Class Period, defendants exercised their power and authority to cause TuSimple to engage in the wrongful acts complained of herein. Defendants, therefore, were "controlling persons" of TuSimple within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of TuSimple securities.

395.   Each of the defendants named herein, therefore, acted as a controlling person of TuSimple. By reason of their senior management positions and/or being directors of TuSimple, each of the defendants named herein had the power to direct the actions of, and exercised the same to cause, TuSimple to engage in the unlawful

4887-3830-0802.v2

acts and conduct complained of herein.  They also exercised control over the general operations of TuSimple and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

396.   By reason of the above conduct, defendants named herein are liable pursuant to §20(a) of the Exchange Act for the violations committed by TuSimple.

### COUNT VII

**(Violations of §20A of the
Exchange Act Against Chao)**

397.   Plaintiffs repeat and reallege the allegations contained in ¶¶1-313 and 365-396 as if fully set forth herein.

398.   This Count is brought against Chao on behalf of Poirier and the other members of the Class who traded contemporaneously with Chao and is based upon §20A of the Exchange Act, 15 U.S.C. §78t-1.

399.   Chao was in possession of material, non-public information about TuSimple and Hydron.  As alleged above, Chao took advantage of the material nonpublic information regarding TuSimple and its funneling of proprietary intellectual property to Hydron to make millions of dollars in insider trading profits during the Class Period.  These transactions were made while Chao possessed material non-public information.

400.   Chao's   transactions   in   TuSimple's   securities   were   made contemporaneously with Poirier's and Class members' purchases of TuSimple securities during the Class Period.  For instance, on April 16, 2021, Poirier purchased 1,300 shares of TuSimple common stock at a price of $37.51 per share and contemporaneous with Chao's sale of approximately 6,756,756 shares.

401.   All members of the Class who purchased shares of TuSimple securities in connection with the IPO and contemporaneously with sales by Chao (i) have suffered damages because they paid artificially inflated prices as a result of the Exchange Act

- 119 -

4887-3830-0802.v2

violations alleged herein; and (ii) would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by defendants' false and misleading statements and omissions.  At the time of the purchases of the securities, the fair and true value of the securities was substantially less than the price paid by these Class members.

402.   By reason of the above conduct, Chao is liable pursuant to §20A of the Exchange Act.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against TuSimple, the individual defendants, and the Underwriter Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives of the Class;

B.   Requiring TuSimple, the individual defendants, and the Underwriter Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other equitable relief, including injunctive relief, as this Court may deem just and proper.

4887-3830-0802.v2

1  **XIII.  JURY DEMAND**

2       Plaintiffs hereby demand a trial by jury.

3  DATED:  October 2, 2023                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
4                                             DARREN J. ROBBINS
                                              LUCAS F. OLTS
5                                             HEATHER G. GEIGER
                                              STEPHEN JOHNSON
6

7                                                    Lucas F. Olts
8                                             LUCAS F. OLTS

9                                             655 West Broadway, Suite 1900
                                              San Diego, CA  92101
10                                            Telephone:  619/231-1058
                                              619/231-7423 (fax)
11                                            darrenr@rgrdlaw.com
                                              lolts@rgrdlaw.com
12                                            hgeiger@rgrdlaw.com
                                              sjohnson@rgrdlaw.com
13
                                              Lead Counsel for Lead Plaintiff, Indiana
14                                            Public Retirement System and Named
                                              Plaintiff Michelle Poirier
15
                                              KAHN SWICK & FOTI, LLP
16                                            RAMZI ABADOU (222567)
                                              580 California Street, Suite 1200
17                                            San Francisco, CA  94104
                                              Telephone:  866/467-1400
18                                            ramzi.abadou@ksfcounsel.com

19                                            KAHN SWICK & FOTI, LLC
                                              ALEXANDER L. BURNS (*pro hac vice*)
20                                            ALEXANDRA PRATT *(pro hac vice)*
                                              JAMES T. FETTER (*pro hac vice*)
21                                            1100 Poydras Street, Suite 960
                                              New Orleans, LA  70163
22                                            Telephone:  504/455-1400
                                              alexander.burns@ksfcounsel.com
23                                            alexandra.pratt@ksfcounsel.com
                                              james.fetter@ksfcounsel.com
24
                                              Counsel for Named Plaintiff Robert Miller
25

26

27

28
                                     - 121 -           3:22-cv-01300-BEN-MSB
                                                       (Consolidated with No. 3:23-
                                                       cv-00282-BEN-MSB)

4887-3830-0802.v2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on October 2, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

 s/ Lucas F. Olts
LUCAS F. OLTS

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Email:  lolts@rgrdlaw.com

4887-3830-0802.v2

**Mailing Information for a Case 3:22-cv-01300-BEN-MSB Dicker v. TuSimple Holdings, Inc. et al**

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzi.abadou@ksfcounsel.com,Ashley.Errington@ksfcounsel.com

- **Adam Marc Apton**
  aapton@zlk.com

- **Alexander Louis Burns**
  alexander.burns@ksfcounsel.com

- **Rachele R Byrd**
  byrd@whafh.com,fileclerk@whafh.com

- **Andrew Brian Clubok**
  andrew.clubok@lw.com

- **Jordan David Eth**
  jeth@mofo.com,jordan-eth-3756@ecf.pacerpro.com

- **James Thomas Fetter**
  james.fetter@ksfcounsel.com

- **Heather Geiger**
  hschlesier@rgrdlaw.com,HSchlesier@ecf.courtdrive.com,E_File_SD@rgrdlaw.com,CReis@ecf.courtdrive.com,creis@rgrdlaw.com

- **Lucas E. Gilmore**
  lucasg@hbsslaw.com,sf_filings@hbsslaw.com

- **Elaine F. Harwell**
  elaine.harwell@procopio.com,calendaring@procopio.com,emily.brosky@procopio.com

- **Jason Nathaniel Haycock**
  jason.haycock@klgates.com,lianne.jitodai@klgates.com

- **Nicole Kim**
  nicolekim@goodwinlaw.com

- **Kevin P. Muck**
  kevin.muck@wilmerhale.com,whdocketing@wilmerhale.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Lucas F. Olts**
  lolts@rgrdlaw.com,e_file_sd@rgrdlaw.com,lolts@ecf.courtdrive.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,tsayre@pomlaw.com,egoodman@pomlaw.com,tprzybylowski@pomlaw.com,jlopiano@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,m

- **William Paine**
  william.paine@wilmerhale.com

- **Alexandra Pratt**
  alexandra.pratt@ksfcounsel.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com,bmurray@glancylaw.com

- **Sophia Marie Rios**
  srios@bm.net,jgionnette@bm.net

- **Darren Jay Robbins**
  darrenr@rgrdlaw.com,E_File_SD@rgrdlaw.com,dmyers@rgrdlaw.com

- **Laurence M. Rosen**
  lrosen@rosenlegal.com,lrosen@ecf.courtdrive.com,pkim@rosenlegal.com

- **Joseph Caldwell Sarles**
  josephsarles@quinnemanuel.com,andreallamas@quinnemanuel.com

- **Jonathan Acker Shapiro**
  JShapiro@goodwinlaw.com,SCRobinson@goodwinlaw.com

- **Colleen Carlton Smith**
  colleen.smith@lw.com,#occecf@lw.com,colleen-c-smith-7786@ecf.pacerpro.com

- **Robert Kingsley Smith**
  robert.smith@wilmerhale.com

- **R. Brian Timmons**
  briantimmons@quinnemanuel.com,albertvillamil@quinnemanuel.com,calendar@quinnemanuel.com,brian-timmons-2774@ecf.pacerpro.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Elton          Joe Kendall
Provost Umphrey Law Firm, LLP
3232 Mckinney Avenue, Suite 700
Dallas, TX 75204

David          Avi Rosenfeld
Robbins Geller Rudman & Dowd LLP (LI)
58 South Service Road
```

Suite 200
Melville, NY 11747