1  ROBBINS GELLER RUDMAN
    & DOWD LLP
2  DARREN J. ROBBINS (168593)
   LUCAS F. OLTS (234843)
3  JENNIFER N. CARINGAL (286197)
   HEATHER G. GEIGER (322937)
4  STEPHEN JOHNSON (347822)
   655 West Broadway, Suite 1900
5  San Diego, CA  92101
   Telephone:  619/231-1058
6  619/231-7423 (fax)
   darrenr@rgrdlaw.com
7  lolts@rgrdlaw.com
   jcaringal@rgrdlaw.com
8  hgeiger@rgrdlaw.com
   sjohnson@rgrdlaw.com
9
   KAHN SWICK & FOTI, LLP
10 RAMZI ABADOU (222567)
   580 California Street, Suite 1200
11 San Francisco, CA  94104
   Telephone:  (415) 459-6900
12 Facsimile:  (504) 455-1498
   ramzi.abadou@ksfcounsel.com
13
   [Additional counsel appear on signature page.]
14
15                    UNITED STATES DISTRICT COURT

16                  SOUTHERN DISTRICT OF CALIFORNIA

17  AUSTIN DICKER, Individually and on )   Case No. 3:22-cv-01300-BEN-MSB
    Behalf of All Others Similarly Situated, )   (Consolidated with No. 3:23-cv-00282-
18                                     )   BEN-MSB)
                          Plaintiff,   )
19                                     )   CLASS ACTION
          vs.                          )
20                                     )   PLAINTIFFS' OMNIBUS
    TUSIMPLE HOLDINGS, INC., et al.,   )   MEMORANDUM OF LAW IN
21                                     )   OPPOSITION TO DEFENDANTS'
                          Defendants.  )   MOTIONS TO DISMISS
22                                     )
                                       )   Judge:      Hon. Roger T. Benitez
23                                     )   Courtroom:  5A
                                       )   Date:       March 18, 2024
24  _____ )   Time:       10:30 a.m.
25
26
27
28

4855-0278-0828.v1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................... 1

    A.    Defendants Are Strictly Liable for Plaintiffs' Securities Act Claims ........................................................................................... 3

    B.    Plaintiffs' Hydron Allegations Are Actionable ..................................... 4

    C.    Plaintiffs' Safety Allegations Are Actionable ...................................... 6

II.   FACTUAL BACKGROUND ................................................................... 7

III.  ARGUMENT ......................................................................................... 11

    A.    The Complaint Adequately Alleges Claims Under the Securities Act ....................................................................................... 11

        1.    Rule 8(a) Applies to Plaintiffs' Securities Act Claims ............. 12

        2.    Defendants' False and Misleading Statements and Omissions in the Registration Statement Are Actionable Under the Securities Act ....................................................... 16

            a.    TuSimple's Materially Misleading Statements and Omissions Concerning Hydron ..................................... 16

            b.    Defendants' Materially False and Misleading Safety Statements and Omissions ................................. 20

        3.    Plaintiffs' Section 12 Claim Is Also Actionable ...................... 25

    B.    The Complaint Adequately Alleges Claims Under the Exchange Act ....................................................................................... 27

        1.    Defendants' False and Misleading Statements and Omissions Regarding Hydron ................................................. 27

        2.    Defendants' False and Misleading Statements and Omissions Concerning Safety ................................................. 32

            a.    Defendants' Statements that TuSimple's Technology Was "Feature Complete" Were False and Misleading ................................................................ 33

            b.    Defendants' Statements Purporting to Prioritize Safety Were False and Misleading ................................. 34

            c.    The April Crash Revealed the Falsity of Defendants' Statements About Safety, and Rendered Statements that Followed Misleading by Omission ...................................................................... 36

1

2                                                                                           **Page**

3                          3.      The Complaint Adequately Alleges Scienter ...........................39

4                                  a.      The Complaint Adequately Alleges Scienter as to
                                           the Hydron Statements ......................................................39
5
                                   b.      Plaintiffs Adequately Allege Scienter for the
6                                          Safety Statements ..............................................................43

7                                  c.      Multiple Resignations, Terminations, and
                                           Departures Support Scienter.............................................45
8
                                   d.      Defendants' Stock Sales Are Indicative of Scienter ......48
9
                          4.      Defendants' Additional Scienter Arguments Fail ...................50
10
                          5.      The Complaint Adequately Pleads Scheme Liability..............52
11
                          6.      The Complaint Adequately Alleges Loss Causation................53
12
                  C.     Defendants' Remaining Arguments Fail ............................................54
13
                          1.      The Complaint States Claims Under §§15 and 20(a)...............54
14
                          2.      Lu and Buss Made False and Misleading Statements ..............55
15
        IV.      CONCLUSION ............................................................................................55
16

17

18

19

20

21

22

23

24

25

26

27

28
                                              - ii -                        3:22-cv-01300-BEN-MSB
                                                                   (Consolidated with No. 3:23-cv-
                                                                              00282-BEN-MSB)

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

4

*Abady v. Lipocine Inc.*,
5
2023 WL 2938210 (D. Utah Apr. 13, 2023) ....................................................... 22

6
*Arthur Children's Tr. v. Keim*,
7
994 F.2d 1390 (9th Cir. 1993) ........................................................................... 54

8
*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. 27, 2018) ............................................................ 49
9

10
*Baker v. Seaworld Entm't, Inc.*,
2016 WL 2993481 (S.D. Cal. Mar. 31, 2016) ................................................... 14
11

12
*Basic Inc. v. Levison*,
485 U.S. 224 (1988) ................................................................................... 11, 21
13

14
*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008) ..................................................... 49
15

16
*Bennett v. H&R Block Fin. Advisors, Inc.*,
2005 WL 8178042 (N.D. Cal. June 1, 2005) ..................................................... 34

17
*Berson v. Applied Signal Tech., Inc.*,
18
527 F.3d 982 (9th Cir. 2008) ............................................................................. 31

19
*Bos. Ret. Sys. v. Uber Techs., Inc.*,
20
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) .............................................. 13, 33

21
*Bricklayers & Masons Local Union No. 5*
*Ohio Pension Fund v. Transocean Ltd.*,
22
866 F. Supp. 2d 223 (S.D.N.Y. 2012) ............................................................... 24

23
*Brodsky v. Yahoo! Inc.*,
24
592 F. Supp. 2d 1192 (N.D. Cal. 2008) ............................................................ 35

25
*Brody v. Transitional Hosps. Corp.*,
26
280 F.3d 997 (9th Cir. 2002) ............................................................................. 30

27
*Brown v. Brewer*,
2008 WL 6170885 (C.D. Cal. July 14, 2008) ................................................... 42
28

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-
00282-BEN-MSB)

4855-0278-0828.v1

**Page**

*Brown v. China Integrated Energy, Inc.*,
   2012 WL 1129909 (C.D. Cal. July 12, 2012) ................................................... 13

*Brown v. China Integrated Energy, Inc.*,
   875 F. Supp. 2d 1096 (C.D. Cal. 2012) ............................................................. 16

*Carey Camp v. Qualcomm Inc.*,
   2020 WL 1157192 (S.D. Cal. Mar. 10, 2020) ........................................... 42, 48

*Cheung v. Keyuan Petrochemicals, Inc.*,
   2012 WL 5834894 (C.D. Cal. Nov. 1, 2012) ............................................. 27, 30

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
   2022 WL 4491093 (S.D. Cal. Sept. 27, 2022) ................................................... 50

*Copperstone v. TCSI Corp.*,
   1999 WL 33295869 (N.D. Cal. Jan 19, 1999) ................................................... 29

*Dura Pharms. v. Broudo*,
   544 U.S. 336 (2005) ........................................................................................... 53

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
   81 F.4th 918 (9th Cir. 2023) .............................................................................. 35

*ECA, Loc. 134 IBEW Joint Pension Tr. of*
   *Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2nd Cir. 2009) ............................................................................ 42

*El Paso Firemen & Policemen's Pension Fund*
   *v. Innovage Holding Corp.*,
   2024 WL 199061 (D. Col. Jan. 18, 2024) ......................................................... 15

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976) ........................................................................................... 11

*Feyko v. Yuhe Int'l, Inc.*,
   2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ...................................................... 14

*Flynn v. Sientra, Inc.*,
   2016 WL 3360676 (C.D. Cal. June 9, 2016) ..................................................... 14

- iv -

4855-0278-0828.v1

**Page**

*Fouad v. Isilon Sys., Inc.*,
  2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ................................................. 47

*Fresno Cnty. Emps.' Ret. Ass'n v. Alphatec Holdings, Inc.*,
  607 F. App'x 694 (9th Cir. 2015) ..................................................................... 3

*Garden City Emps.' Ret. Sys. v. Psych. Sols., Inc.*,
  2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011) ........................................ 32, 33

*Hall v. The Children's Place Retail Stores, Inc.*,
  580 F. Supp. 2d 212 (S.D.N.Y. 2008) ................................................................ 47

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) ......................................................................................... 12

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) ............................................................................ 37

*Hildes v. Arthur Andersen LLP*,
  734 F.3d 854 (9th Cir. 2013) ............................................................................ 12

*Howard v. Arconic Inc.*,
  2021 WL 2561895 (W.D. Pa. June 23, 2021) .................................................... 25

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) .......................................................................... 54

*In Primo v. Pac. Biosciences of Cal., Inc.*,
  940 F. Supp. 2d 1105 (N.D. Cal. 2013) ...................................................... 26, 34

*In re Aceto Corp. Sec. Litig.*,
  2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019) ..................................................... 48

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021),
  *cert denied sub nom. Alphabet Inc.*
  *v. Rhode Island*, __ U.S. __, 142 S. Ct. 1227 (2022) .................................. *passim*

*In re Amgen Inc. Sec. Litig.*,
  2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ................................................... 39

- v -

4855-0278-0828.v1

**Page**

*In re Amylin Pharms., Inc., Sec. Litig.*,
2002 WL 31520051 (S.D. Cal. Oct. 10, 2002)...................................................41

*In re AnaptysBio, Inc.*,
2021 WL 4267413 (S.D. Cal. Sept. 20, 2021) .......................................42, 48, 49

*In re Aqua Metals, Inc. Sec. Litig.*,
2019 WL 3817849 (N.D. Cal. Aug. 14, 2019)...........................................22, 52

*In re Atossa Genetics Inc. Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) ..................................................................... 1, 6

*In re BP p.l.c., Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ...........................................................21

*In re Century Aluminum Co. Sec. Litig.*,
749 F. Supp. 2d 964 (N.D. Cal. 2010)...........................................................26

*In re Charles Schwab Corp. Sec. Litig.*,
257 F.R.D. 534 (N.D. Cal. 2009) .........................................................14, 26

*In re Cloudera, Inc.*,
2021 WL 2115303 (N.D. Cal. May 25, 2021) .................................................34

*In re Conns. Corp. Sec. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008)...........................................................35

*In re Cornerstone Propane Partners, L.P.*,
355 F. Supp. 2d 1069 (N.D. Cal. 2005) .........................................................48

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
934 F. Supp. 2d 1219 (C.D. Cal. 2013)...........................................................35

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008).........................................................12

*In re CytRx Corp. Sec. Litig.*,
2015 WL 5031232 (C.D. Cal. July 13, 2015) .................................................53

*In re Daou Sys. Inc.*,
411 F.3d 1006 (9th Cir. 2005).......................................................................12

4855-0278-0828.v1

**Page**

*In re Daou Sys., Inc. Sec. Litig.*,
397 F.3d 704 (9th Cir. 2005) ................................................................ 54

*In re Dura Pharms., Inc. Sec. Litig.*,
452 F. Supp. 2d 1005 (S.D. Cal. 2006) ................................................ 23

*In re Eargo, Inc. Sec. Litig.*,
656 F. Supp. 3d 928 (N.D. Cal. 2023) .................................................. 16

*In re Facebook, Inc. Sec. Litig.*,
84 F.4th 844 (9th Cir. 2023) ................................................... 6, 17, 18

*In re Francesca's Holdings Corp. Sec. Litig.*,
2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) ...................................... 19

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) .............................................................. 53

*In re Honest Co. Sec. Litig.*,
615 F. Supp. 3d 1149 (C.D. Cal. 2022) ................................................ 23

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ..................................... 25, 26, 40

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) .................................................... 33

*In re Jiangbo Pharms. Sec. Litig.*,
884 F. Supp. 2d 1243 (S.D. Fla. 2012) ................................................. 29

*In re LendingClub Sec. Litig.*,
254 F. Supp. 3d 1107 (N.D. Cal. 2017) ................................................ 28

*In re Maxwell Techs., Inc. Sec. Litig.*,
18 F. Supp. 3d 1023 (S.D. Cal. 2014) ................................................... 48

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..................................... 1, 2, 32

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
78 F. Supp. 3d 1215 (N.D. Cal. 2015) ........................................ 27, 54

4855-0278-0828.v1

**Page**

*In re Nat'l Golf Props., Inc.,*
2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) ................................................ 26

*In re NVIDIA Corp. Sec. Litig.,*
768 F.3d 1046 (9th Cir. 2014) ................................................................. 25, 44

*In re OmniVision Techs., Inc. Sec. Litig.,*
937 F. Supp. 2d 1090 (N.D. Cal. 2013) ............................................................ 24

*In re ON24, Inc. Sec. Litig.,*
2003 WL 7449838 (N.D. Cal. July 7, 2023) ....................................................... 22

*In re Peregrine Sys., Inc. Sec. Litig.,*
2005 WL 8158825 (S.D. Cal. Mar. 30, 2005) ...................................................... 16

*In re Pivotal Sec. Litig.,*
2020 WL 4193384 (N.D. Cal. July 21, 2020) ...................................................... 37

*In re Progenity, Inc. Sec. Litig.,*
2023 WL 4498502 (S.D. Cal. July 12, 2023) ...................................................... 20

*In re Qualcomm Inc. Sec. Litig.,*
2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) ................................................. 23, 25

*In re Quality Sys., Inc. Sec. Litig.,*
865 F.3d 1130 (9th Cir. 2017) ............................................................. 6, 35, 45

*In re Questcor Sec. Litig.,*
2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ....................................................... 49

*In re Scholastic Corp. Sec. Litig.,*
252 F.3d 63 (2d Cir. 2001) ....................................................................... 35

*In re SeeBeyond Techs. Corp. Sec. Litig.,*
266 F. Supp. 2d 1150 (C.D. Cal. 2003) ........................................................... 49

*In re SeraCare Life Sciences, Inc. Sec. Litig.,*
2007 WL 935583 (S.D. Cal. Mar. 19, 2007) ....................................................... 16

*In re Silicon Image, Inc. Sec. Litig.,*
2007 WL 2778414 (N.D. Cal. Sept. 21, 2007) ..................................................... 35

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-00282-BEN-MSB)

4855-0278-0828.v1

**Page**

*In re Sipex Corp. Sec. Litig.*,
2005 WL 3096178 (N.D. Cal. Nov. 17, 2005) .................................................. 19

*In re Snap Inc. Sec. Litig.*,
2018 WL 2972528 (C.D. Cal. June 7, 2018) .................................................... 31

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996) ................................................................ 12, 16

*In re Sunrun Inc. Sec. Litig.*,
2018 WL 10323335 (N.D. Cal. July 19, 2018) ................................................ 32

*In re Surebeam Corp. Sec. Litig.*,
2005 WL 5036360 (S.D. Cal. Jan. 3, 2005) ..................................................... 3

*In re UnitedHealth Grp. PSLRA Litig.*,
2007 WL 1621456 (D. Minn. June 4, 2007) ..................................................... 2

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) .......................................................... 45

*In re Vaxart, Inc. Sec. Litig.*,
2023 WL 3637093 (N.D. Cal. May 25, 2023) .................................................. 52

*In re Violin Memory Sec. Litig.*,
2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) .............................................. 13, 14

*In re Volkswagen "Clean Diesel" Mktg.,*
*Sales Pracs., & Prods. Liab. Litig.*,
258 F. Supp. 3d 1037 (N.D. Cal. 2017) ........................................................ 54

*In re WageWorks, Inc., Sec. Litig.*,
2020 WL 2896547 (N.D. Cal. June 1, 2020) .............................................. 45, 46

*In re Wash. Mut., Inc. Sec, Derivative & ERISA Litig.*,
259 F.R.D. 490 (W.D. Wash. 2009) ......................................................... 26, 27

*In re Yahoo! Inc. Sec. Litig.*,
2012 WL 3282819 (N.D. Cal. Aug. 10, 2012),
*aff'd*, 611 F. App'x 387 (9th Cir. 2015) ....................................................... 38

- ix -                                   3:22-cv-01300-BEN-MSB
                                      (Consolidated with No. 3:23-cv-
                                                00282-BEN-MSB)

4855-0278-0828.v1

**Page**

*Jackson v. Abernathy,*
    960 F.3d 94 (2d Cir. 2020) ............................................................... 42

*John Lechner v. Infusystem Holdings, Inc.,*
    2017 WL 11593803 (C.D. Cal. Dec. 15, 2017) ............................... 45

*Karinski v. Stamps.com, Inc.,*
    2020 WL 281716 (C.D. Cal. Jan. 17, 2020)...................................... 49

*Khoja v. Orexigen Therapeutics, Inc.,*
    899 F.3d 988 (9th Cir. 2018) ............................................. 4, 7, 30, 31

*Lamartina v. VMware, Inc.,*
    2021 WL 4133851 (N.D. Cal. Sept. 10, 2021)................................. 48

*Lamartina v. VMware, Inc.,*
    2023 WL 2763541 (N.D. Cal. Mar. 31, 2023).................................. 50

*Lindland v. TuSimple, Inc.,*
    2022 WL 19001977 (S.D. Cal. Dec. 19, 2022)............................ 34, 35

*Litwin v. Blackstone Grp., L.P.,*
    634 F.3d 706 (2nd Cir. 2011) ......................................................... 29

*Lloyd v. CVB Fin. Corp.,*
    811 F.3d 1200 (9th Cir. 2016)........................................................ 53

*Loos v. Immersion Corp.,*
    762 F.3d 880 (9th Cir. 2014) ......................................................... 48

*Lorenzo v. Secs. & Exch. Comm'n,*
    587 U.S.__, 139 S. Ct. 1094 (2019) .......................................... 52, 53

*Luna v. Marvell Tech. Grp.,*
    2017 WL 2171273 (N.D. Cal. May 17, 2017) ................................. 54

4855-0278-0828.v1

**Page**

*Mallen v. Alphatec Holdings, Inc.*,
    861 F. Supp. 2d (S.D. Cal. 2012),
    *aff'd sub nom. Fresno Cnty. Emps.' Ret. Ass'n
    v. Alphatec Holdings, Inc.*,
    607 F. App'x 694 (9th Cir. 2015).......................................................3, 12, 14, 15

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ..................................................................................*passim*

*McIntire v. China MediaExpress Holdings, Inc.*,
    927 F. Supp. 2d 105 (S.D.N.Y. 2013) ...............................................................47

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008)......................................................................35, 49

*Middlesex Ret. Sys. v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007)..............................................................47

*Mulligan v. Impax Lab'ys*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014).................................................................24

*N.M. State Inv. Council v. Ernst & Young LLP*,
    641 F.3d 1089 (9th Cir. 2011) ...........................................................................40

*Nathanson v. Polycom, Inc.*,
    87 F. Supp. 3d 966 (N.D. Cal. 2015).................................................................30

*No. 84 Emp.-Teamster Joint Council Pension
    Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) .........................................................................2, 50

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ...........................................................................49

*Omnicare, Inc. v. Laborers Dist. Council
    Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ....................................................................................22, 23

*Osher v. JNI Corp.*,
    256 F. Supp. 2d 1144 (S.D. Cal. 2003) .............................................................49

- xi -

4855-0278-0828.v1

**Page**

*Pinter v. Dahl,*
   486 U.S. 622 (1988) ........................................................................ 26

*Plumbers & Pipefitters Loc. Union #295*
   *Pens. Fund v. CareDx, Inc.,*
   2023 WL 4418886 (N.D. Cal. May 24, 2023) .................................. 34

*Plumley v. Sempra Energy,*
   2017 WL 2712297 (S.D. Cal. June 20, 2017) ................................. 21

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,*
   759 F.3d 1051 (9th Cir. 2014) ........................................................ 38

*Reese v. Malone,*
   747 F.3d 557 (9th Cir. 2014) .......................................................... 41

*Rice as Tr. of Richard E. & Melinda Rice*
   *Rev. Fam. Tr. 5/9/90 v. Intercept Pharms., Inc.,*
   2022 WL 837114 (S.D.N.Y. Mar. 21, 2022) ................................... 42

*Roberti v. OSI Sys., Inc.,*
   2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ........................... 41, 43

*S. Ferry LP #2 v. Killinger,*
   687 F. Supp. 2d 1248 (W.D. Wash. 2009) ..................................... 44

*S. Ferry LP, No. 2 v. Killinger,*
   542 F.3d 776 (9th Cir. 2008) ..................................................... 1, 39

*S.E.C. v. China Ne. Petrol. Holdings Ltd.,*
   27 F. Supp. 3d 379 (S.D.N.Y. 2014) .............................................. 18

*Schaffer v. Evolving Sys., Inc.,*
   29 F. Supp. 2d 1213 (D. Colo. 1998) ............................................. 26

*Schueneman v. Arena Pharms., Inc.,*
   840 F.3d 698 (9th Cir. 2016) ............................................................ 5

*Shenwick v. Twitter, Inc.,*
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ............................................ 6

4855-0278-0828.v1

**Page**

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009),
   *aff'd*, 563 U.S. 27 (2011) ............................................................................... 18, 31

*Smilovits v. First Solar Inc.*,
   119 F. Supp. 3d 978 (D. Ariz. 2015),
   *aff'd sub nom. Mineworkers' Pension Scheme*
   *v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018) .................................. 28, 30, 53

*Snellink v. Gulf Res., Inc.*,
   870 F. Supp. 2d 930 (C.D. Cal. 2012)............................................. 12, 18, 27, 49

*Special Situations Fund III QP, L.P. v. Brar*,
   2015 WL 1393539 (N.D. Cal. Mar. 26, 2015) .................................................. 55

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ............................................................................... 39, 48, 51

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976) ......................................................................................... 29, 30

*Veal v. LendingClub Corp.*,
   423 F. Supp. 3d 785 (N.D. Cal. 2019).................................................................. 44

*Waterford Twp. Police v. Mattel, Inc.*,
   321 F. Supp. 3d 1133 (C.D. Cal. 2018)................................................................. 42

*Wilhoite V. Xiaodi Hou, et al.*,
   No.: 3:23-cv-02333-BEN-MSB
   (S.D. Cal. Jan. 23, 2024) .................................................................................... 11

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ....................................................................... 32, 44

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-
00282-BEN-MSB)

4855-0278-0828.v1

1
2

**Page**

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §77k ...................................................................................*passim*
  §77k(a) ...................................................................................... 11
  §77l ..................................................................... 14, 25, 26, 27
  §77l(a)(2) ......................................................................... 25, 26, 27
  §78j ........................................................................................... 27
  §78o ........................................................................................... 54
  §78t(a) ....................................................................................... 54

Federal Rules of Civil Procedure
  Rule 8 ............................................................... 3, 14, 15, 17
  Rule 8(a) ............................................................................ 12, 16
  Rule 8(a)(2) .............................................................................. 12
  Rule 9(b) ...............................................................................*passim*
  Rule 10b-5 ........................................................................... 52, 53
  Rule 10b-5(a) ............................................................................ 52
  Rule 10b-5 (c) ........................................................................... 52
  Rule 12(b)(6) ............................................................................. 12

17 C.F.R.
  §229.404(a) ............................................................................... 19
  §240.10b-5(a) ............................................................................ 52
  §240.10b-5(c) ............................................................................ 52

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-
00282-BEN-MSB)

4855-0278-0828.v1

| Defined Term | Meaning |
|---|---|
| Audit Committee | The Audit Committee of the Board of Directors of TuSimple Holdings, Inc. |
| Board | TuSimple Holdings, Inc's Board of Directors |
| Buss MTD | Defendants Buss' and Francis' Memorandum of Points and Authorities in Support of Motion to Dismiss Consolidated Amended Class Action Complaint (ECF 136-1) |
| Chen MTD | Memorandum of Points and Authorities in Support of Defendant Mo Chen's Motion to Dismiss Consolidated Amended Class Action Complaint (ECF 139-1) |
| Complaint | Plaintiffs' Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF 103). Unless otherwise noted, all "¶__" or "¶¶__" citations herein refer to the Complaint |
| Defs' Ex. __ | Defendants' Exhibits attached to the Declaration of William Paine in Support of Motion to Dismiss Consolidated Amended Class Action Complaint (ECF 138-3) |
| Dillon MTD | Memorandum of Points and Authorities in Support of Defendant Patrick Dillon's Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint (ECF 142-1) |
| Ex. __ | Plaintiffs' Exhibits attached to the Declaration of Lucas F. Olts in Support of Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss, filed concurrently herewith |
| Exchange Act Defendants | Defendants TuSimple, Chao, Hou, Chen, Zhang, Lu, Dillon, and Buss |
| Hou MTD | Defendant Xiaodi Hou's Memorandum of Points and Authorities in Support of His Motion to Dismiss Consolidated Amended Class Action Complaint (ECF 141-1) |
| Lu MTD | Cheng Lu's Memorandum of Points and Authorities in Support of Motion to Dismiss Consolidated Amended Class Action Complaint (ECF 137-1) |
| PRC | The People's Republic of China |
| Rule(s) | Federal Rules of Civil Procedure |
| TSP | [TuSimple's] Memorandum of Points and Authorities in Support of Motion to Dismiss Consolidated Amended Class Action Complaint (ECF 138-1) |
| UW Defendants | Underwriter Defendants, *see* ¶¶70-83 |
| UW MTD | Underwriter Defendants' Memorandum in Support of Motion to Dismiss Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF 135-1) |
| *WSJ* | *The Wall Street Journal* |

## I.      INTRODUCTION

Defendants' motions to dismiss the Complaint primarily challenge scienter and material falsity.[1]  Plaintiffs respectfully submit this omnibus memorandum of law in opposition to their motions.  As to scienter, courts are to "consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation" as defendants propose.  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).[2]  To assess falsity, courts simply ask "whether Plaintiffs in the amended complaint 'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'"  *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 794 (9th Cir. 2017).  The Complaint pleads both.

Defendants initially seek to have the Court disregard facts pled from a series of corroborating investigative reports.  "This objection is not well-taken, because all pleadings on information and belief are hearsay.  Even under the Reform Act, plaintiffs are only required to plead facts, not to produce admissible evidence."  *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000).  Hence, while defendants TuSimple and Hou in particular hope to undermine the *WSJ's* investigative reporting in this matter, defendants' motions conspicuously fail to dispute its factual accuracy with respect to any of Plaintiffs' related-party (Hydron) or safety allegations.

To the contrary, after the *WSJ* published its October 30, 2022 investigative report titled: "TuSimple Probed by FBI, SEC Over Its Ties to a Chinese Startup," the Company for the first time revealed that the very next **day**, on October 31, 2022, the

---

[1]   As set forth in Plaintiffs' motion regarding service and preservation (ECF 148) defendants Charles Chao and Bonnie Zhang are actively evading service.  Defendant Chao's evasion is particularly troubling given his close ties to the PRC and his ***$275 million*** single day stock sale on Chinese entity Sun Dream's behalf in connection with the IPO.  ¶¶11, 28, 238.

[2]   Unless otherwise noted, citations are omitted, emphasis is added, and capitalized terms not otherwise defined have the same meaning as set forth in the Complaint.

"Company shared confidential information with Hydron and its partners, which was not brought to the attention of the Audit Committee and Government Security Committee." ¶¶18, 116. TuSimple summarily terminated defendant Hou, "effective" the same ***day*** the *WSJ's* October 30, 2022 report was published. ¶¶19, 288. Clearly, "'[r]eliance on an article in *The Wall Street Journal* is not reliance on an insubstantial or meaningless investigation.'" *McKesson*, 126 F. Supp. 2d at 1272; *see also No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920 at 934, 940 n.18 (9th Cir. 2003) (crediting the *WSJ* for plaintiffs' materiality and scienter allegations).[3]

Further, defendants have no answer – none – for why the Company's securities tanked by ***ninety-eight percent*** (98%) when the truth about their conduct was revealed over the course of the Class Period, other than for what Plaintiffs cogently allege was the direct result of defendants' fraud. ¶¶7, 274-299. The ***only*** defendant even willing to raise "loss causation" is defendant Hou – who is currently under investigation by the FBI and SEC for his related-party transactions with Hydron – but whose motion speciously claims is the "biggest victim" here. Hou MTD at 1; ¶17. Now that the Company has voluntarily delisted itself from NASDAQ, fired virtually the entirety of its American workforce, and is moving its operations to China, Hou's victimhood pleas ring hollow. Ex. 1 at 7; Ex. 2 at 21-22.

Finally, defendants' claim that Plaintiffs' allegations are "absurd," "xenophobic," and "racist," while characterizing the Complaint as based on "some sort of Chinese spy-ring" that is "far-fetched," are a clumsy attempt to distract from the truth. *See, e.g.*, Hou MTD at 1; TSP at 24, 48. There is nothing "xenophobic" or "far-fetched" in the Complaint given that the Company has ***admitted*** that: (i) it engaged in undisclosed related-party transactions with Chinese-based Hydron; (ii) the

---

[3] *See also In re UnitedHealth Grp. PSLRA Litig.*, 2007 WL 1621456, at *1 (D. Minn. June 4, 2007) (relying on *WSJ* to sustain plaintiffs' §§11 and 10(b) allegations) (Rosenbaum, J.).

federal government is currently investigating TuSimple, Hou, and Chen for civil and criminal violations of the federal securities and national security laws for sharing sensitive information with Hydron and its partners; (iii) Hou was terminated for concealing the Company's relationship with Hydron from the Audit Committee; and/or (iv) Chao and Lu pocketed over ***$280 million*** in unloading their TuSimple shares in connection with the IPO.  Further, given that TuSimple's shares currently trade at $0.32 from their Class Period high of over $70 per share, defendants' victimhood pleas are as fictitious as their attacks on Plaintiffs' purported "racist trope[s]."  Hou MTD at 1; Ex. 3 at 25, 40.

## A.   Defendants Are Strictly Liable for Plaintiffs' Securities Act Claims

Hoping to escape their strict liability under §11 for selling TuSimple's securities to the public using a Registration Statement containing multiple materially misleading statements, the Underwriter Defendants in particular strenuously claim that all of the Complaint's allegations sound in fraud.  Not so.  The Complaint pleads its Securities Act claims against the Underwriter Defendants entirely separately from any claims of fraud.  *See*, ¶¶314-364 (realleging only a subset of specific non-fraud factual allegations, making no allegations that the Underwriter Defendants, Francis, or Dillan knowingly made false statements, and setting forth basis for liability under the Securities Act).  This aligns identically to the Court's holding in *Mallen v. Alphatec Holdings, Inc.*, and numerous other courts, which held that Rule 8 applies under such circumstances.  861 F. Supp. 2d 1111, 1123-24 (S.D. Cal. 2012), *aff'd sub nom. Fresno Cnty. Emps.' Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015).  *See id.* ("[b]ecause the CAC makes no allegations of fraud or intent to deceive on behalf of the Underwriter Defendants, the allegations against these defendants are sufficiently bifurcated for Rule 9(b) purposes"); *In re Surebeam Corp. Sec. Litig.*, 2005 WL 5036360, at *7 (S.D. Cal. Jan. 3, 2005) ("[t]he Section 11 claims against the Underwriter Defendants are not subject to Rule 9(b)'s pleading requirements").

4855-0278-0828.v1

### B.     Plaintiffs' Hydron Allegations Are Actionable

On September 7, 2023, TuSimple disclosed that it was ***cooperating*** with a CFIUS investigation concerning TuSimple's violations of its February 18, 2022 National Security Agreement with CFIUS "as it relates to information shared by TuSimple U.S. with TuSimple's China-based businesses ('TuSimple China'), Hydron, and Hydron's partners." ¶¶29, 153, 254. It also announced that same day that the Company was ***cooperating*** with "subpoenas from the SEC requesting the production of Company documents" in response to the U.S. government's various investigations into TuSimple's "related party transaction with Hydron." ¶¶29, 152, 254. There is nothing "***absurd***" or "***far-fetched***" about Plaintiffs' parallel allegations.

TuSimple, Chen, and Hou acknowledge that "Hydron was incorporated a few weeks before the IPO." TSP at 7; Chen MTD at 1 n.1; Hou MTD at 1. Their motions also concede that defendants Hou and Chen created related-party Hydron without the Audit Committee's or shareholders' knowledge, and despite being under simultaneous investigation by CFIUS for defendants' ties to PRC-subservient Sun Dream. ¶¶11, 155-156. It is implausible that defendants did not immediately begin sharing trade secrets with Hydron starting in March 2021, given that Hydron was autonomous ready by November 2022. The Company has even publicly confirmed that Hou and Chen, in violation of their federal securities law obligations, "shared confidential information with Hydron and its partners, which was ***not brought to the attention of the Audit Committee*** and Government Security Committee, and ***before*** entering to relevant non-disclosure and other cooperation agreements." ¶¶18, 116, 287. The Complaint alleges that defendants similarly failed to disclose the same related-party Hydron transactions with TuSimple's shareholders. Such omissions constitute "obvious, affirmative misrepresentation[s]" in this Circuit. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1016 (9th Cir. 2018).

4855-0278-0828.v1

And while defendants try to suggest that Plaintiffs' allegations lack the requisite particularity, they ignore that the Complaint specifically details how defendants Hou and Chen expropriated "***technical data, blueprints and schematics that would enable Hydron to replicate TuSimple's technology***." ¶¶102, 109, 251. In response, TuSimple makes the breathtaking argument that "mentioning one related party transaction gives rise to no duty to disclose another." TSP at 19. If adopted, that baseless proposition would turn the federal securities laws on their head because once a defendant chooses to speak on a particular subject, "'they [are] bound to do so in a manner that wouldn't mislead investors.'" *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016). In other words, while they disclosed other related-party transactions in the Registration Statement and other SEC filings during the Class Period, defendants failed to simultaneously disclose Hydron. *See, e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011) ("companies can control what they have to disclose under these provisions by controlling what they say to the market"). End of story. Indeed, the Company ***itself*** condemned Hou's "***lack of candor*** and transparency with the Board" concerning his Hydron interactions. ¶¶22, 247. He exhibited the same lack of candor over that same related-party subject matter with the Company's shareholders.

Notably, just five days after defendant Chen's first public disclosure of Hydron on June 10, 2022 (after having surreptitiously incorporated Hydron weeks before the March 2021 IPO), the Company's then-CFO (defendant Dillon) ***resigned*** on June 15, 2022. ¶¶91 n.7, 256. On August 31, 2022, just a month after the Audit Committee commenced its then-undisclosed investigation of defendants Chen's and Hou's interactions with Hydron, the Company's Chief Legal and Administrative Officer (James Mullen) also abruptly ***resigned*** effective September 30, 2022. ¶258. The Company's auditor (KPMG, LLP) also thereafter noisily ***resigned*** on November 21, 2022, while it was actively investigating defendants Chen and Hou in connection with

the Hydron scheme.   ¶¶26, 142, 250, 260.   "Accordingly, because they are 'accompanied by additional evidence of [d]efendants' wrongdoing,' these resignations or terminations constitute evidence of scienter."  *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1148 (N.D. Cal. 2017).

All the while, TuSimple's Class Period SEC filings cynically warned investors (with the Underwriter Defendants' acquiescence in the Registration Statement) that "[o]ur business **may** be adversely affected **if** we are unable to adequately establish, maintain, protect, and enforce our intellectual property and proprietary rights or prevent third parties from making unauthorized use of our technology and other intellectual property rights."  ¶¶160, 165, 171, 174, 177, 187, 189, 329.  There was, however, no "may" or "if" about it.  The Complaint therefore "plausibly allege[s] that [the] company's SEC filings warned that risks 'could' occur when, in fact, those risks had already materialized."  *In re Facebook, Inc. Sec. Litig.*, 84 F.4th 844, 858-59 (9th Cir. 2023).

## C.   Plaintiffs' Safety Allegations Are Actionable

Defendants also simultaneously misrepresented the performance and safety of TuSimple's technology.  Specifically, the Complaint alleges that, on April 6, 2022, a semi-trailer truck operating autonomously by TuSimple nearly caused a catastrophic collision with a pickup truck (the "April Crash") in Arizona.  The previous month, on March 30, 2022, defendant Hou publicly misrepresented during a live CNBC interview that "***we have no unconquered technological challenges on the table***." ¶31.  That statement directly contradicted the truth about TuSimple's safety that he was either aware of or recklessly ignored.  *See Atossa*, 868 F.3d at 794-95 (falsity alleged where plaintiff points to facts that contradict or undermine what a defendant previously stated).  Furthermore, Hou's statement was not corporate "puffery" as defendants now try to claim given its absolute and verifiable nature.  TSP at 14; *cf. In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017).

4855-0278-0828.v1

Then, between the April Crash and its full public disclosure by the *WSJ* on August 1, 2022, the Company made numerous statements touting the Company's purported safety record ***without disclosing the April Crash***.  ¶34.  Those material omissions are actionable for the simple and obvious reason that they concealed the April Crash while simultaneously touting the Company's safety record. *See Khoja*, 899 F.3d at 1008-09 (defendants must "'disclos[e] adverse information that cuts against the positive information'").  Defendants' claim that they had "no obligation to rush disclosure of the accident" is therefore meritless.  TSP at 33.

While defendants half-heartedly raise other arguments – such as "control person" liability and "materiality" – these merit little more than passing mention. Predominantly, they simply raise questions of fact that should not be decided here. And, in those rare instances where such arguments could be decided on a motion to dismiss, defendants utterly fail to carry their burden.  Defendants' motions to dismiss should be denied in their entirety.

## II.      FACTUAL BACKGROUND

Founded by Chen and Hou in September 2015, TuSimple is a semitruck AI company initially funded by Chinese private equity investors. ¶7.  On April 15, 2021, the Company held its IPO, raising over $1 billion at $40 per share from public investors giving it an artificially-inflated valuation of over $8.5 billion. *Id*.  Prior to the IPO, defendants were forced to disclose that CFIUS had initiated an investigation focused on TuSimple's connections to Sun Dream. ¶¶11-13.  The IPO was conducted against a backdrop of heightened regulatory scrutiny of Chinese companies operating in U.S. markets. ¶¶9-10.  Regulatory authorities were concerned "stolen or coerced American technology . . . g[a]ve Chinese companies an unfair advantage in global markets," particularly as related to companies like TuSimple, developing "artificial intelligence." ¶¶92-98.  Aware of this heightened scrutiny, defendants incorporated TuSimple in the United States rather than China.  ¶14.

On March 29, 2021, two weeks before the IPO, Chen launched a rival autonomous trucking company based in China – Hydron.  ¶8.  Chen founded Hydron with Hou's knowledge and with financial backing from Chao, who also held a significant interest in TuSimple and Sun Dream at the time of the IPO.  ¶¶101, 155. The Company has since admitted that Hou, Chen, and Chao secretly expropriated TuSimple's most valuable asset throughout 2021-2022, its intellectual property, including "technical data, blueprints and schematics that would enable Hydron to replicate TuSimple's technology," violating not only the federal securities laws at issue here, but various U.S. national security laws. ¶¶16, 102, 109, 251.

Within a year of the IPO, on February 18, 2022, CFIUS' investigation resulted in the Company being forced to enter into a National Security Agreement.  The NSA required TuSimple to maintain certain safeguards meant to protect the intellectual property of the purportedly American company.  ¶12.  Under the NSA, Chao and Zhang were no longer permitted to sit on the Company's Board following the end of their then-current terms, Chao relinquished control of two Board seats he and Zhang controlled, and TuSimple appointed a "security officer" and a "security director" on its Board that would chair a "Government Security Committee."  ¶¶103-106. Additionally, the Company was required to isolate its data and technology to prevent its Chinese subsidiary from acquiring sensitive intellectual property. *Id.*  During the Class Period, TuSimple violated nearly every term of the NSA.  ¶¶108-116.

In July 2022, TuSimple's Board launched an internal investigation into the Company's ties to Hydron.  ¶15.  Following extensive public reporting of the various criminal investigations into defendants' violations of the NSA, on October 31, 2022, TuSimple announced it had terminated its founder, Hou.  ¶112.  However, Hou and Chen responded by using their majority voting power to remove the very committee that removed Hou as CEO – and fired the entire Audit Committee, including its national security director, in blatant violation of the NSA.  ¶¶113-121.  In response,

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-
cv-00282-BEN-MSB)

TuSimple's auditors at KPMG immediately resigned and, as widely reported, members of CFIUS recommended criminal espionage charges against Chen and Hou. ¶121. More investigations have followed, with the Company admitting on September 7, 2023, that the SEC had issued subpoenas to Company insiders concerning its ties to Hydron. ¶152.

While defendants misrepresented the Company's related-party transactions and ties to Hydron, defendants simultaneously misrepresented the performance and safety of TuSimple's AV technology. On April 6, 2022, a semi-truck running on TuSimple's autonomous driving technology was traveling on Interstate 10 in Tucson, Arizona. ¶31. When its autopilot engaged, the 80,000 pound semi-truck suddenly lurched left, slamming into a concrete divider causing the April Crash. *Id*. On July 25, 2022, a TuSimple employee publicly leaked video footage of the April Crash. ¶32. The next day, TuSimple falsely blamed "human error" for the crash. ¶¶33, 229.

Defendants' statements prior to and following the April Crash severely misrepresented the safety of TuSimple technology, its status and development, and the focus on safety that the Company maintained. For example, TuSimple described safety as its number one priority (¶¶198, 200, 202) and represented that its trucks were "feature complete" (¶¶205-206, 208-209, 216, 218), "fail safe" (¶209), and had "no unconquered technical challenges on the table" (¶211). In reality, Company employees responsible for ensuring the safety of TuSimple technology were dismissed, silenced, and in some cases fired, as the TuSimple defendants internally flouted the very concern for safety they outwardly touted. ¶¶126, 129, 239, 241-245. Indeed, the Company's Functional Safety Engineering Lead, John Lindland, was fired after he refused to sign off on safety standards the Company had yet to meet. ¶261.

The truth about defendants' materially false statements and omissions was gradually revealed in a series of corrective disclosures. On March 3, 2022, the Company unexpectedly announced the replacement of defendant Lu as President and

CEO and the removal of Chen as Chairman of the Board. ¶275. The market reacted swiftly, with the price of TuSimple stock falling 32% in the two days that followed. ¶¶276-279. Then, on August 1, 2022, the *WSJ* published an article exposing previously undisclosed concerns about the safety of TuSimple's vehicles, contradicting defendants' claims of safety being the Company's number one priority as well as defendants' misleading excuses regarding the cause of the April Crash, including reports from independent analysts, interviews with former TuSimple employees, and internal Company documents. ¶¶280-281. In response, TuSimple shares declined 9.7% in a single day. ¶¶283-285.

Then, on October 30, 2022, the *WSJ* published another investigative report, this time revealing that the FBI, SEC, and CFIUS were each investigating the Company and its executives to determine whether they improperly shared Company technology and intellectual property with Hydron. ¶286. The very next day, the Company admitted that its "employees spent paid hours working on matters for Hydron" and that TuSimple had "shared confidential information with Hydron and its partners" in related-party transactions that were "not presented to, or approved by, the Audit Committee" in direct violation of the Company's Code of Conduct. ¶287. The same October 31, 2022 press release on SEC Form 8-K announced that TuSimple had fired defendant Hou "and removed Dr. Hou from his position as Chairman of the Board, in each case, effective [yesterday]." ¶288. More than a half-dozen analyst reports were issued in the days that followed, downgrading the Company's stock and lowering price targets, and TuSimple stock dropped over 40% in a single trading day. ¶289.

On December 5, 2022, and in direct response to these negative developments, TuSimple announced Navistar's termination of its partnership with TuSimple to develop self-driving trucks. ¶292. Again, analysts downgraded the Company's stock and its price declined significantly, this time by over 19%. ¶¶292-294. On December 20, 2022, news leaked that TuSimple intended to lay off a significant portion of its

4855-0278-0828.v1

workforce, which the Company confirmed the next day as part of "a broad restructuring plan." ¶296. TuSimple's stock price again declined significantly, down to $1.42 per share from its $40 IPO price just 18 months earlier. ¶¶297-298. Today, TuSimple stock trades for $0.32 per share, a greater than 99% decline from the price at which defendants sold over $1 billion of TuSimple stock to investors. Ex. 3 at 25. On January 17, 2024, the Company began the process of delisting its shares from NASDAQ in order to officially move its operations to China. *See* Ex. 1 at 7. On January 23, 2024, this Court granted a temporary restraining order enjoining TuSimple from transferring its trade secrets to Hydron or other businesses outside of the United States. *Wilhoite V. Xiaodi Hou, et al.*, No.: 3:23-cv-02333-BEN-MSB, ECF 36 at 7 (S.D. Cal. Jan. 23, 2024).

## III.   ARGUMENT

### A.   The Complaint Adequately Alleges Claims Under the Securities Act

The Securities Act "was designed to provide investors with full disclosure of material information concerning public offerings." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976). "Disclosure, and not paternalistic withholding of accurate information, is the policy chosen and expressed by Congress." *Basic Inc. v. Levison*, 485 U.S. 224, 231-34 (1988). The Supreme Court has "recognized time and again, a 'fundamental purpose' of the various Securities Acts, 'was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.'" *Id.*

Section 11 catalogues certain statutorily-enumerated persons subject to strict liability under the statute – including **issuers, underwriters, and signatories** of a registration statement that, upon becoming effective, "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. §77k(a); *see also*

*In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996).[4] Section 11 places a "relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). As long as "'a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements.'" *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013). "'The plaintiff in a §11 claim must [only] demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment.'" *In re Daou Sys. Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005). "'No scienter is required for liability under §11.'" *Id.* Rather, defendants are "'liable for innocent or negligent material misstatements or omissions.'" *Id.*

### 1.    Rule 8(a) Applies to Plaintiffs' Securities Act Claims

"A complaint need only satisfy the minimal notice pleading requirements of Rule 8(a)(2) – a short and plain statement – to survive a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 935 (C.D. Cal. 2012). "'To ascertain whether a complaint "sounds in fraud," [the Court] must normally determine, after a close examination of the language and structure of the complaint, whether the complaint "alleges a unified course of fraudulent conduct" and "relies entirely on that course of conduct as the basis of a claim."'" *Mallen*, 861 F. Supp. 2d at 1123-24. Rule 8(a) applies to Plaintiffs' Securities Act claims.

In arguing that Rule 9(b) applies here, defendants ignore that the Complaint "does the work of 'stripping' the allegations that sound in fraud." *In re Countrywide*

---

4   Defendants are all "issuers, underwriters, [or] signatories" as enumerated entities under §11 of the Securities Act. ¶¶318-320.

*Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1162 (C.D. Cal. 2008); *see also* ¶¶314, 341, 351.  Indeed, the gravamen of the Complaint for Plaintiffs' Securities Act claims is negligence, not fraud.[5]   For example, Plaintiffs allege that the Underwriter Defendants: (1) were required to conduct due diligence into TuSimple in order to participate in the IPO (¶322); (2) "had continual access to internal, confidential, then current corporate information concerning TuSimple's most up-to-date operational and financial results and prospects" (*id.*); (3) participated in drafting the Registration Statement (¶323); and (4) "in the exercise of reasonable care should have known of, TuSimple's existing problems and the untrue statements of material fact and omissions in the Registration Statement alleged herein" (*id.*).  And as Plaintiffs further allege, "[n]one of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omission of any material facts and were not misleading."  ¶325.  Nowhere do Plaintiffs allege fraud against the Underwriter Defendants.  *See* ¶¶314-364.

Hence, Rule 9(b)'s pleading standards do not apply to Plaintiffs' negligence claims against the Underwriter Defendants.  *See Brown v. China Integrated Energy, Inc.*, 2012 WL 1129909, at *3 (C.D. Cal. July 12, 2012) (holding allegation that an underwriter defendant "lacked 'reasonable grounds' for believing that the registration statement was accurate" sounded in negligence rather than fraud); *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *4 (N.D. Cal. Aug. 7, 2020) (holding that Rule 9(b) standard did not apply to §11 claims, when the plaintiff had "'made an effort to plead a non-fraudulent basis for Section 11 liability'"); *In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *8 (N.D. Cal. Oct. 31, 2014) ("[p]laintiffs have . . .

---

[5]   Tellingly, the sentence to which the UW Defendants point to claim fraud is a "core premise" of the Complaint is an out of context phrase from a section of the Complaint describing the national security events relevant to the events at issue – not Plaintiffs' Securities Act claims.  UW MTD at 5 (citing ¶98).

4855-0278-0828.v1

1    pleaded non-fraud bases for liability.  Thus, the Court declines to find that Plaintiff's

2    CAC necessarily sounds in fraud"); *In re Charles Schwab Corp. Sec. Litig.*, 257

3    F.R.D. 534, 546 (N.D. Cal. 2009) (declining to apply Rule 9(b) pleading standard to

4    §11 claim because it was "possible that many of the defendants were . . . merely

5    negligent in failing to recognize and prevent them"); *Flynn v. Sientra, Inc.*, 2016 WL

6    3360676, at *17 (C.D. Cal. June 9, 2016) (declining to apply Rule 9(b) pleading

7    standard to §§11 and 12 claims).[6]

8         Further, Plaintiffs do not allege that the Underwriter Defendants (or defendant

9    Francis) knowingly made any false statements or otherwise committed fraud in

10   connection with the Registration Statement's material Hydron related-party omissions

11   and/or risk factors.  *See* ¶¶314-364.  But, were this Court to find the allegations in

12   support of Plaintiffs' Securities Act claims are in any way related to fraud, it should

13   still not apply Rule 9(b) to the Underwriter Defendants.  *See* ¶¶365-402.  *See also*

14   *Feyko v. Yuhe Int'l, Inc.*, 2013 WL 816409, at *7 n.4 (C.D. Cal. Mar. 5, 2013)

15   ("[a]lthough Lead Plaintiff's Section 11 claim against the Yuhe Defendants sounds in

16   fraud, this ruling does not automatically apply to the other Defendants"); *Mallen*, 861

17   F. Supp. 2d at 1125 (same).

18   _____

19   [6]   Defendants attempt to manufacture a rule that for Rule 8 to apply to Plaintiffs'
     Securities Act claims, Plaintiffs must "'expressly exclude and disclaim any allegation
20   that could be construed as alleging or sounding in fraud or intentional or reckless
     misconduct.'"  TSP at 10 (quoting *Baker v. Seaworld Entm't, Inc.*, 2016 WL 2993481,
21   at *6 (S.D. Cal. Mar. 31, 2016)).  TuSimple's reading of *Baker* is highly misleading,
     however, as it only stands for the proposition that merely disclaiming fraud is
22   insufficient when Plaintiffs' Complaint "makes a **wholesale** adoption of the securities
     fraud allegations for purposes of Plaintiffs' Securities Act claims."  *Baker*, 2016 WL
23   2993481, at *6.  In *Baker*, the plaintiffs repeated and realleged the first 241
     paragraphs of their complaint before their Securities Act claims, thus compelling the
24   Court to hold that these claims were subject to the heightened Rule 9(b) standard.  *Id.*
     Conversely, here, Plaintiffs only reallege specific relevant paragraphs of their
25   Complaint in support of their Securities Act claims.  ¶¶314, 341, 351.  Defendants'
     other cited authority directly refutes their position here.  *See Violin*, 2014 WL
26   5525946, at *8 (applying Rule 8 pleading standard to Securities Act claims, because
     "[t]he CAC does not specifically allege fraud and avoids averments inherently
27   suggestive of fraud – *i.e.*, there is no allegation that defendants 'knowingly' or
     'intentionally' concealed information or made misrepresentations").

28

4855-0278-0828.v1

1       This Court's ruling in *Mallen* is instructive. *Id.* There, although this Court

2   rejected the plaintiffs' attempt to disclaim fraud against the defendants named in both

3   their Securities Act and Exchange Act claims, it further held that Rule 8 still applied

4   to claims against the underwriter defendants, because they were only alleged to have

5   been negligent. *Id.* There, as here, "the only allegations against the Underwriter

6   Defendants are that they drafted and disseminated the [Registration Statement]

7   pursuant to which [TuSimple's] shares were sold." *Id.* Because the Complaint made

8   "no allegations of fraud or intent to deceive on behalf of the Underwriter Defendants,"

9   this Court bifurcated the allegations and held that "[a]ccordingly, Rule 9(b)

10  particularity requirements do not apply to the allegations against the Underwriter

11  Defendants." *Id.*; *see also El Paso Firemen & Policemen's Pension Fund v. Innovage

12  Holding Corp.*, 2024 WL 199061, at *4 (D. Col. Jan. 18, 2024) ("[l]ead [p]laintiffs'

13  claims against [d]efendants sound in negligence").

14      Defendants similarly claim that Plaintiffs' allegations against the Exchange Act

15  Defendants somehow implies that all defendants, including the Underwriter

16  Defendants, were engaged in that fraud. UW MTD at 5. Not so. The Underwriter

17  Defendants were as negligently in the dark about Hydron as the Audit Committee.

18  Indeed, Plaintiffs nowhere allege that they took any part in, or were even aware of,

19  defendants' fraudulent scheme. The Underwriter Defendants also point to Plaintiffs'

20  reliance on certain similar underlying facts for their Securities Act and Exchange Act

21  claims. *Id.* at 6. This argument fails for the same reasons. While Plaintiffs do

22  incorporate a specific subset of non-fraud allegations into their Securities Act claims

23  which are also relevant to their Exchange Act claims, that is beside the point.

24  Defendants must, but cannot, show that "'the complaint "alleges a unified course of

25  fraudulent conduct" and "relies entirely on that course of conduct as the basis of a

26  claim."'" *Mallen*, 861 F. Supp. 2d at 1123-24. The Court however need not reach

27  this issue because, as set forth *infra*, "the Complaint adequately states [Securities Act]

28

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-
cv-00282-BEN-MSB)

4855-0278-0828.v1

1   claim[s] under both Rules 9(b) and 8(a)." *In re Peregrine Sys., Inc. Sec. Litig.*, 2005

2   WL 8158825, at *77 (S.D. Cal. Mar. 30, 2005) (Benitez, J.).[7]

3            **2.    Defendants' False and Misleading Statements and
                      Omissions in the Registration Statement Are
4                     Actionable Under the Securities Act**

5            **a.    TuSimple's Materially Misleading Statements
                      and Omissions Concerning Hydron**

6

7           TuSimple concedes that it failed to disclose the relevant defendants'

8   interactions with Hydron, a Chinese tech startup and self-driving semi-truck rival

9   founded by Chen, which was founded just two weeks before the IPO.  ¶8.  That

10  material omission is actionable because the Company disclosed other related-party

11  transactions in the Registration Statement.  Defendants also concede that these related-

12  party Hydron transactions led to investigations by the FBI, Treasury Department, and

13  SEC into whether TuSimple improperly financed and transferred its technology to

14  Hydron.  ¶99.  And, tellingly, defendants do not attempt to justify the simple fact that

15  TuSimple failed to disclose that Chen launched Hydron before the IPO.  *See Brown v.*

16  *China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1118 (C.D. Cal. 2012)

17  (allegations that defendant company failed to disclose transactions with entities owned

18  by the defendant CEO's son adequately pleaded material falsity).

---

19  [7]    The UW Defendants' authority is either inapposite or supports Plaintiffs' position.
    In *Stac Electronics*, plaintiffs alleged that "Stac, its outside directors, and other
20  venture capital defendants, schemed with the Underwriters to project false reports
    following the IPO." 89 F.3d at 1410.  Plaintiffs here make no similar fraud allegations
21  against the Underwriter Defendants or defendant Francis.  The UW Defendants'
    reliance on *In re Eargo, Inc. Sec. Litig.*, 656 F. Supp. 3d 928 (N.D. Cal. 2023) is
22  similarly misplaced, as plaintiffs there incorporated by reference their fraud
    allegations into their Securities Act claims, and the court did not address at all whether
23  allegations against the underwriters could be bifurcated.  Defendants also rely to their
    detriment on *In re SeraCare Life Sciences, Inc. Sec. Litig.*, 2007 WL 935583 (S.D.
24  Cal. Mar. 19, 2007).  Plaintiffs there attempted to disclaim fraud as the basis for their
    §11 claim but also alleged that the underwriter defendant "made a myriad of
25  fraudulent misrepresentations." *Id.* at *12.  Again unlike Plaintiffs here, the *SeraCare*
    plaintiffs "fully incorporated their previously averred allegations of fraud into their
26  §11 claim." *Id.*  Accordingly, this case is inapposite, and defendants cannot overcome
    the absence of any allegations in the Complaint that the UW Defendants and
27  defendant Francis participated in, or knew of, the fraudulent scheme to plunder
    TuSimple's technology.

28

                                    - 16 -                          3:22-cv-01300-BEN-MSB
                                                                    (Consolidated with No. 3:23-
                                                                    cv-00282-BEN-MSB)

Instead, defendants argue that the vagueness of TuSimple's October 31, 2022, corrective disclosure – that "***during 2021*** Company employees spent paid hours working on matters for Hydron Inc" (¶116) – insulates it from liability because the paid work ***could*** theoretically have been performed after the March 2021 IPO.  It is implausible that defendants did not immediately begin sharing trade secrets with Hydron starting in March 2021 given that Hydron was autonomous ready by November 2022.   Defendants' argument ignores that, ***at the time of the IPO***, defendant Chen had already launched Hydron to pilfer the Company's AI technology. ¶¶8, 55.  Nor did investors know that defendant Chao, whose ties to Xi Jinping TuSimple also failed to disclose, backed both TuSimple and Hydron.  ¶¶11, 50.  And investors were certainly unaware that TuSimple was developing its technology for Hydron's benefit, let alone that a transfer of technology to Hydron was in the offing and did, in fact, occur "during 2021" ***and*** 2022.  ¶116.  Under Rule 8, these material omissions in the Registration Statement are sufficient to state Securities Act claims against, *inter alia*, the Underwriter Defendants for negligence in connection with the IPO.

The Company's purported "risk factors" in the Registration Statement are also actionable for their omission of Hydron.  ¶¶160-163, 328-331.  As the Ninth Circuit has recently held, these allegations are more than sufficient to "plausibly" allege that the Company's SEC filings warned that risks "'could' occur when, in fact, those risks had already materialized" at the time of the IPO.  *Facebook*, 84 F.4th at 858-59; *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021) ("the complaint plausibly alleges that Alphabet's warning in each Form 10-Q of risks that 'could' or 'may' occur is misleading to a reasonable investor when Alphabet knew that those risks had materialized"), *cert denied sub nom. Alphabet Inc. v. Rhode Island*, __ U.S. __, 142 S. Ct. 1227 (2022).

4855-0278-0828.v1

1   As in *Facebook* and *Alphabet*, defendants here disclosed risks which had
2   already materialized with Hydron's founding weeks prior to the IPO, especially given
3   that TuSimple was already under investigation for its related-party ties to Sun Dream.
4   ¶¶328-331. At the time of the IPO, defendants were sharing technology with Hydron,
5   despite no disclosure whatsoever of any relationship between TuSimple and Hydron.
6   ¶332. Accordingly, the "risk factors" in the Registration Statement had already
7   materialized before the IPO, rendering these misstatements and omissions in the
8   Registration Statement materially misleading. *See Siracusano v. Matrixx Initiatives,*
9   *Inc.*, 585 F.3d 1167, 1181-82 (9th Cir. 2009) (finding misleading "risk factors"
10  actionable), *aff'd*, 563 U.S. 27 (2011); ¶160 ("[f]ailure to adequately protect our
11  intellectual property rights ***could*** result in our competitors offering similar products").
12  Hydron was one such competitor and the Registration Statement concealed that simple
13  fact.

14   In addition, Regulation S-K expressly requires the disclosure not only of past
15  but also of pending related-party transactions. "[W]hile related-party transactions are
16  not *per se* unlawful, we view them with 'extreme skepticism,' especially when they go
17  undisclosed." *S.E.C. v. China Ne. Petrol. Holdings Ltd.*, 27 F. Supp. 3d 379, 389
18  (S.D.N.Y. 2014). Defendants also ignore the multiple resignations following the
19  revelation of these related-party transactions with Hydron, as well as defendant Hou's
20  termination on October 31, 2022 by TuSimple's own Board for "lack of candor and
21  transparency." ¶247. "[T]he goal of Regulation S-K is to require disclosure of all
22  information material to investors' understanding of a registrant's business." *Snellink*,
23  870 F. Supp. 2d at 940. Item 404 of Regulation S-K also requires a registrant to
24  "[d]escribe any transaction, since the beginning of the registrant's last fiscal year, or
25  any currently proposed transaction, in which the registrant was or is to be a participant
26  and the amount involved exceeds $120,000, and in which any related person had or

27
28

4855-0278-0828.v1

1   will have a direct or indirect material interest."   17 C.F.R. §229.404(a).   Here,

2   defendants concede that Plaintiffs have met the excess of $120,000 threshold.   ¶116.

3       Defendants' argument that the 2021 work performed for Hydron was "paltry" in

4   comparison to TuSimple's then market cap and total assets also fails (TSP at 21),

5   because it flatly contradicts Item 404 of Regulation S-K, which sets the threshold for

6   materiality at $120,000.   17 C.F.R. §229.404(a); ¶156.   Defendants have already

7   admitted the Hydron transactions exceeded that amount.   ¶116.   TuSimple's reliance

8   on *In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464 (S.D.N.Y. Mar.

9   31, 2015), is therefore misplaced.   There, the court held that "the mere relatedness of a

10   party supplying $250,000 worth of inventory could hardly be considered a material

11   fact significant in relation to investment decisions." *Id.* at *16.[8]   The issue here is not

12   the impact of the dollar value of the work performed by TuSimple employees for

13   Hydron, however, but the fact that TuSimple developed technology for Hydron's

14   benefit and then transferred that technology to Hydron.   Indeed, TuSimple's

15   relationship with Hydron was material because "[i]nvestors would be interested in

16   knowing that [management] was personally orchestrating the [Hydron transactions]

17   alleged.   This would have raised a red flag for investors that top management was

18   potentially corrupt.   This was not disclosed.   This alone made the [Hydron]

19   transaction[s] material." *In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, *2 (N.D.

20   Cal. Nov. 17, 2005).   There is, by contrast, not a single mention of intellectual

21   property or the transfer thereof in *Francesca's*, rendering it wholly inapposite.

22       The Audit Committee investigation into TuSimple's relationship with Hydron,

23   and the related flood of suspiciously timed and noisy resignations and terminations,

24   further demonstrate the materiality of these undisclosed related-party transactions.

25   _____

26   [8]   Unlike defendants here who concealed their related-party transactions with Hydron
from the Audit Committee, defendants in *Francesca's* disclosed their related-party

27   transactions to the audit committee as they were required to do under that company's
"Related Party Transaction Policy."  *Id.* at *4.

28

4855-0278-0828.v1

¶¶91 n.7, 225-261.  In addition, TuSimple's undisclosed related-party transactions with Hydron were undoubtedly material given that the Department of Justice being urged by a representative of CFIUS to criminally charge Chen and Hou with "economic espionage."  ¶¶27, 145, 251.  None of defendants' authorities involved such qualitative indicia of materiality.

Finally, the nature of the work TuSimple employees performed for Hydron, and the technology TuSimple transferred to Hydron, erases all doubt that the related-party transactions at issue here were material.  As revealed by the *WSJ*, the Board's investigation into the transfer of information to Hydron "included technical data, blueprints and schematics that would enable Hydron to replicate TuSimple's technology as well as specific information about TuSimple personnel who would be valuable to Hydron" and the "TuSimple employees who also worked for Hydron included top staff in marketing, product development, business development and government relations."  ¶251.  TuSimple's related-party transactions with Hydron were therefore material to investors.  ¶95.[9]

### b.   Defendants' Materially False and Misleading Safety Statements and Omissions

The Complaint also adequately alleges that defendants made a number of materially false and misleading statements and omissions in the Registration Statement regarding the safety of their trucks.  ¶¶127-128, 314-327, 333-340. Defendants challenge the materiality of the safety statements.  Materiality is determined by whether there is "'a substantial likelihood that the disclosure of the

---

[9]   Defendants' reliance on *In re Progenity, Inc. Sec. Litig.*, 2023 WL 4498502 (S.D. Cal. July 12, 2023) is altogether misplaced.  Plaintiffs there alleged defendants should have disclosed a pending refund they were required to issue to government payers without alleging facts sufficient to show defendants knew of the overpayment at the time of the IPO or had an obligation to accelerate their audit of the relevant quarter's financial statements.  *Id.* at *10.  Here, by contrast, defendants knew not only of Chen's underlying relationship with Hydron, which indisputably formed before the IPO, but also of the either actualized or contemplated third-party transactions with Hydron in 2021 and 2022.  Indeed, as Plaintiffs allege, TuSimple's *raison d'etre* was to develop and test technology in the U.S. for transfer to Hydron in China.  ¶8.

1    omitted fact would have been viewed by the reasonable investor as having

2    significantly altered the 'total mix' of information made available.'" *Basic*, 485 U.S.

3    at 231-32.  Because the materiality inquiry involves mixed questions of law and fact,

4    alleged misstatements are not properly dismissed for lack of materiality unless they

5    are so obviously unimportant to a reasonable investor that reasonable minds could not

6    differ on the question of their importance.  *See Matrixx*, 563 U.S. at 38.  Defendants

7    cannot meet that burden.

8         The Complaint fully describes how defendants repeatedly misrepresented the

9    safety of the Company's technology in the Registration Statement.  ¶¶333-340.

10   Defendants assured investors that their autonomous software and network delivered

11   customers "safe and seamless end-to-end autonomous freight capacity."  ¶¶335.

12   Defendants, however, failed to disclose that their technology contained fundamental

13   safety deficiencies overlooked in their rush to market. ¶336.  These deficiencies were

14   only revealed when the truth of the April Crash was disclosed by a whistleblower

15   video and the subsequent investigation by the *WSJ*.  ¶¶136-138.[10]

16        These safety issues did not suddenly materialize after the IPO, however.

17   Lindland, a former Functional Safety Engineering Lead at the Company, states that

18   during his tenure at TuSimple, there was a company culture of ignoring safety in a

---

19   [10]  Defendants reliance on *Plumley v. Sempra Energy*, 2017 WL 2712297 (S.D. Cal.
20   June 20, 2017), to argue that the safety statements are "immaterial as a matter of law"
     (TSP at 14) is misplaced.  There, this Court held that certain statements related to
21   safety were non-actionable, because "[p]laintiffs have not identified any metrics,
     reports, recommendations, etc., from which SCG's actions may be compared to."  *Id.*
22   at *7.  Here, by contrast, Plaintiffs allege that TuSimple claimed it had adhered to
     specific safety standards, when it in fact disregarded those standards.  ¶125 ("[t]hat is
23   why we are building International Organization for Standardization (ISO) 26262 into
     every aspect of our system, hardware, software, purchasing, and production processes
24   and are designing to meet the stringent ISO/PAS 21448 SOTIF (safety of the intended
     function)").  Indeed, this Court expressly contrasted the non-specific statements at
25   issue in *Plumley* with "specific and measurable statements sufficient to survive a
     motion to dismiss." 2017 WL 2712297, at *7 (citing *In re BP p.l.c., Sec. Litig.*, 843 F.
26   Supp. 2d 712, 757-58 (S.D. Tex. 2012)).  The statements at issue here concerning
     TuSimple's purported adherence to specific standards, such as ISO 26262, are akin to
27   those found actionable in *BP*.  *Id.* (citing *BP*, 843 F. Supp. 2d at 757-58).  Tellingly,
     defendants neglect to address the statements quoted in ¶125 of the Complaint.

28

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-
cv-00282-BEN-MSB)

rush to be first to market exemplified in the Company's rejection of legally-required adherence to international safety standards.  ¶¶126-131, 241-242.  Here, reasonable investors could certainly have found the misleading statements and omissions in the Registration Statement altered the "total mix" of information, especially when multiple, independent sources revealed TuSimple's apparent dismissal of common safety practices and features before, during, and after the IPO.  ¶¶136-138, 239-242, 280-284.

Defendants' remaining arguments are meritless.  First, simply because the April Crash did not occur simultaneously with the IPO does not render the safety statements true.  TSP at 12-13; UW MTD at 9-10.  The April Crash brought TuSimple's safety deficiencies to light publicly, but it was not the first indication ***internally*** that TuSimple's trucks were dangerous.  Though TuSimple described their trucks as safe in the Registration Statement, given the Company-wide disregard for safety standards and features before, during, and after the IPO, the challenged statements are clearly false.  Defendants mysteriously rely on *In re Aqua Metals, Inc. Sec. Litig.*, 2019 WL 3817849, at *8, *10 (N.D. Cal. Aug. 14, 2019) and *Abady v. Lipocine Inc.*, 2023 WL 2938210, at *11-*12 (D. Utah Apr. 13, 2023) to argue otherwise, though both cases actually concern puzzle pleading – an issue defendants do not seriously raise.  The Underwriter Defendants mistakenly rely on *In re ON24, Inc. Sec. Litig.*, 2003 WL 7449838, at *9-*10 (N.D. Cal. July 7, 2023) for the same incorrect argument.  *ON24* is inapposite as it concerns company forecasting.  This argument is also a conscious misinterpretation of the Complaint.

Defendants' contention that the statements in the Registration Statement were mere opinions and not actionable because Plaintiffs did not allege that those beliefs were not genuinely held is a clear misinterpretation of the Supreme Court's holding in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015).  TSP at 13-14.  There, the Supreme Court examined the standards for

- 22 -

alleging the falsity of an opinion under §11 of the Securities Act, and explained that the most significant difference between statements of fact and expressions of opinion is that "a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *Omnicare*, 575 U.S. at 183. Even the briefest of examination of the Complaint shows that challenged statements are clearly statements of fact. ¶¶333-335.

The statements do not display conditionality, and a reasonable investor would certainly read them as factual descriptions of the safety of TuSimple's trucks and development process. For example, the Registration Statement stated that TuSimple's trucks were "powered by our on-board autonomous driving software, our TuSimple Connect cloud-based autonomous operations oversight system, autonomous HD route mapping support, and emergency roadside assistance to provide safe and seamless end-to-end autonomous freight capacity as a service." ¶335. Defendants' argument here does not withstand even the most basic scrutiny.

Defendants next mischaracterize the challenged statements as puffery. TSP at 14.[11] The challenged safety statements, however, do not concern the type of "'vague, generalized and unspecific assertions of corporate optimism'" that "'"the mere puffery" rule precludes.'" *In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1033 (S.D. Cal. 2006). A court may grant a motion to dismiss on the basis that offered "'statements are "puffery" only if it concludes that the statement is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance."'" *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *7 (S.D. Cal. Mar. 18, 2019); *see also In re Honest Co. Sec. Litig.*, 615 F. Supp. 3d 1149, 1154 (C.D. Cal. 2022).

---

[11]   Defendants also muddy the waters here by highlighting statements (¶¶197-198, 228-229) not found in the Registration Statement rather than the statements Plaintiffs actually challenge under §11. TSP at 14. For example, the quotation TuSimple cites, "mission is to make trucking safer, more efficient and at lower cost," was made by defendant Lu during TuSimple's May 10, 2021 earnings call. ¶197.

Here, the challenged statements were specific, objectively verifiable statements regarding the safety of TuSimple's product.  When TuSimple claimed that its trucks "provide safe and seamless end-to-end autonomous freight capacity" (¶335), it was not simply expressing an opinion.  *But c.f. In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1103 (N.D. Cal. 2013) (describing puffery as vague statements of opinion such as "'it's a great time for a company like ours'").  The safety of a vehicle, autonomous or not, is a fact that can be measured and quantified.

The facts alleged are comparable to *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223 (S.D.N.Y. 2012).  There, the court found that statements regarding the defendant company's "'extensive' training and safety programs" were actionable because safety training in "an industry as dangerous as deepwater drilling" would be considered seriously by investors.  *Id.* at 233, 244.  The description of "'extensive' training" in *Bricklayers* objectively implies a high degree of training, *e.g.*, the safety training comports with all requisite standards within a highly regulated industry.  *Mulligan v. Impax Laboratories*, Inc., 36 F. Supp. 3d 942, 968 (N.D. Cal. 2014), is similarly instructive.  There, a pharmaceutical manufacturer received significant warnings from the FDA regarding problems in its manufacturing and quality control processes.  *Id.* at 947-50.  While defendants there made repeated public statements trumpeting the defendant company's remediation methods, plaintiffs alleged that they sought temporary fixes or took no action at all in response to the government warnings.  *Id.* at 956.  The court in *Mulligan* found the challenged statements did not warrant dismissal as puffery because it was unreasonable to believe that investors in the highly-regulated pharmaceutical industry deemed consistency and sanitation in production unimportant.  *Id.* at 968.

TuSimple's description of "safe and seamless end-to-end autonomous freight capacity" (¶335) is objectively verifiable as representing that TuSimple's vehicles would meet all the safety requirements within the highly regulated trucking industry.

4855-0278-0828.v1

¶¶134-135 (describing how multiple federal agencies responded to the April Crash); ¶242 (describing "ISO 26262," an internationally-recognized standard related to the functional safety of electrical and/or electronic systems in motor vehicles, as legally required).  This Court should reject defendants' puffery argument because it is not plausible to believe that a reasonable investor in an AV company would view the safety of TuSimple's trucks to be so "'obviously unimportant'" that "'reasonable minds could not differ on the question of their unimportance.'" *Qualcomm*, 2019 WL 1239301, at \*7; *see also Howard v. Arconic Inc.*, 2021 WL 2561895, at \*13 (W.D. Pa. June 23, 2021) (reasonable for investor to rely on statements regarding specific aspects of a company's safety policies).

Finally, defendants' argument that the challenged statements "simply describe TuSimple's technology" is obtuse.  TSP at 14.[12]  The phrases they cite – "powered" by an "autonomous driving software" and "operations oversight system" – are technologies that the Company highlighted as reasons why defendants touted TuSimple's trucks as safe.  *See* ¶¶334-336.  It is not the existence of these technologies that Plaintiffs challenge, but TuSimple's assertions that these technologies resulted in a safe autonomous vehicle.  *Id.*  In other words, even if a statement is not false, it may be misleading if it omits material information.  *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014).

### 3.    Plaintiffs' Section 12 Claim Is Also Actionable

In addition to satisfying §11 as set forth above, the Complaint also satisfies §12(a)(2) and Plaintiffs have standing to litigate that claim at this stage.  *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1039 (S.D. Cal. 2005) ("the Complaint provides sufficient grounds for a presumption of standing at this stage of the action"); ¶¶44-46, 343 ("Poirier and members of the class purchased shares of

---

[12]  Plaintiffs note this is in direct opposition to TuSimple's previous argument that the challenged statements are opinions rather than factual statements.

4855-0278-0828.v1

1   TuSimple common stock pursuant to the Prospectus."); ECF 103-2 (showing Poirier

2   purchased TuSimple stock *on April 16, 2021 – the date of the IPO*).[13]  Nothing more

3   is required.  *See Immune*, 375 F. Supp. 2d at 1039.

4          Defendants' argument that they are not statutory sellers within the meaning of

5   §12(a)(2) (UW MTD at 13), is premature at this stage.  *See In Primo v. Pac.*

6   *Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1126 (N.D. Cal. 2013) (""""whether an

7   individual is a seller under Section 12 is a question of fact, not properly decided on a

8   motion to dismiss"""); *see also In re Nat'l Golf Props., Inc.*, 2003 WL 23018761, at

9   *3 (C.D. Cal. Mar. 19, 2003); *In re Wash. Mut., Inc. Sec, Derivative & ERISA Litig.*,

10  259 F.R.D. 490, 508 (W.D. Wash. 2009).  A "seller" is someone: (1) who passes title

11  to the securities; or (2) who solicits the sale of securities to serve his own financial

12  interest or the financial interest of the securities' owner.  *Pinter v. Dahl*, 486 U.S. 622,

13  647-50 (1988).  The Complaint more than adequately alleges that the Underwriter

14  Defendants are "sellers" within the meaning of §12(a)(2).  ¶¶84-85; 341-350; *see also*

15  *Charles Schwab*, 257 F.R.D. at 534.

16         Indeed, "liability is not 'limited to the person who passes title to the securities,

17  but extends "to the person who successfully solicits the purchase, motivated at least in

18  part by a desire to serve his own financial interests or those of the securities owner.""""

19  *Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213, 1222 (D. Colo. 1998).  Here, the

20  Complaint clearly alleges that defendants sold or solicited the securities at issue *via*

21  the Registration Statement.  ¶¶4, 69-85, 341-350; *see also Primo*, 940 F. Supp. 2d at

22  1126 (registration statement is a solicitation document).  And on a motion to dismiss,

23  there is no requirement that plaintiffs allege that each underwriter defendant passed

24  title to a particular plaintiff or that the plaintiffs were actually solicited by each

25  _____

26  [13]  These facts and allegations, without more, distinguish this case from the UW
    Defendants' reliance on *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964
27  (N.D. Cal. 2010), where, unlike here, plaintiffs' certifications established that none of
    the named plaintiffs actually purchased their shares on the offering date.  Defendants
28  here, by contrast, do not challenge Plaintiffs' standing under §11 of the Securities Act.

4855-0278-0828.v1

1    underwriter defendant in order to state a §12 claim.  *See Wash. Mut.*, 259 F.R.D. at

2    508 ("[p]laintiffs need not allege 'which underwriter sold securities to each plaintiff'

3    to state a claim under Section 12(a)(2)")

4    **B.    The Complaint Adequately Alleges Claims Under the Exchange Act**

5

6    **1.    Defendants' False and Misleading Statements and Omissions Regarding Hydron**

7            Defendants failed to disclose TuSimple's related-party transactions with

8    Hydron and its sharing of confidential and proprietary information.  Those facts are

9    not in dispute, and rendered defendants' Class Period statements regarding its efforts

10   to safeguard its intellectual property and the risks the Company faced for failure to do

11   so materially false and misleading.  ¶¶154-195.  Indeed: (i) TuSimple has admitted

12   that "***the Company shared confidential information with Hydron and its partners,***

13   ***which was not brought to the attention of the Audit Committee and Government***

14   ***Security Committee***," including, "technical data, blueprints and schematics that would

15   enable Hydron to replicate TuSimple's technology"; (ii) the FBI and SEC have

16   launched investigations into the Company's interactions with Hydron; and (iii) Hou

17   was fired as CEO, President, and Chairman for "his lack of candor and transparency"

18   for handing over TuSimple's technology to Hydron.  ¶¶18-22, 102, 109.  These

19   uncontested facts confirm that defendants' statements, about protecting the

20   Company's intellectual property and their omissions of the related-party transactions

21   are materially false and misleading.  ¶¶154-195.

22           Courts in this Circuit "have consistently found that failure to disclose

23   related-party transactions constitutes a material omission under §10."  *Cheung v.*

24   *Keyuan Petrochemicals, Inc.*, 2012 WL 5834894, at *8 (C.D. Cal. Nov. 1, 2012).  *See,*

25   *e.g.*, *Snellink*, 870 F. Supp. 2d at 939-40 (failure to disclose related-party transactions

26   adequately pleaded falsity); *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d

27   1215, 1224-25 (N.D. Cal. 2015) (falsity adequately alleged where "defendants

28

4855-0278-0828.v1

essentially concede that [company] was a related party" and related-party "was at all relevant times owned by an officer of [company], or by an employee of a [company] officer's family member"). Faced with their own admissions, the Complaints' well-plead allegations, and the wealth of case law, defendants' arguments that their statements are not actionable all fail.

*First*, TuSimple argues that because the Complaint does not plead which day in 2021 the first Hydron transaction occurred, the allegations arising from the April 2021 Form 424B4 Prospectus and quarterly reports in August and November 2021 on SEC Forms 10-Q must be dismissed. TSP at 2, 18-20. This ignores the Complaint's allegations. In addition to the fact the Company has **admitted** it engaged in related-party transaction with Hydron in 2021 (the same year as the IPO), and transferred confidential and proprietary information to Hydron, defendant Chen, while a director and Executive Chairman of TuSimple, launched Hydron just a month **before** the TuSimple IPO, all while TuSimple was under investigation by CFIUS for TuSimple's connections to another Chinese company. ¶¶8, 18. There are ongoing investigations by the FBI and SEC into whether TuSimple improperly financed Hydron. ¶¶17, 99, 110, 286. These facts all support the inference that defendants' interactions with Hydron pre-date the Class Period, and the allegations that the Registration Statement and SEC Forms 10-Q falsely omitted that TuSimple was "contemporaneously engaging in undisclosed related party transactions with Hydron" and that "defendants shared confidential information and/or proprietary technology with Hydron without Board approval." ¶¶163, 172. *See In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1116-17 (N.D. Cal. 2017) (rejecting argument that the "complaint fails to show that the systems were inadequate at the time of the IPO" where defendants admitted

4855-0278-0828.v1

1    internal control failures a year after the IPO, as the complaint "further alleged specific

2    facts warranting the inference that the same circumstances existed as of the IPO").[14]

3        ***Second***, TuSimple's argument that its interactions with Hydron were immaterial

4    and it had no duty to disclose the Hydron transactions fail.  TSP at 19-21.  Materiality

5    is established when there is "'a substantial likelihood that the disclosure of the omitted

6    fact would have been viewed by the reasonable investor as having significantly altered

7    "the total mix" of information made available.'"  *Matrixx*, 563 U.S. at 38; *see*

8    *also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (all that is needed

9    "is a showing of a substantial likelihood that, under all the circumstances, the omitted

10   fact would have assumed actual significance in the deliberations of the reasonable

11   shareholder").  Here, the notion that reasonable investors would not want to know that

12   the Company was engaged in related-party transactions with Hydron and handing over

13   its most valuable asset – its intellectual property – to a competitor controlled by the

14   Chinese government in violation of federal law is specious given the U.S.

15   government's keen focus on TuSimple's misdeeds.  ¶¶17-29.  *See Alphabet*, 1 F.4th at

16   703 ("[t]he market reaction, increased regulatory and governmental scrutiny, both in

17   the United States and abroad, and media coverage alleged by the complaint to have

18   occurred after disclosure all support the materiality of the misleading omission").

19       Defendants also ignore that materiality is an inherently fact-based inquiry that is

20   rarely appropriate for pre-trial determination, let alone at the pleading stage.  *See*

21   *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2nd Cir. 2011) ("'"a complaint

22   may not properly be dismissed . . . on the ground that the alleged misstatements or

23   omissions are not material unless they are so obviously unimportant to a reasonable

24   _____

25   [14]   Defendants' authority supporting this argument contain no such admissions.  TSP
     at 20 (citing *Copperstone v. TCSI Corp.*, 1999 WL 33295869, at *6 (N.D. Cal. Jan 19,
26   1999) (holding "hindsight" realizations of poor strategy decisions did not render past
     statements false); *In re Jiangbo Pharms. Sec. Litig.*, 884 F. Supp. 2d 1243, 1258-59
27   (S.D. Fla. 2012) (specificity lacking where complaint contained zero "factual
     allegations to establish that [defendant corporation] was a party to the transaction or
28   when the transaction occurred").

4855-0278-0828.v1

investor that reasonable minds could not differ on the question of their importance"""); *see also TSC*, 426 U.S. at 450 (noting that even at the summary judgment stage, the "determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact"). Thus, defendants' unsupported claim that the $300,000 of work TuSimple did for Hydron was "paltry" compared to the Company's total market capitalization is irrelevant. TSP at 21.[15] *See Matrixx*, 563 U.S. at 44 (rejecting bright-line rule for materiality, which requires a "contextual inquiry").[16]

TuSimple's decision to purportedly disclose its "Related Party Transactions" in its SEC filings also triggered its obligation to disclose the Hydron transactions. ¶¶170, 173. By choosing to tell investors of **some** of its related-party transactions, but omitting any mention of Hydron, defendants gave the misleading impression that the Company was not engaged in any other related-party transactions. *Khoja*, 899 F.3d at 1008-09 (even an objectively true statement "may be misleading if it **omits** material information"); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (omission misleading where it "create[s] an impression of a state of affairs that differs

---

[15]   In fact, the $300,000 in Hydron work equaled over 30% of the Company's entire 1Q21 reported revenues, which is clearly material. Defs' Ex. F at 16; *Cheung*, 2012 WL 5834894, at *8 ("[g]iven the magnitude of these [related-party] transactions, both in dollar terms and in proportion to the company's operations as a whole, these transactions are something 'a reasonable investor might have considered . . . important' and so are material").

[16]   *See also Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 974 (N.D. Cal. 2015) ("[e]ven assuming, as Defendants argue, that these misstatements or omissions were 'minor or technical in nature,' and thus quantitatively immaterial, Plaintiff has adequately pleaded materiality because '[i]nvestors have a right to know – and would consider it important'"); *Smilovits v. First Solar Inc.*, 119 F. Supp. 3d 978, 1002-03 (D. Ariz. 2015) ("[b]ut the test for materiality is factual – whether a misrepresented or omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information made available – and Defendants fail to provide undisputed evidence that a reasonable investor would consider a product defect irrelevant if it constitutes, say, only 1.5% of net income"), *aff'd sub nom. Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018).

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-00282-BEN-MSB)

4855-0278-0828.v1

in a material way from the one that actually exists").   In other words, "'once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.'"   *Khoja*, 899 F.3d at 1008-09.

The Company's purported "risk disclosures" statements emphasizing defendants' knowledge of the need to protect TuSimple's intellectual property, the risks associated with the disclosure of that intellectual property, and the risk of government investigations were also false and misleading, as they omitted the fact defendants had ***already*** engaged in related-party transactions with Hydron, which had ***already*** increased the risk of regulatory scrutiny.   ¶¶161-163, 165-166, 171-172, 174-175, 177-178, 186-187, 189-190; TSP at 24-27.   A statement that "speaks entirely of as-yet-unrealized risks and contingencies" is misleading where it does not "alert[] the reader that some of these risks may already have come to fruition."   *Berson v. Applied Signal Tech., Inc*., 527 F.3d 982, 986 (9th Cir. 2008).

This Circuit has consistently held risk disclosures actionable where defendants knew but failed to disclose that the factors they warned of as mere possibilities had already come to pass.   *See id*; *Khoja*, 899 F.3d at 996 (holding complaint sufficiently pled falsity by omission where statements in Form 10-Q warned that new data "'***may*** be inconsistent'" with prior results, when defendants "already [knew] that the 'new data' revealed exactly that"); *Siracusano*, 585 F.3d at 1181 (Form 10-Q statements that were misleading for giving "no indication that the risk 'may already have come to fruition'" were "sufficiently strong to survive a motion to dismiss" where complaint alleged that defendants had knowledge that the risks had materialized); *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *6 (C.D. Cal. June 7, 2018) (same).

***Finally***, defendants' remaining scatter shot arguments are all meritless.   Their claim that any allegations from articles written in news reports must be disregarded as "unreliable" is directly rejected by the authority they cite.   TSP at 20; 41.   *See*

*McKesson*, 126 F. Supp. 2d at 1272 ("[t]o the extent that a newspaper article corroborates plaintiff's own investigation and provides detailed factual allegations, it can – at least in combination with plaintiff's investigative efforts – be a reasonable source of information and belief allegations"); *Garden City Emps.' Ret. Sys. v. Psych. Sols., Inc.*, 2011 WL 1335803, at *44 (M.D. Tenn. Mar. 31, 2011) ("[n]ewspaper accounts are also sufficient bases on which to plead, if not prove, facts giving rise to a claim for securities fraud").[17]  In fact, far from being "unreliable," it was the October 30, 2022 *WSJ* article that first broke the news that the FBI, SEC, and CFIUS were investigating the Hydron transactions, and led to the Company ***admitting*** the next day it had shared sensitive information with Hydron.  ¶¶17-18.  None of the facts cited from the *WSJ* have ever been disputed by the Company or retracted by the paper.

Defendants' claim that Hydron was not a competitor of TuSimple, and rather just an OEM, and so engaging in related-party transactions and sharing intellectual property was "necessary" is directly contradicted by the alleged facts.  TSP at 26.  Far from being "necessary," defendants' actions with Hydron have resulted in FBI, CFIUS, SEC, and Audit Committee investigations, the firing and resignation of multiple executives, and a collapse in the Company's stock price.  Defendants' attempt to spin these facts must be rejected.

## 2.  Defendants' False and Misleading Statements and Omissions Concerning Safety

Defendants repeatedly represented that: (i) safety was TuSimple's number one priority, claiming the Company placed safety "above all else" (¶198) and "before all

---

[17]  Defendants' authority fails to support any notion that *WSJ* reporting is "unreliable and insufficient." TSP at 20. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (discussing consideration of statements from confidential witnesses, not *WSJ* article); *In re Sunrun Inc. Sec. Litig.*, 2018 WL 10323335, at *1 (N.D. Cal. July 19, 2018) (consideration of statement from a reporter identified as a confidential witness, not a published article); *McKesson*, 126 F. Supp. 2d at 1272 (upholding scienter allegations based in part on *WSJ* reporting, holding "if the newspaper article includes numerous factual particulars and is based on an independent investigative effort, it is a source that may be credited").

4855-0278-0828.v1

else" (¶200) as its "primary focus" (¶202); (ii) the Company's employees were not only allowed, but "encouraged to actively identify and address safety concerns" (*id.*); and (iii) the Company's technology was winning the race with its competitors to produce the first "fail safe" (¶209), "feature complete" (¶¶205-206, 208-209, 216, 218) autonomous trucking fleet that achieved "minimal risk condition" (¶¶125, 200, 204, 217, 219) and "eliminate[d] human error" (¶226), and having "removed single point of failure" (¶196).  In reality, each of these statements was false and misleading. ¶¶201, 203, 207, 210, 212, 215, 225, 227, 230.

Courts routinely hold these types of statements actionable.  *See Matrixx*, 563 U.S. at 47 (statement that product's """"safety and efficacy . . . have been well established"""" held actionable); *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 833-34 (N.D. Cal. 2014) ("a reasonable investor would reasonably rely on these assertions of safety coming from the company"); *Uber*, 2020 WL 4569846, at *7 (statement that company was "'committed to enhancing safety'" was false given defendants' alleged knowledge of the company's safety issue).

       a.    **Defendants' Statements that TuSimple's Technology Was "Feature Complete" Were False and Misleading**

TuSimple's challenges to the alleged misstatements concerning TuSimple's technology being "feature complete" fail.  TuSimple moves the goalposts and conflates Plaintiffs' allegations, suggesting that defendants' statements cannot be misleading because they did not say their technology was "free from issue" and that defendants were using the term "'feature ready' consistently with its dictionary definition" all along.  TSP at 27.  According to TuSimple, this meant the technology "'contain[ed] some bugs and requir[ed] other improvements.'"  *Id.* at 27-28. TuSimple's revisionist spin contradicts the Complaints' well-pleaded allegations and was not what the market understood defendants to mean.  In fact, analysts rejoiced at the announcement that TuSimple's technology was "feature complete," describing

4855-0278-0828.v1

these misrepresentations to mean that the trucks utilizing TuSimple's autonomous driving systems could "handl[e] all the conceived 'what if' scenarios." ¶218.

TuSimple challenges these allegations by claiming "Plaintiffs do not even explain what 'feature ready' means," citing to a series of inapposite cases where no explanation whatsoever was given for the meaning of industry-specific terms. TSP at 28.[18] Neither Plaintiffs nor the Court need resort to their dictionaries to determine what defendants meant when they repeatedly described their technology as "feature ready." Defendants provide a definition themselves: "[W]e are feature complete, *which means* our autonomous driving system has *all the capabilities required for true Driver Out operations* along commercial routes, *and that is able to safely mitigate or contain all the edge cases* during operations." ¶205. It is thus no surprise analysts and the market took defendants to mean their systems were "fail safe." ¶209.

### b. Defendants' Statements Purporting to Prioritize Safety Were False and Misleading

Recognizing the plain contradiction between defendants' representations and the truth revealed by the complaint's allegations in *Lindland v. TuSimple, Inc.*, 2022 WL 19001977 (S.D. Cal. Dec. 19, 2022), the confidential TuSimple employee report leaked to Mutha Trucker, the *WSJ* articles detailing TuSimple's disregard for safety, as well as Phil Koopman, the AV technology expert cited by the *WSJ* and interviewed by Plaintiffs' counsel (¶36 n.6), TuSimple asks the Court to ignore all of those sources entirely. TSP at 29-31. But each of the four sources corroborate each other, distinguishing the Complaint's allegations relying on those sources from each of the cases TuSimple cites. *See* TSP at 29-30 (citing *Plumbers & Pipefitters Loc. Union #295 Pens. Fund v. CareDx, Inc.*, 2023 WL 4418886, at *4-*5 (N.D. Cal. May 24, 2023) (relying on a single, uncorroborated, untested complaint); *Bennett v. H&R*

---

[18] Citing *In re Cloudera, Inc.*, 2021 WL 2115303, at *12 (N.D. Cal. May 25, 2021) (finding statements could not be found misleading where there was "[no] definition or explanation" for what the industry-specific term at issue meant); *Primo*, 940 F. Supp. 2d at 1120 (same where there was "no unique meaning" provided).

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-00282-BEN-MSB)

1     *Block Fin. Advisors, Inc.*, 2005 WL 8178042, at \*4 (N.D. Cal. June 1, 2005) (an

2     untested complaint was the "one basis of knowledge"); *In re Conns. Corp. Sec. Litig.*,

3     542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (untested complaint with no "additional

4     bas[is]" for the allegations)).[19]   Further distinguishing these cases is the fact

5     Lindland's allegations have been supported by evidence and survived summary

6     judgement. *See generally Lindland*, 2022 WL 19001977.

7        TuSimple also challenges the relevance of Lindland's allegations here on the

8     grounds that he left the Company prior to the Class Period, citing to a series of cases

9     that reflect now-stale law.  TSP at 30 (citing *Metzler Inv. GMBH v. Corinthian Colls.,*

10    *Inc.*, 540 F.3d 1049, 1066 (9th Cir. 2008); *In re Silicon Image, Inc. Sec. Litig.*, 2007

11    WL 2778414, at \*2 (N.D. Cal. Sept. 21, 2007); *Brodsky v. Yahoo! Inc.*, 592 F. Supp.

12    2d 1192, 1200-01 (N.D. Cal. 2008)).  The Ninth Circuit has since found allegations

13    relying on accounts of pre-class period employees are properly considered.  *See, e.g.*,

14    *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 939 (9th Cir. 2023); *see*

15    *also Quality Sys.*, 865 F.3d at 1145 (crediting statements from witness who "was not

16    at [defendant company] during the Class Period," but who "had personal knowledge

17    of executive-level management's real-time access to" relevant reports).   This is

18    because information from outside the Class Period can "confirm what a defendant

19    should have known during the class period." *In re Scholastic Corp. Sec. Litig.*, 252

20    F.3d 63, 72 (2d Cir. 2001).  And defendants make no suggestion that anything

21    changed between Lindland's departure and the Class Period concerning TuSimple's

22    focus on safety.  Defendants similarly, in prime position to do so, do not contest the

23    accuracy, authenticity, or validity of any of the information conveyed in the Mutha

24    Trucker YouTube video of the April Crash, nor the letter from the FMCSA depicted

25

26

27

---

[19]   TuSimple also relies on a case that is entirely inapposite to support this position. *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1225-26 (C.D. Cal. 2013) (finding allegations in untested complaints immaterial in the context of a truth on the market theory, concerning whether said allegations could put putative plaintiffs on notice of defendants' fraudulent conduct).

28

4855-0278-0828.v1

therein, only waging ad hominem attacks at the sources, whom the Company calls "unreliable." TSP at 30; Ex. 4. The fact that nothing changed is further corroborated by the Class Period and post-Class Period publications by the *WSJ*.[20]

Besides asking the Court to disregard the overwhelming allegations contradicting the Company's prioritization of safety, TuSimple's challenges to the misstatements are limited. TuSimple argues that its statement representing "[e]mployees [we]re encouraged to actively identify and address safety concerns, including via a confidential safety hotline" cannot be actionable, because Plaintiff does not allege the hotline did not exist. TSP at 29. Defendants mischaracterize their own mischaracterization. The general proposition that employees were "encouraged to actively identify and address safety concerns" is the issue, not the specific example of one manner through which those concerns may have been raised. That general proposition is plainly contradicted by Plaintiffs' allegations. In fact, employees were not only not "encouraged" to identify safety concerns, they were dissuaded from doing so (¶261), ignored, and then fired when they did so (¶242).

       **c.**    **The April Crash Revealed the Falsity of Defendants' Statements About Safety, and Rendered Statements that Followed Misleading by Omission**

TuSimple argues that the April Crash, and the reported causes thereof, could not reveal the false and misleading nature of statements made prior to the April Crash, calling these allegations "illogical[]." TSP at 31. Nonsense. This is precisely the logical and temporal nature of causes and effects. When AV's crash due to known safety issues, statements regarding the safety of those cars are revealed to be false. TuSimple goes on to, again, move the goalposts, arguing that Plaintiffs do not state a

---

[20] As to the *WSJ* article, and the sources cited therein, TuSimple wishes to have it both ways – urging the Court to disregard and disbelieve the facts asserted therein that do not serve their position (as relate to TuSimple's focus on safety), but consider and believe the article when it does (suggesting the April Crash was caused in part by human error). TSP at 30-31 & n.31.

4855-0278-0828.v1

1   claim because they did not "plead facts showing TuSimple had **no regard** for safety."

2   *Id.* at 32.  "No regard" is a far cry from the focus and care for safety that TuSimple

3   claimed to maintain.  ¶¶198, 200, 202.  TuSimple then recites a grab-bag of arguments

4   as to why defendants' repeated omissions of the April Crash from updates to investors

5   as to the safety and progress of its technology following the April Crash are not

6   actionable.  TSP at 32-35.  Each fails.

7        TuSimple suggests that statements in the May 2021 SEC Form 10-Q, including

8   defendants' description of "defects, errors, or bugs in [TuSimple's] hardware or

9   software" as mere hypothetical risk factors, are inactionable, because the April Crash

10  was caused by human error.  ¶223.  This argument contradicts the Company's own

11  admission.  ¶246 (confessing the April Crash was "not only a human error" but a

12  result of "software and system-related failures").  TuSimple's corporate admissions

13  are the opposite of the conclusory assertions to which the Company analogizes these

14  allegations.  TSP at 33 (citing *In re Pivotal Sec. Litig.*, 2020 WL 4193384, *7 (N.D.

15  Cal. July 21, 2020)).  And the remaining statements therein concerning the safety and

16  progress of the Company's technology (¶¶221-222) were misleading given the

17  material omission of both the April Crash and the immediate grounding of TuSimple's

18  entire fleet (¶229).

19       Additionally, TuSimple argues that it had no obligation to "rush" disclosure of

20  the April Crash and subsequent grounding of its entire fleet of trucks that followed.

21  TSP at 33-34.  But the Company did not only fail to "rush" disclosure of these facts,

22  defendants consciously omitted both facts from several updates to investors, including

23  a quarterly earnings call and quarterly Form 10-Q filing with the SEC that defendants

24  certified included all material facts.  ¶34.  As demonstrated by defendants' own cases,

25  while companies may take reasonable time to investigate the truth, when the truth is

26  readily available to companies at the time they provide quarterly updates to investors,

27  they do have a duty to disclose those material developments.  *See, e.g.*, *Higginbotham*

28

1    *v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007) ("[t]hat's what the 'Q' means"

2    in "a system of periodic rather than continual disclosures"); *In re Yahoo! Inc. Sec.*

3    *Litig.*, 2012 WL 3282819, *22 (N.D. Cal. Aug. 10, 2012) (delayed disclosure of a

4    material development reasonable because it was disclosed in the first quarterly update

5    to investors that followed), *aff'd*, 611 F. App'x 387 (9th Cir. 2015).

6          Even if TuSimple's arguments that the April Crash did not require disclosure

7    because of a need to investigate the causes thereof had merit (they do not), reasonable

8    minds cannot differ as to whether ***grounding the Company's entire fleet of trucks*** –

9    the Company's core operation (*see infra* §III.B.3.) – ***was material*** and required to be

10   disclosed.  Moreover, TuSimple's arguments that the delay was due to a necessary and

11   lengthy investigation are belied by the timing of the Company's ultimate disclosure of

12   the April Crash's purported causes: the day after the news had leaked to the public, the

13   Company already had its story straight.  ¶¶228-229.

14         TuSimple next challenges defendant Hou's misstatement that claimed

15   TuSimple's technology "eliminate*s* the human error area element involving . . . causes

16   of crashes" only by arguing "Plaintiffs' challenge . . . makes no sense" as "[n]othing

17   in the statement suggests the Company was representing that its technology ***at that***

18   ***time*** prevented all human error." TSP at 34 (emphasis in original).  Not so.  To start,

19   the first word in the statement – and the statement in its entirety – is in the present

20   tense.  There is no other reasonable way to interpret the statement.  Moreover, the

21   Company's prior statements provided investors with the same misleading impression

22   about the "fail safe" (¶209) nature of its technology.[21]  Finally, TuSimple challenges

23   the blog post it issued after news of the April Crash leaked, suggesting it was not

24   misleading.   TSP at 34-35.   This, again, is contradicted by defendants' own

25

26   ─────────────────

27   [21]   TuSimple here cites only one case for the uncontroversial proposition that context
     is important.  TSP at 34 (citing *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
     759 F.3d 1051, 1060 (9th Cir. 2014), the context here was a market that already
     thought TuSimple's technology was "fail safe." ¶209.

28

4855-0278-0828.v1

admissions.  On July 26, 2022, defendants' story began by attributing the crash to "human error" but by November 1, 2022, defendants apparently felt the need to correct the record they created, admitting the April Crash was "not only a human error."  ¶246.

### 3.      The Complaint Adequately Alleges Scienter

A complaint successfully pleads the element of scienter where it "'state[s] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind'" – *i.e.*, that the defendants' conduct was "'***knowing***' or '***intentional***'" or otherwise rose to the level of "'deliberate recklessness.'"  *S. Ferry*, 542 F.3d at 782 (emphasis in original).  A "strong inference" is one that a reasonable person would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007).  When considering scienter allegations, a court must ***not*** "scrutinize each allegation in isolation" and should instead "assess all the allegations holistically."  *Id.* at 326.  An inference of scienter is "strong" when it is "cogent and ***at least as compelling as any opposing inference*** one could draw from the facts alleged."  *Id*. at 324.  The inference "need not be irrefutable . . . or even the 'most plausible of competing inferences.'"  *Id*.  A "'tie goes to the Plaintiff.'"  *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014).  Here, the Complaint alleges that the Exchange Act Defendants had actual knowledge of the Company's interactions with Hydron and the safety issues plaguing TuSimple's technology, or were deliberately reckless in ignoring those facts.  ¶¶232-273.  These allegations alone establish scienter, and defendants' competing inferences simply confirm that this is a question of fact.

#### a.      The Complaint Adequately Alleges Scienter as to the Hydron Statements

The "'fact that the defendants published statements when they ***knew*** facts suggesting the statements were inaccurate or misleadingly incomplete is classic

1   evidence of scienter.'" *Immune*, 375 F. Supp. 2d at 1022 (S.D. Cal. 2005); *see also*

2   *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011).

3   Plaintiffs have adequately alleged that the Exchange Act Defendants were directly

4   involved in the related-party transactions with Hydron.  For example, Hou, Chen, and

5   Chao were all TuSimple senior insiders with deep ties to Hydron.  Chen, co-founder

6   of TuSimple, was not only the Company's President, CEO, and Chairperson of the

7   Board (¶55), but he also was the one to launch Hydron as a rival autonomous trucking

8   company just prior to TuSimple's IPO.  ¶14.  Chen served as a director and CEO of

9   Hydron and at all pertinent times maintained an ownership interest in Hydron greater

10  than 10%.  ¶155.  Chao was a "critical backer" of TuSimple and Hydron and also a

11  "confidant and adviser" to both Chen and Hou, investing in both TuSimple and

12  Hydron.  ¶234.  Hou further admitted that he and Chen "have a long-standing and

13  deep partnership that has helped build this entire company." *Id.*  Chao, Hou, Chen,

14  Zhang, Buss, and Lu are all alleged to have made related-party misrepresentations

15  throughout the Class Period, and accordingly were each involved "involved in the

16  allegedly-fraudulent statement that failed to disclose the transactions." *See, e.g.*,

17  ¶¶160-162, 164-166, 168, 170-171, 173-174, 177, 179, 181-183, 185-187, 189, 191-

18  194.

19       Defendants attempt to reduce Plaintiffs' allegations to "***scienter* by status**" (TSP

20  at 36; Buss MTD at 11-12; Dillon MTD at 4; Hou MTD at 6-7) (emphasis in original),

21  ignore the allegations and the law.  As the Ninth Circuit has explained, "we may

22  consider a senior executive's role includ[ing] . . . whether, given the importance of the

23  information, 'it would be "absurd" to suggest that management was without

24  knowledge of the matter.'" *Alphabet*, 1 F.4th at 706 (scienter alleged as it was absurd

25  to suggest no one told the CEO about key operations information at issue).  Given

26  Hou, Chen, and Chou's deep involvement in both TuSimple and Hydron, it would be

27  beyond absurd to suggest that they were without knowledge of the scheme.  Plaintiffs

28

4855-0278-0828.v1

allege that defendants were aware of, and had direct access to, the adverse undisclosed information about TuSimple's business, operations, and practices via their positions in the upper echelons of TuSimple management.  ¶¶50-67.  Defendants also had access to, *inter alia*, internal corporate documents, conversations and contact with other corporate officers and employees, attendance at meetings, reports, and other information provided to them.  ¶62.  For example, as a result of the NSA, TuSimple entered into a heightened level of required oversight whereby TuSimple periodically met with and reported to certain CFIUS monitoring agencies and "agreed to limit access to certain data and adopt a technology control plan, appoint a security officer and a security director, establish a government security committee of the Board to be chaired by the security director."  ¶235.

Under the "core operations" doctrine, scienter may be imputed to the Exchange Act Defendants "based on the inference that [they] have knowledge of the 'core operations' of the company." *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014); *see also In re Amylin Pharms., Inc., Sec. Litig.*, 2002 WL 31520051, at *8 (S.D. Cal. Oct. 10, 2002) (imputing knowledge of misstatements to officers of small company with few products where misstatements related to company's primary product); *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015) (same).  The core operations doctrine supports an inference of scienter where – as here – "'defendants had actual access to the disputed information'" or where "it would be 'absurd' to suggest that management was without knowledge of the matter." *Reese*, 747 F.3d at 575-76.

Defendants argue that: (1) the allegations based upon Chao's relationship with Hydron fail because they rely upon a *WSJ* article; and (2) Plaintiffs failed to allege facts concerning the value of the Hydron work performed, or the value of information shared.  TSP at 36-37.  These arguments fail for the same reasons Plaintiffs adequately alleged the material falsity of the Hydron misrepresentations.  *See supra* §III.A.2.a;

§III.B.1. Defendants' assertion that Plaintiffs failed to plead that defendants knew the materiality of the concealed related-party transactions should be rejected given that the related-party transactions involved the core of the Company's business – expropriating TuSimple's intellectual property to Hydron, which included "technical data, blueprints and schematics that would enable Hydron to replicate TuSimple's technology."   ¶109; *see also supra* §III.A.2.a.[22]   Defendants next contend that developing autonomous trucking technology is a core operation of TuSimple – not the protection of intellectual property.   TSP at 38.   This logical contortion fails.[23] Defendants ***themselves*** described TuSimple's intellectual property as "an essential asset of [the] business" and the Registration Statement expressly stated that TuSimple's "business may be adversely affected if [it is] unable to adequately establish, maintain, protect, and enforce [its] intellectual property and property rights or prevent third parties from making unauthorized use of [its] technology and other intellectual property rights."   ¶269.  TuSimple's Form 24B4 Prospectus also stated that its "technological differentiation" was a "key driver" of the Company's sales. ¶270.  TuSimple's 2021 Annual Report on Form 10-K further confirmed that the

---

[22]   TuSimple cites a series of inapposite cases in which scienter was lacking because the facts omitted were immaterial and/or there was no duty to disclose them and thus their omission was more likely innocent or, at worst, negligent.  TSP at 37 (citing *Carey Camp v. Qualcomm Inc.*, 2020 WL 1157192, at *6 (S.D. Cal. Mar. 10, 2020); *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1152 (C.D. Cal. 2018); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 202 (2nd Cir. 2009); *Brown v. Brewer*, 2008 WL 6170885, at *2 (C.D. Cal. July 14, 2008); *In re AnaptysBio, Inc.*, 2021 WL 4267413, at *11 (S.D. Cal. Sept. 20, 2021)).  As detailed *supra* (§III.B.1), the Complaint adequately pleads both that the individual defendants were aware of the undisclosed related-party transactions with Hydron and that those omissions were material.

[23]   Here, the misstatements at issue relate to the key (indeed, only) product the company produces, distinguishing it from the cases TuSimple cites.  For example, in *Jackson v. Abernathy*, 960 F.3d 94 (2d Cir. 2020), defendant companies manufactured medical equipment, with the subject matter at issue described as "a 'key product.'" TSP at 38.  TuSimple's remaining cases to this effect are similarly distinguishable.  *Id.* (citing *Rice as Tr. of Richard E. & Melinda Rice Rev. Fam. Tr. 5/9/90 v. Intercept Pharms., Inc.*, 2022 WL 837114, at *22 (S.D.N.Y. Mar. 21, 2022) (an "important," but not only, product), and *AnaptysBio*, 2021 WL 4267413, at *13 (same)).

4855-0278-0828.v1

security of TuSimple's intellectual property was at the core of TuSimple's business. ¶271 (the Company's ability to succeed is dependent on its ability to "maintain, and protect our intellectual property and other proprietary rights relating to our key technology, and our ability to successfully enforce these rights against third parties").

### b. Plaintiffs Adequately Allege Scienter for the Safety Statements

Defendants made specific statements about safety throughout the Class Period, demonstrating that defendants either knew about the then-existing facts that contradicted their statements, or recklessly disregarded that the statements they made were false and misleading. *See, e.g.*, *Roberti*, 2015 WL 1985562, at *12 ("scienter can be established by the fact that the [d]efendants touched on the specific issue . . . in their public statements"). For example, in the lead-up to the IPO, TuSimple posted its 2021 Safety Report and touted how it was developing "the world's safest autonomous truck" and "perform[ing] extensive testing to evaluate the reliability of every component of the system and implement 3-tier redundancy whenever possible. . . . All safety mechanisms, faults, and fault tolerances are validated as is required to meet our functional safety goals." ¶124. The 2021 Safety Report also stated that the trucks were being developed "in accordance with exceedingly high safety standards." ¶125.

Throughout the Class Period, defendants continued to tout the safety of the Company's operations and how key it was to their business. For example, defendant Lu represented to investors that "we're going to ensure safety above all else" (¶198); "[s]afety comes before all else at TuSimple" (¶200); and "we are feature complete" (¶205). Lu and Dillon also told investors that "safety is our primary focus" (¶202); and "[n]ow that we have proven our Driver Out capabilities, our focus fully shifts to commercialization" (¶204). Hou told the market that "we have actually have no unconquered technical challenges on the table" (¶211); and "our autonomous driving system is now feature complete" (¶216). Additionally, TuSimple had set a goal of 500 practice runs prior to completing the initial "Ghost Rider" driverless run in December

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-00282-BEN-MSB)

4855-0278-0828.v1

1    2021, but "had conducted less than half of those [practice runs] when it launched the

2    fully automated drive, which it did without informing its security teams." ¶241.  To

3    the extent defendants "did not in fact have such knowledge, it would be at least

4    actionably reckless to reassure the public about these matters at all." *S. Ferry LP #2 v.*

5    *Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009).

6        Plaintiffs additionally allege particularized facts regarding Hou that were

7    derived from Lindland – a former TuSimple employee in Hou's functional safety

8    department who had numerous personal interactions with Hou.  ¶130.  For example,

9    Lindland stated: "One of Hou's favorite phrases was 'we are going to do Functional

10   Safety the TuSimple way,' meaning ignoring the legal requirements of ISO 26262 and

11   IATF 16949." *Id.*  Lindland also stated that "[d]espite [his] efforts to perform the

12   duties of his job, [he] was prevented from doing so by . . . Mr. Hou" and "[o]n several

13   occasions, Mr. Hou instructed [him] to cease working on functional safety analyses,

14   which made it impossible for [him] to perform his job.  On one occasion, Mr. Hou

15   instructed [Lindland] to stop working on functional safety." ¶131.  At bottom, Hou

16   was at the center of the failure to follow safety standards and regulations.  ¶245.

17       Defendants complain that these allegations fail because they rely upon two

18   unreliable and/or stale sources.   TSP at 39; Buss MTD at 11.[24]   Given the

19   corroborating sources that Plaintiffs rely upon in the Complaint, defendants' argument

20   fails.  *See supra* §III.B.2.b.  Defendants further complain that Lindland's allegations

21   are "unreliable because they are based on his work at TuSimple more than a year

22   before any challenged statement was made." TSP at 39; Buss MTD at 11.  However,

23   the Ninth Circuit has credited statements from witnesses outside the Class Period who

---

[24]  TuSimple's own arguments distinguish the case it cites to rebut the fact that the
Lindland allegations support an inference of scienter.  *Compare* TSP at 39 (conceding
Lindland details specific interactions and direct contacts with defendant Hou) *with
Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 814 (N.D. Cal. 2019) (holding
confidential witness ("CW") allegations did not support inference of scienter where
they detail zero direct or indirect contact with any individual defendant); *Zucco
Partners*, 552 F.3d at 996-98 (same); *NVIDIA*, 768 F.3d at 1064 (same).

had personal knowledge of management's access to relevant information.  *See, e.g.*, *Quality Sys.*, 865 F.3d at 1145; *see also supra* III.B.2.b.[25]

### c.    Multiple Resignations, Terminations, and Departures Support Scienter

Executive departures and resignations that are "'uncharacteristic' or 'accompanied by suspicious circumstances'" support an inference of scienter.  *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *6 (N.D. Cal. June 1, 2020). Plaintiffs allege the suspicious timing of the resignations, terminations, and departures of numerous TuSimple employees – including many at the highest levels of the Company – that demonstrate many of those individuals had been involved in the alleged wrongdoing.  For example, just over a week after TuSimple announced the NSA, Hou was announced as Lu's replacement as President and CEO and Chen as Chairman of the Board.   ¶255.   After the April Crash and the subsequent investigations by the FMCSA and the NHTSA, additional executives began resigning from the Company.  ¶256.  Dillon unexpectedly resigned from his role as TuSimple's CFO five days after Chen publicly disclosed his "launch" of Hydron on June 10, 2022. *Id.*  Less than a month after the Audit Committee commenced an investigation into TuSimple's connection with Hydron, James Mullen resigned from his position as Chief Legal and Administrative Officer effective September 30, 2022.  ¶258.  *See, e.g.*, *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009)

---

[25]   Lindland's allegations provide more than vague conclusions as to the Company's corporate culture, providing the supporting "who, what, where, or when."  *Compare John Lechner v. Infusystem Holdings, Inc.*, 2017 WL 11593803, at *5-*6 (C.D. Cal. Dec. 15, 2017) (finding no scienter based on CW that vaguely "'described a corporate culture'" but provided no details at all as to the supporting "'who, what, where, or when'") *with* ¶129 ("Lindland details numerous incidents" in which Hou (who) gave Lindland the impression he considered safety "a waste of [his team's] time" (what)), ¶130 (Lindland asked to falsify safety information (what)), ¶131 ("Mr. Hou instructed [Lindland] to stop working on functional safety" (what)), ¶261 (Lindland "wrongfully fired after he refused to sign off on safety standards that the Company had yet to meet" (what)), and ¶129 (during his time at TuSimple (where) "from August 2018 through March 2020" (when)).

4855-0278-0828.v1

1  ("[a]t the very least, the timing of Defendants' departures might suggest that the
2  Company believed Defendants had been involved in wrongdoing").

3       Then, a day after the *WSJ* investigative report "TuSimple Probed by FBI, SEC
4  Over Its Ties to a Chinese Startup" was published, and in the same press release that
5  contained the October 31, 2022 corrective disclosure, defendants also announced that
6  Hou had been terminated.  ¶19.  In a press release issued one week later, on November
7  7, 2022, TuSimple confirmed Hou's termination was "due to concerns about his lack
8  of candor and transparency with the Board.  The decision to terminate Dr. Hou was
9  ***made in connection with an ongoing investigation that was initiated by the Board's***
10 ***Audit Committee***."   ¶22.   The *San Diego Union-Tribune* further reported that
11 TuSimple had "fired" "Hou after an internal probe found that [the] [C]ompany shared
12 confidential information with a Chinese startup without proper disclosures."  ¶19.
13 Buss also confirmed the "decision to terminate the CEO . . . was made in connection
14 with an ongoing internal investigation launched by the Audit Committee in July."
15 ¶21.  *See WageWorks*, 2020 WL 2896547, at *6 ("The use of the same statement and
16 the close temporal proximity to the initial revelations weigh against an innocent
17 inference that defendants resigned for 'unrelated personal or business reasons.'").

18      Shortly thereafter, on November 10, 2022, Hou and Chen leveraged their
19 combined majority power to take control of the Board by ousting the remaining
20 TuSimple directors, and appointed Chen and Lu as directors, creating a non-
21 independent Board.    ¶¶248-249.   Just three weeks later, KPMG resigned as
22 TuSimple's auditor while it was actively investigating Chen on the Audit Committee's
23 behalf in connection with the Hydron scheme, with TuSimple disclosing that the
24 resignation was the "result of recent events that culminated in the dismissal of
25 [TuSimple's] previous Board . . . including its Audit Committee."  ¶260.  Also, after
26 the Class Period, following the *WSJ's* February 1, 2023 report that the Justice
27 Department had been "urged" by CFIUS to "consider economic-espionage charges"
28

4855-0278-0828.v1

1  against Hou and Chen for their undisclosed Hydron ties and an internal investigation
2  into claims that Hou was poaching TuSimple talent in the prior months, TuSimple
3  announced Hou's resignation from the Board on March 13, 2023.  ¶¶145, 252.

4      Plaintiffs further allege that dozens of TuSimple employees in key roles
5  departed the Company and the *WSJ* reported that "those who raised safety concerns
6  were ignored, or even fired in some instances."  ¶261.  *See, e.g.*, *Fouad v. Isilon Sys.,*
7  *Inc.*, 2008 WL 5412397, at *11-*12 (W.D. Wash. Dec. 29, 2008) (allegations of fraud
8  supported by the fact that the former CEO and CFO "left their positions . . . two weeks
9  before the Audit Committee announced that it would be conducting an internal
10 investigation" of revenue recognition practices); *Hall v. The Children's Place Retail*
11 *Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) ("[CEO's] forced resignation
12 and Deloitte's resignation 'add to the overall pleading of circumstantial evidence of
13 fraud'"); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 127
14 (S.D.N.Y. 2013) (holding that the resignations of the company's CFO and
15 independent auditor supported a finding of scienter).  Notably, after ousting the Board
16 that fired him to regain control of the Company, defendant Hou later resigned in
17 March 2023 while under active investigation by the Audit Committee for ***again***
18 pilfering the Company's intellectual property that the Company's Class Period SEC
19 filings falsely vowed to protect.  *See* ¶¶27, 146-147, 252; *Middlesex Ret. Sys. v. Quest*
20 *Software Inc.*, 527 F. Supp. 2d 1164, 1188 (C.D. Cal. 2007) (finding scienter pled
21 where insider resigned specifically to avoid cooperating with internal investigation).

22     Defendants argue these resignations, terminations, and departures fail to support
23 scienter because they are not "in any way related to anyone misleading the market,"
24 "purely a matter of internal governance," and there are "any number of reasons that an
25 executive might resign" that had "nothing to do with the accuracy of any challenged
26 statement."  TSP at 40-41.  That defendants would have the Court believe ***none*** of
27 these resignations, terminations, and departures are suspicious and related to the

28

4855-0278-0828.v1

scheme given the magnitude and timing of each strains credulity and "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.[26] Finally, Lu also asserts that his resignation as President and CEO on March 3, 2022 does not support scienter because he would later return as CEO after the end of the Class Period. Lu MTD at 9-10. But why Lu returned after the fraud was revealed does nothing to explain the suspicious timing of why he departed shortly after the resolution of the CFIUS investigation. *See, e.g.*, *Lamartina v. VMware, Inc.*, 2021 WL 4133851, at *14 (N.D. Cal. Sept. 10, 2021) (executive resignation in proximity to SEC investigation "'add[s] [a] piece to the scienter puzzle'").

### d. Defendants' Stock Sales Are Indicative of Scienter

Plaintiffs allege that both Chao and Lu's insider stock sales support a motive to commit fraud. ¶¶262-267. "[P]ersonal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325. At the start of the Class Period, Chao sold 6,756,756 shares of TuSimple's stock, reaping an astounding ***$270,270,240*** in proceeds. ¶262. Lu, through multiple sales at suspicious times throughout the Class Period, sold over 330,422 shares for a gain of ***$13,203,096***. ¶267. Defendants argue this insider trading does not support scienter, but none of their arguments pass muster.

First, Chao argues that his sale of over 7 million shares through Sun Dream does not support an inference of scienter, as the shares were owned by Sun Dream and

---

[26] The facts here are in stark contrast to the bare allegations in the cases relied upon by defendants. TSP at 40-41. *See In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1092 (N.D. Cal. 2005); *AnaptysBio*, 2021 WL 4267413, at *13 (lack of suspicious circumstances surrounding resignations); *In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *9 (E.D.N.Y. Aug. 6, 2019) (departure of individual not alleged to have been involved in actual fraud); *In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1040 (S.D. Cal. 2014); *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) ("the announcement of an investigation, without more, is insufficient to establish ***loss causation***"); *Camp*, 2020 WL 1157192, at *6, is entirely inapposite – the CFIUS investigation there was not into the defendant corporation or individual defendants' wrongdoing, but initiated by defendants to heighten regulatory scrutiny into a potential acquisition. *Id.* at *1.

were sold pursuant to a prospectus with no actionable statement.  TSP at 43-44. However, it is not disputed that Chao controls Sun Dream (¶11; Defs' Ex. E at 3 n.3), and even the indirect receipt of insider trading sales is indicative of scienter.  *See Snellink*, 870 F. Supp. 2d at 941 (individual defendant's wife's class period stock sales supported inference of scienter).  Chao also argues that his sale was not suspicious because it only represented 21% of Sun Dream's shares.  TSP at 43.[27]

The Ninth Circuit holds by contrast that "where, as here, stock sales result in a truly astronomical figure, less weight should be given to the fact that they may represent a small portion of the defendant's holdings." *Oracle*, 380 F.3d at 1232.  Lu similarly argues that his insider sales are not suspicious because he only sold 9%-10% of his shares over the Class Period (including versus not including vested options).  TSP at 45.  Courts have found a strong inference of scienter where total sales percentages were smaller.  *See, e.g.*, *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *14-*15 (C.D. Cal. July 1, 2008) (7%); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) (7.6%).

Both Chao and Lu argue that their sales were not made at Class Period highs, thereby negating scienter (TSP at 44-45), but this argument has been rejected by courts.  *See, e.g.*, *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *19 (N.D. Cal. 27, 2018). Relying on out-of-circuit authority, Chao and Lu claim their sales were not suspicious because they were far removed, prior to any alleged corrective disclosure, but courts have rejected this argument as well.  TSP at 44-45.  *See, e.g.*, *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *17 (C.D. Cal. Oct. 1, 2013) (sales more than ten months before first disclosure probative of scienter); *Karinski v. Stamps.com, Inc.*, 2020 WL

---

[27] TuSimple's cases do not create the bright line rule the Company suggests. *Compare* TSP at 43 (citing *AnaptysBio*, 2021 WL 4267413, at *9; *Metzler*, 540 F.3d at 1067; and *Osher v. JNI Corp.*, 256 F. Supp. 2d 1144, 1163-64 (S.D. Cal. 2003) to suggest a defendant selling 21% of his holdings could never support an inference of scienter) *with Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (holding a defendant's sale of 2.1% of his holdings supported an inference of scienter).

281716, at *15 (C.D. Cal. Jan. 17, 2020) (sales "an entire year" before disclosures probative of scienter).

Defendants argue that because no other individual defendants sold shares during the Class Period, no permissible inference can be drawn based on Chao and Lu's trading. TSP at 43; Chen MTD at 7-8; Dillon MTD at 3-4; Hou MTD at 8-9. However, courts have held that "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period. . . . In other words, the lack of stock sales by a defendant *is not dispositive* [of] scienter." *Am. W.*, 320 F.3d at 944. Lu also argues that his increased holdings of TuSimple forecloses an inference of scienter (Lu MTD at 7), but all of his acquisitions were through stock compensation awards. *See, e.g.*, Defs' Ex. U at 3 n.9; *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *15 (N.D. Cal. Mar. 31, 2023) (finding individual defendants' increased class period holdings of 31% and 19% resulting from compensation awards, and not volitional purchases, does not negate scienter). Lu further argues that because his sales were non-discretionary, they cannot support scienter, but this argument has also been rejected. Lu MTD at 7-8; *see City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2022 WL 4491093, at *12-*13 (S.D. Cal. Sept. 27, 2022). Finally, Lu asserts that Plaintiffs failed to connect his sales to three random events. TSP at 45. This completely ignores Plaintiffs' well-plead allegations that Lu sold: (i) in September 2021 at the tail end of CFIUS' 45-day investigation into TuSimple's 2017 purchase of its U.S. business – which ultimately resulted in the NSA agreement; (ii) in late 2021 while a group of employees had raised significant safety and security complaints; and (iii) throughout 2021 while TuSimple employees were working on matters for Hydron – undisclosed to investors. ¶¶263-267.

### 4. Defendants' Additional Scienter Arguments Fail

Defendants' various additional scienter arguments are without merit. First, defendants' argument that TuSimple's June 2023 announcement that it was

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-00282-BEN-MSB)

4855-0278-0828.v1

1   considering selling its U.S. business could be attributed to "any number of reasons"

2   (TSP at 42) fails because it ignores the Complaint's allegations that the timing of the

3   announcement came just months after reports that economic-espionage charges were

4   being considered against TuSimple's leaders, and news of an internal investigation

5   into Hou's attempt to poach TuSimple employees for Hydron – which led to Hou's

6   resignation from the Board.  ¶¶251-252.  Second, Hou contends that Plaintiffs failed

7   to allege a rational theory of scienter for him, arguing that he "had no financial interest

8   in Hydron (but a huge financial interest in the Company)," that acting in favor of

9   Hydron would be "against his own interest," and that it was "nonsensical" that Hou

10   "intended to harm his own company by neglecting safety concerns."  Hou MTD at 5-

11   6.  However, the absence of personal financial gain not dispositive of scienter.

12   *Tellabs*, 551 U.S. at 325.[28]   Moreover, defendants' arguments ignore Plaintiffs'

13   well-pled allegations that demonstrated that he, for example: (1) aided Chen and

14   Hydron by expropriating TuSimple's intellectual property and transferred it to

15   Hydron, which included "technical data, blueprints and schematics that would enable

16   Hydron to replicate TuSimple's technology" (¶102); (2) was at the center of the

17   failure to follow safety standards and regulations (¶245); and (3) resigned from the

18   Board after an internal investigation into reports that he was poaching TuSimple talent

19   for Hydron (¶252).   Third, Chen argues that the related-party transactions were

20   "unworthy of disclosure" and "not consequential" and that there is no plausible motive

21   alleged for him to conceal the related-party transactions.  Chen MTD at 8.  The

22   transfer of TuSimple's intellectual property to Hydron cannot be so easily brushed

23   aside.  ¶102.  *See also Tellabs*, 551 U.S. at 324.

24

25

---

26   [28]   Hou's suggestion that "he lost enormous sums," was "the biggest victim" in this

27   case, and thus could not have scienter (Hou MTD at 1) falls flat.  While Hou's net
worth declined on paper, he did not "lose" money he put into the Company, and that
the fraud did not pan out as well as he may have hoped does not negate scienter.

28

4855-0278-0828.v1

### 5.    The Complaint Adequately Pleads Scheme Liability

Plaintiffs allege facts showing that defendants TuSimple, Chao, Hou, Chen, Zhang, and Lu engaged in a course of conduct that operated as a fraud on investors, known as "'scheme liability.'" *Lorenzo v. Secs. & Exch. Comm'n*, 587 U.S.__, 139 S. Ct. 1094, 1101 (2019); ¶¶376-379.  SEC Rule 10b-5 makes it unlawful for any person to "employ any device, scheme, or artifice to defraud" or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[] in connection with the purchase or sale of any security."   17 C.F.R. §240.10b-5(a), (c).  "These provisions capture a wide range of conduct." *Lorenzo*, 139 S. Ct. at 1101.  The Complaint details defendants' intentional fraudulent scheme, including that they controlled and financed Hydron, incorporated Hydron in Delaware just two weeks before TuSimple's IPO, and then secretly transferred TuSimple's proprietary technology via related-party transactions to Hydron without Board approval or informing TuSimple shareholders, and concealed the fact that the Board had launched an internal investigation in July 2022 into the Company's ties to Hydron.  ¶¶14-15.

Defendants also completed TuSimple's IPO and allowed Chao to cash out more than $270 million while concealing TuSimple's safety record from shareholders and regulators.   ¶377.   These allegations are precisely the type of scheme allegations courts have held are sufficient to state a claim under Rules 10b-5(a) and (c). *See, e.g.*, *Aqua*, 2019 WL 3817849, at *9 (Denying motion to dismiss where "[p]laintiff has sufficiently alleged that Defendants intentionally engaged in a fraudulent scheme to conceal material facts, thereby leading to the dissemination of untrue statements about the commercial viability of the process.  This alleged scheme went beyond the making of any alleged misrepresentations and statements."); *In re Vaxart, Inc. Sec. Litig.*, 2023 WL 3637093, at *3 (N.D. Cal. May 25, 2023) ("[defendants] did not merely trade on material nonpublic information; they participated in an intentional scheme to

4855-0278-0828.v1

1   manipulate the price of [company] shares for the purpose of selling them at an

2   artificially inflated price . . . [selling] a substantial number of shares to profit from

3   [company's] misleading statements").

4        The Supreme Court has rejected defendants' argument (TSP at 47) that these

5   provisions are "violated only when conduct other than misstatements is involved."

6   *Lorenzo*, 139 S. Ct. at 1101-02; *Alphabet*, 1 F.4th at 709.   Rather, there is

7   "considerable overlap" between the subsections of SEC Rule 10b-5, and scheme

8   liability under subsections (a) and (c) can be based on a scheme to take advantage of

9   misleading statements – even while subsection (b) speaks to the actual making of such

10  statements.  *See Lorenzo*, 139 S. Ct. at 1102; *see also In re CytRx Corp. Sec. Litig.*,

11  2015 WL 5031232, at *12 (C.D. Cal. July 13, 2015).

## 6.        The Complaint Adequately Alleges Loss Causation

13       Hou's single-page argument that the Complaint does not satisfy the threshold

14  for pleading loss causation fails.  Hou MTD at 10-11.  The inquiry into loss causation

15  requires "no more than the familiar test for proximate cause."  *First Solar*, 881 F.3d at

16  753; *accord Dura Pharms. v. Broudo*, 544 U.S. 336, 347 (2005) (plaintiff need only

17  "provide a defendant with some indication of the loss and the causal connection that

18  the plaintiff has in mind").  "[L]oss causation is a 'context dependent' inquiry, as there

19  are an 'infinite variety' of ways for a tort to cause a loss" (*Lloyd v. CVB Fin. Corp.*,

20  811 F.3d 1200, 1210 (9th Cir. 2016)), including by identifying price declines that

21  accompany the materialization of concealed risks or the disclosure of information

22  previously concealed by fraud.  *First Solar*, 881 F.3d at 753-54; *In re Gilead Scis. Sec.*

23  *Litig.*, 536 F.3d 1049, 1057-58 (9th Cir. 2008).  The Complaint easily meets these

24  standards, as it alleges in specific detail how the alleged corrective disclosures on

25  March 3, August 1, October 30, December 5, and December 20, 2022, revealed that

26  Hydron's safety statements were false and misleading and caused TuSimple's stock to

27  decline.  ¶¶274-299.

28

### C.     Defendants' Remaining Arguments Fail

#### 1.     The Complaint States Claims Under §§15 and 20(a)

Defendants argue that Plaintiffs' §§15 and 20(a) claims fail because Plaintiffs' primary violation claims are not adequately alleged.  TSP at 50; Chen MTD at 9. Because Plaintiffs have pled primary violations under the Securities Act and Exchange Act, their control person allegations under §§15 and 20(a) should be sustained.  "'[S]ection 20(a) [of the Exchange Act] is an analogue of section 15 of the Securities Act.'"  *In re Daou Sys., Inc. Sec. Litig.*, 397 F.3d 704, 725 (9th Cir. 2005); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  Chen, Dillon, and Buss nevertheless try to suggest that Plaintiffs failed to plead specific facts as to each of their day-to-day participation required under a §20(a) claim.  Chen MTD at 9-10; Dillon MTD at 5; Buss MTD at 7-8.[29]  "'[C]ourts have found general allegations concerning an individual's title and responsibilities to be sufficient to establish control.'"  *Montage*, 78 F. Supp. 3d at 1228.    Additionally, allegations that a defendant spoke on behalf the company, including the signing of statements that contained the material misrepresentations, demonstrate control.  *Id.*  Here, Plaintiffs made myriad specific allegations as to Chen, Dillon, and Buss regarding their day-to-day control, including details concerning their title, responsibilities, statements that

---

[29]  Defendants' authorities are thus inapposite.  *See* Chen MTD at 10 (citing *Arthur Children's Tr. v. Keim*, 994 F.2d 1390, 1396-97 (9th Cir. 1993) (one director who had nothing to do with prospectus and the other "had minimal interaction with the company, due partly to ill health"); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 258 F. Supp. 3d 1037, 1048-49 (N.D. Cal. 2017) (chairman did not control the company or exercise that control by removing the entire audit committee)); Chen MTD at 5 n.6 (citing *Howard*, 228 F.3d at 1065-66 (supporting a finding of control where the court found control by defendant who participated in day-to-day management and reviewed and signed financial statements)); and Dillon MTD at 5 (citing *Luna v. Marvell Tech. Grp.*, 2017 WL 2171273, at *6 (N.D. Cal. May 17, 2017) (plaintiffs alleged the company was "'family run and controlled,'" thereby foreclosing control liability for other defendants)).

1  they signed that contained the material misrepresentations, and other instances where

2  each spoke on TuSimple's behalf.[30]  These allegations are more than sufficient.

3  ### 2. Lu and Buss Made False and Misleading Statements

4  As Lu acknowledges, his absence from TuSimple during seven of the over

5  twenty months spanning the Class Period does not prevent his liability for the false

6  and misleading statements he made during his time as the Company's President and

7  CEO.  Lu MTD at 3; ¶58.  Of course, Plaintiffs do not seek to hold Lu liable for

8  statements made in his absence.  However, as TuSimple acknowledges and Lu does

9  not dispute, a majority of the misstatements alleged in the Complaint were adequately

10 alleged to have been "made by" Lu.  Lu MTD at 3; Defs' Ex. A at 3-12.  Buss argues

11 he cannot be liable for any of the safety misstatements because he did not make them.

12 Buss MTD at 8-10.  Not so.  The Complaint adequately alleges materially false and

13 misleading statements and omissions in the Registration Statement regarding safety.

14 Defendant Buss signed the Registration Statement, and thus is a "maker" of and liable

15 for the alleged misstatements therein.  ¶60; *Special Situations Fund III QP, L.P. v.*

16 *Brar*, 2015 WL 1393539, at *3 (N.D. Cal. Mar. 26, 2015).  This fact alone

17 distinguishes the cases cited by Buss.  Buss MTD at 8-10.

18 ## IV. CONCLUSION

19 For the foregoing reasons, defendants' motions should be denied in their

20 entirety.

21 DATED:  January 29, 2024                Respectfully submitted,

22

23                                          s/ Lucas F. Olts
                                          LUCAS F. OLTS

24

25

---

26 [30]  *See, e.g.*, ¶¶7, 14-15, 21, 23-25, 30, 55, 59-60, 86, 108-109, 113-114, 119-122,
27 155, 158, 163-164, 168, 170, 173, 176, 178-179, 187, 196, 199, 202-204, 207, 214-215, 220, 225, 233-234, 237, 248-249, 287, 382, 385, 388-395.

28

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-00282-BEN-MSB)

1

2    ROBBINS GELLER RUDMAN
    & DOWD LLP
3    DARREN J. ROBBINS
   LUCAS F. OLTS
4    JENNIFER N. CARINGAL
   HEATHER G. GEIGER
   STEPHEN JOHNSON
5    655 West Broadway, Suite 1900
   San Diego, CA 92101
6    Telephone: 619/231-1058
   619/231-7423 (fax)
7    darrenr@rgrdlaw.com
   lolts@rgrdlaw.com
8    jcaringal@rgrdlaw.com
   hgeiger@rgrdlaw.com
9    sjohnson@rgrdlaw.com

10   Lead Counsel for Lead Plaintiff Indiana
   Public Retirement System, and Named
11   Plaintiff Michelle Poirier

12   KAHN SWICK & FOTI, LLP
   RAMZI ABADOU
13
          s/ Ramzi Abadou
14           RAMZI ABADOU

15   580 California Street, Suite 1200
   San Francisco, CA 94104
16   Telephone: 866/467-1400
   ramzi.abadou@ksfcounsel.com
17
   KAHN SWICK & FOTI, LLC
18   ALEXANDER L. BURNS (*pro hac vice*)
   ALEXANDRA PRATT (*pro hac vice*)
19   JAMES T. FETTER (*pro hac vice*)
   1100 Poydras Street, Suite 960
20   New Orleans, LA 70163
   Telephone: 504/455-1400
21   alexander.burns@ksfcounsel.com
   alexandra.pratt@ksfcounsel.com
22   james.fetter@ksfcounsel.com

23   Counsel for Named Plaintiff Robert Miller

24

25

26

27

28

- 56 -

4855-0278-0828.v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SIGNATURE CERTIFICATION

Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative Policies and Procedures Manual, I hereby certify that the content of this document is acceptable to counsel for Plaintiffs, and that I have obtained counsel's authorization to affix his electronic signature to this document.

DATED:  January 29, 2024

_____
s/ Lucas F. Olts
LUCAS F. OLTS

4855-0278-0828.v1