# EXHIBIT 1

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Phillip Kim
Jing Chen
Daniel Tyre-Karp
Robin Howald
275 Madison Ave, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
      pkim@rosenlegal.com
      jchen@rosenlegal.com
      dtyrekarp@rosenlegal.com
      rhowald@rosenlegal.com

*Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE DIDI GLOBAL INC. SECURITIES LITIGATION<br><br>This Document Related To: All Actions | Master Docket<br><br>21-CV-5807 (LAK)(VF)<br><br>**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................................ 1

II.   JURISDICTION AND VENUE ................................................................................. 10

III.  CLASS ACTION ALLEGATIONS ......................................................................... 10

IV.  PARTIES ...................................................................................................................... 12

   A.   Plaintiffs ............................................................................................................ 12

   B.   Didi Defendants ............................................................................................... 12

   C.   Underwriter Defendants .................................................................................. 14

   D.   Relevant Non-Parties ....................................................................................... 17

V.   BACKGROUND FACTS .......................................................................................... 18

   A.   The Chinese Communist Party Controls All Branches of Government, Chinese Commerce, and Is Integrated Into the Structure of All Companies; Businesses Are Expected to Heed All Regulators' Directives in Addition to Complying With Laws and Regulations ................................................................................................... 18

   B.   The Cyberspace Administration of China Is a Powerful Agency Directly Supervised by President Xi Jinping to Enforce His Internet, Network, and Data Security Policies ............................................................................................................. 20

       1.   The Cyberspace Administration of China is under the direct leadership of Xi Jinping ...................................................................................................... 21

       2.   Amid growing tensions with the United States, Xi Jinping stresses the importance of cybersecurity to China ................................................................. 22

   C.   To Carry Out President Xi's Directives, China Has Enacted a Series of Laws to Protect National Security, Cybersecurity, Data Security and Private Personal Data ........................................................................................................................ 27

       1.   The Standing Committee of the National People's Congress's Decision on Strengthening Information Protection on Networks .................................... 28

       2.   The National Security Law of China .......................................................... 28

       3.   The Cybersecurity Law of China ................................................................ 29

4.	Data Security Law...................................................................................... 31

5.	Personal Information Protection Law ("PIPL")..................................... 32

D.	To Implement Xi's Cybersecurity Vision, the CAC Adopted Extensive Regulations to Enforce China's National Cybersecurity Laws ......................................... 32

1.	Provisions on the Administration of Mobile Internet Applications Information Services (the "Provisions")................................................................................. 33

2.	Interim Measures for the Administration of Online Taxi Booking Business Operations and Services (the "Taxi Booking Measures")........................... 33

3.	The Measures of Cybersecurity Review (the "CSR Measures") ............................. 34

4.	Regulations on the Scope of Necessary Personal Information for Common Types of Mobile Internet Applications ........................................................ 35

E.	Didi Collects Personal Information as Well as Mapping and Traffic Data Concerning China's Critical Infrastructure Information; Didi Was Required to Comply With Both Cybersecurity and Privacy Laws and Regulations and the CAC ................................................................................................................................ 35

F.	Defying Xi Jinping and the CAC's Directives Created a Serious Risk of Material Harm to Didi's Current Business and Future Growth................................... 38

VI.	DEFENDANTS HAD AN AFFIRMATIVE DUTY TO CONDUCT A REASONABLE DUE DILIGENCE INVESTIGATION OF DIDI'S BUSINESS .................................. 42

VII.	Defendants Had An Affirmative Obligation to Disclose THE OMITTED FACTS IN THE REGISTRATION STATEMENT .................................................................. 43

A.	17 C.F.R. §229.105 – Item 105 (Risk Factors) ..................................................... 43

B.	Form F-1 – Item 5(D) (Trend Information) ......................................................... 44

VIII.	THE OMITTED FACTS AND JULY 2 PENALTIES WERE MATERIAL............... 47

A.	The CAC Directives and Didi's decision to disobey it was material information for IPO Investors................................................................................................................. 47

B.	The July 2 Penalties Were Material to Didi's Business....................................... 47

IX.	SECURITIES EXCHANGE ACT CLAIMS............................................................. 51

A. The Cyberspace Administration of China Instructed Didi Not to Go Public Until Didi Completed a Thorough Self-Inspection Ensuring Its Compliance with Relevant Cybersecurity Laws and Regulations...................................................... 51

B. Didi and the Officer Defendants Were Determined to Push Ahead With the IPO, Regardless of the CAC's Directives.................................................. 58

C. Defendants' Misconduct Caused Didi's Share Price to Decline .................................. 67

D. Section 10(b) Allegations Against Didi Only ................................................. 80

E. Section 10(b) – Rule 10b5-1 Insider Trading Allegations Against Didi Only ........... 81

F. Section 10(b) - Rule 10b-5(a) and (c) Allegations Against the Officer Defendants and Didi Only.................................................................. 82

G. Additional Scienter Allegations ................................................. 84

H. Presumption of Reliance.................................................................. 88

COUNT I.................................................................................. 88

1. Liability Against Didi for Not Disclosing that the CAC Had Directed Didi to Postpone the IPO Until It Had Fully Complied with the CAC Directives ............ 89

2. Section 10(b) and Rule 10(b)(5) Liability for Insider Trading Against Didi.......... 89

3. Liability Against Didi and the Officer Defendants for Delivering False Officer Certificates to the Underwriters that Deceived them into Closing the IPO and Delivering the ADSs.................................................................. 90

As to All Section 10(b) Claims ................................................. 91

COUNT II................................................................................ 92

COUNT III............................................................................... 92

X. SECURITIES ACT CLAIMS................................................. 93

A. Summary of Allegations Pertaining to the IPO ................................................. 94

B. Defendants Had a Duty to Disclose the Omitted Facts.................................. 102

C. Defendants Statements in the Underwriting Agreement Were Not True or Correct .......................................................................................... 103

iii

**D.** **Defendants Were Negligent in Exercising their Due Diligence Responsibilities and Preparing the Registration Statement** ........................................................................ 106

**COUNT IV** ............................................................................................................................ 107

**COUNT V** ............................................................................................................................. 108

**COUNT VI** ........................................................................................................................... 109

**XI.** **PRAYER FOR RELIEF** ................................................................................................... 110

**XII.** **JURY TRIAL DEMANDED** ............................................................................................ 111

Lead Plaintiff Junhong Cao and named plaintiffs Shereen El-Nahas, Alaka Holdings Ltd., Bosco Wang, Daniil Alimov, and Njal Larson ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, newswire and press releases, media reports of interviews with (i) representatives of Didi Global Inc. ("Didi" or the "Company") and the Underwriters (defined below), and (ii) government officials, and statements published by Didi and the Underwriters regarding Didi.

## I.  INTRODUCTION

1.      This is a securities class action on behalf of all purchasers of Didi's American Depositary Shares ("ADSs") from June 30, 2021, through July 21, 2021 (the "Class," and the period from June 30, 2021, to July 21, 2021, both dates inclusive, is the "Class Period").[1]

2.      Plaintiffs bring the following claims on behalf of the Class: (1) Sections 11 and 15 under the Securities Act of 1933 (the "Securities Act") for all purchasers of Didi ADSs pursuant

---

[1] Excluded from the Class are: (a) Defendants; the present and former officers and directors of Didi, Softbank, Uber Technologies, Inc, Alibaba Group Holdings, Inc., Tencent Holdings, Inc., Boyu Capital or the Underwriters at all relevant times; such excluded persons affiliates, subsidiaries, members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and (b) any entity that any of the Defendants, or any excluded person under subsection (a) controlled or has or had a majority ownership interest at any time. In addition, any persons who suffered no compensable losses under the federal securities laws are excluded from the Class.

1

and/or traceable to the Registration Statement and Prospectus (collectively, the "Registration Statement") in connection with Didi's June 30, 2021, initial public offering ("IPO"); (2) Sections 12(a)(2) and 15 under the Securities Act for all purchasers at the IPO price directly from one of the Underwriters in the IPO; (3) Sections 10(b) and 20(a) under the Securities Exchange Act of 1934 (the "Exchange Act") for all purchasers of Didi ADSs during the Class Period; and (4) Sections 20A and 20(a) under the Exchange Act for all purchasers of Didi ADSs contemporaneous with the sale by Didi of Didi ADSs.

3. Founded in 2012, Didi is a ride-hailing business headquartered in the People's Republic of China ("China" or "PRC"). In the financial press, Didi is often referred to as "the Uber of China." After a series of mergers and acquisitions (including the purchase of Uber China), Didi boasted 377 million active users in China in the year ended March 2021. At the time of its June 2021 IPO, Didi was riding high, enjoying near-complete market dominance in China.

4. The Chinese Communist Party ("CPC" or "Party") has complete control not only over all branches of government in China, but also controls Chinese commerce, the internet in China, and internet-based businesses. Over the past 10 years, the Chinese government has enacted numerous laws and regulations designed to further tighten the Party's grip over cyberspace and the troves of data amassed by internet-based companies in China.

5. The Cyberspace Administration of China (the "CAC") is the government agency responsible for regulating the internet, internet-based businesses and their activities, and the collection, storage, and protection of any type of digital information.

6. The CAC has immense power to regulate the activities of internet-related businesses. This includes, among other things, the power to close businesses, shut down or suspend websites, remove mobile apps from app stores, and to prohibit the business from taking on

customers if the CAC believes the business is violating laws and/or regulations concerning national security, cybersecurity, data security, and/or personal privacy. Because the CAC has wide discretion to mete out these punishments, it has tremendous power to enforce the laws and regulations under its jurisdiction.

7.     Didi's business runs almost entirely on an internet-based platform for all aspects of its operations, including navigating vehicles, communicating with and billing customers, managing and paying drivers, and collecting, managing, and analyzing various related data. As such, Didi's operations fall squarely under the regulatory authority of the CAC.

8.     On Wednesday, June 30, 2021, Didi commenced the IPO, announcing that "[t]he closing of the offering is expected to occur on July 2, 2021, subject to the satisfaction of customary closing conditions."

9.     Didi's IPO Registration Statement omitted material facts required to be stated therein.

10.     Specifically, the Registration Statement failed to inform investors that the CAC directed Didi to postpone its IPO in the United States until after Didi had completed – to the CAC's satisfaction – a thorough self-inspection of its business, operations and policies, including but not limited to a cybersecurity review, to ensure compliance with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information, and rectified any violations (the "CAC Directives" or the "Directives").

11.     Didi had given the CAC the impression that it would follow the Directives. Instead, Didi went forward with its $4.4 billion IPO on the morning of June 30, 2021. It was the second

3

largest ever U.S. IPO of a Chinese firm, falling behind only the historic $25 billion Alibaba U.S. IPO in 2014.

12. When trading commenced at 9:30 a.m. in New York on June 30, it was 9:30 in the evening (of that same day) in Beijing. China was a few hours away from a very important national holiday. July 1, 2021, marked the 100th anniversary of the founding of the Chinese Communist Party with a day of nationwide celebrations. CAC officials were appalled when they learned that Didi had disobeyed the Directives to postpone the IPO.

13. On July 2, 2021, when CAC officials returned to work, they set about to punish Didi for disobeying the Directives. On July 2, 2021, at approximately 6:00 a.m. New York time (6:00 p.m. Beijing time), the CAC notified Didi via telephone that the agency was placing Didi under a cybersecurity review and was also prohibiting Didi from registering any new customers. Approximately an hour later, at 7:19 a.m. New York time, the CAC published the news on its official website, first revealing to the public that Didi was facing intense scrutiny from the CAC and would be prohibited from registering any new customers. By 7:44 a.m., before trading opened on the NYSE, the CAC's announcement was reported by a U.S. news outlet. At that moment, the closing of the IPO transaction had not yet taken place.

14. Two days later, on Sunday, July 4, the CAC announced that it was also forbidding any existing customers to download Didi Travel (Didi's primary app) and that Didi and third parties were required to remove the Didi Travel app from all app stores in China. The CAC said it was imposing these penalties on Didi "due to serious violations of laws and regulations."

15. News of the CAC's serious penalties for Didi's violation of the Directives caused Didi's ADS price to decline dramatically. Didi's stock price fell 20% the next trading day (closing

4

at $12.49 per ADS July 6, 2021[2]), wiping out approximately $15 billion of market value in just a matter of days.

16.     The massive July 6 sell-off followed (i) Didi's July 4 statement that "the app takedown may have an adverse impact on its revenue in China;" and (ii) July 5 news reports that Didi had disobeyed the CAC's Directives that Didi postpone its IPO until it had completed a thorough self-inspection of its legal and regulatory compliance that met with the CAC's approval. Didi's defiance of the CAC Directives and the CAC penalties issued in response would also damage Didi's reputation and strengthen its competitors' efforts to take away Didi's customers and drivers.

17.     Over the following weeks, Didi's share price continued to decline as the market learned more about the business consequences and official penalties that Didi would incur from its refusal to follow the CAC's Directives: On July 7, Didi's mini-program – which affords users access to its services without having to download an app – was removed from the ubiquitous WeChat and Alipay super-apps; on July 9, more than two dozen additional Didi apps were ordered removed from app stores; on July 16, regulators from multiple agencies, including the CAC and the Ministry of State Security (a combination of the FBI and CIA), descended on Didi's offices. By Monday, July 19, 2021, Didi's stock closed at $11.06/ADS – its lowest close since the IPO.

18.     Before the market opened on July 22, it was reported that even more serious penalties for Didi's defiance of the CAC Directives might be imposed including a significant fine, suspension of certain operations, introduction of a state-owned investor, and/or delisting from the NYSE. The price of Didi's ADSs plummeted as investors contemplated Didi's increasingly bleak

---

[2] The NYSE was closed on Monday, July 5.

fate. Didi's stock fell over 11.3% from the prior day, closing at $10.20 per ADS on July 22, 2021, and further fell to just $8.06 per ADS by the close of trading on July 23, 2021—marking a two-day decline of nearly 30% as the market absorbed the additional bad news.

19. On August 23, 2021, the *Global Times*, an English-language newspaper run by the *People's Daily*, published an article entitled "China removes 25 apps as the country cracks down on tech companies to protect citizens' online privacy." [3] The article noted that after the CAC examined a range of mobile apps, 351 were criticized for privacy violation and 25 apps, **all Didi's**, were removed for "collecting and using personal information in serious violations of regulations." On December 11, 2021, the *South China Morning Post* confirmed that 351 apps had been told to "correct serious violations of laws and regulations." [4] In its annual review, the CAC singled out the 25 Didi apps removed for "having severely violated law and regulations for collecting personal information." Clearly, Didi was being singled out and punished for its disobedience. [5]

20. For this reason, during the summer of 2021, as the cybersecurity review grinded on, there was much speculation about what would happen next. Stories circulated about a rift on the Didi board, a senior management shake-up, and possible take-over of Didi by the City of Beijing. One concrete fallout from Didi's actions was that it was forced to shelve its expansion plans in the United Kingdom and Europe.

---

[3] "China removes 25 apps as the country cracks down on tech companies to protect citizens' online privacy," *Global Times* (Aug. 23, 2021) https://www.globaltimes.cn/page/202108/1232164.shtml. Attached hereto as Exhibit 1.

[4] X. Shen, "China tech crackdown: Beijing declares initial victory in cleaning up mobile apps," *South China Morning Post* (Dec. 11, 2021) https://www.scmp.com/tech/policy/article/3159278/china-tech-crackdown-beijing-declares-initial-victory-cleaning-mobile. Attached hereto as Exhibit 2.

[5] http://www.cac.gov.cn/2022-01/27/c_1644887128880847.htm

21.     Ultimately, under tremendous pressure from the CAC and other PRC officials angry that Didi had violated the CAC Directives, Didi announced its plan to delist from the NYSE on December 3, 2021, just five months after its disastrous debut on the U.S. stock market.[6]  This announcement sent Didi's stock into a further tailspin. Didi's stock closed at $6.07 per ADS on December 3, representing more than a 22% drop from its price of $7.80 per ADS at the close of trading on December 2.

22.     After the markets closed on December 29, 2021, Didi reported its financial results for the second and third quarters of 2021. The impact of the ongoing regulatory actions was stark: revenues dropped 11.5% as between the second and third quarters, due primarily to declines in Didi's core ride-hailing business in China; Didi's loss for the quarter was $4.7 billion. Revenue for Q3 2021 was down RMB5.8 billion from Q2 2021.

---

[6] By the fall of 2021, the fact that the CAC issued the Directives and that Didi was being severely punished for disobeying the CAC, to the point of delisting from the NYSE in favor of Hong Kong, was well-recognized by media outlets. *See, e.g.,* Y. Kubota & L. Lin, "In the New China, Didi's Data Becomes a Problem," *Wall Steet Journal* (July 18, 2021) ("Didi pushed ahead with its IPO despite being urged by China's internet regulator to submit itself to a cybersecurity review.") (attached hereto as Exhibit 3);  K. Zhai & L. Lin, "Chinese Regulators Nudge Didi Toward Hong Kong Listing," *Wall Street Journal* (Oct. 21, 2021) ("cyberspace regulators warned the company to delay its listing until it could conduct a thorough internal security review") (attached hereto as Exhibit 4); "China's regulators, in an unprecedented move, ask Didi to develop plans to delist from the New York Stock Exchange," *Fortune* (Nov. 25, 2021) ("Didi sparked the ire of Beijing when it proceeded with its New York stock offering this summer, despite regulatory requests that it ensure the security of its data before the IPO.") (attached hereto as Exhibit 5); S. Chen & C. Liu, "Didi's Brief U.S. Foray Is Ending. What Happens Next?" *Bloomberg* (Dec. 3, 2021) (attached hereto as Exhibit 6); S. Chen & C. Liu, "China's ride-hailing firm Didi reveals $4.7-bn loss ahead of IPO debut," *Business Standard* (Dec. 30, 2021) ("[Didi] incensed regulators after going ahead with the New York debut despite concerns about the security of its data…") (attached hereto as Exhibit 7); *see also* J. Zhu & Y. Sun, "Didi prepares to relaunch apps in China, anticipates probe will end soon," *Economic Times (India)* (Nov. 11, 2021) ("Didi ran afoul of the CAC when it pressed ahead with its New York listing on June 30, even though the regulator had urged the company to put it on hold while a cybersecurity review of its data practices was conducted") (attached hereto as Exhibit 8).

7

23. On March 11, 2022, Bloomberg reported Didi's shares declined almost 49% to $1.89/ADS as it put off plans to list its shares in Hong Kong. The CAC told Didi that the company would not be able to list its shares on the Hong Kong stock exchange because Didi's proposals to prevent security and data leaks fell short of regulatory requirements.

24. On April 16, 2022, Didi announced: (i) a May 23, 2022, "extraordinary general meeting of shareholders" to vote on the voluntary delisting of Didi from the NYSE; and (ii) "in order to better cooperate with the cybersecurity review and rectification measures, the Company will not apply for listing of its shares on any other stock exchange before completion of the Delisting."

25. What was truly "extraordinary" about the announcement is that Didi's singular focus on trying to win the CAC's approval of its "rectification measures" left investors with potentially worthless ADSs, with Didi weakly advising: "whether the Company's ADSs and/or ordinary shares may trade on OTC Pink Sheets will depend on shareholders' and independent third-parties' actions, without the Company's involvement."

26. In an April 18, 2022, filing on Form 6-K, Didi reported poor results for its Q4 2021 operations, with a net loss attributed to ordinary shareholders of $60 million on revenues of just under $6.4 billion, a 12.68% decline from Q4 2020.

27. On April 21, 2022, Bloomberg reported:

Senior Chinese officials have pushed back on a set of proposed punishments for Didi Global Inc. submitted by the nation's cybersecurity regulator, people familiar with the matter said, leaving the future of the troubled ride-hailing giant in limbo.

Didi has been in talks with the Cyberspace Administration of China about a fine and other penalties after proceeding with a U.S. initial public offering last June over the regulator's objections, the people said. The agency had aimed to publish the results of that probe in April but central government officials told the CAC they're not satisfied with the proposed punishments and asked for revisions, the people

8

said. The officials felt the remedies were too lenient, one person said, asking not to be identified because the matter is private.

That's why Didi suspended plans for a Hong Kong listing, the people said, adding that it's uncertain when that dispute could be resolved.

28. On May 4, 2022, Didi filed a Form 20-F with the SEC. The Form 20-F disclosed that "[a]fter our initial public offering in the United States, the SEC contacted us and made inquiries in relation to the offering. We are cooperating with the investigation, subject to strict compliance with applicable PRC laws and regulations. We cannot predict the timing, outcome or consequences of such an investigation." The Form 20-F further disclosed that, on December 16, 2021, the Public Company Accounting Oversight Board notified the SEC of its determination that it is unable to inspect or investigate completely Didi's PRC auditor and that, consequently, the Company "expect[s] to be identified as a 'Commission Identified Issuer' shortly after the filing of this annual report on Form 20-F."

29. Didi's shares currently trade at $1.94 – just 14% of the IPO price.

30. News reports about Class Period events continue to regularly describe the CAC's actions as punishment for Didi disobeying the CAC Directives. As of the filing of this complaint, no formal end to the cybersecurity review and related investigations has been announced, and Didi's apps still have not been restored to the app store.

31. The Securities Act and Exchange Act obligated Defendants to disclose in the Registration Statement the material facts that: (i) the CAC directed Didi to postpone its IPO in the United States until Didi completed – to the CAC's satisfaction – a thorough self-inspection of its business, operations and policies, including, but not limited to, a cybersecurity review, to ensure compliance with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information, and

rectified any violations discovered; and (ii) Didi faced a high risk that CAC would impose harsh penalties against Didi that could harm its business, financial performance, and its reputation if it went forward with its IPO against the CAC's Directives (collectively, the "Omitted Facts").

32. Defendants violated their affirmative duties of disclosure in the Registration Statement and are liable to the Class for the resulting damages.

## II. JURISDICTION AND VENUE

33. The claims asserted herein arise under and pursuant to Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o) and Sections 10(b), 20A, and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

34. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

35. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because certain of the acts and conduct complained of herein, such as the trading of Didi ADSs on the NYSE, occurred in this District.

36. In connection with the acts alleged in this Complaint, including the sale of Didi ADSs to investors in the IPO and the purchase and sale of Didi ADSs on the NYSE, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the internet, and the facilities of the national securities markets.

## III. CLASS ACTION ALLEGATIONS

10

37.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons or entities that purchased Didi ADSs during the Class Period.

38.     The members of the Class are so numerous that joinder of all members is impracticable. There are thousands of members in the proposed Class.

39.     Plaintiffs' claims are typical of the claims of the members of the Class, as all Class purchased Didi ADSs during the Class Period.

40.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

41.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Registration Statement omitted material facts required to be stated therein;

(b) whether Defendants had an affirmative duty to disclose the Omitted Facts;

(c) whether Defendants' failure to disclose the Omitted Facts violated the federal securities laws; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

42.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

11

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IV. PARTIES

### A. Plaintiffs

43. Lead Plaintiff Junhong Cao purchased Didi ADSs pursuant and traceable to the Registration Statement during the Class Period and was damaged thereby. His PSLRA certification was previously filed with the Court and is incorporated by reference herein.

44. Named plaintiffs Shereen El-Nahas and Daniil Alimov purchased Didi ADSs on June 30, 2021, at $14.00 per share directly from the Underwriters in the IPO pursuant and traceable to the Registration Statement during the Class Period and were damaged thereby. Their PSLRA certifications were previously filed with the Court and are incorporated by reference herein.

45. Named plaintiff Alaka Holdings Ltd. purchased Didi ADSs pursuant and traceable to the Registration Statement during the Class Period and was damaged thereby. Its PSLRA certification was previously filed with the Court and is incorporated by reference herein.

46. Named plaintiffs Bosco Wang and Njal Larson purchased Didi ADSs pursuant and traceable to the Registration Statement during the Class Period and were damaged thereby. Their PSLRA certifications were previously filed with the Court and are incorporated by reference herein.

### B. Didi Defendants

47. Didi is an internet-based platform offering a variety of services in China and more than a dozen other countries, including ride hailing, taxi hailing, chauffeur, hitch, and other forms of shared mobility services. Approximately 98% of Didi's revenues are earned from its operations

in China. The Company was formerly known as Xiaoju Kuaizhi Inc. It changed its name to Didi Global Inc. in June 2021.

48. Didi is incorporated in the Cayman Islands and its main office is located at No. 1 Block B, Shangdong Digital Valley, No. 8 Dongbeiwang West Road, Haidian District, Beijing, China.

49. Didi's ADSs traded on the New York Stock Exchange under the ticker symbol "DIDI" from June 30, 2021, until the present.

50. Defendant Will Wei Cheng ("Cheng") was at the time of the IPO and throughout the Class Period the Company's Co-Founder, Chief Executive Officer, and Chairman of the Board of Directors. Cheng owned 7.0% of Didi, 78,384,741 ordinary shares, valued at $4.4 billion at the IPO price. Cheng's shares were supervoting, giving him 16.2% of the voting power pre-IPO (35.5% post-IPO).

51. Defendant Jean Qing Liu ("Liu") was at the time of the IPO and throughout the Class Period the Company's Co-Founder, President and a Director. Liu owned 1.7% of Didi, 19,172,128 ordinary shares, valued at $1.1 billion at the IPO price. Liu's shares were supervoting giving her 6.7% of the voting power pre-IPO (22.8% post-IPO).

52. Defendant Stephen Jingshi Zhu ("Zhu") was at the time of the IPO and throughout the Class Period the Company's Senior Vice President and Chief Executive Officer of the International Business Group and a Director.

53. Cheng, Liu and Zhu are each founding limited partners of the Didi Partnership and are the "Core Management Members" of Didi. They control the partnership. The Didi Partnership is entitled to appoint and remove Executive Directors on the Didi Board of Directors.

54.     Defendant Alan Yue Zhuo ("Zhuo") was at the time of the IPO and throughout the Class Period the Company's Chief Financial Officer.

55.     Didi, Cheng, Liu, and Zhuo are referred to herein collectively as the "Officer Defendants."

56.     Defendant Zhiyi Chen ("Chen") was a Director of the Company until such time as the Registration Statement became effective on June 29, 2021.

57.     Defendant Martin Chi Ping Lau ("Lau") was a Director of the Company at the time of the IPO.

58.     Defendant Kentaro Matsui ("Matsui") was a Director of the Company until such time as the Registration Statement became effective on June 29, 2021.

59.     Defendant Adrian Perica ("Perica") was a Director of the Company at the time of the IPO.

60.     Defendant Daniel Yong Zhang ("Zhang") was a Director of the Company at the time of the IPO.

61.     Defendants Cheng, Liu, Zhu, Zhuo, Chen, Lau, Matsui, Perica, and Zhang are referred to herein as the "Individual Defendants."

62.     The Individual Defendants each reviewed and signed, or authorized the signing, of the Registration Statement in connection with the IPO prior to the Effective Date.

C.      **Underwriter Defendants**

14

63.     Defendant Goldman Sachs (Asia) L.L.C. and Goldman Sachs & Co. LLC (together "Goldman Sachs") served as an underwriter for the IPO. In the IPO, Goldman Sachs purchased and resold to Class members at least 104,544,000 of the Company's ADSs.[7]

64.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the IPO. In the IPO, Morgan Stanley purchased and resold to Class members at least 104,544,000 of the Company's ADSs.

65.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the IPO. In the IPO, J.P. Morgan purchased and resold to Class members at least 50,688,000 of the Company's ADSs.

66.     Together, Goldman Sachs, J.P. Morgan and Morgan Stanley served as the representatives for all of the Underwriters, also known as "Lead Underwriters" for the IPO.

67.     Defendant BofA Securities, Inc. ("BofA Securities") served as an underwriter for the IPO. In the IPO, BofA Securities, Inc. purchased and resold to Class members at least 6,336,000 of the Company's ADSs.

68.     Defendant Barclays Capital Inc. ("Barclays") served as an underwriter for the IPO. In the IPO, Barclays purchased and resold to Class members at least 6,336,000 of the Company's ADSs.

69.     Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter for the IPO. In the IPO, Citigroup purchased and resold to Class members at least 6,336,000 of the Company's ADSs.

---

[7] This was firm commitment underwriting in which the Underwriters committed to purchase all of the IPO shares from Didi.

15

70.     Defendant HSBC Securities (USA) Inc. ("HSBC") served as an underwriter for the IPO. In the IPO, HSBC purchased and resold to Class members at least 6,336,000 of the Company's ADSs.

71.     Defendant UBS Securities LLC ("UBS") served as an underwriter for the IPO. In the IPO, UBS purchased and resold to Class members at least 1,584,000 of the Company's ADSs.

72.     Defendant Mizuho Securities USA LLC ("Mizuho") served as an underwriter for the IPO. In the IPO, Mizuho purchased and resold to Class members at least 1,584,000 of the Company's ADSs.

73.     Defendant China Renaissance Securities (US) Inc. ("CRS") served as an underwriter for the IPO. In the IPO, CRS purchased and resold to Class members an unknown amount of the Company's ADSs.

74.     Defendants Goldman Sachs, Morgan Stanley, J.P. Morgan, BofA Securities, Barclays, Citigroup, HSBC, UBS, Mizuho, and CRS are collectively referred to herein as the "Underwriters."

75.     In the Underwriting Agreement, attached to the Registration Statement, the non-lead underwriters, including defendants BofA Securities, Barclays, Citigroup, HSBC, UBS, Mizuho, and CRS gave to the Lead Underwriters full legal authority to act on their behalf in connection with their underwriting of the IPO. In communications with the SEC, the Lead Underwriters stated that they are acting as representatives for all of the underwriters. Thus, the actions of the Lead Underwriters bound the non-lead underwriters in connection with the IPO.[8]

---

[8] Paragraph 13 of the Underwriting Agreement states: "In all dealings hereunder, the Representatives shall act on behalf of each of the Underwriters, and the parties hereto shall be entitled to act and rely upon any statement, request, notice or agreement on behalf of any Underwriter made or given by the Representatives."

16

**D. Relevant Non-Parties**

76. Didi's early investors held substantial portions of its restricted shares that they were eager to sell publicly as soon as the agreed-upon lock-up period expired six-months following the IPO.

77. Prior to the IPO, Softbank Group Corporation, through a number of limited partnerships, indirectly owned 21.5% of Didi's shares (242,115,016 Class A ordinary shares) valued at approximately $13.6 billion at the IPO's ADS price.[9] Until the time that Didi's Registration Statement became effective on June 29, 2021, Defendant Matsui was Softbank's representative on Didi's board of directors.

78. Uber Technologies Inc., through a wholly owned subsidiary, owned 12.8% of Didi's shares (143,911,749 Class A ordinary shares) prior to the IPO valued at approximately $8.1 billion at the IPO's ADS price.

79. Tencent Group, through two wholly owned subsidiaries, owned 6.8% of Didi's shares (75,777,780 ordinary shares) prior to the IPO valued at approximately $4.24 billion at the IPO price. During the Class Period, Defendant Lau was Tencent's representative on Didi's board of directors.

80. Alibaba Group ("Alibaba") also has a substantial, but undisclosed, investment in Didi. During the Class Period, Defendant Zhang was Alibaba's representative on Didi's board of directors. Alibaba owned approximately 5% of Didi's shares as of September 30, 2017.

81. Boyu Capital, a prominent private equity fund, owns a substantial but undisclosed investment in Didi. Boyu Capital was founded by Jiang Zhicheng who, by virtue of being the

---

[9] Four ADSs represent one Class A ordinary share. *See* Didi Prospectus, filed June 29, 2021.

grandson of Jiang Zemin – China's former President and the Party's former General Secretary – is a Party "princeling," *i.e.*, someone who can use his political connections to gain business advantage, while ensuring the business hews to CPC policies and principles. Until the time that Didi's Registration Statement became effective on June 29, 2021, Defendant Chen was Boyu Capital's representative on Didi's board of directors.

## V. BACKGROUND FACTS

### A. The Chinese Communist Party Controls All Branches of Government, Chinese Commerce, and Is Integrated Into the Structure of All Companies; Businesses Are Expected to Heed All Regulators' Directives in Addition to Complying With Laws and Regulations

82. The rule of law in China—officially called "socialist rule of law with Chinese characteristics"[10]—differs fundamentally from rule of law in the United States. In the U.S. there is not only a separation of powers, with checks and balances limiting the absolute powers of the executive, legislative, and judicial branches of the government, but major elections are hotly contested by two large political parties. China, by contrast, is a country of one-party rule and China's government has no separation of powers; the CPC wields absolute power over all branches of government. The Constitution of CPC provides: "The Party exercises overall leadership over all areas of endeavor in every part of the country."[11] Consequently, the Party's highest-ranking official, the General Secretary, exercises ultimate power and authority over all aspects of the Chinese government.

83. The National People's Congress of China, the Chinese legislature, recognizes the Party's supremacy: "The CPC leads the issuance of law, ensures law enforcement, supports the

---

[10] PRC Constitution, Preamble (as amended March 29, 1993).

[11] https://www.12371.cn/special/zggcdzc/zggcdzcqw/

18

judiciary, and takes the lead in abiding by the law"—a principle announced by the Party's current General Secretary, Xi Jinping.[12] This means that the CPC exercises complete control over the legislature, administrative agencies, law enforcement, and the judiciary.

84.     Antithetical to the American notion of a "private sector" comprised of for-profit businesses with no official ties to the government, the Company Law of the People's Republic of China requires that all entities in China—including non-state-owned corporations such as Didi—employing three or more Party members shall form a primary-level Party organization[13] within the company to "communicate to the public and carry out" CPC's policies.[14] The leader of a primary-level CPC committee within a corporation has the title of "Secretary."[15] Soon after its founding, in 2013, Didi established its CPC committee. By 2016, Didi employed more than 3,000 Party members; more than 3 million of Didi's drivers are also Party members. Jinglei Hou, Didi's Chief Mobility Safety Officer, is currently the Secretary of Didi's CPC committee.

85.     Because the CPC can exert absolute control over all political and economic life, Chinese regulatory agencies such as the Cyberspace Administration of China ("CAC") have tremendous power over the corporations they regulate. Enforcing the will of the Party, the CAC wields authority beyond the letter of the law when providing regulatory guidance and issuing administrative directives to regulated businesses. Didi was fully aware that the CAC was empowered to impose draconian penalties against Didi—preventing new user registration or app

---

[12] http://www.npc.gov.cn/npc/c30834/202110/5f179fe3d55c4da1b6e77dbabaf91eae.shtml

[13] Depending upon how many Party members work at the corporation, the organization may have a "primary-level CPC committee," a "general CPC branch committee", or multiple "CPC branch committees".

[14] Constitution of the Communist Party of China (adopted and revised Oct. 24, 2017), Article 32.

[15] https://trade.ec.europa.eu/doclib/docs/2017/december/tradoc_156474.pdf

19

downloads, or even completely shutting down Didi's network ad website—at any time if the CAC believed Didi was violating national security, cybersecurity, data security and/or collection and protection of personal information laws or regulations, or any other Chinese law or administrative directive.

86. Contrary to our country's core value of upholding the right to publicly criticize all branches of our government, as well as any elected or appointed official, in China, individuals and businesses are required to accord government agencies and officials great respect and deference. If an individual or business ignores a directive from a government official or agency, whether a formal administrative order or an informal one, the official or agency will almost certainly deal severely with such non-compliance—particularly if, as was the case with Didi, the defiance is public.[16]

**B.** **The Cyberspace Administration of China Is a Powerful Agency Directly Supervised by President Xi Jinping to Enforce His Internet, Network, and Data Security Policies**

87. China connected to the internet in 1994. Since then, the number of Chinese citizens who use internet and phone apps has grown exponentially. In 2018 alone, China generated 7.6 zettabytes[17] of data, as compared to 6.9 ZB of data generated by the U.S. in the same year. Data usage in China is expected to grow to 48.6 ZB in 2025. The early years of internet growth and expansion in China came during a period of lax government regulation – first under Jiang Zemin, who stepped down in 2003, and later under his successor, Hu Jintao, who ran the country until

---

[16] "Why Didi defied Beijing and Listed in the U.S.," *SinoInsider.com* (July 15, 2021) https://sinoinsider.com/2021/07/why-didi-defied-beijing-and-listed-in-the-us/ ("Why Didi Defied Beijing"). Attached hereto as Exhibit 9.

[17] A zettabyte ("ZB") is equal to a trillion gigabytes or $10^{21}$ (1,000,000,000,000,000,000,000) bytes.

2012. The era of loose regulation came to an abrupt halt with the ascension of Xi Jinping.[18] Because Xi uses control over internet content to ensure Chinese citizens hew to the Party line, he views data and cybersecurity as critical to the national interest.

### 1. The Cyberspace Administration of China is under the direct leadership of Xi Jinping

88. During the years in which there was only light regulation, China's citizenry used the internet to promote civic organization, advocate for political reform, and hold authorities accountable for their actions.[19] Indeed, "[i]n 2010, a survey of 300 Chinese officials revealed that 70% were anxious about whether mistakes or details about their private life might be leaked online. Of the almost 6,000 Chinese citizens surveyed, 88% believed it was good for officials to feel this anxiety."[20] Soon thereafter, in May 2011, the CAC was established to manage cybersecurity regulation and control internet content and data. The next year, Xi Jinping took over as the CPC's General Secretary and as China's president. As the nation's ultimate authority, Xi took control over China's internet policy.

89. In 2014, the Central Committee of CPC formed the Central Cyberspace Affairs Commission (formerly known as the Cyberspace Affairs Leading Group, "CCAC") to lead the CAC.[21] The Director of the CCAC is Xi Jinping and its Deputy Directors are Premier Li Keqiang, the highest administrative official in China, and Wang Huning. Xi, Li and Wang are also members of the seven-person CPC Politburo Standing Committee, China's top decision-making body. The

---

[18] *See* "Why Didi Defied Beijing," *SinoInsider.com* (July 15, 2021) (Exhibit 9).

[19] "The Great Firewall of China: Xi Jinping's internet shutdown," *The Guardian.com* (June 29, 2018) ("The Great Firewall of China").

[20] The Great Firewall of China, *supra, id.*

[21] http://www.cac.gov.cn/2016-02/29/c_1118191115.htm

Office of CCAC, the operating arm of the CCAC, shares the same leadership team, working staff and offices with the CAC, *i.e.*, they are one agency under the CCAC's leadership.[22] Xi directed the CCAC to "coordinate major cybersecurity and informatization issues in various fields, formulate and implement national cybersecurity and informatization development strategies, macro plans, and major policies, and continuously enhance security assurance capabilities."[23]

**2.**     Amid growing tensions with the United States, Xi Jinping stresses the importance of cybersecurity to China

90.     The United States and China are the world's two superpowers. In the battle for global supremacy, industrial and commercial competition between the two has been fierce; in recent years, each has enacted protectionist trade measures. With respect to cybersecurity, expressions of mutual distrust concerning potential espionage have played out rather publicly.

91.     In the U.S., fears that equipment produced by Chinese companies could be programmed to surreptitiously obtain data from unsuspecting users, including our military, have led to a decade of efforts in Washington to prevent governmental entities and American companies from using products manufactured by large Chinese companies such as Huawei and ZTE. In 2020, the FCC designated those two companies as threats to national security. A month later, former President Trump signed an executive order seeking to remove the popular Tik-Tok app from phones in the United States unless ByteDance sold Tik-Tok to an American company.

---

[22] The CPC gives an agency two names to hide its ultimate control over such agency. A generic, descriptive name, such as the CAC, is used outside of China. Internally, a different name, here the CCAC Office, is used by the CPC to demonstrate its power over the agency. Other examples are the State Council Information Office (internally known as the Propaganda Department of the CPC Central Committee), and the Taiwan Affairs Office of the State Council (internally known as the Taiwan Work Office of the CPC Central Committee).

[23] http://www.cac.gov.cn/2016-02/29/c_1118191115.htm

22

92.     Even more concerning to China than such individual instances are American laws with potentially broad scope seen as usurping China's sovereignty over its citizens' personal data. In 2018, the U.S. Congress enacted the Clarifying Lawful Overseas Use of Data ("CLOUD") Act, empowering federal law enforcement to compel communications service providers subject to U.S. jurisdiction to produce data the company controls, including data stored on foreign soil. [24]

93.     China-based companies' business data was similarly targeted for U.S. review. In December 2020, Congress passed the Holding Foreign Companies Accountable Act ("HFCAA"), directing the SEC to prohibit from trading on a U.S. exchange the securities of SEC-reporting issuers whose financial statements have not been audited for three consecutive years by accounting firms subject to inspection by the Public Company Accounting Oversight Board (the "PCAOB"). China regards the audit work papers sought for PCAOB inspection as containing confidential information, *e.g.*, critical business and industrial information and user data, subject to the protection of Chinese national security laws. U.S.-listed Chinese corporations cannot send audit work papers outside of China without the government's prior approval.[25]

---

[24] The Chinese government, media and academia view the CLOUD Act as imposing severe threats to the "judicial sovereignty and national security of [China'] cyberspace, increasing the legal risks of Chinese enterprises that conduct business overseas, and also violating the personal privacy of Chinese users." http://www.gjbmj.gov.cn/n1/2020/1127/c411033-31947264.html; http://tc.people.com.cn/n1/2018/0801/c183008-30182463.html; http://www.casted.org.cn/channel/newsinfo/8127. For this reason, China warned Chinese enterprises that intend to conduct business overseas that, considering U.S. legislation, they should be aware of data security and privacy protection and, to avoid business/legal risk, "further improve internal data security management mechanisms, clarify requirements for cross-border data flows." http://tc.people.com.cn/n1/2018/0801/c183008-30182463.html

[25] Another provision of the HFCAA requires companies outside the reach of the PCAOB to disclose information relating to any board members who are officials of China's Communist Party. China's Foreign Ministry spokesman, Wang Wenbin, criticized the HFCAA as "an unjustified political crackdown on Chinese enterprises" that "[would] seriously hinder the listing of Chinese enterprises in the United States". https://www.complianceweek.com/regulatory-policy/sec-china-react-as-trump-approves-foreign-audit-oversight-bill/29860.article

94.     China is also concerned about the U.S. strongarming other East-Asian corporations. In September 2021, the U.S. Department of Commerce asked global leaders in the semiconductor supply chain to "voluntarily" fill out questionnaires seeking information pertaining to the ongoing chip shortage. Commerce Secretary Gina Raimondo warned industry representatives that the White House might invoke the Defense Production Act or other tools to force their hands should they fail to respond. Under pressure, the worlds' top chipmakers, companies located in Taiwan and South Korea, provided data to the U.S. before the deadline.[26]

95.     To China's leaders, these acts were viewed as invasive and provocative threats to China's cybersecurity and national security, requiring China to be hyper-vigilant of such perceived threats.[27] In addition to public efforts by the United States to obtain information and data stored in China, there is also a concern about covert cyberwarfare.[28] Xi Jinping has become increasing vocal about the perceived danger that the United States may pose to China's cyberinfrastructure.[29]

96.     Even before the recent escalation of tensions with the U.S., President Xi has consistently stressed the need to treat cyberinfrastructure and data as a national resource: "No cybersecurity, no national security" is Xi's watchword. President Xi first expressed this principle

---

[26]     https://www.bloomberg.com/news/articles/2021-11-07/tsmc-withholds-customer-specific-data-in-answering-u-s-request?sref=L0o59hMS

[27] https://cn.chinadaily.com.cn/a/202112/08/WS61b0b199a3107be4979fc199.html

[28] In 2018, the National Computer Network Emergency Response Technical Team found that the more cyberattacks against Chinese networks were initiated in the U.S. than in any other country.

[29] https://www.globaltimes.cn/content/1164607.shtml

24

during the CCAC's initial session in 2014,[30] and has repeated it in high-visibility fora thereafter. Examples include:

(a) In a December 16, 2015, speech at the opening ceremony of the Second World Internet Conference, President Xi maintained that cyberspace is an element of a nation's sovereignty and requested that all countries refrain from cyber activities that interfere with or jeopardize a country's national security.[31]

(b) On April 19, 2016, presiding over a Cybersecurity and Informatization Work Symposium, President Xi expressed his fundamental philosophy in a speech given to CAC directors, central governmental officials in charge of cybersecurity and development, and executives of leading internet companies, such as Jack Ma of Alibaba Group. Xi described information technology as China's biggest "gate of life".[32] As such, China "needs to keep control over its internet development and keep the internet and the nation safe."[33] President Xi mandated that the cyberinfrastructure of the communications and transport industries – both essential to the proper functioning of society – receive the "highest priority" of protection. Xi also demanded active scrutiny of existing cybersecurity to identify and eliminate risks. In a demonstration of the close

---

[30] "Xi Jinping: The Overall Planning And Coordinating Of The Innovation And Development Of All Parties, Strives To Build Our Country Into A Cyber Power", *People.com.cn*, February 28, 2014. http://cpc.people.com.cn/n/2014/0228/c64094-24488180.html

[31] "Xi Jinping: Speech at the Opening Ceremony of the Second World Internet Conference," People.com.cn, September 24, 20121. http://cpc.people.com.cn/n1/2015/1217/c64094-27938930. People.com.cn html; *see also* "The Great Firewall of China".

[32] In traditional Chinese medicine, this refers to a spot on the lower back that holds the Yin and Yang, the origin from which all substances and functions develop. The "gate of life" has come to refer to the most fundamental part of a policy, as well as its enforcement, operations, and survival.

[33] "Xi Jinping's Speech at The Cybersecurity and Informatization Work Symposium", Xinhua Net, April 26, 2016. http://www.xinhuanet.com//zgjx/2016-04/26/c_135312437.htm

relationship between private companies and the Chinese government, to aid efforts to safeguard their enormous troves of cyber information and data from external security threats, Xi also demanded that the nation's large information-based companies share the information and data with the government to actively participate in its protection. This speech was deemed to be of critical importance and was widely disseminated by national media; its text was published as a primary guide for both government agencies and businesses with respect to these issues.

(c) At an October 9, 2016, CPC Politburo Standing Committee conference discussing China's cyber strategies, President Xi urged China to "strengthen the protection of critical information infrastructure" and "keep cyberspace secure and cyber data intact, secure and reliable, and improve our ability to safeguard cyberspace security."[34]

(d) At a December 8, 2017, CPC Politburo Standing Committee conference to analyze China's "big data" strategies, President Xi noted that the exponential increase in data usage and technology development fundamentally impacts both governmental functions and citizen's daily lives. Given its central role in society, Xi emphasized that data security is critical: "[China] shall strengthen the security protection of critical information infrastructure, strengthen the ability of protecting the national critical data resources, and enhance data security, early notification, and source tracing ability."[35]

---

[34] "Xi Jinping: Accelerate the independent innovation of Cyber information technology; Persist in Our efforts towards the goal of building a cyber power", People.com.cn, October 10, 2016. http://cpc.people.com.cn/n1/2016/1010/c64094-28763907.html .

[35] http://www.gov.cn/xinwen/2017-12/09/content_5245520.htm.

(e) During Cybersecurity Week in September 2019, President Xi pledged to "safeguard the security of personal information and citizens' legal rights and interests in cyberspace." [36]

(f) On March 15, 2021, chairing a meeting of the Party's top financial advisory and coordination committee, in "unusually strongly worded comments," President Xi ordered regulators to "step up" oversight of internet platform companies, noting that internet companies need to enhance data security.[37]

**C.    To Carry Out President Xi's Directives, China Has Enacted a Series of Laws to Protect National Security, Cybersecurity, Data Security and <u>Private Personal Data</u>**

97.    Over the past ten years, corresponding to President Xi's increasing level of concern over cybersecurity sovereignty, China has enacted a series of laws pertaining to cybersecurity and data protection. To centralize regulation and enforcement, upon the formation of the CAC in 2011, the State Council, China's chief administrative authority, authorized the CAC "to manage internet content in China and be in charge of supervising and managing the law enforcement in this regard to ensure the healthy and orderly development of internet information services, protect Chinese people's … rights and maintain national security…" ("State Council Authorization").[38] Among

---

[36] http://politics.people.com.cn/n1/2019/0916/c1024-31355600.html

[37] Zheping Wang and Bloomberg, "China President Xi Jinping singles out 'platform' companies in sign tech crackdown will continue," *Fortune.com* (Mar. 16, 2021). https://fortune.com/2021/03/16/china-xi-jinping-platform-companies-tech-internet-crackdown/. The article noted that although, to date, the crackdown was focused on Alibaba and Ant Group, "[t]he term platform economies could apply to a plethora of mobile and Internet giants that offer services to hundreds of millions, from ride-hailing behemoth Didi Chuxing …."

[38] http://www.cac.gov.cn/2014-08/28/c_1112264158.htm

the many laws governing Didi's business operations, at least five relate to data storage and cybersecurity.

**1.** The Standing Committee of the National People's Congress's Decision on Strengthening Information Protection on Networks

98.    On December 28, 2012, the Standing Committee of the National People's Congress of China published a Decision on Strengthening Information Protection on Networks ("Congress Decision"), which first established network service providers' duties to keep personal digital information confidential and safe and barred providers from leaking or illegally providing personal information to a third party. Violations of the Congress Decision are punishable by monetary fines, revocation of business licenses, and/or the closure of websites held in violation.

**2.** The National Security Law of China

99.    Effective July 1, 2015, the National Security Law ("NSL") updated a 1993 law focusing on cybersecurity. Article 25 of the NSL broadly provides for the creation of a structure for the research, development and implementation of cybersecurity systems (particularly in critical areas), increased network management, the enactment and enforcement of criminal laws against breaches of national data security, and the maintenance of cyberspace sovereignty and security.

100.    The NSL also establishes a review and oversight system to safeguard data deemed essential to national security from malevolent foreign actors. Highly relevant to the case at bar, Article 59 provides, *inter alia*, for "conducting national security review of foreign commercial investment, special items and technologies, internet information technology products and services … as well as other significant matters and activities that impact or may impact national security." Article 60 simultaneously empowers multiple government agencies to enforce its provisions: "Each agency of the central government carries out the duty of national security reviews, issues

28

national security review opinions, and supervises enforcement in accordance with law and administrative regulations."

### 3. The Cybersecurity Law of China

101. The Cybersecurity Law ("CSL"), effective June 1, 2017, specifically regulates cyber information and data that originates in China or is imported from overseas, and activities relating to China's cyberinfrastructure. Among its relevant provisions:

102. Article 8 empowers the CAC to comprehensively plan and coordinate cybersecurity activities, as well as related supervision and management.

103. Article 31 expands the scope of cybersecurity coverage beyond network providers to all businesses deemed to be critical information infrastructure ("CII") operators, requiring a multi-level protection scheme ("MLPS") for "public communication and information services, energy, traffic, water resources, finance, public service, e-government, and other critical information infrastructure" which, if destroyed, disabled or compromised "might seriously endanger national security, national welfare, the people's livelihood, or the public interest."

104. Article 35 authorizes the CAC and other agencies to conduct a national security review if a CII's purchase of network products and services may impact national security.

105. Article 37, China's strongest expression of cyber-sovereignty to date, requires CIIs to conduct self-inspections if their "business requirements" – potentially in connection with an IPO – make it necessary for them to provide personal information or important data outside of China:

> "[c]ritical information infrastructure operators that gather or produce personal information or important data during operations within the mainland territory of the People's Republic of China, shall store it within mainland China. Where due to business requirements it is truly necessary to provide it outside the mainland, they shall follow the measures jointly formulated by the State cybersecurity and

29

informatization agencies and the relevant agencies of the State Council to conduct a security assessment…"[39]

106.    Article 38 further requires CII operators to conduct self-inspections:

At least once a year, critical information infrastructure operators shall conduct an inspection and assessment of their networks' security and potential risks, either on their own or through retaining a cybersecurity services organization and submit a cybersecurity report on the results of such inspection and assessment, as well as improvement measures, to the relevant regulatory agency in charge of protecting critical information infrastructure security.

107.    Article 39 authorizes the CAC and other state regulators to directly inspect CIIs, to require CIIs to conduct emergency cybersecurity response drills, to promote information sharing among regulatory agencies, CIIs, and cybersecurity service organizations, and to provide technical assistance for cybersecurity emergency management and recovery.

108.    To limit the cybersecurity risks posed by the collection, storage, and use of vast amounts of private, personal information not essential to the provision of services, Article 41 prohibits the collections of unnecessary information and requires notice and informed consent from persons whose data is collected:

Network operators collecting and using personal information shall abide by the principles of legality, propriety, and necessity; publish rules for collection and use, explicitly stating the purposes, means, and scope for collecting or using information, and obtaining the consent of the person whose data is gathered.

Network operators must not gather personal information unrelated to the services they provide; must not violate the provisions of laws, administrative regulations or agreements between the parties to gather or use personal information; and shall follow the provisions of laws, administrative regulations and agreements with users to process personal information they have stored.

---

[39] Law firms warned those doing business in China that CIIs would have to submit to a security assessment *before* information could be sent outside of China for business reasons. *See, e.g.,* https://www.skadden.com/insights/publications/2017/06/privacy-and-cybersecurity-june-2017 ("[W]hat qualifies as "truly necessary" remains undefined, and companies seeking reprieve under this exception would still have to submit to a security assessment…")

30

109.     Article 66 provides penalties of increasing severity for violations of the law, including the provision of warnings, ordering of corrective measures, confiscation of unlawful gains, levying of fines against businesses and supervisory personnel, suspension of a business or its operations pending correction, closing down of websites, and the revocation of permits and business licenses.

**4.**     Data Security Law

110.     The Standing Committee of the National People's Congress enacted the Data Security Law ("DSL") on June 10, 2021. The first draft of this law was released in July 2020; the second draft was released on April 29, 2021. Law firms updated clients on important comparisons between the first two drafts.[40] One firm noted that the second draft of the law included a provision that "stipulates that where a foreign judicial or law enforcement organ requests for data that is 'stored' within China, such data shall not be provided unless China's 'competent government agency' has approved such a provision (Article 35)."[41] As explained above, this new requirement, ultimately enacted as DSL Article 36 effective September 1, 2021, could present a formidable roadblock for China-based companies seeking to list and trade on U.S. exchanges. Because regulations have not yet been adopted setting forth the bases for approving or rejecting such a request, a company could not be certain whether requested documentation, including but not limited to work papers required for a PCAOB audit, would be allowed to leave China.

---

[40] *See* https://www.huntonprivacyblog.com/2021/05/03/china-issues-the-second-version-of-the-draft-of-data-security-law/#more-20445

[41] "China Released Updated Draft Data Security Law and Personal Information Protection Law for Public Comments," Covington (May 3, 2021) (https://www.cov.com//media/files/corporate/ publications/2021/05/covington-alert--china-released-updated-draft-data-security-law-and-personal-information-protection-law-for-public-comments-may-3-2021.pdf).

111.    More generally, Article 31 mandates that all cross-border data transfers by CII operators comply with the CSL and that cross-border transfers of other important data must comply with CAC rules. Pursuant to Article 45, violations can result in fines, business suspension, license revocation, business closure, and, for violations by CII operators that endanger national security, criminal penalties. Moreover, under Article 24, national security reviews of data processing activities under the state's review system are final and not appealable.

### 5.    Personal Information Protection Law ("PIPL")

112.    Although existing laws and regulations prohibited the collection of more personal information from customers than is necessary to provide service, the first comprehensive law concerning personal information protection in China, effective November 1, 2021, was enacted on August 22, 2021. Draft versions were released on October 21, 2020, and April 29, 2021. The law applies to both personal information and sensitive personal information (the disclosure of which would impinge on one's dignity or cause harm) and sets stringent standards for personal information processors' collection, use and handling of such information. Working in conjunction with the CSL and DSL, CIIs and other processors of large amounts of personal information cannot export such data without either passing a security assessment, being certified to do so, entering into a standard contract (drafted by the CAC) binding the recipient to comply with the PIPL, or as otherwise permitted.

### D.    To Implement Xi's Cybersecurity Vision, the CAC Adopted Extensive Regulations to Enforce China's National Cybersecurity Laws

113.    Since 2018, Zhuang Rongwen has served as Director of both the CAC and of the Office of CCAC. He also serves as Deputy Director of the dual-named CPC Central Propaganda Department/State Council Information Office. In his writings, Zhuang has reiterated Xi's position

32

concerning the importance of data as a critical national asset.[42] Consequently, to implement its

regulatory and enforcement authority over cybersecurity and internet content, the CAC has

published numerous regulations; those most relevant to Didi's business are described below.

**1. Provisions on the Administration of Mobile Internet Applications Information Services (the "Provisions")**

114. Apps have become the main platforms for mobile internet services in China. The

CAC promulgated the Provisions on June 28, 2016, pursuant to the Congress Decision and the

State Council Authorization. Effective August 1, 2016, app service providers were directed to

improve their user information security protection mechanisms. Article 6 broadly prohibits app

service providers from engaging in any activities that may jeopardize national security or

infringing others' legal rights and interests.

**2. Interim Measures for the Administration of Online Taxi Booking Business Operations and Services (the "Taxi Booking Measures")**

115. On July 27, 2016, the CAC, together with the Ministry of Transport, the Ministry

of Industry and Information Technology, the Ministry of Public Security, Ministry of Public

Security, Ministry of Commerce, and State Administration for Market Regulation, published the

Taxi Booking Measures, which were amended on December 28, 2019. The Taxi Booking

---

[42] For example, writing in the People's Daily in 2019, Zhuang said data "will have a significant impact on economic development, governance and everyday life" and "The capability of controlling data is a key measure in a country's competitiveness." In the March 2021 edition of *Qiushi*, the CPC's flagship bi-monthly journal on political theory, Zhuang wrote an article promoting Xi's book on building China to be a cyber power. Underscoring Xi's watchword, "No Internet Security, No National Security," Zhuang elsewhere pledged to carry out Xi's mandate to strengthen the protection of critical cyberinfrastructure, important personal information, and data. http://www.iwhr.com/zgskywwnew/ztbdtwo/networksafe2020/sjjs./webinfo/2020/09/1600002885975085.htm

Measures require ride hailing companies in China to observe China's security-related laws and expressly prohibit any data collected or generated by a ride hailing company to leave China. Specifically, Article 27 requires ride-hailing companies to: comply with "relevant national network and information security regulations," store the personal information collected and the business data generated for two years, and, unless otherwise permitted, retain all such information in China. Under Article 37, the CAC, as well as public security and communication agencies, are empowered to impose civil and criminal penalties for violations.

### 3. The Measures of Cybersecurity Review (the "CSR Measures")

116. To implement the CSL, on April 27, 2020, the CAC, together with another 10 ministries,[43] published the CSR Measures, effective June 1, 2020. The CSR Measures outline the process by which the CAC will safeguard critical information infrastructure and national security.

117. Under Article 2, CIIs such as Didi – which possesses vast quantities of sensitive mapping and traffic data – "procuring network products and services that influence or may influence national security should conduct a cybersecurity review according to these measures." Thus, even if no information and data will be exported, imported network products and services are subject to a cybersecurity review if the services provided could affect national security.

118. Article 4 provides that "under the leadership of CCAC", the CAC, in conjunction with the other 10 agencies, will establish national standards and a process for cybersecurity reviews that will be conducted by the Cybersecurity Review Office of the CAC. Articles 5-13 set forth the

---

[43] The National Development and Reform Commission, the Ministry of Industry and Information Technology, the Ministry of Public Security, the Ministry of State Security, the Ministry of Finance, the Ministry of Commerce, the People's Bank of China, the State Administration for Market Regulation, the National Radio and Television Administration, the National Administration of State Secrets Protection, and the State Cryptography Administration.

requirements for submitting proposed transactions to the CAC for a determination of whether a cybersecurity review is required, the documents to be submitted, the factors to be considered during a cybersecurity review, and the period of review – which can vary depending upon the level of complexity, whether there is a uniform opinion among the reviewing agencies, and whether remediation and supplemental submissions are required. Eventually, the CAC determines whether the proposed transaction may proceed.

> **4.** Regulations on the Scope of Necessary Personal Information for Common Types of Mobile Internet <u>Applications</u>

119. On March 12, 2021, four agencies, including the CAC,[44] jointly promulgated the "Provisions on the Scope of Necessary Information for Common Types of Common Mobile Internet Applications" ("Provisions on Necessary Information"). The preamble and Article 1 of the regulations indicate that they were written to implement Article 41 of the CSL, prohibiting the collection of more information from a user than is necessary to provide the service.[45] Article 5 of the regulation sets forth 39 different service categories of apps and, for each, sets forth the type of information deemed necessary to provide the service. A provider who requests information unnecessary to the provision of its service can be reported to the agencies for enforcement. The Provisions on Necessary Information took effect May 1, 2021.

**E.** **Didi Collects Personal Information as Well as Mapping and Traffic Data Concerning China's Critical Infrastructure Information; Didi Was Required**

---

[44] The other agencies are the Ministry of Industry and Information Technology, the Ministry of Public Security, and the State Administration for Market Regulation.

[45] http://www.cac.gov.cn/2021-03/22/c_1617990997054277.htm

**to Comply With Both Cybersecurity and Privacy Laws and Regulations and the CAC**

120.    From China's Congress Decision in 2012 through the enactment of the PIPL in the summer of 2021 (a second draft of which had been published on April 29, 2021, prior to the IPO), the need to keep personal information securely stored has been well-established in Chinese law. Moreover, multiple CAC regulations – from the Provisions and the Taxi Booking Measures adopted in 2016 to the Provisions on Necessary Information – made it abundantly clear that Didi had to secure personal user information, strengthen its network security, ensure that the information did not leave China, and limit the amount of information requested to only that necessary to provide its myriad services. This is no small task, as Didi has 377 million annual active ride-hailing users in China who provide their cellphone numbers (which are linked to their real names and identifications), and often share photos, recurring destinations (*e.g.*, home and office), as well as their gender, age, occupation, and employers. To use other Didi services, customers may also have to share more personal information, including facial-recognition data. During the car ride, in-car cameras and recorders can capture conversations. In addition to private, personal user information, Didi also has 13 million drivers in China who must provide their real names, vehicle information, criminal records, and credit- and bank-card information to Didi.

121.    In addition to its vast amounts of personal information, Didi possesses the most extensive traffic and mapping data in China, to wit: (a) its repository of real-world traffic data is the world's largest, with 25 million daily rides on its platform in China feeding a database of pickup points, destinations, routes, distance and duration;[46] (b) In 2017, Didi won a government

---

[46] On March 24, 2021, Ding Neng, a Didi Vice President, stated that "Didi is the only company with hundreds of billions of kilometers of travel scene data," providing a very accurate picture of

license to produce high-precision maps. Not only are foreign companies barred from this work, for national security reasons, [47] but only 29 Chinese entities are licensed to do detailed surveying and mapping; and (c) The traffic and road data that Didi owns—surveying, mapping, car flow, people flow, and car-charging network data—fall into the definition of "automobile industry significant data" according to the Automobile Data Security Management Decisions (draft) published on May 12, 2021.[48]

122.    Under the National Security Law and the Cybersecurity Law, critical information infrastructure operators must comply with a multi-level protection scheme to protect information that is critical to China's national security, expressly including traffic information. Didi could not potentially expose its comprehensive and sensitive traffic and mapping data to foreign review by listing on a U.S. exchange before undertaking a thorough self-inspection of its business, operations, and policies to the satisfaction of the CAC.

123.    Beyond the letter of the law, in April 2016, during his seminal Symposium speech, President Xi urged China's leading cyber-infrastructure companies to share their vast stores of data with the government so that they could actively participate in protecting that data in the interest of national security. Thereafter, Didi made a very public showing of cooperating with the CAC.

---

a city's travel operations. For example, Ding indicated, just in Beijing alone, Didi's cars travel through every street at least 400 times a day. https://www.sohu.com/a/458288326_389742

[47] "Mapping points to potentially sensitive areas such as Chinese defense zones … can be a treasure trove of information for hostile actors," said Carly Ramsey, a Shanghai-based director at consulting firm Control Risks Group. Y. Kubota & L. Lin, "In the New China, Didi's Data Becomes a Problem," *The Wall Street Journal* (July 18, 2021). https://www.wsj.com/articles/in-the-new-china-didis-data-becomes-a-problem-11626606002. Attached hereto as Exhibit 3.

[48] https://baijiahao.baidu.com/s?id=1704446235397813267&wfr=spider&for=pc

37

124.    On April 13, 2017, to commemorate the anniversary of President Xi's speech, the CAC held a meeting with key cyber-infrastructure entities. Wang Xin, a Didi Vice President who attended the meeting, stated that Didi innovated "big data," with a world-leading 1.43 billion orders generated on Didi's platform. Wang promised that "Didi will always be following General Secretary's Xi's calling …. and endeavor to play an active role in the cyberspace construction."

125.    Similarly, in 2020, Defendant Wei—Didi's Co-Founder, CEO, and Chairman of the Board of Directors—was a keynote speaker at the headline forum at National Cybersecurity Week. In a speech entitled "Build Cybersecurity ecosystem together, Share terrific outings," Wei proclaimed that "cybersecurity is the vital foundation of Didi's security system."[49]

126.    Didi's public displays of cooperation in the past led the CAC to believe that Didi would complete a thorough self-inspection, submit the results, and obtain CAC approval—all measures the CAC deemed necessary to implement Xi's national security vision – prior to Didi conducting its IPO on the NYSE.

127.    The CAC and CCAC were furious when they learned that Didi had charged ahead with the IPO in violation of the CAC Directives.

**F.    Defying Xi Jinping and the CAC's Directives Created a Serious Risk of Material Harm to Didi's Current Business and Future Growth**

128.    Xi Jinping is the paramount leader who dictates the law and policies in China. As such, as the global media has widely reported, it is reasonably foreseeable that defying President Xi's directives will result in severe punishment to one's person or business.

129.    The CAC has the expansive power to close or suspend websites, close down businesses, revoke business licenses, and/or impose large fines or other draconian penalties if it

---

[49] https://tech.sina.com.cn/roll/2020-09-15/doc-iivhvpwy6797611.shtml

38

determines that a business is violating any cybersecurity-related law or implementing regulation. *See, e.g.,* CSL Articles 59-69; *see also* DSL Article 45.

130.    Purportedly careful to not run afoul of national, provincial, or local authorities, Didi maintains an enormous government affairs team of over 200 persons skilled in navigating the complexities of PRC government policies.[50]

131.    No Chinese company, no matter how large, is powerful enough to run up against the will of China's central government: Although technology entrepreneurs in China can be wildly popular and tremendously wealthy, Beijing ultimately has the upper hand. For example, in November 2020, just days before Ant Group's $34 billion initial public offering – which would have established a world record on the Shanghai and Hong Kong exchanges rather than on the NYSE – Jack Ma, the controller of Ant Group and Alibaba Group, publicly criticized China's state-owned banks for not being innovative or taking risks, saying they operated with a "pawnshop" mentality. Top-level officials viewed Jack Ma's remarks as a disgrace to the Chinese government. Upon hearing of Ma's criticism, Xi was furious and personally made the decision to initiate an investigation into Ant and halt the Ant Group IPO.[51]

132.    Specifically, on November 2, just nine days after Ma's critical comments went viral, financial regulators issued new rules pertaining to online microlending. The same day, Jack Ma, Eric Jing, and Simon Hu were very publicly summoned to be interviewed by representatives of the central bank as well as Chinese financial, insurance, and securities regulators. The next day,

---

[50] J. Zhu & Z. Yan, "How Didi's govt relations team navigated myriad regulators, until IPO dustup," *Reuters*, (July 20, 2021, 6:20 a.m. EDT). Attached hereto as <u>Exhibit 10</u>.

[51] https://www.wsj.com/articles/china-president-xi-jinping-halted-jack-ma-ant-ipo-11605203556

the Hong Kong Stock Exchange and the Shanghai Stock Exchange suspended the IPO, citing changes in the regulatory environment.[52]

133.    Not only did investors who had already committed to paying more than $34 billion for Ant's IPO shares walk away empty-handed, but its existing owners were also dealt a blow. Alibaba, which owns a 33% stake in Ant Group, saw its Hong Kong-listed shares tumble by more than 7% in Asia trading that day and its NYSE shares close more than 8% lower overnight.

134.    Several months later, Ant still felt the pain of having crossed President Xi. In April 2021, the Chinese government slapped a record $2.75 billion fine on Alibaba Group for violations of anti-monopoly laws.[53] American media noted that Chinese central bank regulators had forced Ant to become a less-valuable holding company,[54] "leaving the company's employees and investors in limbo."[55]

135.    Alibaba had a similar experience when it conducted its IPO in 2014. In 2015, it was revealed that two months prior to Alibaba's 2014 IPO, Alibaba was summoned to a critical meeting with China's State Administration for Industry and Commerce to address numerous violations of law on Alibaba's web platforms, including the sale of illegal and counterfeit items. The incident resulted in severe administrative guidance in China and a record-setting securities class action in

---

[52]https://www.wsj.com/articles/china-president-xi-jinping-halted-jack-ma-ant-ipo-11605203556

[53]  https://prod.reuters.com/business/retail-consumer/china-regulators-fine-alibaba-275-bln-anti-monopoly-violations-2021-04-10/

[54] "Jack Ma's Ant Group to become a financial holding company under a Beijing-enforced revamp," *CNBC.com* (April 12, 2021) https://www.cnbc.com/2021/04/12/jack-mas-ant-group-to-become-financial-holding-company.html.

[55]  https://www.wsj.com/articles/jack-mas-costliest-business-lesson-china-has-only-one-leader-11629473637

the U.S. for Alibaba's failure to disclose the meeting and its attendant risks in Alibaba's IPO registration statement.

136. Outside the spotlight of Ant's aborted IPO and Alibaba's massive fine in China, violations of the laws and regulations cited in the prior section have resulted in serious administrative sanctions levied against many thousands of persons and businesses. From 2015 to 2017, the CAC summoned more than 2,200 website operators for administrative meetings, shut down over 13,000 websites, and closed nearly 10 million user accounts "that had violated relevant laws and regulations."[56] In 2019 and 2020, enforcement actions rose significantly: the number of operators summoned by the CAC for administrative meetings increased from 2,767 in 2019 to 4,282 in 2020, to 5,654 in 2021; warnings were issued to 2,174 companies in 2019, and 4,445 companies in 2021; 384 websites were suspended in 2019, sharply increasing to 1,994 in 2020, and 3,008 in 2021; and regulators shut down 11,767 websites in 2019 and a whopping 18,489 in 2020 because they had "violated laws."[57]

137. Both the high-profile cases and the tens of thousands of information services companies that have been sanctioned and warned since the CPC took over the CAC in 2014 demonstrate that the CAC wielded significant power to direct the actions of businesses, such as Didi, that fell within its purview to ensure compliance with all relevant laws and regulations.

138. According to several Didi employees, the Chinese government's investigation into Didi has disrupted its business: "Several business units of the company have lowered their

---

[56] https://www.scmp.com/news/china/policies-politics/article/2125592/china-shuts-down-over-13000-websites-past-three-years; http://www.xinhuanet.com/2017-12/24/c_1122158880.htm

[57] http://www.cac.gov.cn/2020-02/18/c_1583568767032468.htm (2019); https://news.cctv.com/2021/01/30/ARTIbZW8p6fmvDhDnz6tbu8c210130.shtml (2020). http://www.cac.gov.cn/2022-01/27/c_1644887128880847.htm (2021).

performance targets for 2021, which were set in January at the start of the financial year, because those goals were no longer realistic, given the review of the company's business on July 16."[58]

139. As of September 17, 2021, the CAC penalties imposed on Didi had caused its daily active ride-hail users to drop 30% from the IPO date. Based on its historical rate of sign-ups, the ban on opening customer accounts is depriving Didi of about 4 million *new* ride-hail users a month.[59] The removal of all Didi's apps from app stores also depressed Didi's daily active ride-hail figures among *pre-existing* users by preventing any new drivers from signing up for Didi's ride-sharing app.

140. On December 29, 2021, Didi disclosed a $4.7 billion loss in the third quarter of 2021, largely due to the Chinese government's regulatory actions against Didi. Didi's revenues from its China Mobility services declined more than 12.9 % from the previous quarter.

141. On April 18, 2021, Didi disclosed additional erosion of its core China Mobility services during the fourth quarter of 2021, announcing a 15% revenue decline from the prior quarter.

## VI. DEFENDANTS HAD AN AFFIRMATIVE DUTY TO CONDUCT A REASONABLE DUE DILIGENCE INVESTIGATION OF DIDI'S BUSINESS

142. Didi, the Underwriters, and each of the Individual Defendants who at the time were officers and/or directors of Didi and signed the Registration Statement, each had a legal duty to conduct a thorough due diligence investigation of Didi's business and carefully review the

---

[58] C. Feng and M. Hu, "Didi's business slows from break-neck pace as on-site probes by China's cybersecurity regulators gum up operations," *South China Morning Post* (Aug. 17, 2021). Attached hereto as Exhibit 11.

[59] R. McMorrow, "Didi loses 30% of daily users after Beijing crackdown following IPO Promotions and discounts help ride-hailing rivals increase customer numbers," *Financial Times* (September 15, 2021); M. Hu, "Didi Chuxing's ride-hailing orders fall in August as Beijing's data security investigation starts to bite," *South China Morning Post* (Sept. 17, 2021).

Registration Statement to ensure that it did not omit to state any material facts required to be stated therein and that it was true and complete in all material respects.

143. The Underwriters were required to conduct an investigation reasonably calculated to reveal all those facts that would be of interest to a reasonably prudent investor. The Underwriters were required to exercise a high degree of care in investigation and independent verification of Didi's representations.

144. Especially in light of Didi's April 2021 meeting with the State Administration for Market Regulation and its May 2021 meeting with the Ministry of Transport, both convened to ensure regulatory compliance in the wake of Xi's March 15, 2021, strong exhortation to regulators to "step up" oversight of internet platforms, the required due diligence investigation included obtaining a thorough understanding of whether Didi was the subject of any other regulatory warnings, orders, directives, prohibitions, investigations, or other actions that might be material to Didi's business or to the success of the IPO. The CAC Directives, requiring Didi to ensure its business, operations and policies complied with applicable cybersecurity and data protection laws and regulations before going public, constituted a material regulatory event that should have been ascertained and analyzed in any reasonable due diligence investigation.

## VII.  Defendants Had An Affirmative Obligation to Disclose THE OMITTED FACTS IN THE REGISTRATION STATEMENT

145. Provisions of SEC Regulation S-K govern the duty of affirmative disclosure imposed upon filers of various reports under the Securities Act and the Securities Exchange Act. Some regulations apply to all filings and others apply exclusively to Registration Statements and Prospectuses. In connection with the IPO, these regulations imposed on each Defendant the duty to disclose in the Registration Statement the Omitted Facts.

### A.  17 C.F.R. §229.105 – Item 105 (Risk Factors)

43

146.    Issuers are obligated to "provide, under the caption 'Risk Factors,' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." The presentation of risks that could apply generically to any registrant or any offering is discouraged. Item 105(a). Where a summary of risk factors is required, the issuer should provide "a series of concise, bulleted or numbered statements that is no more than two pages summarizing the principal factors that make an investment in the registrant or offering speculative or risky."

147.    Going forward with the IPO without first completing, to the CAC's satisfaction, a thorough self-inspection of Didi's business, operations and policies, including a cybersecurity review, to ensure compliance with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information, and rectifying any violations, as the CAC had instructed Didi, made Didi's IPO especially risky because of the harsh consequences Didi would face from the CAC and other PRC regulators.  Thus, Defendants had a duty to disclose under Item 105 the Omitted Facts in the Registration Statement.

### B.    Form F-1 – Item 5(D) (Trend Information)

148.    SEC Regulation S-K (17 C.F.R. 229.10) provides that Registration Statements such as the one filed by Didi on Form F-1 comply with the other requirements of Regulation S-K "to the extent provided in the forms to be used for registration under the [Securities] Act." Part I, Item 4(a) of Form F-1 requires registrants to furnish the information required by Part I of Form 20-F.

149.    Part I, Item 5(D) Form 20-F, requires registrants to:

[D]iscuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition. (Emphasis added)

44

150.     Didi's decision to ignore the CAC Directives and proceed with the IPO was clearly a material uncertainty that was reasonably likely to have an effect on its revenue, income and operations.

151.     "[T]wo assessments management must make where a trend, demand, comment, event or uncertainty is known: 1. Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required. 2. If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur". SEC January 2002 Release at 3748 (2003 WL 22996757, 18).

152.     The fact that Didi was going forward with the IPO in defiance of the CAC Directives was not contingent or speculative. It was certain as of the date Didi filed the final Prospectus. The only contingent event or uncertainty was the magnitude and effect of the penalty that the CAC would impose on Didi for disobeying the Directives.

153.     It was reasonably likely that the CAC would penalize Didi if Didi disobeyed its Directives. It was also not possible, or at least extremely reckless, for Didi to conclude that any CAC penalty would not have a material effect on its business. Therefore, Didi was required to disclose the CAC Directives and the likelihood of material penalties if Didi did not follow it.

154.     Certainly, investors would want to know that Didi is defying a directive from Xi Jinping that could result in immediate and serious penalties and irreparably damage Didi's relationship with the government—which could have even bigger adverse consequences over the long term.

45

155. As a foreign issuer, Didi faces heightened obligations to disclose potential governmental or regulatory action in their home country. Item 303 specifically instructs foreign private registrants to "discuss briefly any pertinent governmental economic, fiscal, monetary, or political policies or factors that have materially affected or could materially affect, directly or indirectly, their operations or investments by United States nationals." 17 C.F.R. § 229.303(b) & Instruction ¶9.

156. Even a one-time regulatory event, if "reasonably expect[ed]" to have a material impact on the company, must be disclosed.

157. Item 5(D) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K".[60] And pursuant to Item 303, issuers must disclose actual and contemplated regulatory action or "changes in" the "regulatory environment[.]" *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*, Release No. 8350 (Dec. 19, 2003) (the "2003 Guidance") available at 2003 WL 22996757, *1 nn.1, 27. The CAC Directives were clearly an actual or contemplated regulatory action or change in the regulatory environment that Didi was required to disclose.

158. The CAC's Directives issued to Didi constituted an important regulatory event that was reasonably likely to result in harsh penalties impacting Didi's business and financial performance should Didi fail to comply. Thus, pursuant to Item 5(D), Didi had an affirmative duty to disclose the Omitted Facts in the Registration Statement.

---

[60] *See also* SEC Division of Corporation Finance's *Financial Reporting Manual* ("FRM") which provides: "The requirements for MD&A [Management's Discussion & Analysis] are set forth in Item 5 of Form 20-F, under Operating and Financial Review and Prospects (sometimes referred to as the OFR). This Item calls for the same disclosure as S-K 303 …" FRM §9410.1. FRM §9410.2 further provides: "The requirements of Item 5 of Form 20-F are as follows: … d. Trend information – Item 5.D."

## VIII. THE OMITTED FACTS AND JULY 2 PENALTIES WERE MATERIAL

### A. The CAC Directives and Didi's decision to disobey it was material information for IPO Investors

159. When the CAC told Didi to complete a self-inspection to ensure its operations complied with all relevant cybersecurity and data protection laws, Didi was on notice that regulators believed Didi's operations may not comply with relevant laws and regulations.

160. Didi's decision to ignore the CAC Directives and proceed with the IPO without completing a thorough self-inspection, the results of which were satisfactory to the CAC, substantially increased the risk that CAC and other regulators would penalize Didi for violating relevant cybersecurity and data protection laws.

161. Didi also knew that its failure to follow the CAC Directives would likely anger the CAC and provoke a harsh punitive response against Didi that could materially harm its business.

### B. The July 2 Penalties Were Material to Didi's Business

162. On July 2, 2021, the CAC announced that "[i]n order to prevent national data security risks, safeguard national security and protect public interests, in accordance with the National Security Law of the People's Republic of China and the Cyber Security Law of the People's Republic of China, the Cyber Security Review Office will conduct a cyber security review on Didi Chuxing pursuant to the Cyber Security Review Measures. During the review, Didi Chuxing will halt new user registration in order to cooperate with the cyber security review and prevent further risks." (hereinafter referred to as the July 2 Penalties").

163. The July 2 Penalties, which affected more than two dozen Didi apps in China, had a material adverse effect on Didi. The announcement caused an immediate decline in pre-market trading of Didi's share price.

164. In addition, the fact that CAC determined Didi's platform posed a national security risk and a threat to the public interest was a very strong indication that Didi's platform was not in compliance with Chinese laws and regulations.

165. The July 2 Penalties were a harbinger of future government regulatory action. Given the open-ended nature of the July 2 Penalties, with broad sweeping finding that Didi's operations posed a national security threat and a threat to the public interest, it was apparent that additional serious regulatory action and/or consequences was likely to follow.

166. Further, the CAC prohibition against Didi registering new users would severely negatively impact Didi's revenue growth. The CAC announcement did not state the duration of the prohibition against registering new users. The law allowed the CAC to ban new user registration indefinitely.[61] Thus, it was entirely possible the ban on new user registration could last for months and even years.[62] Indeed, as of April 25, 2022, the CAC ban on new user registration continues to be in effect.

167. Didi's share price valuation in the IPO and on the NYSE was predicated on Didi's continued growth of new users and concomitant revenues. Indeed, Didi's Registration Statement makes more than one hundred references to the expected growth of its business and the importance of continued customer and revenue growth to its financial performance, including the following statements:

---

[61] Pursuant to Article 13 of the 2020 CSR Measures, a cybersecurity review would "generally" conclude in 45 working days. However, if the "situation is complicated," Article 14 provided that the review can be "extended appropriately," i.e., for an indeterminate time period.

[62] One reporter noted "The regulator didn't say how long the review would last but said that the move was aimed at safeguarding national data security." China's Internet Regulator Reviewing Cybersecurity of Didi Chuxing, Dow Jones Institutional News 2 July 2021.

48

a.  "If we are unable to attract or retain consumers, our platform will become less appealing to drivers and businesses, and our business and financial results may be materially and adversely impacted."  Form F-1/A, filed June 28, 2021, at 10, 24.

b.  Under the heading "Market Opportunity," Didi said "[w]e expect the shift from traditional mobility such as private cars and public transportation to shared mobility to further accelerate. The global mobility market is expected to reach US$16.4 trillion by 2040, by which time the penetration of shared mobility and electric vehicles is expected to have increased to 23.6% and 29.3%, respectively, according to CIC." *Id.* at 8.

c.  "According to CIC, user penetration for shared mobility, defined as average monthly active users as a percentage of total population, among Tier 3 and below cities in China was approximately 7% in the fourth quarter of 2020, compared to 24% in Tier 1 and Tier 2 cities. ***This represents a massive opportunity for expansion***, especially in lower tier cities." *Id.* at 151. (Emphasis added.)

d.  "Since our inception, we have experienced rapid growth in our business, the number of drivers and consumers on our platform and our geographic reach, and we expect to continue to experience growth in the future." *Id.* at 32.

e.  "The shared mobility market and related markets in China and elsewhere may not grow at the rates projected by market data, or at all. The failure of these markets to grow at the projected rates may have a material adverse effect on our business and the market price of our ADSs." *Id.* at 86.

f.  "**Core Platform Transactions**: We define Core Platform Transactions as the sum of transactions for our China Mobility and International segments. We believe Core Platform Transactions are a useful metric to measure the scale and usage of our mobility

49

services. We believe we have a significant opportunity to continue to grow the number of Core Platform Transactions." *Id*. at 113-14.

g.   "**Factors Affecting Our Results Of Operations**
Our results of operations are primarily affected by the following company-specific factors:

Ability to grow Core Platform Transactions
The number of Core Platform Transactions is a key factor affecting our revenues. This is in turn affected by our ability to attract, retain and engage consumers. … . For China Mobility, we intend to increase our penetration across China." *Id*. at 116.

h.   "Increasing Penetration of Shared Mobility Creates a Massive Opportunity

The shared mobility market size represents the total value of consumer spend on four-wheel ride hailing, taxi-hailing, hitch, and chauffeur services. The appeal of shared mobility is evidenced by its continued increase in consumer penetration and is driven by both demand and supply factors. In China, shared mobility as a percentage of total mobility was 4.1% in 2020 based on consumer spending. Despite temporary impacts of evolving industry standards and the COVID-19 pandemic between 2018 and 2020, it is estimated that shared mobility penetration will increase from 1.2% in 2015 to 8.1% by 2025, according to CIC. It is expected that by 2040, shared mobility penetration will be 35.9% of total mobility spending in China. Shared mobility as a percentage of total mobility based on the number of rides increased from 0.7% in 2015 to 2.1% in 2019 and 2020. This is expected to further grow to 4.8% and 26.9% in 2025 and 2040, respectively." *Id.* at 148.

168.   One investor analyst, on Seeking Alpha, stated "with DiDi priced like a growth tech company, a minor loss of market share could be disastrous to its valuation." Seeking Alpha July 4, 2021.[63]

169.   In the nine months since the CAC announced the cybersecurity review, Didi has lost approximately 36 million new customers, which, had they been added to the pre-IPO customer

---

[63] ALT Perspective, "DiDi: Manifestation Of Risks," *Seeking Alpha* (July 5, 2021) https://seekingalpha.com/article/4437930-didi-near-term-ride-looks-bumpy. Attached hereto as Exhibit 12.

50

base of 377 million annual users, would have accounted for approximately 8.7% of its current revenue base (assuming it never lost any customers). As Didi was already the dominant player in the ride-hail market, growth via new users was essential to its continued success. Instead, its competitors have been gaining ground and were able to use the July 2 Penalties as an *opportunity* to take away some of Didi's customers. For example, on November 4, 2021, *Bloomberg* reported that Didi's ride-hailing market share in China dropped from 80% in July 2021 to 75% in September 2021.[64]

170.    Given the stated importance of growing its user base, the July 2 Penalties were a material adverse event for Didi's business.

## IX.    SECURITIES EXCHANGE ACT CLAIMS

171.    All of the preceding allegations in the Complaint are repeated and realleged herein as they are applicable to Plaintiffs' claims under Sections 10(b), 20(a) and 20(A) of the Securities Exchange Act of 1934.

172.    The allegations in this Securities Exchange Act section apply only to claims under the Securities Exchange Act of 1934 and are not alleged in respect of any of Plaintiffs' Securities Act of 1933 claims.

### A.    The Cyberspace Administration of China Instructed Didi Not to Go Public Until Didi Completed a Thorough Self-Inspection Ensuring Its Compliance with Relevant Cybersecurity Laws and Regulations

173.    According to the Wall Street Journal, when plans to list on the Hong Kong exchange fell apart in April because of a stringent requirement that issuers' operations must be fully compliant and licensed, something Didi and its millions of drivers admittedly could not

---

[64] A. Grant, "Competition Grows Among China's Ride-Hailing Ventures," *Bloomberg* (Nov. 4, 2021) https://www.bloomberg.com/news/newsletters/2021-11-04/competition-grows-among-china-s-ride-hailing-ventures Attached hereto as Exhibit 13.

achieve in every market, Didi decided to list in the United States. To do so, however, Didi knew it needed cooperation from Beijing. For that reason, Didi was in discussions with Chinese regulators well in advance of the June 30, 2021 IPO.65

174. After Didi filed its SEC Form F-1 registration statement in early June, it told officials from the Ministry of Transport, the Chinese Securities Regulatory Commission, the National Development and Reform Commission and the CAC that it had tentatively planned the IPO to be completed in early July.66

175. In the weeks leading up to the IPO, however, officials directed Didi to postpone its IPO in the United States until Didi completed – to the CAC's satisfaction – a thorough self-inspection of its business, operations and policies, including but not limited to a cybersecurity review, to ensure compliance with all applicable laws and regulations concerning national security,

---

[65] J. Yang, K. Zhai & C. Driebusch, "Didi Tried Balancing Pressure From China and Investors. It Satisfied Neither. *The Wall Street Journal* (Jul. 9, 2021) ("Didi Tried Balancing Pressure From China") https://www.wsj.com/articles/didi-ipo-china-regulators-investors-trouble-11625873909. (attached hereto as Exhibit 14)

[66] Didi Tried Balancing Pressure From China, *The Wall Street Journal* (Jul. 9, 2021) (Exhibit 14).

network security, data security, and/or the collection and protection of private personal information, and rectified any violations .67 As *The Wall Street Journal* explained:[68]

> ***The Chinese officials urged the company to postpone the share sale*** because Beijing was concerned that IPO documents required by U.S. regulators could have sensitive information and data it didn't want U.S. authorities to have.
>
> ***The officials made clear to Didi***, according to the two people, ***that the government*** didn't intend to block the IPO, but ***wanted the company to wait until it had carried out the proper security checks*** and made sure the documents it would present to the U.S. regulators contained no sensitive information.
>
> The officials also wanted to address the issue of audit working papers, the two people said . . . Audit materials could contain raw data such as meeting logs, user information and email exchanges between the company and government agencies, among other things.
>
> One person close to the company said Didi hasn't handed anything sensitive to U.S. regulators to date. ***Chinese officials, however, argue that it is for regulators, not the company, to decide what is sensitive.*** In China, the ride-hailing company is classified by law as a "critical infrastructure provider," language that signals national-security sensitivities.

---

[67] The CAC's instructions to Didi to postpone the IPO were independently reported in numerous international media. *See* J. Yang, K. Zhai & C. Driebusch, "Didi Tried Balancing Pressure From China and Investors. It Satisfied Neither," *The Wall Street Journal* (Jul. 9, 2021) (Exhibit 14); C. Feng, C. Pan, M. Hu & Z. Xin, "Didi Chuxing 'forced its way' to a New York listing, triggering data security review, sources say," *South China Morning Post* (July 6, 2021) (attached hereto as Exhibit 15); H. Lockett, T. Kinder, S. Yu, C. Shepherd, Y. Yang & J. Franklin, "Didi Caught As China And US Battle Over Data," *Financial Times* (July 6, 2021) (attached hereto as Exhibit 16); Bloomberg News, "China Weighs Unprecedented Penalty for Didi After U.S. IPO" *The Japan Times* (July 22, 2021, 5:44 AM EDT, Updated on July 22, 2021, 4:22 PM EDT) (attached hereto as Exhibit 17); L. Wei & K. Zhai, "Chinese Regulators Suggested Didi Delay Its U.S. IPO," *The Wall Street Journal* (July 5, 2021 2:43 pm ET) (attached hereto as Exhibit 18); Nearly all of the many news reports on this point state the meeting between Didi and the CAC occurred "weeks" or in the "weeks" before the IPO. One source—a former director of the Publicity Department of the Central Committee of the CPC and currently an executive at a Chinese internet company—identifies June 21, 2021 as the specific date of the meeting, "*Interpretation on the Didi Incident*", an analysis circulated internally in Huaxi Securities, a Chinese investment bank. https://drive.google.com/file/d/18diceb2XXdsQG4tofHmTvGRxO8t1aWUY/view.

[68] "Didi Tried Balancing Pressure From China," *The Wall Street Journal* (Jul. 9, 2021) (Exhibit 14).

Beijing's suggestion that Didi delay its IPO left the company having to decide whether to comply with U.S. or Chinese priorities.

Didi signaled to regulators that it would consider the request, and that it wouldn't be a problem to postpone the listing if needed, say people familiar with its communications with regulators. (Emphasis supplied.)

176. *Bloomberg* similarly reported on July 6, 2021, that "Chinese regulators asked Didi as early as three months ago to delay its landmark U.S. IPO because of national security concerns involving its huge trove of data, according to people familiar with the matter."[69]

177. Another report, in the *South China Morning Post* confirmed a meeting between the CAC and Didi in Beijing. Meetings such as these are not always highly formal, but although the format of the CAC's meeting with Didi may have "produced no written records," there is no mistaking the message being given: "For the CAC, such sit-down discussions … constituted channels to formally deliver the regulator's instructions, with no room for defiance."[70]

178. While the CAC's explicit authority over IPOs was not yet enshrined in law, the Cybersecurity Law *already empowered* the CAC to both demand that Didi conduct a self-inspection and submit its results to the CAC (Article 38, *see* ¶101, above) and impose a wide array of draconian penalties for violations of the law (Article 66, *see* ¶104, above). Indeed, Didi, which purportedly employed several hundred in its governmental affairs department, is very well aware

---

[69] "China Cyber Watchdog Asked Didi to Delay IPO on Data Concern," *Bloomberg News* (July 6, 2021). https://www.bloomberg.com/news/articles/2021-07-06/didi-slumps-after-china-regulators-order-stores-to-remove-app. Attached hereto as Exhibit 20. In fact, Didi's Registration Statement boasted: "Our technology is powered by the world's largest repository of real-world traffic data from our shared mobility fleet." Form F-1/A, filed June 28, 2021, at 6, 162, 173, 181, and 182.

[70] M. Hu, M. Borak, C. Zhou, & Z. Xin, "China's regulators suspect Didi's US listing was 'deliberate act of deceit', a portrayal that shows severity of mistrust, sources say," *South China Morning Post* (July 9, 2021) ("Didi's US listing was 'deliberate act of deceit'") https://www.scmp.com/tech/policy/article/3140471/chinas-regulators-suspect-didis-us-listing-was-deliberate-act-deceit. Attached hereto as Exhibit 21.

of the annual statistics that the CAC published regarding its regulatory enforcement actions. News of the CAC's annual statistics for administrative meetings held, warnings issued, websites suspended and websites taken down are widely reported by Chinese national news media upon their publication. (*See* ¶¶ 20 and 133, above).

179.     Didi led the CAC to believe that it would comply with its Directives and would postpone its IPO until it had completed the required cybersecurity review.

180.     In truth, Didi had other plans. It did not intend to follow the CAC's Directives.

181.     As the *South China Morning Post* reported, regulators called Didi's actions of charging ahead with the IPO in defiance of the CAC's Directives a "deliberate act of deceit." Specifically, "Some officials are privately describing Didi's move as '*yang feng yin wei*'— to comply publicly but defy privately (or, put another way, to say one thing and then do another)— according to a source who was briefed, speaking on condition of anonymity for describing confidential discussions." [71]

182.     After the IPO, Didi employees shared information on Chinese social media saying that Didi was under pressure from the CAC to delay its initial public offering but proceeded anyway.[72] Similarly, the *Financial Times* reported that "one person close to Didi acknowledged

---

[71] Didi's US listing was 'deliberate act of deceit,' *South China Morning Post* (July 9, 2021) (Exhibit 21).

[72] C. Feng, C. Pan, M. Hu & Z. Xin, "Didi Chuxing 'forced its way' to a New York listing, triggering data security review, sources say, *South China Morning Post* (July 6, 2021) ("Didi Forced Its Way") (Exhibit 15) (citing a July 5 research note by Gavekal's Ernan Cui and Thomas Gatley).

that the company had been advised by the CAC to delay its listing until it had conducted a data security review".[73]

183.    Chinese officials characterized Didi's actions as "'forc[ing] its way' to go public in New York without completing a through data security assessment by CAC, a necessary step for Beijing amid its enhanced scrutiny of data security." According to an anonymous source close to CAC, the focus of the CAC's concern with the Didi IPO was that there was a potential security risk of "important data and the personal information of Chinese citizens going abroad."[74]

184.    In the aftermath, Chinese officials said they were quite certain that Didi understood their instructions to postpone its IPO until it had ensured the security of its data.[75] "Regulators urged Didi to ensure the security of its data before proceeding with the IPO or to shift the location to Hong Kong or mainland China where disclosure risks would be lower, the people said. Regulators didn't explicitly forbid the company from going public in the U.S., ***but they felt certain Didi understood the official instructions***, they said. One person involved in the meetings, when asked why Didi didn't act on suggestions from regulators, referred to a proverb that you can't wake a person pretending to sleep. … Some regulatory officials expressed in private that they think Didi may have rushed its IPO out before China unveiled a new web security law, which could have hurt its valuation, one of the people said."[76]

---

[73] "Didi Caught As China And US Battle Over Data," *Financial Times* (July 6, 2021) (Exhibit 16).

[74] Didi Forced Its Way, *South China Morning Post* (July 6, 2021) (Exhibit 15).

[75] "China weighs unprecedented penalty for Didi after US IPO," *Bloomberg* (July 22, 2021) (Exhibit 17).

[76] "China weighs unprecedented penalty for Didi after US IPO," *Bloomberg* (July 22, 2021) (Exhibit 17).

185.    Duowei News later reported "[a]ccording to sources close to China's financial regulators, the 'Didi Travel' App was taken down due to both higher-up concerns about data leakage risks to the country and Chinese citizens, and that fact that 'Didi Travel' rushed to the U.S. market despite repeated communications from regulators. Sources say the penalties for Didi Travel will be far more severe than that of Alibaba. … The inside source said that the Beijing authority's heavy crack down stemmed from Didi Travel rushing to list in the U.S. despite being advised not to. *It is reported that the regulator has communicated with the company's senior management several times that they did not want Didi to go public in the United States*."[77]

186.    On August 11, 2021, the *South China Morning Post* reported that "China's regulators have been conducting investigations at Didi's Beijing head office for weeks, involving daily summons of mid-level managers for hours of questioning at short notice, even on weekends, sources said." "The investigators' top priorities are to ascertain the line of responsibility in Didi's IPO decision, and to fix what are considered security loopholes in Didi's apps." "The investigations, which are being conducted to ascertain the persons responsible for Didi's decision to force its way to list in New York, contrary to the Chinese regulators' verbal instructions – characterized by officials as a 'deliberate act of deceit' – may result in Liu's role being changed, said one of the sources, speaking on condition of anonymity about an ongoing investigation."[78]

---

[77] "Exclusive: Higher-Ups' Discontent With The U.S. Listing Of Didi, Punishment Will Go Far Beyond That Of Alibaba," *Duowei News* (July 5, 2021) (attached hereto as Exhibit 22).

[78] J. Ye, "China's probe into ride hailing giant Didi Chuxing may lead to management reshuffle, sources say," *South China Morning Post* (Aug. 11, 2021) (attached hereto as Exhibit 23). Another later report confirmed that Chinese officials said that part of the on-site investigation was focused on the decision-making process behind Didi's IPO. *See* K. Zhai & L. Lin, "Chinese Regulators Nudge Didi Towards Hong Kong Listing," *The Wall Street Journal* (Oct. 21, 2021) (attached hereto as Exhibit 4).

187. The fact that Chinese regulators believed that Didi deceived them, and that the regulators wanted to determine who at Didi is responsible for not following the CAC Directives – which the CAC believes were clear instructions to Didi – demonstrate that Didi and the Officer Defendants were aware of or reckless in not knowing of the CAC's instructions to postpone the IPO.

**B. Didi and the Officer Defendants Were Determined to Push Ahead With the IPO, Regardless of the CAC's Directives**

188. In June 2021, it appeared that the window for high valuation Chinese IPOs in the United States could close very soon. Tensions between U.S and Chinese government regulators concerning audit transparency were heating up. On June 10, China had also passed the Data Security Law, to become effective September 1, 2021,[79] and drafts of the Personal Information Protection Law, ultimately enacted on August 22, 2021,[80] had been circulated. The DSL would give Chinese regulators authority over data requests from foreign regulators and increase security measures for all cross-border data transmission; the PIPL would increase regulation over private information requiring, before data could be exported, special certification and the recipient's agreement to abide by the PIPL. With the continued crackdown on big data platform companies, Didi and the Officer Defendants did not want the window of opportunity to close.

189. Compliance with the CAC's Directives could mean a lengthy delay – as long as six months or more – and perhaps an inability to move forward in the U.S at all after the new laws took effect. Completion of the IPO, however, would enable both Didi's founders (Cheng and Liu)

---

[79] http://www.npc.gov.cn/npc/c30834/202106/7c9af12f51334a73b56d7938f99a788a.shtml
[80] http://www.npc.gov.cn/npc/c30834/202108/a8c4e3672c74491a80b53a172bb753fe.shtml

and other early investors to cash out their investment and make billions. Didi faced pressure from some of its early investors to go ahead with the IPO and earn them a big payout.[81]

190.    While Didi's founders and some of its early investors were eager to complete the IPO in violation of the CAC Directives, two of Didi's directors – Daniel Yong Zhang (Chairman and CEO of Alibaba Group Holdings) and Martin Chi Ping Lau (president and executive director of Tencent Holdings) – "were surprised and furious when they learned that Didi was in trouble with the Cyberspace Administration of China." In fact, "Messrs. Lau and Zhang had earlier advised Didi Chairman Will Cheng and President Jean Liu—who also sit on the eight-member board— against rushing to go public in the midst of China's wide-ranging regulatory crackdown on the business practices of dozens of internet-technology companies, the people familiar with the matter said."[82]

191.    These cooler heads did not prevail. Instead of heeding the CAC's Directives and its own directors' urging to delay the IPO, Didi accelerated the process to avoid the CAC taking action to halt the IPO, conducting 3.5 days of "round-the-clock virtual meetings," in an unusually short

---

[81] L. Wei & K. Zhai, "Chinese Regulators Suggested Didi Delay Its U.S. IPO: Ride-hailing giant, under pressure to reward shareholders, pushed ahead with NYSE listing despite concerns of China's cybersecurity watchdog," *The Wall Street Journal* (July 5, 2021) (Exhibit 18); "China Weighs Unprecedented Penalty for Didi After U.S. IPO," *Bloomberg*, (July 22, 2021) (Exhibit 17).

[82] J. Yang, "Rift Forms on Didi's Board Following Beijing's Regulatory Assault," *The Wall Street Journal* (Aug. 18, 2021) (attached hereto as Exhibit 24). The article confirms an earlier report in the *South China Morning Post* "that the Tencent and Alibaba executives advised Didi to defer its New York listing." *See* "China's probe into ride hailing giant Didi Chuxing may lead to management reshuffle, sources say," *South China Morning Post* (Aug. 11, 2021) (Exhibit 23).

time frame for a $4.4 billion public offering. In fact, "[i]t was one of the shortest periods to take investor orders for an IPO in recent memory, according to bankers, investors and lawyers."[83]

192.    Didi also scheduled its IPO to occur the day before July 1st, a major Chinese National Holiday celebrating the founding of the Chinese Communist Party. The CPC Founding Day is a holiday in which all government workers suspend their daily work and conduct only celebratory activities. The CPC Founding Day in 2021 was particularly important because it was the 100th anniversary of the CPC. According to *Fortune*: "This is a week of pomp [and] pageantry … as the Chinese Communist Party, which has ruled the nation since 1949, celebrates the 100th anniversary of its founding congress in July 1921."[84] When Didi's shares began trading on the NYSE at 9:30 a.m. on June 30, it was 9:30 p.m. on the eve of Founding Day in Beijing and the festivities had been underway for several days.

193.    Scheduling its IPO to coincide with CPC Founding Day lessened the risk that CAC officials would be able to immediately react to Didi's disobeying the CAC's Directives, or otherwise interrupt or stop the IPO once it commenced. When President Xi decided to personally block the Ant Group IPO, although retribution for Jack Ma's comments critical of state-owned banks was swift, it did not happen overnight.[85] *Duowei News* reported that regulators were furious

---

[83] *See* Didi Tried Balancing Pressure From China, *The Wall Street Journal* (July 9, 2021) (Exhibit 14).

[84] "The debate that racked China's Communist Party founders 100 years ago still reverberates today," *Fortune* (June 29, 2021). https://fortune.com/2021/06/29/china-communist-party-100th-anniversary-date-debate/. The article describes President Xi's appearances at a spectacular show at the National Stadium on Monday and at a ceremony at the Great Hall of the People to award medals to "ordinary heroes" for their contributions to the Party.

[85] https://www.cnn.com/2020/11/03/tech/ant-ipo-postponed-beijing-jack-ma/index.html   Little more than a week passed between Ma's s unfortunate remarks and meetings with regulators scuttling the Ant IPO.

that Didi deliberately chose to go public in the United States before the Communist Party's centennial celebration, hoping to list 'preemptively.'"[86]

194. Didi began its marathon roadshow on June 24 and completed it on June 28, 2021, one day earlier than planned.[87]

195. On June 29, 2021, Didi's Chairman and CEO, and the Underwriters, filed separate letters requesting the SEC to declare the Registration Statement Effective at 4:00 pm on June 29.

196. Less than 90 minutes later, at 5:23 p.m. on June 29, 2021, a report indicated that the Underwriters and Didi priced the IPO at $14.00/share, the upper end of the previously discussed $13 - $14 range.[88]

197. On June 30, at 12:15 a.m. the SEC declared the Registration Statement effective.

198. The Underwriters offered 316.8 million shares at $14.00 per share hoping to rake in proceeds of $4.4 billion (including the overallotment option) in the IPO. Upon the IPO, Didi had a market capitalization of $68 billion. Its founders Cheng and Liu were worth at least $4.4 billion and $1.1 billion respectively. Softbank's stake was now worth $13.6 billion.

199. On June 30, Didi issued a terse press release announcing the IPO and stating that "[t]he closing of the offering is expected to occur on July 2, 2021, *subject to the satisfaction of customary closing conditions*." (Emphasis added.)

---

[86] "Exclusive: Higher-Ups' Discontent With The U.S. Listing Of Didi, Punishment Will Go Far Beyond That Of Alibaba," *Duowei News* (July 5, 2021) (attached hereto as Exhibit 22).

[87] S. Murdoch, J. Zhu & Y. Sun, "Chinese firm Didi's $4 bln IPO books covered on first day of bookbuild – sources," *Reuters* (June 24, 2021) https://www.reuters.com/business/autos-transportation/chinas-didi-list-new-york-stock-exchange-2021-06-24/; Y. Sun & S. Murdoch, "Didi's $4bln IPO order books to close Monday – sources," *Reuters* (June 27, 2021).

[88] C. Driebusch, "Didi Global Prices IPO at $14 a Share," *Dow Jones Institutional News* (June 29, 2021, at 5:23 p.m.).

200.     To maintain a low profile, unlike almost every other IPO, particularly multi-billion-dollar IPOs, Didi's senior management did not ring the NYSE bell the morning of the IPO. Didi was doing its best to fly below the radar and not flout its defiance of the CAC.

201.     Didi succeeded in pulling off its IPO while the CAC and other regulatory agencies were closed for the 100th anniversary celebration of CPC Founding Day. However, its victory was short-lived.

202.     On July 2, at 6:00 pm Beijing time (6:00 a.m. New York Time), the CAC contacted Didi and warned that in one hour the CAC would publicly order Didi to stop signing up new users and would commence a cybersecurity review of Didi.[89]

203.     The punishment was in response to Didi's refusal to comply with the CAC's Directives. Now instead of conducting a thorough self-inspection and seeking CAC sign-off, Didi would have to endure an investigation by the CAC – one of indeterminate length. This punishment would also have major financial consequences for Didi because none of its apps could take on new customers in China, halting all growth and giving its competitors a chance to take new and existing customers away from Didi.

204.     At 7:19 pm Beijing time on July 2 (7:19 a.m. New York time), the CAC posted a notice on its website that "In order to prevent national data security risks, safeguard national security and protect public interests, in accordance with the National Security Law of the People's Republic of China and the Cyber Security Law of the People's Republic of China, the Cyber Security Review Office will conduct a cyber security review on Didi Chuxing pursuant to the Cyber Security Review Measures. During the review, Didi Chuxing will halt new user registration

---

[89] "Didi Caught As China And US Battle Over Data," *Financial Times* (July 6, 2021) (Exhibit 16).

in order to cooperate with the cyber security review and prevent further risks." The CAC also announced that Didi was no longer permitted to accept new user registrations in China.

205. Before U.S. markets opened for trading on Friday, July 2, 2021, a number of prominent news outlets reported the CAC's actions against Didi:

206. CNBC reported this news at 7:44 a.m. New York time.

207. At 7:55 a.m. New York time, Reuters reported "China's cyberspace administration said on Friday it has launched a new investigation into ride-hailing giant Didi Global Inc to protect national security and the public interest."

208. On July 2, at 8:09 a.m. New York time, *Bloomberg News* reported:

> Didi Dives as China Unveils New Cyber Probe After Mega IPO
>
> Didi Global Inc. tumbled Friday after China said its starting a cybersecurity review of the ride-hailing company just two days after it pulled off one of the biggest U.S. stock market debuts of the past decade.
>
> The move is to prevent data security risks, safeguard national security and protect public interest, according to a statement from the Cyberspace Administration of China. Didi has halted new user registrations during the probe.

209. By 8:51 a.m. on July 2, 2021, *Marketwatch* reported that Didi said it will "fully cooperate and examine its risks."

210. Five hours after learning the news, and more than 90 minutes since the start of trading on the NYSE, Didi issued a press release at 11:03 a.m., confirming the CAC's announcement and stating: "DiDi will fully cooperate with the PRC government authority during the review. It plans to conduct a comprehensive examination of cybersecurity risks and continue to improve on its cybersecurity systems and technology capabilities." Given the dissemination of

63

an alarming story concerning a company that just two days earlier had conducted a blockbuster $4.4 billion IPO, the lengthy delay in issuing a formal statement was quite unnerving.

211. The *Financial Times* shed light on what was happening during this critical period: "Didi's bankers, who were still settling shares allocated in [its June 30] New York $4.4bn IPO, were forced to pause while lawyers assessed whether the [CAC's] order was 'an existential threat to the company'".[90] This was an excellent question. With no user sign-ups allowed during the pendency of the review, should the investigation last 45 calendar days, one analyst estimated that Didi would lose *at least* 6 million new users.[91] However, as Chinese law does not limit the review time to 45 days, no one knew how long Didi would be forbidden to take on any new customers.[92] Once a fast-growing company, Didi was now possibly a facing a long period of no user and revenue growth or even a decline.

212. Specifically, when the news broke before 8:00 a.m. in New York, the IPO had not yet closed. Closing for the transaction was set for later that day on July 2. The underwriting agreement contained the standard closing conditions that the Underwriters could cancel the transaction, and not close, if: (i) a material adverse event occurred, (ii) the Registration Statement omitted a material fact or was inaccurate as of the closing, (iii) any of Didi's representations and warranties in the underwriting agreement are inaccurate, including the absence of a material adverse event or pending or threatened government regulatory action or inquiry, (iv) or Didi's

---

[90] "Didi Caught As China And US Battle Over Data," *Financial Times* (July 6, 2021) (Exhibit 16).

[91] "Chinese Regulators Target Ride-Hailing Company Didi Just Days After IPO, *Wall Street Journal* (July 2, 2021) (citing Bernstein analyst Cherry Leung). Attached hereto as Exhibit 25.

[92] Pursuant to Article 13 of the 2020 CSR Measures, a cybersecurity review would "generally" conclude in 45 working days. However, if the "situation is complicated," Article 14 provided that the review can be "extended appropriately," i.e., for an indeterminate time period.

64

officers didn't provide satisfactory officer certificates attesting that all of the representations and warranties continued to be accurate, all of the closing conditions are satisfied, and that there had been no material adverse events, including regulatory actions, as of the closing.[93]

213. The Registration Statement stated that "[t]he underwriters are offering the ADSs subject to their receipt and acceptance of the ADSs and subject to prior sale. The underwriting agreement provides that the obligations of the several underwriters to pay for and accept delivery of the ADSs offered by this prospectus are subject to the approval of certain legal matters by their counsel and *to certain other conditions*." Form F-1/A at 257. (Emphasis added.)

214. Thus, the Registration Statement, and the underwriting agreement made clear that the Underwriters would not purchase the IPO shares from Didi and proceed to resell them to investors unless and until the Underwriters had done their due diligence and confirmed that all closing conditions – including the absence of any material adverse events or governmental actions and that the Registration Statement did not contain an omission of material fact – as of the time of closing, had been met.

215. Not only was Didi aware of the CAC's power to punish Didi under the Cybersecurity Law for failing to comply with the CAC Directives prior to the IPO, but certainly by 6:00 a.m. on July 2, Didi knew the CAC was extremely angry at Didi for flouting its Directives and pushing forward with the IPO – and that the CAC had issued the July 2 Penalties in response to Didi ignoring the CAC Directives.

---

[93] The Underwriting Agreement, filed with the SEC as Exhibit 1.1 to Didi's Amendment No. 2 to Form F-1 on June 28, 2021, is attached hereto as Exhibit 19 and incorporated by reference herein.

65

216.    Having learned on July 2 that the CAC was punishing Didi by banning it from taking on any new customers while responding to a serious cybersecurity review of indefinite duration, deemed necessary by the CAC "to prevent national data security risks, safeguard national security and protect the public interest," Didi and the Officer Defendants knew that: (i) the representations and warranties in the Underwriting Agreement were not accurate; (ii) the Registration Statement omitted material facts as of the closing; (iii) Didi's failure to follow the CAC Directives and the imposition of the July 2 Penalties would have a material adverse effect on Didi's business, and (iv) the closing conditions were not satisfied.

217.    On July 2, prior to closing, the Underwriters, Didi, and the Officer Defendants, held a call – referred to as a "bring-down" due diligence call – where Underwriters asked the company a series of questions to verify that all of Didi's representations and warranties in the underwriting agreement were true and accurate as of the closing, to ensure all closing conditions are satisfied, as well as to verify that no material adverse events or adverse governmental actions or inquiries had occurred since the most recent diligence call immediately prior to pricing the IPO on June 29. Such material events may include "a material development in the company's business or expectations regarding its future financial results, or a previously unforeseen regulatory issue arising."[94]

218.    The due diligence call gave the Underwriters an opportunity to question the Officer Defendants and Didi's other executive officers about the reasons for the July 2 Penalties, as well as their potential impact on the Company's business.

---

[94] "Strategies For Going Public," Deloitte & Touche LLP and Skadden, Arps, Slate, Meagher & Flom LLP. (Feb. 2020). https://www.skadden.com/insights/publications/2020/02/strategies-for-going-public.

66

219. The CAC's action, banning Didi from taking on any new customers pending a cybersecurity review of indeterminate length, was a material adverse event and/or a governmental action or inquiry rendering the representations and warranties in the Underwriting Agreement false and causing material conditions for closing to be unsatisfied, thus providing a basis to cancel the IPO.

220. To complete the IPO and obtain $4.4 billion from Investors, Didi and the Officer Defendants engaged in a fraudulent course of conduct to (i) conceal the CAC Directives and the reasons for the July 2 Penalties, (ii) conceal the importance of the July 2 Penalties and its effect on Didi's business, and (iii) issue materially false officer certificates to the Underwriters to persuade them to go forward with the closing of the IPO.

221. The Officer Defendants issued false officer certificates to the Underwriters at the closing falsely attesting that (i) the representations and warranties in the Underwriting Agreement were accurate; (ii) the Registration Statement did not omit material facts as of the closing; (iii) there had not been any governmental regulatory action that could have a material adverse effect on Didi's business, and (iv) all of the closing conditions were satisfied.

222. The false Officer Certificates were a necessary and critical step for the IPO to go forward and close. Without these fraudulent Officer Certificates, the Underwriters would not have closed the IPO and would not have released from escrow to Didi the $4.4 billion of Investors' funds.

223. Having received the false officer certificates, the Underwriters went forward and closed the IPO transaction on July 2.

C. **Defendants' Misconduct Caused Didi's Share Price to Decline**

224. During the period following the IPO the Chinese government implemented a series of regulatory actions and penalties against Didi for disobeying the CAC Directives and going

67

forward with the IPO. These regulatory actions and penalties were a materialization of the concealed risk that Didi's flouting the CAC Directives posed for IPO Investors and caused Didi's share price to decline. In addition, when news of the Omitted Facts was partially revealed to the market in a series of adverse news reports, this also caused Didi's share price to decline.

225. On July 2, 2021, prior to market open, the CAC posted on its website at 7:19 a.m., and CNBC reported at 7:44 a.m., that Didi is subject to cybersecurity review by the CAC and that, until further notice, Didi is required to suspend new user registration in China. This was the materialization of the concealed risks posed by the Omitted Facts.

226. Didi's share price immediately began to decline in off-exchange after-market trading. Didi's off-exchange price declined from about \$16.88/share to \$14.96/share when the NYSE opened for trading.

227. Because of the adverse news, Didi's share price opened on the NYSE \$1.44/share lower than its prior day's closing price of \$16.40/share, opening at \$14.96/share, 8.8% lower, and traded down as low as \$14.60/share that day.

228. On July 3, 2021, with the tide of public opinion quickly turning against Didi, company Vice President Li Min took to Weibo (a Twitter-like platform) to state that all domestic user data is stored on servers in China and that Didi would sue anyone who accused it of transferring such data to the U.S.

229. On the morning of Sunday, July 4th, newswires began reporting an official announcement that the CAC posted to its website at 7:40 a.m. New York time:

> Based on reports, and after tests and investigations, the "Didi Travel" app was found to have **seriously violated laws and regulations in collecting and using personal information**. According to the relevant provisions of the Cybersecurity Law of the People's Republic of China, **the Cyberspace Administration of China notifies all app stores to remove the "Didi Travel" app** and requires Didi Travel Technology Co., Ltd. to strictly follow the legal requirements and national

68

standards to rectify existing problems, to effectively protect the safety of personal information of all users.

This affirmative measure to remove the main Didi Travel app from all app stores was another major blow to Didi because existing users could no longer download updated versions of the app. This was a further materialization of the concealed risks posed by the Omitted Facts.

230. In a statement posted to its Weibo account, Didi abandoned the defiant tone taken the day before, when it had threatened to sue those who disparaged its protection of user data from cross-border disclosure, instead stating: "We sincerely thank the responsible departments for guiding Didi to look into the risks." Didi promised to "conscientiously rectify" the problems.

231. At 12:40 p.m., the *Wall Street Journal* reported upon the Didi app removal following the CAC's finding of "serious" legal and regulatory violations regarding the collection and use of personal data. The story suggested that Didi may have known it was not in compliance with user data laws: "A notice on Didi's app dated June 29, one day ahead of its stock market debut, said new changes to its user information and data privacy policy would come into effect on July 7."

232. At 1:30 p.m. New York Time, July 4, 2021, Didi confirmed the escalation of the CAC's punitive measures in a press release titled "Didi Announces App Takedown in China" which stated, in relevant part, that:

> [A]ccording to the announcement posted by the Cyberspace Administration of China (the "CAC") on July 4, 2021, the CAC stated that it was reported and confirmed that the "Didi Chuxing" app had the problem of collecting personal information in violation of relevant PRC laws and regulations. Pursuant to the PRC's Cybersecurity Law, the CAC notified app stores to take down the "Didi Chuxing" app in China, and required the Company to strictly comply with relevant laws and regulations, follow the relevant standards set by the PRC government authorities, and rectify the problem to ensure the security of users' personal information.

69

Once the "Didi Chuxing" app is taken down from app stores in China, the app can no longer be downloaded in China, although existing users who had previously downloaded and installed the app on their phones prior to the takedown may continue using it. The Company will strive to rectify any problems, improve its risk prevention awareness and technological capabilities, protect users' privacy and data security, and continue to provide secure and convenient services to its users. ***The Company expects that the app takedown may have an adverse impact on its revenue in China***. (Emphasis added.) [95]

233.    The July 2 Penalties and the July 4 CAC penalties demonstrate that Didi never completed the required self-inspection and never satisfied the CAC Directives.

234.    On July 5, 2021, Didi issued its first denial – of sorts. Speaking to Reuters, Didi stated: "Prior to the IPO, Didi had no knowledge of the CAC's decisions, announced on July 2 and July 4, 2021, with respect to the cybersecurity review and suspension of new user registrations in China, and the removal of the Didi Chuxing app from the app stores in China, respectively." Denying knowledge of the *form of Didi's punishment* for defying the CAC's Directives to delay the IPO is hardly the same as denying that the CAC had instructed Didi not to go public in the U.S. until it satisfied the CAC that, following a thorough self-inspection, Didi complied with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information.

235.    On July 5, 2021 (an NYSE trading holiday), the *Wall Street Journal* published an article titled "Chinese Regulators Suggested Didi Delay Its U.S. IPO: Ride-hailing giant, under pressure to reward shareholders, pushed ahead with NYSE listing despite concerns of China's cybersecurity watchdog" which reported the following, in pertinent part:

---

[95]  Although Didi did not make the same statement, to wit, that the CAC's actions would adversely affect revenues, when it was barred from registering new users on July 2, as Didi's press release notes, users who have already downloaded the app may continue to use it. Thus, with the minor exception that existing users may not be able to upgrade to the latest version of the app, there is little practical difference between the financial impact of the July 2 and July 4 announcements.

*Weeks before Didi Global Inc. [] went public in the U.S., China's cybersecurity watchdog suggested the Chinese ride-hailing giant delay its initial public offering and urged it to conduct a thorough self-examination of its network security, according to people with knowledge of the matter.*

*But for Didi, waiting would be problematic. In the absence of an outright order to halt the IPO, it went ahead.*

The company, facing investor pressure to list after raising billions of dollars from prominent venture capitalists, wrapped up its pre-offering "roadshow" in a matter of days in June—much shorter than typical investor pitches made by Chinese firms. The listing on the New York Stock Exchange raised about $4.4 billion, making it the biggest stock sale for a Chinese company since Alibaba Group Holding Ltd. BABA[]'s IPO in 2014.

Back in Beijing, officials, especially those at the Cyberspace Administration of China, remained wary of the ride-hailing company's troves of data potentially falling into foreign hands as a result of greater public disclosure associated with a U.S. listing, the people said.

Didi's American depositary shares began trading in New York on Wednesday, just a day before the ruling Communist Party celebrated its centenary.

The Cyberspace Administration waited a day after the major political event to deliver a one-two punch to the company. On Friday, it started its own cybersecurity review into Didi and blocked the company's app from accepting new users; and on Sunday, it ordered mobile app stores to pull Didi from circulation. (Emphasis added.)

The reporters had reached out to Didi for comment but "Didi said in response to questions that it doesn't comment on speculation and had no knowledge before the IPO of the regulator's decisions to put the company under cybersecurity review and to ban new downloads of its ride-hailing app."[96] Didi's carefully worded denial – that it was unaware in advance of the IPO of the specific penalties the CAC would impose on it: that the CAC would exercise its authority under various provisions of the Cybersecurity Law to punish Didi, including, but not limited to, Articles 8, 31,

---

[96] L. Wei & K. Zhai, "Chinese Regulators Suggested Didi Delay Its U.S. IPO," *The Wall Street Journal*, (July 5, 2021 2:43 pm EDT) (Exhibit 18).

39, 41 and 66 – does not deny that the CAC had instructed Didi to conduct a thorough self-inspection, as required by, *inter alia*, Articles 37 and 38 of the Cybersecurity Law, before moving ahead with the IPO.

236.    The July 4 CAC penalties and the July 5 news reports were a further materialization of the concealed risks posed by the Omitted Facts. In addition, the July 5 *Wall Street Journal* article was a partial corrective disclosure of Didi's omission to state the Omitted Facts in the Registration Statement.

237.    On July 6, 2021, in premarket trading, Didi's shares immediately declined from $15.37/share to $12.02.share and going as low as $11.77/share as a result of the news on July 4 and 5.

238.    On July 6, 2021, Didi's shares opened for trading on the NYSE at $11.78/share, down $3.75/share from the $15.53/share closing price on July 2 as a result of the adverse news reports on July 4 and 5. Didi's share price would have fallen further had the Underwriters not presumably intervened and engaged in market stabilizing transactions to keep Didi's share price up.[97]

239.    On July 6, 2021, at 9:30 a.m. New York Time, the *South China Morning Post* reported:[98]

> **Didi Chuxing 'forced its way' to a New York listing, triggering data security review, sources say**

---

[97] "Strategies for Going Public", Fifth Edition, *Deloitte & Touche LLP and Skadden, Arps, Slate, Meagher & Flom LLP*, pages 14 55, 90; Initial Public Offerings, an Issuers Guide, *Mayer Brown LLP*, 2017, pages 21, 25, 31. *See also* Registration Statement at page 261.

[98] "Didi Chuxing 'forced its way' to a New York listing, triggering data security review, sources say" (July 6, 2021) (Exhibit 15).

Didi Chuxing pushed ahead with its listing in New York before the Cyberspace Administration of China (CAC) had fully cleared the ride-hailing giant's data security concerns, forcing Beijing to put it under a national security review and kick it off the country's app stores, according to two people familiar with the situation.

One regulatory source in Beijing, who is not directly involved in the case but was briefed on discussions, said Didi had "forced its way" to go public in New York without completing a thorough data security assessment by CAC, a necessary step for Beijing amid its enhanced scrutiny of data security.

But as a data assessment is not yet an institutionalised part of the listing process, Didi was able to go ahead with its US listing plan without complete clearance from CAC, which would include conducting a full body check of disclosed information to see whether an initial public offering (IPO) might impair China's data security, the source added.

The ruling Chinese Communist Party and the State Council, the cabinet, issued a new policy guideline on Tuesday night, saying China will change its rules around the overseas listings of Chinese businesses and empower domestic regulators and watchdogs to have a say in their listing.

\*\*\*

A second source close to CAC, who requested anonymity as the information is private, said that the investigation into Didi is focused on whether there is a security risk of "important data and the personal information of Chinese citizens going abroad".

China published a cybersecurity review regulation last year and created an office within CAC to coordinate among 12 ministries, including the Ministry of Public Security and the Ministry of State Security, over cybersecurity reviews.

\*\*\*

CAC has also accused Didi of a severe violation of laws and regulations in its collection and use of consumer data.

According to a research note by Gavekal analysts Ernan Cui and Thomas Gatley, published on Monday, ***Didi employees have shared information on Chinese social media saying that the company was under pressure from the cybersecurity regulator to delay its initial public offering but proceeded anyway***.

"If this is the case, and top leaders have been angered, the firm could face more investigations and penalties," they wrote.

240. The July 6 news was a corrective disclosure partially revealing the Omitted Facts. Didi's share price continued to decline over the next two trading days as the adverse news of the CAC's regulatory actions and the partial revelation of the Omitted Facts were more fully evaluated by the market, as discussed below.[99]

241. For example, on July 7, 2021, at 4:23 a.m., CNBC reported that the Didi mini-program was removed for new users from Tencent's WeChat and Ant Group's Alipay super-apps, which have 1 billion and 900 million users, respectively. This was a significant blow to Didi, whose app could be accessed through the two super apps without a user having to download the Didi app. Since neither super-app is an app store *per se*, it appears that the removal was not required. [100]

242. Later on July 7, Dow Jones reported on the negative impact the CAC's penalties would have on Didi's business:[101]

**Didi's China Probe Adds to Business Challenges at Home and Abroad**

---

[99] Other media outlets also reported similar news on July 6 that that the CAC directed Didi to postpone its IPO until it had completed a cybersecurity review, including H. Lockett, T. Kinder, S. Yu, C. Shepherd, Y. Yang & J. Franklin, "Didi Caught As China And US Battle Over Data," *Financial Times* (July 6, 2021) (attached hereto as Exhibit 16); "China Cyber Watchdog Asked Didi to Delay IPO on Data Concern," *Bloomberg News* (July 6, 2021). https://www.bloomberg.com/news/articles/2021-07-06/didi-slumps-after-china-regulators-order-stores-to-remove-app. Attached hereto as Exhibit 20.

[100] A. Kharpal, "Didi removed from WeChat and Alipay apps for new users in another big blow," *CNBC.com* (July 6, 2021) (attached hereto as Exhibit 26). It appears as if the CAC closed that loophole on July 9, calling for the removal of Didi from super-apps.

[101] L. Lin & C. Koh Ping, "Didi's China Probe Adds to Business Challenges at Home and Abroad," *The Wall Street Journal*, (July 7, 2021). Attached hereto as Exhibit 27.

Didi hogged 96% of China's ride-hailing market in 2018, according to researcher Deloitte. In recent years, rivals have whittled that down to around 80% to 90%, according to Cherry Leung, an analyst at Sanford C. Bernstein in Hong Kong. She estimates that Didi could lose about 6 million new customer installs over the period of the data security investigation, assuming the probe lasts the standard duration of six weeks.

"Many competitors are looking for the right opportunity to play offense," said Tu Le, managing director of advisory firm Sino Auto Insights. "Before this, Didi was a healthy company. Now, they are wounded."

243. Similarly, on July 7, Reuters reported:

Didi Global Inc fell for the third consecutive session on Wednesday after China ordered the app removed from mobile app stores as part of a broader crackdown on China-based companies with overseas listings.

In its fifth day of trading as a U.S.-listed company, the stock was last down 4.2%, about 28% below its $16.65 offer price.

"For Didi, the situation is bleak, but for Chinese companies preparing to list in the U.S. it may be even bleaker," said Samuel Indyk, senior analyst at uk.Investing.com.

244. On July 7, Didi's share price closed down $0.58 /share or 4.6%. On July 8, Didi's share price closed down another $0.70/share or 5.9%.

245. In total, the adverse news from July 2 through July 7, caused Didi's share price to decline a total of $5.19/share from $16.40/share on July 1 to $11.21 on July 8 or 31.6%.

246. The Registration Statement says that the Underwriters may engage in stabilizing transactions that will have the effect of preventing or retarding a decline in the market price of Didi's shares. Upon information and belief, the Underwriters engaged in such stabilizing transactions to prevent or lessen the decline in Didi shares resulting from the adverse news on July 2 through July 7. The decline in Didi's share price from the adverse news would have been much greater but for the Underwriters stabilizing transactions. In short, the Underwriters engaged in market activity to prop up Didi's share price in the face of all this bad news.

247. On July 9, 2021, the *Wall Street Journal* published a report that said in pertinent part:

BEIJING—China ordered mobile app stores to remove 25 more apps operated by Didi Global Inc.'s China arm, saying the apps illegally collect personal data, escalating its regulatory actions against the ride-hailing company.

The apps newly targeted on Friday include Didi's app for drivers offering rides through its platform, an app for corporate users and a financing app. On Sunday, the Cyberspace Administration of China ordered mobile stores to remove Didi's main app in China.

The cyber watchdog also banned websites and platforms from providing access to Didi-linked services in China, according to the watchdog's statement. Users who had already downloaded Didi's apps appeared unaffected

\*\*\*

The latest regulatory actions could further dent Didi's business in its home market, which the company relies heavily on for revenue even as it expands into overseas markets.

By ordering the removal of apps used by drivers, the CAC made it impossible for new drivers to sign up with Didi. Now Didi could add neither new users nor new drivers.

248. On the next trading day, July 12, 2021, at 5:40 a.m. New York time, Didi issued the following press release:

BEIJING--(BUSINESS WIRE)--July 12, 2021
Didi Global Inc. ("Didi" or the "Company") (NYSE: DIDI), the world's leading mobility technology platform, today announced that: According to the announcement posted by the Cyberspace Administration of China (the "CAC") on July 9, 2021, the CAC stated that it was confirmed that 25 apps operated by the Company in China, including the apps used by users and drivers, had the problem of collecting personal information in serious violation of relevant PRC laws and regulations. Pursuant to the PRC's Cybersecurity Law, the CAC notified app stores to take down these apps and cease to provide viewing and downloading service in China, and required the Company to strictly comply with relevant laws and regulations, follow the relevant standards set by the PRC government authorities, and rectify the problem to ensure the security of users' personal information. ***The Company expects that the app takedown may have an adverse impact on its revenue in China***.

76

249. On July 12, as a result of Didi's July 12 press release, indicating that the CAC's order to remove 25 additional apps from all app stores may have an adverse impact on revenues, Didi's share price opened lower at $11.73/share, down $0.30/share from the prior closing price. As the market continued to digest this adverse information, Didi's share price continued to decline on July 12 reaching a low of $11.12/share before closing at $11.16/share, down $0.87/share or 7.2% from its July 9 closing price of $12.03/share.

250. The penalty the CAC issued on July 9, along with the share price decline in response to Didi's announcement that the app takedown would have a material adverse effect on its business, were a materialization of the risks concealed by the Omitted Facts.

251. On July 16, media reported that officials from seven government agencies – including, in addition to the CAC, such varied ministries as Natural Resources, Transport, and Taxation – raided the offices of Didi Global.[102] The Ministry of Public Security is in charge of China's domestic security, while the Ministry of State Security oversees China's civilian arm for intelligence gathering and counter-espionage. The *Wall Street Journal* reported that: "their participation signals the potentially serious nature of the investigation. Potential outcomes include financial penalties, suspensions of business licenses and criminal charges." Notably, personnel from the Ministries of State Security and Public Security were stationed inside of Didi's offices. The raid signaled to the market the serious and wide-ranging nature of the cybersecurity review resulting from Didi's failure to follow the CAC's Directives to postpone its IPO.[103]

---

[102] L. Lin, "China Sends State Security, Police Officials to Didi for Cybersecurity Probe," *Wall Street Journal* (July 16, 2021). Attached hereto as Exhibit 28.

[103] In addition to the cybersecurity review, the investigation also focused upon determining who at Didi was responsible for the decision to defy the CAC and moved forward with the IPO on June 30, 2021.

252. On this news, Didi's share price declined from a closing price of $12.37 on July 15 to a closing price of $11.97/share on July 16 and then to a closing price of $11.06/share the next trading day, July 19—marking a 2-day decline of over 10.5%. This adverse new and share price decline were a further materialization of the risks concealed by the Omitted Facts.

253. On July 22, 2021, at 5:44 a.m. New York time, *Bloomberg News* reported:

Chinese regulators are considering serious, perhaps unprecedented, penalties for Didi Global Inc. after its controversial initial public offering last month, according to people familiar with the matter.

Regulators see the ride-hailing giant's decision to go public despite pushback from the Cyberspace Administration of China as a challenge to Beijing's authority, the people said, asking not to be named because the matter is private.

\*\*\*

Regulators are weighing a range of potential punishments, including a fine, suspension of certain operations or the introduction of a state-owned investor, the people said. Also possible is a forced delisting or withdrawal of Didi's U.S. shares, although it's unclear how such an option would play out.

… Beijing is likely to impose harsher sanctions on Didi than on Alibaba Group Holding Ltd., which swallowed a record $2.8 billion fine after a months-long antitrust investigation and agreed to initiate measures to protect merchants and customers, the people said.

\*\*\*

Regulators urged Didi to ensure the security of its data before proceeding with the IPO or to shift the location to Hong Kong or mainland China where disclosure risks would be lower, the people said. Regulators didn't explicitly forbid the company from going public in the U.S., but they felt certain Didi understood the official instructions, they said.

One person involved in the meetings, when asked why Didi didn't act on suggestions from regulators, referred to a proverb that you can't wake a person pretending to sleep.

\*\*\*

> Some regulatory officials expressed in private that they think Didi may have rushed its IPO out before China unveiled a new web security law, which could have hurt its valuation, one of the people said.

254. On this July 22 news, which was a further corrective disclosure, as well as the materialization of the concealed risk, Didi's shares opened at $10.86/share, down $0.64/share from the prior day's close. Didi's share price continued to decline on this adverse news reaching a low of $10.17/share before closing at $10.20/share, down $1.30/share or 11.3% from the prior day's close. On July 23, 2021, Didi's share price opened at $8.98/share, down $1.22/share from the prior day's closing price. Didi's share price continued to drop during trading hours on July 23, reaching a low of $7.93/share and closing that day at $8.06/share for a two-day decline of 29.9%.

255. On September 20, 2021, at 10:46 a.m. New York Time, Dow Jones reported that "The founder and president of Didi Global reportedly has told some close associates that she intends to step down as the Chinese ride-hailing giant has rankled regulators since going public in June."

256. This adverse news was a further materialization of the concealed risk that Didi might lose its Co-founder and President because of Didi's failure to follow the CAC's Directives to postpone its IPO caused Didi's share price to drop $0.55/share or 6.6% on September 20.

257. On December 3, 3021, under intense pressure from the CAC and other PRC regulators resulting from Didi going forward with its IPO despite the CAC's Directives, Didi announced that it would delist its shares from NYSE and relist on the Hong Kong Exchange. On this news, Didi's share price declined $1.73/share or 22.2% from the prior day's close.

258. After the market closed on December 29, 2021, Didi reported its operating results for the second and third quarters of 2021. The impact of the CAC's ongoing investigation resulted

in a lot of red ink: revenues dropped 11.5% as between the second and third quarter; Didi's loss for the quarter was $4.7 billion; and the company burned $2.1 billion in cash in six months.

259.    On March 11, 2022, Bloomberg reported Didi would not be able to list its shares in Hong Kong because the Cyberspace Administration of China determined Didi's proposals to prevent security and data leaks fell short of regulatory requirements.  As a result, Didi's shares declined almost 49% to $1.89/sh.

260.    Following the issuance of a press release on April 16, 2022, on the morning of April 18, 2022, Didi announced would call a vote of its shareholders on May 23, 2022, to voluntarily delist from the NYSE. Further, "to better cooperate with the cybersecurity review and rectification measures, the Company will not apply for listing of its shares on any other stock exchange before completion of the Delisting." Didi also released fourth quarter financial results, showing a net loss attributed to ordinary shareholders of $60 million on revenues of just under $6.4 billion, a 12.68% decline from the fourth quarter of 2020. Didi's ADS price dropped from $2.46 on April 14, 2022, (markets were closed on April 15, 2022) to $2.01/ADS, more than 18%, on extremely heavy trading volume – ten times higher than the previous session – of more than 140,000,000 ADSs.

261.    Today, the cybersecurity review has still not been completed, the prohibitions against downloading Didi's app and prohibiting registration of new users continue in effect, and Didi's ADSs now trade at $1.94/share, a far cry from the IPO price of $14.

**D.    Section 10(b) Allegations Against Didi Only**

262.    262.    The Registration Statement failed to disclose the Omitted Facts.

263.    Didi had a duty under Reg. S-K, Items 105 and 303/5(D), to disclose the Omitted Facts in the Registration Statement.

264.    Prior to the Effective Date, Didi knew or recklessly disregarded that the CAC had directed Didi to postpone its IPO in the United States until Didi completed – to the CAC's

80

satisfaction – a thorough self-inspection of its business, operations and policies, including but not limited to a cybersecurity review, to ensure compliance with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information, and rectified any violations.

265. Didi also knew or recklessly disregarded the certain danger that the CAC and/or other PRC governmental agencies would impose harsh regulatory penalties against Didi that would seriously disrupt its business, and adversely impact Didi's financial performance and condition, and harm its reputation if Didi ignored the CAC's Directives.

266. Didi knew, or was severely reckless in not ascertaining, that Didi had an affirmative duty to disclose in the Registration Statement the Omitted Facts.

267. Didi concealed this material adverse information from investors, omitted it from the Registration Statement, and disobeyed the CAC's Directives, causing the CAC to take regulatory action that damaged Didi, and along with revelations about the Omitted Facts, caused its stock price to decline.

### E.  Section 10(b) – Rule 10b5-1 Insider Trading Allegations Against Didi Only

268. Didi had a duty under 17 C.F.R. §240.10b5-1 – Trading "on the basis of" material non-public information, to ensure that Didi disclosed the Omitted Facts in the Registration Statement.

269. As the sellers of $4.4 billion of stock in the IPO, Didi had a duty to either (a) refrain from selling stock in the IPO, or (b) to disclose in the Registration Statement the Omitted Facts.

270. Didi sold its shares at the time of the IPO and Plaintiffs and Class Members purchased Didi shares contemporaneously with Didi's sale of shares.

271. Didi knew the Omitted Facts were material to IPO Investors.

81

272. Didi made substantial profits from its sale of Didi shares contemporaneous with Plaintiffs and Class Members' purchases.

**F. Section 10(b) - Rule 10b-5(a) and (c) Allegations Against the Officer Defendants and Didi Only**

273. On July 2, 2021 at approximately 6:00 p.m. Beijing time (6:00 a.m. New York time) the CAC called Didi and told them that CAC was placing them under cybersecurity review and that they were prohibited from taking on any new customers.

274. Upon information and belief, on July 2 when the CAC contacted Didi and informed Didi it was under cybersecurity review and was prohibited from taking on new customers, the CAC told Didi that it was implementing these penalties because Didi had disobeyed the CAC Directives by going forward with its IPO. Indeed, the CAC implemented the July 2 Penalties hours before the scheduled closing of the IPO, indicating that the CAC may have made a final effort to persuade Didi from going forward and closing the IPO.

275. Prior to closing, as a condition precedent for the Underwriters to close the transaction and wire Didi the $4.4 billion in IPO funds, the Underwriting Agreement required Cheng, Liu and Zhuo to provide officer certificates attesting that the representations and warranties in the Underwriting Agreement were true and correct as of the closing date and that all of the conditions for closing had been satisfied, including that no material adverse event had occurred prior to closing, the Prospectus did not, as of closing, contain any omission to state a material fact, and that no governmental action or inquiry had occurred that could have a material effect on Didi's business as of the closing time.

276. Didi, Cheng, Liu and Zhuo knew that they were required to provide officer certificates to the Underwriters as a condition of closing stating that the representations and warranties in the Underwriting Agreement were true as of closing and that they were not aware of

any material adverse events or government regulatory actions or inquiries that could negatively impact Didi's business. Didi, Cheng, Liu and Zhuo also had a duty to diligently investigate the reasons for the CAC's harsh actions on July 2 prior to closing. Didi, Cheng, Liu and Zhuo knew, or were reckless in not diligently investigating, the reasons for the CAC's commencement of a cybersecurity review and banning new user registrations when the CAC contacted Didi at 6:00 a.m. New York time on July 2 prior to closing.

277. At the IPO closing, Cheng, Liu and Zhuo [104] provided knowingly false officer certificates dated July 2, 2021 to the Lead Underwriters attesting that:

(i) The representations and warranties of the Company in the Underwriting Agreement are true and correct as of the date hereof as though made on and as of the date hereof;

(ii) The Company has complied with all agreements and satisfied all conditions on its part to be performed or satisfied under the Underwriting Agreement on or prior to the date hereof;

(iii) Subsequent to the date of the Underwriting Agreement, there has been no development or event having a Material Adverse Effect, except as set forth in the Registration Statement, the Pricing Disclosure Package and the Prospectus.

278. Cheng, Liu, and Zhuo knew that the CAC Directives and the July 2 Penalties rendered the representations and warranties in the Underwriting Agreement false.

279. Cheng, Liu, and Zhuo also knew the CAC Directives coupled with the July 2 Penalties would have a material adverse effect on Didi's business. Thus, Cheng, Liu and Zhuo also knew that because of the Omitted Facts and July 2 Penalties, and the adverse effect these would have on Didi's business, the closing conditions had not been satisfied.

---

[104] The Underwriters filed Cheng's false officer certificate with the Court. (Dkt. # 97-2). Upon information and belief, Liu and Zhuo also provided substantively identical false officer certificates to the Underwriters in order to close the IPO.

280. Relying on the Officer Defendants' false officer certificates, the Underwriters went forward and closed the IPO.

### G. Additional Scienter Allegations

281. Xi Jinping is the paramount leader who dictates the law and policies in China. As such, as global media has widely reported, it is reasonably foreseeable that defying Xi's directives will result in severe punishment to one's person or business. Didi's senior management clearly knew or should have known that not following the CAC's Directives would result in substantial regulatory penalties.

282. Careful to not run afoul of national, provincial, or local authorities, Didi maintains an enormous government affairs team of over 200 persons skilled in navigating the complexities of PRC government policies. This dedicated team, in addition to senior representatives of tech giants Alibaba and Tencent serving on Didi's board of directors, would surely have understood the government's policies on cybersecurity as it relates to Didi going public in the U.S.[105]

283. Defendant Zhang, who until December 29, 2021, served on Didi's board, knew from his personal experience as the Chairman and CEO of Alibaba exactly what could happen if a company conducted an IPO without disclosing regulatory issues. In 2015, it was revealed that two months prior to Alibaba's 2014 IPO, at which time Zhang served as the company's COO, Alibaba met with the State Administration for Industry and Commerce about numerous violations of law on its web platforms, including the sale of illegal and counterfeit items. The incident resulted in severe administrative guidance against Alibaba in China and a record-setting securities class action in the U.S.

---

[105] "How Didi's govt relations team navigated myriad regulators, until IPO dustup," *Reuters*, (July 20, 2021 6:20 a.m. EDT) (Exhibit 10).

84

284. Prior to Didi's IPO, two board members, Martin Lau and Daniel Zhang are reported to have "advised Didi Chairman Will Cheng and President Jean Liu—who also sit on the eight-member board—against rushing to go public in the midst of China's wide-ranging regulatory crackdown on the business practices of dozens of internet-technology companies."[106] Cheng and Liu not only ignored the advice, but also failed to inform board-members of the CAC's Directives prior to the IPO: "After the listing, Tencent President Martin Lau and Alibaba Chairman and Chief Executive Daniel Zhang were surprised and furious when they learned that Didi was in trouble with the Cyberspace Administration of China. … Didi executives didn't fully inform the board about the cyberspace regulator's concerns before the IPO, making it hard for board members to fully ascertain the risks of going ahead." *Id*.

285. Didi was motivated to conceal the Omitted Facts because it wanted to receive the $4.4 billion in IPO proceeds. If it had postponed its IPO, the window for China-based issuer IPOs in the U.S. may very well have closed because Didi would not be able to come into compliance with existing network and data security laws and personal user data protections prior to the effective dates of the more stringent DSL and PIPL and/or more restrictive U.S. laws applicable to China-based issuers. In fact, only one of 17 IPOs in process at the time the CAC came down on Didi proceeded to a listing in 2021. There had been 34 listings of China-based issuers during the first half of 2021.

---

[106] J. Yang, "Rift Form's on Didi's Board Following Beijing's Regulatory Assault," *The Wall Street Journal* (Aug. 18, 2021) (Exhibit 24). The article confirms an earlier report in the *South China Morning Post* "that the Tencent and Alibaba executives advised Didi to defer its New York listing." *See* "China's probe into ride hailing giant Didi Chuxing may lead to management reshuffle, sources say," *South China Morning Post* (Aug. 11, 2021) (Exhibit 23).

286.    Cheng and Liu were motivated to conceal the Omitted Facts because their stake in Didi became worth $4.4 billion and $1.1 billion respectively. The lock-up period for their shares ended on December 28, 2021.

287.    In the Registration Statement, at 58, Didi disclosed that:

[I]n April 2021, the State Administration for Market Regulation, together with the Cyberspace Administration and the State Administration of Taxation, held a meeting with more than 30 major internet companies in China, including us. All companies that participated in the meeting were required to conduct a self-inspection within one month to identify and correct possible violations of anti-monopoly, anti-unfair competition, tax and other related laws and regulations and submit their compliance commitments for public supervision. As of the date of this prospectus, we have completed the self-inspection and the relevant governmental authorities have conducted onsite inspections of our company. Our self-inspection uncovered a number of areas which could be deemed problematic from the compliance perspective, including potential anti-competitive practices in certain ancillary services such as electric vehicle charging, disclosure of driver income and related policies, inaccurate marketing and promotional materials, potentially unfair pricing in the community group buying business which has ceased to be our consolidated subsidiary since March 31, 2021, and failure to make filings of certain transactions subject to merger control review. We have made efforts to correct or improve the above areas to ensure compliance to the extent we can. We cannot assure you that the regulatory authorities will be satisfied with our self-inspection results or that we will not be subject to any penalty with respect to any violations of anti-monopoly, anti-unfair competition, pricing, advertisement, privacy protection, food safety, product quality, tax and other related laws and regulations.

Further, on May 14, 2021, the Ministry of Transport and several other regulators convened a meeting with multiple transport-related platforms in China including us, in which the regulators required those platforms to review their business practice in the areas of driver income, pricing, and related mechanisms and make rectifications to ensure transparency and fairness to platform participants, including passengers and drivers. Specifically, for the sake of transparency and fairness, the regulators required us to share information with the drivers on our platform about their income. We have been making efforts to meet the latest guidance from regulators, including issuing public letters to drivers to explain our future periodic statements to each driver setting forth details of the driver's income with us, beginning from July 2021. We will review and modify our business practice continually to ensure compliance with regulatory requirements and guidance.

288.    The meeting and discussions that Didi had with the CAC in which the CAC issued to Didi the CAC Directives to postpone its IPO and complete a thorough cybersecurity review

were more material than the meetings Didi had with regulators on April 21, 2021, and May 14, 2021. First, both the April 21 meeting and the May 14 meeting were between regulators and multiple companies. The meeting and discussions between CAC and Didi concerning the CAC Directives concerned Didi, alone, and no other companies. Second, the CAC Directives directly affected the shares Didi planned to issue in the IPO because the CAC told Didi not to go forward with the IPO until the self-inspection was completed. In addition, Didi disclosed that it had completed the specific self-inspection related to the April 21 meeting, found areas that "could be deemed problematic," and made efforts to "correct or improve" to "ensure compliance." Similarly, Didi was making efforts to comply with the guidance provided by the Ministry of Transport on May 14. In contrast, Didi knew it had not completed a thorough self-inspection related to national security, network security, data security, and/or the collection and protection of private personal information, that it was violating the CAC Directives, and that as a result the CAC would likely issue material penalties to Didi.

289. Cheng, Liu, and Zhuo knowingly issued false and misleading officer certificates to the Underwriters to persuade them to close the IPO falsely attesting that the July 2 Penalties did not and would not have a material adverse effect on Didi's business.

290. In 2017, Didi granted $3 billion (USD) in stock options to its senior executives and directors, equivalent to 66.7 million shares, pursuant to an equity incentive plan. Didi did not identify the individual recipients of the options, which had already vested as of the date of Didi's IPO.[107]

_____

[107] "China's probe into ride hailing giant Didi Chuxing may lead to management reshuffle, sources say, *South China Morning Post* (Aug. 11, 2021) (Exhibit 23).

291. That PRC regulators were, as part of their investigations, interviewing Didi employees and other to ascertain the persons responsible for Didi's decision to "force its way" to a listing on the NYSE contrary to the Chinese regulators' verbal instructions – which officials characterized as a "deliberate act of deceit" – shows that the CAC believes that its instructions to Didi were loud and clear and Didi was fully aware of CAC's Directives to postpone the IPO until it had completed, to the CAC's satisfaction, a thorough self-inspection of its operations and policies to ensure compliance with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information, and rectified any violations. That Didi misled CAC to believe it would follow CAC's Directives, and instead rushed through its IPO, further shows Didi's scienter.

## H.      Presumption of Reliance

292. In pursuing all of their Securities Exchange Act claims under Section 10(b), 20(a) and 20A, Plaintiffs are entitled to the presumption of reliance, including the presumption established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as it is impossible for Plaintiffs and the Class to show proof of reliance on the Omitted Facts and the deceptive acts, including the false officer certificates.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

### Against Didi and the Officer Defendants

293. Plaintiffs repeat and reallege every allegation contained above as if fully set forth herein.

294. This Count is asserted against Didi and the Officer Defendants for violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

88

295.    There are three separate theories of liability under Section 10(b) and Rule 10b-5.

**1.    Liability Against Didi for Not Disclosing that the CAC Had Directed Didi to Postpone the IPO Until It Had Fully Complied with the CAC Directives**

296.    Prior to the Effective Date, Didi knew or recklessly disregarded that (i) the CAC had directed Didi to postpone its IPO in the United States until Didi completed – to the CAC's satisfaction – a thorough self-inspection of its business, operations and policies, including but not limited to a cybersecurity review, to ensure compliance with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information, and rectified any violations, and (ii) Didi faced a high risk that CAC would impose harsh penalties against Didi that could harm its business, financial performance and reputation if it went forward with its IPO against the CAC's instructions.

297.    Didi knew or recklessly disregarded the risk that the CAC and/or other PRC governmental agencies would take strong regulatory actions against Didi that would seriously disrupt its business if Didi ignored the CAC's Directives to delay the IPO.

298.    Didi knew, or was severely reckless in not ascertaining, that Didi had an affirmative duty under Items 105 and 303/5(d) to disclose in the Registration Statement the Omitted Facts.

299.    Didi concealed this material adverse information from investors, omitted it from the Registration Statement, and caused Didi to disobey the CAC's Directives, causing the CAC to take regulatory action that damaged Didi and caused its stock price to decline. Didi thus violated Rule 10b-5(b).

**2.    Section 10(b) and Rule 10(b)(5) Liability for Insider Trading Against Didi**

300.    Didi, through its officers and employees, was in possession of material non-public information at the time it sold shares in the IPO, namely the Omitted Facts.

301. Didi knew the Omitted Facts were material to IPO Investors.

302. As the sellers of $4.4 billion of stock in the IPO, Didi had a duty to either (a) refrain from selling stock in the IPO, or (b) to disclose in the Registration Statement the Omitted Facts.

303. Didi, through the Underwriters, sold shares to investors in the IPO while in possession of material non-public information.

304. Plaintiffs and Class Members purchased Didi shares contemporaneously with Didi's sale of shares.

305. Didi is liable to all persons purchasing Didi shares contemporaneously with Didi's sale of ADSs in the IPO.

> **3.** **Liability Against Didi and the Officer Defendants for Delivering False Officer Certificates to the Underwriters that Deceived them into Closing the IPO and Delivering the ADSs**

306. Didi and the Officer Defendants learned at approximately 6:00 a.m. New York time that: (1) the CAC had ordered Didi not to accept any new customers and had commenced a cybersecurity review, and (2) these penalties would have a material adverse impact on Didi's business and financial performance.

307. The Officer Defendants provided to the Underwriters false officer certificates that falsely stated that the representations and warranties in the Underwriting agreement were true and correct as of the Closing Date. In addition, the officer certificates falsely stated that the conditions for closing had been satisfied, namely that the Registration Statement did not omit to state a material fact, that the representations and warranties were true, and that no material adverse event or development or governmental inquiry or action had occurred prior to closing that could have a material adverse effect on Didi's business.

90

308.    The Officer Defendants provided false officer certificates to the Underwriters that deceived the Underwriters into closing the IPO and allowed Didi to obtain $4.4 billion from IPO Investors.

309.    By delivering false officer certificates to the Underwriters that deceived them into going forward with the IPO, Didi and the Officer Defendants engaged in an act or course of business which operated as a fraud or deceit on investors.

310.    The misconduct of Didi and the Officer Defendants operated as a fraud and deceit upon IPO Investors who purchased shares that were worth much less than their selling price due to the omission of material facts and that the defendants knowingly sold the shares when Didi's business had been adversely affected by the July 2 Penalties.

311.    Didi is liable for the acts of the Defendants Cheng and Liu and Didi's other officers and employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

312.    The scienter of Defendants Cheng, Liu, Zhuo, and other Didi employees and agents is similarly imputed to Didi under *respondeat superior* and agency principles.

### As to All Section 10(b) Claims

313.    But for Didi and the Officer Defendants misconduct, Plaintiffs and the Class would not have purchased Didi shares or they would have purchased them at a lower price.  As a result, Plaintiffs and the Class have been damaged.

314.    By reason of the foregoing, Didi and the Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and members of the Class for substantial damages which they suffered in connection with their purchases of Didi's ADSs during the Class Period.

91

315.    This action was filed within five years of each Class member's purchase of Didi ADSs and within two years of the discovery of the Defendants' fraudulent statements. It is therefore timely.

## COUNT II

### Violation of Section 20A of The Exchange Act

### Against Didi

316.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

317.    This count is against Didi for insider trading violations of Section 20(A).

318.    Didi violated Section 10(b)'s prohibitions against insider trading.

319.    Didi, through its officers and employees, was in possession of material, nonpublic information at the time Didi sold shares in the IPO.

320.    Each of the Plaintiffs purchased Didi ADSs contemporaneously with the sales by Didi, as set forth in each Plaintiff's PSLRA Certification form filed with the Court, which are incorporated by reference herein.

321.    Plaintiffs and Class members who purchased shares of Didi ADSs contemporaneously with sales by Didi suffered damages.

322.    This action was filed within five years of each Class member's purchase of Didi ADSs contemporaneous with Didi's sales of ADSs in the IPO and is therefore timely.

## COUNT III

### Violation of Section 20(a) of the Exchange Act

### Against Cheng and Liu

323.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

92

324.     At all relevant times, Cheng and Liu were in the senior most management positions of control and did control, Didi. Cheng was Founder, Chairman of the Board and CEO of Didi. Liu was Co-Founder, Director and President of Didi. Cheng and Liu also controlled Didi through their ownership of Didi shares and their voting control over Didi.[108]

325.     Cheng and Liu knew, or were severely reckless in not knowing, the Omitted Facts.

326.     Cheng and Lieu knew or were severely reckless in not knowing that Didi had an affirmative duty to disclose in the Registration Statement the Omitted Facts.

327.     Cheng and Liu knew, or were severely reckless in not ascertaining, that Didi was selling shares in the IPO while in possession of material non-public information. Didi had a duty to either postpone or cancel the IPO or to disclose the Omitted Facts.

328.     Didi violated Sections 10(b) and 20A. Cheng and Liu culpably participated in Didi's violation of Sections 10(b) and 20A.

329.     This action was filed within five years of each Class member's purchase of Didi ADSs and within two years of the discovery of the Defendants' fraudulent statements.

## X.     SECURITIES ACT CLAIMS

330.     The claims alleged in this Section are based on principles of negligence and strict liability only. Only the allegations in paragraphs 1 through 167 above are realleged in this section pertaining to the Securities Act claims and only such paragraphs apply to the Securities Act Claims.

---

[108] Cheng's and Liu's control over Didi through their positions, and their share ownership and voting control is described in detail in the Registration Statement and is incorporated by reference herein.

331.    None of the preceding allegations in the Complaint in paragraphs 168 through 323. that are set forth in the Class's claims under Sections 10(b), 20(a), and 20(A) of the Securities Exchange Act of 1934 apply to these Securities Act claims.

### A.    Summary of Allegations Pertaining to the IPO

332.    In the weeks leading up to the IPO, the CAC met in person with Didi and directed Didi to postpone its IPO in the United States until Didi completed – to the CAC's satisfaction – a thorough self-inspection of its business, operations and policies, including but not limited to a cybersecurity review, to ensure compliance with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information, and rectified any violations.[109]

333.    Didi employees shared information on Chinese social media saying that Didi was under pressure from the CAC to delay its initial public offering but proceeded anyway.[110]

---

[109] The CAC's instructions to Didi to postpone the IPO were independently reported in numerous international media. *See* J. Yang, K. Zhai & C. Driebusch, "Didi Tried Balancing Pressure From China and Investors. It Satisfied Neither," *The Wall Street Journal* (Jul. 9, 2021) (Exhibit 14); C. Feng, C. Pan, M. Hu & Z. Xin, "Didi Chuxing 'forced its way' to a New York listing, triggering data security review, sources say," *South China Morning Post* (July 6, 2021) (attached hereto as Exhibit 15); H. Lockett, T. Kinder, S. Yu, C. Shepherd, Y. Yang & J. Franklin, "Didi Caught As China And US Battle Over Data," *Financial Times* (July 6, 2021) (attached hereto as Exhibit 16); Bloomberg News, "China Weighs Unprecedented Penalty for Didi After U.S. IPO" *The Japan Times* (July 22, 2021, 5:44 AM EDT, Updated on July 22, 2021, 4:22 PM EDT) (attached hereto as Exhibit 17); L. Wei & K. Zhai, "Chinese Regulators Suggested Didi Delay Its U.S. IPO," *The Wall Street Journal* (July 5, 2021 2:43 pm ET) (attached hereto as Exhibit 18); Nearly all of the many news reports on this point state the meeting between Didi and the CAC occurred "weeks" or in the "weeks" before the IPO. One source—a former director of the Publicity Department of the Central Committee of the CPC and currently an executive at a Chinese internet company—identifies June 21, 2021 as the specific date of the meeting, "*Interpretation on the Didi Incident*", an analysis circulated internally in Huaxi Securities, a Chinese investment bank. https://drive.google.com/file/d/18diceb2XXdsQG4tofHmTvGRxO8t1aWUY/view.

[110] C. Feng, C. Pan, M. Hu & Z. Xin, "Didi Chuxing 'forced its way' to a New York listing, triggering data security review, sources say, *South China Morning Post* (July 6, 2021) ("Didi

334.     Similarly, the *Financial Times* reported that "one person close to Didi acknowledged that the company had been advised by the CAC to delay its listing until it had conducted a data security review".[111]

335.     As *The Wall Street Journal* explained:[112]

***The Chinese officials urged the company to postpone the share sale*** because Beijing was concerned that IPO documents required by U.S. regulators could have sensitive information and data it didn't want U.S. authorities to have.

***The officials made clear to Didi***, according to the two people, ***that the government*** didn't intend to block the IPO, but ***wanted the company to wait until it had carried out the proper security checks*** and made sure the documents it would present to the U.S. regulators contained no sensitive information.

The officials also wanted to address the issue of audit working papers, the two people said . . . Audit materials could contain raw data such as meeting logs, user information and email exchanges between the company and government agencies, among other things.

One person close to the company said Didi hasn't handed anything sensitive to U.S. regulators to date. ***Chinese officials, however, argue that it is for regulators, not the company, to decide what is sensitive.*** In China, the ride-hailing company is classified by law as a "critical infrastructure provider," language that signals national-security sensitivities.

Beijing's suggestion that Didi delay its IPO left the company having to decide whether to comply with U.S. or Chinese priorities.

Didi signaled to regulators that it would consider the request, and that it wouldn't be a problem to postpone the listing if needed, say people familiar with its communications with regulators. (Emphasis supplied.)

---

Forced Its Way") (Exhibit 15) (citing a July 5 research note by Gavekal's Ernan Cui and Thomas Gatley).

[111] "Didi Caught As China And US Battle Over Data," *Financial Times* (July 6, 2021) (Exhibit 16).

[112] "Didi Tried Balancing Pressure From China," *The Wall Street Journal* (Jul. 9, 2021) (Exhibit 14).

336.     *Bloomberg* similarly reported on July 6, 2021, that "Chinese regulators asked Didi as early as three months ago to delay its landmark U.S. IPO because of national security concerns involving its huge trove of data, according to people familiar with the matter."[113]

337.     Another report, in the *South China Morning Post* confirmed a meeting between the CAC and Didi in Beijing. Meetings such as these are not always highly formal, but although the format of the CAC's meeting with Didi may have "produced no written records," there is no mistaking the message being given: "For the CAC, such sit-down discussions … constituted channels to formally deliver the regulator's instructions, with no room for defiance."[114]

338.     The CAC believed that Didi had agreed to comply with the CAC's Directives and would postpone its IPO.[115] While the CAC's explicit authority over IPOs was not yet enshrined in law, the Cybersecurity Law ***already empowered*** the CAC to both demand that Didi conduct a self-inspection and submit its results to the CAC (Article 38, *see* ¶101, above) and impose a wide array of draconian penalties for violations of the law (Article 66, *see* ¶104, above). Indeed, Didi, which purportedly employed several hundred in its governmental affairs department, is very well aware of the annual statistics that the CAC published regarding its regulatory enforcement actions. News of the CAC's annual statistics for administrative meetings held, warnings issued, websites

---

[113] China Cyber Watchdog Asked Didi to Delay IPO on Data Concern," *Bloomberg News* (July 6, 2021). https://www.bloomberg.com/news/articles/2021-07-06/didi-slumps-after-china-regulators-order-stores-to-remove-app. Attached hereto as Exhibit 20.

[114] M. Hu, M. Borak, C. Zhou, & Z. Xin, "China's regulators suspect Didi's US listing was 'deliberate act of deceit', a portrayal that shows severity of mistrust, sources say," *South China Morning Post* (July 9, 2021) ("Didi's US listing was 'deliberate act of deceit'") https://www.scmp.com/tech/policy/article/3140471/chinas-regulators-suspect-didis-us-listing-was-deliberate-act-deceit. Attached hereto as Exhibit 21.

[115] M. Hu, M. Borak, C. Zhou & Z. Xin, "China's regulators suspect Didi's US listing was 'deliberate act of deceit', a portrayal that shows severity of mistrust, sources say," *South China Morning Post* (July 9, 2021) (Exhibit 21).

suspended and websites taken down are widely reported by Chinese national news media upon their publication. (*See* ¶¶ 20 and 133, above).

339. Didi did not follow the CAC's Directives. Instead, it conducted its $4.4 billion IPO on June 30, 2021.

340. "Some officials have privately described Didi's move as *yang feng yin wei* – to comply publicly but defy privately – according to a source who was briefed, speaking on condition of anonymity for describing confidential discussions."[116] Chinese officials described Didi's actions as "forcing its way" to a listing on the NYSE against specific instructions to postpone the IPO until it had completed a through data security assessment by CAC, a necessary step for Beijing amid its enhanced scrutiny of data security.[117,] According to an anonymous source close to CAC, the focus of the CAC's concern with the Didi IPO was that there was a potential security risk of "important data and the personal information of Chinese citizens going abroad." *Id.*

341. In the aftermath, Chinese officials said they were quite certain that Didi understood their instructions to postpone its IPO until it had ensured the security of its data.[118]

342. On June 30, 2021, the Underwriters offered 316.8 million shares at $14.00 per share for total proceeds of $4.4 billion (including the overallotment option) in the IPO.

343. On July 2, at 6:00 pm Beijing time (6:00 a.m. New York Time), the CAC contacted Didi senior management and warned them that in one hour the CAC would publicly order Didi to

---

[116] M. Hu, M. Borak, C. Zhou, & Z. Xin, "China's regulators suspect Didi's US listing was 'deliberate act of deceit', a portrayal that shows severity of mistrust, sources say," *South China Morning Post* (July 9, 2021) (Exhibit 21).

[117] "China's probe into ride hailing giant Didi Chuxing may lead to management reshuffle, sources say*," South China Morning Post* (Aug. 11, 2021) (Exhibit 15).

[118] "China weighs unprecedented penalty for Didi after US IPO," *Bloomberg* (July 22, 2021) (Exhibit 12).

stop signing up new users and place it under cybersecurity review.[119] The punishment was in response to Didi's refusal to comply with the CAC's Directives. This punishment would have major financial consequences to Didi because it could no longer take on new customers, halting all growth and giving its competitors a chance to take new and existing customers and drivers away from Didi.

344. At 7:19 pm Beijing time on July 2 (7:19 a.m. Eastern Daylight Savings time), the CAC posted a notice on its website that "In order to prevent national data security risks, safeguard national security and protect public interests, in accordance with the National Security Law of the People's Republic of China and the Cyber Security Law of the People's Republic of China, the Cyber Security Review Office will conduct a cyber security review on Didi Chuxing pursuant to the Cyber Security Review Measures. During the review, Didi Chuxing will halt new user registration in order to cooperate with the cyber security review and prevent further risks." The CAC also announced that Didi was no longer permitted to accept new user registrations.

345. Before U.S. markets opened for trading on Friday, July 2, 2021, a number of prominent news outlets reported the CAC's actions against Didi:

346. CNBC reported this news at 7:44 a.m. New York time.

347. At 7:55 a.m. (New York Time), Reuters reported "China's cyberspace administration said on Friday it has launched a new investigation into ride-hailing giant Didi Global Inc to protect national security and the public interest."

348. At 8:09 a.m. New York Time, *Bloomberg News* reported:

> Didi Dives as China Unveils New Cyber Probe After Mega IPO

---

[119] "Didi Caught As China And US Battle Over Data", *Financial Times* (July 6, 2021) (Exhibit 16).

Didi Global Inc. tumbled Friday after China said its starting a cybersecurity review of the ride-hailing company just two days after it pulled off one of the biggest U.S. stock market debuts of the past decade.

The move is to prevent data security risks, safeguard national security and protect public interest, according to a statement from the Cyberspace Administration of China. Didi has halted new user registrations during the probe.

349.    By 8:51 a.m. on July 2, 2021, *Marketwatch* reported that Didi said it will fully cooperate and examine its risks."[120]

350.    That Sunday, July 4, the CAC issued the following announcement:

Based on reports, and after tests and investigations, the "Didi Travel" app was found to have ***seriously violated laws and regulations in collecting and using personal information***. According to the relevant provisions of the Cybersecurity Law of the People's Republic of China, ***the Cyberspace Administration of China notifies all app stores to remove the "Didi Travel" app*** and requires Didi Travel Technology Co., Ltd. to strictly follow the legal requirements and national standards to rectify existing problems, to effectively protect the safety of personal information of all users.

351.    That day, Didi issued a press release acknowledging the further penalties and responding to the CAC's actions, saying in pertinent part:

Once the "Didi Chuxing" app is taken down from app stores in China, the app can no longer be downloaded in China, although existing users who had previously downloaded and installed the app on their phones prior to the takedown may continue using it. The Company will strive to rectify any problems, improve its risk prevention awareness and technological capabilities, protect users' privacy and data security, and continue to provide secure and convenient services to its users. ***The Company expects that the app takedown may have an adverse impact on its revenue in China.*** (Emphasis added.)[121]

_____

[120] Didi issued a press release at 11:03 a.m., confirming the CAC's announcement and stating: "DiDi will fully cooperate with the PRC government authority during the review. It plans to conduct a comprehensive examination of cybersecurity risks and continue to improve on its cybersecurity systems and technology capabilities."

[121]    Although Didi did not make the same statement, to wit, that the CAC's actions would adversely affect revenues, when it was barred from registering new users on July 2, as Didi's press release notes, users who have already downloaded the app may continue to use it. Thus,

99

352.    On 8:25 a.m., Sunday, July 4th, the *Dow Jones Newswires* began reporting that the CAC ordered app stores to remove the Didi Chuxing app, with an 8:37 a.m. update explaining that the CAC took this action because Didi's app has "serious problems involving illegal collection of personal data."

353.    Duowei News reported "[a]ccording to sources close to China's financial regulators, the 'Didi Travel' App was taken down due to both higher-up concerns about data leakage risks to the country and Chinese citizens, and that fact that 'Didi Travel' rushed to the U.S. market despite repeated communications from regulators. Sources say the penalties for Didi Travel will be far more severe than that of Alibaba. … The inside source said that the Beijing authority's heavy crack down stemmed from Didi Travel rushing to list in the U.S. despite being advised not to. *It is reported that the regulator has communicated with the company's senior management several times that they did not want Didi to go public in the United States*."[122]

354.    On July 22, the *Wall Street Journal* reported that Chinese regulators are considering serious, perhaps unprecedented, penalties for Didi after disobeying the CAC's Directives to postpone its IPO until it had completed a required cybersecurity review.[123]

355.    On December 3, 3021, under tremendous pressure from the CAC and other regulators, Didi filed a Form 6-K with the SEC announcing its plan to delist from the NYSE and relist on the Hong Kong Exchange.

---

with the minor exception that existing users may not be able to upgrade to the latest version of the app, there is little practical difference between the financial impact of the July 2 and July 4 announcements.

[122] **"**Exclusive: Higher-Ups' Discontent With The U.S. Listing Of Didi, Punishment Will Go Far Beyond That Of Alibaba,**"** *Duowei News* (July 5, 2021).

[123] "China Weighs Unprecedented Penalty for Didi After US IPO," *Bloomberg* (July 22, 2021) (Exhibit 17).

356. On March 11, 2022, Bloomberg reported Didi's shares declined almost 49% to $1.89/sh because Didi put off plans to list its shares in Hong Kong. The Cyberspace Administration of China told Didi that the company would not be able to list its shares on the Hong Kong stock exchange because Didi's proposals to prevent security and data leaks fell short of regulatory requirements.

357. Following the issuance of a press release on April 16, 2022, on the morning of April 18, 2022, Didi announced would call a vote of its shareholders on May 23, 2022, to voluntarily delist from the NYSE. Further, "to better cooperate with the cybersecurity review and rectification measures, the Company will not apply for listing of its shares on any other stock exchange before completion of the Delisting." Didi also released fourth quarter financial results, showing a net loss attributed to ordinary shareholders of $60 million on revenues of just under $6.4 billion, a 12.68% decline from the fourth quarter of 2020. Didi's ADS price dropped from $2.46 on April 14, 2022, (markets were closed on April 15, 2022) to $2.01/ADS, more than 18%, on extremely heavy trading volume – ten times higher than the previous session – of more than 140,000,000 ADSs.

358. On May 4, 2022, Didi filed a Form 20-F with the SEC. The Form 20-F disclosed that "[a]fter our initial public offering in the United States, the SEC contacted us and made inquiries in relation to the offering. We are cooperating with the investigation, subject to strict compliance with applicable PRC laws and regulations. We cannot predict the timing, outcome or consequences of such an investigation." The Form 20-F further disclosed that, on December 16, 2021, the PCAOB notified the SEC of its determination that it is unable to inspect or investigate completely Didi's PRC auditor and that, consequently, the Company "expect[s] to be identified as a 'Commission Identified Issuer' shortly after the filing of this annual report on Form 20-F."

101

359. As of the filing of this complaint, the CAC has not yet concluded the cybersecurity review.

360. As of today, Didi's share price is $1.94/share, about 14% of the IPO price.

**B.** **Defendants Had a Duty to Disclose the Omitted Facts**

361. Defendants omitted to disclose in the Registration Statement: (i) the CAC directed Didi to postpone its IPO in the United States until Didi completed – to the CAC's satisfaction – a thorough self-inspection of its business, operations and policies, including but not limited to a cybersecurity review, to ensure compliance with all applicable laws and regulations concerning national security, network security, data security, and/or the collection and protection of private personal information, and rectified any violations; and (ii) Didi faced a high risk that CAC would impose harsh penalties against Didi that could harm its business, financial performance and reputation if it went forward with its IPO against the CAC's instructions.

362. Defendants had a duty under Regulation S-K, Items 105, 303/5(D) and Rule 408 to disclose the Omitted Facts in the Registration Statement.

363. Item 408 of Regulation C creates a duty for registrants to supply non-misleading registration statements. It states: "In addition to the information expressly required to be included in a registration statement, there shall be added such further information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 230.408.

364. Didi had a duty under Item 408 to disclose the Omitted Facts. Didi's concealment of the Omitted Facts rendered the lengthy disclosures in the Registration Statement of risk factors related to government regulation of Didi's business misleading in the light of the circumstances under which they were made.

365. Each Defendant was legally responsible for the statements made in the Registration Statement.

366. Each Defendant had the duty to make a reasonable investigation of Didi's business, including its regulatory affairs. Each was required to exercise reasonable diligence to ensure that all material facts required to be stated in the Registration Statement were in fact disclosed, and Didi and each Individual Defendant was required to and did sign, and each Defendant did authorize, the filing of the Registration Statement. Each Defendant bears the burden of demonstrating their compliance with this duty.

C. **Defendants Statements in the Underwriting Agreement Were Not True or Correct**

367. SEC regulation §229.500 et. seq. requires detailed information about the underwriting agreement be included in the Registration Statement. SEC Regulation § 229.601 (Item 601) Exhibits, requires the issuer attach a copy of the underwriting agreement to the Registration Statement as an exhibit. These SEC regulations demonstrate the importance of the underwriting agreement to investors for evaluating the risks, quality, and nature of the securities offering. The underwriting agreement was incorporated by reference into the Registration Statement and was thus an integral part of the Registration Statement and Prospectus.

368. In the Underwriting Agreement, Didi made a series of representations and warranties that both Didi and the Underwriters agreed were true and correct. These included in part:

369. At the time the Prospectus was filed, it did not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (Para.1(iii));

103

370. As of the date of the Effective Date and as of the Closing Date, the Registration Statement and Prospectus *did not and will not* contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. (Para. 1(iv)).

371. These representations and warranties in Paragraphs 1.(iii) and 1.(iv) of the Underwriting Agreement were not true as of the effective date or as of the Closing Date because Didi had a duty to disclose the Omitted Facts in the Registration statement and Prospectus and had not so disclosed them.

372. In addition, as of the Closing Date these representations and warranties in Paragraphs 1.(iii) and 1.(iv) of the Underwriting Agreement were untrue because the CAC had issued the July 2 Penalties.

373. In the Underwriting Agreement, Didi also represented and warranted that:

374. Didi has not "since the date of the latest audited financial statements included in the Registration Statement, … and the Prospectus, (i) sustained any material loss or interference with its business from … governmental action, order or decree … ." (Para. 1(v));

375. "[S]ince the respective dates as of which information is given in the Registration Statement, … and the Prospectus, there has not been … (y) any Material Adverse Effect (as defined below); as used in this Agreement, "Material Adverse Effect" shall mean any material adverse change or effect on, or any development involving a prospective material adverse change or effect, in or affecting (i) the business, properties, general affairs, management, financial position, shareholders' equity or results of operations of the Company and its Subsidiaries and Consolidated Affiliated Entities, taken as a whole." (Para. 1.(v));

104

376.    "There are no legal or governmental actions, suits or proceedings pending or threatened (including any inquiries or investigations by any governmental entity, domestic or foreign) to which the Company, … is a party … (i) other than actions, suits or proceedings that, individually or in the aggregate, would not have a Material Adverse Effect or (ii) that are required to be described in the Registration Statement or the Prospectus and are not so described" (Para. 1(xxxv).

377.    These representations and warranties in Paragraphs 1.(v) and (Lii) of the Underwriting Agreement were not true and correct as of the Effective Date because of the Omitted Facts. Nor were they true and correct as of the Closing Date because the CAC issued the July 2 Penalties prior to Closing and those penalties were the result of a governmental action, inquiry or development that would have a material adverse effect on Didi's business.

378.    In the Underwriting Agreement, Didi also represented and warranted that:

> "The Company and its Subsidiaries and the Consolidated Affiliated Entities are presently in material compliance with all applicable laws or statutes and all judgments, orders, rules and regulations of any court or arbitrator or governmental or regulatory authority, internal policies and contractual obligations relating to the privacy and security of IT Systems and Personal Data and to the protection of such IT Systems and Personal Data from unauthorized use, access, misappropriation or modification. (Para. 1(Lii).

379.    This representation and warranty in Paragraph 1.(Lii) of the Underwriting Agreement was not true as of the Effective Date or as of the Closing Date. The CAC announcement on July 2, 2021, that Didi was being placed under a cybersecurity review and was prohibited from taking on any new customers "[i]n order to prevent national data security risks, safeguard national security and protect public interests, in accordance with the National Security Law of the People's Republic of China and the Cyber Security Law of the People's Republic" showed Didi was in material violation of the Cybersecurity Law as of the Effective Date and as of the Closing Date. In

105

addition, on July 4, 2021, the CAC issued an order stating that Didi was in serious violation of relevant PRC laws and regulations because its ride sharing app collected and used personal information in violation of cybersecurity and related laws. The CAC ordered Didi, "[p]ursuant to the PRC's Cybersecurity Law, … to take down the 'Didi Chuxing' app in China, and required [Didi] to strictly comply with relevant laws and regulations, follow the relevant standards set by the PRC government authorities, and rectify the problem to ensure the security of users' personal information." Further, on July 9, 2021 Didi announced that the CAC ordered the takedown of an additional 25 Didi apps because they had "the problem of collecting personal information in serious violation of relevant PRC laws and regulations. Pursuant to the PRC's Cybersecurity Law, the CAC notified app stores to take down these apps and cease to provide viewing and downloading service in China, and required the Company to strictly comply with relevant laws and regulations, follow the relevant standards set by the PRC government authorities, and rectify the problem to ensure the security of users' personal information."

380.    The CAC's July 2, July 4, and July 9 announcements showed that as of the Effective Date and as of the Closing Date, Didi was not in "material compliance with all applicable laws or statutes and all …orders, rules and regulations of any … governmental or regulatory authority, internal policies … relating to the privacy and security of IT Systems and Personal Data and to the protection of such IT Systems and Personal Data from unauthorized use, access, misappropriation or modification.

### D.    Defendants Were Negligent in Exercising their Due Diligence Responsibilities and Preparing the Registration Statement

381.    Didi, the Individual Defendants, and the Underwriters were negligent in preparing the Registration Statement, and negligent in performing due diligence in connection with the IPO in failing to discover and disclose the Omitted Facts.

382.    None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that all material facts required to be disclosed in the Registration Statement were disclosed and that there were no untrue statements of material fact.

383.    The Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, the Registration Statement, which failed to disclose the Omitted Facts and included untrue statements of material fact in the Underwriting Agreement. By reason of the conduct alleged herein, each Defendant violated the Securities Act.

## COUNT IV

### Violations of §11 of the Securities Act

### Against All Defendants

384.    Plaintiffs repeat and re-allege the foregoing allegations in paragraphs 1 through 167 and 324 through 369. None of the preceding allegations in the Complaint in paragraphs 168 through 323 that are set forth in the Class's claims under Sections 10(b), 20(a), and 20(A) of the Securities Exchange Act of 1934 apply to these Securities Act claims.

385.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

386.    Didi is strictly liable for issuing, and all other Defendants are liable for negligently issuing, the Registration Statement.

387.    Plaintiffs advance two theories of liability under Section 11.

388.    First, the Registration Statement failed to disclose the Omitted Facts that were required to be stated therein.

389.    Second, the Underwriting Agreement, which was incorporated by reference into, and an integral part of the Registration Statement, included untrue statements of material fact.

107

390. Didi is the issuer of the shares in the IPO. The Individual Defendants, the officers and directors of Didi just prior to the IPO, each signed the Registration Statement. The Underwriters were the underwriters for the IPO. Each of these defendants is liable under Section 11 for the omission of material facts and untrue statements of material facts in the Registration Statement.

391. Plaintiffs purchased Didi ADSs pursuant to and traceable to the Registration Statement.

392. The true value of Didi's ADS's at the time this lawsuit was filed was substantially below the IPO price.

393. This claim is brought within one year after discovery of the omissions from the Registration Statement, and within three years of the effective date of the Registration Statement.

## COUNT V

### Violations of §12(a)(2) of the Securities Act

### Against the Underwriters and Didi

394. Plaintiffs repeat and re-allege the foregoing allegations above. Plaintiffs repeat and re-allege the foregoing allegations in paragraphs 1 through 167 and 324 through 369. None of the preceding allegations in the Complaint in paragraphs 168 through 323 that are set forth in the Class's claims under Sections 10(b), 20(a), and 20(A) of the Securities Exchange Act of 1934 apply to these Securities Act claims.

395. The Underwriters and Didi were sellers, offerors, and/or solicitors of buyers of Didi ADSs offered pursuant to the Registration Statement for their own financial gain.

396. The Underwriters are statutory sellers as they are in privity with Plaintiff Shereen El-Nahas and Daniil Alimov and with other members of the Class who purchased Didi shares

108

directly from the various Underwriters in the IPO. Shereen El-Nahas and Daniil Alimov purchased shares directly from the Underwriters in the IPO.

397. As the issuer of the ADSs in the IPO, Didi was a statutory seller pursuant to SEC Rule 159A which provides that "in a primary offering of securities," an issuer is a statutory seller for the purposes of Section 12(a)(2) "regardless of the underwriting method used to sell the issuer's securities." *See* 17 C.F.R. 230.159A.

398. Didi and the Underwriters used the means and instrumentalities of transportation and communication in interstate commerce and of the mails, in offering, soliciting, and selling Didi ADSs to Plaintiffs and other members of the Class.

399. Plaintiffs have two theories of liability under Section 12.

400. First, the Registration Statement failed to disclose material facts required to be stated therein. Specifically, it failed to disclose the Omitted Facts.

401. Second, the Underwriting Agreement, which was incorporated by reference into, and an integral part of the Registration Statement, included untrue statements of material fact.

402. Neither Plaintiffs, nor any member of the Class knew, or in the exercise of reasonable care could have known, of the Omitted Facts or of the untrue statements of material fact in the Underwriting Agreement.

403. This action was brought within one year after the discovery of the omissions in the Prospectus, and within three years after the sale of Didi ADSs pursuant to the Prospectus.

404. Plaintiffs and the other members of the Class hereby tender their Didi ADSs and seek recission and return of the consideration they paid with interest, or seek rescissory damages or such other damages to the extent permitted by law.

## COUNT VI

### Violations of §15 of the Securities Act

109

**Against Cheng and Liu**

405.    Plaintiffs repeat and re-allege the foregoing allegations in paragraphs 1 through 167 and 324 through 369. None of the preceding allegations in the Complaint in paragraphs 168 through 323 that are set forth in the Class's claims under Sections 10(b), 20(a), and 20(A) of the Securities Exchange Act of 1934 apply to these Securities Act claims.

406.    This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against Cheng and Liu, each of whom was a control person of Didi during the relevant period.

407.    At all relevant times, Cheng and Liu were in the senior most management positions of control and did control, Didi. Cheng and Liu also controlled Didi through their ownership of Didi shares and their voting control over Didi.[124] Cheng was Founder, Chairman of the Board and CEO of Didi. Liu was Co-Founder, Director and President of Didi.

408.    This claim is brought within one year after discovery of the omissions in the Registration Statement, and within three years of the effective date of the Registration Statement.

## XI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class Representatives;

(b)    Awarding damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, together with interest thereon;

---

[124] Cheng and Liu's control over Didi and their share ownership and voting control is described in detail in the Registration Statement and is incorporated by reference herein.

110

(c)     Awarding Plaintiffs and the other members of the Class prejudgment and post-

interest; and

(d)     Awarding Plaintiffs and other members of the Class such other and further relief as

the Court may deem just and proper.

## XII.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: May 5, 2022                              Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Laurence M. Rosen*
Laurence M. Rosen
Phillip Kim
Jing Chen
Daniel Tyre-Karp
Robin Howald
275 Madison Ave, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com
        jchen@rosenlegal.com
        dtyrekarp@rosenlegal.com
        rhowald@rosenlegal.com

*Lead Counsel for Plaintiffs*

and

**GLANCY PRONGAY & MURRAY LLP**

Gregory Linkh
30 Park Ave, Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Fax: (212) 884-0988
Email: glinkh@glancylaw.com

111

*Additional Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on May 5, 2022, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.


          <u>/s/ *Laurence M. Rosen*</u>