Kevin P. Muck (California SBN 120918)
    kevin.muck@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
One Front Street, Suite 3500,
San Francisco, CA 94111
Tel: (628) 235-1000 / Fax: (628) 235-1001

William Paine, *pro hac vice*
    william.paine@wilmerhale.com
Robert Kingsley Smith, *pro hac vice*
    robert.smith@wilmerhale.com
Sonia Sujanani, *pro hac vice*
    Sonia.sujanani@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street, Boston, MA 02109
Tel: (617) 526-6759 / Fax: (617) 526-5000

Elaine F. Harwell (California SBN 242551)
    elaine.harwell@procopio.com
PROCOPIO, CORY, HARGREAVES
    & SAVITCH, LLP
525 B Street, Suite 2200,
San Diego, CA 92101
Tel: (619) 238-1900 / Fax: (619) 235-0398

*Attorneys for Defendant TuSimple Holdings Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUSTIN DICKER, INDIANA PUBLIC RETIREMENT SYSTEM, ROBERT MILLER, MICHELLE POIRIER, Individually and on Behalf of All Others Similarly Situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>TUSIMPLE HOLDINGS INC., GUOWEI "CHARLES" CHAO, XIAODI HOU, MO CHEN, BONNIE YI ZHANG, CHENG LU, PATRICK DILLON, BRAD BUSS, KAREN C. FRANCIS, MORGAN STANLEY & CO. LLC, CITIGROUP GLOBAL MARKETS, INC., J.P. MORGAN | Case No. 3:22-cv-01300-BEN-MSB (Consolidated with No. 3:23-cv-00282-BEN-MSB)<br><br>**REDACTED OPPOSITION OF DEFENDANT TUSIMPLE HOLDINGS INC. TO PLAINTIFFS' *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND LIMITED EXPEDITED DISCOVERY**<br><br>Judge: Hon. Michael S. Berg<br>Courtroom: 2C |

SECURITIES LLC, BOFA SECURITIES, INC., COWEN AND COMPANY, LLC, CREDIT SUISSE SECURITIES (USA) LLC, NOMURA SECURITIES INTERNATIONAL, INC., RBC CAPITAL MARKETS, LLC, NEEDHAM & COMPANY, LLC, OPPENHEIMER & CO., INC., PIPER SANDLER & CO., ROBERT W. BAIRD & CO. INCORPORATED, and VALUABLE CAPITAL LIMITED,

Defendants.

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Apple, Inc. v. Samsung Elecs. Co.*, 877 F. Supp. 2d 838 (N.D. Cal. 2012) ................................................................................................25

*Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 12487666 (C.D. Cal. Feb. 6, 2014) ...........................................................................................22

*Burnett v. Rowzee*, 2007 WL 2809769 (C.D. Cal. Sept. 26, 2007) ........................14

*Cisco Sys., Inc. v. Dexon Comput., Inc.*, 2023 WL 6466384 (N.D. Cal. Oct. 3, 2023) ..........................................................................................25

*Clayton v. Heartland Res., Inc.*, 2009 WL 57140 (W.D. Ky. Jan. 8, 2009) ....................................................................................................14

*Dan D. Peterson Living Tr. Dated Apr. 2, 2009 v. Fyve LLC*, 2023 WL 7282295 (D. Ariz. Nov. 3, 2023) ...........................................................24

*Dipple v. Odell*, 870 F. Supp. 2d 386 (E.D. Pa. 2012) ...........................................23

*Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173 (9th Cir. 2021) .....................14

*Duggs v. Eby*, 2014 WL 5035006 (N.D. Cal. Oct. 8, 2014)...................................11

*Eisner v. Meta Platforms, Inc., et al.*, 2024 WL 2749433 (N.D. Cal. May 28, 2024)....................................................................................22, 24

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999)................................................................................................11, 12

*Herrley v. Frozen Food Express Indus., Inc.*, No. 3:13-cv-3004-B(BF), 2013 WL 4417699 (N.D. Tex. Aug. 19, 2013)................................22

*Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969 (N.D. Cal. 2006)...............................14

*In re Am. Funds Sec. Litig.*, 493 F. Supp. 2d 1103 (C.D. Cal. 2007).....................23

*In re Asyst Techs., Inc. Derivative Litig.*, 2008 WL 916883 (N.D. Cal. Apr. 3, 2008)............................................................................................22

*In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964 (N.D. Cal. 2010) ...............................................................................................16

*In re Estate of Marcos*, 25 F.3d 1467 (9th Cir. 1994) .......................................13, 17

*In re Facebook, Inc. S'holder Derivative Priv. Litig.*, 411 F. Supp. 3d 649 (N.D. Cal. 2019) ...................................................................................23

*In re Focus Media Inc.*, 387 F.3d 1077 (9th Cir. 2004) .....................................3, 11

*In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983 (S.D. Cal. 2005) ..............................................................................................................15

*In re Lernout & Hauspie Sec. Litig.*, 214 F. Supp. 2d 100 (D. Mass. 2002) ..............................................................................................................22

*In re Meta Platforms, Inc., Sec. Litig.*, 2024 WL 923770 (N.D. Cal. Mar. 4, 2024) ..................................................................................................23

*In re UnitedHealth Grp. Inc. S'holder Derivative Litig.*, No. 06-cv-01216 (D. Minn. Sept. 21, 2006), ECF No. 134 .........................................13

*In re Wilson*, 442 F.3d 872 (5th Cir. 2006)...............................................................17

*In re Worlds of Wonder Sec. Litig.*, 694 F. Supp. 1427 (N.D. Cal. 1988) ..............................................................................................................15

*JBF Interlude 2009 Ltd v. Quibi Holdings LLC*, 2020 WL 9311954 (C.D. Cal. Dec. 3, 2020) ...............................................................................3, 11

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) .............................................13

*Jorgensen v. Cassiday*, 320 F.3d 906 (9th Cir. 2003) .............................................24

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991) ........................................20

*Kokka & Backus, PC v. Bloch*, 2010 WL 458909 (N.D. Cal. Feb. 4, 2010) ..............................................................................................................11

*Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883 (7th Cir. 2000).....................25

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ...............................14

*Oh v. Sunvalleytek Int'l, Inc.*, 2023 WL 3549523 (N.D. Cal. May 17, 2023) ..............................................................................................................20

*Panyanouvong v. Aphay*, 2014 WL 916456 (W.D. Wash. Feb. 25. 2014) ..............................................................................................................13

*Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105 (N.D. Cal. 2013) ...........................................................................................................15

*Reliance Hosp. LLC v. 5251 S Julian Drive LLC,* 2023 WL 2601255 (D. Ariz. Mar. 22, 2023) .............................................................................13

*Rosen v. Cascade Int'l, Inc.,* 21 F.3d 1520 (11th Cir. 1994) ...................................12

*Rovio Ent. Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086 (N.D. Cal. 2012) ...........................................................................................................18

*S&G Labs Hawaii, LLC v. Graves*, 2021 WL 4927494 (D. Haw. Oct. 21, 2021) ..............................................................................................................21

*SG Cowen Sec. Corp. v. U.S. Dist. Ct. for N. Dist. of Cal.*, 189 F.3d 909 (9th Cir. 1999) ...............................................................................................23

*Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623 (9th Cir. 2016) ...................21

*Takiguchi v. MRI Int'l, Inc.*, 2013 WL 5150444 (D. Nev. Sept. 12, 2013) ..............................................................................................................14

*Talib v. SkyWay Commc'ns Holding Corp.*, 2005 WL 8160176 (M.D. Fla. Apr. 5, 2005) ..............................................................................................13

*Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029 (N.D. Cal. 2016) ....................................................................................................15

*Thrailkill v. Gordon*, 2010 WL 11552964 (C.D. Cal. July 27, 2010) .....................13

*Towers v. Iger*, 912 F.3d 523 (9th Cir. 2018) ..........................................................20

*W. Watersheds Project v. Salazar*, 692 F.3d 921 (9th Cir. 2012) ..........................17

*Wade v. Indus. Funding Corp.*, 29 F.3d 637 (9th Cir. 1994) ...................................13

*Wangson Biotechnology Grp., Inc. v. Tan Tan Trading Co.*, 2008 WL 4239155 (N.D. Cal. Sept. 11, 2008) ............................................................18

*Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510 (9th Cir. 1992) ..........................21

*Woldanski v. TuSimple Holdings, Inc. et al.*, No. 3:23CV00282 (S.D. Cal. Jan. 9, 2023), Dkt. 34-3 .....................................................................20

## STATUTES, RULES, AND REGULATIONS

15 U.S.C. § 77l..................................................................................................3

15 U.S.C. § 77z-1(b)(1) ....................................................................................22

15 U.S.C. § 78u-4(b)(3)(B)..........................................................................22, 23

Fed. R. Civ. P. 26(d)(1)......................................................................................22

Fed. R. Civ. P. 65 .................................................................................11, 14, 24

Section 10(b) of the Exchange Act ..................................................................3, 12

Section 20A of the Exchange Act.........................................................................3

Section 11 of the Securities Act......................................................................3, 12

Section 12 of the Securities Act...............................................................*passim*

Section 15 of the Securities Act...........................................................................3

## INTRODUCTION

Plaintiffs ask this Court to freeze hundreds of millions of dollars in TuSimple's assets based on Plaintiffs' claim, without factual basis, that the Individual Defendants have for years intended to expropriate TuSimple's property from the United States to China. But the event that Plaintiffs claim "necessitated" this request was the payment of a legitimate business expense from a U.S. bank account to a U.S. vendor. Specifically, although it had no obligation to do so, TuSimple agreed ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████. In response, Plaintiffs seek to freeze all assets, putting them (or this Court) in charge of every future payment made by TuSimple, a company with hundreds of employees on two continents and a ████████ annual budget. Given ████████ ██████████████████████████████████ ████████████—an asset freeze is utterly unnecessary. And, as described below, Plaintiffs have no legal right to any asset freeze, the imposition of which would cause irreparable harm to TuSimple by threatening its continued existence.

Plaintiffs' Motion relies on very few facts. Their so-called "Statement of Facts" is riddled with citations to the Plaintiffs' own *unverified* complaint, which in turn relies heavily on supposition and unreliable sources. TuSimple's mistaken early payment of a legitimate business expense is by no means a wrongful dissipation of any assets. Plaintiffs accordingly strain to identify relevant "circumstantial evidence" such as sharing of information with a potential business partner for a proper business purpose as long ago as 2022, and TuSimple's lawful attempt in November 2023 to *reduce expenses* by lawfully mailing computer chips from the U.S. to Australia rather than selling them at a loss in the U.S. and buying them at full price in Australia.

These "circumstances" no more support the conclusion that anyone plans or intends to wrongfully dissipate TuSimple's assets than the fact that TuSimple decided months ago to *reduce expenses* by winding down its more expensive U.S. business hampered by its lack of access to critical partners (suppliers of autonomous-ready trucks capable of being operated in the U.S.) and focusing its operating efforts on its long-standing Asia Pacific ("APAC") business.

Critically, Plaintiffs are not entitled to the extraordinary relief they seek. Federal courts have limited powers to freeze assets, and (except in cases involving bankruptcy or claims for fraudulent conveyance not at issue here) can only do so when the moving party has an equitable claim to the property sought to be restrained. Here, none of the Plaintiffs has a viable Section 12 claim.  None purchased stock from TuSimple—only Poirier even claims she bought in the IPO, but she did not— and TuSimple is not otherwise a statutory seller.  And, even if the Court did have the authority to order an asset freeze, Plaintiffs cannot show that one should be entered, let alone one of the scope they seek.  Plaintiffs have no risk of irreparable harm in the absence of the relief requested because the "circumstances" upon which they rely do not make it likely that assets (mostly deposits in U.S. banks that have been deposited there for years) will be sent abroad, and because TuSimple's existing controls are adequate to prevent any improper transfer of assets abroad.  And, because no class has been certified, in no event could there be an asset freeze in excess of $50,000.

Finally, entry of the TRO would expose TuSimple to irreparable harm. TuSimple's employees, partners, and vendors must have confidence that TuSimple will satisfy its existing obligations and any additional obligations necessary to operate the business.  Interposing Plaintiffs or the Court as a gatekeeper empowered to prevent TuSimple from making payments will crush TuSimple's prospects (and its ability to generate value for existing stockholders) by increasing the challenges of entering into customer or vendor relationships and retaining necessary talent.

## RELEVANT BACKGROUND

### A.  Plaintiffs Have No Equitable Claim To TuSimple's Assets

Plaintiffs filed the operative Complaint (Dkt. 103, "CAC") on October 2, 2023. The CAC focuses on the sharing of information two years ago in 2022 by TuSimple to Hydron Inc. ("Hydron"), a company founded by TuSimple's co-founder, Mo Chen. Plaintiffs advance legal (not equitable) claims for damages under Section 10(b) of the Exchange Act and Section 11 of the Securities Act, and a defective claim for rescission and restitution under Section 12(a)(2) of the Securities Act.[1] Only the Section 12 claim could confer an equitable right to particular property because Section 12 affords a right of rescission and restitution to certain buyers of securities in a public offering who continue to hold them.[2]

Plaintiffs have no likelihood of success on a Section 12 claim against TuSimple because TuSimple was not a statutory seller who could be liable under Section 12, and because there is no evidence that any Plaintiff bought securities in the only offering and continues to hold them. The record is clear that only one Plaintiff (Poirier) bought TuSimple securities on the same day as the offering. But

---

[1]  Plaintiffs also plead claims against the Individual Defendants for controlling person liability under Section 20 of the Exchange Act and Section 15 of the Securities Act. And they plead a claim under Section 20A of the Exchange Act against Defendant Charles Chao. Because these claims are not asserted against TuSimple, they cannot serve as the basis for equitable relief against TuSimple. *JBF Interlude 2009 Ltd v. Quibi Holdings LLC*, 2020 WL 9311954, at *25 (C.D. Cal. Dec. 3, 2020) ("It is not enough that the party seeking injunctive relief can assert an equitable claim to *something* at issue in the litigation. Rather, the 'authority of a district court in equity to enter a preliminary injunction freezing assets' requires a 'nexus between the assets sought to be frozen through an interim order and the ultimate relief requested in the lawsuit' such that there is 'a cognizable claim to specific assets of the defendant or [ ] a remedy involving those [specific] assets.'") (quoting *In re Focus Media Inc.*, 387 F.3d 1077, 1085 (9th Cir. 2004)).

[2]  Successful plaintiffs may recover under Section 12 "the consideration paid for such security with interest thereon … upon tender of such security, or for damages if he no longer owns the security." 15 U.S.C. § 77l.

Poirier paid less than the offering price, which means she did not purchase TuSimple securities in the offering itself. *See* CAC ¶¶ 159, 400.

Defendants moved to dismiss the CAC on December 8, 2023, and sought dismissal of the Section 12 claim on these grounds. *See* Dkt. 138-1. Plaintiffs make no reference to these defects in their Motion, and provide no evidence suggesting any Plaintiff bought TuSimple securities in the offering and continues to hold those same securities.

### B.     Proceedings In *Wilhoite* Reveal The Weakness Of The Hydron Allegations And Harms To TuSimple Caused By An Injunction

The plaintiffs in the *Wilhoite* shareholder derivative action, which also focuses on the information sharing with Hydron in 2022, sought and obtained a temporary restraining order intended to prevent future trade secret misappropriation. *See* No. 3:23-cv-02333-BEN-MSB, Dkt. 36 ("*Wilhoite* TRO"). That order has been extended multiple times. A panel of the Ninth Circuit granted TuSimple's motion to expedite TuSimple's appeal from the *Wilhoite* TRO and has consolidated TuSimple's appeal of each extension of that order with its appeal of the original order.

Early on, Judge Benitez appeared to accept the conclusion that information sharing with Hydron years ago posed a risk that trade secrets might be transferred imminently to Hydron. *See* TRO Mot. 6-7 (quoting *Wilhoite* TRO). Later, however, Judge Benitez expressed concern that the plaintiffs had provided no evidence of any imminent trade secret misappropriation. *See* Ex. I (*Wilhoite*, March 12 Hr'g Tr.) at 28:8-29:18, 68:3-7. The three depositions subsequently taken in that case confirm that there is no evidence of past, ongoing, or future misappropriation of TuSimple's trade secrets by TuSimple, Hydron, or any other defendant. *See* Ex. H (*Wilhoite*, Dkt. 212) at 6-7, 10-11.

▮▮▮▮▮▮▮▮▮▮▮. *See* Lu Decl. ¶ 54. Yesterday, Judge Benitez stayed the *Wilhoite* action pending the Ninth Circuit's decision on TuSimple's expedited appeal. *Wilhoite*, Dkt. 237.

### C.   The Events Preceding The Motion And Improvements In Cash Controls Show No Asset Freeze Is Warranted

In the midst of the multiple motions and ancillary proceedings prompted by the efforts of the plaintiffs in *Wilhoite* to obtain an injunction, Plaintiffs and TuSimple engaged in discussions intended to avoid similar proceedings in this Action to freeze TuSimple's cash assets. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Paine Decl. ¶ 19.

The cash controls that TuSimple described to Plaintiffs included ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



███████████████████████████████████████████████████. *See* Paine Decl. ¶ 21. ███████ mistakenly █████████████████████████ ████████████████████████████████████████ █████ *See* Lu Decl. ¶¶ 20-21. TuSimple contracts with Amazon Web Services ("AWS") for cloud data storage. *Id.* ¶ ████████████████ ████████████████████████████████. *Id.* ███ █████████████████████████████████ *Id.* On April 26, TuSimple's CEO approved payment of a ████████ AWS invoice due to be paid on May 13, with the expectation that the payment would be paid in May. *Id.* ¶ 19. However, the ███ ██████ payment to AWS was processed on April 29, 2024, increasing TuSimple's cash outflow for April 2024 to █████████████. *Id.* ¶ 21. The payment was processed early because █████████████████████████████████████████████████████████ *Id.* ███████████████████████████████████████████████████. *Id.* Had that payment been processed on May 13 as expected—or at any time in May—TuSimple's cash outlay in April ██████████████████. *Id.* ¶ 22.

[REDACTED]

On May 30, 2024 TuSimple reiterated its willingness to consider further process changes that would give Plaintiffs assurances that TuSimple [REDACTED] while still allowing the Company to run its business. Paine Decl. ¶ 25.

On June 6, 2024, [REDACTED]

Lu Decl. ¶ 14. [REDACTED]

[REDACTED] *Id.* The current Security Director is a U.S. citizen, resident, and former case officer with the Central Intelligence Agency, whose appointment is approved by the Committee on Foreign Investment in the U.S. (an inter-agency committee with representatives from the U.S. Departments of Treasury and Defense) ("CFIUS") and to whom he has reporting obligations under the National Security Agreement between TuSimple and CFIUS. *Id.* ¶ 15. The Security Director is also a member of the Audit Committee. *Id.* [REDACTED]

**D.      Other Relevant Facts**

**1.      TuSimple's efforts to control costs leading to the wind-down of its U.S. operations were sensible and well disclosed.**

At the time of TuSimple's public offering in 2021, TuSimple had standalone businesses focused on the APAC region headquartered in China ("TuSimple China") and the U.S. ("TuSimple U.S."). The public, including TuSimple shareholders like Plaintiffs, could not have been surprised by TuSimple's announcement in December 2023 that it had decided to wind down its U.S. operations.

By 2022, TuSimple had concluded that continuing to operate both businesses might be too costly, and disclosed that, as part of cost control efforts, it was considering strategic alternatives for its APAC business, including divestiture. Ex. F (Dec. 21, 2022 Form 8-K, Ex. 99.1). On December 5, 2022, TuSimple disclosed that its only U.S. truck manufacturing OEM partner had terminated its relationship with TuSimple. Ex. E (Dec. 5, 2022 Press Release). Later that month, TuSimple disclosed that it would be restructuring its U.S. business. Ex. F. In June 2023, having no replacement partner and no path to commercialization of its technology in the U.S., TuSimple disclosed that it was seeking strategic alternatives for its U.S. business. *See* Ex. C (Form 8-K dated June 28, 2023). Over the next six months, the Board attempted to find a buyer for the Company but was unable to obtain a satisfactory price. Lu Decl. ¶ 6. It was on this basis that the Board concluded that the Company's prospects in the U.S. were not worthy of further investment at that time, and that APAC offered greater prospects for commercialization given TuSimple's existing relationships with partners in APAC, regulatory changes throughout the region which had made autonomous trucking more feasible, and the lower cost of doing business in APAC. *Id.* TuSimple therefore disclosed in December 2023 its intention to wind down its U.S. business and shift its focus to APAC. Ex. D (Dec. 4, 2023 Form 8-K). Despite shifting its operational focus to APAC, TuSimple remains a Delaware corporation headquartered in the U.S. A

majority of TuSimple's directors are U.S. citizens who reside in the U.S.  Lu Decl. ¶ 16.

Consistent with its objective of cutting costs and saving cash, TuSimple has decreased its overall spending over time. ██████████████ ██████████████████████. *Id.* ¶ 9.

### 2.  TuSimple China relies on funding from TuSimple U.S.

TuSimple China has been in operation since TuSimple's founding in 2015. TuSimple China and TuSimple U.S. are subsidiaries of the same company.  *Id.* ¶ 5. In other words, they have the same shareholders (most of whom reside in the U.S.) who have always been well aware of the Company's operations in China.

TuSimple has historically kept, and continues to keep, the majority of its cash or cash equivalents in the U.S. and has funded operations abroad with monthly capital calls.  *Id.* ¶ 10. ███████████



██████ *Id.* ██████████████████████ ████████████████████████████████████ ██████████████████████████ *Id.* ███ ████████████████████████████ ██████████ *Id.* ¶ 11.

As TuSimple has reduced its overall spending over the last two years, its spending in APAC has gradually increased consistent with growing opportunities in the region.███████████



████████████. *Id.* ¶ 9. ████████ ████████████████████████ *Id.* ████ ████████████████████████████████████ ████████████████. *Id.*  If TuSimple China is not timely supplied with cash it will go out of business.

### 3.  TuSimple did not attempt to send computer chips to China.

As it winds down its U.S. operations, TuSimple sought to redeploy from the

U.S. to APAC third-party computer chips that can be used in its Australia operations. *Id.* ¶ 48. Although these computer chips can be purchased in Australia, TuSimple concluded that it would be cheaper to ship the chips it already owned to Australia than it would be to sell them at a discount in the U.S. and buy them at full in Australia. *Id.* Accordingly, in November 2023, TuSimple decided to ship NVIDIA computer chips to its subsidiary in Australia. *Id.* TuSimple had briefly considered sending them to China, but determined not to do so when informed of export restrictions that did not apply to Australia. *Id.* TuSimple intended to send the chips to the office of a company helping TuSimple to set up operations in Australia, and did not intend to send them to China when they were "picked up" from that company's office. *Id.* The *Wall Street Journal*'s report, based on undisclosed sources, is incorrect.

### 4. The confidential information sharing in 2022 was benign.

In late 2021 and early 2022, Hydron proposed to supply TuSimple with autonomous-ready trucks compatible with TuSimple software. *Id.* ¶ 36. To assess Hydron as a potential OEM partner, and consistent with TuSimple's assessment of other potential OEMs, TuSimple in 2022 shared with Hydron from the United States a small number of documents describing hardware required to be installed in an autonomous-ready truck capable of using TuSimple software. *Id.* This information sharing was for a reasonable business purpose, and the information shared is protected by a retroactive non-disclosure agreement signed a few months after the sharing began and expressly covered information shared both before and after it was signed. *Id.* None of these documents provide insight into TuSimple software. Evidence demonstrating these conclusions was provided to the plaintiffs in *Wilhoite*, and to the Court, leading Judge Benitez to observe that he had seen no evidence of likelihood of imminent harm. *See* Ex. I at 28:8-29:18, 68:3-7. Judge Benitez then permitted depositions (including the deposition of Hydron's principal and TuSimple's founder Mo Chen), which likewise showed that the information shared

by TuSimple was similarly benign and intended for a proper business purpose. *See* Ex. H at 6-7, 10-11.

**ARGUMENT**

**I.     PLAINTIFFS ARE NOT ENTITLED TO A TRO**

Plaintiffs do not state the kind of claim for equitable relief required to permit an asset freeze under the Supreme Court's decision in *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999).  Even if they had, they cannot satisfy the standard for a TRO under Rule 65.

> **A.     Plaintiffs' Attempt To Preserve Assets From Which To Recover Damages Is Barred by Supreme Court Precedent**

In *Grupo Mexicano*, the Supreme Court held that a district court has "***no authority*** to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of [a] claim for money damages." *Grupo Mexicano*, 527 U.S. at 333 (emphasis added); *see also Kokka & Backus, PC v. Bloch*, 2010 WL 458909, at *1 (N.D. Cal. Feb. 4, 2010) (explaining that *Grupo Mexicano* held "a federal court generally lacks jurisdiction to issue an 'asset freeze' simply to ensure that any judgment a plaintiff may ultimately obtain will be collectible" (citing *Grupo Mexicano*, 527 U.S. at 319-320)).[3]  Rather, a federal court may only "enjoin dissipation of a specific asset, where the plaintiff has an equitable claim against that asset." *Duggs v. Eby*, 2014 WL 5035006, at *2 (N.D. Cal. Oct. 8, 2014).

Plaintiffs seek to elide *Grupo Mexicano* by asserting broadly that equitable relief is "available" in claims brought under the federal securities laws.  TRO Mot. 11-12.  But this contention is insufficient because an asset freeze requires an actual equitable claim to particular assets; not the theoretical "availability" of equitable relief in an action generally.  *See In re Focus Media Inc.*, 387 F.3d at 1085; *JBF Interlude 2009*, 2020 WL 9311954, at *25.  Here, other than in connection with their

---

[3]     *Grupo Mexicano* refers to only two potential exceptions: those involving fraudulent conveyance and bankruptcy. 527 U.S. at 322.  Neither applies here.

claim under Section 12 of the Securities Act (where Plaintiffs plead entitlement to "rescind and recover the consideration paid for their shares," CAC ¶ 349), Plaintiffs neither have a judgment nor assert an equitable claim to specific assets. Specifically, for their remaining claims (Section 11 and 10(b) claims) they plead only claims for damages. *See* CAC ¶¶ 337 (claiming damages for Section 11 claim), 375 (claiming damages for Section 10(b) claim), 379 (same); *see also id.* at Prayer for Relief (demanding TuSimple "pay damages sustained by Plaintiffs").[4]

As the Supreme Court noted in *Grupo Mexicano,* the requirement of a judgment or an equitable claim to particular property is both required by the limits of the equitable powers of federal courts, 527 U.S. at 327, and consistent with the "historical principle that before judgment (or its equivalent) an unsecured creditor has no rights at law or in equity in the property of his debtor," *id.* at 330. A contrary rule would allow "any prowling creditor, before his claim was definitely established by judgment, and without reference to the character of his demand, to file a bill to discover assets, or to impeach transfers, or interfere with the business affairs of the alleged debtor"—a rule which "would manifestly be susceptible of the grossest abuse." 527 U.S. at 330 (quoting Wait, Fraudulent Conveyances § 73, at 110-111).

The Supreme Court's decision in *Deckert v. Indep. Shares Corp.* is consistent with this analysis. 311 U.S. 282 (1940). There, a third party held the funds to which plaintiffs had an equitable claim to restitution under Section 12(2)—now Section 12(a)(2)—of the Securities Act. *See id.* at 288; *see also Grupo Mexicano*, 527 U.S. at 325 ("*Deckert* is not on point here because, as the Court took pains to explain, 'the bill state[d] a cause [of action] for equitable relief.'"). Similarly, in *Newby v. Enron Corp.*, an asset freeze was potentially available (but ultimately denied) only because

---

[4]    Plaintiffs' generic prayer for "such other equitable relief, including injunctive relief, as this Court may deem just and proper" does not change the analysis. *See, e.g., Rosen v. Cascade Int'l, Inc.,* 21 F.3d 1520, 1531 (11th Cir. 1994) (holding that a request for "such other and further relief" that the court "deems just and proper" does not convert a claim for damages into a claim for equitable relief).

the plaintiffs had asserted equitable claims—including claims for accounting, disgorgement of insider trading profits, restitution, rescission, and imposition of a constructive trust for violations of the securities laws.  188 F. Supp. 2d 684, 692 (S.D. Tex. 2002).  Plaintiffs have pleaded no such claims here.  Nothing in *Deckert* or *Newby* stands for the proposition that a plaintiff can freeze assets to which she has no equitable claim or preserve assets for potential recovery of a *damages* award under the securities laws.[5]

Plaintiffs' other cited cases are not to the contrary.  *Wade v. Indus. Funding Corp.*, 29 F.3d 637 (9th Cir. 1994) was a pre-*Grupo Mexicano* remand decision directing the district court to consider *In re Estate of Marcos*, 25 F.3d 1467, 1480 (9th Cir. 1994).  In *Marcos*, the court acknowledged that the Supreme Court had not decided whether an asset freeze would be available in a case where only monetary damages were at issue.  *In re Estate of Marcos*, 25 F.3d at 1477.  *Grupo Mexicano*, of course, answered that question in the negative.  *Compare Reliance Hosp. LLC v. 5251 S Julian Drive LLC,* 2023 WL 2601255, at *1 (D. Ariz. Mar. 22, 2023) ("[T]he Supreme Court's 1999 decision in *Grupo Mexicano* limits *In re Marcos* to those cases which are primarily based on equitable claims.").

Six of Plaintiffs' cited cases involve claims for equitable relief and are therefore consistent with *Grupo Mexicano*.  *See Thrailkill v. Gordon*, 2010 WL 11552964, at *4 (C.D. Cal. July 27, 2010) (restitution and injunctive relief); Compl. at ¶ 62, *Panyanouvong v. Aphay*, 2014 WL 916456 (W.D. Wash. Feb. 25. 2014) (rescission or restitution); *Talib v. SkyWay Commc'ns Holding Corp.*, 2005 WL 8160176, at *3 (M.D. Fla. Apr. 5, 2005) (rescission for Section 12 claim); Am. Compl. at 8, *In re UnitedHealth Grp. Inc. S'holder Derivative Litig.*, No. 06-cv-01216 (D. Minn. Sept. 21, 2006), ECF No. 134 (rescission and unjust enrichment); *Johnson v. Couturier*, 572 F.3d 1067, 1084 (9th Cir. 2009) (equitable relief for

---

[5]    Indeed, the court in *Newby* recognized that there must be a nexus between the equitable claim and particular property.  188 F. Supp. 2d at 697.

ERISA claims).  In *Phillips v. Cook*, the Court granted an asset freeze in a case where plaintiffs sought to protect the very funds they had turned over to the defendants in an alleged fraudulent investment scheme, and as to which they had a contractual right to return.  2009 WL 10711666, at *3 (D. Minn. Sept. 15, 2009).  As the Court explained, "[f]rom the proceedings thus far, it is clear to the [c]ourt that what [p]laintiffs ultimately seek is the return of their investment – as was promised them before the investment was made."  *Id*.  No such promise was made here or is sought to be enforced.

Finally, the decisions in three cases cited by Plaintiffs that granted an asset freeze despite no apparent equitable claim did not even address *Grupo Mexicano* and simply cannot be reconciled with that binding authority.  *See Burnett v. Rowzee*, 2007 WL 2809769 (C.D. Cal. Sept. 26, 2007); *Takiguchi v. MRI Int'l, Inc.*, 2013 WL 5150444 (D. Nev. Sept. 12, 2013); *Clayton v. Heartland Res., Inc.*, 2009 WL 57140 (W.D. Ky. Jan. 8, 2009).  Accordingly, the only claim that can serve as the basis for Plaintiffs' TRO is their claim under Section 12 of the Securities Act.  As set out below, that claim is not viable.

### B.    Plaintiffs Cannot Satisfy the Injunction Standard

Plaintiffs have not shown that they are entitled under Rule 65 to the "extraordinary" and "drastic" remedy of preliminary injunctive relief.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).  Although Plaintiffs are correct that the Ninth Circuit applies a "sliding scale" approach to the standard factors for preliminary injunctive relief, *see, e.g.*, *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1177 (9th Cir. 2021), this does not dilute Plaintiffs' burden to prove their entitlement to extraordinary relief.  If Plaintiffs establish only "serious questions going to the merits"—as opposed to a likelihood of success on the merits—then they

must also show that "the balance of hardships tips sharply" in their favor. *Id.*[6] Not only do Plaintiffs raise no serious question about their entitlement to relief, but the balance of harms tips overwhelmingly toward TuSimple.

### 1.      Plaintiffs cannot succeed on the merits.

As explained above, the only equitable claim that arguably affords Plaintiffs an equitable interest in TuSimple's assets is a claim under Section 12(a) of the Securities Act. But Plaintiffs INPRS and Miller do not even purport to sue under Section 12. *See* CAC ¶ 343. So the sole question is whether Plaintiff Poirier has a likelihood of success on her Section 12 claim. She does not.

Section 12(a)(2) of the Securities Act requires plaintiffs to prove that they purchased a security directly from a "statutory seller" as part of the initial offering, "rather than in the secondary market." *Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1124 (N.D. Cal. 2013); *see also Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1054 (N.D. Cal. 2016) (same); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1039 (S.D. Cal. 2005) (statutory standing exists where "plaintiff purchased the security directly from the issuer"). Poirier has not pleaded—and cannot prove—either that she purchased her TuSimple securities from TuSimple or that she purchased them as part of the initial offering and not in the secondary market.

***First***, TuSimple is not a statutory seller. To be a statutory seller, TuSimple would have had to directly solicit Poirier's purchase of TuSimple securities. *See, e.g.*, *In re Worlds of Wonder Sec. Litig.*, 694 F. Supp. 1427, 1435 (N.D. Cal. 1988) (explaining that Section 12 "plaintiffs must allege facts which demonstrate that defendants 'solicited' the purchase of the securities at issue"). But TuSimple did not directly solicit Poirier's purchase. TuSimple sold its stock to underwriters in a firm

---

[6]      "'Serious questions' are those which are 'substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberative investigation.'" *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 975 (N.D. Cal. 2006) (citation omitted).

commitment offering. *See* Ex. G (April 7, 2021 Form S-1A, Ex. 1.1). Those underwriters then sold those securities to others. *See id.* The allegation in the Complaint that Defendants "promoted, solicited, offered for sale, and sold TuSimple common stock to Plaintiffs and other members of the Class," CAC ¶ 342, does not establish "seller" status. Plaintiffs do not pretend to prove that conclusion or offer any evidence at all on this critical point.

***Second***, Poirier does not allege or provide evidence that she purchased TuSimple stock in the offering and not in the secondary market. Nowhere does Poirier claim that she acquired her securities directly from TuSimple or the underwriters. She merely *alleges* the *conclusion* that she purchased stock "pursuant to the Prospectus." CAC ¶ 343. But that is not enough, particularly where the Complaint reveals that she *necessarily* purchased in the secondary market: the offering price on April 16, 2021 was $40 per share, *id.* ¶ 159, but the certification that Poirier attached to the Complaint states that she paid just $37.51 per share on that date for 1,300 shares (*i.e.*, $48,763 in total), *see* Dkt. 103-2 at 3. These facts are dispositive of Poirier's Section 12 claim. *See In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 976 (N.D. Cal. 2010) (dismissing claim where plaintiffs' certifications showed they did not "purchase[] any shares" at the offering price).[7]

Poirer thus has no claim under Section 12(a)(2) and TuSimple has none of her money to which she has any equitable right; she cannot demonstrate a likelihood of success on the merits.

### 2. There is no likelihood of irreparable harm.

Although Plaintiffs assert that a TRO is necessary to preserve the status quo and prevent TuSimple from dissipating cash or other assets, they have offered no credible "[e]vidence of dissipation," either direct or circumstantial. TRO Mot. 18.

---

[7] Of course, Plaintiffs also have not adequately pleaded falsity with respect to any prospectus statement, as explained in detail in TuSimple's pending motion to dismiss. *See* Dkt. 138-1 at 11-14.

To start, Plaintiffs' theory makes no sense. If TuSimple always intended to "abscond to China" with the remaining U.S.-based cash, *id.* at 19, then why would TuSimple not have done so in 2023 or before? ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[8]

Moreover, the evidence TuSimple offers, through the sworn declaration of its CEO (Mr. Lu), shows that Plaintiffs' supposed "[e]vidence of dissipation" is nothing of the sort. *First*, the Company's wind-down of U.S. operations was a business decision, made in response to the loss of key business partnerships in the U.S. and in an effort to capitalize on a more favorable regulatory environment in the APAC region. Lu Decl. ¶¶ 39, 41. TuSimple itself is incorporated in Delaware. *Id.* ¶ 42. *Second*, the supposed "attempt to send advanced computer chips to China" was innocuous. The chips at issue were valuable but nonproprietary pieces of hardware that TuSimple aimed to send to Australia so that they could be used there. *Id.* ¶ 48. *Third*, TuSimple has not "funneled" its intellectual property to Hydron; it shared with Hydron, a potential truck-supplying OEM partner, the information ordinarily shared with potential truck-supplying OEMs to determine whether the OEM can supply trucks capable of being operated by TuSimple's autonomous-driving software. *Id.* ¶¶ 36-40. *Fourth*, TuSimple's breach of the Disclosure Agreement was the result of a mistake that did not dissipate any assets and instead caused a necessary payment to be paid days earlier than anticipated. *Id.* ¶¶ 21-22. And TuSimple has already taken steps—disclosed weeks ago to Plaintiffs' counsel—to ensure that similar inadvertent errors will not occur again. *Id.* ¶ 23.

---

[8] Plaintiffs' citation to *Marcos* is entirely inapposite. As explained above, *Marcos* pre-dated *Grupo Mexicano* and is inconsistent with *Grupo Mexicano*'s central holding. *See supra* p. 13. Also, the defendant there had "engaged in a pattern of secreting or dissipating assets to avoid judgment," including "secreting assets through foreign bank accounts by the use of aliases and shell corporations." *Marcos*, 25 F.3d at 1480. Plaintiffs offer no such evidence here.

Plaintiffs' delay in seeking this TRO also weighs strongly against their request for injunctive relief now. Equity does not reward parties for "delays of [their] own making." *In re Wilson*, 442 F.3d 872, 875 (5th Cir. 2006); *accord W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012) (citing plaintiff's "delay" in seeking relief as one "equitable factor[]" supporting denial of preliminary injunction). Here, ██████████████████████████████████████ ██████████████████████—Plaintiffs' evidence in support of a TRO is based on information that was public months or years before Plaintiffs approached TuSimple about reassurances leading to the ███████████████. Courts routinely disapprove of "emergency" preliminary injunctive relief on such a timeline. *See, e.g.*, *Rovio Ent. Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1097 (N.D. Cal. 2012) (delay of six months weighed against issuing preliminary relief); *Wangson Biotechnology Grp., Inc. v. Tan Tan Trading Co.*, 2008 WL 4239155, at *6 (N.D. Cal. Sept. 11, 2008) (delay of two months weighed against granting relief).

Finally, with no class certified, only Plaintiff Poirier is even *alleged* to have an equitable claim to TuSimple's assets, via her (meritless) claim to rescission and to recovery of the $48,763 that she paid someone other than TuSimple in April 2021. *See supra* p. 16. To establish a prospect of irreparable harm, Plaintiffs would need to show that, without this Court's drastic intervention, TuSimple is on the cusp of dissipating ████████ in cash, such that there would not even be $48,763 left to satisfy an equitable judgment against the Company.

### 3. The balance of hardships weighs against an asset freeze.

In contrast to the lack of imminent irreparable harm on Plaintiffs' side of the balance, the relief Plaintiffs are seeking would harm TuSimple enormously. The Company's current plan for commercializing its technology and generating shareholder value is to wind down its U.S. operations and re-focus its business on its APAC operations. Lu Decl. ¶ 41. After the U.S. wind-down, TuSimple China will be the Company's principal operating asset and, for the foreseeable future, the

sole means by which TuSimple's shareholders may benefit from the optimization and sale of TuSimple technology. *Id.* ¶ 50. To execute that plan, TuSimple needs to be able to draw upon the common pool of cash that supports all its businesses, and to allocate appropriate capital and other resources to support its APAC subsidiaries. *Id.* By seeking their sweeping injunction, Plaintiffs threaten to starve the Company of necessary resources and shut down its operations. *Id.* ¶ 51.

Moreover, if TuSimple's employees, partners and vendors must contend with an adversary in litigation (seeking to represent many former shareholders eager to shut TuSimple's business down) or the Court approving every payment (here or abroad), then TuSimple is likely to go out of business. To protect itself from additional legal action in the event TuSimple is prevented from satisfying a payment or performance obligation, TuSimple would need to add to every commercial and employment contract that payment/performance is dependent upon external approval. TuSimple's partners, vendors, and employees will walk away. Employees concerned about compliance with future payroll obligations will seek new jobs. Partners and providers of goods who are not obliged to do business with TuSimple will not risk that an adversary may prevent the satisfaction of TuSimple's obligations. These impacts to TuSimple are not speculative or hypothetical. ███████████ ███████████████████████████████████████████ █████████████████ *See* Lu Decl. ¶ 54. These impacts will only be exacerbated if TuSimple's ability to pay its partners and suppliers is conditioned on approval by Plaintiffs or the Court.

The proposed arrangement will also undoubtedly prejudice TuSimple and the other Defendants' ability to defend themselves against this litigation. TuSimple needs access to its funds to finance its defense, and has obligations to indemnify the Underwriter Defendants and Individual Defendants that are involved in the litigation. Ex. G at 32. Putting Plaintiffs' counsel in a position of power with regard to Defendants' ability to fund a robust defense would be a perverse result indeed.

Finally, and particularly in light of TuSimple's enhanced controls, Plaintiffs have an adequate alternative remedy—the existing ███████████████. This Court can and should take much less dramatic and more appropriate steps to help ensure that the agreement is honored.

**4.    An asset freeze is not in the public interest.**

The public interest weighs against entering sweeping injunctive relief that, in effect, transfers control of TuSimple from its directors to Plaintiffs' counsel and to this Court, thereby upending "the basic principle of corporate governance that the decisions of a corporation . . . should be made by the board of directors or the majority of shareholders." *Towers v. Iger*, 912 F.3d 523, 528 (9th Cir. 2018) (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991)). And Plaintiffs' conclusory *ipse dixit* that they are the "victims of securities fraud," TRO Mot. 19, is untrue. They have not even pleaded a viable claim. *See supra* § I.B.1.

**C.    The Scope Of Plaintiffs' Asset Freeze Is Improper**

Injunctive relief prior to class certification is limited to the named plaintiffs alone. *See, e.g., Oh v. Sunvalleytek Int'l, Inc.*, 2023 WL 3549523, at *2 (N.D. Cal. May 17, 2023) (pre-class certification asset freeze not appropriate because named plaintiff would receive only a small fraction of total award). Here, however, despite a class not yet being certified, Plaintiffs are seeking to freeze hundreds of millions of dollars. As noted above, even if Plaintiff Poirier could prevail on her Section 12 claim, her restitutionary interest would be at most $50,000—not the ██████ Plaintiffs seek to freeze. *See supra* § I.B.1. And even if Plaintiffs INPRS, Miller, and Poirier were entitled to an asset freeze to preserve funds for any potential damages award (they are not), their lead plaintiff filings assert losses of approximately $900,000 (INPRS), $350,000 (Miller), and $95,000 (Poirier)—not the ██████ Plaintiffs seek to freeze. *See* Dkt 30-5; *Woldanski v. TuSimple Holdings, Inc. et al.*, No. 3:23CV00282 (S.D. Cal. Jan. 9, 2023), Dkt. 34-3. Plaintiffs have no basis for the scope of relief sought.

### D.    A TRO Would Amount To An Improper Civil-Contempt Sanction

████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ Plaintiffs do not argue, however, that the asset freeze requested is an appropriate remedy for ███████████████ ███████t.  It is not.  And, in any event, TuSimple should not be subject to a civil-contempt sanction in any form.

The "two independent purposes" of civil-contempt sanctions are "to coerce the defendant into compliance with the court's order" and "to compensate the complainant for losses sustained."  *S&G Labs Hawaii, LLC v. Graves*, 2021 WL 4927494, at *2 (D. Haw. Oct. 21, 2021) (quoting *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992)).  "Unlike the punitive nature of criminal contempt sanctions, civil contempt sanctions are wholly remedial."  *Id.* at *4 (alterations omitted) (quoting *Whittaker*, 953 F.2d at 517).

No compensatory civil-contempt sanctions are necessary here because Plaintiffs have not lost anything.  The money ████████████████ had to be paid sooner or later, and Plaintiffs had no claim to it.  No coercive civil-contempt sanctions are necessary because TuSimple has agreed to ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████  And even if coercive sanctions were warranted, they are "intended to deter [and] generally take the form of conditional fines."  *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016).  An asset freeze is a world apart.  "[T]he ability to purge is perhaps the most definitive characteristic of coercive civil contempt."  *Id.*

### II.    PLAINTIFFS ARE NOT ENTITLED TO EXPEDITED DISCOVERY

Plaintiffs request expedited discovery, but tellingly offer no reason why lifting the PSLRA stay is warranted.  Plaintiffs do not—and cannot—meet the rigorous standard for lifting the PSLRA discovery stay, which requires both that Plaintiffs

face undue prejudice and that the proposed discovery be particularized.[9] *See* 15 U.S.C. § 78u-4(b)(3)(B); 15 U.S.C. § 77z-1(b)(1); *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 12487666, *2 (C.D. Cal. Feb. 6, 2014).  "Moreover, courts have found that the PSLRA stay applies irrespective of whether there is a pending preliminary injunction motion." *Eisner*, 2024 WL 2749433, at *4.

### A.   Plaintiffs' Discovery Requests Are Not Particularized

Plaintiffs' requests are overly broad and unduly burdensome.  To satisfy the requirement of "particularized" discovery, Plaintiffs must "adequately specify the target of the requested discovery and the types of information needed to relieve that burden."  *In re Asyst Techs., Inc. Derivative Litig.*, 2008 WL 916883, at *1 (N.D. Cal. Apr. 3, 2008) (quoting *In re Lernout & Hauspie Sec. Litig.*, 214 F. Supp. 2d 100, 108 (D. Mass. 2002).  Here, Plaintiffs seek six categories of documents and three depositions of unidentified witnesses:

> (i) all documents produced by defendants to plaintiffs in the *Wilhoite* Action; (ii) all transcripts and recordings of depositions taken in the *Wilhoite* Action; (iii) all unredacted filings in the *Wilhoite* Action; (iv) all documents and communications between TuSimple and CFIUS related to any CFIUS investigation involving TuSimple; (v) all documents concerning the location of the hundreds of millions of cash and cash-like assets that TuSimple has located in the United States; (vi) all documents concerning all pending and contemplated sales and/or transfers of TuSimple's assets; and (vii) three depositions of individuals who may have information relevant to the preservation of TuSimple's assets, regardless of whether those individuals are located in the United States or abroad.

---

[9]   The proper inquiry is not whether good cause exists, but rather whether Plaintiffs have satisfied the PSLRA's requirements for lifting the mandatory discovery stay. *See Eisner v. Meta Platforms, Inc., et al.*, 2024 WL 2749433, at *2 (N.D. Cal. May 28, 2024) (alteration in original) (citing *Herrley v. Frozen Food Express Indus., Inc.*, No. 3:13-cv-3004-B(BF), 2013 WL 4417699, at *1 (N.D. Tex. Aug. 19, 2013) ("Plaintiff's arguments that 'good cause' exists for ordering expedited discovery under Fed. R. Civ. P. 26(d)(1) are inapposite as the threshold issue is whether any discovery is appropriate [under the PSLRA] prior to the resolution of the pending motions to dismiss.")).

TuSimple's Opp. to Pls.' TRO Mot.          - 22 -          Case No. 3:22-cv-01300-BEN-MSB

TRO Mot. 20. Only the first three are particular and discrete. The fourth focuses on a government investigation concerning events two years old. The fifth is overly broad, and unnecessary in light of ████████████████. The sixth is a fishing expedition. And the seventh knows no bounds.

None of these requests would be necessary to "preserve [TuSimple's] remaining U.S.-based cash assets," TRO Mot. 1, even if Plaintiffs had a right to insert themselves or the Court into TuSimple's daily operations. *See In re Meta Platforms, Inc., Sec. Litig.*, 2024 WL 923770, at *1 (N.D. Cal. Mar. 4, 2024) (finding discovery request not particularized "as Plaintiffs' broad request for all materials disclosed in [certain] cases fails to identify the volume of discovery requested or the subject matter of the documents"); *In re Am. Funds Sec. Litig.*, 493 F. Supp. 2d 1103, 1107 (C.D. Cal. 2007) (finding request for all documents produced to government agency was not particularized as it failed to identify, among other things, "how the documents sought will be relevant to the claims Plaintiffs intend to assert in this case"); *Dipple v. Odell*, 870 F. Supp. 2d 386, 392 (E.D. Pa. 2012) (denying motion to lift PSLRA stay where "all documents" in particular categories were sought because such discovery was not particularized).

Nor can Plaintiffs show that the discovery sought is necessary to prevent undue prejudice. *See* 15 U.S.C. § 78u-4(b)(3)(B). That Plaintiffs may be strategically and/or informationally disadvantaged absent discovery does not justify lifting the stay. *See In re Facebook, Inc. S'holder Derivative Priv. Litig.*, 411 F. Supp. 3d 649, 653 (N.D. Cal. 2019) (collecting cases); *In re Meta Platforms, Inc., Sec. Litig.*, 2024 WL 923770, at *1 (N.D. Cal. Mar. 4, 2024) ("Wanting discovery and not having access to it is not the kind of undue prejudice that justifies lifting a discovery stay."); *see also SG Cowen Sec. Corp. v. U.S. Dist. Ct. for N. Dist. of Cal.*, 189 F.3d 909, 913 (9th Cir. 1999) (explaining lack of facts necessary to state claim is not undue prejudice).

Further, "Plaintiff[s] do[] not explain why the discovery is crucial or how the discovery sought relates (in any way) to the preliminary injunction motion." *Eisner v. Meta Platforms, Inc., et al.*, 2024 WL 2749433, at *5 (N.D. Cal. May 28, 2024) (emphasis omitted). They cannot do so given that TuSimple already voluntarily provided Plaintiffs with a myriad of documents, including ███████ ████████████████████████████████████████████████████ ████████████████████████████████████. Paine Decl. ¶¶ 19. TuSimple also provided Plaintiffs with a ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████. *Id.* After the parties executed the ████████ ██████████ TuSimple provided Plaintiffs with ████████████████ ████████████████████████████████████████████████████ █████████████████████████ Paine Decl. ¶¶ 22. And TuSimple disclosed ████████████████████████████. Paine Decl. ¶¶ 23. Even if any discovery were permitted, Plaintiffs' request for depositions is insufficiently particularized; and its request to depose people in China is more of a poison pill (given the legal risk in China to anyone so deposed) than anything calculated to lead to critical information regarding the risk of future improper asset dissipation.

**III.    PLAINTIFFS REQUESTED TRO REQUIRES A MASSIVE BOND**

If relief is granted, TuSimple requests that the Court order that Plaintiffs provide security in the amount of at least $150 million.

Rule 65(c) requires that the party moving for a TRO "give[] security in an amount . . . proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court "may only 'dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining [its] conduct.'" *Dan D. Peterson Living Tr. Dated Apr. 2, 2009 v. Fyve LLC*, 2023 WL 7282295, at *4 (D. Ariz. Nov. 3, 2023) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)). As

explained above, the asset freeze threatens TuSimple's ability to survive and pursue business opportunities worth more than $1 billion and at least $150 million. *See supra* § I.B.3. A bond is therefore required.

In assessing the size of the required bond, courts "err on the high side." *Apple, Inc. v. Samsung Elecs. Co.*, 877 F. Supp. 2d 838, 918 (N.D. Cal. 2012) (quoting *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000)), *rev'd on other grounds*, 695 F.3d 1370 (Fed. Cir. 2012)). That is because the security is "an upper limit on an injured party's redress for a wrongful injunction." *Id.* (ordering $95 million bond). In determining the appropriate amount, courts also consider whether an injunction "may result in strained relationships" with customers. *Cisco Sys., Inc. v. Dexon Comput., Inc.*, 2023 WL 6466384, at *7 (N.D. Cal. Oct. 3, 2023).

It cannot be disputed that forcing TuSimple to shut down would destroy TuSimple's relationships with its business partners and deprive TuSimple of potential contracts with customers that would have purchased TuSimple's autonomous driving technology. The value of the commercial contracts that TuSimple would lose as a result of the TRO exceeds ███████. *See* Lu Decl. ¶ 55. But the value of TuSimple's commercial opportunities is worth much more than that, and more than the ████████ it currently holds. In April 2021, investors paid over $1 billion for only about 13% of TuSimple's stock, to allow for pursuit of these opportunities. Because this TRO threatens to cripple TuSimple entirely, the bond should be sufficient to compensate TuSimple for the loss of these commercial opportunities.

## CONCLUSION

Plaintiffs' requested TRO and expedited discovery should be denied.

Dated: June 7, 2024

Respectfully submitted,

*/s/ William Paine*

Kevin P. Muck (California SBN 120918)
    kevin.muck@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Tel: (628) 235-1000 / Fax: (628) 235-1001

William Paine, *pro hac vice*
    william.paine@wilmerhale.com
Robert Kingsley Smith, *pro hac vice*
    robert.smith@wilmerhale.com
Sonia Sujanani, *pro hac vice*
    sonia.sujanani@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6759 / Fax: (617) 526-5000

Elaine Harwell (California SBN 242551)
    elaine.harwell@procopio.com
PROCOPIO CORY
    HARGREAVES & SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA 92101
Tel: (619) 238-1900 / Fax: (619) 235-0398

*Counsel for Defendant TuSimple Holdings Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, the 7th day of June, 2024, I electronically transmitted a copy of this document to the Clerk's office using the CM/ECF system, which will send a notice of filing to all counsel of record.

/s/ William Paine
William Paine