1 | Kevin P. Muck (California SBN 120918)
kevin.muck@wilmerhale.com
2 | WILMER CUTLER PICKERING
HALE AND DORR LLP
3 | One Front Street, Suite 3500,
San Francisco, CA 94111
4 | Tel: (628) 235-1000 / Fax: (628) 235-1001

5 | William Paine, *pro hac vice*
william.paine@wilmerhale.com
6 | Robert Kingsley Smith, *pro hac vice*
robert.smith@wilmerhale.com
7 | Sonia Sujanani, *pro hac vice*
Sonia.sujanani@wilmerhale.com
8 | WILMER CUTLER PICKERING
HALE AND DORR LLP
9 | 60 State Street, Boston, MA 02109
Tel: (617) 526-6759 / Fax: (617) 526-5000

10 |
11 | Elaine F. Harwell (California SBN 242551)
elaine.harwell@procopio.com
PROCOPIO, CORY, HARGREAVES
12 | & SAVITCH, LLP
525 B Street, Suite 2200,
13 | San Diego, CA 92101
Tel: (619) 238-1900 / Fax: (619) 235-0398

14 |
*Attorneys for Defendant TuSimple Holdings Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUSTIN DICKER, *et al.*, Individually and on Behalf of All Others Similarly Situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> TUSIMPLE HOLDINGS INC., *et al.*, <br><br> *Defendants.* | Case No. 3:22-cv-01300-BEN-MSB <br><br> (Consolidated with Case No. 3:23-cv-00282-BEN-MSB) <br><br> **REDACTED DECLARATION OF CHENG LU IN SUPPORT OF DEFENDANT TUSIMPLE HOLDINGS INC.'S OPPOSITION TO PLAINTIFFS' *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND LIMITED EXPEDITED DISCOVERY** |

I, Cheng Lu, declare as follows:

1.      I offer this declaration in support of Defendant TuSimple Holdings Inc.'s ("TuSimple") Memorandum of Points and Authorities in Opposition to Plaintiffs' *Ex Parte* Motion for a Temporary Restraining Order and Limited Expedited Discovery ("TRO Motion").

2.      I graduated from the University of Virginia in 2005 with a Bachelor of Science degree in computer science and economics.  I graduated from Harvard Business School in 2010 with a Master of Business Administration.  I am a citizen of the United States and only a citizen of the United States.

3.      I have served as TuSimple's Chief Executive Officer ("CEO") since November 2022.  Previously, I served as TuSimple's CEO from September 2020 until March 2022, and as TuSimple's Chief Financial Officer from January 2019 to December 2020.  I also served as a member of TuSimple's Board of Directors ("Board") from June 2020 until March 2022 and from November 2022 to present.

4.      My responsibilities as CEO include leading TuSimple's overall go-to-market and commercialization strategy.  That requires that I interact directly with the Company's partners, suppliers, customers, and regulators.  I am responsible for negotiating and approving the terms of material contracts into which TuSimple enters with its partners, suppliers, and customers.  I am intimately familiar with TuSimple's technology; familiar with the market in which TuSimple and its subsidiaries, our partners, suppliers, and customers, are working together to commercialize TuSimple's technology; and familiar with the impediments and risks to the commercialization of TuSimple's technology.  I am also intimately familiar with TuSimple's business model and finances.

5.      TuSimple is a company at the development stage, intended to operate at a loss for years as it optimizes and commercializes its proprietary technology.  TuSimple has historically operated two standalone businesses.  One is focused on

DECLARATION OF CHENG LU                    Case No. 3:22-cv-01300-BEN-MSB

operations in the United States and is known as "TuSimple U.S." The other is focused on the Asia-Pacific region ("APAC") and is known as "TuSimple China." TuSimple U.S. and TuSimple China are each a collection of subsidiaries of TuSimple (direct or indirect), organized and doing business in each region. TuSimple U.S. and TuSimple China have historically operated with stand-alone engineering teams and software code bases and infrastructure.

6.    In June 2023, TuSimple announced a strategic review of the U.S. operations having lost its key OEM development partnership with Navistar and the high operating costs of running two separate operations. TuSimple engaged Perella Weinberg LLP, a publicly traded investment bank focused on mergers and acquisitions, to run a sales process for all or part of TuSimple's U.S. operations. TuSimple was not able to find a buyer for the entire business, but, in May 2024 TuSimple signed a non-binding term sheet to sell certain soft-IP assets to a U.S.-based technology company. Separately, TuSimple is winding down the rest of its TuSimple U.S. business. TuSimple China will be the principal operating asset of TuSimple and, for the foreseeable future, the sole means by which TuSimple's shareholders—including many U.S. investors—may benefit from the commercialization of TuSimple's autonomous driving technology.

7.    Despite this shift in TuSimple's operational focus, TuSimple is a Delaware corporation subject to U.S. jurisdiction.

I.    **TuSimple's Cash Controls**

8.    I understand that Plaintiffs' counsel in this class action have raised questions relating to TuSimple's cash controls. As CEO, I am familiar with those cash controls, which I describe briefly here.

9.    ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

- 2 -

1

2

3

4

5      10.    TuSimple's philosophy on cash management has not changed in the

6  past three years.

7

8

9

10

11

12

13

14      11.

15

16

17

18

19

20

21      12.    TuSimple is consistently and proactively examining ways to provide

22  better corporate governance and to ensure safe cash management process.  On March

23  4, 2024, TuSimple's Board unanimously adopted a resolution ("March Resolution")

24  enhancing the Company's controls with respect to certain types of cash transactions.

25

26

27

28

3 -

1

2

3

4

5

6  13.  ████████████████████████████████████████████

7

8

9

10

11

12

13

14  14.  On June 6, 2024, TuSimple's Board further enhanced the Company's

15  cash controls.

16

17

18

19

20

21  15.  TuSimple's current Security Director is Albert Schultz.  He is a U.S.

22  citizen and resident, and a former case officer with the Central Intelligence Agency.

23  He has also served in the Army National Guard and Reserve and has served on the

24  Board of several private companies.  His appointment as Security Director was

25  approved by the Committee on Foreign Investment in the United States ("CFIUS")

26  (an inter-agency committee with representatives from the United States Departments

27  of Treasury and Defense), to whom he has reporting obligations under the National

28

Security Agreement between TuSimple and CFIUS.  The Security Director is a member of the Company's Audit Committee.

16.    The other current members of the Company's Audit Committee are James Lu and Zhen Tao.  Mr. Lu and Ms. Tao are outside directors and are not TuSimple officers.  They are not alleged to have ties to China or to have engaged in any wrongdoing.  Each one is a U.S. citizen and resident and is highly qualified to serve as a director and an Audit Committee member.  For example, Mr. Lu is the chairman of a Nasdaq-listed, U.S.-based public company and has served on numerous corporate boards.  And Ms. Tao, in addition to being a senior partner at an investment firm, is the elected Treasurer of the city of South Pasadena, CA.

## II.    TuSimple's April 29, 2024 Payment to Amazon Web Services

17.    █████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████

18.    █████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
███████████████████████████████████████   These AWS payments are ordinary business expenses.

19.    TuSimple received an invoice from AWS in late March for $4 million, which was due on May 13, 2024.  On April 26, 2024, I approved that invoice for

payment.  My expectation at that time was that the payment would be processed on or near the due date of May 13, 2024.

20.    As of the week ending April 28, 2024, TuSimple's monthly cash outflow for April 2024 was ███████████████████████. Thus, had the ███████ payment to AWS been made in May 2024 as expected, TuSimple's cash outflow for April 2024 would have been ███████████████████ ██████████████████.

21.    However, the $4 million payment to AWS was processed on April 29, 2024, increasing TuSimple's cash outflow for April 2024 to ███████████ ██████████████████████████████████ ██████████████████████████████████ ████████████████ ███████████████ ██████████████████████████████████ ████████████████████████████.

22.    This was a timing error; had the ███████ AWS payment been processed just two days later (on May 1, 2024), there would have been no issue ███ ████████████.

23.    In response to the prematurely processed AWS payment, ██████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ █████████████ ████████████████████ ██████████████████████████████████ ██████████████████████████████████

1

2

3

4

5

## III.   TuSimple's Past Relationship with Hydron

24.     I understand that, in the TRO Motion, Plaintiffs have asserted that TuSimple's intellectual property has been improperly transferred to Hydron in the past.  This is false.

25.     At the time of its initial public offering, TuSimple disclosed that it did not intend to manufacture trucks.  Rather, TuSimple's plan was to focus on developing autonomous driving software and to use partnerships with third parties who would use their own capital to develop a commercially viable "scalable production semi-truck" capable of being controlled by TuSimple software.  Ex. A (Prospectus) at 24, 121.  TuSimple explained that this business model allowed it to obtain the "benefits of capital light vertical integration." *Id.*  That is, TuSimple intended to incentivize OEMs and component manufacturers to use their own capital to develop trucks while TuSimple used its capital to develop software, which would allow all key components of a commercial solution to be developed with significantly less investment of capital by TuSimple than if it attempted to pursue these goals alone.  *See id.* at 6, 16, 24, 37, 82, 104, 113-117, 124.

26.     Consistent with its plan, TuSimple does not manufacture trucks (and has no intention of doing so).  To commercialize its autonomous driving technology, TuSimple needs semi-truck Original Equipment Manufacturers ("OEM") capable of assembling purpose-built trucks with components that interface with TuSimple's autonomous driving software.  Specifically, TuSimple needs OEMs who assemble or contract to manufacture trucks, and other OEMs who provide custom-built

28

DECLARATION OF CHENG LU                                        Case No. 3:22-cv-01300-BEN-MSB

DocuSign Envelope ID: E77D96A2-E537-4CA0-B9AA-80C266990FF7

components, including suppliers of powertrains, transmissions, steering, and brakes built to meet TuSimple's requirements (*i.e.*, capable of being controlled by TuSimple's autonomous driving software). For example, the braking and steering systems necessary to interface with TuSimple's autonomous driving technology requires higher levels of precision and predictability than what is ordinarily available. The margin of error or confidence interval between actual performance and reported performance needs to be lower than what is acceptable with a human driver so that the response to an autonomous driving command is identical every time. Additional built-in "fail safe" or "redundancy" features are also necessary given that there is no human driver to engage if a component fails. These components are typically referred to as "autonomous-ready" components, meaning that the components can be controlled by autonomous driving software like TuSimple's. A truck having all necessary components to allow it to be controlled by software like TuSimple's is an "autonomous-ready" truck, but such a truck does not come equipped with software capable of controlling the truck. The major difference between an autonomous truck and autonomous-ready truck is that the former is equipped with software, such as TuSimple software, capable of controlling the components of a truck that are susceptible to autonomous control.

27.　TuSimple's business partnerships, including with OEMs and component manufacturers, are central to its business model and prospects for commercial success. TuSimple in its public offering prospectus stated that it believed that "leveraging these partnerships significantly . . . accelerates [its] pace to commercializing [its] AFN at the requisite scale to adequately serve the freight industry." Ex. A at 16, 113. TuSimple's executives are thus authorized to share information with OEMs, subject to an appropriate non-disclosure agreement, in order to assess and enter into essential partnerships. However, TuSimple does not

share with its OEMs any source code or other information that would enable an OEM to copy TuSimple's software.

28. It is important that TuSimple partner with more than one truck manufacturer OEM and component supplier for each region in which we intend to commercialize our technology. Partnering with a single OEM or component supplier in any region subjects TuSimple to what is known as "sole source" risk. "Sole source" risk is the risk to a company like TuSimple if its sole supplier is unable to supply, or does not supply, the trucks or components it is contracted to provide or, for potential OEMs and component suppliers, is considering whether to provide. As TuSimple disclosed in the prospectus for its April 2021 initial public offering, "sole source" risk is a material risk to TuSimple's business model. Ex. A at 42-43.

29. Supply stoppages or delays—whether caused by potential suppliers declining to enter agreements or suppliers terminating agreements, supplier bankruptcy, or the acquisition of a supplier by another company—can significantly set back the commercialization of TuSimple's autonomous driving technology. *Id*. That was particularly true during the COVID-19 pandemic, which significantly impacted global supply chains—including the supply of automotive parts. Relying on a single OEM or component supplier also reduces TuSimple's bargaining leverage when negotiating the terms of its partnerships. Increasing the number of actual and potential truck manufacturer OEMs and component suppliers reduces "sole source" risk and increases TuSimple's leverage in negotiations with its suppliers, so that it can try to obtain the most commercially favorable terms.

30. The number of potential business partners and OEMs who will partner with a development-stage company like TuSimple is limited. TuSimple is still developing and working to commercialize its technology, and as a result its demand for trucks is substantially smaller than established, non-autonomous freight-hauling competitors. The fleet of trucks that TuSimple owns and operates is small—less

than 70 trucks.  For context, an average of 250,000 new Class A trucks are sold every year, and Navistar (the fourth largest seller in this market) sells approximately 30,000 trucks each year.  It is not profitable for business partners and OEMs to supply custom, purpose-built trucks and components on the small scale that TuSimple now requires.  When they partner with us, OEMs are looking toward the future, because they must invest their own capital to work with TuSimple to design, manufacture, or assemble trucks or component parts without expecting a prompt return on investment.

31.     Historically, TuSimple sought to partner with established truck manufacturer OEMs and component suppliers.  At the time of its initial public offering, TuSimple had partnerships with both TRATON and Navistar, two of the world's largest commercial truck OEMs.  *See* Ex. A at 16-17.  In my role as CEO, I was responsible for negotiating TuSimple's Joint Development Agreement with Navistar.  I was also a member of the Project Steering Committee, which was responsible for overseeing the overall partnership between TuSimple and Navistar. As a member of the Project Steering Committee, I saw firsthand how TuSimple worked with Navistar and component suppliers to develop trucks that were capable of interfacing with TuSimple's autonomous driving technology.  I also saw firsthand what information of TuSimple was shared with Navistar and component suppliers to facilitate their development of trucks and components that were capable of interfacing with TuSimple's autonomous driving technology.

32.     In July 2021, TRATON and Navistar merged.  *See* Ex. B (Feb. 24, 2022 Form 10-K) at 5.  That merger meant that TuSimple went from two OEMs capable of manufacturing trucks (including assembling component parts from other suppliers) for use in the United States, to just one—subjecting TuSimple to the "sole source" risk described above (*supra* ¶ 28) in the middle of the COVID-19 pandemic. This "sole source" risk was one of the greatest risks to the Company at the time, and

DocuSign Envelope ID: E77D96A3-E537-4CA0-B9AA-90C266990FF7

the risk and need to identify a second OEM for truck manufacture and assembly for that region was actively discussed with the Board of Directors throughout the second half of 2021 and into 2022.

33.    To address its "sole source" risk, TuSimple engaged in a deliberate process to identify additional potential OEMs for truck manufacture and assembly with which to partner.  TuSimple's senior management presented to the board of directors about this risk and met monthly to assess potential OEMs as business partners.  As part of that process, TuSimple proactively reached out to ten such potential partners. TuSimple also engaged in feasibility studies with some of them to assess the suitability of a partnership.  Those feasibility studies required sharing proprietary information of TuSimple with the potential partners.  That information included proprietary information about the components that TuSimple's potential partners would manufacture to interface with TuSimple's autonomous driving software.  Specifically, that information included, among other things, product, design, and performance requirements for interfacing with TuSimple's autonomous driving software and monitoring and testing data.

34.    Hydron, Inc. ("Hydron") was one of the potential OEM partners considered by TuSimple.  Hydron (originally known as Turing Auto) was founded by one of TuSimple's co-founders, Mo Chen, to be a source of trucks.  In 2021, TuSimple employees, who were not engineers or software developers, performed work for Hydron.  These employees, who had business, accounting, legal, marketing and business development responsibilities, worked on marketing or business development projects such as research into the market for electric delivery vans (similar to the size of a UPS truck), branding, logo and the look of a prototype electric delivery van that Hydron might have paid to have manufactured by Foton, a Chinese truck manufacturer that is one of the world's largest, for display at a trade

DECLARATION OF CHENG LU                          Case No. 3:22-cv-01300-BEN-MSB

show (the 2022 Computer Electronics Show) in Las Vegas. TuSimple later estimated that the value of the work that they performed was less than $300,000.

35. In late 2021, I was told that Hydron had decided it would not be in the business of providing smaller delivery vans and had shifted its focus to semi-trucks powered by hydrogen fuel cells. I was also informed at this time that Hydron did not have its own autonomous driving software—and as far as I know, that is still true, since I have never been informed otherwise.

36. In 2022, TuSimple began evaluating Hydron as a potential OEM partner. Hydron proposed to work with TuSimple as an OEM supplying TuSimple with "autonomous-ready" trucks capable of being driven with TuSimple software. An "autonomous-ready" truck is a truck with hardware capable of being controlled by autonomous driving software. As with any autonomous-ready truck developed by a truck manufacturing OEM, Hydron's trucks are necessarily equipped with sensors, computing units, and redundant hardware (like brakes and steering columns) capable of interacting with autonomous-driving software like that developed by TuSimple. During the process of evaluating this potential business relationship, TuSimple shared information with Hydron, including a small number of documents describing hardware required to be installed in an autonomous-ready truck capable of using TuSimple Software. This information sharing was for a reasonable business purpose, and the information shared is protected by a non-disclosure agreement that was signed a few months after the sharing began and expressly covered information shared both before and after it was signed.

37. I was not involved in the details of TuSimple's efforts to evaluate Hydron, but as CEO and a director of TuSimple I understood the opportunity that a relationship with Hydron presented to TuSimple. As explained to me, Hydron as a start-up zero emissions OEM did not have a dedicated manufacturing facility. Rather, Hydron had access to capital (over $80 million USD in venture capital

funding), and vehicle design, hydrogen fuel cell vehicle engineering, and procurement capabilities. Hydron planned to pay ██████, a Chinese truck manufacturer OEM that TuSimple was already partnering with in China, to be a contract manufacturer for vehicles capable of being used in the U.S. The base vehicle would be based on an existing ██████ vehicle platform. This is common practice in commercial and passenger vehicle manufacturing. As an example, in the United States, start-up OEM company Hyliion uses an existing Paccar platform. Another example is Nikola, a US-based hydrogen fuel cell OEM start-up that utilizes an Iveco S-way platform. Furthermore, Iveco was the initial contract manufacturing for Nikola trucks to assemble the base platform with new hydrogen fuel cell components. While ██████ has manufacturing capabilities, it did not possess hydrogen fuel cell vehicle development experience. By working with Hydron, ██████ would not have to invest its own capital to develop this product and could obtain payment from Hydron for use of its excess manufacturing capacity. By reducing the capital investment of OEMs involved in the project, or even offering them an opportunity to profit from the small-scale production that Hydron and TuSimple needed at that time, Hydron could make it more likely that TuSimple would have another qualified OEM to assemble trucks for use in the United States. Accordingly, although it lacked manufacturing capability of its own, Hydron could become an OEM supplier to TuSimple of trucks it paid others to assemble—*e.g.*, ██████, and other component OEMs, including ████████████████████████████ ███████████████████████ that was also an OEM partner of TuSimple China. The information shared with Hydron is consistent with information shared with other potential OEMs, and only a small subset of the information shared with OEMs with whom TuSimple entered into a formal cooperation agreement.

38.   By offering key business partners the opportunity to decrease the financial risk that they otherwise would have accepted when they undertook development and small scale manufacturing and assembly activities for TuSimple, I understood that Hydron could make an important contribution to TuSimple's success. A partnership between TuSimple and Hydron, in short, had the potential not only to address TuSimple's "sole source" risk in the United States, but also to reduce the risk to TuSimple's existing OEMs—which in turn was intended to motivate the OEMs to continue working with TuSimple.

39.   As I understood the opportunity, Hydron would not compete with TuSimple any more than TuSimple's established OEM truck manufacturer partners like Navistar.  It is important to understand that because TuSimple did not have the capital to develop or manufacture trucks, and had decided to partner with those who did, our OEM partners do not compete with us.  These OEMs have complementary business models because they are necessary for our business, and without them we cannot succeed. If information supplied by TuSimple to Hydron and its partners had facilitated a more rapid development of another autonomous-ready truck for use in America, that would have assisted TuSimple and would not have harmed TuSimple at all.  Rather, TuSimple was not successful in finding a second OEM partner after the Navistar merger with TRATON.  That meant that, when Navistar terminated its OEM agreement with us on November 16, 2022, we had no OEM partner capable of manufacturing such a truck for use here.  This played a significant role in the decision of TuSimple's Board to attempt to sell and ultimately wind down TuSimple's business in the United States.

40.   I did not participate in the feasibility study in which TuSimple evaluated Hydron as an OEM partner beginning in early 2022, in part because I stopped working for TuSimple in March 2022.  However, working directly with a contract manufacturer and component suppliers is commonplace in vehicle

development.   I have reviewed the information shared by TuSimple U.S. with Hydron as part of the 2022 feasibility study, and I have also reviewed the information shared by TuSimple with a European-based potential truck manufacturer OEM partner as part of a feasibility study conducted in 2021.  The information shared by TuSimple U.S. with Hydron is consistent with the type of information shared in connection with the feasibility study conducted with the European-based potential truck manufacturer OEM partner as part of a feasibility study conducted in 2021— and consistent with the purpose of the Hydron relationship as described to me before I left TuSimple.   That information is also only a small subset of the kind of information TuSimple must share—and has shared—with truck manufacturer OEMs like Navistar with whom it has entered into a partnership to develop the autonomous-ready trucks that can interface with TuSimple's autonomous driving software.

41.     Without a replacement OEM to build trucks that could integrate with TuSimple software, TuSimple had no path to commercialization of its technology in the United States. TuSimple therefore publicly disclosed on June 28, 2023 that it was seeking strategic alternatives for its U.S. business.  Ex. C (June 28, 2023 Form 8-K).  The Board engaged investment bankers who conducted a thorough process to determine whether TuSimple's U.S. business could be sold as a going concern, and the Board also considered selling TuSimple U.S.'s proprietary technology.  *Id.* Unable to identify acceptable buyers for its TuSimple U.S. business, TuSimple eventually announced that it would wind down its TuSimple U.S. business and shift its focus to the APAC region. This strategy shift was necessitated by the Board's conclusion that the Company's prospects in the United States were not worthy of further investment and that APAC offered greater prospects for commercialization given its existing relationships with business partners in countries like China and Japan, and regulatory changes throughout the region that more freely permit use of autonomous driving on public roads.  It is also important to note that the U.S.

business was expensive, having annual operating expenses of more than $300 million USD (as opposed to approximately half that, for TuSimple China). Without a viable OEM in the U.S., the Board believed that shifting the Company's focus to the less expensive APAC region was the best opportunity to commercialize the Company's software and generate value for its shareholders.

42.    Despite this shift in TuSimple's operational focus, as I stated above (*supra* ¶ 7), TuSimple is a Delaware corporation subject to U.S. jurisdiction.

## IV.    Plaintiffs Misunderstand the Other "Circumstantial Evidence" They Describe

43.    I understand that, according to the TRO Motion, Plaintiffs allege that certain "circumstantial evidence" suggests that TuSimple may "abscond to China with the Company's assets." This is false. TuSimple has no such plan or intention. In suggesting otherwise, Plaintiffs are misinterpreting the "circumstantial evidence" that they describe.

44.    As stated above (at ¶ 10), TuSimple has business reasons for keeping its cash in the United States (until it is needed in APAC to fund operations). Those reasons remain valid even after the wind-down of TuSimple U.S. and the Company's shift of its operational focus to the APAC region.

45.    TuSimple's wind-down of U.S. operations was not part of a secret scheme—it was and is a publicly disclosed business decision, made by the Board in response to the challenges and adverse developments in the United States that I described above (*supra* ¶¶ 39-41). The subsidiaries that constitute TuSimple China are a key part of TuSimple—indeed, they are the operating subsidiaries through which TuSimple intends and expects to generate value for TuSimple's shareholders in the coming years.

46.    TuSimple's decision to delist its shares from the Nasdaq National Market was also not part of some secret scheme to take its cash to China. There is

no relationship between TuSimple's cash management and whether TuSimple remained publicly listed.  On January 16, 2024, the day before TuSimple announced that it would delist its shares from Nasdaq, TuSimple's stock closed at $0.7064 per share, implying a market capitalization of approximately $160 million.  That valuation was substantially lower than even the cash and cash equivalents held by TuSimple.  Continuing to trade as a public company given the discrepancy between TuSimple's implied market value and the assets owned by TuSimple (including its technology and cash) would not have been in the interests of TuSimple's shareholders.  Any effort to raise capital at a valuation less than the assets it had on hand would significantly dilute the interests of existing shareholders, all while TuSimple continued to incur significant expense to meet the requirements of a publicly listed company.

47.     As part of its strategic shift to APAC, TuSimple established operations in Australia through an Australian subsidiary, TuSimple Australia Pty Ltd.

48.     TuSimple is also looking to redeploy to APAC from the United States hardware components purchased from third parties that can be used to commercialize its technology in APAC without incurring the unnecessary expense of purchasing those same components in APAC. TuSimple's recent shipment of certain NVIDIA chips to Australia for use in Australia by its Australian subsidiary was consistent with that objective. Rather than purchase in Australia the exact same NVIDIA chips owned by TuSimple U.S. and for which TuSimple U.S. now has no purpose, TuSimple attempted to send unused NVIDIA chips in the United States to its Australian subsidiary. Although these computer chips can be purchased in Australia, TuSimple determined that it would be cheaper to ship the chips it already owned there than it would be to sell them at a discount here and buy them at full price there.  There was never any intention to re-route these chips from Australia to China. Indeed, TuSimple specifically decided *not* to make a similar shipment of

chips to China, for legal and regulatory reasons, after exploring whether shipping the chips to China was permissible. TuSimple proposed to send the chips to the office of a company helping TuSimple to set up operations in Australia and did not intend to send them to China when they were "picked up" from that company's office.  I made clear at the time in writing that the chips should not go to China.

## V.    The Requested Injunction Would Hurt TuSimple Badly

49.    I understand that Plaintiffs are requesting that the Court enter an order that would preclude TuSimple from spending any of its cash without prior approval by Plaintiffs and the Court.

50.    The order Plaintiffs are seeking would harm TuSimple enormously and likely would precipitate the shutting down of the Company.  As explained above, the Company's current strategic plan for commercializing its technology and generating shareholder value is to wind down its U.S. operations and re-focus its business on its APAC operations.  After the U.S. wind-down, TuSimple China will be the Company's principal operating asset and, for the foreseeable future, the sole means by which TuSimple's shareholders may benefit from the optimization and sale of TuSimple technology.  To execute on that business plan, TuSimple needs to be able to draw upon the common pool of cash that supports all its businesses and to allocate appropriate capital and other resources to support its APAC subsidiaries.

51.    Plaintiffs' requested order threatens to substantially slow down and starve the Company of necessary resources to execute this business plan.  Obtaining Plaintiff- and Court-approval for all expenditures will necessarily require that the Company devote more resources—and likely expend more legal fees—preparing disclosures for Plaintiffs and the Court and resolving with Plaintiffs and the Court any disagreements about potential expenditures.  With respect, Plaintiffs have no experience operating a development-stage technology company with hundreds of employees; and disputes concerning what actually are ordinary and necessary

expenses are likely to occur frequently.  Obtaining approval from Plaintiffs and the Court also risks delaying the Company's ability to timely address TuSimple's obligations, let alone address emergency expenditures.   These impediments to necessary operations are only exacerbated by the fact that TuSimple's operating subsidiaries are located in foreign jurisdictions, including China (which has laws governing collecting information to be provided to U.S. courts).

52.   Moreover, if TuSimple's employees, partners, and vendors must contend with a reality in which the Court or an adversary in litigation (whose best outcome would be putting TuSimple out of business while it has the most cash available to satisfy any judgment it might obtain) must approve every payment (here or abroad), TuSimple's prospects for commercial success are likely to be thwarted. TuSimple would need to revise every commercial agreement requiring cash payments to state such payments are subject to court approval.  That is because TuSimple would otherwise be subject to claims of breach if Plaintiff or the Court did not approve of a payment required by TuSimple's commercial agreements.  And doing so would effectively end these commercial arrangements and prevent TuSimple from signing any future supplier agreements.  The recipient of every payment must have, in advance, confidence that it will be paid and will continue to be paid.  Partners who are not obliged to do business with TuSimple need not spend their own time and money on a business relationship burdened with the risk that an adversary may prevent the payment of TuSimple's obligations or the deployment of people and assets necessary to make their investment of time and money worthwhile.

53.   Employees concerned about compliance with future payroll obligations will also leave TuSimple for other employment.  As with its commercial agreements, to avoid potential claims for unpaid wages, TuSimple will need to amend all employment agreements to state that the employee's remuneration is contingent on approval by Plaintiffs or the Court of the payment of that remuneration.  Inserting

- 19 -

1    such provisions into employment agreements would effectively prevent TuSimple

2    from hiring critical talent in a highly competitive labor environment.

3            54.    These impacts to TuSimple are not speculative or hypothetical. █████

4    ████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████

6    ████████████████████████████████  ██████████████████████

7    ████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████

16   ███████████████    These impacts will only be exacerbated if TuSimple's ability to

17   pay its partners and suppliers is conditioned on approval by Plaintiffs and the Court.

18           55.    If the TRO causes TuSimple to lose its partners, the TRO substantially

19   threatens several potential revenue opportunities exceeding ███████████.   As

20   TuSimple disclosed in June 2023, TuSimple China was among the first autonomous

21   driving technology companies to be awarded a driverless test license by the Pudong

22   New Area of Shanghai in China ("Pudong Shanghai"). The license granted to

23   TuSimple China is a significant step toward the commercialization of TuSimple's

24   autonomous driving technology and presents TuSimple China with the opportunity

25   to contract with the Port of Shanghai for approximately ███████████ in freight

26   delivery services over the next three years—currently TuSimple's most promising

27   contract for commercializing its L4 autonomous driving technology. TuSimple

28

China has also contracted with ████████████████████████████ ████████████████████████████ for installation in trucks manufactured by those truck manufacturers and sold to third parties.  Each contract has the potential to generate nearly ████████████████ in revenue over the coming years.  If TuSimple is subject to a TRO freezing its assets, these partners, ████████████████████████████████ will almost certainly begin looking for new partners to replace TuSimple.

56.    I understand that if it is ultimately determined that an injunction has been improvidently entered, TuSimple's only recourse for payment of damage caused by the injunction is the bond posted by Plaintiffs.  Because the injunction threatens TuSimple's ability to move forward to commercialize its software, the bond should be of sufficient size to compensate TuSimple for the value of such a lost opportunity.  In April 2021, investors paid over $1 billion for approximately 13% of TuSimple's stock, for the purpose of providing capital to pursue this opportunity.  Although progress has been made, and success remains uncertain, the value of success certainly exceeds the $1 billion of the investments made in 2021 and the ████████ in cash on hand.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on June 7, 2024 at the U.S. Embassy, Beijing, China.

*Cheng Lu*

_____

Cheng Lu

- 21 -