# EXHIBIT H
# FILED UNDER SEAL

Kevin P. Muck (California SBN 120918)
    kevin.muck@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
One Front Street, Suite 3500, San Francisco, CA 94111
Tel: (628) 235-1000 / Fax: (628) 235-1001

William Paine, *pro hac vice*
    william.paine@wilmerhale.com
Robert Kingsley Smith, *pro hac vice*
    robert.smith@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street, Boston, MA 02109
Tel: (617) 526-6759

Elaine F. Harwell (California SBN 242551)
    elaine.harwell@procopio.com
PROCOPIO, CORY, HARGREAVES & SAVITCH, LLP
525 B Street, Suite 2200, San Diego, CA 92101
Tel: (619) 238-1900 / Fax: (619) 235-0398

*Attorneys for Defendant*
    *TuSimple Holdings Inc.*

[Additional counsel appear on signature page.]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORMAN WILHOITE and JUDITH WILHOITE, derivatively on behalf of TuSimple Holdings, Inc., <br><br> *Plaintiffs*, <br><br> v. <br><br> XIAODI HOU, MO CHEN, CHENG LU, GUOWEI "CHARLES" CHAO, and HYDRON, INC., <br><br> *Defendants*, <br><br> and <br><br> TUSIMPLE HOLDINGS, INC., <br><br> *Nominal Defendant*. | Case No. 3:23-cv-02333-BEN-MSB <br><br> **REDACTED SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES OF NOMINAL DEFENDANT TUSIMPLE HOLDINGS INC. IN FURTHER OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** <br><br> Judge: Hon. Roger T. Benitez <br> Courtroom: 5A |

TuSimple's Suppl. Opp. to Pls.' PI Mot.          Case No. 3:23-cv-02333-BEN-MSB

**TABLE OF CONTENTS**

I.      The Court Lacks Jurisdiction To Rule Upon The Motion During The Pendency Of TuSimple's Appeals.................................................2

II.     Plaintiffs' Chosen Depositions Show That Plaintiffs Are Not Entitled To A Preliminary Injunction.................................................3

    A.      Plaintiffs Have Still Not Specified a Single Trade Secret.........................4

    B.      Plaintiffs Still Have No Evidence of Ongoing or Imminent Harm............6

    C.      Plaintiffs Still Have No Evidence of Past Misappropriation ...................10

    D.      The Balance of Equities Still Weighs Against an Injunction...................16

- i -

TuSimple's Suppl. Opp. to Pls.' PI Mot.                    Case No. 3:23-cv-02333-BEN-MSB

98

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Action Learning Sys., Inc. v. Crowe*, 2014 WL 12564011 (C.D. Cal.
Aug. 11, 2014) ................................................................................4, 6

*Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d
1001 (E.D. Cal. 2011) ........................................................................5

*Alphonso Inc. v. Tremor Video, Inc.*, 2022 WL 17968081 (N.D. Cal.
Oct. 31, 2022) ...............................................................................6, 11

*Apartment Ass'n of Los Angeles Cty., Inc. v. City of Los Angeles*, 10
F.4th 905 (9th Cir. 2021) ...................................................................3

*Attia v. Google LLC*, 983 F.3d 420 (9th Cir. 2020) ......................................8

*BladeRoom Grp. Ltd. v. Facebook, Inc.*, 2018 WL 514923 (N.D. Cal.
Jan. 23, 2018) .....................................................................................8

*Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023) ...........................................3

*CoreLogic Sols., LLC v. Geospan Corp.*, 2020 WL 7786537 (C.D.
Cal. Aug. 21, 2020) ...........................................................................1

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) ..................................2

*Genasys Inc. v. Vector Acoustics, LLC*, 638 F. Supp. 3d 1135 (S.D.
Cal. 2022) ..........................................................................................5

*Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56 (1982) ...........2, 3

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) ...............................17

*Maxlite, Inc. v. ATG Elecs., Inc.*, 2020 WL 6260007 (C.D. Cal. July
13, 2020) ............................................................................................3

*Novation Sols., Inc. v. Issuance Inc.*, 2023 WL 6373871 (C.D. Cal.
Aug. 16, 2023) .................................................................................17

- ii -

TuSimple's Suppl. Opp. to Pls.' PI Mot.          Case No. 3:23-cv-02333-BEN-MSB

99

*Reno-Tahoe Specialty, Inc. v. Mungchi, Inc.*, 2019 WL 4750249 (C.D.
Cal. Mar. 4, 2019)......................................................................................3

*Tina v. Countrywide Home Loans, Inc.*, 2008 WL 3157455 (S.D. Cal.
Aug. 5, 2008) ............................................................................................3

*Whitmore v. Hartford Cas. Ins. Co.*, 2010 WL 5021571 (S.D. Cal.
Dec. 3, 2010)...........................................................................................16

*Wilhoite, et al. v. TuSimple Holdings Inc.*, No. 24-1608 (9th Cir.).....................2, 14

*Wisk Aero LLC v. Archer Aviation Inc.*, 2021 WL 8820180 (N.D. Cal.
Aug. 24, 2021) ......................................................................................4, 6

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 65(c)....................................................................................18

- iii -

TuSimple's Suppl. Opp. to Pls.' PI Mot.                    Case No. 3:23-cv-02333-BEN-MSB

100

Pursuant to the Court's order at Dkt. 130, Nominal Defendant TuSimple Holdings, Inc. ("TuSimple") respectfully submits this supplemental brief in opposition to Plaintiffs' Motion for a Preliminary Injunction ("PI Motion").

**INTRODUCTION**

At the previous hearing on Plaintiffs' PI Motion, the Court expressed concern that Plaintiffs had no evidence of the ongoing or future irreparable harm necessary to satisfy an injunction and granted the extraordinary relief of permitting Plaintiffs "to depose whoever it is [they] want to depose." March 12 Hr'g Tr. at 28:8-29:18, 68:3-14.[1] Despite having taken three depositions of their choosing (including the deposition of the Company's former interim CEO who is not a named defendant) to cure this defect, Plaintiffs still have *no evidence* that Hydron or any Defendant ever misappropriated or will imminently misappropriate TuSimple's still unspecified trade secrets concerning the L4 autonomous driving technology that are the subject of the Verified Shareholder Derivative Complaint (the "Complaint"). Instead, the depositions show only that: (1) the information TuSimple shared with Hydron in 2022 was for a legitimate business purpose and subject to a retroactive NDA; (2) Hydron never used TuSimple's trade secrets to develop an autonomous or autonomous-ready truck; (3) TuSimple has no current or planned relationship with Hydron; and (4) there is no current, ongoing, or imminent threat of misappropriation of TuSimple's trade secrets by Hydron or any other Defendant.

Unable to muster any evidence of ongoing or future irreparable harm, Plaintiffs pivot to new theories never pleaded (something that the legal requirement

---

[1] The Court expressed doubt as to whether evidence of harm is necessary. March 12 Hr'g Tr. at 68:4-6. As explained in TuSimple's PI Opposition, *see* Dkt. 93-3 at 16, there is no likelihood of irreparable harm where there is "no evidence of any current or ongoing effort by Defendants to acquire or use … trade secret information," *CoreLogic Sols., LLC v. Geospan Corp.*, 2020 WL 7786537, at *3 (C.D. Cal. Aug. 21, 2020).

- 1 -

TuSimple's Suppl. Opp. to Pls.' PI Mot.                    Case No. 3:23-cv-02333-BEN-MSB

101

of a reasonably specific description of the trade secrets at issue is intended to prevent). *See* Dkt. 93-3 at 10-11. Plaintiffs now assert without evidence that: (1) Hydron received unspecified "confidential information" and "know-how"—not trade secrets—having nothing to do with the L4 autonomous driving technology that is the subject of the Complaint, and this unspecified "confidential information" and "know-how" allowed Hydron to develop a prototype truck; and (2) Hydron must necessarily still be using that unspecified "confidential information" and "know-how" because TuSimple had no plans to sell TuSimple U.S.'s patents—again, not trade secrets—when it sought to sell TuSimple U.S. in 2023. Pls. Suppl. Mem. at 3, 9-10. None of these baseless inferences, which lack support from actual deposition testimony, and which misunderstand the differences between trade secrets and other forms of intellectual property, support an injunction in this *trade secret* misappropriation case. *See Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (no injunction where alleged "harms are too attenuated from the purpose of" law underlying the claims).

It is now more clear than ever that Plaintiffs are not likely to succeed on the merits, that there is no evidence TuSimple would suffer irreparable harm absent an injunction, and that any further injunction will only exacerbate the harms TuSimple has already incurred from the serial injunctions Plaintiffs have obtained to date.

**I.    THE COURT LACKS JURISDICTION TO RULE UPON THE MOTION DURING THE PENDENCY OF TUSIMPLE'S APPEALS**

As TuSimple has previously explained, it noticed appeals from two of the Court's injunction orders. *See* Dkt. 135, 161. It has since noticed an appeal of the most recent injunction order. *See* Dkt. 200. The first two appeals were consolidated and are pending before the Ninth Circuit. *See Wilhoite, et al. v. TuSimple Holdings Inc.*, No. 24-1608 (9th Cir.). That consolidated appeal "divests [this Court] of its control over those aspects of the case involved in the appeal." *Griggs v. Provident*

- 2 -

TUSIMPLE'S SUPPL. OPP. TO PLS.' PI MOT.                    Case No. 3:23-cv-02333-BEN-MSB

*Consumer Discount Co.*, 459 U.S. 56, 58 (1982).  As TuSimple has explained in prior briefing, *see* Dkt. 180, 186, this "entire case is essentially 'involved in the appeal,'" given that a "question on appeal is whether the case belongs in" this Court at all.  *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 741, 743 (2023) (quoting *Griggs*, 459 U.S. at 58) (reasoning that benefits of interlocutory appeal arguing that case belongs in alternative forum would be "irretrievably lost" if district courts could simply "move forward with pre-trial and trial proceedings," including "intrusive discovery," during appeal).  Accordingly, the Court at this time lacks jurisdiction over the PI Motion, which involves issues that are "inextricably bound up with the merits of the matters on appeal."  *Reno-Tahoe Specialty, Inc. v. Mungchi, Inc.*, 2019 WL 4750249, at *1 (C.D. Cal. Mar. 4, 2019) (citation and quotation marks omitted).

## II.   PLAINTIFFS' CHOSEN DEPOSITIONS SHOW THAT PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION

A preliminary injunction is "an extraordinary and drastic remedy" that "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Apartment Ass'n of Los Angeles Cty., Inc. v. City of Los Angeles*, 10 F.4th 905, 911 (9th Cir. 2021) (citation omitted) (emphasis in original).  And the Court must rely on *evidence*, not allegations or speculation. *See Maxlite, Inc. v. ATG Elecs., Inc.*, 2020 WL 6260007, at *2 (C.D. Cal. July 13, 2020); *Tina v. Countrywide Home Loans, Inc.*, 2008 WL 3157455, at *2 (S.D. Cal. Aug. 5, 2008).  To the extent the Court determines it retains jurisdiction, Plaintiffs have still not made the clear showing, supported by evidence, that they are entitled to the extraordinary remedy they seek.

Plaintiffs once again claim that the "serious questions" standard should apply to the Court's analysis of their PI Motion.  Pls. Suppl. Mem. at 3.  But as TuSimple explained previously and explains below, it does not apply because the balance of hardships does not tip "sharply" in Plaintiffs' favor.  *See* Dkt. 93-3 at 9 n.7, 19-22;

- 3 -

*see also supra* § II.D.  Even if it did, decades of case law establish that a preliminary injunction is not appropriate where, as here, Plaintiffs fail to set forth a description of the allegedly misappropriated trade secrets and fail to provide evidence of ongoing or future misappropriation or harm or imminent harm therefrom.

### A.    Plaintiffs Have Still Not Specified a Single Trade Secret

As TuSimple previously explained, *see* Dkt. 93-3 at 10, a plaintiff asserting a claim for trade secret misappropriation and an injunction to prevent future misappropriation must describe with specificity the purported trade secrets they allege have been, or will be, misappropriated.  *See Action Learning Sys., Inc. v. Crowe*, 2014 WL 12564011, at *4 (C.D. Cal. Aug. 11, 2014).  That is because, without that specificity, a plaintiff can "engag[e] in a 'shifting sands' tactic in which they allege secrets vaguely, discover what is in the defendant's possession, and claim it was a trade secret all along."  *Wisk Aero LLC v. Archer Aviation Inc.*, 2021 WL 8820180, at *9 (N.D. Cal. Aug. 24, 2021) (citation omitted).  Not only does Plaintiffs' supplemental brief fail to identify with any degree of specificity the trade secrets they allege have or will be misappropriated, but Plaintiffs' have engaged in the very "shifting sands" tactic that the requirement that they identify trade secrets with specificity is intended to prevent.

As in their prior briefing, Plaintiffs' supplemental brief nowhere identifies with requisite specificity the trade secrets at issue.  Plaintiffs instead assert that what was or will be misappropriated is unspecified "confidential information," "know how," and technology memorialized in unspecified "patents."  *See* Pls. Suppl. Mem. at 3 ("TuSimple China employees used TuSimple's *confidential information* predominantly to design a truck on behalf of Hydron")[2]; *id*. at 4 ("Defendant Xiaodi Hou and TuSimple management *in China*[3] coordinated TuSimple's efforts to use its

---

[2] All emphasis added unless otherwise noted.
[3] Emphasis in original.

- 4 -

TuSimple's Suppl. Opp. to Pls.' PI Mot.          Case No. 3:23-cv-02333-BEN-MSB

104

*know-how* and other *confidential information* to help create Hydron's first prototype truck"); *id.* at 6 ("Hydron appears to have been so dependent on the *know-how* of TuSimple China personnel"); *id.* at 6 ("U.S. employees used their *know-how* of TuSimple's autonomous freight network to develop Hydron's network of hydrogen filling stations"); *id.* at 7 (references to "know-how, confidential information, and other assistance"); *id.* at 9-10 (argument that retaining patents evidences risk of misappropriation).    But such vague references to intellectual property are insufficient to obtain an injunction for trade secret misappropriation. *See Genasys Inc. v. Vector Acoustics, LLC*, 638 F. Supp. 3d 1135, 1151 (S.D. Cal. 2022) ("[I]nsight, knowledge, and know-how acquired by an insider to a particular trade does not, in and of itself, constitute trade secrets.") (quoting *Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1019 (E.D. Cal. 2011) (denying injunction)); *see also Agency Solutions.Com*, 819 F. Supp. 2d at 1020 ("[T]he bare assertion that a document represents 'proprietary insight' or 'know how' or is a 'trade secret' is insufficient to carry the burden to show that is the case").

Worse, Plaintiffs have shifted the focus of their trade secret claims to include technology nowhere identified in their Complaint or in prior briefing in this Court (something that would be unnecessary if they thought their original theory was viable).  Until their supplemental brief, Plaintiffs have steadfastly asserted that the trade secrets at issue in this litigation comprise "software and other non-public scientific, technical, or engineering information relating to TuSimple's L4 and AFN technologies" developed in the U.S.  Dkt. 73-01 at 12; *see also* Compl. ¶ 41.  Having no evidence that TuSimple's L4 technology was misappropriated by any Defendant, Plaintiffs now assert that the purported trade secrets at issue include TuSimple's L2

- 5 -

and L3 advanced driver assistance technology ("ADAS").  Pls. Suppl. Mem. at 4.[4] Not only is there no merit to the assertion that L2 and L3 ADAS technology was misappropriated by anyone—Plaintiffs only allege there was collaboration on that technology between TuSimple U.S. and TuSimple China—but Plaintiffs' shift betrays the very tactic that the requirement to identify with specificity the trade secrets at issue is intended to preclude.  *Wisk Aero LLC*, 2021 WL 8820180, at *9.

Plaintiffs' failure to allege, much less describe, any actual trade secret that was shared, or is likely to be shared, with Hydron or any other Defendant is fatal to their request for an injunction.  *See, e.g.*, *Alphonso Inc. v. Tremor Video, Inc.*, 2022 WL 17968081, at *4 (N.D. Cal. Oct. 31, 2022); *Action Learning Sys., Inc. v. Crowe*, 2014 WL 12564011, at *4-5 (C.D. Cal. Aug. 11, 2014).

**B.    Plaintiffs Still Have No Evidence of Ongoing or Imminent Harm**

The depositions in no way demonstrate any threat of imminent harm to Plaintiffs—or TuSimple, whose interests they purport to represent—justifying a preliminary injunction.[5]  To the contrary, the depositions and uncontroverted evidence show that:

- TuSimple decided not to have a business relationship with Hydron and discussions regarding that potential relationship ended in 2022,

---

[4]    L4 automation refers to a fully-autonomous truck, capable of being operated without a human driver.  *See* Ex. B (Lu Tr.) at 92:24-93:2.  L2 and L3 automation does not refer to full automation, but includes advanced driver assistance systems ("ADAS") such as cruise control and lane-keeping.  *Id*. at 100:8-101:3.

[5]    A review of the full transcripts would reveal that, contrary to the Court-mandated purpose of the depositions, Plaintiffs spent most of their time delving into their claims about past misappropriation and barely touched on any risk of future misappropriation.

- 6 -

TuSimple's Suppl. Opp. to Pls.' PI Mot.                    Case No. 3:23-cv-02333-BEN-MSB

106

*see* Ex. A[6] (Chen Tr.) at 68:16-69:11[7];

- TuSimple has no current or planned relationship with Hydron, *see* Ex. B (Lu Tr.) at 324:23-326:13;

- TuSimple's L4 intellectual property in the U.S. has been sequestered from TuSimple China since August 2022, *see id*. at 108:22-109:17;

- Hydron is no longer in the business of developing an L4 autonomous-ready truck and is currently designing only non-commercial vehicles that do not use TuSimple's autonomous-driving technology, *see* Ex. A at 134:3-136:10;

- While Hydron is currently using L2 ADAS technology, TuSimple had no "role in the development or provision of the L2 technologies currently being used by Hydron"—the L2 ADAS technology is being provided by an unrelated third-party, *id.* at 136:24-137:3;

- TuSimple and Chen have entered into a cooperation agreement by which Chen has agreed, until January 2026, that neither he, nor, Hydron, nor any other company controlled by Chen will engage in *any* related-party transactions between Hydron and TuSimple nor cause any TuSimple funds to be used to benefit Hydron, *see* Ex. D (April 9, 2024 Schedule 13D, Ex. 99.5) at 2; and

- In any event, Chen does not currently have any interests that he is aware of in autonomous driving companies for which TuSimple's trade secrets would be useful, *see* Ex. A at 33:20-34:1.

---

[6]    Citations to "Ex. __" refer to exhibits attached to the Declaration of Robert Kingsley Smith, filed herewith.

[7]    Even if the information shared in 2022 was trade secret, it would now be too stale to support an injunction. *See* Dkt. 93-3 at 14 (citing Ninth Circuit decision affirming denial of PI based on findings that no information had been shared since 2022 and trade secrets from 2022 were now stale).

- 7 -

TuSimple's Suppl. Opp. to Pls.' PI Mot.          Case No. 3:23-cv-02333-BEN-MSB

107

Plaintiffs omit all of this from their brief and offer a non-sequitur instead. They assert, as supposed "evidence [of] ongoing harm," that because TuSimple did not offer TuSimple U.S.'s patents for sale when TuSimple sought to sell that business in 2023, the attempted sale of TuSimple U.S. was a sham and "TuSimple China, Hydron, or others outside the United States can continue to use TuSimple's U.S.-developed technologies without the need for a license or infringing on TuSimple's intellectual property rights." Pls. Suppl. Mem. at 2, 9-11. This makes no sense.[8] What TuSimple sought to do with its patents as part of the sale of TuSimple U.S. has nothing to do with Plaintiffs' claims for *trade secret* misappropriation. Patents, which by their nature are public, are not and do not contain *trade secrets*. *See Attia v. Google LLC*, 983 F.3d 420, 426 (9th Cir. 2020) ("[I]t appears to us to be well-settled that publication of information in a patent application eliminates any trade secrecy."). Indeed, whereas trade secrets derive value because they are *secret*, patents derive value from the right to exclusive use in exchange for being made *public*. *See BladeRoom Grp. Ltd. v. Facebook, Inc.*, 2018 WL 514923, at *9 (N.D. Cal. Jan. 23, 2018) ("Whereas a patent protects a publicly-disclosed idea from appropriation by others, trade secret law protects only the right to control the dissemination of information." (citation omitted)). Therefore, retaining patent rights says nothing *at all* about the extent to which any party has access to or is using TuSimple's *trade secrets.* And selling patent rights would

---

[8]   That TuSimple did not plan on selling its patents in no way renders TuSimple's attempted sale of its TuSimple U.S. business a "sham." TuSimple hired a reputable investment bank—Perella Weinberg LLP—to market TuSimple U.S., Ex. B at 279:14-21, and received initial indications of interest, *id.* at 273:3-6. And there are any number of reasons why TuSimple may have decided to keep its patent portfolio—including to continue to monetize those assets through licenses or to leverage that technology in new markets into which the Company may expand. That decision says nothing about whether TuSimple actually intended to sell the other assets that constitute TuSimple U.S.

- 8 -

TuSimple's Suppl. Opp. to Pls.' PI Mot.          Case No. 3:23-cv-02333-BEN-MSB

108

confer no right to control the use of *trade secrets*. In any event, Chen's uncontroverted testimony is that Hydron has never used any inventions covered by TuSimple's patents. *See* Ex. A at 108:23-109:3.

Without any actual "evidence [of] ongoing harm," Plaintiffs are left to argue that TuSimple is "delay[ing] in complying with . . . discovery orders" and "will likely refuse to comply with its Court-ordered document production obligations," all to Plaintiffs' detriment. Pls. Suppl. Mem. at 1. But the Court has already rejected that argument, instead affording Plaintiffs the extraordinary relief of multiple depositions of Plaintiffs' choosing. *See* March 12 Hr'g Tr. at 28:8-29:19, 68:3-14. Indeed, the Court ordered depositions and set the initial date for the continued hearing on Plaintiffs' PI Motion *before* TuSimple's production deadline ordered by Judge Berg. *See id.* at 68:19-69:4 (granting 30 day continuance over Plaintiffs' request for the 45 days Judge Berg afforded TuSimple to produce documents from China). Moreover, TuSimple is not refusing to comply with its Court-ordered document production obligations. TuSimple has asked its subsidiaries in China to provide the documents the Court has ordered for production. *See* Smith Decl. ¶ 5. But those subsidiaries have refused to provide those documents without first complying with the law in China, *see id.*, laws which Judge Berg has already found preclude the production of documents in U.S. litigation and non-compliance with which would subject those subsidiaries and their employees to civil and criminal penalties, *see* March 7 Hr'g Tr. at 22:14-17, 34:25-35:3. Those subsidiaries have initiated an investigation to identify responsive documents and will seek approval from the relevant Chinese authorities to provide the documents to TuSimple for production in this action. *See* Smith Decl. ¶ 5. But TuSimple's status as a controlling shareholder is simply not enough under Chinese corporate law to compel its Chinese subsidiaries to violate Chinese law and provide it with documents for production in this action within the time ordered. *See* Dkt. 134 at 3-4. At bottom, despite being able to depose anyone

- 9 -

TuSimple's Suppl. Opp. to Pls.' PI Mot.                Case No. 3:23-cv-02333-BEN-MSB

109

of their choosing, Plaintiffs still have presented no evidence whatsoever that Chen, Hydron, or any other Defendant received any TuSimple trade secrets, much less is actually using TuSimple's trade secrets or has the intention or ability to do so, or that there is any imminent risk of harm to TuSimple from trade secret misappropriation.

### C.    Plaintiffs Still Have No Evidence of Past Misappropriation

The depositions also in no way demonstrate that Plaintiffs are likely to succeed on the merits of their trade secret misappropriation claim. Plaintiffs' supplemental brief completely ignores testimony that Hydron was a potential OEM partner for TuSimple with whom TuSimple shared the kind of information shared with any other OEM—hardware requirements for an autonomous-ready truck capable of operating TuSimple's software, *see* Dkt. 93-3 at 4-5—and that the shared information was subject to a retroactive non-disclosure agreement. Specifically, the uncontroverted deposition testimony demonstrates that:

- TuSimple was concerned that when TRATON acquired Navistar, TuSimple would no longer have a partner supplying trucks to TuSimple, depriving TuSimple of a truck supplying OEM partner, *see* Ex. A at 45:5-47:5, 50:5-51:22, Ex. B at 194:21-195:6, 195:14-197:4;

- Accordingly, TuSimple's management considered partnerships with additional OEM to supply trucks for the U.S., *see* Ex. B at 198:5-10;

- When TuSimple was considering additional OEM partners, Chen proposed to TuSimple's management that Hydron supply TuSimple with hydrogen-powered trucks, a proposal that was discussed at Board meetings and with individual Board members, *see* Ex. A at 111:24-115:3, 115:24-117:25, Ex. B at 201:5-14;

- Hydron would have helped mitigate TuSimple's OEM risk and

- 10 -

would have been willing, unlike other truck suppliers, to provide custom trucks on TuSimple's timeline, *see* Ex. B at 245:5-18;

- "[I]t was Hydron's expectation to supply trucks to TuSimple to operate," Ex. A at 71:20-72:1;

- "[T]he plan was for Hydron to make the truck and for TuSimple to install its own autonomous driving equipment," *id*. at 104:12-20;

- TuSimple shared with Hydron "certain requirements [] on [the] type of sensors [and] electrical interfaces [TuSimple] needed," Ex. B at 210:4-17;

- Hydron's hydrogen-powered truck initiative never advanced to the point of developing an autonomous-ready truck, such that it could have ever "used" any purported "trade secrets" Hydron received from TuSimple, *see* Ex. A at 98:21-25, 106:5-14; and

- Hydron had no use for TuSimple's trade secrets in developing prototypes because they could not support autonomous driving, *see id*. at 96:8-12, 120:24-125:23.

Again, failing to address or even acknowledge this testimony and having no actual evidence to support their claims, Plaintiffs attempt to obfuscate the evidentiary standard by making allegations that, even if true, do not amount to evidence of trade secret misappropriation.

***First***, Plaintiffs baselessly claim that "Hydron Had Access to TuSimple Trade Secrets . . . Through 2023." Pls. Suppl. Mem. at 3. Putting aside that *access* without *use* does not constitute misappropriation or justify an injunction, *see Alphonso Inc. v. Tremor Video, Inc.*, 2022 WL 17968081, at *6 (N.D. Cal. Oct. 31, 2022), neither piece of purported evidence on which Plaintiffs rely supports their conclusion. The Lu testimony to which Plaintiffs cite demonstrates only that *TuSimple China* and *TuSimple U.S.* had access to each other's trade secrets until August 2022, *see* Pls.

- 11 -

TuSimple's Suppl. Opp. to Pls.' PI Mot.          Case No. 3:23-cv-02333-BEN-MSB

111

Suppl. Mem. at 4—an unremarkable point TuSimple has never contested and which in no way demonstrates that *Hydron* had access to TuSimple U.S. trade secrets through 2023. And the claim that, after August 2022, "TuSimple's China and U.S.-based engineers continue to jointly develop ███████████████████ ████████████," Pls. Suppl. Mem. at 4, not only concerns L2 technology that is not the same as the L4 technology at issue in the Complaint, but in no way demonstrates that *Hydron* had access through 2023 to U.S.-developed trade secrets.

██████████████████████████████████████████████████ ██████ *See* Ex. B 98:14-99:20 ██████████████████████ ████████████████████████████████

**Second**, Plaintiffs claim that "Defendant Xiaodi Hou and TuSimple management *in China* coordinated TuSimple's efforts to use its know-how and other confidential information to help create Hydron's first prototype truck." Pls. Suppl. Mem. at 4. But the evidence upon which they rely shows no actual provision by TuSimple to Hydron of any know-how or confidential information, let alone actual *trade secret* misappropriation.

The meeting minutes to which Plaintiffs refer, from February 22, 2022, outline a future communication plan among Hydron (then known as Turing Auto), TuSimple, and ████ that supports TuSimple's explanation of the relationship among the three companies: Hydron was to obtain trucks from ████, assemble them with autonomous-ready components from other OEMs, and provide them to TuSimple to operate them with its autonomous software. *See* Dkt. 93-3 at 3-4. That the minutes reference TuSimple providing an "autonomous driving solution," *see* Pls. Suppl. Mem. at 6, is consistent with TuSimple installing its autonomous driving software in Hydron's prototype truck (something Chen testified never occurred).[9]

---

[9] Plaintiffs lean heavily on testimony from Chen that Hydron was only a "truck

- 12 -

TuSimple's Suppl. Opp. to Pls.' PI Mot.                Case No. 3:23-cv-02333-BEN-MSB

112

*See infra* at 12. Moreover, contrary to Plaintiffs' supposition, it makes perfect sense for a manager of business development and an expert in TuSimple's software to be involved: partnering with Hydron was a business development opportunity, and TuSimple had to be sure that the truck Hydron supplied would be compatible with TuSimple's software.[10] Nothing about that document suggests that TuSimple

designing company." *See* Pls. Suppl. Mem. at 3, 5. But that testimony is nothing more than an inconsequential difference in nomenclature extracted from translated testimony offered in response to a translated question. TuSimple has never asserted that Hydron would ever manufacture trucks; it has always maintained that Hydron would source trucks and components from suppliers and supply those trucks under the Hydron brand. *See* Dkt. 93-3 at 3-4; *see also* Dkt. 92-1 at ¶ 15. Chen's testimony is fully consistent. *See* Ex. A at 98:4-101:11 (explaining that other OEMs supplied components for the prototypes); *see also id.* at 98:8-9 (explaining that Hydron "assembled" its prototype trucks). And so is Lu's. *See* Ex. B at 51:3-9, 52:6-7 (OEMs can include "suppliers" and anyone who "sell[s] [TuSimple] something"). In any event, Chen was never asked—and so never testified—that Hydron was *not* a prospective OEM for TuSimple.

Plaintiffs also lean heavily on testimony from Chen that Project Ares was "not related to any potential partnership between Hydron and TuSimple to manufacture autonomous trucks." Pls. Suppl. Mem. at 5. But Plaintiffs conveniently ignore the balance of Chen's testimony. Chen explained that Project Ares referred to Hydron's development of a truck, only "part of [which] is about autonomous driving." Ex. A at 125:9-10. And it was only the part "that does not involve autonomous driving, [that] has nothing to do with TuSimple." *Id*. at 125:11-13. Indeed, elsewhere, Chen testified—consistent with Hydron's intended role as an OEM for TuSimple—that "one of [Project Ares's] divisions – one of its subdivisions is to work with the TuSimple." *Id*. at 124:13-15.

[10] Indeed, as Yumer testified, the expert in TuSimple's software who participated in the discussions with Hydron was "responsible for electronic software, low level electronics software that *went onto some of the hardware components in the truck*." Ex. C (Yumer Tr.) at 113:24-114:2; *see also* Ex. A at 81:11-16 ("I know that this person's [i.e., Xiaoling Han] work involves the sensors and also the installations of the sensors on the truck"). It makes perfect sense that an employee well-versed in the software necessary for hardware components of an autonomous-ready truck would be involved in discussions with a prospective OEM that would supply TuSimple with autonomous-ready hardware.

- 13 -

TuSimple's Suppl. Opp. to Pls.' PI Mot.    Case No. 3:23-cv-02333-BEN-MSB

113

contributed any know-how or confidential information to Hydron, let alone that any trade secrets were misappropriated.

Similarly, the deposition testimony of TuSimple's former interim CEO, Ersin Yumer, regarding the installation of hydrogen fueling stations along TuSimple's autonomous freight networks, is consistent with TuSimple partnering with Hydron as an OEM. *See* Pls. Suppl. Mem. at 6-7. As Yumer explained in testimony that Plaintiffs conspicuously do not cite, TuSimple considered Hydron as a potential supplier of hydrogen-powered trucks for TuSimple to operate on its autonomous freight networks using TuSimple's autonomous driving technology. Ex. C (Yumer Tr.) at 55:12-14, 67:11-24. And "if TuSimple were to *collaborate* with Hydron . . . *TuSimple* would need hydrogen pumping stations somewhere along *TuSimple* routes." *Id*. at 55:14-16. The discussion in which Yumer participated was therefore limited to "understanding where it would make sense to put hydrogen stations" along TuSimple's autonomous freight network routes. *Id.* at 55:17-18; *see also* Ex. A at 111:12-22 (rejecting the notion that TuSimple would perform work for Hydron related to hydrogen refueling stations, and explaining that it would be *TuSimple* that "need[s] to have the hydrogen refueling stations" if they purchased "hydrogen-powered vehicles"). Nothing about that testimony suggests that TuSimple contributed any know-how or confidential information to Hydron, let alone that any trade secrets were misappropriated.

***Third***, Plaintiffs assert as evidence of purported misappropriation that "Hydron developed its prototype truck in just six months"—a feat they assert is "impossible without TuSimple's know-how, confidential information, and other assistance." Pls. Suppl. Mem. at 7. But Plaintiffs ignore the uncontroverted testimony that Hydron never successfully made an autonomous-ready truck, Ex. A at 98:21-24, 106:5-8; the prototypes developed by Hydron did not have the hardware necessary for a truck to be autonomous-ready, *id*. at 95:11-96:23, 101:13-21, 105:8-

- 14 -

106:3; Hydron's prototype trucks were never capable of L4 autonomous driving, *id.* at 89:3-8, 125:15-23; and they were never tested on TuSimple's autonomous freight network, *id.* at 106:16-20.  As Chen explained, the prototype trucks developed by Hydron were simply hydrogen-powered trucks.  *Id.* at 94:21-95:9.  The development of prototype trucks that were not autonomous-ready—let alone actually operated by autonomous driving software—in no way depended on TuSimple's L4 autonomous driving technology that Plaintiffs assert are the trade secrets at issue in this action.[11]

*Fourth*, Plaintiffs assert that the evidence "shows that Hydron never actually entered into the NDA" with TuSimple.  Pls. Suppl. Mem. at 8.  But neither Chen's lack of recollection of signing the NDA nor the misidentification of Hydron in the NDA as a "California corporation"—the sole evidence on which they rely for this proposition—invalidate the NDA.  As an initial matter, Chen's lack of recollection does not mean he never signed the agreement; he acknowledged his signature.  Ex. A at 126:22-24.  Indeed, Chen explained why he may not recall the NDA.  Because the NDA is in English (a language he has limited ability to speak and read), others at Hydron would have explained its content to him prior to his signing it; he would not have read it himself.  *Id.* at 127:2-20.  And although he may have recalled the

---

[11] Plaintiffs' comparison of the development timelines of hydrogen-power trucks developed by Hydron and Nikola fares no better.  *See* Pls. Suppl. Mem. at 7 & n.13.  As Chen testified, Hydron only developed a *prototype* truck by mid-2022 and was "still very far from mass production."  Ex. A at 91:7-12.  By contrast, the article on which Plaintiffs rely describes Nikola making its first "*commercial deliveries* of [its] . . . fuel cell trucks."  Agnete Klevstrand, *Six years after faking a working prototype, Nikola should finally deliver its first hydrogen trucks in 2023*, HYDROGENINSIGHT (Feb. 20, 2023), available at https://www.hydrogeninsight.com/transport/analysis-six-years-after-faking-a-work ing-prototypenikola-should-finally-deliver-its-first-hydrogen-trucks-in-2023/2-1-140 6373 (last visited May 7, 2024).  The timeline to delivery of a prototype and commercially-ready truck are two very different things; the timeline to market of the latter says nothing about the extent to which the development timeline of the former was the result of any trade secret misappropriation.

- 15 -

TuSimple's Suppl. Opp. to Pls.' PI Mot.                    Case No. 3:23-cv-02333-BEN-MSB

115

substance of the document had he been able to read its contents, he had no ability to read the document at the deposition because, despite knowing that Chen had limited English abilities, Plaintiffs did not translate the document in Mandarin for Chen to review. *Id*. at 126:12-127:7. Moreover, the NDA's purported misidentification of Hydron as a "California corporation" does not, as a matter of law, invalidate or otherwise impede the enforcement of the NDA. *See Whitmore v. Hartford Cas. Ins. Co.*, 2010 WL 5021571, at *3 (S.D. Cal. Dec. 3, 2010) (where text is "obviously a typographical error, [] it's unreasonable to opportunistically seize upon the error . . . and argue that it renders the [contract] ambiguous."). Chen acknowledged that Hydron had entered into an NDA with TuSimple.

At bottom, despite being afforded the ability to depose whomever they wish, and despite obtaining deposition testimony from all three witnesses whose depositions they noticed, Plaintiffs have not established a likelihood of success on the merits of their claim for past misappropriation.

**D.     The Balance of Equities Still Weighs Against an Injunction**

As explained above, Plaintiffs still have shown no credible prospect of imminent harm to TuSimple absent an injunction. There is no ongoing information sharing or use by any Defendant of purportedly misappropriated trade secrets.

On the other hand, TuSimple has described, and the depositions confirm, the very real harms TuSimple will suffer, and is already suffering, from the injunction:



- ███████████████████████████████████████████████████ Ex. B at 280:4-284:3, ████████████████████, Dkt. 157 at ¶ 51;

- ███████████████████████████████████████████████████ ████████████████, Ex. B at 284:25-285:23, ██ ████████████████, Dkt. 157 at ¶ 51;

- ███████████████████████████████████████████████████

- 16 -

TuSimple's Suppl. Opp. to Pls.' PI Mot.          Case No. 3:23-cv-02333-BEN-MSB

116

██████████████████████, Ex. B at 289:22-290:5;

- ██████████████████████████████████████
██████████████████████████████████████ ██████, *id*. at 291:11-293:10; and

- ██████████████████████████████████████
██████████████████████████████████████
██████ Dkt. 157 at ¶ 48.

Without addressing the ██████████████████████████, which alone demonstrates greater harm to TuSimple from an injunction than without an injunction, Plaintiffs' only rejoinder to this uncontroverted evidence is to claim that Lu's declarations are not reliable because Lu did not himself speak directly to ████, ████████, and did not recall at his deposition who specifically had those conversations. Pls. Suppl. Mem. at 10. But nothing about Lu hearing secondhand about ████████████████████████████████████ undermines that those events have in fact occurred—particularly in the absence of any controverting evidence. As courts have repeatedly made clear, preliminary injunctive proceedings are not subject to the strictures of the rules of evidence; hearsay is not prohibited. *See Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009); *see also Novation Sols., Inc. v. Issuance Inc.*, 2023 WL 6373871, at *6 (C.D. Cal. Aug. 16, 2023) ("A court may consider hearsay when determining whether to issue a preliminary injunction."). Moreover, it would be highly unusual for a company's CEO, rather than the teams working directly with the company's partners, to first hear from those partners about ████████████████████; Plaintiffs do not suggest otherwise. And there is also no reason a CEO should necessarily recall the name of the employee who reported the current status of a business partnership up through the reporting structure and ultimately to the CEO's desk; again, Plaintiffs do not suggest otherwise.

- 17 -

TuSimple's Suppl. Opp. to Pls.' PI Mot.         Case No. 3:23-cv-02333-BEN-MSB

117

**CONCLUSION**

For the reasons explained in TuSimple's PI Opposition, Sur-Reply, and this Supplemental Brief, to the extent the Court believes it retains jurisdiction to hear Plaintiffs' PI Motion, that Motion should be denied.[12]  Further, for the reasons set forth in TuSimple's Motion to Dismiss, *see* Dkt. 27-01, the Complaint should be dismissed.

Dated: May 8, 2024                    Respectfully submitted,

                                      */s/ Robert Kingsley Smith*
                                      Kevin P. Muck (California SBN 120918)
                                         kevin.muck@wilmerhale.com
                                      WILMER CUTLER PICKERING
                                         HALE AND DORR LLP
                                      One Front Street, Suite 3500
                                      San Francisco, CA 94111
                                      Tel: (628) 235-1000 / Fax: (628) 235-1001

                                      William Paine, *pro hac vice*
                                         william.paine@wilmerhale.com
                                      Robert Kingsley Smith, *pro hac vice*
                                         robert.smith@wilmerhale.com
                                      Sonia Sujanani, *pro hac vice*
                                         sonia.sujanani@wilmerhale.com
                                      WILMER CUTLER PICKERING
                                         HALE AND DORR LLP
                                      60 State Street
                                      Boston, MA 02109
                                      Tel: (617) 526-6759 / Fax: (617) 526-5000

                                      Charles Bridge, *pro hac vice*
                                         charles.bridge@wilmerhale.com
                                      WILMER CUTLER PICKERING
                                         HALE AND DORR LLP
                                      7 World Trade Center
                                      250, Greenwich Street
                                      New York, NY 10007
                                      Tel: (212) 295-6418 / Fax: (212) 230-8888

---

[12]     To the extent the Court grants Plaintiffs' PI Motion, TuSimple requests leave to brief the appropriate security Plaintiffs must provide to pay the costs and damages sustained by TuSimple if found wrongfully enjoined.  *See* Fed. R. Civ. P. 65(c).  As set forth herein, TuSimple is continuing to incur significant harm as a result of the injunctions imposed upon it to date, which harm will only be exacerbated by an injunction for the duration of this action.

- 18 -

TuSimple's Suppl. Opp. to Pls.' PI Mot.                    Case No. 3:23-cv-02333-BEN-MSB

Alexis Pfeiffer (California SBN 312007)
   alexis.pfeiffer@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Tel: (650) 858-6000 / Fax: (650) 858-6100

Elaine Harwell (California SBN 242551)
   elaine.harwell@procopio.com
PROCOPIO CORY
   HARGREAVES & SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA 92101
Tel: (619) 238-1900 / Fax: (619) 235-0398

*Counsel for Nominal Defendant
   TuSimple Holdings Inc.*

- 19 -

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, the 8th day of May, 2024, I electronically transmitted a copy of this document to the Clerk's office using the CM/ECF system, which will send a notice of filing to all counsel of record.

/s/ *Robert Kingsley Smith*
Robert Kingsley Smith

TuSimple's Suppl. Opp. to Pls.' PI Mot.          Case No. 3:23-cv-02333-BEN-MSB

120

Robert Kingsley Smith, *pro hac vice*
  robert.smith@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street, Boston, MA 02109
Tel: (617) 526-6759

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORMAN WILHOITE and JUDITH WILHOITE, derivatively on behalf of TuSimple Holdings Inc., <br><br> *Plaintiffs*, <br><br> v. <br><br> XIAODI HOU, MO CHEN, CHENG LU, GUOWEI "CHARLES" CHAO, and HYDRON, INC., <br> *Defendants*, <br><br> and <br><br> TUSIMPLE HOLDINGS INC., <br><br> *Nominal Defendant*. | Case No. 3:23-cv-02333-BEN-MSB <br><br> **DECLARATION OF ROBERT KINGSLEY SMITH IN SUPPORT OF SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES OF NOMINAL DEFENDANT TUSIMPLE HOLDINGS INC. IN FURTHER OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Judge: Hon. Roger T. Benitez <br> Courtroom: 5A |

DECLARATION OF ROBERT KINGSLEY SMITH        Case No. 3:23-cv-02333-BEN-MSB

I, Robert Kingsley Smith, hereby declare as follows:

1.      I am an attorney with the law firm of Wilmer Cutler Pickering Hale and Dorr LLP, counsel for Nominal Defendant TuSimple Holdings Inc. ("TuSimple").

2.      I am a member in good standing of the State Bar of Massachusetts.

3.      I am over the age of eighteen and have personal knowledge of and am competent to testify about the factual matters asserted herein.  If called as a witness, I could and would competently testify thereto.

4.      I submit this Declaration in support of the Supplemental Memorandum of Points and Authorities of Nominal Defendant TuSimple Holdings Inc. in Further Opposition to Plaintiffs' Motion for Preliminary Injunction [ECF No. 73], filed in this Action.

5.      As I have explained to Plaintiffs' counsel and Judge Berg during telephonic conferences, TuSimple has asked its subsidiaries in China to provide the documents the Court has ordered for production.  Those subsidiaries have refused to provide those documents without first complying with the law in China, but they have initiated an investigation to identify responsive documents and will seek approval from the relevant Chinese authorities to provide the documents to TuSimple for production in this Action.

6.      Attached hereto as **Exhibit A** is a true and correct excerpt from the transcript of the deposition of Mo Chen, taken in this action on April 24, 2024.  The cover page of the transcript currently states that Chen was located in Beijing for the deposition, but that is incorrect; he testified from Hong Kong.  The court reporter is in the process of correcting the transcript to reflect the correct location, but the parties have not received a corrected copy.

7.      Attached hereto as **Exhibit B** is a true and correct excerpt from the transcript of the deposition of Cheng Lu, taken in this action on April 12, 2024.

- 1 -

DECLARATION OF ROBERT KINGSLEY SMITH        Case No. 3:23-cv-02333-BEN-MSB

8.      Attached hereto as **Exhibit C** is a true and correct excerpt from the transcript of the deposition of Ersin Yumer, taken in this action on April 2, 2024.

9.      Attached hereto as **Exhibit D** is a true and correct excerpt of TuSimple's Schedule 13D, filed with the SEC on April 9, 2024 and available online, in full, at http://edgar.secdatabase.com/519/119312524090788/filing-main.htm.

***

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Boston, Massachusetts, on this 8th day of May 2024.

*/s/ Robert Kingsley Smith*
Robert Kingsley Smith

- 2 -

DECLARATION OF ROBERT KINGSLEY SMITH          Case No. 3:23-cv-02333-BEN-MSB

123

# EXHIBIT A
# REDACTED

124

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

NORMAN WILHOITE AND JUDITH    ) CASE NO. 23CV2333 BEN (MSB)
WILHOITE, DERIVATIVELY ON     )
BEHALF OF TUSIMPLE HOLDINGS,  )
INC.,                         )
                              )
          PLAINTIFFS,         )
                              )
          vs.                 )
                              )
XIAODI HOU, MO CHEN, CHENG    )
LU, GUOWEI "CHARLES" CHAO,    )
AND HYDRON, INC.,             )
                              )
          DEFENDANTS,         )
                              )
TUSIMPLE HOLDINGS, INC.,      )
                              )
          NOMINAL DEFENDANT.)
_____)


          CONFIDENTIAL - ATTORNEYS' EYES ONLY


          VIDEOTAPED DEPOSITION OF MO CHEN
               THURSDAY, APRIL 25, 2024
                    BEIJING, CHINA




FILE  SD 6666656

REPORTED BY  MARK McCLURE, CRR
          CAL CSR 12203




                                        Page 1

CONFIDENTIAL - ATTORNEYS EYES ONLY

MR. TALOTTA:  Object to the form.    08:56:22

THE WITNESS:  So after returning to China, I am a career entrepreneur, as well as an investor.  There are many companies that I have ownership interest.  I don't recall how many.  There are too many of them.  In China, there is a software, which is called, like, Sky Eye Inquiry.  So you can go on that, go on that software and check all of the companies that I have ownership in, and you can do it yourself.    08:56:34 / 08:57:02 / 08:57:08 / 08:57:14 / 08:57:17 / 08:57:24 / 08:57:28 / 08:57:34

BY MR. RIEDEL:

    Q.   You don't need a username or password or account to use Sky Eye?    08:57:45 / 08:57:49

MR. SMITH:  Objection to the form of the question.    08:57:53 / 08:57:54

THE WITNESS:  My understanding is that you don't need it because this is -- in China, this is a public record.  You don't need that in order to check the information.    08:58:01 / 08:58:02 / 08:58:05 / 08:58:09

BY MR. RIEDEL:

    Q.   Are you aware of having an ownership interest in any companies in the autonomous vehicle space other than TuSimple and Hydron?    08:58:21 / 08:58:23 / 08:58:32

MR. TALOTTA:  Object to the form.    08:58:37

THE WITNESS:  So my understanding is no, but I was also the OP for several funds, so my understanding    08:59:11 / 08:59:16

Page 33

CONFIDENTIAL - ATTORNEYS EYES ONLY

company under Volkswagen had a name of Traton.    09:25:44

BY MR. RIEDEL:    09:25:59

    Q.    Traton?    09:26:01

    A.    Yes.  Thank you.    09:26:10

    Q.    Why did TRATON's acquisition of Navistar    09:26:24
prompt Turing Auto to change its business model?    09:26:35

        MR. TALOTTA:  Object to the form.    09:26:39

        THE WITNESS:  So this answer is going to be    09:27:01
long so let me try to answer your question in a simple    09:27:08
way.    09:27:18

        So for TuSimple to be successful, it has to    09:27:32
be -- it has to work with OEM, because TuSimple is a    09:27:36
software developer.  It has to install its software on    09:27:42
the hardware.    09:27:48

        So when TuSimple works with a truck company,    09:27:58
it has two business models, two cooperation models.    09:28:02

09:28:27

09:28:32

09:28:39

09:28:44

09:28:48

09:28:54

09:29:04

09:29:09

09:29:15

Page 45

CONFIDENTIAL - ATTORNEYS EYES ONLY



At the time, there were four biggest truck companies. One is Daimler, the other one is Volvo, the third one is Traton, and the last one is Navistar.

Page 46

128

CONFIDENTIAL-ATTORNEYS EYES ONLY



MS. XIE:  Objection to the translation.

MR. TALOTTA:  Go ahead, Olivia.

MS. XIE:  I'm sorry, Barbara, Mr. Chen said that it was --

THE INTERPRETER:  I disagree.  Maybe we can ask Mr. Chen to repeat his answer.

THE WITNESS:  Please ask me the question again.  Then I can answer the question again.

So what I meant was that -- maybe you can ask me which parts you were not clear about, not asking -- not asking the attorney to repeat the question.

MR. CHANG:  Let's not have a conversation between the interpretations.  Just ask the question again, and then he can answer again.

BY MR. RIEDEL:

Page 47

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

129

CONFIDENTIAL ATTORNEYS EYES ONLY

question.

THE WITNESS:  I don't know, because at this time, I was not part of the leadership of TuSimple.

BY MR. RIEDEL:

███████████████████████████████████████████████████

MR. SMITH:  Objection.

THE INTERPRETER:  The interpreter needs to inquire.

THE WITNESS:  I don't know.  At the time, I was not part of the U.S. company's leadership or the managerial personnel.  But within the TuSimple ourselves, I had a discussion with Tong Li and also Xiaodi, and we thought -- we considered this having a risk.

BY MR. RIEDEL:

Q.  You believed that the merger between Traton and Navistar posed a business opportunity in the autonomous truck space?

MR. TALOTTA:  Object to the form. Mischaracterizes the testimony.

THE INTERPRETER:  The interpreter needs to inquire.

Page 50

130

CONFIDENTIAL - ATTORNEYS EYES ONLY

(Interpreter and witness confer.)                    09:42:42

THE WITNESS:  So, no, I did not view this as a    09:42:54
business opportunity.  My forecast is that if TuSimple    09:42:57
does not have a company that supplies trucks to assist    09:43:04
it, then TuSimple will be dead.  So if TuSimple loses    09:43:12
Navistar, then TuSimple will be dead, like what it is    09:43:18
right now.                                              09:43:23

BY MR. RIEDEL:

Q.    Did you consider the risk that creating Hydron    09:43:37
would cause Traton to end TuSimple's partnership with    09:43:44
Navistar?                                               09:43:52

MR. TALOTTA:  Objection.                           09:43:54

MR. SMITH:  Objection to the form of the           09:43:56
question.                                               09:43:58

THE WITNESS:  No, it would not.  It's             09:44:16
unrelated.  It's not relevant.                          09:44:18

BY MR. RIEDEL:

Q.    Why?                                          09:44:22

                                                        09:44:26
                                                        09:44:48
                                                        09:44:55
                                                        09:45:00

MR. TALOTTA:  Eric, when you get to a break,       09:45:14
can we take one?                                        09:45:17

MR. RIEDEL:  Yes.  Let me just follow up here.     09:45:18

Page 51

CONFIDENTIAL - ATTORNEYS EYES ONLY

was not in charge of the business.  But I recall -- I do        10:42:47

recall it was either at the end of 2022 or the beginning        10:42:53

of 2023.        10:43:01

MR. TALOTTA:  Eric, whenever you're ready,        10:43:05

let's take a break in a few minutes.        10:43:08

MR. RIEDEL:  Okay.        10:43:11

BY MR. RIEDEL:

Q.   And when Hydron handed over the manufacturing        10:43:14

to its partner, did that refer to Foton?        10:43:19

MR. SMITH:  Objection to the form of the        10:43:25

question.        10:43:26

THE WITNESS:  Because the manufacturing never        10:43:49

happened, but our plan was to hand the manufacturing        10:43:54

over to Foton, but it never happened.        10:43:58

BY MR. RIEDEL:

Q.   And when TuSimple, in the U.S., decided not to        10:44:04

have a relationship with Hydron, did Tusen, in China,        10:44:12

continue to maintain a business relationship with        10:44:17

Hydron?        10:44:20

MR. TALOTTA:  Object to the form.        10:44:21

THE INTERPRETER:  The interpreter needs to        10:45:07

inquire.        10:45:09

(Interpreter and witness confer.)        10:45:11

THE WITNESS:  So I don't recall they were        10:45:38

maintaining any business relationship, and so the reason        10:45:59

Page 68

CONFIDENTIAL – ATTORNEYS EYES ONLY

for us to do the autonomous driving truck is to replace    10:46:04

the drivers of the trucks.  In the United States, the    10:46:11

labor cost or the labor cost for the truck drivers is    10:46:16

six to seven times as high as that in China, so if the    10:46:26

commercialization of the autonomous truck driving is not    10:46:33

successful in the U.S., then there's no reason for the    10:46:38

company of Hydron to exist, because our focus was on the    10:46:45

U.S. trucking industry.    ███████████████    10:46:52

██████████████████████████████████    10:47:17

██████████████████████████████████    10:47:21

██████████████████████████████████    10:47:27

MR. TALOTTA:  Eric, is this a good time?    10:47:40

MR. RIEDEL:  I have one more question about    10:47:43

this.    10:47:45

THE WITNESS:  No problem.  You can continue,    10:47:54

please.    10:47:56

BY MR. RIEDEL:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

MR. TALOTTA:  Object to the form.    10:48:10

THE WITNESS:  Well, you cannot say that is    10:48:51

completely the reason.  Just now, there was one point    10:48:54

that I wanted to add but I did not have this    10:48:58

opportunity.  So it's very hard for us to do the    10:49:01

Page 69

133

CONFIDENTIAL - ATTORNEYS EYES ONLY

MR. TALOTTA:  How long do you want to take a    10:52:30

break right now?    10:52:33

MR. RIEDEL:  Five minutes.    10:52:40

MR. TALOTTA:  Okay.    10:52:41

THE VIDEOGRAPHER:  We are off the record at    10:52:42

10:52 a.m.    10:52:44

(A short recess was taken.)    10:53:48

THE VIDEOGRAPHER:  This is the beginning of    11:04:03

Media File No. 4.  We are back on the record at 11:04    11:04:16

a.m.    11:04:20

BY MR. RIEDEL:    11:04:20

Q.  Mr. Chen, earlier, we talked about TuSimple    11:04:25

having two business models --    ███████████████    11:04:27

████████████████████████████████████████████    11:04:31

Is that a fair characterization of the    11:04:37

business models?    11:04:40

MR. TALOTTA:  Object to the form.    11:04:42

THE WITNESS:  Yes, yes.    11:05:18

BY MR. RIEDEL:    11:05:18

Q.  And it was Hydron's expectation to supply    11:05:22

trucks to TuSimple to operate?    11:05:26

MR. SMITH:  Objection to the form of the    11:05:30

question.    11:05:35

THE WITNESS:  Yes.  That was the one of our    11:05:47

plan.  It's one of our plan.  But that plan did not get    11:05:59

Page 71

CONFIDENTIAL – ATTORNEYS EYES ONLY

fulfilled. 11:06:05

BY MR. RIEDEL: 11:06:12

Q.   Did Hydron expect to be TuSimple's only supplier of trucks?

MR. TALOTTA:  Object to the form. 11:06:27

THE WITNESS:  No. 11:06:30

THE INTERPRETER:  The interpreter needs to inquire.

(Interpreter and witness confer.) 11:06:48

THE WITNESS: 11:06:57

MS. XIE:  Objection to translation. 11:07:17

MR. TALOTTA:  Go ahead, Olivia. 11:07:18

MS. XIE:  Barbara, Mr. Chen gave a time frame, that they were not able to find it after Navistar was purchased or merged.

THE INTERPRETER:  Oh, sorry, yes.  Thank you for that correction.  Yes, yeah, that was missing from my interpretation.  Sorry.

BY MR. RIEDEL:

Q.   Can you explain that, TuSimple needed a hydrogen and diesel truck supplier?

MR. TALOTTA:  Object to the form. 11:07:59

THE WITNESS:  Let me explain.  Here's the 11:08:20

Page 72

CONFIDENTIAL - ATTORNEYS EYES ONLY

Han?                                                          11:31:16

            MR. SMITH:  Objection to the form of the          11:31:19

question.                                                     11:31:21

            THE WITNESS:  Yes.                                11:31:28

BY MR. RIEDEL:                                                11:31:29

    Q.   How do you know Xiaoling Han?                        11:31:29

            MR. SMITH:  Objection.                            11:31:38

            THE WITNESS:  Xiaoling Han is a colleague of      11:31:33

TSP USA.                                                      11:31:52

BY MR. RIEDEL:                                                

    Q.   Do you know Mr. Han's job at TuSimple USA?           11:31:59

            MR. TALOTTA:  Object to the form.                 11:32:04

            THE WITNESS:  I don't know her (sic) specific     11:32:29

job for sure, but I know that this person's work              11:32:33

involves the sensors and also the installations of the       11:32:40

sensors on the truck.                                         11:32:44

BY MR. RIEDEL:                                                

    Q.   Do you know someone named Ping Yuan?                 11:32:49

            MR. SMITH:  Objection to the form of the          11:32:57

question.                                                     11:32:59

            THE WITNESS:  No.                                 11:33:06

BY MR. RIEDEL:                                                11:33:06

    Q.   Do you know someone named Yu Zhang?                  11:33:09

            MR. SMITH:  Objection to the form of the          11:33:17

question.                                                     11:33:27

                                          Page 81

CONFIDENTIAL - ATTORNEYS EYES ONLY

BY MR. RIEDEL:

    Q.   Let's start with autonomous-vehicles software.    11:52:52

    A.   Before Hydron had a transformation --    11:53:12
transferred its business to do passive (phonetic) SUV    11:53:19
and pickup truck, we were in contact with some other    11:53:24
companies.    11:53:28

    THE INTERPRETER:  I'm sorry, I did not hear    11:53:32
the last part.    11:53:33

    The previous interpretation was correct.    11:53:47

    THE WITNESS:  So we were in contact with other    11:53:49
companies that were engaged in the autonomous vehicles.    11:53:53

    Q.   What companies were they?    11:54:05

    MR. TALOTTA:  Objection.    11:54:10

    MR. SMITH:  Objection to form.    11:54:12

BY MR. RIEDEL:

    Q.   Strike that.    11:54:16

    What companies?    11:54:16

    MR. TALOTTA:  Object to the form.    11:54:17

    THE WITNESS:  I do not have a recollection    11:54:27
because that part was not within my purview because I do    11:54:30
not do technology -- I'm not a tech guy.    11:54:36

BY MR. RIEDEL:

    Q.   You're not aware of any communications between    11:54:41
Hydron and Aurora?    11:54:44

Page 89

137

CONFIDENTIAL ATTORNEYS EYES ONLY

Around June of 2022, how many trucks did                11:57:29

Hydron expect to sell to TuSimple?                      11:57:37

MR. TALOTTA:  Object to the form.                       11:57:41

THE INTERPRETER:  The interpreter needs to              11:58:18

inquire.                                                11:58:19

(Interpreter and witness confer.)                       11:58:20

THE WITNESS:  I don't know.  So, back then,             11:58:34

the prototype for the hydrogen truck was just available,  11:58:50

and it was still very far from the mass production, so  11:58:58

we did not think that far, and there was no such a      11:59:03

detailed plan.  And plus, at that time, TuSimple and    11:59:07

Hydron did not start the cooperation yet.               11:59:17

THE INTERPRETER:  The interpreter needs to              11:59:38

confirm.                                                11:59:39

(Interpreter and witness confer.)                       11:59:44

THE WITNESS:  There's one more information I            11:59:47

would like to add.                                      11:59:48

█                                                 11:59:50

█                                                 11:59:54

█                                                 12:00:01

█                                                 12:00:05

MR. TALOTTA:  Eric, when you get a chance,              12:00:12

let's try to take a break.  We are getting to the top of  12:00:14

the hour again.                                         12:00:17

MR. RIEDEL:  Okay.                                      12:00:18

Page 91

CONFIDENTIAL - ATTORNEYS EYES ONLY

THE VIDEOGRAPHER:  This is the beginning of Media File No. 5.  We are back on the record at 12:40 p.m.

BY MR. RIEDEL:

Q.   Mr. Chen, during the break, did you talk about your deposition?

A.   (In English) No.

Q.   Are you familiar with the company's ongoing investigation by the special litigation committee of the board of directors?

MR. TALOTTA:  Object to the form.

MR. SMITH:  Objection to the form of the question.

THE WITNESS:  I'm not very familiar with that.

BY MR. RIEDEL:

Q.   Have you been interviewed in connection with the special litigation committee's investigation?

MR. TALOTTA:  Object to the form.

THE WITNESS:  As of right now, no.

BY MR. RIEDEL:

Q.   You stated before the break that hydrogen's prototype truck became available mid-2022.

What do you mean by "became available"?

MR. TALOTTA:  Object to the form. Mischaracterizes testimony.

Page 94

CONFIDENTIAL - ATTORNEYS EYES ONLY

THE WITNESS:  We produced a prototype of the    12:43:09

hydrogen-powered truck, and we also made a video out of    12:43:15

it.  And also, we asked -- we asked our investors to try    12:43:19

and have a ride in that truck.    12:43:26

BY MR. RIEDEL:    12:43:39

    Q.   Was that prototype truck, in fact, powered by    12:43:39

hydrogen propulsion?    12:43:43

        MR. TALOTTA:  Object to the form.    12:43:45

        THE WITNESS:  Yes.    12:44:00

BY MR. RIEDEL:    12:44:02

    Q.   And was the prototype equipped with sensors    12:44:02

for L4 autonomous driving?    12:44:10

        MR. TALOTTA:  Object to the form.    12:44:14

        MR. SMITH:  Objection to the form of the    12:44:15

question.    12:44:17

        THE WITNESS:  So we set aside spots for    12:45:00

installation of these sensors.  However, we just    12:45:03

installed a little bit -- a part -- several of them,    12:45:09

some of them.  But we did not light the sensors up    12:45:13

because we did not have a central computer.    12:45:17

BY MR. RIEDEL:    12:45:40

    Q.   So hydrogen's prototype trucks were not    12:45:40

actually capable of L4 autonomous driving?    12:45:43

        MR. TALOTTA:  Object to the form.    12:45:48

        MR. SMITH:  Objection to the form of the    12:45:50

Page 95

CONFIDENTIAL - ATTORNEYS EYES ONLY

question.                                                    12:45:51

        MR. TALOTTA:  Eric, you keep saying "hydrogen"    12:45:51

instead of "Hydron."                                         12:45:54

        MR. RIEDEL:  Oh, sorry.                           12:45:55

        MR. TALOTTA:  That's okay.  It's fine.            12:45:56

BY MR. RIEDEL:

   Q.   All right.  I'll try again.                     12:45:59

So Hydron's prototype trucks were not actually               12:46:00
capable of L4 autonomous driving?                            12:46:04

        MR. TALOTTA:  Object to the form.                 12:46:08

        THE WITNESS:  No, they are not.  Yeah, that's     12:46:28
correct, they are not.                                       12:46:30

BY MR. RIEDEL:

   Q.   But the prototypes had the sensors installed,   12:46:35
just not turned on?                                          12:46:39

        MR. TALOTTA:  Object to the form.                 12:46:41
Mischaracterizes testimony.                                  12:46:43

        THE WITNESS:  It was not that all of the          12:47:11
sensors were installed.  Only some of the sensors were       12:47:13
installed to make sure they looked good.  Otherwise, you     12:47:17
will leave the holes in there, which did not look --         12:47:24
look good.  So some of the sensors were installed, but       12:47:28
not lit up.                                                  12:47:34

BY MR. RIEDEL:

   Q.   How did Hydron know where to place the          12:47:36

Page 96

CONFIDENTIAL ATTORNEYS EYES ONLY

MR. TALOTTA:  Object to the form.

THE WITNESS:  In China.

BY MR. RIEDEL:

Q.  Were the prototypes assembled by Hydron or Foton?

MR. SMITH:  Objection to the form of the question.

THE WITNESS:  Hydron assembled this with the help of Foton and Long Chuan.

BY MR. RIEDEL:

Q.  When did Hydron begin research and development on its prototype trucks?

MR. TALOTTA:  Object to the form.

BY MR. RIEDEL:

Q.  Strike that.

When did Hydron begin research and development for its prototype trucks?

MR. TALOTTA:  Same objection.

THE WITNESS:  Around end of 2021.

BY MR. RIEDEL:

Q.  Were the prototypes ever sent to the United States for testing?

MR. SMITH:  Objection to the form of the question.

THE WITNESS:  No.

Page 98

CONFIDENTIAL - ATTORNEYS EYES ONLY

BY MR. RIEDEL:

Q.   Did Hydron have a nondisclosure agreement in place with Foton?

MR. TALOTTA:  Object to the form.

THE WITNESS:  There was one.  As far as my understanding goes, there was one, but I myself did not get involved in the signing of this agreement.  That was taken care of by our legal affairs department.  I'm not very sure, but as far as I know, there is one.

BY MR. RIEDEL:

Q.   Did Foton or Cummins make the powertrain?

MR. TALOTTA:  Object to the form.

THE WITNESS:  If you are referring to the fuel cells, then that was manufactured by a Chinese company called Yihuatong.

MS. XIE:  Objection for translation.

MR. TALOTTA:  Go ahead, Olivia.

MS. XIE:  It's Yihuatong.

THE INTERPRETER:  Sorry, I heard Yihuatong.

Mr. Chen, did you say Yihuatong?

THE WITNESS:  (Speaking Chinese.)

MR. RIEDEL:  Can you spell that.

THE INTERPRETER:  The interpreter is not sure. There might be an official English name, but Y-i-h-u-a-t-o-n-g.

Page 99

CONFIDENTIAL ATTORNEYS EYES ONLY

During the break, the interpreter will try to find the official translation for the name Yihuatong.

BY MR. RIEDEL:

Q.   Did the prototypes run on liquid hydrogen or compressed hydrogen?

MR. SMITH:  Objection to the form of the question.

THE WITNESS:  Compressed hydrogen.

BY MR. RIEDEL:

Q.   Who manufactured the steering components?

MR. SMITH:  Objection to the form of the question.

THE INTERPRETER:  I'm sorry.  Sorry, the interpreter needs to inquire.

(Interpreter and witness confer.)

THE WITNESS:  So I'm not sure.  Maybe it was manufactured by ZF.

BY MR. RIEDEL:

Q.   Did Hydron have a nondisclosure agreement in place with ZF?

MR. TALOTTA:  Object to the form.

THE WITNESS:  I don't know.

BY MR. RIEDEL:

Q.   Who manufactured the brakes?

MR. TALOTTA:  Object to the form.

Page 100

CONFIDENTIAL ATTORNEYS EYES ONLY

THE WITNESS:  I'm not sure, but there are only    12:59:48
two companies that manufacture the brake systems.  One    12:59:49
is --    12:59:54

THE INTERPRETER:  The interpreter needs to get    12:59:56
the name.    12:59:58

THE WITNESS:  Wako (phonetic) and Knorr.  I'm    13:00:11
sorry, the interpreter is not able to spell it.  The    13:00:14
interpreter needs to inquire.    13:00:26

(Interpreter and witness confer.)    13:00:29

THE WITNESS:  So one is called Wako, and the    13:00:38
other one is Knorr.    13:00:43

BY MR. RIEDEL:    13:00:49

Q.    Were the prototypes equipped with cameras for    13:00:51
autonomous driving?    13:00:56

MR. TALOTTA:  Object to the form.    13:00:58

THE WITNESS:  So they were not lit up.  The    13:01:16
cameras were not installed on the prototype trucks    13:01:40
themselves, but in order to make it look good, we placed    13:01:45
cameras inside the holes, but they were not hooked up    13:01:52
onto the system for the prototypes because we did not    13:01:56
have -- we do not have a central computer.    13:02:01

BY MR. RIEDEL:    13:02:16

    13:02:23

    13:02:30

Page 101

CONFIDENTIAL - ATTORNEYS EYES ONLY

THE INTERPRETER:  So that was not correct.    13:09:24

     13:09:25

     13:09:29

     13:09:34

     13:09:38

BY MR. RIEDEL:

Q.    Instead of Hydron, you mean?    13:09:45

A.    That's correct, it should be installed by    13:09:48
TuSimple company instead of by Hydron company.    13:10:00

Q.    Thank you.    13:10:03

A.    Thank you.    13:10:06

Q.    So the plan was for Hydron to make the truck    13:10:09
and for TuSimple to install its own autonomous driving    13:10:14
equipment?    13:10:20

MR. SMITH:  Objection to the form of the    13:10:22
question.    13:10:48

THE WITNESS:  So that should have been -- that    13:10:48
would be the business model, if those -- if those two    13:10:49
companies achieved a cooperation agreement, just like    13:10:54
the agreement with the Navistar.    13:10:59

BY MR. RIEDEL:

Q.    Wasn't the agreement with Navistar, for    13:11:06
Navistar to make trucks pre-installed with TuSimple's    13:11:08
autonomous driving equipment?    13:11:14

MR. SMITH:  Objection to the form of the    13:11:16

Page 104

146

question.    13:11:17

THE WITNESS:  That was the plan, when the
product goes into mass production.  During the testing
phase, then it would be for Navistar to manufacture its
own trucks, and then for TuSimple to modify the trucks
and also add its own equipment.

BY MR. RIEDEL:

Q.  Did Hydron's prototype have -- prototypes have
lidars installed?

MR. TALOTTA:  Object to the form.

THE WITNESS:  I don't know.  Even if they
had -- they did have lidar, they would have not been
installed because we did not have a central computer.

BY MR. RIEDEL:

Q.  Did TuSimple's prototypes have radars
installed?

MR. TALOTTA:  Object to the form.

THE WITNESS:  Were you talking about
TuSimple's trucks or the Hydron's trucks?

BY MR. RIEDEL:

Q.  Sorry.

Did Hydron's prototypes have radars installed?

MR. TALOTTA:  Object to the form.

THE INTERPRETER:  I'm sorry.

THE WITNESS:  I don't know.  Even if -- just

Page 105

CONFIDENTIAL - ATTORNEYS EYES ONLY

like the lidar, even if the radars were installed, they    13:14:04

were not able to be lit up because we do not have the    13:14:09

central computer.    13:14:15

BY MR. RIEDEL:

    Q.  Did Hydron ever successfully make an    13:14:23

autonomous-ready truck?    13:14:28

       MR. TALOTTA:  Object to the form.    13:14:29

       THE WITNESS:  No.    13:14:45

BY MR. RIEDEL:

    Q.  Did Hydron ever test TuSimple's autonomous    13:15:05

driving software on any of its prototype trucks?    13:15:09

       MR. SMITH:  Objection to the form of the    13:15:13

question.    13:15:15

       THE WITNESS:  No.    13:15:33

BY MR. RIEDEL:    13:15:34

    Q.  Hydron's trucks were not tested on TuSimple's    13:15:45

autonomous freight network?    13:15:48

       MR. TALOTTA:  Object to the form.    13:15:51

       MR. SMITH:  Objection.    13:15:53

       THE WITNESS:  No.    13:16:11

BY MR. RIEDEL:    13:16:11

    Q.  Were Hydron's prototype autonomous trucks    13:16:22

designed to be agnostic?    13:16:26

       MR. TALOTTA:  Objection to the form of the    13:16:28

question.    13:16:31

Page 106

148

CONFIDENTIAL - ATTORNEYS EYES ONLY

MR. TALOTTA:  Object to the form.    13:18:36

MR. SMITH:  Objection to the form of the    13:18:36
question.    13:18:38

THE WITNESS:  So here's the situation.  For    13:19:03
the trucks that do not have all the autonomous driving    13:19:06
capabilities, we would be willing to sell those to    13:19:11
anyone.  So in the area of autonomous driving, there are    13:19:15
a lot of works involving customization.  If I recall    13:19:29
correctly,    13:19:45
    13:19:58

So Hydron did not collect even one cent from    13:20:10
Tusen for any of its work done in customization.    13:20:15
Therefore, Hydron would not be -- perform this kind of    13:20:28
work for free for any other companies.  So, plus, at the    13:20:32
time Hydron believed that only TuSimple's company's L4    13:20:55
technology was reliable and every else's was not    13:21:02
reliable.  The result, Hydron would not be performing    13:21:07
this kind of work for any other companies.    13:21:11

THE INTERPRETER:  Sorry, this is the    13:21:48
interpreter speaking.  On the transcription, the "salt"    13:21:49
should have been the "result," "as a result."    13:21:54

BY MR. RIEDEL:

Q.  Did Hydron receive a license to use any of    13:22:08
TuSimple's patents?    13:22:11

MR. SMITH:  Objection to the form of the    13:22:13

Page 108

CONFIDENTIAL - ATTORNEYS EYES ONLY

question.                                                    13:22:31

        THE WITNESS:  My understanding is that it did         13:22:31

not use any of TuSimple's patents.                           13:22:33

BY MR. RIEDEL:

    Q.   If Hydron's trucks would have had its               13:22:48

autonomous sensors installed on them, wouldn't Hydron        13:22:51

have had to obtain a license?                                13:22:56

        MR. TALOTTA:  Object to the form.                     13:23:00

        MR. SMITH:  Objection to the form of the              13:23:01

question.                                                    13:23:03

BY MR. RIEDEL:

    Q.   Let me strike that.                                 13:23:07

        If Hydron's trucks would have had TuSimple's         13:23:09

autonomous sensors installed on them, wouldn't Hydron        13:23:13

have had to obtain a license?                                13:23:17

        MR. TALOTTA:  Object to the form.                     13:23:19

        THE WITNESS:  Those sensors were not                  13:23:55

manufactured by TuSimple, they were all manufactured by       13:23:57

a third-party provider.  No matter it's the lidar or the     13:24:01

sensors, none of them were manufactured by TuSimple.         13:24:08

        MS. XIE:  Objection for translation.                  13:24:19

        MR. TALOTTA:  Go ahead, Olivia.                       13:24:20

        MS. XIE:  Barbara, Mr. Chen's last sentence          13:24:22

is -- sorry, Mr. Chen also has one last sentence, and        13:24:27

you may have missed it, and it said that -- Mr. Chen         13:24:31

                                                Page 109

CONFIDENTIAL - ATTORNEYS EYES ONLY

Thank you, Mr. Chen.                                                  13:27:34

BY MR. RIEDEL:

    Q.   Are you aware of TuSimple's employees working      13:27:37
to design hydrogen refueling stations for Hydron?                     13:27:40

        MR. TALOTTA:  Object to the form.                    13:27:46

        MR. SMITH:  Objection to the form of the             13:27:48
question.                                                            13:28:27

        THE WITNESS:  I believe that the employees of        13:28:27
Tusen do not have that type of capabilities to design                13:28:30
and build hydrogen refueling stations.                               13:28:33

BY MR. RIEDEL:

    Q.   Were you aware of TuSimple employees engaged        13:28:48
in work related to hydrogen refueling stations for                   13:28:56
Hydron?                                                              13:29:02

        MR. TALOTTA:  Objection.                             13:29:03

        MR. SMITH:  Objection.                               13:29:03

        THE WITNESS:  So I'm not too clear about that,       13:29:39
but I do not quite understand why do they have to work               13:29:42
to do this hydrogen refueling station for Hydron.  And               13:29:47
since they have -- they have purchased the                           13:29:52
hydrogen-powered vehicles, then they need to have the                13:29:58
hydrogen refueling stations.                                         13:30:00

BY MR. RIEDEL:

    Q.   Did you participate in TuSimple board meetings      13:30:29
where the risk of having a partnership with only one                 13:30:32

Page 111

CONFIDENTIAL – ATTORNEYS EYES ONLY

truck manufacturer in the United States was discussed?                13:30:36

                MR. SMITH:  Objection to the form of the              13:30:42

question.                                                            13:30:43

                THE WITNESS:  Are you talking about the period        13:31:16

of 2020 or 2021?                                                     13:31:19

BY MR. RIEDEL:

     Q.   I don't know.                                              13:31:27

                My next question is:  When were those board          13:31:28

discussions?                                                         13:31:32

                MR. TALOTTA:  Objection.                             13:31:43

                MR. SMITH:  Objection to the form of the             13:31:47

question.                                                           13:31:48

                THE WITNESS:  I recall that, in both 2021 and        13:31:58

2022, there were discussions.  Usually, when we hold the            13:32:02

board meetings, my habit is that I would not say                    13:32:15

anything because my English is not that good.  So all my            13:32:19

concerns would be related to Cheng Lu and Xiaodi.  Both             13:32:29

of them -- both of them are members of the board, and               13:32:42

they are also the senior executives of the company.  So             13:32:51

both of them would be the main talkers at the board                 13:33:02

meeting.                                                            13:33:06

                MS. XIE:  Objection for translation.                13:33:11

                MR. TALOTTA:  Go ahead, Olivia.                     13:33:12

                MS. XIE:  Barbara, did you say "all of those        13:33:15

concerns are related" -- "would be related to Cheng Lu             13:33:19

Page 112

CONFIDENTIAL - ATTORNEYS EYES ONLY

and Xiaodi"?

          I think his response is that all the concern would be shared with Cheng Lu and Xiaodi before that.

          THE INTERPRETER:  I said "communicated."

          MS. XIE:  Okay.

BY MR. RIEDEL:

     Q.   Prior to June 2022, did Cheng Lu or Xiaodi discuss Hydron TuSimple's board of directors?

          MR. SMITH:  Objection to the form of the question.

          THE WITNESS:  In March 2022, Cheng Lu also departed from the post.  But I clearly remember -- clearly recall that we did have the meeting records, and also, on both of those board meetings, we did discuss the risks of having one partners, and also the issues with Hydron.

BY MR. RIEDEL:

     Q.   What issues with Hydron were discussed with the board in March 2022?

          MR. TALOTTA:  Object to the form.

          Albert, can you mute your computer.

          THE WITNESS:  Sorry, can you please ask again?

BY MR. RIEDEL:

     Q.   What issues with Hydron were discussed with TuSimple's board in March of 2022?

Page 113

CONFIDENTIAL ATTORNEYS EYES ONLY

MR. TALOTTA:  Same objection.    13:36:17

THE WITNESS:  I do recall it was -- there was a meeting on March -- I'm sorry.  I do not recall if it was discussed on the meeting on March 22nd, 2022, but I do recall on both of the board meetings, there were discussions about that.    13:36:39  13:36:44  13:36:50  13:36:56  13:37:01

So I remember, at the time, the issues we talked about was at that present time.    13:37:39  13:37:42

If Hydron and TuSimple were to have a cooperation, do we need to make a public announcement on that?    13:37:48  13:37:52  13:37:57

That was one.    13:37:58

And the other one was that -- why do we need Hydron to help TSP?    13:37:58  13:38:05

And to reduce the risks.    13:38:09

THE INTERPRETER:  The interpreter was not able to catch the last thing Mr. Chen said, and the interpreter would like Mr. Chen to repeat the last sentence, but Mr. Chen said "Sorry, I forgot."    13:38:30  13:38:32  13:38:35  13:38:38

BY MR. RIEDEL:    13:38:47

Q.  So the discussions you just mentioned about whether Hydron and TuSimple were to have a cooperation, a public announcement was needed, and why TuSimple needed Hydron to help -- those discussions were with the full board?    13:38:47  13:38:54  13:39:00  13:39:09  13:39:15

Page 114

CONFIDENTIAL - ATTORNEYS EYES ONLY

MR. SMITH:  Objection to the form of the question.

THE WITNESS:  Yes.

MR. TALOTTA:  Eric, we have been going over an hour.

MR. RIEDEL:  Yeah, I need some coffee anyways.

MR. TALOTTA:  Can we go off the record?

THE VIDEOGRAPHER:  We are off the record at 1:40 p.m.

(A short recess was taken.)

THE VIDEOGRAPHER:  This is the beginning of Media File No. 6.  We are on the record at 1:52 p.m.

BY MR. RIEDEL:

Q.  Mr. Chen, did you write an email to TuSimple management in December 2021 regarding Hydron?

MR. SMITH:  Objection to the form of the question.

THE INTERPRETER:  I'm sorry, the interpreter lost the real-time transcript.

How do I get back to there?

Let me see.  Sorry.

Can you please repeat the question?

BY MR. RIEDEL:

Q.  Did you write an email to TuSimple management in December 2021 regarding Hydron?

Page 115

CONFIDENTIAL - ATTORNEYS EYES ONLY

MR. SMITH:  Objection to the form of the question.    13:53:28 / 13:53:56

THE WITNESS:  I do recall there was such an email, but it was not prepared by me personally.  And I went to tell either my assistant or my interpreter, so I audited this, and they prepared the email for me.    13:53:57 / 13:53:59 / 13:54:04 / 13:54:11

BY MR. RIEDEL:

Q.  Who was the email sent to?    13:54:16

MR. SMITH:  Objection to the form of the question.    13:54:21 / 13:54:26

THE INTERPRETER:  I'm sorry, the interpreter needs to make a correction.  The word was not "audit," it was "dictated."  Sorry.    13:54:26 / 13:54:27 / 13:54:32

"I dictated that orally, and then my assistant or my interpreter helped prepare that email."    13:54:34 / 13:54:39

THE WITNESS:  I recall the email was sent to all of the senior executives for TFP.    13:54:59 / 13:55:00

MR. TALOTTA:  TSP.    13:55:08

THE INTERPRETER:  TSP.    13:55:11

Mr. Chen, did you say "TFP" or "TSP"?    13:55:13

THE WITNESS:  TSP.    13:55:18

THE INTERPRETER:  TSP, thank you.    13:55:19

BY MR. RIEDEL:

Q.  In the dictated email, what did it say?    13:55:33

MR. TALOTTA:  Objection.    13:55:35

Page 116

CONFIDENTIAL-ATTORNEYS EYES ONLY

THE WITNESS:  If I recall correctly, the gist    13:55:53
of this email was to say that, given our current    13:55:57
situation, we need a backup OEM partner.    13:56:01

THE INTERPRETER:  The interpreter needs --    13:56:18

THE WITNESS:  And then I activated the    13:56:31
hydrogen-powered truck project to see if it can help the    13:56:34
TuSimple company.  The business model -- the cooperation    13:56:41
model should be the same as our cooperation with    13:56:58
Navistar, but ███████████████████████ So    13:57:03
that was approximately the case.    13:57:18

BY MR. RIEDEL:    13:57:23

Q.  ████████████████████████    13:57:25

MR. TALOTTA:  Object to the form.    13:57:30

THE WITNESS:  Yes, yes, yes, we did.    13:57:47

BY MR. RIEDEL:    13:57:56

Q.  Did you discuss Hydron with individual members    13:57:56
of TuSimple's board other than Mr. Hou and Mr. Lu?    13:58:01

MR. TALOTTA:  Object to the form.    13:58:21

THE WITNESS:  At both of the board meetings,    13:58:56
we discussed -- I discussed this issue, and then --    13:58:59
individually.  And other than discussing this with    13:59:07
Mr. Lu and Mr. Hou, I talked with Mr. Chao, Brad, and    13:59:11
also Madam Shang on -- by making phone calls.  And then    13:59:18
later with Reed, I also discussed this on the phone with    13:59:25
him.    13:59:29

Page 117

157

CONFIDENTIAL - ATTORNEYS EYES ONLY

time.                                                                    14:04:49

BY MR. RIEDEL:

    Q.   I put before you what's been premarked as           14:05:44
Exhibit 7.                                                               14:05:52

        Have you seen this document before?                 14:05:55

        MR. TALOTTA:  Eric, I don't see 7 in the            14:06:07
folder.                                                                  14:06:10

        MR. RIEDEL:  It should be there.                    14:06:21

        MR. TALOTTA:  I see 16, 17, 18, 19.                 14:06:25

        MR. RIEDEL:  It comes up as 19, but it has          14:06:29
been premarked as 7.                                                     14:06:32

        THE WITNESS:  I saw it.  I can see it.              14:07:32

BY MR. RIEDEL:

    Q.   Have you seen this document?  Strike that.         14:07:34

        Have you seen Exhibit 7 before?                     14:07:38

    A.   I don't recall.  I don't think I saw it             14:07:39
because I wouldn't be -- I wouldn't have paid attention                  14:07:53
to this much detail.                                                     14:07:58

        MR. RIEDEL:  And for the record, Exhibit 7 is       14:08:02
a document in Chinese titled "Ares" with the date                       14:08:04
February 22nd, 2022.                                                     14:08:09

        THE WITNESS:  Yes.                                  14:08:33

BY MR. RIEDEL:                                                           14:08:36

    Q.   And so you're not aware of Hydron receiving,        14:08:37
in connection with Project Ares, technical information                  14:08:43

Page 120

CONFIDENTIAL - ATTORNEYS EYES ONLY

from TuSimple?                                                      14:08:50

                MR. TALOTTA:  Objection.                            14:08:52

                MR. SMITH:  Objection to the form of the           14:08:55

question.                                                          14:09:22

                THE WITNESS:  So, first of all, I do not know.      14:09:24

        And secondly, on the current documents, I did              14:09:27

not see anything related -- anything related to the                14:09:31

Tusen's -- TuSimple's technical information.                       14:09:39

BY MR. RIEDEL:

    Q.   Do you know whether Hydron employees shared               14:10:14

information they learned -- learned from TuSimple in                14:10:16

connection with Ares with any other company?                       14:10:21

                MR. TALOTTA:  Objection.  Form.                    14:10:24

                THE WITNESS:  I don't know if there was any.        14:10:49

I'm not -- I don't know, but based on my understanding,             14:11:20

Ares project is a project with the Hydron company, so it            14:11:28

will not have any technologies from the Tusen.  It does             14:11:37

not involve any core, confidential or secrets from                  14:11:44

the -- from TuSimple.  So it does not -- they do not                14:11:49

need to get that information from TuSimple.                         14:11:53

BY MR. RIEDEL:                                                     14:11:59

    Q.   Hydron never requested information about                  14:12:02

sensor positioning?                                                14:12:04

                MR. TALOTTA:  Object to the form.                  14:12:06

                THE WITNESS:  So under this kind of business        14:12:37

Page 121

CONFIDENTIAL - ATTORNEYS EYES ONLY

model, it's just the other way around. So this would be a request from TuSimple to Hydron, and Hydron would not request such information because, in the future, it will be TuSimple that will operate the -- it will operate the trucks, that's correct.

BY MR. RIEDEL:

Q.    TuSimple never provided and Hydron never requested information about the braking requirements necessary to work with TuSimple's autonomous driving technology?

MR. TALOTTA:  Object to the form.

MR. SMITH:  Objection.

THE WITNESS:  Let me explain this one more time by using Navistar as an example.

TSP wanted to purchase the autonomous driving trucks from Navistar. Then, it would -- the Tusen company would make a request to the Navistar, and to say how modifications should be made on the basis of Navistar's trucks so that the TuSimple softwares can be installed.

And also, TuSimple will also make a request to Navistar to tell them what kind of steering system, what kind of braking system and the power systems -- power system to use.

So after Navistar received these requests, and

Page 122

CONFIDENTIAL ATTORNEYS EYES ONLY

then because there will be a lot of work to do, then    14:16:08

[REDACTED]    14:16:12

14:16:19

TuSimple company will make its requests to    14:16:31

Navista[REDACTED]nd other OEMs.  It will make its    14:16:44

request to all of them.  Some companies agreed to help    14:16:52

TuSimple, but a majority of companies would decline.    14:17:05

BY MR. RIEDEL:

Q.   Did TuSimple make a request to Navistar to    14:17:12

tell Navistar what kind of steering systems and what    14:17:16

kind of braking systems and power systems to use?    14:17:21

MR. SMITH:  Objection to the form of the    14:17:28

question.    14:17:50

THE WITNESS:  As far as I know, yes.    14:17:50

BY MR. RIEDEL:

[REDACTED]    14:17:55

14:18:00

MR. TALOTTA:  Object to the form.    14:18:02

THE WITNESS:  As far as I know, yes.    14:18:13

BY MR. RIEDEL:

Q.   Did TuSimple make a request to Hydron    14:18:23

regarding which steering systems, braking systems and    14:18:25

power systems to use?    14:18:28

MR. SMITH:  Objection to the form of the    14:18:31

question.    14:18:32

Page 123

CONFIDENTIAL - ATTORNEYS EYES ONLY

MR. TALOTTA:  Object to the form.                    14:18:32

THE WITNESS:  I don't know for sure, but based      14:19:05
on my understanding, yes.  Otherwise, then, the work --   14:19:07
it was impossible for the work to proceed.          14:19:14

BY MR. RIEDEL:

Q.   So Project Ares built a prototype truck that   14:19:21
was specific to the specifications required by TuSimple   14:19:27
for the steering systems, braking systems and power   14:19:33
systems necessary to work with TuSimple's autonomous   14:19:37
driving technology?                                 14:19:41

MR. SMITH:  Objection to the form of the            14:19:42
question.                                           14:19:43

THE WITNESS:  No.  The Ares project is a            14:20:58
hydrogen energy truck.  So one of its divisions -- one   14:21:02
of its subdivisions is to work with the TuSimple.  So   14:21:11
the Ares project itself --                          14:21:22

THE INTERPRETER:  Sorry, I need to inquire.         14:21:27

(Interpreter and witness confer.)                   15:01:20

THE WITNESS:  So the Ares project itself will       14:21:46
not choose to use so expensive, like, suppliers in terms   14:21:49
of the steering system, the braking system and the power   14:21:55
system.                                             14:21:59

BY MR. RIEDEL:

Q.   So Project Ares was separate from any          14:22:04
collaboration between Hydron and TuSimple?          14:22:12

Page 124

CONFIDENTIAL - ATTORNEYS EYES ONLY

MR. SMITH:  Objection to the form of the question.                                                                                    14:22:16 / 14:22:18

BY MR. RIEDEL:

Q.  Sorry.  Strike that.                                                                                   14:22:20

So Project Ares was not related to a potential partnership between Hydron and TuSimple?                                                          14:22:27 / 14:22:34

MR. TALOTTA:  Object to the form.                                                                          14:22:40

THE WITNESS:  You can put it that way.  So the Ares project is a truck.  So part of it is about the autonomous driving.  So that part can be -- it can work together with TuSimple.  So if that is -- does not involve autonomous driving, then it has nothing to do with TuSimple.                                          14:22:40 / 14:23:20 / 14:23:28 / 14:23:37 / 14:23:43 / 14:23:48

BY MR. RIEDEL:                                                                                   14:23:59

Q.  And the prototypes that were developed mid-2022, they were not developed for the purpose of autonomous driving?                                        14:24:00 / 14:24:04 / 14:24:08

MR. SMITH:  Objection to the form of the question.                                                                          14:24:11 / 14:24:35

THE WITNESS:  Because the conditions were not ripe.  And at that time, the domain controller was not developed yet, so without the domain controller, and then, it cannot support the autonomous driving.        14:24:35 / 14:24:39 / 14:24:54 / 14:24:59

BY MR. RIEDEL:                                                                                   14:25:07

Q.  Do you understand that on June 21st, 2022,                                        14:25:09

Page 125

Hydron and TuSimple entered into a nondisclosure agreement?                                                    14:25:14
14:25:19

MR. SMITH:  Objection.                                                                                          14:25:32

THE WITNESS:  I don't know.  I don't know because I would not read a specific agreement, nor do I understand, so I would not -- I would not read a specific agreement.                                                14:25:51
14:25:52
14:25:57
14:26:02

MR. RIEDEL:  Mr. Chen, if you refresh your Exhibit Share, you should see what's been marked as plaintiffs' Exhibit 20.                                                                                                         14:27:03
14:27:09
14:27:11

(Exhibit 20 marked for identification.)

MR. RIEDEL:  This document has TuSimple, at the top left, and it's titled "Mutual Confidentiality and Nondisclosure Agreement."  It says:                                                                                    14:27:34
14:27:36
14:27:40
14:28:03
14:28:07
14:28:13
14:28:17

Q.   Do you recall this document?                                                                              14:28:51

MR. SMITH:  Objection to the form of the question.                                                             14:28:57
14:28:58

THE WITNESS:  I do not recall this document.  However, that signature looked like my electronic signature.                                                                                                                 14:29:02
14:29:05
14:29:10

Page 126

CONFIDENTIAL - ATTORNEYS EYES ONLY

BY MR. RIEDEL:

Q. Do you recall giving authorization for your signature to be attached to this document?

MR. TALOTTA: Object to the form.

MR. SMITH: Object to the form.

THE WITNESS: So I do not understand this document. So our regular work process would be -- and the management of the company will bring documents -- or all the documents to me, and then they would explain to me why I need to sign these documents.

Then, after I took this document, I would go to see my attorneys. And then if they said I can sign this document, then I would sign this document.

Because there's too much English there, and I do not understand English. So I was relying on the management team of my company, as well as the attorneys to tell me if they say I can sign this document -- these documents, I would sign, but I would not read these documents. I would not know the contents of the document.

BY MR. RIEDEL:

Q. Do you recall discussing with your management team or your lawyers entering into a nondisclosure agreement between Hydron and TuSimple in June of 2022?

MR. SMITH: Objection to the form of the

Page 127

CONFIDENTIAL - ATTORNEYS EYES ONLY

to extend it.                                                      14:52:53

BY MR. RIEDEL:

    Q.   What is the current status of Hydron's              14:52:57

business?                                                          14:53:00

        MR. TALOTTA:  Objection.                        14:53:06

        THE WITNESS:  We are currently designing two    14:53:21

SUVs and one pickup truck, all electric, electrical.               14:53:25

BY MR. RIEDEL:

    Q.   Does Hydron have any continued involvement in     14:53:34

Hydron propulsion technology?                                      14:53:39

        MR. TALOTTA:  Objection.                        14:53:43

        MR. SMITH:  Object to the form.                 14:53:45

        THE WITNESS:  No, because the development of    14:54:06

hydrogen energy is very costly, and currently, the                14:54:21

economy is not that good.  So we are trying to look for           14:54:24

some business which would be closer to the cash flow.             14:54:29

BY MR. RIEDEL:

    Q.   Does Hydron have any continued involvement        14:54:37

with autonomous-vehicle technology?                               14:54:40

        MR. TALOTTA:  Objection to form.                14:54:44

        THE WITNESS:  Hydron has never conducted R&D    14:55:01

in the autonomous driving technology.  However, our               14:55:05

newly developed two SUVs and the one pickup truck, yes.           14:55:18

BY MR. RIEDEL:

    Q.   Can you describe the autonomous driving           14:55:27

Page 134

CONFIDENTIAL - ATTORNEYS EYES ONLY

technology used by Hydron's two SUVs and pickup truck?    14:55:30

MR. SMITH:  Objection to the form of the    14:55:36
question.    14:55:47

THE WITNESS:  So we have identified an L2    14:55:54
technology provider through the bidding process, but I    14:56:15
do not recall which company that was.  And it was a set    14:56:21
of -- a product at the cost of about 1,000 RMB, and a    14:56:28
product with the cost at about 1,000 RMB.    14:56:40

BY MR. RIEDEL:    14:56:47

    Q.   1,000 RMB per car?    14:56:52

MR. TALOTTA:  Objection.    14:56:58

THE WITNESS:  Correct.    14:57:00

BY MR. RIEDEL:

    Q.   Is the provider of -- the L2 technology used    14:57:05
in Hydron's SUVs and pickup trucks, how does it compare    14:57:23
to the L2 technologies available to TuSimple?    14:57:27

MR. TALOTTA:  Objection.    14:57:36

MR. SMITH:  Objection.    14:57:38

BY MR. RIEDEL:

    Q.   Developed by TuSimple?    14:57:40

    A.   So TuSimple developed or develops L2 and L4    14:57:41
technology for the heavy trucks only, while the L2    14:58:29
technology is used on the two SUVs and one pickup truck.    14:58:36
And these are just the vehicles.  These are not heavy    14:58:43
trucks.  So the development direction for development is    14:58:49

Page 135

different.                                                      14:58:55

Q.   Why can't L2 technology used for trucks be      14:59:02
used for cars?                                                  14:59:06

MR. SMITH:   Object to the form.                14:59:08

THE WITNESS:   So, for the trucks, the braking  14:59:48
range, the braking horizon, and also the perception            14:59:54
range would be much longer than the smaller vehicles.          14:59:59
And then -- and also, the system -- the L2 system and L4       15:00:05
systems are much more expensive than the systems used on       15:00:14
the smaller vehicle.                                           15:00:18

BY MR. RIEDEL:

Q.   So the L2 technologies that Hydron currently    15:00:30
uses were in no way provided or developed by TuSimple?         15:00:34

MR. TALOTTA:   Object to the form.              15:00:45

THE INTERPRETER:   The interpreter needs to     15:01:16
inquire.                                                       15:01:17

(Interpreter and witness confer.)              15:01:19

THE WITNESS:   So the L2 system used on the     15:01:28
TuSimple trucks, ███████████████████████ and then     15:01:32
that would be -- the smaller vehicles would not be able        15:01:43
to -- like, that expensive.                                    15:01:48

BY MR. RIEDEL:

Q.   My question is a little different.              15:01:58

Did TuSimple have any role in the development   15:02:01
or provision of the L2 technologies currently being used       15:02:06

Page 136

CONFIDENTIAL - ATTORNEYS EYES ONLY

by Hydron?

MR. TALOTTA:  Object to the form.

THE WITNESS:  The answer is no.

BY MR. RIEDEL:

    Q.  You don't recall who Hydron's supplier is for L2 technologies?

MR. SMITH:  Objection to the form of the question.

THE WITNESS:  We didn't.  I do not recall.  So we have not signed our contract yet.  We have not made our final choice.

MR. TALOTTA:  Can we get a time check from the court reporter?

THE VIDEOGRAPHER:  It's about six hours.

BY MR. RIEDEL:

    Q.  Mr. Chen, do you own property in Canada?

    A.  No, based on my understanding.

    Q.  Do you recall entering into an amended and restated cooperation agreement with TuSimple?

MR. SMITH:  Objection.

THE WITNESS:  I recall, in the recent period, there was an agreement, cooperation agreement, signed with TuSimple, with the special committee of TuSimple.

BY MR. RIEDEL:

    Q.  And you recall signing that agreement this

Page 137

Page 75 of 128

CONFIDENTIAL - ATTORNEYS EYES ONLY

STATE OF CALIFORNIA          )

COUNTY OF SANTA BARBARA  )    ss.


        I, Mark McClure, C.S.R. No. 12203, in and for the State of California, do hereby certify:

        That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

        That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and the same is a true, correct, and complete transcript of said proceedings;

        That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript { } was {X} was not requested.

        I further certify that I am not interested in the event of the action.

        Witness my hand this 29th day of April, 2024.


        Certified Shorthand Reporter

        State of California

        CSR No. 12203


                                        Page 150

170

171

# EXHIBIT B
# REDACTED

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

NORMAN WILHOITE and JUDITH          Case No.: 3:23-cv-02333-

WILHOITE, derivatively on                BEN-MSB

behalf of TuSimple Holdings

Inc.,

         Plaintiffs,

    v.

XIAODI HOU, MO CHEN, CHENG LU,

GUOWEI "CHARLES" CHAO, and

HYDRON, INC.,

      Defendants.

and

TUSIMPLE HOLDINGS, INC.,

     Nominal Defendant.

_____

**\*\*CORRECTED\*\***

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF CHENG LU

San Diego, California

Friday, April 12, 2024

Volume 1

Reported by:

LESLIE JOHNSON

RPR, CCRR, CSR No. 11451

Job No.: 6638908

PAGES 1 - 354

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

BY MR. RIEDEL:                                        09:49:48

Q    Great.

So, depending on the context, when would you use "OEM" versus "supplier"?

MR. SHAPIRO:  Objection.                    09:49:54

MR. SMITH:  Objection.

THE WITNESS:  It also depends on the context.  And then also is -- so OEM could also be a supplier.

BY MR. RIEDEL:                                       09:50:02

Q    Say that again.

A    An OEM could be a supplier.

Q    To who?

A    To us, if we pay them.

Q    How so?                                          09:50:08

A    If you pay somebody, they're a supplier to you, no?

Q    Okay.  So are they -- they're a supplier of what?

MR. SHAPIRO:  Objection.                    09:50:15

MR. SMITH:  Objection.

THE WITNESS:  Depends what they're an original equipment manufacturer of, trucks or steering columns or brakes.

/ / / /

Page 51

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

BY MR. RIEDEL:                                          09:50:21

    Q    So we share the understanding that if you

manufacture the equipment, you can be an OEM?

            MR. SHAPIRO:  Objection.

            MR. SMITH:  Objection.                     09:50:29

            THE WITNESS:  If you sell us something,

you could be an OEM, sure.

BY MR. RIEDEL:

    Q    Great.

         So I just want to make sure we're not        09:50:37

getting confused here.  If I'm incorrectly using

"component manufacturer" versus "OEM," please let me

know.

            MR. SHAPIRO:  Objection.  That's not -- he

didn't ask a question.                                09:50:47

            THE WITNESS:  Yeah.

BY MR. RIEDEL:

    Q    Is it true that if a non-disclosure

agreement is in place, TuSimple executives are

authorized to share confidential information with     09:50:58

potential OEMs?

            MR. SMITH:  Objection to the form of the

question.

            THE WITNESS:  Say it again.

/ / / /

                                              Page 52

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

                    MR. SMITH:  Objection.                    10:38:00

                    THE WITNESS:  When you say "L4," what does

        that mean.  As in like driver-in, no driver at all,

        or with driver?

        BY MR. RIEDEL:                                        10:38:07

            Q    Would there be a driver in those trucks?

                    MR. SMITH:  Objection.

                    THE WITNESS:  My understanding is,

        initially, there will be a driver in the trucks.

        BY MR. RIEDEL:                                        10:38:16

            Q    The trucks would be fully autonomous, but

        there would be a driver in for safety?

                    MR. SMITH:  Objection to the form of the

        question.

                    THE WITNESS:  How do you define "fully      10:38:24

        autonomous"?

        BY MR. RIEDEL:

            Q    How do you define it?  If you would help

        me understand.

                    MR. SMITH:  Objection.                    10:38:31

                    THE WITNESS:  Well, there's different

        levels.

        BY MR. RIEDEL:

            Q    So Level 4, what does that mean?

            A    Level 4 SAE is a truck that is fully          10:38:36

                                                              Page 92

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

autonomous within a defined geofence area or set of            10:38:40

boundaries.

        Q    ███████████████████████████████████████

██████████████████████████████████

        MR. SMITH:   Objection to the form of the            10:38:57

question.

        THE WITNESS:   We are developing Level 4 --

trying to develop Level 4 trucks.  As we said, we're

not commercialized for Level 4 trucks.

BY MR. RIEDEL:                                              10:39:10

        Q    For the ██████████████████████████

███████████, what is the service that TuSimple would

be providing?

        A    Freight delivery.

        Q    What does that mean?                          10:39:17

        A    We pick up -- my understanding is we pick

up their container and deliver it to a dropoff at a

different place.

        Q    And, when you pick up the container, is

that an L4 driverless truck picking up the container       10:39:28

or it's a truck with a driver operating the truck?

        MR. SHAPIRO:   Objection.

        MR. SMITH:   Objection.

        THE WITNESS:   What point in time?

/ / / /

Page 93

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



BY MR. RIEDEL:                                          10:43:24

    Q   ███████████████████████████

███████████████████████

        Are there any other features?

        MR. SMITH:  Objection.                 10:43:32

        THE WITNESS:  There's a lot of features.

BY MR. RIEDEL:

    Q   What are the core features?

        MR. SMITH:  Objection.

        THE WITNESS:  The idea -- what are core     10:43:42
features?  The whole point is to make it so it's
safer for the driver.

BY MR. RIEDEL:

    Q   ████████████████████████████

██████████████                                         10:43:54

        MR. SMITH:  Objection to the form of the
question.

        THE WITNESS:  ████████████████████

BY MR. RIEDEL:

    Q   Yes.                                   10:44:01

    A   I don't think so.

    Q   ████████████████████████████

████████████████████████████

██████

        MR. SMITH:  Objection.                 10:44:20

Page 98

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

THE WITNESS: Sorry. So I think you're 10:44:20
asking the question the wrong way.

BY MR. RIEDEL:

Q    Okay.

A    There is a set of technologies we have, 10:44:24
and then you're trying to tackle different markets.

████████████████████████████████████

██████████████████████████████  ████

████████████████████████████████████ ,

███████████  ██████████████████  10:44:45

█████████████████████████

Q    ██████████████████████

S██████

MR. SMITH: Objection to the form of the
question. 10:45:00

THE WITNESS: Today or at what time?

BY MR. RIEDEL:

Q    Ever.

MR. SMITH: Same objection.

THE WITNESS: We tried for a few months. 10:45:05

BY MR. RIEDEL:

Q    When?

A    2023.

Q    Why? Why does that make business sense,
since the car manufacturers already have ██████ 10:45:17

Page 99

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

their vehicles?                                    10:45:21

MR. SMITH:  Objection.

MR. SHAPIRO:  Objection.

THE WITNESS:  I mean, look at Mercedes.
They're talking about next-level ADAS.  So ADAS       10:45:24
separated by different functions and levels.

BY MR. RIEDEL:

Q    What was the level being developed in the
United States?

MR. SMITH:  Objection to the form of the       10:45:38
question.

THE WITNESS:  ADAS starts with cruise
control, speed.  And there's also the different
level, how fast can you keep that speed.  Then
there's horizontal control, lane-keeping.             10:45:51

And then there are times when it could be
hands-free like autopilot.  All those are considered
ADAS, but they're different levels of ADAS or
different functions.  So you have to be very
specific.  And they benefit consumers or drivers      10:46:08
incrementally.

BY MR. RIEDEL:

Q    What level of ADAS was TuSimple developing
in the United States?

MR. SMITH:  Objection to the form of the       10:46:18

Page 100

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

question.                                           10:46:18

        THE WITNESS:  ADAS by default is

considered L2, L3 in SAE.

BY MR. RIEDEL:

    Q    So you said hands-free driving is an      10:46:27

example of ADAS?

        MR. SMITH:  Objection.

        THE WITNESS:  I mean, autopilot, there is

some hands-free driving.  That largely is considered

ADAS.                                              10:46:39

BY MR. RIEDEL:

    Q    Okay.  ████████████████

█████████████████████████

        MR. SMITH:  Objection.

        THE WITNESS:  ████████████████     10:46:50

███████

BY MR. RIEDEL:

    Q    ██████████████████████████

███████████████████████████

████████████████████                               10:46:58

    A    Correct.

    Q    ██████████████████████

███████████████████████████

██████

        MR. SHAPIRO:  Objection.                   10:47:09

                                              Page 101

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

THE WITNESS:  There's a -- do you want the          10:55:22

NSA definition, the exact definition?  I have to

look at the NSA.

BY MR. RIEDEL:

Q    What's your understanding of the          10:55:29

definition?

MR. SMITH:  Objection.

THE WITNESS:  What's my understanding?

BY MR. RIEDEL:

Q    Yes.          10:55:35

A    It's covered IP is core IP, sensitive IP

to U.S., that's developed in the U.S.

Q    For any technology developed in the U.S.?

A    Self-driving technology.

MR. SMITH:  Objection.          10:55:49

BY MR. RIEDEL:

Q    ███████████████

MR. SMITH:  Objection.

THE WITNESS:  ███████████████████████

███████████████          10:55:57

BY MR. RIEDEL:

Q    All right.  So -- and then under the terms

of the NSA, TuSimple's systems had to be separated

by August of 2022; is that correct?

MR. SHAPIRO:  Objection.          10:56:09

Page 108

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

MR. SMITH:  Objection.                          10:56:10

THE WITNESS:  Look, I -- there is a

transition date that happens in August is my

understanding.

BY MR. RIEDEL:                                   10:56:18

Q    And do you know one way or another whether

TuSimple actually segregated its systems as of the

transition date?

MR. SHAPIRO:  Objection.

MR. SMITH:  Objection to the form of the        10:56:27

question.

THE WITNESS:  You mean all systems?

You've got to repeat that again.

BY MR. RIEDEL:

Q    Systems containing covered IP.            10:56:32

MR. SHAPIRO:  Objection.

THE WITNESS:  That's my understanding.

BY MR. RIEDEL:

Q    So, if prior to separating its systems by

the transition date an engineer in China accessed     10:56:49

information on a U.S. trade secret repository, could

they have copied it?

MR. SHAPIRO:  Objection.

MR. SMITH:  Objection.

THE WITNESS:  You're asking a hypothetical     10:57:04

Page 109

of --                                                          01:12:06

BY MR. RIEDEL:

        Q    Sorry.  I wanted to just specify.

                                                              01:12:12

                MR. SMITH:  Objection.

                THE WITNESS:

BY MR. RIEDEL:

        Q                                                     01:12:21

                MR. SMITH:  Same objection.

                THE WITNESS:

BY MR. RIEDEL:                                                01:12:30

        Q

        A

                                                              01:12:48

        Q

                MR. SMITH:  Objection.

                THE WITNESS:  What time frame?                 01:13:28

                                                      Page 194

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

BY MR. RIEDEL:                                          01:13:29

Q    Any time frame.

MR. SMITH:  Same objection.

THE WITNESS:  ███████████████

████████████████████████████████████          01:13:35

█████████████████████████

BY MR. RIEDEL:

Q    ██████████████████████████████

██████████████████████████████████

████████████████████████                        01:13:51

MR. SHAPIRO:  Objection.

THE WITNESS:  ████████████

BY MR. RIEDEL:

Q    During the second half of 2021 and into

2022, did TuSimple's board discuss the need to   01:14:05

identify an additional truck OEM for manufacture and

assembly of trucks in the United States?

MR. SMITH:  Objection.

THE WITNESS:  I believe so.

BY MR. RIEDEL:                                   01:14:29

Q    What was discussed?

MR. SMITH:  Objection to the form of the

question.

THE WITNESS:  Sorry, what was discussed in

terms of the need for -- I remember us, the      01:14:36

Page 195

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

management team, identifying Traton/Navistar merger    01:14:45

as a big risk.  Also identifying even the way we're

working with Navistar could present risk.  So the

OEM risk has always been our top business risk

across, you know, most board discussions.    01:15:01

BY MR. RIEDEL:

    Q    And that's because, if you don't have a

partner for purpose-built trucks, it would be more

difficult to scale?

        MR. SHAPIRO:  Objection.    01:15:11

        MR. SMITH:  Objection.

        THE WITNESS:  Among other things, yes.

BY MR. RIEDEL:

    Q    What are the other things?

    A    To scale, to go through the valuation of    01:15:21

the entire system, to, you know, be -- to be safely

driven across long distance of road.  It could be

multiple factors.

    Q    And the scale issue is really not that

TuSimple can't continue its operations.  It's really    01:15:42

that retrofitting trucks is a less efficient process

than a purpose-built truck?

        MR. SMITH:  Objection.

        MR. SHAPIRO:  Yes.  And also as to scope.

Like --    01:15:56

Page 196

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

THE WITNESS:  It's way more than that.                    01:15:58
It's not only about efficiency.  It's cost, it's
safety, it's who provides a warranty.  It's many
things.  Liabilities.

BY MR. RIEDEL:                                             01:16:15

    Q    ████████████████████████████

████████████████████████████████████

████████████████████████████

        MR. SHAPIRO:  Objection.

        MR. SMITH:  Objection.                           01:16:25

        THE WITNESS:  Those -- to my
understanding, those are ongoing discussions we have
with ████████████████  And that's what we're
striving to do, is to work towards it.

BY MR. RIEDEL:                                            01:17:04

    Q    And is it accurate that in connection with
the board-level discussions in the second half of
2021 and into 2022, TuSimple's senior management
presented to the board about the -- strike that.

        Is it accurate that as part of the               01:17:20
discussions with the board about the truck OEM for
the United States that occurred in the second half
of 2021 and into 2022, you participated in those
presentations?

        MR. SHAPIRO:  Objection.                         01:17:36

Page 197

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

MR. SMITH:  Objection.                          01:17:36

THE WITNESS:  I could have some.  I don't

know if I participated in all of them.

BY MR. RIEDEL:

Q    And in that time period, second half of   01:17:48

2021 and into 2022, TuSimple's management was

considering additional truck OEM partnerships for

the United States?

MR. SHAPIRO:  Objection.

THE WITNESS:  Yeah.                             01:18:02

BY MR. RIEDEL:

Q    So, if you go to paragraph 12.

MR. SMITH:  Sorry, are we still on

Exhibit 2?

MR. RIEDEL:  Yes.                               01:18:35

BY MR. RIEDEL:

Q    Do you see the sentence that says, "As

part of that process, TuSimple proactively reached

out to 10 such potential partners"?

A    Uh-huh.                                     01:18:44

Q    Who were those 10 partners?

A    Do you want me to list all of them?  I'll

try to list them.

Q    Yes, please.

A    ███████████████████████████                 01:18:54

Page 198

they've already entered into a partnership with          01:21:13

another competitor, and, you know, they weren't

interested.

BY MR. RIEDEL:

    Q   Was Hydron discussed with the board as a       01:21:36

potential truck OEM?

        MR. SMITH:  Objection.

        THE WITNESS:  What time?

BY MR. RIEDEL:

    Q   2021 and into early 2022.                      01:21:44

    A   I mean, Hydron -- many people on the board

knew about Hydron is my understanding.  And there's

been back and forth, I think, discussions about what

Mo was doing.  Yeah.

    Q   When you say many people on the board knew    01:22:13

about Hydron, was that in early 2022, like when you

were CEO, January to March 3rd?

        MR. SMITH:  Objection.

        THE WITNESS:  Yeah.  I think so.

BY MR. RIEDEL:                                           01:22:27

    Q   And so those board members would be Xiaodi

Hou?

        MR. SMITH:  Objection.

        THE WITNESS:  I would think he knows.

/ / / /

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

BY MR. RIEDEL:                                        01:28:21

Q    And Mo's goals for Hydron was to make an autonomous, capable, chassis-over-engine semi-truck that was hydrogen-fueled?

MR. SHAPIRO:  Objection.                              01:28:37

MR. SMITH:  Objection.

THE WITNESS:  Autonomous-ready. Autonomous -- so like -- yeah, an autonomous-ready truck fueled by a hydrogen fuel cell that could work in multiple markets.                                 01:28:53

BY MR. RIEDEL:

Q    And Hydron had a prototype, correct?

MR. SHAPIRO:  Objection.

MR. SMITH:  Objection.

THE WITNESS:  At what time?                           01:29:00

BY MR. RIEDEL:

Q    I guess I should say, do you recall becoming aware that Hydron had a prototype truck?

MR. SMITH:  Objection.

THE WITNESS:  I do recall.  Much later,              01:29:16
but yeah.

BY MR. RIEDEL:

Q    So, like, in the late 2021, 2022 time period, you did not see a video of Hydron's prototype truck?                                     01:29:26

Page 207

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

question.                                          01:30:50

THE WITNESS:  I mean, I don't recall.

BY MR. RIEDEL:

Q    So during -- what due diligence efforts
were conducted on Hydron as part of TuSimple's      01:31:02
feasibility study with Hydron?

MR. SMITH:  Objection to the form of the
question.

THE WITNESS:  My understanding was -- is
that share certain requirements with them on type of    01:31:18
sensors, electrical architecture interfaces that we
needed.

BY MR. RIEDEL:

Q    Okay.  So TuSimple provided, as part of
the feasibility study, technical information to      01:31:36
Hydron?

A    Requirements.

MR. SMITH:  Objection.

BY MR. RIEDEL:

Q    Technical requirements.                  01:31:44

So did TuSimple perform any investigation
into Hydron's corporate structure?

MR. SMITH:  Objection.

THE WITNESS:  I don't know.

/ / / /

Page 210

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

paragraph 15.                                                   02:05:47

MR. RIEDEL:  Yes.

MR. SMITH:  Oh, I see.  Yeah.  Go ahead.

BY MR. RIEDEL:

Q    "But as CEO and a director of TuSimple, I    02:05:58
understood the opportunity that our relationship
with Hydron presented to TuSimple."

Can you explain what that opportunity was
that you're referring to here?

A    Yes.  That we needed to diversify our OEM    02:06:14
risk and that, you know, we -- it's not easy working
with very large OEMs because they want to do things
with scale.  They want to do things on their own
timeline.

And so having an OEM that was willing to    02:06:29
customize the design specifically for us or, you
know, more than just us that could meet our timeline
had value.

Q    And you go on to write, "As explained to
me, Hydron as a startup" -- "as a startup    02:06:45
zero-emissions OEM did not have a dedicated
manufacturing facility."

And I believe -- so are you saying that
sort of the next few sentences here are what was
explained to you?                                         02:07:00

Page 245

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

THE WITNESS:  That's right.                          02:58:11

BY MR. RIEDEL:

Q    ███████████████████████████████

MR. SMITH:  Objection.

THE WITNESS:  We received initial                    02:58:23

indications of interest.

BY MR. RIEDEL:

Q    Did any of those initial indications of

interest result in any offers?

MR. SMITH:  Objection.                               02:58:35

THE WITNESS:  No.

BY MR. RIEDEL:

Q    So ██████ is a component supplier for

TuSimple, correct?

MR. SMITH:  Objection.                               03:00:15

THE WITNESS:  You can say that.

BY MR. RIEDEL:

Q    And it was the expectation when the

Navistar relationship existed that █████████

██████████████████                                   03:00:31

MR. SHAPIRO:  Objection.

MR. SMITH:  Objection.

THE WITNESS:  No.

BY MR. RIEDEL:

Q    What was ████████ supposed to supply to       03:00:37

Page 273

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

MR. SHAPIRO:  Objection.                        03:05:56

MR. SMITH:  Objection to the form of the question.

THE WITNESS:  I don't know.

MR. RIEDEL:  All right.  Can we take a          03:06:13
break?

THE VIDEOGRAPHER:  This is the end of
Media 6.  We are going off the record.  The time is
3:06 p.m.

(Recess taken.)                                03:06:22

THE VIDEOGRAPHER:  The time is 3:18 p.m.
We are back on the record.

BY MR. RIEDEL:

    Q    Mr. Lu, the board engaged an investment
banker to explore whether TuSimple or portions of    03:18:14
TuSimple's U.S. business could be sold, correct?

MR. SMITH:  Objection.

THE WITNESS:  Correct.

BY MR. RIEDEL:

    Q    Who was that investment banker?          03:18:24

    A    Perella Weinstein -- Weinberg.

    Q    If you go next to Exhibit 4 --

    A    Okay.

    Q    -- which is your declaration from
March 29, 2024.                                    03:18:49

Page 279

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

A    Okay.                                          03:19:01

Q    Please turn to paragraph 45.

A    Okay.

Q    So referring to paragraph 45 here, after the Court issued its TRO, is it accurate that ██████    03:19:30

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████

MR. SMITH:  Objection.

THE WITNESS:  That's my understanding.    03:19:51

BY MR. RIEDEL:

Q    Were you told that personally?

MR. SMITH:  Objection.

THE WITNESS:  ██████████  ███████████

██████████████████                          03:19:56

BY MR. RIEDEL:

Q    Yes.

A    I -- like, through my team.

Q    Did they provide any specifics other than

██████████████████████████████████        03:20:09

████████████████████████

MR. SMITH:  Objection to the form of the question.

THE WITNESS:  What other specifics would you --                                           03:20:20

Page 280

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY



BY MR. RIEDEL:                                              03:20:20

Q    Did they provide any reasons why ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮                                                    03:20:31

MR. SHAPIRO:  Objection.

MR. SMITH:  Objection.

THE WITNESS:  ▮▮▮  ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮                                          03:20:40

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

BY MR. RIEDEL:                                             03:20:56

Q    ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

MR. SMITH:  Objection to the form of the
question.                                                  03:21:07

THE WITNESS:  Again, I don't recall having
that discussion.

BY MR. RIEDEL:

Q    Okay.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮                                                      03:21:22

Page 281

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY



MR. SHAPIRO:  Objection.                    03:21:23

MR. SMITH:  Objection.

THE WITNESS:  ████████████

████████████████████████████

████████████                              03:21:31

BY MR. RIEDEL:

Q    ████████████████████  --

A    ████████████████

Q    ██████████  ██████████

████████████  --                          03:21:39

A    That's my understanding.

MR. SMITH:  Objection.

THE WITNESS:  Sorry.  That's my

understanding.

BY MR. RIEDEL:                            03:21:45

Q    So let's take this -- so ████ supplies

trucks to TuSimple China that are then retrofitted

with TuSimple's autonomous-driving technology; is

that correct?

MR. SMITH:  Objection.                    03:22:00

THE WITNESS:  There are multiple --

multiple touch points.  One is that -- which is on

the Level 4 side.

BY MR. RIEDEL:

Q    Okay.                                03:22:10

Page 282

HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY



A    The other one is the ████    So then    03:22:10

TuSimple is a supplier to █████ and selling them --

like, their goal is to sell them integrated

hardware-software components that they can install

in their vehicles.  So it could be a number of those    03:22:26

collaborations.

Q    Which collaboration or which

collaborations are you referring to in this

paragraph 45?

MR. SMITH:  Objection to the form of the    03:22:41

question.

THE WITNESS:  ████████████████

███████████████████████████████

█████████████

BY MR. RIEDEL:    03:22:49

Q    ████████████████████████

██████████████████████████████

██████████████████████

MR. SMITH:  Objection to the form of the

question.    03:23:02

THE WITNESS:  B████████████████

██████████████████████████████

████████████████████████████

BY MR. RIEDEL:

Q    █████████████    03:23:20

Page 283

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

A    That's my understanding.                          03:23:22

Q    And your understanding comes from?

A    What my team has told me.

Q    Who at your team?

MR. SMITH:  Objection.                               03:23:28

THE WITNESS:  I can't specifically recall.

I mean, employees, senior management based in China.

BY MR. RIEDEL:

Q    But you don't recall specifically which

senior manager in China?                             03:23:38

MR. SMITH:  Objection.

THE WITNESS:  Could be multiple, but I

can't recall specifically.

MR. SMITH:  Cheng, just slow down a

little.                                              03:23:46

THE WITNESS:  Sorry.  I'm sorry.

BY MR. RIEDEL:

Q    ████████████████████████████

████████

MR. SHAPIRO:  Objection.                             03:23:52

THE WITNESS:  Directly?

BY MR. RIEDEL:

Q    Yes.

A    I have not.

Q    And, when you say that ████████        03:24:06

Page 284

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY



MR. SMITH:  Objection.

THE WITNESS:

BY MR. RIEDEL:

Q    Okay.

MR. SMITH:  Objection.

THE WITNESS:

BY MR. RIEDEL:

Q

MR. SMITH:  Objection to the form of the question.

THE WITNESS:  That's my understanding.

BY MR. RIEDEL:

Q    I just want to make sure I understand.

Page 285

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

THE WITNESS:  No.  Because that would be    03:28:11

an official -- that would be an official

communication.

BY MR. RIEDEL:

Q    Did you participate in any of the    03:28:15

back-channel communications?

MR. SMITH:  Objection.

THE WITNESS:  I -- directly.  So did I

speak with something in ████ or . . .

BY MR. RIEDEL:    03:28:28

Q    Yes.

A    I did not.

Q    Do you know who did?

MR. SMITH:  Objection.

THE WITNESS:  Members of our business    03:28:33

development team in China.

BY MR. RIEDEL:

Q    Do you know specifically who?

A    It could be Shan -- Ying Shan who leads

that group.  It could be people that work underneath    03:28:44

her.

Q    Going back to paragraph 46.  It says ██

████████████████████████████████████

████████████████████████████████████

████████████████████    03:28:59

Page 289

200

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

What are you referring to when you say    03:29:01

"▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

MR. SMITH:  Objection.



03:29:14

03:29:34

03:29:52

BY MR. RIEDEL:    03:30:07

Q    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

MR. SMITH:  Objection.

THE WITNESS:  I have not.    03:30:18

Page 290

BY MR. RIEDEL:                                      03:30:18

Q    Do you know who did?

A    Same answer.

MR. SMITH:  Objection.

THE WITNESS:  Business development teams.    03:30:23

BY MR. RIEDEL:

Q    But you don't know specifically?

MR. SMITH:  Objection.

THE WITNESS:  (Witness shakes head.)

BY MR. RIEDEL:                                      03:30:36

Q    In paragraph 47 here, you write that



MR. SHAPIRO:  Objection.  I think you       03:30:50

misread it.

THE WITNESS:

I mean,

multiple concerns arise because of the TRO.    03:31:10

BY MR. RIEDEL:

Q

MR. SMITH:  Objection.

THE WITNESS:  I mean, multiple              03:31:24

Page 291

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

conversations.  I've had some.  I've heard it    03:31:25

through others that are based in China.

BY MR. RIEDEL:

Q    What was his name?

A    ██████ --    03:31:34

MR. SMITH:  Objection.

THE WITNESS:  Sorry.

MR. SMITH:  Go ahead.

THE WITNESS:  ████████████████

██████    03:31:40

BY MR. RIEDEL:

Q    ███████████████████████

███████████████████████

███████

MR. SMITH:  Objection.    03:31:52

THE WITNESS:  That's my understanding.

BY MR. RIEDEL:

Q    ████████████████████

███████████████████████

███████████████████████    03:32:03

MR. SMITH:  Objection.

THE WITNESS:  There was nothing prior to

the TRO.  I mean, he was -- shifting the focus to

APAC was seen as a very positive for the team in

APAC because now they have more attention, more    03:32:18

Page 292

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

resources.  So, again, nothing prior to the TRO sort    03:32:22

of suggested a concern.



So, yeah, I mean, my understanding is

primarily because of the -- what happened because of

the TRO.    03:32:51

BY MR. RIEDEL:

Q    Are you aware that plaintiffs have offered

to make reasonable modifications to the TRO

03:33:02

MR. SHAPIRO:  I'm going to object.  And,

Mr. Cheng, don't answer that question if the only

basis for it is a communication that you've had with

either company counsel or myself.

BY MR. RIEDEL:    03:33:14

Q    And that's a yes-or-no question.

MR. SHAPIRO:  Well, let's take it slowly.

Number one, do you know in your head the

answer to that question?

THE WITNESS:  Yes.    03:33:21

Page 293

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

BY MR. RIEDEL:                                    04:30:10

Q    Okay.  It's an outside law firm?

A    Well, there's both internal --

MR. SMITH:  Objection.

THE WITNESS:  Sorry.  There's both            04:30:19

internal counsel and outside law firm.

(Exhibit 15 marked for identification.)

BY MR. RIEDEL:

Q    You've been given what has been marked as

Plaintiffs' Exhibit 15.  It's titled, "The          04:31:34

Declaration of Cheng Lu in Support of Opposition of

Nominal Defendant TuSimple Holdings, Inc.'s

Opposition to Plaintiffs' Motion for Temporary

Restraining Order and Expedited Discovery."

If you go to paragraph 28.  Oh, sorry.        04:31:52

Before I do that, if you turn to page 11, you'll see

that this is marked "executed January 16, 2024 from

San Diego" and has your signature.

Do you recognize this as your January 16,

2024 declaration?                                   04:32:15

A    Yes.

Q    Okay.  All right.  So we're at page 10,

paragraph 28.  Starting at line 9, the very end, it

says "The company disclosed in its September 7, 2023

form 10-K that the company is not currently          04:32:51

Page 324

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

partnering with or party to any agreement with        04:32:53

Hydron, other than a 2022 nondisclosure agreement

with Hydron to cover information shared that year."

That was the 10-K that we reviewed

earlier, Exhibit 14?        04:33:07

A    Yes.

MR. SMITH:  Objection.

BY MR. RIEDEL:

Q    Okay.  And then you say "that statement

remains true."        04:33:16

So it's true as of the date of your

declaration here that, as of January 16, 2024,

TuSimple is not partnering with or party to any

agreement with Hydron?

MR. SMITH:  Objection.        04:33:35

THE WITNESS:  In the context of Audit

Committee.  Again, I mentioned that.  And that's my

understanding, yes.

BY MR. RIEDEL:

Q    I guess you're explaining that here,        04:33:40

right?  Like, that it's other than the nondisclosure

agreement.

So, other than the nondisclosure

agreement, there is no partnerships or agreements

with Hydron?        04:33:50

Page 325

A    I'm not aware of any agreements with    04:33:52

Hydron, partnership agreements.

Q    And then you write, "TuSimple has no plan

in effect to do so after today."

What do you mean by that?    04:34:04

MR. SHAPIRO:  Objection.

THE WITNESS:  My understanding is, in the

context of the case, which is a misappropriation of

trade secrets, if we don't even plan to party -- to

partner or sign -- partner with Hydron in the    04:34:20

future, then, again, there is no reason for us to

misappropriate trade secrets.  Or there is no --

yeah.

BY MR. RIEDEL:

Q    Are you aware one way or the other what    04:34:33

information from TuSimple is in the possession of

Hydron?

MR. SMITH:  Objection.

MR. SHAPIRO:  Objection.

THE WITNESS:  I can't speak on behalf of    04:34:46

Hydron.

BY MR. RIEDEL:

Q    So, setting aside that you can't speak on

behalf of Hydron -- I would never ask you to do

that -- as of CEO of TuSimple, as yourself, are    04:35:00

Page 326

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

REPORTER'S CERTIFICATION

I, Leslie Johnson, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 4/18/24

LESLIE JOHNSON

CSR No. 11451, RPR, CCRR

Page 352

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

NORMAN WILHOITE and          )

JUDITH WILHOITE,             )

derivatively on behalf       )

of TUSIMPLE HOLDINGS,        )

INC.,                        )

    Plaintiffs,              ) Case No.

vs.                          ) 23Cv2333 BEN(MSB)

XIAODI HOU, MO CHEN,         )

CHENG LU, GUOWEI             )

"CHARLES" CHAO and           )

HYDRON, INC.,                )

    Defendants,              )

       - and -             )

TUSIMPLE HOLDINGS,           )

INC.,                        )

    Nominal Defendant.       )

_____)

*HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

Deposition of MEHMET ERSIN YUMER

April 2, 2024 * 10:01 a.m. PDT

Location:  Zoom

Reporter:  Ann Fleming, RPR

JOB No. 6625113

Page 1

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

Q.    But you do not remember anything about what was discussed?

MR. SMITH:  Objection to the form of the question.

MS. GURLEY:  Mischaracterizes testimony.

A.    I did say I remember some things that were discussed, yes.

Q.    And what were they, what were those some things?

MR. SMITH:  Objection to the form of the question.

A.    The meeting was about Hydron, we talked about Hydron having a hydrogen truck product potentially.  So if TuSimple were to collaborate with Hydron, it would need, TuSimple would need hydrogen pumping stations somewhere along TuSimple routes, so it was mostly about understanding where would it make sense to put hydrogen stations for the Hydron TuSimple location.

Q.    Besides that meeting in early 2022, did you attend any other meetings relating to Hydron?

MR. SMITH:  Objection to the form of the question.  Mr. Yumer, again, you can identify meetings that you had attended and you can include, you know, whether there were attorneys there at those

Page 55

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

that TuSimple was involved in with Hydron?

MR. SMITH:  Objection to the form of the question.

MS. GURLEY:  Objection.  It's vague.  I just want you to specify the time because I don't want him to testify about anything that's privileged based on the instruction and, so, I don't want him to be cornered into that sort of testimony, so if we can specify, that will be helpful.

MR. CHANG:  That's fine.

Q.  Mr. Yumer, you testified earlier that Mr. Hou told you at a meeting, together with other VP's, about the project with Hydron.  I'm asking you what do you know about that project?

MR. SMITH:  Objection to the form of the question.

MS. GURLEY:  Objection; asked and answered.

A.  I know that Hydron is, as I mentioned, at the time was a hydrogen truck manufacturer that also potentially had an opportunity to collaborate with TuSimple.  This is in general what I knew about the project as far as between Hydron and TuSimple at the time when I had that meeting.

Q.  Did you gain more information about the

Page 67

that are reporting to me working with his team.  It's never -- I shouldn't say never.  It's very seldom would be myself.  I wasn't the one that was operationally acting on that work.

Q.   And what were the teams?  Who are the members of the teams that you are referring to?

MR. SMITH:  Objection to the form of the question.

A.   Part of the -- the test operations team would be the most and then there would be the hardware team.  Those two teams would be interacting with Mr. Han's team.

Q.   Okay.  And Mr. Han is in charge of the hardware team?

A.   Mr. Han is in charge of, in charge of --

MS. GURLEY:  I will object to the form and the time when you're, at what point in time you're asking in this question.

MR. SMITH:  And I'm going to say, Dr. Yumer, at the time, I've been saying Mr. Yumer and I apologize, if you could just give us a chance to object, I'd appreciate it.

THE WITNESS:  Yes.

A.   Okay.  So, so Xiaoling Han's team was responsible for electronics software, low level

Page 113

electronics software that went onto some of the hardware components in the truck. He was also responsible for some of those electronic components. There's another hardware team that's responsible for the truck mechanical hardware itself. It's the brakes and the engine, right, but these two teams need to collaborate because the electronics have to work with the other hardware of the truck.

Q. I see. And when you say low level, how do you mean?

MR. SMITH: Objection to the form of the question.

A. Depending on who you ask in the software industry, their definition of what low level software is would be slightly different than mine, and mine is also not a formal definition per se. When we say software, low level software, we are talking about a stack of different software components, and as the software components get closer to the hardware that it's running on, we tend to characterize it as the lower level software pieces. So this Zoom or video application that's running on the laptop, right, it's a very high level component or software. Then there's the operating system and there's the electronic drivers, then there's the electronics

Page 114

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

REPORTER'S CERTIFICATE

I, ANN FLEMING, a Registered Professional Reporter, hereby certify:

THAT I reported the taking of the deposition of the witness, Mehmet Ersin Yumer, commencing on April 2, 2024, at 10:01 a.m. PDT;

THAT prior to being examined, the witness was, by me, duly sworn to testify to the truth.  That I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true, and accurate transcription of said shorthand notes.

I further certify that I am in no way related to any of the parties, nor am I in any way interested in the outcome thereof.

( ) Review and signature was requested.

( ) Review and signature was waived.

(X) Review and signature was not
        requested.

IN WITNESS THEREOF, I have subscribed my name on this 8th day April, 2024.

ANN FLEMING, RPR

Page 119

# EXHIBIT D

216

# SECURITIES AND EXCHANGE COMMISSION

**WASHINGTON, D.C. 20549**

---

## SCHEDULE 13D
**(Rule 13d-101)**
**(Amendment No. 2)**

**INFORMATION TO BE INCLUDED IN STATEMENTS FILED PURSUANT TO RULES 13d-1 (a) AND AMENDMENTS THERETO FILED PURSUANT TO 13d-2 (a)**

---

# TuSimple Holdings Inc.
**(Name of Issuer)**


**Class A common stock, $0.0001 par value per share**
**(Title of Class of Securities)**


**90089L108**
**(CUSIP Number)**


**Mo Chen**
**3282 King Edward Ave. W**
**Vancouver, BC V6L 1 V7, Canada**
**+1(619)513-2986**
**(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)**


**April 3, 2024**
**(Date of Event Which Requires Filing of this Statement)**

---

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(e), 13d-1(f) or 13d-1(g), check the following box  ☐.

---

Note: Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See Rule 13d-7 for other parties to whom copies are to be sent.

---

\*      The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities and for any subsequent amendment containing information which would alter disclosures provided in the cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

---

217

**Explanatory Note:** This Amendment No.2 ("Amendment No. 2") amends and supplements the statement on Schedule 13D originally filed by the Reporting Persons on November 15, 2022 and as amended by amendment No. 1 on Schedule 13D filed by the Reporting Persons on January 17, 2024 (the "Schedule 13D"). Unless otherwise indicated, each capitalized term used but not defined in this Amendment No. 2 shall have the meaning assigned to such term in the Schedule 13D.

**Item 4.**  **Purpose of Transaction**

Item 4 of Schedule 13D is hereby amended and supplemented to add the following before the last paragraph:

On April 3, 2024, Mo Chen, as Executive Chairman of the Company's Board of Directors (the "Board"), entered into an amended and restated cooperation agreement (the "Amended Cooperation Agreement") with the Company, which amended and restated the cooperation agreement dated January 16, 2024 by and between Mo Chen with the Company.

Pursuant to the Amended Cooperation Agreement, in addition to the terms and conditions agreed to between Mo Chen and the Company in the Cooperation Agreement, Mo Chen agreed that during a period of two years from January 16, 2024, the effective date of the Cooperation Agreement, he will not (i) solicit, initiate, discuss, negotiate, enter into or effectuate, directly or indirectly, any related party transaction between the Company or any of its subsidiaries and Hydron, Inc. or any of its subsidiaries, or (ii) cause any funds of the Company or any of its subsidiaries to be used for or to advance the business of Hydron, Inc. or its subsidiaries.

The foregoing description of the Amended Cooperation Agreement is qualified in its entirety by reference to the Amended Cooperation Agreement, a copy of which is attached to this Schedule 13D as Exhibit 99.5 and incorporated herein by reference.

**Item 6.**  **Contracts, Arrangements, Understandings or Relationships with respect to Securities of the Issuer**

Item 6 of Schedule 13D is hereby amended and supplemented as follows:

The information set forth in Item 4 of this Amendment is incorporated herein by reference.

**Item 7.**  **Material to be Filed as Exhibits**

Item 7 of Schedule 13D is hereby amended and supplemented to add the following:

Exhibit 99.5 Amended and Restated Cooperation Agreement by and between the Company and Mo Chen dated April 3, 2024.

SIGNATURE

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Dated: April 9, 2024

| Gray Jade Holding Limited | By: | /s/ Mo Chen |
| | Name: | Mo Chen |
| | Title: | Director |

| Mo Star LLC | By: | /s/ Mo Chen |
| | Name: | Mo Chen |
| | Title: | Director |

| THC International Limited | By: | /s/ Mo Chen |
| | Name: | Mo Chen |
| | Title: | Director |

| Brown Jade Holding Limited | By: | /s/ Mo Chen |
| | Name: | Mo Chen |
| | Title: | Director |

| Mo Chen | | /s/ Mo Chen |

8

219

Exhibit 99.5

Execution Version

**AMENDED AND RESTATED COOPERATION AGREEMENT**

This Amended and Restated Cooperation Agreement, dated as of April 3, 2024 (this "Agreement"), is by and among TuSimple Holdings Inc. (the "Company") and Mo Chen ("Executive").

WHEREAS, as of the Effective Date (as defined below), Executive serves as the Executive Chairman of the board of directors of the Company (the "Board") and, together with his Family Members and Affiliates and other parties who are subject to a proxy or voting agreement, for so long and only so long as such other parties are subject to a proxy or voting agreement, in each case listed on Schedule 1 hereto (collectively, the "Executive 13D Group"), Beneficially Owns 19,734,628 shares of Class A common stock of the Company, par value $0.0001 per share ("Class A Common Stock"), and 24,000,000 shares of Class B common stock of the Company, par value $0.0001 per share ("Class B Common Stock", collectively, the "Common Stock");

WHEREAS, the Board has previously approved restructuring plans with the aim of winding down the Company's U.S. operations, which may include sales of U.S. assets (the "Restructuring"), in order to facilitate the Company's strategic shift to the Asia-Pacific region;

WHEREAS, it is anticipated that, in addition to the Restructuring, subject to and in accordance with applicable law, the Common Stock (i) will cease to be registered under the Securities Act of 1933, as amended (the "Securities Act"), and (ii) will be delisted from the NASDAQ Stock Market LLC and may begin trading on the OTC;

WHEREAS, the parties acknowledge that the deregistration and delisting of the Common Stock (i) will eliminate the corporate governance requirements currently imposed upon by the Company by NASDAQ and U.S. securities laws and (ii) may increase the price and trading volatility of the Common Stock given the potential illiquidity of securities traded on the OTC market;

WHEREAS, in light of the foregoing, the Company and Executive entered into that certain cooperation agreement (the "Cooperation Agreement") on January 16, 2024 (the "Effective Date") setting forth certain rights, limitations and obligations of the Company and Executive in respect of, among other things, Executive's Beneficial Ownership of the Common Stock and any acquisition thereof subsequent to the Effective Date, as provided herein; and

WHEREAS, the parties to the Cooperation Agreement desire to enter into this Agreement to amend and restate the Cooperation Agreement.

220

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. <u>Standstill Provisions</u>. During the period (the "<u>Standstill Period</u>") commencing on the Effective Date and ending on the date that is two (2) years from the effective date of a Form 15 filed by the Company in respect of the Class A Common Stock, Executive shall not, and shall cause and direct his Family Members and Affiliates (and any Associates of the foregoing) and any other member of the Executive 13D Group not to, directly or indirectly, in any manner, take any of the following actions (unless prior Independent Approval has been obtained):

(a) acquire, offer to acquire, or cause to be acquired any ownership or other interest in any Class A Common Stock or any Synthetic Position, or otherwise enter into any contract, arrangement, understanding or relationship (or modify or amend any such existing contract, arrangement, understanding or relationship) with respect to any Class A Common Stock or any Synthetic Position, such that Executive would have Beneficial Ownership of more than (i) 25% of the issued and outstanding Class A Common Stock or (ii) in the event Executive's Beneficial Ownership is greater than 25% of the issued and outstanding Class A Common Stock (after receiving prior Independent Approval hereunder), any acquisition of more than 3% of the issued and outstanding Class A Common Stock immediately following the consummation of such transaction;

(b) solicit proxies or written consents of stockholders or conduct any other type of referendum (binding or non-binding) with respect to, or from the holders of, Voting Securities, or become a "participant" (as such term is defined in Instruction 3 to Item 4 of Schedule 14A promulgated under the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>")), in or assist, advise, knowingly encourage or knowingly influence any Third Party in any "solicitation" of any proxy, consent or other authority (as such terms are defined under the Exchange Act) to vote any Voting Securities, against (or to withhold support for) or that is intended to seek the removal of, or is in support of any "competing" nominee or slate running against, any Independent Director (as defined herein) then serving on the Board or any Company Nominee (as defined herein);

(c) other than through open market or block trade brokered sale transactions where (i) the identity of the purchaser is unknown to Executive, or (ii) Executive does not directly or indirectly select or influence the selection of the purchaser, sell, offer or agree to sell any Voting Securities of the Company to any Third Party that, to the knowledge of Executive after due inquiry, (x) has aggregate Beneficial Ownership (together with its Affiliates and Associates) of more than 9.9% of the issued and outstanding Common Stock or (y) would result in such Third Party having aggregate Beneficial Ownership (together with its Affiliates and Associates) of more than 9.9% of the issued and outstanding Common Stock;

(d) effect or seek to effect, offer or propose to effect, cause or participate in, or in any way assist, facilitate or encourage any other Person to effect or seek, offer or propose to effect or participate in, any tender or exchange offer, merger, consolidation, acquisition, scheme, arrangement, business combination, recapitalization, reorganization, sale or acquisition of all or a substantial portion of the Company's assets, liquidation, dissolution or other extraordinary transaction involving the Company or any of its subsidiaries or any of their respective securities (each, an "<u>Extraordinary Transaction</u>");

(e) except as is reasonably acceptable to the Company, form or join in a partnership, limited partnership, syndicate or other group, including a "group" as defined under Section 13(d) of the Exchange Act, with respect to the Voting Securities (excluding any group composed solely of Executive's Family Members and his and their respective Affiliates and any member of the current Executive 13D Group);

2

221

(f) (i) solicit, initiate, discuss, negotiate, enter into or effectuate, directly or indirectly, any related party transaction between the Company or any of its subsidiaries and Hydron, Inc. or any of its subsidiaries, or (ii) cause any funds of the Company or any of its subsidiaries to be used for or to advance the business of Hydron, Inc. or its subsidiaries.

(g) enter into any discussions, negotiations, agreements, or understandings with any Third Party with respect to any of the foregoing, or assist, advise, knowingly encourage or knowingly influence any Third Party to take any action or make any statement with respect to any of the foregoing, or otherwise take or knowingly cause any action, or make any statement, inconsistent with any of the foregoing; or

(h) (i) contest the validity of, or (ii) publicly request any waiver of, the obligations set forth in this Section 1; provided, that clause (g) shall not be deemed to prevent Executive from defending any claim by the Company that Executive has breached this Section 1.

Notwithstanding anything in this Agreement to the contrary, the foregoing provisions of this Section 1 shall not be deemed to restrict Executive in the exercise of his fiduciary duties to the Company and all of its stockholders.

2. Voting Commitments. Executive agrees that it will cause all Voting Securities Beneficially Owned by Executive as of the record date for any meeting of stockholders (or action via written consent) of the Company occurring during the Standstill Period (including, for the avoidance of doubt, Beneficial Ownership of any Voting Securities acquired after the date of this Agreement) to be present for quorum purposes and voted at such meetings in favor of any nominees of Board to serve as Independent Directors ("Company Nominees"), and against (or to withhold votes for) any director nominee for a position or vacancy on the Board that would otherwise be filled by any such Company Nominee, if elected.

3. Representations and Warranties of All Parties. Each of the parties represents and warrants to the other party that: (a) such party has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder, (b) this Agreement has been duly and validly authorized, executed and delivered by it and is a valid and binding obligation of such party, enforceable against such party in accordance with its terms (subject to applicable bankruptcy and similar laws relating to creditors' rights and to general equity principles), and (c) this Agreement will not result in a violation of any terms or conditions of any agreements to which such Person is a party or by which such party may otherwise be bound or of any law, rule, license, regulation, judgment, order or decree governing or affecting such party.

4. Extraordinary Transactions. During the Standstill Period: (i) any Extraordinary Transaction between the Company or its subsidiaries and Executive and/or his Family Members or Affiliates (and/or any Associates of the foregoing) and/or any other member of the Executive 13D Group shall be negotiated with and approved by an Independent Special Committee or a majority of the Independent Directors then serving on the Board; and (ii) Executive shall not, directly or indirectly, in any way participate in such a transaction, unless such Extraordinary

3

222

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement or caused the same to be executed by its duly authorized representative as of the date first above written.

**TUSIMPLE HOLDINGS INC.**

By:    /s/ Cheng Lu

Name:  Cheng Lu

Title:   CEO

**EXECUTIVE**

By:    /s/ Mo Chen

         Mo Chen

[*Signature Page to Cooperation Agreement*]